**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,<br><br>      Plaintiff,<br><br>  v.<br><br>JILL HUNSAKER RYAN, EXECUTIVE DIRECTOR OF THE COLORADO DEPARTMENT OF PUBLIC HEALTH & ENVIRONMENT, in her official capacity.<br><br>      Defendant. | Case No. _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. Colorado's Producer Responsibility Program for Statewide Recycling Act (the "Act") attempts to shift the cost of most recycling in Colorado from taxpayers to companies that produce packaged consumer products. The Act's ostensible aim is to increase recycling, but its means are unconstitutional: it grants excessive governmental power to a self-interested private party, it discriminates against and disrupts interstate commerce, and it abridges businesses' freedom of speech.

2. The Act imposes recycling costs on companies it calls "producers" through an "extended producer responsibility" ("EPR") scheme. It primarily targets companies based outside of Colorado, including producers whose brand names appear on product packaging and distributors with a national footprint. It uses the money exacted from producers to expand recycling infrastructure and provide free recycling services across Colorado.

3. The State does not itself run this sweeping program. The Act hands effective authority over the entire scheme to a private "producer responsibility organization" ("PRO"), subject to no meaningful state oversight. It forces producers to "join" the state's designated PRO, on the PRO's non-negotiable terms, before their products may be sold in Colorado.

4. Under the Act, the Colorado Department of Public Health and Environment ("CDPHE") designated Circular Action Alliance ("CAA") as the PRO that producers must join. But CAA is not a disinterested party: its founding members are major national and multinational corporations, including competitors of some of the producers whom the Act regulates, and its board is controlled by representatives of some of those same corporations.

5. The Act gives CAA substantial authority to determine the fees producers must pay—mandatory payments the Act calls "dues." Each producer's fee amount depends on the volume of packaging or other "covered materials" used in its products sold in Colorado.

6. The Act's requirements have imposed a crushing burden on distributors. CAA's fees can exceed the producer's margin on a product or even a product's price.

7. The Act also forces producers to implement complex tracking and reporting systems covering entire supply chains. Each producer must track all packaging it uses for every product, including the specific packaging materials and the weight of each category of material used for each type of product. Tracking at this granular level is extremely costly and disrupts producer operations in many states. These tracking and reporting requirements also force many producers' upstream and downstream supply chain members to incur additional costs.

8. Further, the Act's definition of producer sweeps in many wholesale distributors, some of them NAW members. These distributors must pay even though they have no control over the selection, design, or manufacture of most product packaging.

9. Producers cannot contest CAA's fees in court because the non-negotiable agreement they must sign with CAA forces them to waive that right and to submit any dispute over fees or the Act's terms to binding arbitration.

10. Having to comply with even one state's EPR law creates a logistical nightmare that forces distributors to incur extensive costs, though it is currently difficult or impossible to identify the total dollar amount. Having to comply with multiple states' EPR laws makes the problem worse. A company that sells in multiple states must satisfy the requirements for its Colorado sales while also doing the same under other

2

states' EPR laws. Among other differences, states have different definitions of "producer"—which means that the "producer" of a given product under one state's law might not be the "producer" under another state's law. States also have different, and complex, schedules of covered materials and differing fees for the same materials.

11. Colorado could have pursued its recycling goals without this complex and costly scheme—and without burdening interstate commerce. It could have funded it through taxes or imposed a fee at the point of sale in Colorado. But new taxes and fees are unpopular with voters. So the state instead shifted the burden upward in the supply chain—overwhelmingly to businesses based in other states. And the Act forbids producers from passing the costs of EPR fees on to consumers in the form of a fee. That cannot stop producers from raising prices in response to increased costs. But it does prevent businesses from informing Colorado consumers—on the point-of-sale communication, the one communication customers must see—of the reason for higher prices.

12. This scheme is not only devastating to distributors and national supply chains—it also is unconstitutional in five ways.

13. First, it violates the Due Process Clause of the Fourteenth Amendment, which forbids governments from delegating their regulatory power to a self-interested private entity, whose leaders will then exert regulatory power over their competitors in the marketplace.

14. Second, the Act imposes an unconstitutional condition by forcing businesses that wish to sell to Colorado consumers to sign an agreement with CAA under which they must surrender their rights to due process of law and a federal judicial forum, and must pay fees that are not even roughly proportional to their impacts on the state.

15. Third, the Act violates the Dormant Commerce Clause by discriminating against interstate commerce, and by severely burdening interstate commerce to achieve local benefits that could be attained without burdening interstate commerce.

16. Fourth, the Act violates the First Amendment by prohibiting businesses from charging Colorado customers a fee to recover their EPR costs—which bans businesses from *informing* consumers

that EPR fees are the cause of the resulting higher prices via the one place they are sure to look: their invoices.

17. Finally, the Act violates producers' First Amendment rights to freedom of speech and association by compelling them to join CAA and to fund its advocacy both for EPR laws as an effective means of increasing recycling and for CAA as the exclusive administrator of EPR programs nationwide.

18. Plaintiff National Association of Wholesaler-Distributors ("NAW") brings this lawsuit on behalf of its members, which include wholesale distributors who are forced to register as "producers" and pay fees under the Act. Plaintiff asks this Court to declare that the Act violates the Constitution on the five grounds set out above and to enjoin its enforcement.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3) because the claims arise under the Constitution and laws of the United States. Plaintiff brings claims under 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States.

20. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Colorado, and the Defendant responsible for administering the challenged law is located within this district.

## PARTIES

21. Plaintiff NAW is a national trade association whose members, some of whom conduct business in Colorado, are wholesalers and distributors (collectively, "distributors"). Founded in 1946, NAW comprises direct member companies and a federation of national, regional, and state associations across 19 commodity lines of trade that together include approximately 35,000 entities operating nearly 150,000 locations. NAW's members are publicly held and private companies, including many family-owned businesses.

22. Many NAW members import, distribute, or supply packaged goods into Colorado and are subject to the Act's burdens. Approximately 35 NAW members have registered as producers in Colorado.

4

23. NAW members that are "producers" under the Act began receiving dues invoices from CAA in January 2026, and initial payments were due as early as February 19, 2026.

24. For example, NAW members R.J. Schinner Company, Inc. and Shamrock Foods Company are registered with CAA as "producers" under the Act. Each has received a substantial dues invoice from CAA and also has incurred compliance costs as a direct result of the Act's requirements.

25. NAW's primary mission is advocacy, including championing policies that strengthen free enterprise, protect the supply chain, and promote economic growth. Through government relations, public affairs, and the NAW Legal Policy Center, NAW works to advance the interests of distributors and defend the critical role they play in the American economy and way of life.

26. Thus, NAW brings the claims set forth below on its members' behalf because those claims, and the injuries they seek to remedy, are directly germane to NAW's mission of advocating for and supporting its members.

27. It is unnecessary for any of NAW's members to participate as a party in this litigation because NAW seeks only declaratory and injunctive relief on its members' behalf.

28. NAW satisfies each requirement for associational standing: its members would have standing to sue in their own right, the interests NAW seeks to protect are germane to its organizational purpose, and neither the claims asserted nor the relief requested requires the participation of individual members in this litigation. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

29. Defendant Jill Hunsaker Ryan is the Executive Director of the Colorado Department of Public Health & Environment ("CDPHE"), the Colorado state agency charged with administering and enforcing the Act. Colo. Rev. Stat. § 25-17-705. Among other statutory responsibilities, CDPHE reviews and approves producer responsibility program plans and amendments, and is authorized under the Act to inspect and enforce the Act. Colo. Rev. Stat. § 25-17-710. Defendant Ryan is sued solely in her official capacity.

**BACKGROUND AND FACTUAL ALLEGATIONS**

I.     **Legal Background**

A.  **The Act Mandates a Comprehensive EPR Program that Applies to Packaging for Most Consumer Products**

30. Enacted in 2022, the Act mandates creation of a statewide recycling program for most consumer-product packaging and most paper products sold in Colorado. Colo. Rev. Stat. §§ 25-17-703(13), 25-17-705.

31. The Act's stated goal is to increase the percentage of waste that Colorado recycles. Colo. Rev. Stat. § 25-17-702(1)(c), (d). Also according to the Act, "[a]ll parties have the obligation to share in the responsibility to reduce negative impacts of end-of-use management for covered materials by building a system designed to minimize waste and to increase reuse and recycling of products and packaging." Colo. Rev. Stat. § 25-17-702(1)(f).

32. But the Act does not pursue its stated goal of increasing the percentage of waste that Colorado recycles by simply giving Coloradans incentives to recycle or reduce waste.

33. Instead, it establishes a comprehensive "extended producer responsibility" ("EPR") scheme operated by a private "producer responsibility organization" ("PRO") and funded by companies it calls "producers"—those whose products are sold in Colorado or who are part of those products' supply chain.

34. The Act replaces the local taxes, user fees, and subscription fees that previously funded recycling programs with fees paid by producers.

35. To comply with the Act, producers must undertake extremely burdensome, costly measures that disrupt nationwide supply chains. They must also pay fees to the private PRO based on the products with "covered materials" that they sell and ultimately are sold in Colorado. The private PRO then uses those fees to fund free recycling services for Colorado residents and select businesses.

6

36. According to the CDPHE, the Act provides "Free recycling for all residents of Colorado."[1] The Act thus transfers the cost of Colorado's recycling system from Colorado state and local governments (and their taxpayers) to companies that are part of the national supply chain—with, as explained below, significant costs borne by companies located outside of Colorado.

**B. The Act Adopts Very Broad Definitions of "Covered Materials" and "Producer"**

37. A company is subject to the Act's obligations if it is a "producer" of "covered materials." Colo. Rev. Stat. § 25-17-708(1). Under the Act, "covered materials" encompasses the packaging used in the vast majority of consumer goods, including, with certain exceptions, (i) all packaging material intended for single or short-term use for delivery to consumers at the point of sale, and (ii) most paper products. Colo. Rev. Stat. § 25-17-703(13), (25)–(26).

38. The Act's definition of "producer" identifies the "person" in the supply chain responsible to pay to recycle the covered materials. Colo. Rev. Stat. § 25-17-703(30). It identifies the "producer" of a given product according to the following sequence. If the product is sold or distributed under the manufacturer's own brand, or without any brand, the manufacturer is the producer. Colo. Rev. Stat. § 25-17-703(30)(a)(I). If the manufacturer does not own the brand under which the product is sold, then the brand licensee is the producer. Colo. Rev. Stat. § 25-17-703(30)(a)(II). If the preceding two categories do not cover a company located in the United States, the producer is the product's importer. Colo. Rev. Stat. § 25-17-703(30)(a)(III). Finally, if none of these three categories applies, the producer is the company that "first distributes the covered material in or into" Colorado. Colo. Rev. Stat. § 25-17-703(30)(e).

---

[1] CDPHE, *Producer Responsibility Policy: HB22-1355*, Recycle Colorado (March 7, 2023) ("HB22-1355 Summary" at 6 ("Free recycling for all residents of Colorado" and "Reimbursement to local governments for recycling programs"), available at https://cdphe.colorado.gov/hm/epr-program, (follow "find recordings … ," "Rulemaking #1 …," "2023," "Rulemaking #1 … ") (last visited July 24, 2026). *See also* Circular Action Alliance Colorado, LLC, Colorado Program Plan 2026 - 2030 60 (November 2025) (stating that Coloradans will receive recycling services at "no cost").

39. The Act thus places primary responsibility on the owners of consumer brand names, though it also sweeps in companies throughout the supply chain. Consumer brands sold in Colorado are overwhelmingly national and owned by out-of-state companies. (The specific covered-material volumes that producers reported to CAA are confidential to CAA and CDPHE.)

40. The definition of producer thus concentrates the Act's financial obligations on companies that are headquartered or located primarily outside of Colorado and whose operations inherently depend on interstate commerce. The definition deflects responsibility away from in-state retailers, non-profits, and governmental organizations.

41. The Act exempts several large categories of businesses and organizations. The most significant categories are sellers with less than $5 million in annual gross revenue, Colo. Rev. Stat. § 25-17-713(1)(a), (e) (adjusted to $5,632,843 by 6 Colo. Code Regs. § 1007-2.1-1.8.2); state and local governments, Colo. Rev. Stat. § 25-17-713(1)(c); nonprofit organizations, *id.* § 25-17-713(1)(d); retail food establishments licensed in Colorado, *id.* § 25-17-713(1)(f); and all construction companies, *id.* § 25-17-713(1)(g).

42. These exemptions force non-exempt "producers" to subsidize exempt producers by paying the exempt producers' share of recycling costs. The exempt producers that receive this subsidy are overwhelmingly Colorado entities. They also receive the benefit of the recycling services paid for by producers.

**C. To Implement Its Program, the Act Delegates Regulatory Authority to a Private "Producer Responsibility Organization"**

43. Instead of directly implementing and supervising its new EPR program, Colorado has mandated the creation of—and delegated its sovereign authority to—an unaccountable private party, Circular Action Alliance ("CAA").

44. The Act requires producers to establish—and requires every covered, non-exempt producer to join—a private PRO. Colo. Rev. Stat. §§ 25-17-705(1)(a), (4), 25-17-708(1).

45. The PRO must obtain approval from CDPHE. Colo. Rev. Stat. § 25-17-705(1)(b)(II).

46. The Act provides for the approval of only one PRO at the EPR program's outset. Colo. Rev. Stat. § 25-17-705(1)(a)–(c). After January 1, 2029, CDPHE may but need not approve additional PROs. Colo. Rev. Stat. § 25-17-708(2)(a)–(b).

47. The Act provides an ostensible alternative to joining a private PRO: a producer may create its own "individual program proposal" ("IPP") that provides statewide recycling services for that producer's materials. Colo. Rev. Stat. § 25-17-705(8)(a). This alternative is, however, cost prohibitive and therefore illusory. An IPP is feasible only for a producer whose products are limited to a specific category; that producer has fewer collection, logistics, education, reporting, and compliance variables to manage. This limitation is illustrated by the only IPP established under the Act, created by the Lubricants Packaging Management Association to process automotive lubricant packaging.

48. On May 1, 2023, CDPHE designated CAA as the exclusive PRO. Colorado Program Plan ("Plan") (Attachment A hereto) at 16. CAA will remain the exclusive PRO for at least five years. *See* Colo. Rev. Stat. § 25-17-708(2)(a), (b) (providing for possible additional PRO beginning January 1, 2029).

49. CAA is a non-profit organization that, according to its website, "is operating as the single PRO" in the six states that have passed similar EPR laws: "California, Colorado, Maryland, Minnesota, Oregon and Washington." *About Circular Action Alliance*, CIRCULAR ACTION ALLIANCE, https://circularactionalliance.org/about (last visited July 24, 2026). (All URLs are last visited July 24, 2026 unless otherwise stated.) It has established a separate wholly-owned entity for each state, including "Circular Action Alliance Colorado LLC" to serve as Colorado's "representative stewardship organization." Plan at 40. *See also* Plan, cover page. CAA and Circular Action Alliance Colorado LLC are registered in Colorado as foreign entities. https://www.sos.state.co.us/biz/BusinessEntityCriteriaExt.do (search "circular action alliance"). The remainder of this Complaint refers to CAA and Circular Action Alliance Colorado LLC collectively as "CAA."

50. Large multinational corporations founded and govern CAA. Its founding members include the two largest companies in the Fortune 500, Amazon and Walmart. The others are The Campbell's Company; The Coca-Cola Company; Colgate-Palmolive; Conagra Brands; Danone North America; Ferrero US;

General Mills; Georgia-Pacific; IKEA Supply AG; Keurig Dr Pepper; The Kraft Heinz Company; L'Oréal USA; Mars, Inc.; McDonald's USA, LLC; Mondelēz International; Nestlé USA; Niagara Bottling, LLC; PepsiCo, Inc.; Procter & Gamble; Starbucks Corporation; SC Johnson; and Target. Plan at 40.

51. CAA's structure concentrates authority in these founding members. Its National Board of Directors consists of representatives of founding member companies. Plan at 40–41.

52. Neither CDPHE nor any other governmental entity has authority to appoint CAA board members or members of CAA management.

53. Neither CDPHE nor any other governmental entity has authority to remove CAA board members or members of CAA management.

54. Regional and mid-sized companies, including NAW's members, have minimal or no influence over CAA decisions. They have no representation on the CAA Board.

55. Before being designated as the PRO, an organization seeking to fill that role must submit a "plan proposal" for CDPHE's review and approval. Colo. Rev. Stat. § 25-17-705(4).

56. CAA submitted a proposed program plan (the "Plan") on February 3, 2025 and a revised plan on July 1, 2025.

57. CDPHE's review of a PRO plan proposal is limited to determining that the proposal complies with the Act. Colo. Rev. Stat. § 25-17-705(5)(b)(II). The Act does not authorize CDPHE to exercise any discretion with respect to approval of the initial exclusive private PRO.

58. CDPHE reviewed the proposal, as did a "producer responsibility program for statewide recycling advisory board," Colo. Rev. Stat. § 25-17-703((2), but that board's role is limited to making recommendations to the executive director of CDPHE.

59. CDPHE approved CAA's proposed plan in December 2025.

60. CAA's Plan establishes Colorado's first statewide system to recycle covered packaging materials and paper products—to be funded by producers for the benefit of Colorado residents and businesses.

61. The Plan creates a comprehensive framework that, among other things, retains and pays a statewide network of recycling service providers; plans public education campaigns; sets recycled content targets for key material categories; and describes, in general terms, the methodology CAA uses to determine the dues producers must pay.

62. CAA contracts with local governments and private haulers to provide recycling services, including curbside pickup, drop-off collection sites, and hauling and transfer operations. Plan, §§ 17.1–17.3, Tables 17 and 20.

63. CAA must provide these services at no charge to Colorado residences and eventually to qualifying non-residential locations, including the same small businesses that are exempt from the obligation to join and pay the private PRO. Colo. Rev. Stat. § 25-17-703(12) (defining "covered entities"); *id.* § 25-17-706(3)(a) (requiring the private PRO to provide free recycling services to "covered entities").

64. The Plan funds CDPHE as well as the recycling program. Under the Act, CDPHE receives funding for its administration of the program from the PRO rather than through legislative appropriation. The Act requires the private PRO's plan to include a funding mechanism for "[r]eimbursing the department . . . for its costs in administering and implementing this part 7." Colo. Rev. Stat. § 25-17-705(4)(i)(I)(F). CAA's plan meets this requirement but imposes two conditions on CAA's payment obligation: CAA reimburses only costs it considers "reasonable" under standards that it defines, and CAA pays only "[u]pon . . . verification of CDPHE's cost accounting." Plan at 98. CDPHE consented to these extra-statutory limitations.

65. Producers must register with CAA and accept the terms of a non-negotiable CAA Participant Producer Agreement with CAA ("Producer Agreement") and a Colorado Addendum to the Producer Agreement ("Addendum"). (The alternative of creating an IPP, rather than joining CAA, is impracticable, as explained above.)

66. Neither CDPHE nor any government body approved the Producer Agreement or the Addendum. See Plan at 211 ("CAA will develop a set of binding agreements and policies (Policies) that clarify producer obligations for registration, reporting and dues payments.").

11

67. As of October 31, 2024, 1,594 companies had registered with CAA as producers. Plan at 41. The most recent public list, dated April 8, 2026, contains approximately 3,400 companies. https://perma.cc/DY8Q-AR4C (follow "Download Colorado Registration List").

**D. The Act and Regulations Do Not Provide a Meaningful Standard to Govern CAA's Setting of Producers' Dues**

68. The Act fails to provide standards for CAA's budget or a mechanism for meaningful government oversight. The Joint Budget Committee reviewed the initial budget, Colo. Rev. Stat. § 25-17-705(3)(d), but the Act exempts all future budgets from government review, *id.* § 25-17-705(3)(e).

69. CAA projects annual budgets of hundreds of millions of dollars each year. The projected budget for the first program year of 2026 is $215 million to $267 million. The Plan predicts CAA growth of as much as 85 percent in just five years, reaching $300 million to $397 million by 2030. Plan at 176.

70. CAA funds these amounts entirely through "producer responsibility dues." Colo. Rev. Stat. § 25-17-705(4)(i)(II); *see also* § 25-17-709(1)(a). The Act authorizes the PRO to set "dues" amounts but fails to establish standards for setting those amounts, requiring only that dues "must vary by the type of covered material, whether or not the material is readily recyclable, and be based on the net recycling services costs for each covered material in the state." Colo. Rev. Stat. § 25-17-705(4)(i)(II).

71. This provision prescribes no methodology, no formula, and no objective standard by which CAA's fee determinations can be evaluated or challenged.

72. The regulations do not provide the missing standard. They require only that the private PRO's plan provide "a description of the process used to determine producer responsibility dues." 6 Colo. Code Regs. § 1007-2:1-18.5.2(C)(1).

73. The Plan's discussion of dues adopts the Act's vague language:

Dues will be calculated annually using CAA Colorado's methodology that integrates material costing indices accounting for Colorado's material-specific management costs, commodity revenues, and non-material expenses. The producer dues are based on the *net recycling services costs for each covered material* in the state and vary by the *type of covered material* and if it is readily recyclable.

Plan at 26 (emphasis added). *See* Colo. Rev. Stat. § 25-17-705(4)(i)(II) (stating that dues "must vary by the type of covered material" and "be based on the net recycling services costs for each covered material").

74. After asserting unilateral "authority to determine the [dues-setting] methodology," Plan at 180, CAA's Plan gives only a general description of that methodology. To set producer dues for a given year, CAA first estimates its total cost of fulfilling its obligations under the Plan, including the costs of paying recycling service providers, funding educational programs, and administering the program. It allocates those costs to producers based on the types and weights of covered materials each distributes into the state. In this process, CAA assigns each of the 61 categories of covered materials a base fee amount based on the material's "relative cost to manage." For each covered material that a producer distributes into the state, CAA multiplies the base amount for that material by the weight of the materials the producer sold. The result is the producer's "base dues." Total "dues" on a producer's invoice consist of "base dues," with a possible "eco-modulation" discount for putatively greener packaging changes. Plan at 180–84.

75. Thus, CAA does not calculate producer fees based on the marginal cost of handling disposal of each producer's materials. Rather, it imposes producer fees in an amount sufficient to provide the funds CAA needs to build out and maintain a statewide recycling program. Plan at 32, 37–38, 176 (Table 30).

76. The Act also requires the private PRO to make annual fee increases, to "reflect changes in program costs and relevant plan revisions," without review by CDPHE. Colo. Rev. Stat. § 25-17-705(4)(i)(III)(C). The regulations acknowledge that the private PRO has unilateral authority to impose annual increases without CDPHE approval in order "to align with the most recent sales information." 6 Colo. Code Regs. § 1007-2:1-18.5.3(B)(1)(b); *see also* Colo. Rev. Stat. § 25-17-709(2)(a)(V) (requiring the PRO to report, but not requiring approval of, dues increases or decreases).

77. Neither CDPHE nor any governmental entity approves the dues amounts CAA requires each member to pay or permits any member to appeal its assessed dues amount.

**E.  CAA Denies Producers Access to Judicial Review to Dispute Base Dues Amounts**

78. The Act and the regulations compel producers to pay the dues that the private PRO demands. Colo. Rev. Stat. § 25-17-709(1)(a); 6 Colo. Code Regs. § 1007-2:1-18.2.4(C). The Addendum subjects

13

producers that fail to pay dues on time to liquidated damages and enforcement referrals to CDPHE. Addendum §§ 5.6.2, 6.2.7.

79. CAA's Addendum bars producers from seeking judicial relief to challenge any action arising out of the Addendum, requiring them to submit all disputes to binding arbitration. Addendum § 8. This arbitration requirement denies producers, including NAW members, any meaningful opportunity to challenge CAA base dues or methodology.

80. It also bars producers from challenging a CAA decision to expel them from the EPR program. The Addendum authorizes CAA to "terminate" a producer for any material breach, which CAA defines to include matters such as "failure to keep required records." *Id*. § 7.2. The arbitration provision then bars the terminated producer from challenging its termination in court. *Id*. § 8.

81. The only exception to the arbitration requirement is for dues increases based on eco-modulation factors. CDPHE amended the initial implementing regulations to permit producers to challenge these increases in an administrative forum. 6 Colo. Code Regs. § 1007-2:1-18.2.7. Under this provision, a producer can challenge an increase based on eco-modulation factors in a hearing before the "Advisory Board" for the producer responsibility program. That Board issues a recommendation to the Director of the CDPHE Hazardous Materials and Waste Management Division, which issues a decision that is subject to judicial review. 6 Colo. Code Regs. § 1007-2:1-18.2.7(C), (D), (F).

82. But the regulations place the burden of proof on the producer, 6 Colo. Code Regs. § 1007-2:1-18.2.7(C), and require the producer to pay the increase to dispute it, 6 Colo. Code Regs. § 1007-2:1-18.2.7(E). Nor do the regulations identify a limiting standard governing a decision on the merits of the dues increase. They refer only to the vague language contained in the "[CAA] Plan, IPP [if any], applicable regulations, guidance, or" the Act. 6 Colo. Code Regs. § 1007-2:1-18.2.7(C).

83. The Act does not provide this judicial-review option for changes to base dues, which constitute the bulk of producer dues. The only possible adjustment to base dues is eco-modulation adjustments, which are limited to 10 percent of base dues. 6 Colo. Code Regs. § 1007-2:1-18.9.1(B).

14

84. When CDPHE proposed the regulatory amendment that allows producers to dispute CAA eco-modulation decisions through an administrative and judicial process, CAA opposed the proposal—which illustrates the conflict of interest between CAA's governing members and most of the producers CAA governs. CAA argued that permitting its members even this limited right to challenge eco-modulation adjustments would increase CAA's expenses and create uncertainty. CAA even argued that CDPHE was exceeding the scope of its authority to make rules relating to CAA.[2]

**F.   The Act Exposes Producers to Onerous Penalties**

85. As explained above, neither the Act nor the regulations set out a specific standard that limits CAA's imposition of dues. As also explained above, producers cannot challenge CAA's base dues in court, but must submit to binding arbitration on the terms CAA has imposed. A producer that fails to pay dues on time, including while it is arbitrating the dues amount, is subject to an enforcement action and penalties. Indeed, the Act requires the private PRO to track compliance with its requirements and "collaborate with the executive director [of CDPHE] to bring producers into compliance." Colo. Rev. Stat. § 25-17-705(4)(e).

86. These penalties can be onerous. The Act authorizes penalties of $5,000 for the first day of a first violation and $1,500 per day afterward. Colo. Rev. Stat. § 25-17-710(1)(a). Penalties for repeat violations rise to $20,000 for the first day followed by $6,000 for each subsequent day. *Id.* § 25-17-710(1)(c); 6 Colo. Code Regs. § 1007-2:1-18.11.3.

**G.   The Act Restricts Producers' Speech by Prohibiting Them from Charging a Fee on Invoices to Recover the Cost of Their EPR Fees**

87. The Act also prohibits producers from effectively informing Colorado consumers that their prices are higher than they would otherwise be because of the compliance costs and fees the Act imposes.

---

[2] CDPHE, *Stmt. of Basis & Purpose & Specific Stat. Auth. for Amends. to the Regulations Pertaining to Solid Waste Sites & Facilities,* PDF at 13 (Nov. 18, 2025) (pertaining to 6 Colo. Code Regs. 1007-2, pt. 1), https://oitco.hylandcloud.com/cdphermpop/docpop/docpop.aspx.

In this way, the Act shields Colorado officials from criticism and political consequences they might otherwise face.

88. The Act provides: "A person shall not charge any kind of point-of-sale or point-of-collection fee to consumers to recoup its costs in meeting the obligations of complying with [the Act]." Colo. Rev. Stat. § 25-17-714.

89. This provision does not prohibit a producer from raising prices to recoup the costs that it incurs as a result of EPR fees.

90. Rather, the Act prohibits producers from including a line-item fee on their invoices to "consumers" that identifies the amount of a price increase resulting from the producer's payment of an EPR fee for the product.

91. A "consumer" includes "any person who purchases or receives covered materials in the state and is located at a covered entity." Colo. Rev. Stat. § 25-17-703(10).

92. The Act defines "covered entity" to include residences, small businesses (often the same small businesses whose annual revenue exempts them from the Act's definition of "producer"), schools, hospitality locations, and state and local governmental buildings. Colo. Rev. Stat. § 25-17-703(12); *see also* 6 Colo. Code Regs. § 1007-2-18.1.6, -18.2.3(A) (defining "small business" identically for purposes of "covered entity" status and "producer" exemption).

93. Because it does not prohibit producers from increasing prices to recoup EPR fees, the Act's "fee" ban is in fact a ban on speech—that is, a prohibition on communicating the source of a price increase to "consumers" on an invoice by describing it (accurately) in a line item as reflecting a fee.

94. The inclusion of such line items is political in nature, as it would be intended to inform Colorado customers of the costs imposed by the Act, and to encourage support for the Act's amendment or repeal.

II.    **The Act Imposes Heavy Burdens on NAW Members and Inflicts Substantial Harm on Interstate Commerce and Markets**

95. As distributors, NAW's members play integral roles in regional and national supply chains by operating distribution centers that serve as critical links in complex networks extending from manufacturers

to consumers. Distributors purchase bulk inventory, warehouse it, organize it into the units requested by their customers (called "breaking bulk"), and ship it to them. Their typical customers are retailers, educational and health institutions, and other non-consumer entities. Many distributors handle hundreds of thousands or even millions of different products.

96. The Act imposes "producer" status on many distributors for many of the products they handle, even though distributors generally do not control the packaging consumers receive at the point of sale. *See* Colo. Rev. Stat. § 25-17-703(25)(a) (defining "packaging material"). As a result, they are not in a position to reduce packaging materials, or to benefit from eco-modulation reductions.

97. The Act imposes substantial costs on these NAW members, burdening their interstate operations.

98. It requires them to pay CAA dues that can be so high they exceed the low margin that distributors earn on these transactions.

99. The dues that distributors must pay are even more burdensome because CAA sets them retrospectively. This retrospective approach prevents distributors from planning their costs and properly managing their complex operations.

100. CAA dues are only a fraction of the costs the Act imposes. Distributors must also incur the greater costs of making sweeping changes to their interstate operations to comply with the Act.

101. Each distributor must determine whether it is the producer under Colorado law for each of the thousands or millions of units of product it handles. Because the Act's tiered definition of "producer" is so complex, this process requires distributors to coordinate extensively with manufacturers, suppliers, customers, and other potential producers to determine which entity bears responsibility as the producer.

102. For products for which a distributor is the producer, the distributor must identify the specific packaging materials used for each product and the weight of each material used. Distributors typically do not have this information and often must engage in burdensome requests to suppliers or conduct physical analyses.

17

103. This request process requires some upstream suppliers to incur substantial costs to enable the distributors to meet their obligations under the Act.

104. Once distributors learn those material types, they must calculate and report the weights of categories for materials used for each product sold into Colorado. These extensive reporting requirements impose substantial additional costs.

105. Distributors often cannot know in advance whether units of product they sell ultimately will be sold in Colorado. Distributors therefore must trace each unit of product—each retail-level box, for example—through their distribution channels to the ultimate point of sale.

106. Distributors generally need to obtain this information from the downstream members of their supply chains. The downstream companies often must incur substantial costs to provide the distributors the tracking information they need to meet their obligations under the Act. Or, downstream companies may refuse to provide the information to distributors, which can result in distributors paying CAA dues based on sales of products that were not ultimately sold in Colorado.

107. Distributors that are NAW members also incur higher costs in the form of higher prices charged by their suppliers. Where a distributor's manufacturer (or another upstream actor) is the "producer" under the Act, the manufacturer sometimes invoices distributors for the EPR-related cost.

108. To cover these dues, distributors are forced to raise some of their prices. For many products, distributors cannot limit these price increases to products ultimately sold in Colorado. The result is price increases imposed on consumers in numerous states other than Colorado.

109. These complex processes are further complicated by several other states' ongoing adoption of EPR laws. To date, six other states have adopted similarly broad EPR statutes: California, Maine, Maryland, Minnesota, Oregon, and Washington. These statutes vary in their details, including their definitions of covered material and producers as well as their classifications of packaging materials.

110. The Act's requirements are especially burdensome to the many NAW members that are mid-sized distributors. Among other disadvantages, these members are above the threshold for the Act's small-business exemption. Yet they lack the scale that allows large producers to better absorb the additional labor,

18

information-technology, and related costs they must incur because of the Act. In addition, mid-sized distributors generally have minimal in-house legal and compliance resources compared with larger companies like those on the CAA Board.

111. CAA's fee structure also creates incentives that cut against the Act's purpose and goals. For example, it does this by assessing dues based on packaging weight—rewarding producers for shifting to lighter but less-recyclable materials rather than for improving recyclability. *See* Plan at 180–81; 183.

112.  Adding to the above burdens, the Act and regulations require producers to maintain extensive records and provide them on demand to CAA or CDPHE. Colo. Rev. Stat. § 25-17-709(1)(b); 6 Colo. Code Regs. § 1007-2:1-18.1.5, -18.2.5. These records must be extremely detailed. They must include "all documents and records related to the calculation and payment of producer responsibility dues, recycling rates, collection rates, postconsumer-recycled-content rates, and any other materials necessary for the executive director to determine compliance with" the Act, which the producer must "make . . .available for inspection by the executive director" of the CDPHE. Colo. Rev. Stat. § 25-17-709(1)(b); *see also* 6 Colo. Code Regs. § 1007-2:1-18.2.5. CAA conducts annual audits of producer records. Colo. Rev. Stat. § 25-17-708(5); Colo. Code Regs. § 1007-2:1-18.1.5(D); Plan at 27.

113. The Act imposes irreparable harm on NAW members, mandating compliance with a regulatory framework in which they face crushing burdens, exercise no consequential voice, and have no meaningful recourse.

114. Moreover, but for the Act's prohibition on point-of-sale collection fees, Colo. Rev. Stat. § 25-17-714, some of NAW's producer members would include a line item (or items) reflecting the cost increases resulting from EPR compliance costs and fees on their invoices to Colorado customers, including those whom the Act defines as "consumers."

**<u>CLAIMS FOR RELIEF</u>**

**<u>Count I</u>**
**42 U.S.C. § 1983**
**Violation of the Fourteenth Amendment Due Process Clause:**
**Unlawful Delegation to Private Party**

115. Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

116. Section 1 of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

117. This requirement of due process prohibits the government from delegating regulatory authority to private market participants without meaningful governmental control or oversight.

118. The Act violates the due-process rights of NAW's members in this way.

119. The Act delegates authority to CAA, as the only approved PRO, to set the terms, conditions, and fees for all "producers" in the state.

120. CAA is controlled in substantial part by representatives of companies that are competitors of producers, including NAW members, who are regulated under the Act.

121. CAA's "founding members" include some of the nation's largest companies that are themselves producers under the Act.

122. Most or all members of CAA's national Board of Directors are representatives of CAA's large founding member companies.

123. Some of those founding members and Board members are competitors of NAW's members, and some are retailers or suppliers who have an interest in having companies like NAW's members (that is, distributors) bear a larger share of the costs of the EPR program.

124. This creates irreconcilable conflicts of interest that the Due Process Clause forbids.

125. CAA's founding members are better able than most CAA members to absorb EPR fees or shift those fees onto others. The founding members thus may be more willing to impose and/or accept

program features that have an outsized, unduly burdensome effect on others, such as higher total costs for a bigger program, or higher fees on some product types than on others.

126. An obvious conflict of interest arises to the extent that disputes or issues over fees may arise between CAA and a founding member or company represented on CAA's Board; when such disputes are resolved in "insider" companies' favor, other producers must bear a relatively greater share of the program's costs.

127. Thus, a block of controlling, self-interested producers wields inordinate power and influence to regulate the terms of conducting business for an unwilling minority that includes NAW's members.

128. CDPHE does not meaningfully protect against CAA regulating Board members' companies' competitors for the benefit of the Board members' companies.

129. As explained above, the Act provides only high-level guidance that does not sufficiently cabin CAA's broad discretion in formulating its plan, with respect to both setting total system costs and allocating those costs to different material types.

130. CDPHE did not engage in any economic impact analysis to determine the impact of CAA's plan on different types of producers and products. The Department does not require approval for changes to CAA's fee schedule or individual fee adjustments.

131. In addition, disputes arising between CAA and NAW's members regarding base fee amounts must be resolved through confidential arbitration; there is no administrative appeal process or right to judicial review.

132. The fee structure further compounds its due process problem by operating on a retrospective basis.

133. Due process demands that "regulated parties . . . know what is required of them so they may act accordingly." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

134. Because CAA assesses fees based on prior years' volumes, applying rates that are determined only after the fact, businesses cannot accurately predict what their fees will be or conform their operations accordingly.

135. The Act further offends due process in failing to provide businesses like NAW's members adequate notice and opportunity to contest fees, imposed by CAA under the Act, during the CAA invoicing process.

136. By enforcing the Act, Defendant, acting under color of state law, is depriving NAW's members of their Fourteenth Amendment right against deprivation of property without due process of law.

137. NAW's members have been injured and will continue to be injured unless and until this Court enjoins Defendant from enforcing the Act against NAW and its members.

**Count II**
**42 U.S.C. § 1983**
**Violation of the Fourteenth Amendment Due Process Clause:**
**Unconstitutional Conditions**

138. Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

139. The Supreme Court "ha[s] said in a variety of contexts that the government may not deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (cleaned up). This "principle, known as the unconstitutional conditions doctrine, . . . vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Id*.

140. Colorado's EPR program violates this doctrine because the Act forces producers to submit to regulation by CAA, on terms CAA dictates, including a waiver of their right to bring any claims against CAA in state or federal court. As set forth in Paragraphs 37 through 80 above, forcing producers to submit to regulation by this self-interested party, and denying producers judicial review of any disputes with that party, violates the Due Process Clause. Making producers "agree" to that arrangement as a condition of selling to customers in the state thus imposes an unconstitutional condition.

141. Apart from the Due Process Clause, the Act also imposes an unconstitutional condition by forcing producers to waive their right to a federal judicial forum as a condition of doing business in that state. *See S. Pac. Co. v. Denton*, 146 U.S. 202, 207 (1892) (holding that this is constitutionally

22

impermissible); *see also Koontz*, 570 U.S. at 607 (citing the forced waiver in *Denton* as an example of an unconstitutional condition).

142. In addition, forcing producers to pay CAA dues is an unconstitutional condition because it forces producers to pay for services in Colorado that have nothing to do with their own activities in Colorado. Distributors' fees pay not only for the recycling of waste resulting from the products they sell in the places where they sell them; they also pay for recycling services everywhere else in Colorado, including the recycling of waste generated by exempt producers, and for a statewide education and outreach program. Thus, CAA dues do not bear even "rough proportionality" to the costs that producers' products impose on the state but instead are a means of "extortion" against distributors who exercise their right to engage in otherwise-lawful interstate commerce. *See Koontz*, 570 U.S. at 605–06.

143. Distributors do not consent to these unconstitutional conditions; agreement to CAA's terms is forced upon them as a condition of engaging in interstate commerce. Although the Act ostensibly allows a producer to create its own IPP, that alternative is cost-prohibitive and therefore illusory. And although the Act contemplates the approval of PROs other than CAA, no other PRO may be approved before 2029, and CDPHE need never approve any other PRO. *See* Colo. Rev. Stat. § 25-17-708(2).

144. Defendant could not impose any of these unconstitutional conditions directly, and may not do so by adding the extra step of forcing producers to enter a putative agreement with a private party. With respect to constitutional rights, "what cannot be done directly cannot be done indirectly." *Cummings v. Missouri*, 71 U.S. 277, 325 (1866); *see also, e.g.*, *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 190 (2024) ("[A] government official cannot do indirectly what she is barred from doing directly.").

145. By imposing these unconstitutional conditions on producers, Defendant is harming NAW's members, and NAW's members will continue to suffer harm to their constitutional rights unless and until the Court enjoins enforcement of these conditions.

## Count III
## 42 U.S.C. § 1983
## Violation of the Dormant Commerce Clause

146. Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

147. Article I, Section 8, Clause 3 of the U.S. Constitution authorizes Congress to "regulate Commerce … among the several States."

148. Among the reasons the Constitution's Framers included this provision was to prevent states from imposing self-serving regulations that burden interstate commerce for parochial purposes. *Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023).

149. Toward that end, even where Congress has not spoken, the "Dormant" Commerce Clause forbids state actions that discriminate against or unduly burden interstate commerce. A state law per se violates the Commerce Clause if it directly discriminates against interstate commerce or favors local interests. *See id.*; *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994). Even a facially neutral state law violates the Commerce Clause if it imposes burdens on interstate commerce that clearly exceed the law's putative local benefits. *Nat'l Pork Producers*, 598 U.S. at 377–78; *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

150. The Act violates the Dormant Commerce Clause in both ways.

151. First, the Act discriminates against interstate commerce to benefit local economic interests.

152. The Act incorporates this discrimination into its structure. The Act defines "producer" to target manufacturers that own national product brands—most often large national companies based outside Colorado—and other companies upstream in product supply chains. The Act also grants exemptions that favor primarily in-state actors. It thus imposes costs more heavily on out-of-state producers than on the in-state producers with whom they compete.

153. For example, the favored in-state economic interests include Colorado "small business" producers, who are exempt from the Act's requirements but will receive free recycling services funded in significant part by out-of-state producers' PRO fees. *See* Colo. Rev. Stat. § 25-17-703(12) (defining

24

"covered entities" to include small businesses); *id.* § 25-17-706(3) (requiring the PRO to fund recycling services for covered entities); *id.* § 25-17-713 (exempting businesses with less than $5 million in revenue from the Act's requirements).

154. The favored in-state economic interests also include Colorado taxpayers, who would otherwise be responsible for funding the recycling infrastructure. The Act impermissibly forces out-of-state producers to fund an in-state project for the benefit of state residents as the price of access to Colorado customers.

155. Second, the Act violates the Dormant Commerce Clause by imposing substantial burdens on interstate commerce that clearly exceed any local benefits the Act provides—particularly given that Colorado can obtain any such local benefits without burdening interstate commerce.

156. The Act burdens interstate commerce by imposing extensive compliance costs on producers, including NAW members, and inflicting broad consequential harms on interstate markets including higher prices in other states.

157. It burdens producers in several ways. One is by requiring them to pay fees based on the volume of "covered materials" attributed to them. These fees can exceed the margin that producers would earn on certain products. Aggravating this burden, CAA determines those fees after the fact through an opaque process that producers cannot challenge in court.

158. The Act also requires producers to comply with a labyrinthine, granular reporting regime enforced by the CAA. The reporting requirements force producers to obtain information from their suppliers about the composition and weight of packaging materials used for thousands of kinds of products, often generating millions of data points producers must process to compile the required information. It also requires them to track which of their thousands or millions of products ultimately reach consumers in Colorado. This requires producers to track products through their customers who sell the products further down the supply chain.

159. These complex tracking and reporting obligations disproportionately affect producers who are out-of-state members of national or regional supply chains.

160. These burdens are multiplied by the need to coordinate the Act's requirements with requirements imposed by other states' EPR statutes. The various EPR statutes, including the Act, create a patchwork of inconsistent obligations that disrupt the uniformity of an inherently national market.

161. This regulatory framework imposes barriers to the free flow of packaged goods across state lines, unduly burdening the operation of a market that routinely crosses state lines and is characterized by a national supply chain.

162. These burdens on distributors and other companies operating nationwide far exceed any putative local benefits. Speculative or marginal reductions of in-state waste cannot outweigh the significant disruption of the interstate market. The CAA Needs Assessment prepared under Colo. Rev. Stat. § 25-17-705(2) attributes predicted increases in recycling to improved recycling services and public education, not to the imposition of costs on producers.[3] Any recycling benefits could be achieved by simply taxing goods at the point of sale or through other direct funding by the state, and/or by regulating products sold in the state.

163. By enforcing the Act, Defendant, acting under color of state law, is depriving NAW's members of a right protected by the U.S. Constitution.

164. Defendant's enforcement of the Act has injured NAW's members and will continue to do so unless and until this Court enjoins it.

**<u>Count IV</u>**
**42 U.S.C. § 1983**
**Violation of the First Amendment Right to Free Speech:**
**Prohibiting Speech**

165. Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

---

[3] Needs Assessment at Executive Summary 4–5, 7, 10. https://cdphe.colorado.gov/hm/epr-program.

166. The First Amendment to the U.S. Constitution, which applies against the states through the Fourteenth Amendment, prohibits any law "abridging the freedom of speech."

167. Under the Act, a producer "shall not charge any kind of point-of-sale or point-of-collection fee to consumers to recoup its costs" of paying fees to CAA or complying with the Act. Colo. Rev. Stat. § 25-17-714.

168. This provision does not prohibit producers from increasing their prices to cover the increased costs resulting from the fees charged by CAA and the costs of complying with the Act; rather, it restricts producers' speech by prohibiting them from informing customers of the reason for that increase by identifying the increase as a "any kind of . . . fee" on an invoice (or similar point-of-sale communications).

169. Because the Act regulates speech based on what it says, the Act is a content-based restriction on speech. *See Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015).

170. The speech that the Act restricts is political in nature, not commercial, because it is speech that would inform consumers that the state government is the source of their increased price. It is speech that would tend to—and, for many of NAW's members, would be intended to—encourage Colorado consumers to seek the Act's amendment or repeal. *See BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499, 505 (6th Cir. 2008) (explaining that a ban on invoice line-items to reflect taxes served to "permit[] legislators to duck political responsibility for the new tax").

171. Defendant cannot show that this restriction on speech satisfies strict scrutiny or the intermediate scrutiny that some courts apply (incorrectly, in Plaintiff's view) to content-based restrictions on political speech or the intermediate scrutiny that courts apply to restrictions on commercial speech. *See id*.

172. Some of NAW's members sell directly to Colorado consumers.

173. But for the Act's prohibition, some of NAW's members would inform their Colorado customers that the Act is the source of their increased prices by identifying the portion of the price attributable to the Act as a "fee" on customer invoices.

27

174. By enforcing the Act's speech prohibition, Defendant, acting under color of state law, is depriving NAW's members of their right to freedom of speech.

175. The Act's speech prohibition has injured NAW's members and will continue to do so unless and until this Court enjoins Defendant from enforcing it.

**Count V**
**42 U.S.C. § 1983**
**Violation of the First Amendment:**
**Compelled Speech and Association**

176. Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

177. The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

178. The First Amendment therefore protects individuals against being compelled to express viewpoints on political and ideological matters, *see Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018), and against being compelled to make statements of fact, *see Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797–98 (1988).

179. Similarly, the "[f]reedom of association" that the First Amendment protects "plainly presupposes a freedom not to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

180. Just as forcing someone to speak violates the First Amendment, compelling a person to subsidize another private party's speech "seriously impinges on First Amendment rights." *Janus*, 585 U.S. at 894. Thus, when the government mandates the payment of compulsory fees to a private organization that uses those fees to engage in speech, especially speech with "powerful political and civic consequences," this constitutes a form of compelled speech and association that imposes a "significant impingement on First Amendment rights." *Id.* at 893.

181. As explained above, the Act mandates that virtually all producers become members of, and pay dues to, a private PRO—namely, at this time and for the foreseeable future, CAA.

182. CAA uses some of producers' mandatory dues money to engage in speech.

183. For example, CAA promotes the idea that EPR laws are an effective means of increasing recycling, minimizing waste, and improving the environment.

184. By its own admission, CAA "provide[s] [its] point of view on regulatory concepts" to States considering EPR legislation designed to enable those States to "hit the ground running when it's time to turn [an EPR] program on."[4]

185. And CAA expressly aims at a political goal: to establish itself as the dominant organization responsible for administering EPR laws across multiple states.

186. Many businesses, including NAW members, disagree with CAA's speech on these matters and do not wish to fund it. Although NAW and its members overwhelmingly support sustainability and the promotion of a circular economy, they disagree with CAA's message that packaging EPR laws are an effective means of pursuing those interests. Nor do they believe that a single private organization, let alone CAA in particular, should function as a *de facto* interstate regulator with monopolistic control of EPR programs across multiple states.

187. The requirement that NAW members associate with CAA and fund these messages violates NAW members' First Amendment rights against compelled association and compelled support for messages with which they disagree.

188. By enforcing the Act, Defendant, acting under color of state law, is depriving NAW's members of these First Amendment rights.

189. NAW's members have been injured and will continue to be injured unless and until this Court enjoins Defendant from enforcing the Act against NAW and its members.

---

[4] *See* M. Diane McCormick, *A Look Behind Producer Responsibility Organizations*, FlexPackVoice (Feb. 28, 2025), available at https://perma.cc/R2LH-RUV6 (quoting Olivia Barker, "spokesperson" for the CAA).

**REQUEST FOR RELIEF**

190.    Plaintiff respectfully requests that this Court:

A.      Declare that the Act violates the Due Process Clause of the Fourteenth Amendment because it gives economically self-interested private actors the power to regulate their competitors without sufficient statutory standards or agency oversight;

B.      Declare that the Act imposes unconstitutional conditions by forcing producers to agree to regulation by a self-interested private actor in violation of the Due Process Clause of the Fourteenth Amendment, by forcing them to waive their right to a federal judicial forum, by imposing extortionate costs on producers that are not proportional to producers' impact on the state, and by nd by compelling their association with CAA as a condition of doing business in Colorado;

C.      Declare that the Act violates the Dormant Commerce Clause;

D.      Declare that the Act's prohibition on producers charging "any kind of … fee to consumers to recoup" fees paid to CAA, a prohibition that therefore prohibits producers from informing customers of the reason for price increases, violates the First Amendment;

E.      Declare that, by compelling producers to join CAA and to fund its speech on matters of public concern, the Act violates the First Amendment;

F.      Permanently enjoin Defendant from directly or indirectly implementing or enforcing the Act and regulations promulgated thereunder against NAW members;

G.      Award Plaintiff its attorneys' fees and costs under 42 U.S.C. § 1988; and

H.    Award Plaintiff any other relief that the Court deems just and proper.

DATED: July 30, 2026                          Respectfully submitted,

                                              */s/ Andrew J. Morris* __
                                              Andrew J. Morris #DC411865
                                              Jacob H. Huebert #IL6305339
                                              New Civil Liberties Alliance
                                              4250 N. Fairfax Drive
                                              Suite 300
                                              Arlington, VA 22203
                                              (202) 869-5210

                                              Attorneys for Plaintiff