### jjIN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS, Plaintiff, <br><br> v. <br><br> JILL HUNSAKER RYAN, Executive Director of the Colorado Department of Public Health & Environment, in her official capacity. Defendant. | **Case No. 1:26-cv-03460-PAB** <br><br> **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> **ORAL ARGUMENT REQUESTED** <br><br> **EXPEDITED TREATMENT REQUESTED** |

Plaintiff National Association of Wholesaler-Distributors ("NAW") moves pursuant to Fed. R. Civ. P. 65(a) for a preliminary injunction against Jill Hunsaker Ryan, in her official capacity as Executive Director of the Colorado Department of Public Health & Environment ("CDPHE"). The requested injunction would bar enforcement of Colorado's Producer Responsibility for Statewide Recycling Act (the "Act") against NAW and its members.

The Act replaces Colorado's city and county government recycling programs with a statewide program governing virtually all packaging and paper disposed of in the state. Passed in 2022, this "extended producer responsibility" ("EPR") statute shifts recycling costs from taxpayers to companies it calls "producers." Many producers are interstate distributors and NAW members. The Act delegates authority over this scheme to a private entity, Circular Action Alliance ("CAA"), without providing sufficient statutory or agency constraints. CAA enjoys wide discretion to set terms governing the program, including the fees that producers must pay, and it has barred the producers it regulates from challenging its actions in court.

1

The Act violates five constitutional guarantees: (1) due process, by delegating CAA regulatory power without sufficient oversight; (2) the unconstitutional-conditions doctrine, by conditioning market access on the waiver of multiple rights; (3) the Dormant Commerce Clause, by unnecessarily burdening interstate commerce; (4) the First Amendment, by restricting what producers may say to consumers; and (5) the First Amendment again, by compelling producers to join CAA just to sell products in Colorado, as well as to fund CAA's advocacy.

## BACKGROUND

Plaintiff NAW is a national trade association representing the wholesale distribution industry, with approximately 35,000 member companies nationwide, including in Colorado. Dec. of Brian Wild ("Wild Dec.") ¶¶ 3–4. NAW's distributor members occupy the middle of the supply chain, serving as critical links between manufacturers and consumers across many state lines. Dec. of Emily George ("George Dec.") ¶¶ 2–3, 5, 14. Many are mid-sized or family-owned distributors and typically handle thousands of product categories. Wild Dec. ¶ 4; George Dec. ¶¶ 13–15; Dec. of Corey Rodriguez ("Rodriguez Dec.") ¶ 6. Numerous NAW members are subject to the Act as "producers." Wild Dec. ¶ 4.

I.   **THE ACT CREATES A "PRODUCERS"-FUNDED RECYCLING PROGRAM AND DELEGATES CONTROL TO A PRIVATE ORGANIZATION**

A.  **The Act Mandates a Statewide Recycling System While Shifting Costs from Taxpayers to "Producers"**

The Act established a statewide program to recycle the packaging for almost all consumer products sold in Colorado. *See* C.R.S. § 25-17-703(13), (25)–(26). The program replaces the local taxes, user fees, and subscription fees that previously funded recycling

programs, and it expands recycling services across the state. *See* Wild Dec. ¶ 6 & Ex. A (Program Plan ("Plan")) at 49–50, 60; Law Dec. ¶ 3 & Ex. A (CAA FAQ at "EPR 101,"); Law Dec. ¶ 6 & Ex. D (government programs). The Act compels companies it calls "producers," not taxpayers, to fund the program. C.R.S. § 25-17-703(31). Approximately 3,400 companies have registered as producers. Law Dec. ¶ 11 & Ex. I (list). Legislators, CDPHE, and CAA describe the result as "[f]ree recycling for all residents of Colorado." Law Dec. ¶ 5 & Ex. C (CDPHE website) at 6; Plan at 31.

### B. The Act Defines Producer to Push Costs Upward in Supply Chains

A company must register under the Act if it is a "producer" of "covered materials" sold in Colorado. "Covered materials" is all packaging material "intended for single or short-term use … for … delivery of products to the consumer at the point of sale," as well as most paper and single-use foodservice products. C.R.S. § 25-17-703(13)(a)(I)–(II), (25)(a)(II), (26).

For each product, the Act designates one supply-chain member as the producer. C.R.S. § 25-17-703(30). The Act identifies the producer by applying a tiered definition, beginning at the end of the supply chain farthest from the point of sale: first to the manufacturer if the product bears the manufacturer's brand or is sold without brand identification, § 25-17-703(30)(a)(I); then to the brand licensee, § 25-17-703(30)(a)(II); next to the company that imports the product, § 25-17-703(30)(a)(III); and finally to the entity that "first distributes" the product "in or into" Colorado, § 25-17-703(30)(e). The Act exempts several categories of entities, including retail food establishments licensed in Colorado, § 25-17-713(1)(f); state and local governments, § 25-17-713(1)(c); construction companies, § 25-17-713(1)(g); sellers with less than $5 million in annual gross revenue, § 25-17-713(1)(a), (e); and nonprofit

organizations, § 25-17-713(1)(d).

### C. The Act Delegates Power, Without Proper Oversight, to CAA, a Private Organization Controlled by Competitors of Producers It Regulates

Colorado delegates authority to administer the program to a private "producer responsibility organization" or "PRO." C.R.S. § 25-17-705(1)–(2). In May 2023, CDPHE designated CAA as the exclusive private PRO. Wild Dec. ¶ 6 & Ex. A at 8. As a result, every producer must join CAA. C.R.S. §§ 25-17-705(1)(a), (4), 25-17-708(1).

CAA is a non-profit organization founded in 2022 by two dozen large producers of consumer goods, including Amazon and Walmart. Plan at 40. Representatives of these Founding Members constitute the entire CAA "National Board of Directors." Law Dec. ¶ 10 & Ex. H (CAA web page). CDPHE has no authority to select or remove members of the CAA Board. *See* C.R.S. § 25-17-705(1)(c). NAW members also have no role in CAA governance.

In December 2025, CDPHE approved CAA's "Program Plan" for administration of the new recycling system. Law Dec. ¶ 13 & Ex. K. Consistent with the Act, the Plan permits CAA wide discretion. C.R.S. § 25-17-705(4)(g)–(m). The Act limited CDPHE's review of CAA's proposed plan to determining whether it complies with the Act. § 25-17-705(5)(b)(II).

Under the Plan, CAA maintains a statewide network of recycling service providers, contracting with local governments and private haulers to provide services including curbside pickup. *See, e.g.*, Plan at ch. 5 & tbls. 17, 20. CAA also establishes materials-processing facilities and conducts public education campaigns. *Id*. at ch. 5, 6, 8. CAA provides the services at no charge to consumers. *See* C.R.S. §§ 25-17-703(12), 25-17-706(3)(a).

The Act authorizes CAA to set "dues," but it supplies no standard other than vague instructions to take into account types of packaging material and related recycling costs. *See*

4

C.R.S. § 25-17-705(4)(i)(II); § 25-17-709(1)(a). CAA's plan confirms that CAA has the "authority to determine the [dues-setting] methodology." Plan at 180. To set producer dues, CAA determines the total annual amount it needs to fund the entire program, then divides that amount among registered producers based on a schedule that assigns each of the 61 material categories a fee reflecting that category's relative "cost to manage." A producer's dues equal each category's fee multiplied by the weight of material in that category the producer distributes into the state. *Id*. at 180–84. Under this method, a producer's dues cover not just the cost of recycling its own packaging, but also a share of CAA's broader program costs. The dues also cover the producer costs that exempt entities do not have to pay.

CDPHE does not approve CAA's dues-setting process, and producers cannot obtain a CDPHE review of their dues. CAA can increase dues without CDPHE's approval. C.R.S. § 25-17-705(4)(i)(III)(C); 6 Colo. Code Regs. ("CCR") § 1007-2:1-18.5.3(B)(1)(b).

CAA has insulated itself from producer challenges to its governance through two non-negotiable documents it requires producers to sign: a Participant Producer Agreement and a Colorado Addendum. Rodriguez Dec.¶ 4, Ex. A & B. No government body has approved these documents. The Addendum forecloses judicial review of CAA's actions by requiring producers to submit every dispute to binding arbitration. Addendum ("Add.") § 8. A producer therefore cannot challenge CAA's dues amounts or a decision to "terminate" the producer. *Id*. § 7.2.[1] And a producer that fails to pay dues by CAA's deadline faces liquidated damages and

---

[1] CDPHE regulations created a narrow exception by permitting challenges to CAA decisions on "eco-modulation" fee adjustments. 6 CCR §§ 1007-2:1-18.2, 18.2.7(F). Adjustments are capped at 10% of base dues. *Id*. § 1007-2:1-18.9.1(B). CAA opposed even this narrow exception. *See* CDPHE, *Stmt. of Basis & Purpose … ,* at 13 (Nov. 18, 2025).

referral to CDPHE for enforcement and penalties even while arbitrating the amount. *Id.* §§ 5.6.2, 6.2.7. Penalties can escalate rapidly: $5,000 for the first day and $1,500 per day thereafter for a first violation; up to $20,000 for the first day and $6,000 per day thereafter for repeat violations. C.R.S. § 25-17-710(1); 6 CCR § 1007-2:1-18.11.3.

### D. The Act Bars Producers from Disclosing Their Costs to Consumers at the Point of Sale

The Act also provides that "[a] person shall not charge any kind of point-of-sale or point-of-collection fee to consumers to recoup its costs in meeting the obligations of complying with [the Act]." C.R.S. § 25-17-714. Although the Act's "fee" prohibition does not stop a producer from raising prices to recoup its EPR costs, it does prevent the producer from stating those costs as a separate line item that identifies the Act as the reason for the increase. Without this prohibition, some of NAW's members would include a line item on their Colorado invoices identifying the cost increase caused by the Act. Wild Dec. ¶ 16; George Dec. ¶¶ 10, 25. Their purpose would be to inform customers of the Act's costs and to encourage customer support for amending or repealing the Act. Wild Dec. ¶ 17.

### II. THE ACT IMPOSES SUBSTANTIAL COSTS THAT BURDEN NAW MEMBERS AND INTERSTATE COMMERCE

Some NAW members may be producers when they sell products directly into Colorado. Others may be producers when they sell products outside of Colorado to downstream sellers that sell those products in the state. George Dec. ¶¶ 6, 12, 18. NAW's members generally do not manufacture the products they se]ll. *Id*. ¶¶ 4–5; Rodriguez Dec. ¶ 6.

CAA dues relating to a given product can exceed the narrow margin a distributor earns

on a sale. George Dec. ¶ 25; Rodriguez Dec. ¶ 23. Most NAW members cannot reduce these dues by altering product packaging because they generally do not control the packaging consumers receive. George Dec. ¶¶ 4–5; Rodriguez Dec. ¶¶ 6, 25.

Distributors must also incur significant costs to make operational changes to comply with the Act. George Dec. ¶¶ 7–22, 26, 28–30. Distributors often cannot easily determine which company in a supply chain is the producer, because that determination depends on facts distributors frequently cannot know in advance—such as whether a given unit sold in bulk and outside of Colorado is ultimately resold in state. George Dec. ¶¶ 8, 12, 21; Rodriguez Dec. ¶¶ 2, 8–10, 12, 18; Wild Dec. ¶¶ 12–13.

Tracing every unit through downstream channels to its ultimate point of sale imposes a significant operational burden and forces downstream companies to incur compliance costs of their own. George Dec. ¶ 18; Rodriguez Dec. ¶¶ 8, 10. Those downstream companies also might refuse to provide tracing information to the distributor. Rodriguez Dec. ¶ 10.

Distributors also must determine the type and weight of every kind of package ultimately sold in Colorado. Each unit of product can have multiple packaging components. A box of aluminum foil contains seven: the box, its ink, its sticker label, a cardboard roll, a metal cutting strip, glue, and two plastic end caps. George Dec. ¶¶ 13–14. Distributors typically must either obtain this information from their suppliers or analyze the packaging themselves, an expensive option. George Dec. ¶¶ 15–17; Rodriguez Dec. ¶¶ 11–17. Distributors then must assign each component to the correct one of Colorado's 61 materials reporting categories. George Dec. ¶ 15; Rodriguez Dec. ¶¶ 12–15; Plan at 185. NAW members also incur higher costs because supplier pass along their own EPR costs. George Dec. ¶¶ 22, 24, 26.

These cumulative burdens fall most heavily on NAW's mid-sized and small members, which lack the personnel, information systems, and in-house legal resources that enable larger producers to absorb the Act's costs. Wild Dec. ¶¶ 14, 19. Yet these NAW members are too large to qualify for Colorado's small-business exemption. C.R.S. § 25-17-713(1)(a), (e).

The above costs force distributors to raise their own prices. George Dec. ¶¶ 22, 24, 26. For many products, distributors cannot confine these increases to Colorado-bound goods, so that consumers in other states also pay higher prices. George Dec. ¶ 22; Rodriguez Dec. ¶¶ 23–24.

## ARGUMENT

A plaintiff is entitled to a preliminary injunction if it establishes that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). NAW meets every factor.

### I.    NAW IS LIKELY TO SUCCEED ON THE MERITS

#### A.  The Act Violates Due Process by Delegating Regulatory Power to a Self-Interested and Insufficiently Supervised Private Party

The Act violates the Fourteenth Amendment's Due Process Clause because it delegates regulatory power to self-interested private parties: CAA and its board members. In *Carter v. Carter Coal Co.*, the Supreme Court made clear that "one person may not be intrusted with the power to regulate the business of another, and especially of a competitor." 298 U.S. 238, 311 (1936). The exercise of government power by such a private party "clearly [denies] rights safeguarded by the due process clause of the Fifth Amendment." *Id*. The Court struck down a statutory scheme that gave regulatory power to a group of coal producers and laborers to set maximum hours and minimum wages for the industry. *Id*. at 310–11. Courts have continued

to recognize that delegations of government power to self-interested private parties violate due process. *See, e.g.*, *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 821 F.3d 19, 31–34 (D.C. Cir. 2016) ("*Amtrak*") (Amtrak's authority to regulate competitors violated due process).

The Act gives CAA, as the only approved PRO, authority to set the terms, conditions, and fees for all Colorado "producers." CAA does so without significant governmental control of its actions. The state does not determine the contents of a PRO's plan. The Act provides only high-level guidance, and the PRO has broad discretion to decide how to comply with that guidance in devising its plan. CDPHE has *no* discretion to reject a PRO plan as long as the plan satisfies the Act's general requirements. *See* C.R.S. § 25-17-705(5)(b)(II). Without CDPHE approval, CAA selects its Board of Directors and management; imposes all terms that producers must accept to become "members" of the EPR program and avoid enforcement action under the Act; sets the base dues amounts producers must pay; changes the dues schedule; assigns itself the right to terminate producers; and bars producers from access to the courts to challenge CAA (with one minor exception). *See supra* Background § I.C.

CAA is controlled by self-interested private parties: all members of its National Board are representatives of its Founding Member companies—all "producers" under the Act. Some of those companies are competitors of NAW members; others are retailers or suppliers with an interest in making other companies, such as NAW's members, bear a larger share of the EPR scheme's costs. CAA's Board members' "economic self-interest as it concerns other market participants is undeniable" and thus makes them impermissibly "self-interested" for purposes of due process. *Amtrak*, 821 F.3d at 32. Thus, in allowing some industry players to regulate others, the Act's scheme closely resembles the one struck down in *Carter*.

CAA's Board members' self-interest as representatives of large producers creates inevitable conflicts of interest. A conflict of interest exists when disputes arise between CAA and a Founding Member company represented on CAA's boards. If such a dispute is resolved in the Founding Member's favor, other companies—including NAW's affected members—must bear a greater share of the system's costs. Conversely, a conflict exists when a dispute arises between CAA and a distributor who is not represented on CAA's boards: to the extent that a decision places a relatively greater burden on outsider distributors, it reduces the financial burden on CAA's Founding Members. Moreover, to the extent that CAA's Founding Members or board members have access to greater details of CAA's fee-setting methodology, or influence over that methodology, they occupy a privileged position over producers who lack such access. See Wild Dec. ¶ 10. Producers aggrieved by CAA's actions have no recourse in the courts, since the Colorado Addendum mandates that producers submit nearly all disputes over interpretation of the Act and the Plan to binding arbitration. Add. § 8.

Due process requires that an affected party receive "sufficient detail" about an administrative action so that it "can prepare a responsive defense" before being deprived of its property. *K.W. ex rel. D.W. v. Armstrong*, 298 F.R.D. 479, 490 (D. Id. 2014), *aff'd* 789 F.3d 962 (9th Cir. 2015). As explained above, CAA demands payment from producers who cannot determine whether they are being charged for items for which others are also paying producer fees. And if a producer has a legitimate objection or concern, there is no choice but to pay immediately, as failure to do so will result in rapidly rising penalties. *See supra* Background § I.C. Because CAA effectively operates as a state actor for the imposition and collection of regulatory fees, the lack of adequate notice and opportunity to be heard violates

10

procedural due process. Colorado may not evade due process rights by delegating regulatory authority to a private entity with which regulated parties are forced to contract.

### B. The Act Violates Due Process by Conditioning Access to the Colorado Market on Submitting to Regulation by CAA

The Act also violates the unconstitutional-conditions doctrine: that government "may not deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Mgmt. Dist*., 570 U.S. 595, 604 (2013). This doctrine "prevent[s] the government from coercing people into giving [rights] up." *Id*. Here, the state conditions the right to sell lawful goods in interstate commerce on producers' submission to CAA's terms. But that right is "not a special governmental benefit that Government may hold hostage, to be ransomed by the waiver of constitutional protection." *Horne v. Dep't of Agric*., 576 U.S. 350, 366 (2015). The Act forces producers to pay just such a ransom because they must pay EPR fees and submit to regulation by a self-interested party with no recourse to judicial review.

This waiver of the right to sue CAA in court independently violates the doctrine, because a state may not force a corporation to waive its right to a federal judicial forum as a condition of doing business in the state. *S. Pac. Co. v. Denton*, 146 U.S. 202, 207 (1892); *accord Koontz*, 570 U.S. at 607 (citing *Denton* as an example of an unconstitutional condition). But for the Act, out-of-state producers would be entitled to litigate disputes with CAA exceeding $75,000 in federal court. 28 U.S.C. § 1332(a)(1). The Act forecloses that forum entirely—the coerced waiver *Denton* forbids.

Finally, Colorado's EPR fees lack the "nexus" and "rough proportionality" the doctrine requires between what the government demands and the costs the applicant's own conduct imposes. *Koontz*, 570 U.S. at 605–06 (citing *Dolan v. City of Tigard*, 512 U.S. 374,

391 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987)). Distributors' fees not only fund recycling of their own products' waste, but also the waste of exempt producers and other parts of the program such as a statewide education program. *See supra* Background § I.C. The State thus uses EPR fees as a means of "extortion," *Koontz*, 570 U.S. at 606, from those who exercise their right to engage in interstate commerce.

### C. The Act Violates the Dormant Commerce Clause by Imposing Burdens on Interstate Commerce that Are Heavy and Entirely Unnecessary

The Act also violates the Dormant Commerce Clause, which "effectively forbid[s] the enforcement of certain state [economic regulations] even when Congress has failed to legislate on the subject." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (cleaned up). A state law violates the Commerce Clause when it imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Under *Pike*, whether a burden is constitutionally permissible depends "on whether [the local interest involved] could be promoted as well with a lesser impact on interstate activities." *Id*. A majority of the Justices recently reaffirmed the *Pike* test and confirmed that it reaches nondiscriminatory burdens. *Pork Producers*, 598 U.S. at 396 (Roberts, C.J., concurring in part and dissenting in part); *id*. at 403 (Kavanaugh, J., concurring in part and dissenting in part).

Here, the Act imposes extensive burdens both in "immediate costs of compliance" for producers operating in interstate commerce and in broader "consequential [] harms" to "the interstate market itself." *Pork Producers*, 598 U.S. at 398–99 (Roberts, C.J.). Its "economic impact," *id*., radiates beyond producers regulated by the Act to burden companies across the distributor-producers' interstate supply networks and consumers in other states.

12

The Act's "producer" definition extends upstream, away from the point of sale, *see supra* Background § II.B, reaching numerous NAW members. The Act imposes substantial burdens on these distributors precisely because they are enmeshed in complex, multistate supply networks. These burdens include tracing individual units sold into Colorado, *see supra* Background § III.A, B; identifying every packaging component in every product, *id.* § III.B; matching components to Colorado's 61 materials categories, *id.*; the downstream and upstream compliance costs those determinations impose on suppliers and customers, *see id.*; EPR dues that can exceed a distributor's sales margin, *id.*; and price increases that distributors cannot confine to Colorado-bound goods, *id.*

The Act's requirements force distributor-producers and other businesses to make the kinds of substantial changes to their "established operational practices," *Pork Producers*, 598 U.S. at 401 (Roberts, C.J.), that harm "the interstate market itself," *id.* at 399. The out-of-state price increases also can be a cognizable burden on interstate commerce. *Id.* at 386 (opinion of Gorsuch, J.) (distinguishing higher prices imposed on out-of-state consumers from higher prices felt by in-state consumers who voted for the law). *See also id.* at 406 (Kavanaugh, J.) (costs passed on to consumers "via higher ... prices nationwide" are cognizable market-wide harms). These burdens are excessive under *Pike*.

The Act's putative local benefit is increasing Colorado's recycling rate, *see, e.g.*, § 25-17-702(1)(c)–(d), but nothing shows that the Act's funding shift serves that goal. CAA's own "Needs Assessment" attributes projected recycling increases to expanded curbside access and public education—not to the Act's funding shift. Law Dec. ¶ 17 & Ex. O at 10.

These CAA statements show that the putative benefits of higher recycling rates "could

be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142. Colorado could serve its goal of increasing recycling with barely any disruption to interstate commerce: by using the local funding sources previously used by Colorado cities and counties, *see supra* Background § II.A, or by funding CAA from the state's General Fund. Because Colorado can achieve the same benefit without imposing a significant burden on interstate commerce, the Act violates the Dormant Commerce Clause under *Pike*.

**D. The Act Violates the First Amendment by Forbidding Producers from Itemizing the Cost of the EPR Program on Consumer Invoices**

The Act violates the First Amendment by forbidding producers from communicating the cost of EPR dues to consumers in the form of a "fee" stated on invoices. Section 714 states that a producer "shall not charge any kind of point-of-sale or point-of-collection fee to consumers to recoup its costs" of paying fees to CAA or complying with the Act. C.R.S. § 25-17-714. The statute does not prohibit producers from increasing overall prices to cover the costs of the Act. Rather, it prohibits producers from *informing* customers of the *reason* for that increase by identifying it as a "point-of-sale or point-of-collection fee" on an invoice or bill.

That is how courts have viewed similar regulations on charging customers for taxes, fees, or surcharges. The Supreme Court held that a law prohibiting stores from imposing a surcharge on credit-card transactions at the register "regulat[ed] the communication of prices rather than prices themselves," as "[a] merchant who want[ed] to charge $10 for cash and $10.30 for credit [could] not convey that price any way he please[d]," though he could charge those prices. *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47–48 (2017). Similarly, the Fourth Circuit held that a Maryland statute that prohibited sellers of digital advertising

14

from "pass[ing] on the cost of the tax … to a customer … by means of a separate fee, surcharge, or line-item," was a restriction on speech because it "restrict[ed] the ways that a price increase can be *communicated*." *Chamber of Com. of the U.S. of Am. v. Lierman*, 151 F.4th 530, 536 (4th Cir. 2025). As that court explained, "'surcharge' and 'fee' are usually ways to split total costs into their parts—and to then tell customers about them." *Id*. at 537. *See also BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499, 506 (6th Cir. 2008) (Kentucky statute that prohibited telecommunications providers from listing a tax imposed on providers on customers' bills "regulate[d] speech").

By prohibiting producers from conveying a particular message on their invoices, Section 714 imposes a content-based restriction on speech. The Act's ban on fees restricts speech that is highly similar to one of "the oldest American political traditions": "complaining about taxes." *Lierman*, 151 F.4th at 541. In *Lierman*, the Fourth Circuit deemed Maryland's similar ban to be "content based and presumptively unlawful." *Id*. at 540. Likewise, the Sixth Circuit found a Kentucky law that prohibited telecommunications providers from "separately stating" a tax on customers' bills to be content based, *BellSouth*, 542 F.3d at 510, emphasizing that it "permit[ted] legislators to duck political responsibility for the new tax," *id*. at 505. Colorado's own description of the program as providing "[f]ree recycling for all residents of Colorado," *see supra* Background § I.A, underscores the same interest in obscuring who actually bears the cost.

The restriction is therefore subject to strict scrutiny, which it fails. It can survive only if the government "prove[s] that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). Section

15

714 fails that test because it does not serve a compelling government interest, much less do so in a narrowly tailored manner.

*BellSouth* and *Lierman* suggest two interests the government might assert—and explain why those purported interests cannot justify the ban. *BellSouth* rejected the government's argument that a similar line-item ban served its interest in preventing consumer confusion over who is legally and financially responsible for a tax. 542 F.3d at 504, 507. Neither common sense nor any evidence suggested consumers were or would be confused. *Id*. at 509. Likewise, Colorado could have no basis for any claim of consumer confusion resulting from the conveyance of truthful information.

*Lierman* similarly rejected the state's asserted interest in ensuring "that companies bear economic and legal responsibility for the tax." 151 F.4th at 541. The law was clear that companies, not consumers, were legally responsible for the tax. *Id*. As for economic responsibility, the fee ban made no difference, as companies could raise prices whether or not they identified part of the price as reflecting a tax. *Id*. It is the same here: The Act places legal responsibility for payment of CAA dues entirely on producers; listing a fee on an invoice cannot change that. And producers can raise prices to pass on "economic responsibility" regardless of whether they put a fee on their invoices. Thus, Section 714 does not withstand strict scrutiny and violates the First Amendment.

Defendants might argue that Section 714 is a restriction on commercial speech and thus subject to intermediate scrutiny. But the prohibited statement on an invoice is not commercial speech, since it does not propose a transaction or relate solely to the parties' economic interests. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S.

16

557, 561–62 (1980). *See Bloom v. O'Brien*, 841 F. Supp. 277, 281 (D. Minn. 1993) (an "itemized bill … does not propose a transaction as such").

But even if stating a fee on an invoice were commercial speech, Section 714 would still fail *Central Hudson.* Colorado cannot identify a substantial governmental interest in banning point-of-sale or point-of-collection fees, as discussed above, so the ban cannot serve any such interest, nor can it be adequately tailored to it. 447 U.S. at 566.

### E. The Act Violates the First Amendment by Compelling Producers to Join CAA and Fund Its Advocacy

The Act also violates the First Amendment because it compels producers to join CAA and subsidize its speech, including political messages that NAW members disagree with. The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). This protection encompasses a "freedom *not* to associate," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984), and prohibits the government from forcing a private party to subsidize another's speech. *Janus v. AFSCME, Council 31,* 585 U.S. 878, 894 (2018). When the state compels payments to a private organization that engages in speech, especially political speech, it "imposes a significant impingement on First Amendment rights." *Knox v. SEIU, Local 1000*, 567 U.S. 298, 310–11 (2012). Compelled speech and association face "exacting" scrutiny, requiring the state to show that its mandate serves "a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Janus*, 585 U.S. at 894.

The Act triggers this scrutiny by forcing producers to join and fund CAA, an organization engaged in public advocacy. CAA promotes EPR laws as the preferred vehicle to increase recycling, minimize waste, and improve the environment, *see, e.g.*, Law Dec. ¶ 3

17

& Ex. A (CAA *FAQ*), and pursues the political goals of seeking to establish itself as the dominant multi-state administrator of EPR laws. Law Dec. ¶ 19 & Ex. Q (CAA press release describing "CAA's vision … to operate as a PRO in all states that have enacted EPR laws").

NAW members disagree with CAA's speech on these matters. They support sustainability, but they disagree with CAA's message that broad EPR laws funded by producers advance that goal. Wild Dec. ¶ 17. And they disagree that a private organization should be the *de facto* interstate regulator with monopolistic control of EPR programs. *Id*.

This impingement on NAW members' rights cannot survive exacting scrutiny: Even if the state asserts a compelling interest in providing recycling services or reducing waste, it can achieve those goals "through means significantly less restrictive of associational freedoms." *Janus*, 585 U.S. at 894. It could, for example, administer a recycling program directly by contracting with service providers or fund CAA through general revenues. *See id*. at 892–93. Because the state can serve its goals without forcing producers to join or subsidize a private entity that engages in advocacy, the Act violates the First Amendment.

## II. NAW'S MEMBERS WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION

Absent a preliminary injunction deferring enforcement of the EPR program, NAW's members are "likely to suffer irreparable harm." *Winter*, 555 U.S. at 20; *see also Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (plaintiff satisfies this burden by showing a "significant risk of irreparable harm"). First, they will continue to suffer violations of multiple constitutional rights, and "[w]hen a plaintiff is asserting an injury in the form of a violated constitutional right, [courts] presume that the injury will be irreparable." *Ortega v. Grisham*, 148 F.4th 1134, 1142 (10th Cir. 2025). This principle applies to "[a]ny

18

deprivation of any constitutional right." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) (Fourteenth Amendment's Equal Protection Clause); *see also Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (First Amendment); *Ortega*, 148 F.4th at 1142 (Second Amendment).

Second, absent an injunction, NAW's members will be forced to continue to pay fees and incur massive costs to comply with the Act, yet cannot recover damages from the Defendant because of sovereign immunity. That harm is not speculative: CAA began invoicing "producers" in January 2026, with payments due as early as February. George Dec. ¶ 23. The "[i]mposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." *Crowe & Dunlevy*, 640 F.3d at 1157 (citations omitted). NAW members also face a substantial risk that they would not be able to recover from CAA either. CAA is funded exclusively by producer dues and must expend those funds as they come in to fund its many activities. If the Act is ultimately permanently enjoined, CAA may have no source of funds with which to pay a judgment. *See Philip Morris USA Inc. v. Scott,* 561 U.S. 1301, 1304 (Scalia, Circuit Justice 2010) (where fund at issue could be depleted before litigation is concluded, "the resulting loss may be irreparable").

### III.   THE EQUITIES AND PUBLIC INTEREST TIP STRONGLY IN NAW'S FAVOR

The balance of harms and the public interest—which collapse into one consideration when the government is a defendant, *Ortega*, 148 F.4th at 1142—also favor NAW. Violations of constitutional rights tip this dual balance toward the plaintiff and against the government because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132 (internal quotation marks omitted); *see also Free the Nipple*

916 F.3d at 806 ("When a constitutional right hangs in the balance, [] even a temporary loss usually trumps any harm to the defendant." (citation omitted)).

## CONCLUSION

NAW respectfully requests that the Court issue a preliminary injunction barring Defendant from enforcing the Act and regulations promulgated thereunder, and to take such steps as necessary to defer the EPR payment obligations of NAW's members.

DATED: August 5, 2026

Respectfully submitted,
*/s/ Andrew J. Morris*
Andrew J. Morris #DC411865
Jacob H. Huebert #IL6305339
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
(202) 869-5210
Attorneys for Plaintiff

## **Local Rule 7.1 Certification**

Pursuant to D.C.COLO.LCivR 7.1(a), I hereby certify that on July 30, 2026, I conferred with Rebecca Fischer, Assistant Attorney General in the Natural Resources and Environment Section of the Colorado Attorney General's Office, who stated that Defendant will oppose the above motion.

*/s/ Andrew J. Morris*
Attorney for Plaintiff

20