**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS, | ) | |
| Plaintiff, | ) | 3:25-cv-01334-SI |
| vs. | ) | February 6, 2026 |
| LEAH FELDON, et al., | ) | Portland, Oregon |
| Defendants. | ) | |

(Motion Hearing)

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL H. SIMON

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES

FOR THE PLAINTIFF:
David Ryan Carpenter
Caleb J. Bowers
Sidley Austin, LLP
350 South Grand Avenue
Los Angeles, CA 90071

Darin M. Sands
Bradley Bernstein Sands, LLP
1211 NW Glisan Street, Suite 204
Portland, OR 97209

FOR THE DEFENDANTS:
Sara D. Von Loh
Alexander Charles Jones
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201

COURT REPORTER:
Dennis W. Apodaca, RDR, FCRR, CRR
United States District Courthouse
1000 SW Third Avenue, Room 301
Portland, OR 97204
(503) 326-8182

INDEX

Motion hearing 4

(February 6, 2026)

P R O C E E D I N G S

(Open court:)

THE COURT: Good morning, everyone.

Mary, will you please call the case.

THE CLERK: We are here in the matter of National Association of Wholesaler-Distributors v. Feldon, et al.; Case No. 3:25-cv-1334-SI.

I would like to invite counsel for plaintiff to enter your appearance for the record.

MR. CARPENTER: Good morning, Your Honor. David Carpenter of Sidley Austin on behalf of Plaintiff National Association of Wholesaler-Distributors.

THE COURT: Good morning. Welcome.

MR. BOWERS: Good morning, Your Honor. Caleb Bowers of Sidley Austin on behalf of Plaintiff National Association of Wholesaler-Distributors.

THE COURT: Good morning. Welcome.

MR. SANDS: Good morning, Your Honor. Darin Sands, Bradley Bernstein Sands, on behalf of plaintiff.

THE COURT: Good morning.

And counsel for defendants, please.

MS. VAN LOH: Good morning, Sara Von Loh for the Oregon Department of Justice for Defendants Environmental Quality Commission and Department of Environmental Quality.

THE COURT: Good morning. Welcome.

MS. VAN LOH: And we have Alex Jones also from the Department of Justice. We have Jennifer Parrott from DEQ with us here today.

THE COURT: Good morning.

Let me ask counsel for plaintiff, if there are other folks at the table you would like to introduce, you're welcome to.

MR. CARPENTER: Yes, Your Honor. Thank you. I have Brian Wild and Karen Harned of NAW.

THE COURT: Welcome.

All right. I'll start out by saying something that I'm not sure lawyers like to hear from a judge or not, but this is a fascinating dispute.

All right. We are here on two motions. We have plaintiff's motion for preliminary injunction or temporary restraining order, Docket 33. We have defendants' motion to dismiss, Docket 68. I don't see any good reason to separate out argument on those two issues. But since plaintiff filed the first motion, I'll let plaintiff begin with arguing the points it wants.

I'll assure you all, I've read all of the memoranda that you filed. I have read many of the declarations and exhibits -- not all of them, but many. I think I understand the issues.

So what I would encourage you to do is to argue the points that you think are strongest in favor of your side and to respond and tell me why the other side's strongest arguments are not as persuasive as they may think. There is no need to feel like you have to do a comprehensive inventory of every argument you've made in your briefs. Don't do that. Focus on the strength of your arguments and telling me why the other side's strongest arguments aren't as strong as they might originally appear.

All right. I will certainly let plaintiff argue first and then defendants. I will let plaintiff respond. My typical practice is if somebody really wants to say something new in response to what the other side has recently said, I will let them do it. I will let you keep going back and forth until you've all said everything. There is no need to repeat yourselves.

Depending upon timing, probably we will take a break in about an hour or so, or whenever our court reporter asks for one.

All right. Mr. Carpenter, you may proceed.

MR. CARPENTER: Thank you, Your Honor. I have a PowerPoint. It's about 75 pages.

THE COURT: Wonderful. And I see you have two copies for the Court.

MR. CARPENTER: I'm joking. It's very short. But I

do have copies for everyone.

THE COURT: I'll take two copies for the Court.

MS. VAN LOH: Your Honor, I do want to point out that we have not had the opportunity to review this PowerPoint in advance of this hearing.

THE COURT: Me neither.

MS. VAN LOH: Very good.

MR. CARPENTER: Thank you, Your Honor. David Carpenter on behalf of plaintiff, National Association of Wholesaler-Distributors.

NAW and its members, we support sustainability. We support a circular economy. But the program here is neither sustainable nor constitutional. I think when Your Honor says the disputes are "fascinating," in a sense, I agree. They are fascinating because of the unprecedented nature of this program.

It is unprecedented in scope in the number of products that it touches and covers. It is not a traditional EPR program that is specific to a particular product or product type. It touches virtually every product that is sold or distributed in commerce, including the secondary and tertiary packaging that is necessary for that distribution.

There is a broad delegation, as Your Honor identified at the last conference, to this private entity that is controlled by large companies and the competitors of NAW's

members.

THE COURT: Although as I've been studying it further, I do think that the right terminology is to focus on a due process framework rather than a delegation framework, which I view as sort of more of a separation of powers argument. We don't have the federal delegation issue with us. And I think from the motion to dismiss, we're not going to have a state constitutional delegation issue. So most of what I was thinking about previously about delegating to private entities really is properly analyzed under the rubric of due process.

MR. CARPENTER: I agree with Your Honor on that. It is a due process issue where there's a species of a private delegation cases coming out of Carter Coal read exactly. And what ultimately comes out of this program are these fees that are imposed on NAW's members and the other "producers." And these fees are nontransparent, they are exorbitant, and they are retrospective.

As part of the presentation, what I would like to do is really talk about the structure of this program and the issue, particularly with these fees, that then feed in and actually cut across each of the constitutional claims. So I want to focus by talking upfront more about how this program really works and how it impacts the businesses.

So you have, at the outset, this confidential methodology for the fee setting that is not disclosed to CAA's

members at large or the public.

THE COURT: By the way, why is it confidential?

MR. CARPENTER: My understanding is that CAA views at least some data within it as trade secret or proprietary, as if there was some other competing PROs that were out there to try to usurp their business opportunity.

THE COURT: I hear the labels, but I don't understand that. I'll ask the defendants in more pressing detail on that question. But what's your best understanding of what's in there that's proprietary that the Board of CAA is worried that somebody else could copy?

MR. CARPENTER: I will leave that to the defendants.

THE COURT: Okay.

MR. CARPENTER: While we're on it, there are some references to that exhibit that were filed under seal that I would like to refer to in court. I'm not going to refer to any specific numbers. If I need to not talk about the document because it's under seal, I won't. But I think I can talk about high-level generalities without a problem.

THE COURT: If there is any objection to that, we will hear from them. I brought it up with me. I have that sealed document with me. If you want me to look at "page X, lines Alpha through delta," I can do that, and we don't need to say them out loud here.

MR. CARPENTER: Very well.

But the product of this methodology are these fees, and here is a key point, because the fees themselves, they're not actually set or published or approved by DEQ. DEQ blessed a general plan, but it's ultimately CAA that determines what fees it is going to charge to its members -- to producers -- and then CAA is left with the discretion to raise those fees, again, without needing DEQ approval.

And what the declarations show -- and this really isn't disputed -- these fees frequently exceed the margins that are associated with selling the products. These fees are frequently exorbitant percentages of the actual selling price of the product. And there was never in all of the documents and all of the plans and the regulatory process never any economic analysis of the impact on businesses or customers.

THE COURT: So is it your position that the Board of CAA did that, at least in part or with a substantial factor motivation, to hurt or keep out some of its competitors, and if so, why don't we see an antitrust claim? Some of these cases have antitrust claims.

MR. CARPENTER: That is a very interesting aspect of it. I think the antitrust angle is an overlap of whether it's considered a state entity or not. I agree there's an absolute element of antitrust in there, because there's a significant way in which these fees operate to drive out mid-sized businesses and smaller businesses as well while uniquely

benefiting the larger companies who have vertical integration, who have more market power, and can actually absorb those costs while squeezing out their smaller competition. That's absolutely an aspect of this case.

THE COURT: Yeah. The concern I had when I saw that is that when a state agency delegates some price-setting authority to private entities -- and, of course, some competitors -- well, whether they get antitrust immunity or not, Parker v. Brown, will depend upon who sort of has the last word on this and why. I get what you're saying here. So then I was curious why there wasn't an antitrust claim -- not I'm asking for you to file one.

MR. CARPENTER: We can go back and file one for you, if you want, but we are pretty happy with our constitutional claims as they stand.

But then another aspect, though, of the fee setting that is really remarkable is that they're not actually tailored to the true environmental goals or the specific requirements of the products. We say that in the sense that we have our members already using state-of-the-art recyclable packaging, and they're still being hit with these exorbitant fees. There are exorbitant fees being applied to food packaging -- this is in the Winkle declaration -- packaging that is necessary for food safety and to prevent spoilage. And those materials are being smashed with the exorbitant fees.

THE COURT: Let me just ask you hypothetically -- I know the law was passed in 2021, but it just began implementation last year. What if part of the purpose is to start building up a fund to help this program sort of blast into the future, and that's why fees might be at the level that they are?

MR. CARPENTER: Well, I think that is actually explicitly what's happening right now. The fees being charged are not proportionate to the actual costs of disposing of the products right now. They are intended to actually act as a tax to build a new public infrastructure program.

THE COURT: Let's assume that's right. What's wrong with that?

MR. CARPENTER: Because it's a tax that is not transparent, and there is no accountability. It would be one thing if we were to tell consumers, "This is the additional amount that you need to pay for these products so that we can build this system." Instead what's happening, it's being pushed up the supply chain in these obscure and non-transparent ways so that when consumer prices go up, who knows why they're going up? Is it tariffs? Is it inflation? Is it something else?

THE COURT: That may be good or bad public policy, but why is that a constitutional problem?

MR. CARPENTER: So part of it goes to the due process

issue. These are retrospective fees that are being imposed without notice and accountability. Part of it also goes directly to the Dormant Commerce Clause issue about the extraterritorial effect. And here's why: When you have fees that are being imposed on products that exceed the margin and that can't be allocated to the cost, well, what are you going to do? You have to spread it out over your entire product base. So even if the product isn't going to Oregon, you have to raise prices on the products that are going to Nevada and that are going to Alaska. That's also particularly true with retrospective fee setting.

I want to make sure we understand what we are talking about here. In 2026, producers are paying fees based on their 2024 volumes. So even if my volume has cut half in Oregon, I still have to pay based on more product than I'm actually selling. So I can't actually accrue the EPR fees in connection with 2026 sales. How am I supposed to bill those? I have to apply the sales to products being sold elsewhere.

And funny enough, in actually re-reading the materials for the hearing, I found in the Wild declaration, the declaration of Brian Wild -- it's Exhibit D, page 18. And this is where DEQ was talking about the fiscal impacts of the program. And what DEQ said is -- you know, we don't know -- we tried to analyze what the impact on Oregon customers would be. They said, "Economic theory predicts that a portion of producer

costs will be passed on to consumers in the form of higher shelf prices, although producers that sell into multiple states may recover these across customers in multiple states, thereby reducing the price impacts on the public in Oregon."

So here we have a program to build a brand-new state infrastructure in Oregon to pay Oregon local governments. And who is going to pay for it? It's a brilliant plan. Nevada. We will get the citizens of Alaska to pay for it. We'll get the citizens of Washington to pay for it -- by charging the producers fees that we know they are going to have to allocate to customers in other states.

THE COURT: By the way, what's the long-term consequence of this? Because I know that we have similar laws in California, Colorado, Maine, Maryland, Minnesota, and Washington. I know that Illinois, Hawaii, and Rhode Island are considering similar laws. What's the long-term plan?

MR. CARPENTER: Well, that's exactly part of the problem, right. So there are a couple of different issues. One is, as you have more and more states coming online, you create this risk for conflicting environmental standards, conflicting charges, and duplicative charges. So we have already established that the Oregon fees are going to be passed on to customers in Nevada or passed on to customers in California. Well, when California comes online and imposes its own fees, well, those fees are going to be passed on to

customers in Oregon as well, so now Oregon is now paying for California's program. That is the problem in Wynne, where basically the effect of duplicity of taxation or tariff across multiple states, when you have multiple of these programs coming online.

I'll also note, by the way, in CAA's financial report, where it talks about its auditors are saying that there's uncertainty about CAA's ability to continue as a going concern. That's auditor speak for "they might go bankrupt." And here, the plan is to mitigate that. One, CAA is coming online like all the other states. Two, CAA is required to exist by law. And three, CAA is supported by its founding members.

That cuts across all of our constitutional claims. CAA's solvency is dependent on the large companies that sit on its board. CAA is expecting, presuming that it's going to be in the role of an interstate tax fee setter and collector. And it has to exist. People have no choice but to sign up with these. That is each of our claims: Due process, Commerce Clause, and unconstitutional conditions across the board.

THE COURT: What's happening at the national level? By the way, I really just mean in connection with these issues. What's happening with respect to EPR at the national level on plastics?

MR. CARPENTER: I can say that there is an economic

group that was formed to analyze the effect -- or was requested and had companies submit comments on the interstate burdens created by these laws that's among the topics that are being discussed.

We believe that there needs to be solutions to recyclability. There needs to be improvements, right. But it needs to be done in the right way. It needs to be done in a constitutional way. A national solution would certainly be one way of doing it. Another way of doing it is how it would historically be done in EPR programs or through point-of-sale fees that are more transparent.

It's one thing when a customer walks into a store and says, "Oh, I have a $16 collection and disposal fee on my mattress." They might think, hey, that's a lot. Okay, I guess a $16 fee relative to the cost of my mattress. Okay, I guess that makes sense.

The problem here is because the fees are not product -- they're not tied to products -- there's no point in which there is accountability or visibility to the customer, so they can see: Whoa, that's outrageous. Why are the EPR fees 40 percent of the cost of my product? Why is it suddenly more expensive for me to buy fresh produce in the grocery store? Why are all of these products that have been shipped from other states for my food sort of disappearing off the shelves? Whoa, why can I only get this product now from the

large companies that are sitting on the Board rather than the smaller companies that used to actually operate in Oregon and operate distribution centers in Oregon, but now it's not economical for them to do so?

I bring it back to the retrospective fee setting also, because this is where we don't really hear any response from the State about how do you deal with that, except for them to say, "Well, look, if your volumes go down in 2026 or you adopt more environmentally friendly products in 2026, don't worry about it. You'll see reduced fees in 2028."

So a couple of problems with that. One, we don't know that. We don't know what the fees are going to be in 2028. But two, this is not like friends ordering pizza or getting rounds of drinks. You can't just say, "Hey, man. Go ahead and pick up this round, and I'll get the next one." It's not sufficient for businesses who are already operating on thin margins, right. We are talking about 1 to 2 percent, 3 percent total profit margins for the entire company, these mid-sized and small-sized distributors.

It's not sufficient when they have volatile or changing products, multistate distribution chains, just to say, "Hey, don't worry about it. In two years maybe we'll make it up to you."

Now, do you know who that actually does kind of work out for? The really big companies. Because they have more

predictable sales year-to-year. They can absorb the cost in the short term. They are vertically integrated, and so they have more visibility and control over their supply chains. And they also have a broader product range to spread out the fees. So again, this comes to a situation where the whole scheme seems to be set up to drive the mill out of business in favor of the larger companies in order to fund -- really what this is is a brand-new transportation project.

THE COURT: Let me ask you this: I did find Professor Morath's amicus brief to be very interesting. That's Docket 57-1. She talks about how EPR is not new. It has been going on for almost 40 years. It's in many states on many, many different types of products.

Can you give me almost a bullet point response to how the program that you are challenging here is constitutionally different from the almost 40 years' worth of EPR programs and those wide variety of other products?

MR. CARPENTER: Sure. We lay that out in our reply brief in full detail. The bullet points are, one, those programs are product specific. So they provide more transparency and clarity into what's happening. In many cases they are point-of-sale fees that are actually directly set by the legislation or by the regulators, and so there's more transparency into the fee structure, or there's just a smaller, more contained scope of program.

Caleb, can we go to the Alameda slide. This is actually a great example of that. So this is one of the cases that defendants rely on where an EPR program for pharmaceutical buybacks survived a Dormant Commerce Clause challenge. Let's look at the comparison to the programs. So this is an unused drug buyback program for the County of Alameda. The total program costs were about $530,000 to $1.2 million per year. There were actually two PROs who were administering that total volume. That amounted to about $5,000 to $12,000 in charges for a company per year as against a $950 million income stream just in the county for those companies.

Here, in contrast, we have a $730 million project identified in CAA's plan and left to CAA to set the fees to determine the total costs. Even that cost is an estimate. If the costs go up, their fees go up. You have obligations against the producers of 500,000 -- hundreds of thousands of dollars or more -- with fees often exceeding the product margins. So then a typical EPR program -- like with the mattresses -- you have a fee. You have the product. You can identify whether there's a rational relationship between it. You don't have that here.

We see that also echoed in the amicus brief filed by the Air-Conditioning, Heating, and Refrigeration Institute, American Lighting Association, and the Association of Home Appliance Manufacturers. It's a fantastic brief. I don't know

if you've had a chance to fully read it, but they talk about, look, we're selling these products that require particular packaging required by federal regulations, required for employee safety in order for their transportation and distribution and storage in commerce. We need this packaging.

They already are doing everything they can to make that packaging as sustainable as possible while also being able to perform. I get that, yeah, you've got to dispose of the packaging. But do you know what's more wasteful than the packaging? Having a 700-pound refrigeration unit break in transit. That is hard to dispose of. So, yeah, we want that packaging. It makes no sense to impose exorbitant fees on that type of packaging, when it's necessary for the performance, but there's a zero analysis. There is zero opportunity even within this statutory scheme to conduct that. There was no attempt by DEQ to do it. And that very much distinguishes it from the typical programs where they're targeted, they're focused. This is literally every product in commerce without product-specific analysis.

I could walk through the different claims based on what we've covered. I think Your Honor has a grasp on them, or I could respond to specific questions on them.

THE COURT: Would there be any constitutional arguments left if this type of program were administered by the DEQ, were run by the DEQ, the fees were set by the DEQ, and

there would be notice, comments, judicial review? Because I start out with the assumption that plastics are a major problem to our global ecology. Packaging is a large part of that problem. We need to do something. So if DEQ or the various state regulators in each state were to do this directly themselves as opposed to delegate this to private businesses in the way at least that the Oregon plastics pollution law has done, would there be any constitutional problems then? Would you still have a Dormant Commerce Clause problem?

MR. CARPENTER: Yes. Especially the way it's being done right now and especially where it's done in a way that's kind of potentially designed to make people in other states bear the fees. You're still going to get a lot of the conflict. I think that would be mitigated if it were converted to a point-of-sale fee and done kind of more in reference to products, but you would have to see how it's done.

THE COURT: So is the right solution a national system done with full field preemption and a national administrative agency to run this?

MR. CARPENTER: That would be one solution.

THE COURT: Is there a better solution?

By the way, that's not my job, but I do want to understand all of the dimensions of this problem.

MR. CARPENTER: Absolutely. I think this case screams like the quote from the Supreme Court in Dolan: A

strong public desire to improve the public condition will not warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.

If we need a national solution to plastic waste, it probably should come as a national solution, not a patchwork of different states imposing conflicting fees where products may or may not being disposed of in the state, where the fees are necessarily spilling over to other customers, conflicting environmental regulations, much less than saying, "Don't worry. We'll have a single private entity run it all."

THE COURT: On the other hand, we are in a federalist system. We do have statements from Justice Brandeis about the states being "the laboratory of experiment." We can try different ways. And if the way that state 1 tries it, works, and state 2 tries it doesn't work, well, then maybe more states will try it state 1's way.

What's wrong with that?

MR. CARPENTER: So I think for the reasons that we've covered right now, the way that state 1 -- Oregon -- is trying it is not constitutional across the multiple dimensions that we are talking about, and there needs to be care to make sure that it's actually being confined to the orders of the state.

We talk about that also in our papers, about how, when you have the products in the distribution centers, you don't know whether or not it's going to be disposed of in

Oregon. You don't know if it's going to be sold there. That's a major problem.

We will note also on the national point, there have been national solutions done for these major issues, like the Clean Water Act, like the regulation of hazardous waste. This is absolutely something that will be appropriate for --

THE COURT: Let's drill down a little bit more on your Commerce Clause argument, your reference to the Wild declaration, Exhibit D, page 18.

As I understand your argument, the problem here is that we have out-of-state wholesalers and distributors. Part of the way that they can maybe afford the Oregon plan is to basically charge more elsewhere or be absorbing the prices in other states. That's not classically what I understand to be a Dormant Commerce Clause problem. The Dormant Commerce Clause essentially is, or at least classically is, we're going to help our local businesses at the expense of out-of-state businesses. I don't quite see that here. Pike is in utter confusion after Pork and may not have much left anyway after the Pork case.

So am I right that this is not a classic Dormant Commerce Clause problem?

MR. CARPENTER: No. I would disagree with that, because, in part, packaging truly is an instrumentality of commerce, when you talk about the secondary and tertiary packaging that is really necessary for distribution. That puts

us more in a line of instrumentality of commerce cases.

There is an element of this in-state/out-of-state tension in this case that we have just been talking about. Normally you would do an EPR program at the local level. You have a charge on the consumer. You have a charge that is assessed by the retailers. Here, there's a very intentional effort to push those charges onto the people that are operating in interstate commerce and away from the local level on the thought that, yeah, maybe some of those costs get passed back down to customers, but also maybe some of those costs get passed to other people. That is absolutely an in-state versus out-of-state protectionist kind of policy that resonates with the Dormant Commerce Clause.

I would note that Pork Producers -- Pike is still alive after Pork Producers. It is referenced, recognized. This really does trigger the reasons why Pike should exist, when you have a system that is really designed to shift costs to residents in other states.

It's also a situation where -- I will go back and explain it -- of why you really are regulating the movements of products through Oregon and not just the quality of products sold into it. So we talk about these are complex, logistical, multilayer distribution centers. You, as a seller, when you put your packaging together, and you set your fees, and you send it to a regional distribution center, you don't know

whether or not it's going to end up in Oregon. So you have to then set your prices to budget and account for Oregon EPR fees, even if it's going somewhere else. Or you have to completely rework your supply chains. The other problem --

THE COURT: To that extent, does it discriminate against interstate commerce in favor of intrastate commerce?

MR. CARPENTER: There is an element of that, because if you are operating purely in intrastate commerce, you don't have these concerns. You have a much more transparent -- you don't have a concern of: Am I paying fees on products that are going outside?

It's really a unique and disproportionate burden on people that are operating across multiple states.

But the other aspect of it is it's affecting products that are not even going to Oregon. I know that the other side has talked about, well, well, that's not really true. You only pay fees on products that are disposed of in Oregon.

Let's talk about how that realistically works. You, as a distributor, or even as a seller upstream, don't necessarily know where the product is going to end up. And you don't have control over the downstream distributors or sellers or where they're selling to. So the way an audit would work is you might have evidence of, well, I know that these sales went into Oregon. I have to pay fees on that, unless I somehow can prove that it thereafter left the state, which I don't have the

tracking to do. And I don't have the visibility to do.

So the effect is necessarily that the program is going to charge fees on products that enter Oregon even if they leave.

THE COURT: Under what circumstances would they leave other than being transported by the end-user when the seller in Oregon wouldn't know about it? Presumably if a seller brings something into Oregon and resells it in California or Washington, they know about it. They've got the records of what they've sold.

I get the fact that if somebody sells in Oregon to an end-user who then takes the product and disposes of it somewhere else, they have no way of knowing that. But other than that, how would they not know?

MR. CARPENTER: It would be an upstream supplier selling into a Portland distribution center.

THE COURT: Oh, okay. And they would not know where that Portland distribution center would be reselling it to, but they would have records of how much they sold into the Portland distribution center, and that would be part of their enumerator?

MR. CARPENTER: And if I get notes from the other side from people who are more plugged into how these supply chains work, I will promptly do that.

THE COURT: That's fine. I have had many years of

passing such notes and many years of receiving such notes.

MR. CARPENTER: Let me go through this. I think the Dormant Commerce Clause claim also sounds in the duplicative reporting -- the duplicative or conflicting regulations that we talked about before.

Putting it outside the Pike bucket -- and I think a lot of what we're talking about today, we're identifying really fundamental flaws with the system. Then we have constitutional claims that basically allow you to express those problems through different lenses, but we really get to the same result, and there's a nearest flavor that is similar to all of them.

But I think it also fits squarely within the line of cases about the state tariffs for the improper user fees. This truly is a tax. That's really what's going on, right. Oregon says, "We need to renovate our entire public infrastructure; we need to raise money literally as to pay local governments, municipalities to do this waste management. How are we going to raise that money? We don't want to raise the taxes on consumers. We want to push it up here." And that's what's going on. And it's not proportional to the actual costs, for the reasons we've talked about, that we know that people are being overcharged now so they can build reserves for later.

We know that they're overcharged for free-riders and for people who are exempt. Then on top of all of that, which

manifests in the due process clause, is this retrospective fees being set. And that's FCC v. Fox Television. If nothing else, due process stands for the proposition that regulated parties should know what is required of them so they can plan accordingly, and that just doesn't exist when you're charging fees on a two-year lap.

I could continue. I think you asked me about what are the strongest arguments and how do I respond.

Caleb, can you go to the FCC v. Consumers' Research case.

I know that on the due process claim, Consumers' Research was a major case cited, and we go through it pretty thoroughly in our reply brief.

THE COURT: So tell me what I'm missing here. And now we are giving a preview of my question for the State.

But looking at Consumers' Research, it seems to me that it's distinguishable on at least the following five bases:

One is that, although the FCC asks a private nonprofit to assist in the fee-setting process, the final decision is made by the FCC.

Second, the Board of Directors is appointed by the FCC, not self-selected here by the private companies that participate in the CAA.

Third, Oregon allows the CAA to declare its fee-setting methodology a proprietary trade secret and keep its

methodology confidential from all of the other producers that are not on the Board. That's not the case in Consumers' Research.

Fourth, as you mentioned, the fees are based on retrospective criteria. I don't think that's the case in Consumers' Research.

And then finally, anyone who doesn't like what this board does in the FCC v. Consumers' Research case can seek de novo review by the commission. And here, they're stuck with private, non-appealable arbitration. Those are the five distinguishing features that I see between the Oregon law and Consumers' Research.

Am I right and have I missed any?

MR. CARPENTER: I'm looking at my slide on the screen.

THE COURT: I didn't look at your slide. I looked at my notes.

MR. CARPENTER: I think I have five. The five I have are: Final decision made by FCC rather than CAA, so check.

Appointed by FCC rather than self-selected at CAA's Board. That's a check.

Fee-setting methodology, confidential, check.

Retrospective fees versus updated quarterly fees, check.

THE COURT: There we go.

MR. CARPENTER: And then de novo review, check.

THE COURT: We will hear what the state says for why Consumers' Research really is very similar to the Oregon law, and I'll let you rebut that.

MR. CARPENTER: I think I've covered it.

THE COURT: Okay. Let me ask you this: I take it there is no objection to me dismissing the Oregon state constitutional claims under the Eleventh Amendment?

MR. CARPENTER: Correct, Your Honor.

THE COURT: I really think that I should probably dismiss the individual defendants who are part of the Oregon Environmental Quality Commission. We've got as the lead defendant the director of the Oregon DEQ. If you are right on your constitutional arguments, or any of them, I would assume you would get your full relief by a negative injunction against the head of DEQ. So we really don't need to bring in DEQC commissioners.

Am I missing something?

MR. CARPENTER: If it's understood that we can get complete relief against DEQ, then --

THE COURT: Well, here is the way I look at it, so tell me what I'm missing: If you're not right on your constitutional argument, it's no harm, no foul to dismiss the DEQ folks.

If you are right on your constitutional arguments, my

plan would be to order DEQ not to enforce the plan. What more would you be entitled to that could possibly be needed to be done against DEQC?

MR. CARPENTER: No, I think that is likely right.

THE COURT: Yeah.

MR. CARPENTER: I just do want one qualifier, as this was the subject of the briefing on what the relief is. It's to have DEQ not enforce, and that's certainly the most straightforward and what we're entitled to.

THE COURT: And I'm less inclined to order them to give out any type of notice or something like that, leaning towards a mandatory injunction. And besides, if I issue an order that says you're right on the constitutional points, or a constitutional point, and I thereby enjoin DEQ from enforcing the plan, I think that's it. You guys could publicize that all you want. Whether that gets stayed pending appeal or not, that's not my department. I just can't imagine why we need the DEQC folks.

MR. CARPENTER: Right. The further request would be to at least have DEQ to order CAA to stand down on trying to enforce the invoices, although whether that's considered a mandatory junction, we think under Hernandez it would be allowed. That's a blurry line between mandatory and regulatory. We're basically saying -- that's just the follow-on of saying don't enforce the statute is just because

you've delegated the authority to a third party to enforce, they should then be able to continue enforcing it.

THE COURT: But they can't enforce it anyway. They can send out invoices. And if I enter -- and by the way, I honestly have not decided. Every time I read one thing or the other, I say, "Oh, that's a good point. Oh, no. That's a good point." I really am struggling, and so you're not going to get a ruling from the bench.

MR. CARPENTER: Okay.

THE COURT: But if I end up agreeing with any of your significant constitutional arguments, what I see as the right relief is a negative injunction to the head of DEQ: Don't enforce.

MR. CARPENTER: Understood.

THE COURT: I can do this too.

Let me just confirm that you do raise an unconstitutional conditions argument. You talk about it on slide 8. It's in your briefing. But it seems to me that unconstitutional conditions really stands or falls on the other constitutional arguments you make; that if you are correct in any of those constitutional arguments, then we have got an unconstitutional condition being imposed. But if you're wrong -- if I disagree with your other constitutional arguments -- the unconstitutional conditions component doesn't add anything.

Am I right?

MR. CARPENTER: I believe it's overlapping themes, but it is an individual claim. So you had like Southern Pacific v. Denton about you can't condition someone's participation in the market on their waiving a judicial form of remedy. Here, we are being compelled to submit to arbitration for CAA's fee setting and disputes with CAA over interpretations. I think this is a Koontz situation where people are basically being forced as a condition of participation to fund infrastructure projects that are not even roughly proportional to their actual case. Horne v. Department of Agriculture is another example, and Frost as well, that you can't just condition participation in the market on unreasonable burdens. It's a different path to getting to similar notions of what's going on in the due process and Commerce Clause claims, but I believe there is an independent doctrine.

THE COURT: I understand. But if there are no other constitutional problems, then there is not likely going to be a meritorious argument that there is an unconstitutional condition being imposed.

MR. CARPENTER: Well, I think that the hook on the unconstitutional conditions is there's a sense of a frequent contract; that the right to access markets are being wrongfully conditioned and burdened. It's just a different analysis of

the Commerce Clause or due process clause.

THE COURT: Fair enough. If the Commerce Clause permits that and due process doesn't preclude, I will have a very difficult time seeing why there's an unconstitutional condition.

All right. I'll let you rebut as you wish.

MR. CARPENTER: Thank you.

THE COURT: Thank you.

All right. Let's hear from the State and take a break. Then we'll see where we are.

Is that okay with you, Ms. Van Loh?

MS. VAN LOH: Yes. That's fine, Your Honor.

Thank you.

So I think that we need to -- well, I guess I should say what I would like to do here is to provide a little bit more clarity on what the program actually is and what it does and what the statute says. What we have heard from my opposing counsel here is a lot of sort of big words and scary descriptions of what's happening and not a whole lot of context for them.

So I think it's really important, as a baseline matter, to set where we are right now. So this is a comprehensive regulatory structure that the State of Oregon implemented to address a very serious problem of waste management where other countries are no longer taking our

trash.

THE COURT: You have no dispute from me that we have a very serious problem.

MS. VAN LOH: We have a very serious problem, and we have to fix it. And we have to fix it with the law. And so what do we do? In 2018, when it became clear that this was going to be a problem, DEQ put together a steering committee to consider alternatives. They spent two years analyzing the problem; talking to stakeholders. The committee consisted of community members, industry representatives, various people who have a stake in the game to talk about the best way to address these issues.

(Pause.)

Sorry. I was just double-checking.

THE COURT: That's fine. Take your time.

MS. VAN LOH: So the steering committee had representatives from local governments, the recycling industry, and the paper and plastics industries. So those industries were represented through the course of this, and what they decided is that an EPR program is the best way to deal with it. So you were saying to Mr. Carpenter -- one of his last points was, well, individual producers are paying for a program that we aren't responsible for. Our fees are going to things to areas that we don't sell products, for example.

That's just not how this works. If individual

producers could fix this problem themselves, then there wouldn't need to be a PRO that creates a program to address it on a statewide basis. This is not something that an individual -- and I don't think they would even want to. I don't think individual producers have any interest whatsoever in figuring out how they're going to responsibly make sure their products are responsibly recycled, in accordance with the law.

And it is, in fact, the obligation of people bringing in products into this state to ensure that those products are responsibly managed, and how they do that is by joining a PRO. A PRO represents the interests of the producers. It is not an entity that is designed to exactly charge certain businesses more than others, and there's some nefarious plot to get rid of smaller companies.

THE COURT: Let me ask you this, though, because I was very much convinced by the discussion in Professor Morath's brief that EPRs have been going on for a long time, for almost 40 years, in a wide variety of industries. I did see how she talked about how some of them at least -- I think it was in the paint area -- did resolve some things with binding arbitration. But I didn't see any discussion in her brief that any other EPR had a confidential methodology.

First of all, did I miss it? Secondly, are you aware of any EPR in any of the past 40 years that has a confidential

methodology that only its board members can see and know about their fees are set and determined and how they're going to operate?

MS. VAN LOH: Let me tell you why that is.

THE COURT: No, no. First, answer my question. Are there any besides this one?

MS. VAN LOH: I don't know.

THE COURT: Okay. Now can you tell me why we have it here.

MS. VAN LOH: I know why that is the case here. That is the case here because the law explicitly allows other PROs to come in. The CAA spent several years compiling data. They went out and talked to people. They figured out what it was going to cost to put together a comprehensive recycling system, and then they figured out -- they did studies. They referenced studies. They did a lot of work to figure out the cost-to-manage index and to determine how much this system was going to cost.

THE COURT: But the CAA is a nonprofit entity, right?

MS. VAN LOH: Yes.

THE COURT: So why should a nonprofit entity care to keep confidential its so-called "trade secrets" as opposed to share the wealth? The examples I'm thinking of, public radio in Vermont may come up with a new way of doing something that is very helpful, and they freely share it with all the other

public radio stations. They're a nonprofit, and it is for the public benefit.

I gather that the EPR that Oregon set up here is for the public benefit. They set up an entity that has to be nonprofit, but I see that a lot of the board members or the board is represented by the top largest companies that basically sell packaged product all over the nation -- really, all over the world -- and they come up with their methodology that I'll assume is pretty sophisticated and pretty good.

Why would they care about keeping that confidential? Here is what I'm hearing: You are telling me, well, they don't want there to be other PROs in Oregon under this plan because that might reduce their strength or their quantity of business, their quantity of work, and therefore, if they are going to spend a lot of money to do their methodology, they don't want to do other PROs to come in and free-ride off of their research.

That just seems a little bit more private-sector oriented and for the benefit of the Board of Directors of the CAA than it does to be with the sort of public-interest mission that I understand motivates the actions of the state legislature.

What am I missing?

MS. VAN LOH: Well, I think that may be where the processes that are available in state court administrative law

may come in. The decision to -- basically the law in several respects allows -- gives businesses opportunities to submit confidential business information. It's very important to all of the businesses. That's one of the reasons also for the arbitration clause, among other things.

So all of these companies are very protective of their trade secrets. CAA believed that this was a trade secret. I think, as trade secrets are defined by law, it probably is. But whether or not it should be provided to the public -- so DEQ accepted this appendix as confidential because under the statute when people submit confidential materials, you accept it as --

THE COURT: And that's what is causing me a great deal of maybe confusion, maybe consternation, and that's this: I totally get under our state administrative system, our state regulatory agencies require private entities to submit confidential information about their own business that under state law that agency now has to keep confidential. I don't think anybody disputes that. I think it's totally constitutional. I'm not giving an advisory opinion, but I don't know of anybody that has successfully challenged that regime. And that's because these businesses have confidential information, and if they are required by a state agency to present that confidential information to the regulatory agency, so be it. It's kept confidential.

But that's not what the CAA is. The CAA is not a private for-profit business entity. It's a nonprofit entity the PRO created by the law, authorized by DEQ, and it seems to be an entirely different animal to say, well, when they've come up with their methodology on a really good way to set the prices, set the fees and implement the goals of the Oregon Plastics Act here, you're allowed to keep that confidential. That's not like keeping confidential the private business information of a private business.

MS. VAN LOH: Well, Your Honor, my understanding is that CAA, in other states where it operates, does not keep its methodology confidential.

THE COURT: Right.

MS. VAN LOH: Because the other states only have a single PRO authorized.

THE COURT: Right. And I think the other states may be doing it in a more constitutionally appropriate way by not allowing it to be kept confidential. And especially if CAA's methodology is not confidential in the other states where they operate, why are they keeping it confidential here?

MS. VAN LOH: I think that goes to, again, the administrative -- I mean, why they are keeping it confidential or not isn't actually the question. The question is what do we do with the fact that it is --

THE COURT: Sure. And that's why my most important

question for you, and it's really a corollary to what I asked. No. 1, do you know of any other EPR anywhere in the nation for any product that has this type of set-up where the PRO can keep its price-setting methodology confidential? And you said you're not aware of any.

But my next question was going to be: Has there ever been approved or rejected on a constitutional basis? And I guess the answer is, if you don't know of any, then you don't know whether it has or hasn't. We've looked, and we can't find any other situation like that. And so I've never seen any precedent that would allow this type of -- and I originally thought of this as a delegation issue. It's more of a due process issue given that it is from the state, not the feds.

But I've never seen it where the state or a state agency can delegate to a private group of competitors this type of price-setting or fee-setting authority where, No. 1, the methodology of how they determine the fees is kept confidential; No. 2, there isn't any way to even appeal individual fee determinations back up to the state. There may be a way to take to it to private non-appealable arbitration, but I've never seen that approved constitutionally.

MS. VAN LOH: That's not correct, Your Honor.

THE COURT: Okay. Correct me.

MS. VAN LOH: Producers -- so it is not the case that the only option that a producer has is to go to nonbinding

arbitration.

THE COURT: Binding arbitration, non-appealable.

MS. VAN LOH: Thank you.

THE COURT: I messed it up.

MS. VAN LOH: To go to binding arbitration. The way that this has operated has been that producers reach out to both CAA and to DEQ with questions about invoicing, how the fees are established, any of those sorts of issues. There are teams of people that are responding to these questions all the time, and DEQ is one of them -- is actively doing that. In fact, the evidence that Mr. Wild submitted shows that, because Mr. Wild requested that the program be pushed off by a year, at the beginning of July or at the end of June, I guess, and the response from that, which is in the error was -- Nicole Portley, who is the program lead, responded and said, "We would be happy to have a meeting with you to discuss it. We can't pause the program, because it's required under the rules, but we are happy to talk with you about it, and I can set a meeting with you on short notice." And that's what their evidence shows.

So it's not -- the way that it's being presented, it is like -- I don't want to use the word "nefarious," but that's kind of how it comes off sounding, like there's this big plot to, like, enrich these big companies and everything. But you have to keep in mind that what we're talking about is a state

agency who is tasked with protecting its people and the environment.

THE COURT: So then why doesn't the state agency just do that?

MS. VAN LOH: They can't.

THE COURT: Why not?

MS. VAN LOH: Look at all the work that's going into this thing. How is DEQ going to do that?

THE COURT: I don't understand why they can't. I mean, if it was a priority, they would do it. I'm really missing why they can't do it. DEQ does a lot of very complicated things and does it very well. That's not an advisory opinion.

I don't understand why they can't do this. I do understand that EPRs have some benefits, some value. They've been working around the nation in a smaller context. I wonder whether or not something of this scope really requires a national solution, but that's not my call to make.

But I really don't understand why DEQ can't be a national leader in deciding how to reduce packaging waste in the state of Oregon and to charge anyone who contributes to that an appropriate fee.

What am I missing?

MS. VAN LOH: What you're missing is that is exactly what's happening. It's just that there is a nonprofit company.

THE COURT: But they're delegating it to a group of large-scale providers who have an economic interest in both reducing their own expenses, passing it on to their competitors, and keeping things about how they do their methodology hidden.

MS. VAN LOH: There is nothing in the record to show how they would accomplish any of that.

THE COURT: Who is the "they"? DEQ?

MS. VAN LOH: How CAA would disadvantage its competitors. There's nothing in the record to show that. The materials --

THE COURT: Doesn't it disadvantage a competitor to charge a fee that's higher than their profit margin?

MS. VAN LOH: The fees are not set with respect to individual producers. The fees are set by the cost of managing a particular material, and it's based on the amount of material that a specific --

THE COURT: Right. But we have evidence that the fees are currently set are higher than the profit margins of smaller, although not non-exempt, but the ones who are not exempt and still have to pay the fees, those fees are larger than some of their profit margins. We have evidence submitted of that. And that's something that could be more easily absorbed by a larger company with a diverse product base that operates nationwide or worldwide, and that's going to mean that

some of these smaller to mid-level companies aren't going to be able to sell their products in Oregon or bring their products into Oregon in competition with many of the board members of CAA.

Am I misunderstanding those facts?

MS. VAN LOH: Well, I don't think it matters that DEQ is running the program or PROs are running the program. If the fees are more expensive than the profit margins, then that's just the reality of the situation.

THE COURT: If DEQ was running the program, and it was making it more disadvantage for smaller or mid-level businesses to do business in Oregon and more advantage for large businesses, presumably there's a political response to that. Whether or not the polity chooses to exercise that response is the polity's business. But that's where we have concern with essentially the nondelegation doctrine, or as applied under the due process framework, the cases that go all the way back to -- what was that trio of cases from basically the mid-1900s -- the Progressive Era cases.

The concern is that you don't want to let private businesses make decisions that really belong by state decision or public decision-makers who are accountable to the electorate. Because if they make decisions that are bad for folks, there's a political response. There is less of that when the decisions are made by large private entities,

especially when they're shielded by having their methodology kept secret. That's what concerns me.

MS. VAN LOH: Well, there are two issues here. There is the confidentiality of the methodology, but then there is the assertion that CAA basically has unfettered discretion to do whatever they want to with the fees. So I just want --

THE COURT: I agree. If anyone says that they have total unfettered discretion, that's probably an exaggeration. But they sure have a lot of discretion.

MS. VAN LOH: I don't know that that's true. If you look at the statutes, they are very specific, and the rules are very specific about what the fees are supposed to look like and how they are supposed to be calculated. The DEQ has reviewed and approved the confidential appendix. They have been very, very involved in developing how these fees are set, and so there's oversight at the front end. They've looked at this, they think it makes sense, it's reasonable, and they approved it.

The numbers that come out of that, they're hard numbers. They are not -- it is not like -- I think NAW has also sort of portrayed this as, "Oh, we have no idea what anything is ever going to be; it's all very confusing," and part of the reason for that, of course, this is a brand-new system that they're just having to get up to speed.

But the fact is DEQ has dug into all of this stuff at

length for years, and they think that it's reasonable and complies with the statute. So the way that -- the way that's tested is on the back end, when they do their financial reports -- when CAA does their financial reports.

So they just did one for part of the year. That one -- the first report, because it was the first report, the requirements for that one were a little bit different. My understanding is that DEQ is reviewing that now. Every report that comes out, DEQ reviews it, decides whether or not it complies with the statute, and then either rejects it and tells them to do it again or approves it once DEQ decides that it complies with the statute.

So the first report that came out has less information than the regular reports. The regular reports that are going to come out every single year are going to list out with specificity the numbers that we're talking about, like how much did it actually cost to run the system? Where did the money go? How much were the fees? How much did distributors pay?

We don't have all of that information yet because the program just started. And so basically what we have here is what is purportedly an "as applied" claim that is really a facial challenge to this entire program, because there isn't -- we are in a pre-enforcement situation. We don't have full facts yet because the program hasn't gotten to the point where

it's static, or whatever the terminology is.

So the way -- in terms of due process, the way for people affected by this law to get involved in creating it and implementing it was over the last five years when literally thousands of people have been involved in pulling this program together. That includes people who represent the packaging materials industries. It includes people who represent distributors. None of this is new. Even "they're building up reserves," that is required by the statute, not the rule. The statute requires building up reserves, which was enacted in 2021. That is not a surprise to anyone.

So what we have a situation where NAW has not participated in any of that up until recently. They did submit comments back in December for the first time apparently. Meanwhile, there have been multiple groups that -- there is the rulemaking. There have been public rulemakings. Every rulemaking has a rulemaking advisory committee consisting of stakeholders from various communities. All of the interested groups are represented there. They had public comment period. They had public meetings. They respond to all of that information, and they changed the program.

Then there is still an ongoing -- the Oregon Recycling -- I'm going to mess up the name -- but the advisory council, they have an ongoing role in overseeing this process in addition to DEQ. That council is also composed of

stakeholders and industry representatives. I believe that council is also -- those members are also appointed by the governor. So it's not the case that no one has any insight into any of these issues -- how the fees are set. It's all out there. The program plan is like 400 pages long, and a lot of that is dedicated to the fees.

So they may disagree how the fees came out. They might not like it. But whether the fees are higher than the product margins, that's not a function of, "Oh, we're going to put all the small businesses out of commission." It's because it's expensive to recycle these products, and that's what the State of Oregon is trying to do. The State of Oregon is trying to manage this big problem for its residents. How they do that is by adopting an EPR program, precisely the type of program that has been in effect in Canada and the European Union for decades.

THE COURT: With a confidentiality provision?

MS. VAN LOH: With a confidentiality provision? I don't believe so.

But with respect to the confidentiality provision -- so let's say that -- I don't think that the confidentiality provision itself can render this thing unconstitutional. There hasn't been any focus on the -- the arguments about, oh, this is confidential; we don't know what it is; they're making all of these decisions. It's just flatly not true.

Also, when the reports come out, DEQ has an opportunity to see if those things align. The public will have an opportunity to see if those things align. And if they really believe that the fees that are being set are wrong, that they're not complying with the law somehow, they do have other options. Every time DEQ approves a financial report, they can file an EPA action saying that this is a final order that was not in compliance with the Constitution. Every time DEQ allows an amendment -- you know, every time DEQ issues an order, you can go to the state court, and you could say this is unconstitutional for X, Y, or Z reason, based on the actual facts that you are looking at at the time.

THE COURT: What type of orders would DEQ be issuing other than an enforcement of the fees that, as I understand it, carries a $25,000 per day penalty?

MS. VAN LOH: So they issue -- by law, they have to approve these plans. Every approval is a final order that is subject to the Administrative Procedures Act. So the plan approval, the amended plan approval, every approval that they do -- the approval of the financial reports. If they have not yet -- I understand they have not yet approved this most recent financial report. But when they do, if somebody disagrees with it, they can file a petition for judicial review in state court and say, "I don't agree with this for this reason."

THE COURT: Sure. And as I think you have already

hinted at, and I think it's pretty clear, the plaintiff here can obviously file in state court an argument that this particular statute and the way it's being implemented violates the Oregon state nondelegation doctrine.

MS. VAN LOH: Yes, they can. They also raise federal claims. That's the point I was going to make.

THE COURT: They've already done that. But if they want to raise a state nondelegation issue, they have to do that in state court.

MS. VAN LOH: Yes, they can. And they don't have to go through the Administrative Procedures Act to do that.

THE COURT: I know.

MS. VAN LOH: The other thing I wanted to say was, with respect to the confidentiality provision, there is also an avenue for that, which is the Public Records Act. So if they go through the Public Records Act, they request the document. If DEQ says, "No, we think this is, in fact, confidential," they can time an APA claim on that as well and challenge the confidentiality and have someone decide whether or not it is properly confidential.

THE COURT: But if it is confidential under the confidentiality state laws, that doesn't answer the question of whether it violates federal due process to have a scheme where that type of confidential document can be kept from the public or even from the fee-paying members.

MS. VAN LOH: Well, I think what this really comes to, we are here for a motion for preliminary injunction, and the plaintiff has a very, very heavy burden to prove that they are both going to prevail on the merits, they have an irreparable harm, and everything else. Basically what has happened here is they've sat on their hands for years and years, and then they show up when the law goes into effect and say, "Oh, dear. We don't like this. This is too much. We have to file a PI. We have to get relief for our members."

In the meantime, of course, a lot of work has been done. Things have been going on. And I don't think they were planning to file a PI at the beginning of the lawsuit, because their complaint doesn't ask for it.

THE COURT: Right. I think it was -- at least from what I read from it -- when some of their members started seeing what their specific bills were and that they were higher than their profit margin, then they said, "We need relief now." That's the way I perceived things.

MS. VAN LOH: Yes. I think that's right. And the reality is it didn't have to be that way. This has been in the making for years, and there's been outrage. There have been packaging representatives who have been involved in these discussions. And so if that got lost in this -- I mean, NAW is a huge company. I would think that they would have some responsibility for being on top of those sorts of things, but

apparently in this situation that was not the case.

THE COURT: You know, this is just a PI, as you mentioned. What sort of discovery do you anticipate the defendants will need from plaintiff, if any, before you are ready for a trial on the merits?

MS. VAN LOH: Well, it depends on what claims are left.

THE COURT: Assume no state claims and basically all the federal claims.

MS. VAN LOH: Well --

THE COURT: By the way, assume that the only defendant will be Director Feldon; that the DEQ folks will be out.

MS. VAN LOH: Well, for a Commerce Clause claim, I think that could be pretty discovery-heavy, because the evidence that has been put forward so far is, with this handful of products, the fees exceed the margins, and this particular business is negatively impacted, which incidentally I don't think either of those make it unconstitutional.

THE COURT: Say that again.

MS. VAN LOH: I don't think either of those things make the law unconstitutional. That is not sufficient for purposes of Commerce Clause, for example, to establish that there is an undue burden on interstate commerce, because of handful of individual businesses that are feeling the impact of

this thing in a way that's detrimental to their business. I mean, you have to expect that, first of all. But second of all, that's not sufficient to prove that this burdens actually interstate commerce.

THE COURT: What's defendants' response to the plaintiff's point on irreparable damage, even if they pay the fees now, we normally think of money as not being irreparable, but they might not be able to get the money from defendants that they pay to CAA, because the defendant is the State, and so they probably will not be able to get money from the State defendants, and they probably won't be able to get a refund from CAA if CAA doesn't have it? What's your response to that.

MS. VAN LOH: Well, I would say that they can't get money from DEQ, because DEQ doesn't have the money.

THE COURT: So you'd agree that they can't get the money from DEQ.

MS. VAN LOH: Not from DEQ.

THE COURT: Okay. So that's part of their of argument for why they have irreparable injury -- or do you concede that they would have irreparable injury?

MS. VAN LOH: No.

THE COURT: Why not?

MS. VAN LOH: Because I think that the assertion that CAA -- that there's a concern about whether it is going to continue as an entity is overblown. It's based on a single

line in an audit report about -- you know, there's a question about whether the company can continue as a going concern. That's boilerplate language.

THE COURT: No, it's not. Not every financial report has a going-concern disclaimer --

MS. VAN LOH: I think --

THE COURT: -- or note.

MS. VAN LOH: I'm thinking of, like, when you have companies that are publicly traded --

THE COURT: Very few of them have going-concern notes.

MS. VAN LOH: Okay. I feel -- I'm not an expert in this field. I feel like I have seen things like that, but maybe I'm looking at the wrong things.

One thing about that, obviously CAA doesn't have all of the funds that it needs at the beginning, because it gets the funds that it needs from the producers.

THE COURT: Uh-huh.

MS. VAN LOH: And so if you're doing a financial report talking about the funds that you have to run the operations, the funds needed to run the operations are going to be significantly higher than what they have, because they haven't gotten the funds from the producers yet. So the concern -- does that make sense?

THE COURT: No, not yet. I'm trying to figure out

why there is not irreparable injury. We will worry about whether there is substantial likelihood of success later, and we've been talking about it. But if there is, I'm trying to figure out both whether there is likelihood of irreparable injury and then balancing the equities.

I want to hear your positions on those issues.

MS. VAN LOH: So the idea that they wouldn't be able to get their money back. So there is going to be a lot of money coming in and going out every year, and so there is going to be some liquidity there.

The idea that they cannot get their money back is based on, oh, the possibility that CAA is going to go out of business. That possibility is not irreparable harm, and it's also not something that I think that we can take seriously.

THE COURT: You're saying that it is speculative.

MS. VAN LOH: It's speculative. But also, they are the only PRO in the state of Oregon. So actually, if anything could make them go under in the state of Oregon, it would be a preliminary injunction enjoining the State from enforcing the program and shutting down the entire thing. That might make them go under. I don't know. But otherwise, the money will continue to come in. There's no reason whatsoever why they would go under. In the program plan, there's a whole section talking about what they would do in this situation where they're winding down.

THE COURT: So if I don't grant a preliminary injunction, how soon can the State be ready for trial on the merits? Can they be ready by July?

MS. VAN LOH: Probably.

THE COURT: Okay. Anything else you want to say?

I'll let you respond to whatever Mr. Carpenter says as well.

MS. VAN LOH: Give me one moment here.

THE COURT: Sure.

MS. VAN LOH: I'm going through my notes here about what was said earlier.

THE COURT: We are going to take a break in a few minutes anyway. I will let you look at your notes, and then you can come back and say whatever you want, if you want to do that.

MS. VAN LOH: I can do that or keep going.

THE COURT: Well, we definitely have to have a break soon.

Why don't we do this: I have two very short specific questions for Mr. Carpenter. Then let's take a break, and then we'll pick up again with Ms. Van Loh.

Two questions for you, Mr. Carpenter, and then I'll let you do more rebuttal later.

First of all, what's your response to Ms. Van Loh's argument that this is a facial challenge that you have brought

and that you're bringing up an awful lot of facts that seem to go beyond a facial challenge? What's your response to that?

MR. CARPENTER: Do you want me to answer now?

THE COURT: If you can. If you don't want to, you don't have to. But at some point this morning you have to.

MR. CARPENTER: So we cited both a facial challenge and an "as applied" challenge, and those labels get a little blurry. I think effectively what is happening now, at minimum, it's a challenge to the law as it exists being implemented by CAA.

THE COURT: So you're bringing it both as facial and "as applied"?

MR. CARPENTER: Correct.

THE COURT: Second question: Especially if I don't grant a preliminary injunction, and I do get the urgency that your client's members have, could you be ready for trial in mid July?

MR. CARPENTER: Yes.

THE COURT: All right. Let's take a 15-minute break, folks.

(Recess.)

(Proceedings resumed:)

THE COURT: All right. We will pick up with any concluding comments that Ms. Van Loh wants to make or anything else you want to say.

MS. VAN LOH: Thank you, Your Honor.

Also, my colleague, Mr. Jones, has a couple more comments he would like to make as well.

THE COURT: Sure. Of course.

MS. VAN LOH: We haven't touched on a couple of arguments to the motion to dismiss that he would like to address with you.

THE COURT: Of course.

MS. VAN LOH: Thank you.

I have gotten a little bit of additional information. We believe that the -- in Canada, the detailed fee methodology is also not public.

THE COURT: Do you have a case or anything I can find or refer to?

MS. VAN LOH: Not right now, but I'm happy to provide that to you after the hearing.

THE COURT: Okay.

MS. VAN LOH: Another point that we wanted to make is that most states don't require the level of detail that we do. DEQ is very, very prescriptive at every level of regulation -- from the statutes to the rules to the program plans.

Arguably, the RMA is the most prescriptive of the EPR programs for packaging. So DEQ oversees the program. They approve the methodology and they approve the fee schedules through the plan amendment reports. So it's not the case that

DEQ is unaware of what's in them and how they are created.

Another thing I wanted to make clear is that DEQ can enforce against the PRO, if it does not comply with the RMA at any point so it can undertake enforcement actions against the PRO as well.

Then I just wanted to touch on a couple of things that came up in the hearing. This idea that this is an intentional effort to push the fees onto interstate suppliers, interstate businesses or to push fees out of the state is purely -- it's not based on anything. It's speculative at best.

The way that the program works is that materials -- CAA has determined the cost to manage specific materials, then the supply tonnage is reported by the producers, and then they do a public calculation. They determine the fees based on that supply tonnage for each individual producer and for each material.

That applies regardless of who the producer is or what kind of business they operate, and all producers in the PRO are required to pay those fees. So the large producers that make -- that have representatives on the board of CAA as large producers, they pay a significant amount of fees because they pay for all those products too.

THE COURT: So what's the response to what Mr. Carpenter said about the Wild declaration, Exhibit D,

page 18?

MS. VAN LOH: I think the fact that there was a side comment that we don't know how the fees are going to impact consumers and the side comment saying, well, it's possible that they will push the fees out beyond to the entire supply chain does not reflect an intent to discriminate against interstate commerce. It's just describing a factual reality of the situation.

THE COURT: Is intent required under the Dormant Commerce Clause analysis or simply effect?

MS. VAN LOH: Well, if you are talking about discrimination, it can be its purpose or its effect. So we do not have evidence of -- I mean, I don't think that one statement describing a factual reality is sufficient to establish an intent by the legislature in the state of Oregon to discriminate against interstate commerce.

But the narrative that we've been dealing with here is that the program is designed to push costs out of state. The program is focused on distributors and interstate commerce. And I can understand why it might feel that way to distributors who have to deal with it, who may not be located in Oregon, but the reality is that what the law is trying to accomplish is to give us a way to deal with the garbage that arrives here. So the State of Oregon is not interested in crushing small businesses or making other states pay to clean up its waste.

It's trying to fund a program that will achieve those health and safety goals, which are legitimate and recognized as a function of the police power of the State.

The other thing that I wanted to point out too is, when we are talking about having to look at supply chains and how they work and talking to people and figuring out where the products go, and there is no way to figure out if our products end up in Oregon or not, what we are really talking about here, these are methods of operation. This law affects businesses' methods of operation. There is no dispute that's true.

But as the Pork Producers case makes clear, method of operation is not protected. Companies that want to do business in the state of Oregon have an obligation to comply with Oregon's laws, and that includes, in this instance, joining the PRO or creating their own PRO or otherwise ensuring that the covered products that they bring into the state comply with the end market and recycling requirements that we have.

The law doesn't require changes to the packaging. The law doesn't require modifications to the types of materials that are being used. In some instances, if a business can establish through doing a life cycle evaluation that they can achieve some reduction in impact through a course of conduct, and, in fact, have achieved that reduction in impact through a course of conduct, and, in fact, have achieved that reduction, then they may be entitled to a bonus as part of their

individual fee invoicing.

I think I already mentioned that the CAA is charging more now to build up the reserves. I just want to emphasize again that the uncertainty that is such a problem here is not based on a nefarious plot or a lack of oversight, it's because of the nature of getting a program like this off the ground. They had to make estimates at the outset about what the program would likely cost. They had to make estimates at the outset about what the inputs into the system were going to look like, and there's no other way to get a program off the ground but to do that. So the first couple of years the fees, as they get a better sense of what tonnage of materials coming in actually looks like, then that will stabilize.

I wanted to touch on the FCC case a little bit too. I think the broader point of the FCC case was not so much that DEQ has to operate this program in exactly the same way as the FCC operates the universal system fund. It's that the oversight -- in Carter Coal and in all of those cases, the emphasis was on oversight. It wasn't on -- you know, whether this person is affected in a way that other people aren't. It was specifically: Is the government agency maintaining careful oversight over the program? I don't think an argument can reasonably be made under the circumstances that DEQ is not very closely involved in overseeing this program.

Now, with respect to the day-to-day operations, where

CAA handles talking to individual recycling facilities or local governments or dealing with contracts with these folks and getting the funds out the door, those are the kinds of activities that CAA is doing. So when we talk about DEQ operating at a 30,000-foot level, what we even mean is that DEQ has said, "You are authorized to operate within this very detailed scheme and only within this very detailed scheme." Then what you do on the ground in terms of those interactions with individuals, as long as it comports with the program plan, which itself comports with the law, then it's fine. DEQ doesn't need to be involved in that.

When we're talking about fee shifting, that CAA has discretion to shift fees for individual producers, it has to. And the producers would want that, because if there's an error in reporting, if CAA makes an error of some sort, and it's brought to their attention, and they can't address it, they have to do a plan amendment. I don't know if you've noticed, but the plans are hundreds of pages long. And so they have to do a plan amendment in order to adjust someone's fees? Like that doesn't even make any sense. So that is not that type of -- having that kind of flexibility.

THE COURT: Although if the producer thinks that adjustment to the fees is appropriate and CAA disagrees, why shouldn't there be an appeal to DEQ as opposed to the only avenue for relief being private arbitration?

MS. VAN LOH: That's not the only avenue.

THE COURT: Is there a way to appeal to DEQ? Assuming that we are not talking about a change of methodology, just that CAA arguably calculated something incorrectly, or there is some other dispute by a producer. They ask CAA to make a modification. CAA says, "No, we think this is the best interpretation of our plan that has been approved by DEQ."

What avenues of relief does the producer have?

MS. VAN LOH: So they can go to DEQ.

THE COURT: Where in the statute does it show that? I thought they couldn't. If there's not a change in methodology, how do they go to DEQ?

MS. VAN LOH: So if they are having a problem -- no. So DEQ -- DEQ can talk to producers who are having issues with how the program is running, and they do that every day.

THE COURT: All right. So it's more of an informal problem solving, but there's no right to appeal to DEQ for a final decision from DEQ, correct?

MS. VAN LOH: I think an immediate appeal would be --

THE COURT: Immediate or otherwise. Is there any right to appeal and have DEQ be the final decision-maker at least vis-à-vis CAA?

MS. VAN LOH: So if you're talking about something that can't be resolved informally --

THE COURT: Yeah.

MS. VAN LOH: -- and DEQ agrees with CAA that they did it properly, then the appropriate action would be an enforcement action where DEQ has authority to issue a notice of violation, and then there's a contested case proceeding.

THE COURT: What if the DEQ thinks that CAA did it improperly? CAA says, "Thank you, but we respectfully disagree." The producer is out there holding the bag and says, "Now what do I do?" Then CAA says, "Well, I think your only avenue is private arbitration. We'll see what a private arbitrator has to say."

I don't see any avenue where DEQ, in trying to resolve it informally, agreed with the producer against CAA and said, "Well, sorry. We expressed our opinion, but we don't have the legal authority to change that, only an arbitrator might."

Am I misreading this?

MS. VAN LOH: So DEQ wouldn't get -- if CAA does something that does not comport with the statute or the rules, then DEQ has authority to address that.

THE COURT: Right. But what if it doesn't -- I am talking about the violation of the plan's calculation. In other words, the producer thinks that CAA has miscalculated the fees or has somehow otherwise not followed the plan appropriately, which, by the way, the producer probably won't even have access to the plan, so I don't know how they're going

to make that argument.

MS. VAN LOH: The producers do have access to the plans.

THE COURT: Okay. But not the methodology -- not Appendix G. Got it.

So the producer thinks that CAA has not followed the plan. They go to the DEQ. The DEQ agrees but says, "We will talk to CAA." It comes back and says, "We can't persuade them. Sorry."

What other relief is there besides going to private arbitration?

MS. VAN LOH: DEQ has enforcement authority over the PRO as well. So if a producer came to DEQ and said, "They're implementing the methodology incorrectly. The fees are not being accounting for properly, and they're not listening to us," and if DEQ looks at the situation and agrees with them, DEQ has authority to say to the PRO, "Fix it." And if they don't, they can bring an enforcement action against the PRO. They have that authority.

THE COURT: Do you know where in the statute I would find that or in the administrative regs? If not, that's okay.

MS. VAN LOH: Not off the top of my head, Your Honor, but I can get that for you.

THE COURT: That's okay.

MS. VAN LOH: The requirements of the law apply to

both -- the PRO -- so there's responsibilities for the PRO and there are those responsibilities for the producers. The responsibilities of the PRO include, of course, all of the specifics for operating the program, but also just generally complying with the law. So if DEQ comes to the conclusion that some way that CAA is operating does not comply with the law in whatever respect, then DEQ absolutely has authority to say to them, "You have to fix this" -- either by doing a plan amendment or if it's just an error of some kind -- "then fix it." But DEQ absolutely does have that authority.

When we were talking at the scheduling conference about DEQ doesn't have the authority to stop the program and the invoicing, that was more related to the fact that the timing of this program is set forth in rule. So this is not a matter of discretion for DEQ to just say, "Oh, well, I guess this group of producers don't like, so we're just going to close the program." They cannot do that.

But as a general matter, DEQ is very involved. They receive outreach from producers all the time. I mean, there are people that this is their full-time job. Just because something is not, like, oh, a producer can contact X person at DEQ. They can, and they do.

I mean, the reality of the situation is that DEQ and CAA are trying to resolve these issues with producers. They want this -- we want the program to just succeed. I mean "we."

But they want the program to succeed. I want the program to succeed. So it's not in DEQ's interest or CAA's interest to be doing it in a way that clearly does not comply with the law. They may have a difference of opinion about details here and there, but overall they need to be doing all of these things. In other EPR programs that are in the process of being implemented now, they are nowhere near as prescriptive as this one is.

The other thing about the fee methodology, we are talking about their process of figuring out what the system is going to cost to run, but all of that information -- so we know how they calculate the fees. They calculate the fees by material and by weight. They went through -- the way they figured out what the cost to manage each material was, they talked to people. They looked at studies. They figured out what goes into addressing specific types of materials so that they could come up with a sense of how -- this is where it gets complicated -- so they can understand what it will actually cost to address that material.

So again, where we see that is at the end in the financial reports when they talk about this material -- this is how much the program costs. This is where the money went. This is where the money came from, and this is how much went to this, that, or the other thing.

So it's not the case that it's not transparent. It's

just their process for their specific process for -- anyway, I'll just leave it at that.

So I will yield the floor to Mr. Jones, if that's all right.

THE COURT: Thank you very much, Ms. Van Loh.

Mr. Jones.

MR. JONES: Thank you, Your Honor.

THE COURT: Mr. Jones, I think we are already in agreement that I'm going to dismiss the individual defendants who are members of the Environmental Quality Commission under your 12(b)(1). I'm going to dismiss the state constitutional claim under the Eleventh Amendment.

I think that all that's really left is your 12(b)(6) arguments; am I correct?

MR. JONES: That's correct, Your Honor, for the motion to dismiss at least. I was going to talk a little bit about the equal protection claim, which is just a motion to dismiss and was not included --

THE COURT: And I think you are right on the equal protection claim.

MR. JONES: So if the Court doesn't have any further questions about that, I won't go into further detail about that.

I did want to say a few things about the unconstitutional conditions claim, which is part of both

motions, because I think there are some issues there that cut across the rationales for plaintiff's other claims as well.

As Your Honor earlier said, you think that the unconstitutional claim sort of stands or falls with the other claims, there are other constitutional arguments, and for the most part I think that's true, in that when you impose a condition on someone, like to force them to do something, then the thing you're forcing them to do, it still has to be unconstitutional.

THE COURT: So if we're in agreement on that, what is to be gained by dismissing the unconstitutional conditions claim at the 12(b)(6) stage if I'm not going to dismiss on 12(b)(6) Dormant Commerce Clause or due process?

MR. JONES: Well, plaintiff has framed their unconstitutional issues claim as being, in part, separate from those claims. I don't think they're right about that, but I think dismissing that claim, it would make clear that's not a separate avenue for them to go through here.

THE COURT: I think you're probably right that it's not a separate avenue. I even think I heard Mr. Carpenter, at least a third of the way concede that, maybe not fully, but partially. I just don't see how we'd be accomplishing anything meaningful by dismissing the unconstitutional conditions claim now, even though I'll tell you I think you're probably right, and I'm going to spend most of my substantive focus, when we

get there, on Dormant Commerce Clause and due process.

MR. JONES: Your Honor, if I could. The unconstitutional conditions claim, even if you think it is subsumed within the other claims, I think it's worth -- if I could have a few minutes to talk about sort of the issues with that claim, partly because they -- it illustrates other reasons why their other claims fail, and also it gives sort of more fundamental reason for why that claim on its own can't stand, which is not just that the condition that is being imposed isn't unconstitutional, but that the condition that plaintiffs say is being opposed is not actually being invoked. The premise of that claim is that producers are being forced to join CAA and that is their only option. And that is simply not true.

THE COURT: What other PRO can they join?

MR. JONES: They can form another PRO.

THE COURT: Well, only if they have 10 percent or more of the relevant product being disposed of, right?

MR. JONES: If they can get together with other producers that have that.

THE COURT: That's a big "if." Why hasn't that happen so far then?

MR. JONES: Plaintiffs have not put any evidence or any facts into the record or allegations supporting an inference as to why that's impossible. There have been other

potential PROs that have come forward as part of the process -- an application for that -- and plaintiffs are simply saying that, "Out of our 35,000 members of our association, there's no one within our organization, or if we could get together with each other or with other companies, and have a good market share to do that."

They are asserting that that's impossible. So that is not -- it does not give rise to a plausible inference that that's true, let alone give an evidentiary basis to give them an injunction on that.

THE COURT: Okay.

MR. JONES: So aside from that, also, the -- another option here, another possibility of not paying PRO fees is -- well, first of all, plaintiff's assertion -- Mr. Carpenter's assertion earlier that this program applies to -- I think he said "literally all products in the market." That is simply not true. There are dozens of exemptions at least within the statute, including many products that would particularly affect wholesalers and distributors, such as pallet wrap or similar packaging used to secure a palletized load, things like that.

THE COURT: I looked at the product exemptions and the financial exemptions, and you're right. There are some exemptions.

MR. JONES: Your Honor, to highlight another one of those, there is an exemption for privately recycled materials.

This is in ORS 459A.869(13) where a producer can demonstrate to the department -- that is DEQ -- that material is exempt from the requirements for a covered product if it's collected through a recycling collection service not provided under the opportunity to recycle, which means not under public recycling. But if they provide for their own recycling, or they can show that it goes through private recycling, then it's not a covered product. They don't have to pay fees on that. And if all of their products are covered by that, then the law doesn't actually require them to join the PRO.

So if they can go to DEQ and say, "We're recycling all the materials that we're selling in Oregon state that would be covered, then we are not an obligated producer under the statute." In some cases that has happened with some of the materials here. For example, tertiary cardboard, cardboard that is used in packaging for transporting and distributing goods, 2026, was completely exempt from fees, because of the data that DEQ has about how much of that is going to private recycling systems. It was able to zero out the fees. So even if you join CAA, if all you have is tertiary cardboard, then you don't pay anything for it. You get that exemption automatically. And if you want to get a specific exemption for what you're bringing into the state, then if you can provide for recycling of those products yourself or prove that it is being handled through that process, show that to DEQ, then you

don't have to pay fees on it.

THE COURT: I think I understand, but I think I'm missing the bigger picture; and that is: Okay, so some of plaintiff's members, either in whole or in part, don't have to pay the fees. Others do. So what? What does that have to do with unconstitutional conditions for those members that do have to pay the fees?

MR. JONES: The bigger option, or the bigger picture there, is they have the option of providing for private recycling for their own materials and goods. And if they're able to do that, that is a third option. So they can join the PRO that exists, they can start a new PRO, or they can simply take care of their own stuff.

So for unconstitutional conditions, in cases where that theory even applies, the person has to have at least just one option that would be constitutional. So the idea that they only have this one option here of joining CAA, they don't have any control, they had no opportunity to do anything else, is simply not true when they have other options here.

But, of course, beyond that, even if -- the plaintiff asserts in some of their briefing that we've sort of implicitly conceded that if they do have to join CAA, it is unconstitutional. And we have not conceded that.

To touch a few points about that that you were discussing with Ms. Van Loh earlier about, for example, giving

up the right to a judicial forum, first of all, for the reasons I've explained, they are not required to join CAA itself. So even if that were -- if CAA did require them to give up a judicial forum, that condition is not being imposed here.

And second, you were asking earlier about, for example, what if a producer thinks CAA has done something wrong, has calculated something wrong, and they want DEQ to do something about it, and DEQ doesn't do something about it, then they had avenues to challenge that, not just through informal means with DEQ, but through the APA, where if they would go to DEQ and ask DEQ to do something, then if DEQ issues an order denying that, they can challenge that.

THE COURT: What if DEQ doesn't issue an order? It says, "That's not our department. We will talk to them informally, but we are not issuing an order. Go talk to CAA, because that's their bailiwick"?

Is that appealable under the Oregon APA?

MR. JONES: If you issue a decision that is in effect an order -- whether or not they call it an order, they can appeal that as an order. And if they refuse to make a decision at all, they can just challenge that under another part of the APA, ORS 183.490, which is where an agency --

THE COURT: And would the state courts then decide whether or not it's in DEQ's bailiwick, or would they decide the merits? If they decide the former, and they say, "That's

not within DEQ's bailiwick. Under this, that has been delegated to the PRO. The PRO decides it. And if you don't like the PRO's decision, if the PRO is CAA, you do your arbitration."

So yes, they can appeal it under the APA to an Oregon state court, but what they're appealing is not the merits of the decision but whether or not DEQ has to decide it. And as I read the statute on questions of whether or not the fee has been correctly calculated, that's not for DEQ to decide.

Am I mistaken?

MR. JONES: I think it depends on the specifics of the situation. If it's a situation where they are bringing a lawsuit saying, "DEQ didn't make a decision on this, and we think they have to, then under ORS 183.490, the result could be at that stage the Court order DEQ to make an order on that they can challenge. But within that, under the APA, they can challenge actions for being in violation of statute, in violation of the Constitution, and so if they make an argument that says allowing this to stand -- this decision by CAA that's effectively been approved by the DEQ through this order -- if they have an argument that violates their statutory or their constitutional rights, then I think they would be able to raise those arguments.

THE COURT: But no, that's not what their argument would be. Their argument would be, "We think that the PRO" --

here CAA -- "miscalculated our fee, and we want a neutral decision-maker that is a Court to decide that." And CAA says, "No. Sorry. Your only neutral decision-maker is the arbitrator." The producer goes to DEQ and says, "You know, the PRO is right. CAA is right. That's not for us to decide whether the fee is correctly calculated."

So where is that producer then going to be able to get a Court to decide whether the fee was correctly calculated other than through the arbitrator? I don't see how the APA will give any relief to the producer of that.

Where am I mistaken?

MR. JONES: Well, there are two ways where they could get that through the courts. One is through the APA process, because if the argument is that they're not calculating it correctly, then that means they are not correctly applying the methodology and the standards that have been approved by DEQ there; that they're required to follow under the statute. So if they're not doing that correctly, they are violating the RMA, and that would be grounds to challenge it under the APA.

THE COURT: Let me make sure I understand what you are saying. You're saying that any producer who believes that their fee is not being correctly calculated under the methodology can go to court and not just be limited to an arbitration, right?

MR. JONES: I wouldn't be able to say that in the

abstract for every case but for the instances I'm talking about, I think that --

THE COURT: For any case where a producer believes that their fee was not correctly calculated under the formula, the methodology, the plan, they are not limited to going to the contracted-for arbitration. They can go to an Oregon state court and essentially under the APA argue that the CAA is not following the law in their calculation of our fee.

Is that your position?

MR. JONES: I think that's correct, Your Honor. Yes.

THE COURT: Interesting.

MR. JONES: On that, if I could note -- you talked about the contracted-for arbitration provision in the agreement itself. In that agreement itself, at the end of that same paragraph that they quote about arbitration, there is a sentence that says, "Notwithstanding the foregoing, nothing in this section shall limit the ability of a party to seek injunctive relief from a court of competent jurisdiction ordering compliance with this agreement or this Oregon addendum or enjoining and restraining the continuation of a breach of the agreement or this Oregon addendum."

THE COURT: All right. So the producer could go to court -- maybe even federal court if there is jurisdiction -- federal or state court, whatever court that's appropriate -- against CAA to say, "They are not correctly calculating my fee.

That violates this agreement. Therefore, please order them either to correctly calculate the fee or not to take any further action based on an incorrectly calculated fee."

MR. JONES: I think that's what the agreement says there.

THE COURT: All right.

MR. JONES: The agreement itself, when it talks about compliance with the agreement, that agreement and the addendum that's part of that agreement in turn refer back to CAA's obligations under EPR law that says that they will calculate -- they will set fees in accordance with EPR law and the program plan. That plan has been approved by the DEQ. And so if they're not doing it in accordance with that, they're not doing what the agreement says.

THE COURT: That's interesting. I hadn't thought about it that way. It's an interesting point.

MR. JONES: Let me check my notes, Your Honor, about any further points.

I want to touch briefly on some of the cases that -- I want go through each of them exhaustively -- that plaintiff talked about and that they cite in their briefing about unconstitutional conditions.

Of course, the fundamental difference between this case and those ones that I am talking about, in those cases there was a condition that they had to follow. There was no

ifs, ands, or buts. For example, in the Frost case, where they said, "Did you want to operate as a private carrier in the state, then you have to comply with this condition if you want to be allowed to use the public highways." And if you are a carrier, you have to use the highways. They don't really have an option. And here, they talk about you do have options.

And I wanted to highlight -- also, they talked about cases involving conditions on land use permitting. These are the Dolan and Nollan-type cases. Those cases aren't applicable for that same reason, but also because that framework about land use permitting doesn't apply here. They point to the case Koontz, saying that this applies to not just land things but demands for money. But in that case the Supreme Court emphasized that the only reason that the Dolan and Nollan step applied is because the demand for money was directed at -- there's a direct link between that demand and the specific piece of property, saying that if you want to develop this property, you have to pay for -- pay this money and pay for improvements elsewhere. And so here, it's not directed to a specific piece of property. It's not a land use case. It's not in the same category.

And even beyond that, I would point out that plaintiff's description of the outcome of that case is completely inaccurate. The Court did not hold that even the condition in that case was unconstitutional. All they held in

that case was the same "as applied," because it had that connection to land, which is not true here. So plaintiff's attempt to analogize that case here and to say that that creates a broad rule that you can't use money for one thing -- for anything that's not directly the same thing or directly the same property that you're talking about, the connection in that case -- the analogy of that case fails for at least those three different reasons there.

And beyond that, I think I have covered what I have had to say about those claims. If Your Honor has questions about equal protection or anything else, I'm happy to answer.

THE COURT: Thank you, Mr. Jones. I appreciate it.

Back to you, Mr. Carpenter.

MR. CARPENTER: Thank you, Your Honor.

Subject to any questions the Court had, I would just say that we would support moving expeditiously to a trial. I realize mid July -- around July or late summer, something in that range. I know there's a financial report that is actually scheduled to come out July 1.

THE COURT: I didn't hear what you were saying.

Slowly.

MR. CARPENTER: We support moving towards an expedited trial quickly. Whether it's mid July or shortly thereafter. I believe CAA's financial report is going to be due July 1, and so maybe some time to process that.

THE COURT: Sure.

MR. CARPENTER: The question becomes what do we do in the meantime. We think the appropriate interim relief is just a temporary -- only a few months' stay of enforcement to give relief to these businesses in that meantime.

THE COURT: Talk to me then how they will be irreparably injured if I don't give you a stay now and I set a trial date for July 13th?

MR. CARPENTER: Because they are subject to these pending invoices.

THE COURT: When do the invoices become due?

MR. CARPENTER: March 6th.

THE COURT: So they pay the invoices. They pay them under protest. They say, "We think this is an unconstitutional regime that has been set up. We look forward to going to trial on July 13th." You're not really saying that they are unlikely to be able to get their money back if they win this trial on July 13th, are you? It's a bit speculative.

MR. CARPENTER: I think it becomes -- I thought the plan of CAA was to spend the money in the meantime. I don't know that there is a likelihood of us being able to recoup that.

But also, in the meantime, we have prices that are being imposed upon us, even when we are not the obligated producers because of these invoices happening. There is a

threat of enforcement actions if businesses can't afford to pay the invoices. There are businesses who are faced with the choice right now of having to leave the state because of that. So the interim relief, to at least pause enforcement of the $25,000 a day in penalties, would be significant.

THE COURT: Enforcement would be by DEQ, right?

MR. CARPENTER: Yes.

THE COURT: Okay. Let me ask DEQ, if we hold trial on July 13th, is there going to be any enforcement between now and then?

MS. VAN LOH: I'm not aware of any enforcement actions.

THE COURT: Would there be any objection to DEQ agreeing that if we hold trial July 13th, there will be no enforcement between now and trial?

MS. VAN LOH: I'm not sure that we can agree to that, Your Honor, because if people don't think that there's going to be an enforcement action, and there is a trial coming up, that may have the same effect as just issuing a preliminary injunction requiring it.

THE COURT: We would obviate the need for a preliminary injunction at all if the parties agree that there will be no enforcement -- we will have a trial July 13th. You know, a trial two or three years from now could wreak a lot of havoc on the implementation of this plan.

I don't think a trial July 13th will wreak any havoc. So if the parties agree there's not going to be any enforcement by DEQ, as long as they have a trial July 13th, then I won't enter a preliminary injunction, but that's because one won't be needed. It's not at all uncommon that parties reach essentially standstill agreements to obviate the need for a preliminary injunction, as long as they know that we're moving ahead expeditiously towards getting a trial and a resolution. So that's what I'm asking.

MS. VAN LOH: I don't know that I can make that representation here.

THE COURT: Do you want a make a phone call while we take a break?

MS. VAN LOH: Perhaps.

THE COURT: Anything else at this time, Mr. Carpenter?

MR. CARPENTER: No, Your Honor. Thank you.

THE COURT: Ten-minute recess.

MS. VAN LOH: Thank you, Your Honor.

(Recess.)

(Proceedings resumed:)

THE COURT: All right. Ms. Van Loh, do you have a response?

MS. VAN LOH: I do. So just to be clear what you are asking, you're asking if DEQ can pause enforcement of NAW's --

of just obligations under the RMA and not specific to invoicing? Let me say this again.

THE COURT: I just want to know what are the limits of what DEQ can do. Then I will ask the plaintiff whether that solves their immediate short-term problem.

MS. VAN LOH: So what DEQ can do is not initiate an enforcement action against NAW's members.

THE COURT: Okay.

MS. VAN LOH: They would still be expected to pay the fees, and DEQ would still be able to institute enforcement actions against other producers and the PRO.

THE COURT: Yeah, we are only talking about plaintiff. Plaintiff is not speaking for anybody other than plaintiff's members.

So DEQ would not initiate enforcement action against any NAW members during trial -- or pending trial?

MS. VAN LOH: Right.

THE COURT: Since you can't speak for anyone other than your members anyway, is that sufficient for plaintiff's needs?

MR. CARPENTER: I guess I have a question about whether that means they will initiate enforcement proceedings.

THE COURT: Well, if they initiate enforcement proceedings against folks other than your client or your client's members, what business is that of yours? Nothing

personal.

MR. CARPENTER: There are two concerns. The first, as we say in the declarations, there are the obligations that NAW members have to pay directly. But then they are also the upstream suppliers. That may be the people who have the fee obligations that are pushing it onto NAW's members that are causing prices to go up more broadly. I think this is a situation, in which to provide complete relief to NAW members from the EPR fees, a broader injunctive relief is appropriate. If I've lost you on that --

THE COURT: No, I understand what you are saying.

MR. CARPENTER: That's one point. But then the related question I have about the offer to not initiate enforcement actions while pending trial, does that mean that if after trial is resolved, they will then go backwards in time and say, "Okay. Well, you weren't paying for the past six months; and therefore, we are going to charge you $25,000 a day for that backwards time."

THE COURT: That's a fair question.

Defendants' position?

MS. VAN LOH: No. The answer to that is no.

THE COURT: You will not be charging the penalties -- let's make this more precise.

Let's assume that you do not go forward with any enforcement action, we go forward to trial. Defendant wins the

trial. Then you may begin enforcement actions. But one of the big questions that plaintiff -- especially the plaintiff's members will have, is, "Well, we haven't paid then in the last 30 days or 60 days. Does that mean we are at risk for the $25,000 per day penalty going all the way back to February 6th?"

MS. VAN LOH: So we want them to still pay the fees.

THE COURT: So you want them to pay the fees?

MS. VAN LOH: Right.

THE COURT: You won't bring any enforcement action. You won't be suing them to collect the fees. If they don't pay the fees, and then we go to trial on July 13th, and at the end of that week defendant wins, you can then go back and say, "Folks, now you better pay your fees," and hopefully they will. But will they also be liable for $25,000 per day penalty between February 6th and the end of our trial?

MS. VAN LOH: I think that the penalty is a matter of discretion of the agency.

THE COURT: Right. And that's what he wants to know. How will that discretion be exercised? Because if there is a risk that they will be also liable for 25,000 per day between February 6th and the end of trial, that will put them in a very different position. That's what he's asking.

MS. VAN LOH: We still want them to pay the fees.

THE COURT: I agree. And what if they don't? When

you say you're not taking enforcement action, the question is: What precisely does that mean? Does that mean that you will not be seeking the penalties for not paying fees between now and trial, or will the penalties only start to accrue after trial, assuming you win?

MS. VAN LOH: I think what you're asking is, are we going to agree not to do enforcement proceedings, but then that gives all of NAW's members carte blanche to just ignore their fee invoices.

THE COURT: Well, it's not going to give them carte blanche, but it means they're not going to be responsible for the -- they're not going to be at risk for the $25,000 a day. That's really what he is asking. Because if they don't pay the fees, and they are responsible for $25,000 per day, that changes their calculation. So he's asking will the defendant voluntarily agree to not charge or not seek the $25,000 per day penalty.

You certainly would be entitled to all the fees that are owed and unpaid until they're paid. I think he is asking will you agree to not charge the $25,000 per day penalty between now and when you get a decision from trial?

MS. VAN LOH: I don't think the $25,000 per day penalty is set -- it is not a set thing. It's just a --

THE COURT: Okay. So he is asking, will you agree not to seek that $25,000 per day until you get a court ruling

from this Court that the plaintiff's case is without merit?

MS. VAN LOH: I don't think we can agree to something that would allow producers not to pay the fees.

THE COURT: Okay.

MS. VAN LOH: Because I think not paying the fees will have a -- that means that they have to show that they meet all the requirements for injunctive relief, and I don't think that they do.

THE COURT: Okay. I understand.

All right. So that means we do not have a stipulation. The second time I've failed at this in a week.

All right. I have one more substantive question. I'm having trouble with about this last discussion that I had Mr. Jones, and I want to make sure I understand everybody's position on this.

If an invoice goes out to a producer, would the producer have enough information to even make the argument: CAA, you have incorrectly calculated it? I know that Appendix G is confidential, but there are other things that are not confidential as part of the plan. So really what I want to find out is, if the producer gets an invoice, and the producer believes that it has been incorrectly calculated under the plan, will the producer have enough information essentially to do the math themselves, or is that information part of what's still confidential under Appendix G?

Defendants' position?

MS. VAN LOH: That information is not confidential. They should be able to -- the fee is a calculated by multiplying the tonnage by the rate for that particular material.

THE COURT: So it's how that particular fee was set. That's the confidential stuff.

MS. VAN LOH: Well, how it was set -- I mean, the framework of how it was set is not confidential either.

THE COURT: I understand. So the framework is not confidential. Some of the specific inputs that go into calculating the specific amount of the fee -- sorry, the fee formula -- that may be confidential. But the producers will know the formula so they can look at their own data and see has that fee for them on their invoice been correctly calculated or was it calculated by mistake.

MS. VAN LOH: Right.

THE COURT: Okay. Does plaintiff agree with that?

MR. CARPENTER: No, Your Honor, not entirely.

THE COURT: Tell me why.

MR. CARPENTER: There are situations that have arisen, and we identify in the Winkle declaration, for example.

THE COURT: Which declaration?

MR. CARPENTER: The Winkle declaration.

So those are situations in which there could be

duplicated reporting, particularly based on when this was launching in 2024. People were reporting volumes. There's uncertainty about how producers would be identified across the supply chain and who is responsible for different products. So there are situations where they've raised with CAA, "Hey, we believe that this has been double-reported to you."

What we actually see in the supplemental Winkle declaration that we filed that was raised in response to the first invoice, CAA didn't really give a response, and then CAA continued to issue a new invoice, again, based on the disputed volumes. So that's one example.

Then the other example is, we can see from the published rate schedule, they've now decided that paper will be five cents, up a hundred percent increase over before, but we don't know exactly why they got to five cents.

THE COURT: That, I get, but that's not part of my question.

MR. CARPENTER: The first part was to answer your question, I think.

THE COURT: Does the defendant agree with what Mr. Carpenter just said, based on the Winkle declaration, there are going to be circumstances where they don't know how the specific fee was calculated and whether the math was right?

MS. VAN LOH: Well, I think that they believed that the amount was miscalculated, and it isn't right based on what

they're looking at, and they're just unhappy with CAA's response.

THE COURT: So maybe if there is an agreement here -- let me flesh this out. Under the example you gave, Mr. Carpenter, they can see how much they think the numerator and the denominator should be for their fee, and they just disagree, and they say it was double-counted. CAA may look at it. If they agree, they will make an adjustment. If CAA disagrees, they may say, "No, we didn't double-count it. Here's what we included, here is what we multiplied it by, and that's your fee."

Do you agree with that?

MR. CARPENTER: And that would be the kind of dispute that we would be forced into arbitration over without a judicial review. Part of the example, or what we explained in the declarations, there is really no feasible way to do that check to see who else is reporting up and down the stream.

THE COURT: Now, what's your response to what Mr. Jones said that you could have judicial review? Because if they double-counted and put in incorrect information into the determination of that invoice, well, that's not consistent with what the plan allows. And therefore, that's not consistent with the statute. And therefore, you can seek an injunction that they may not enforce that invoice for that improper amount.

MR. CARPENTER: Yeah, that was interesting.

THE COURT: Yeah, I agree.

MR. CARPENTER: Sorry. Let me go back and find the exact language. So it says nothing in the arbitration -- well, the dispute resolution clause -- "shall limit the ability to seek injunctive relief from a court ordering compliance with this agreement or enjoining or restraining the continuation of a breach of this agreement."

I guess you would have to go back to see.

THE COURT: Well, the agreement would set forth how the fees are calculated.

MR. CARPENTER: That would be a question of whether that dispute -- that miscounting dispute then constitutes a breach of the agreement and going back to it. It seems like an interesting situation.

THE COURT: Okay. We will talk more about this at trial. I would like to see evidence on this.

MS. VAN LOH: I have a further response --

THE COURT: Sure. Go ahead.

MS. VAN LOH: -- to the double-counting situation.

THE COURT: Uh-huh.

MS. VAN LOH: That's a matter of who the producer actually is for the covered product, and so that's something that DEQ could be responsive to -- or would be responsive to.

THE COURT: I'm not following your answer. Spell

that out a little more, please.

MS. VAN LOH: So the concern is for this particular individual that there was some double-counting, and then they raised the issue with CAA. CAA didn't respond. So then they don't have any other options except to go into binding arbitration, or this injunctive relief. But they do have another option. That is to go to DEQ and say, "Hey, this was double-counted. This other person is a producer, and we want this fixed." So that is not an option that they can do.

THE COURT: I get that. This is back more to the theoretical point of do they have judicial review of that? First, I thought no, but then Mr. Jones says, "Well, they could seek an injunction against providing an invoice that improperly double-counts."

MS. VAN LOH: I think the important thing -- this goes back to what I was saying earlier about the way that CAA and DEQ see this. It's intended to be somewhat more collaborative. So the binding arbitration isn't so much to, like, keep the proceedings secret and make it so that producers don't have access to judicial review. It's because it's cheaper to do an arbitration than -- if everybody files lawsuits all the time, all of those expenses go back into the program. So if the program is ultimately upheld, everybody pays for it.

THE COURT: I get that. Frankly, I believe

Professor Morath comments on the fact that there are EPR programs and other contexts that do include mandatory arbitration provisions.

MS. VAN LOH: For that very reason.

THE COURT: Yeah, I get it.

All right. Does anybody want to be heard on anything else? I think I've changed my mind, and I'm going to rule from the bench. Does anybody want to be heard any further on anything?

Okay. First of all, on the motions to dismiss, which is Docket 56, defendants' motion to dismiss, I am dismissing -- and this will all be without prejudice. We'll talk in a moment whether -- and defendant will have leave to amend, if you really want to deal with these issues.

I'm dismissing Defendants Matt Donegan, Karen Moynahan, Mark Webb, and Silvia Tanner, who have been named as defendants in their official capacities as members of the Oregon Environmental Quality Commission. We are leaving in as the sole defendant Ms. Leah Feldon, as the Director of the Oregon Department of Environmental Quality, sued in her official capacity. She's the only remaining defendant.

I'm dismissing all of plaintiff's state law claims under the Eleventh Amendment, and I'm dismissing -- and all of this is without prejudice -- plaintiff's equal protection claim and the unconstitutional conditions claim.

I don't think there is a dispute on the equal protection. But on the unconstitutional conditions, I think it was a very interesting and helpful discussion we had. If plaintiff really wants to replead that and show a specific unconstitutional condition, even though they arguably could form their own PRO, you're welcome to replead it. I really don't see how that's going to advance the ball, because I'm not dismissing -- I am denying the motion to dismiss under 12(b)(6). With respect to the Dormant Commerce Clause claim and the due process claim, I think that's really the heart of this problem. But if you want to try to replead unconstitutional conditions, you have leave to do so within two weeks. I think you should take seriously the arguments we've heard and think about whether you really need that claim.

Okay. I think that takes care of everything on the motion to dismiss.

With respect to the motion for preliminary injunction, Docket 33, I am granting that. I am not going to make a finding on a substantial likelihood of success. I am just not there. The furthest I will go is that there are serious questions here. Under Ninth Circuit, we are allowed to use a serious questions test under Cottrell. There are serious questions here. I do find that there is a substantial likelihood of irreparable harm, in part because of the very expensive penalty fees that are possible. And because I'm

looking to serious questions, that tells me that there has to be a balance of equities that tips sharply in favor of the plaintiff. There are some articulated equities that tip in favor of plaintiff, but I see nothing to counterbalance that on behalf of defendant, provided we get to trial soon and make a decision soon.

This would be different if we were talking about delaying this a year or two or three, but the trial is going to be set -- and firmly set -- to begin on Monday, July 13th, 2026, in this courtroom.

Mary, I am correct, right, we are available that entire week?

THE CLERK: Yes.

THE COURT: Trial begins and is firmly set for July 13th, 2026, in this courtroom. I think that if we move expeditiously to trial, and I move expeditiously to get you a decision, there will not be any seriously adverse repercussions to the implementation of the plan, and therefore the balance of equities tip sharply in favor of the plaintiff. But as I said, I am not finding a substantial likelihood of success. I am merely finding serious questions.

I don't know for sure whether you have had your 26(f) conference. If you haven't, I'm waiving it. So start your discovery now if you need discovery. If anybody needs deadlines for discovery shortened so that you can all be fully

prepared for trial on July 13th, I'm going to allow it, but, first, please confer with each other, see what you can reasonably agree, and if you need the assistance of the Court, you will get it. But if you need to shorten the time for discovery, essentially expedited discovery, I'm inclined to give that to you, but first see what you can first work out yourselves.

I do want to have a very brief pretrial conference to make sure we are fully ready for trial. So if we start trial on the 13th, maybe a pretrial conference -- I don't want to mess up your July 4th.

Mary, could we do a pretrial conference on, let's say, maybe Wednesday, July 1st? Are we available on July 1st?

THE CLERK: Yes.

THE COURT: Can you all do a pretrial conference for about an hour or two at most? If you don't want to travel, you are welcome to do that remotely if you want. But would a pretrial conference July 1st -- it's a Wednesday -- work for you all? I'm neutral whether we do it at 10:00 a.m. or 9:00 a.m. or 2:00 p.m. Any preferences?

Are you available and any preferences on that timing?

MR. CARPENTER: Yes. July 1st would be okay.

THE COURT: Any preference on timing? Does 9:00 a.m. work?

All right. Pretrial conference at 9:00 a.m.,

Wednesday, July 1st.

The extent of the preliminary injunction is that Director Feldon may take no steps to enforce the Oregon Plastic Pollution and Recycling Modernization Act against National Association of Wholesaler-Distributors or their members. I'm not going to go beyond that at this stage.

Any questions?

If anything does come up -- I get the priority here. I know that you're going to have is an awful lot to do between now and July 13th. So if you need my assistance, ask for it sooner rather than later. Just contact my courtroom deputy. I will make this case a priority. I will make myself available to you all very promptly. Try to work things out among yourselves. But if you can't, you will have my attention promptly.

MR. CARPENTER: Your Honor, can I just get clarity on the questions you were asking? If defense were to win at trial, are we then liable for the penalties?

THE COURT: I honestly don't know. We can figure that the one out later. But right now, she is enjoined from enforcing the Plastic Pollution Act.

MS. VAN LOH: Against NAW members.

THE COURT: Against plaintiff's members, yes? NAW.

I thought you first said "nonmembers." No. It's against plaintiff's members, correct.

A fascinating problem, folks.

By the way, if there is any chance that you can resolve this among yourselves without a need for a trial -- I know that you have got outstanding counsel on both sides -- please give that a good shot. If not, I'll do my best to untangle it at my level at trial.

And by the way, I don't think we will necessarily need all five days for trial, but right now I don't want to potentially prejudice you, so I will hold open all five days for you. But I'm hopeful that we can probably get this done in about three days. You figure out what you really need. That's my best estimate. I do want to hear from some witnesses on how some of these details that we talked about today actually work in practice and realize that plaintiff is advancing an "as applied" claim and not merely a facial claim.

Thanks, everybody. We will be in recess.

MS. VAN LOH: Thank you, Your Honor.

MR. CARPENTER: Thank you.

(Court adjourned.)

--oOo--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause. A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

/s/ Dennis W. Apodaca February 16, 2026
DENNIS W. APODACA, RDR, RMR, FCRR, CRR DATE
Official Court Reporter

**MR. BOWERS: [1]** 4/15
**MR. CARPENTER: [67]**
**MR. JONES: [20]** 70/7 70/15 70/21 71/14 72/2 72/16 72/19 72/23 73/12 73/24 75/8 76/18 77/11 78/12 78/25 79/10 79/12 80/4 80/7 80/17
**MR. SANDS: [1]** 4/19
**MS. VAN LOH: [101]**
**THE CLERK: [3]** 4/6 98/13 99/14
**THE COURT: [191]**

**$**

**$1.2 [1]** 19/7
**$12,000 [1]** 19/9
**$16 [2]** 16/13 16/15
**$25,000 [11]** 50/15 84/5 87/17 88/5 88/15 89/12 89/14 89/17 89/20 89/22 89/25
**$5,000 [1]** 19/9
**$530,000 [1]** 19/7
**$730 [1]** 19/12
**$730 million [1]** 19/12
**$950 [1]** 19/10
**$950 million [1]** 19/10

**-**

**--oOo [1]** 102/1

**/**

**/s [1]** 102/8

**0**

**01334 [1]** 1/5

**1**

**1 [9]** 17/17 18/11 22/14 22/19 41/2 41/16 70/11 82/19 82/25
**1's [1]** 22/16
**10 [1]** 72/17
**100 [1]** 2/9
**1000 [1]** 2/24
**10:00 [1]** 99/19
**12 [5]** 70/11 70/13 71/12 71/13 97/9
**1211 [1]** 2/6
**13 [1]** 74/1
**1334 [1]** 4/8
**13th [14]** 83/8 83/16 83/18 84/9 84/14 84/23 85/1 85/3 88/12 98/9 98/15 99/1 99/10 100/10
**15 [1]** 58/19
**15-minute [1]** 58/19
**16 [1]** 102/8
**18 [3]** 13/21 23/9 61/1
**183.490 [2]** 76/22 77/14
**1900s [1]** 45/19
**1st [5]** 99/13 99/18 99/22 100/1

**2**

**2 [3]** 17/17 22/15 41/18
**2018 [1]** 35/6
**2021 [2]** 12/2 48/11
**2024 [2]** 13/14 92/2
**2026 [10]** 1/6 4/1 13/13 13/17 17/8 17/9 74/17 98/10 98/15 102/8
**2028 [2]** 17/10 17/13
**204 [1]** 2/6
**25,000 [1]** 88/21
**26 [1]** 98/22
**2:00 [1]** 99/20

**3**

**3 [1]** 17/17
**3 percent [1]** 17/17
**30 [1]** 88/4
**30,000 [1]** 64/5
**30,000-foot [1]** 64/5
**301 [1]** 2/24
**326 [1]** 2/25
**326-8182 [1]** 2/25
**33 [2]** 5/17 97/18
**35,000 [1]** 73/3
**350 [1]** 2/3
**3:25 [2]** 1/5 4/8
**3:25-cv-01334-SI [1]** 1/5

**4**

**4 [1]** 3/2
**40 [5]** 16/21 18/12 18/16 36/19 36/25
**400 [1]** 49/5
**459A.869 [1]** 74/1
**4th [1]** 99/11

**5**

**500,000 [1]** 19/16
**503 [1]** 2/25
**56 [1]** 96/11
**57 [1]** 18/11
**57-1 [1]** 18/11

**6**

**6 [6]** 1/6 4/1 70/13 71/12 71/13 97/9
**60 [1]** 88/4
**68 [1]** 5/18
**6th [4]** 83/12 88/6 88/16 88/22

**7**

**700 [1]** 20/10
**700-pound [1]** 20/10
**75 [1]** 6/22

**8**

**8 [1]** 32/18
**8182 [1]** 2/25

**9**

**90071 [1]** 2/4
**97201 [1]** 2/9
**97204 [1]** 2/24
**97209 [1]** 2/6
**9:00 [3]** 99/20 99/23 99/25
**9:00 a.m [2]** 99/20 99/25

**A**

**a.m [4]** 99/19 99/20 99/23 99/25
**ability [3]** 15/8 79/17 94/5
**able [16]** 20/7 32/2 45/2 54/8 54/10 54/11 56/7 74/19 75/11 77/22 78/7 78/25 83/17 83/21 86/10 91/3
**about [115]**
**above [1]** 102/5
**above-entitled [1]** 102/5
**absolute [1]** 10/22
**absolutely [6]** 11/4 21/24 23/6 24/11 68/7 68/10
**absorb [2]** 11/2 18/1
**absorbed [1]** 44/24
**absorbing [1]** 23/13
**abstract [1]** 79/1
**accept [1]** 39/12

A

**accepted [1]** 39/10
**access [4]** 33/24 66/25 67/2 95/20
**accomplish [2]** 44/7 61/22
**accomplishing [1]** 71/22
**accordance [3]** 36/7 80/11 80/13
**accordingly [1]** 28/5
**account [1]** 25/2
**accountability [3]** 12/15 13/2 16/19
**accountable [1]** 45/22
**accounting [1]** 67/15
**accrue [2]** 13/16 89/4
**achieve [2]** 62/1 62/22
**achieved [2]** 62/23 62/24
**achieving [1]** 22/2
**across [9]** 8/21 14/3 15/3 15/14 15/20 22/20 25/13 71/2 92/3
**act [9]** 12/10 23/5 40/7 50/18 51/11 51/15 51/16 100/4 100/21
**action [11]** 50/7 66/2 66/3 67/18 80/3 84/18 86/7 86/15 87/25 88/10 89/1
**actions [8]** 38/21 60/4 77/17 84/1 84/12 86/11 87/14 88/1
**actively [1]** 42/10
**activities [1]** 64/4
**actual [5]** 10/11 12/9 27/21 33/11 50/11
**actually [28]** 8/21 10/3 11/2 11/17 12/7 12/10 13/15 13/16 13/19 17/2 17/24 18/22 19/2 19/8 22/22 34/16 40/23 47/17 54/3 56/17 63/12 69/18 72/11 74/10 82/18 92/7 94/23 101/13
**add [1]** 32/25
**addendum [3]** 79/19 79/21 80/8
**addition [1]** 48/25
**additional [2]** 12/16 59/10
**address [7]** 34/24 35/11 36/2 59/7 64/16 66/19 69/19
**addressing [1]** 69/16
**adjourned [1]** 101/19
**adjust [1]** 64/19
**adjustment [2]** 64/23 93/8
**administered [1]** 20/24
**administering [1]** 19/8
**administrative [7]** 21/19 38/25 39/15 40/22 50/18 51/11 67/21
**adopt [1]** 17/9
**adopting [1]** 49/14
**advance [2]** 7/5 97/7
**advancing [1]** 101/14
**advantage [1]** 45/12
**adverse [1]** 98/17
**advisory [4]** 39/20 43/13 48/17 48/23
**affect [1]** 73/18
**affected [2]** 48/3 63/20
**affecting [1]** 25/14
**affects [1]** 62/9
**afford [2]** 23/12 84/1
**after [6]** 23/18 23/19 24/15 59/16 87/15 89/4
**again [10]** 10/7 18/5 40/21 47/11 53/20 57/21 63/4 69/20 86/2 92/10
**against [22]** 19/10 19/16 25/6 30/15 30/20 31/3 60/3 60/4 61/6 61/16 66/12 67/18 79/25 86/7 86/11 86/15 86/24 95/13 100/4 100/22 100/23 100/25
**agencies [1]** 39/16
**agency [11]** 11/6 21/19 39/18 39/23 39/24 41/15 43/1 43/3 63/21 76/22 88/18
**agree [21]** 7/14 8/11 10/22 46/7 50/24 54/15 84/16 84/22 85/2 88/25 89/7 89/16 89/20 89/24 90/2 91/18 92/20 93/8 93/12 94/2 99/3
**agreed [1]** 66/12
**agreeing [2]** 32/10 84/14
**agreement [18]** 70/9 71/10 79/13 79/14 79/19 79/21 80/1 80/4 80/7 80/8 80/8 80/9 80/14 93/3 94/7 94/8 94/10 94/14
**agreements [1]** 85/6
**agrees [3]** 66/1 67/7 67/16
**Agriculture [1]** 33/12
**ahead [3]** 17/15 85/8 94/19
**Air [1]** 19/23
**Air-Conditioning [1]** 19/23
**al [2]** 1/7 4/7
**Alameda [2]** 19/1 19/6
**Alaska [2]** 13/10 14/8
**Alex [1]** 5/2
**Alexander [1]** 2/8
**align [2]** 50/2 50/3
**alive [1]** 24/15
**all [88]**
**allegations [1]** 72/24
**allocate [1]** 14/10
**allocated [1]** 13/6
**allow [4]** 27/9 41/11 90/3 99/1
**allowed [4]** 31/23 40/7 81/4 97/21
**allowing [2]** 40/18 77/19
**allows [5]** 28/24 37/11 39/2 50/8 93/22
**almost [4]** 18/12 18/14 18/16 36/18
**alone [1]** 73/9
**Alpha [1]** 9/23
**already [8]** 11/20 14/22 17/16 20/6 50/25 51/7 63/2 70/8
**also [35]**
**alternatives [1]** 35/8
**although [6]** 8/2 14/2 28/18 31/21 44/20 64/22
**am [24]** 13/17 23/20 25/10 29/13 30/18 32/7 33/1 38/23 43/23 45/5 66/16 66/20 70/14 77/10 78/11 80/24 96/11 97/8 97/18 97/18 97/19 98/11 98/20 98/20
**amend [1]** 96/13
**amended [1]** 50/19
**amendment [8]** 30/8 50/9 59/25 64/17 64/19 68/9 70/12 96/23
**American [1]** 19/24
**amicus [2]** 18/10 19/22
**among [4]** 16/3 39/5 100/13 101/3
**amount [6]** 12/17 44/16 60/22 91/12 92/25 93/25
**amounted [1]** 19/9
**analogize [1]** 82/3
**analogy [1]** 82/7
**analysis [5]** 10/14 20/14 20/19 33/25 61/10
**analyze [2]** 13/24 16/1
**analyzed [1]** 8/10
**analyzing [1]** 35/8
**ands [1]** 81/1
**Angeles [1]** 2/4
**angle [1]** 10/21
**animal [1]** 40/4
**another [11]** 11/16 16/9 33/12 59/18 60/2 72/16 73/12 73/13 73/24 76/21 95/7
**answer [8]** 37/5 41/8 51/22 58/3 82/11 87/21 92/18 94/25
**anticipate [1]** 53/3
**antitrust [6]** 10/18 10/19 10/21 10/23 11/8 11/11
**any [63]**
**anybody [6]** 39/19 39/21 86/13 96/6 96/8 98/24
**anyone [5]** 29/7 43/21 46/7 48/11 86/18
**anything [16]** 32/25 46/22 56/17 57/5 58/24 59/13 60/10 71/22 74/21 75/18 82/5 82/11 85/15 96/6 96/9 100/8
**anyway [5]** 23/19 32/3 57/13 70/1 86/19
**anywhere [1]** 41/2
**APA [10]** 51/18 76/10 76/17 76/22 77/5 77/16 78/9 78/13 78/19 79/7
**Apodaca [3]** 2/23 102/8 102/9
**apparently [2]** 48/14 53/1

## A


**appeal [9]** 31/16 41/18 64/24 65/2 65/17 65/19 65/21 76/20 77/5
**appealable [4]** 29/10 41/20 42/2 76/17
**appealing [1]** 77/6
**appear [1]** 6/9
**appearance [1]** 4/10
**APPEARANCES [1]** 1/15
**appendix [5]** 39/10 46/14 67/5 90/19 90/25
**Appendix G [1]** 90/19
**Appliance [1]** 19/25
**applicable [1]** 81/9
**application [1]** 73/2
**applied [8]** 11/22 45/17 47/22 58/7 58/12 81/15 82/1 101/15
**applies [4]** 60/18 73/15 75/15 81/12
**apply [3]** 13/18 67/25 81/11
**applying [1]** 78/15
**appointed [3]** 28/21 29/20 49/2
**appreciate [1]** 82/12
**appropriate [8]** 23/6 40/17 43/22 64/23 66/2 79/24 83/3 87/9
**appropriately [1]** 66/24
**approval [6]** 10/7 50/17 50/19 50/19 50/19 50/20
**approve [3]** 50/17 59/24 59/24
**approved [10]** 10/3 41/7 41/21 46/14 46/17 50/21 65/7 77/20 78/16 80/12
**approves [2]** 47/11 50/6
**arbitration [22]** 29/10 33/6 36/21 39/5 41/20 42/1 42/2 42/5 64/25 66/9 67/11 77/4 78/24 79/6 79/13 79/15 93/14 94/4 95/6 95/18 95/21 96/3
**arbitrator [4]** 66/10 66/14 78/4 78/9
**are [228]**
**are having [1]** 65/13
**area [1]** 36/21
**areas [1]** 35/24
**aren't [5]** 6/8 35/23 45/1 63/20 81/9
**arguably [3]** 59/22 65/4 97/5
**argue [3]** 6/1 6/10 79/7
**arguing [1]** 5/20
**argument [19]** 5/19 6/6 8/5 23/8 23/10 30/23 32/17 33/20 51/2 54/19 57/25 63/22 67/1 77/18 77/21 77/24 77/25 78/14 90/17
**argument for [1]** 54/19
**arguments [17]** 6/3 6/7 6/8 20/24 28/8 30/14 30/25 32/11 32/20 32/21 32/24 49/23 59/6 70/14 71/5 77/23 97/13
**arisen [1]** 91/22
**around [2]** 43/16 82/17
**arrives [1]** 61/23
**art [1]** 11/20
**articulated [1]** 98/3
**as [92]**
**as applied [1]** 101/15
**aside [1]** 73/12
**ask [12]** 5/6 9/8 12/1 18/9 30/6 36/16 52/13 65/5 76/11 84/8 86/4 100/10
**asked [2]** 28/7 41/1
**asking [12]** 11/12 76/5 85/9 85/25 85/25 88/23 89/6 89/13 89/15 89/19 89/24 100/17
**asks [2]** 6/18 28/18
**aspect [4]** 10/20 11/4 11/16 25/14
**asserting [1]** 73/7
**assertion [4]** 46/5 54/23 73/14 73/15
**asserts [1]** 75/21
**assessed [1]** 24/6
**assist [1]** 28/19
**assistance [2]** 99/3 100/10
**associated [1]** 10/10
**association [9]** 1/4 4/7 4/13 4/16 7/9 19/24 19/24 73/3 100/5
**assume [6]** 12/12 30/14 38/9 53/8 53/11 87/24
**assuming [2]** 65/3 89/5
**assumption [1]** 21/2
**assure [1]** 5/22
**attempt [2]** 20/15 82/3
**attention [2]** 64/16 100/14
**audit [2]** 25/22 55/1
**auditor [1]** 15/9
**auditors [1]** 15/7
**Austin [3]** 2/3 4/12 4/16
**authority [12]** 11/7 32/1 41/16 66/3 66/14 66/19 67/12 67/17 67/19 68/7 68/10 68/12
**authorized [3]** 40/3 40/15 64/6
**automatically [1]** 74/22
**available [5]** 38/25 98/11 99/13 99/21 100/12
**avenue [9]** 2/3 2/24 51/15 64/25 65/1 66/9 66/11 71/18 71/20
**avenues [2]** 65/8 76/9
**aware [3]** 36/24 41/5 84/11
**away [1]** 24/8
**awful [2]** 58/1 100/9


## B


**b [5]** 70/11 70/13 71/12 71/13 97/9
**back [24]** 6/14 11/13 17/5 24/9 24/19 41/19 45/18 47/3 48/14 56/8 56/11 57/14 67/8 80/9 82/13 83/17 88/5 88/13 94/3 94/9 94/14 95/10 95/16 95/22
**backwards [2]** 87/15 87/18
**bad [2]** 12/23 45/23
**bag [1]** 66/7
**bailiwick [3]** 76/16 76/24 77/1
**balance [2]** 98/2 98/18
**balancing [1]** 56/5
**ball [1]** 97/7
**bankrupt [1]** 15/9
**base [2]** 13/8 44/24
**based [16]** 13/13 13/15 20/20 29/4 44/16 50/11 54/25 56/12 60/10 60/15 63/5 80/3 92/1 92/10 92/21 92/25
**baseline [1]** 34/21
**bases [1]** 28/17
**basically [12]** 15/3 23/13 27/9 31/24 33/9 38/7 39/1 45/18 46/5 47/21 52/5 53/8
**basis [3]** 36/3 41/7 73/9
**be [151]**
**be doing [1]** 69/3
**bear [1]** 21/13
**became [1]** 35/6
**because [60]**
**become [1]** 83/11
**becomes [2]** 83/2 83/19
**been [36]**
**before [4]** 1/13 27/5 53/4 92/14
**began [1]** 12/2
**begin [3]** 5/20 88/1 98/9
**beginning [3]** 42/13 52/12 55/16
**begins [1]** 98/14
**behalf [5]** 4/12 4/16 4/20 7/9 98/5
**being [44]**
**believe [10]** 16/5 33/2 33/16 49/1 49/19 50/4 59/11 82/24 92/6 95/25
**believed [2]** 39/7 92/24
**believes [3]** 78/21 79/3 90/22
**belong [1]** 45/21
**below [1]** 102/3
**bench [2]** 32/8 96/8
**benefit [3]** 38/2 38/4 38/19
**benefiting [1]** 11/1

## B


**benefits [1]** 43/15
**Bernstein [2]** 2/5 4/20
**besides [3]** 31/12 37/6 67/10
**best [7]** 9/9 35/11 35/20 60/11 65/6 101/5 101/12
**better [3]** 21/21 63/12 88/14
**between [12]** 19/20 29/11 31/23 80/23 81/16 84/9 84/15 88/16 88/21 89/3 89/21 100/9
**beyond [6]** 58/2 61/5 75/20 81/22 82/9 100/6
**big [7]** 17/25 34/18 42/23 42/24 49/13 72/21 88/2
**bigger [3]** 75/3 75/8 75/8
**bill [1]** 13/17
**bills [1]** 52/16
**binding [5]** 36/21 42/2 42/5 95/5 95/18
**bit [8]** 23/7 34/15 38/18 47/7 59/10 63/14 70/16 83/18
**blanche [2]** 89/8 89/11
**blast [1]** 12/4
**blessed [1]** 10/3
**blurry [2]** 31/23 58/8
**board [15]** 9/10 10/15 15/16 15/20 17/1 28/21 29/2 29/8 29/21 37/1 38/5 38/6 38/19 45/3 60/21
**boilerplate [1]** 55/3
**bonus [1]** 62/25
**both [9]** 42/7 44/2 52/4 56/4 58/6 58/11 68/1 70/25 101/4
**Bowers [2]** 2/2 4/15
**Bradley [2]** 2/5 4/20
**brand [3]** 14/5 18/8 46/23
**brand-new [3]** 14/5 18/8 46/23
**Brandeis [1]** 22/12
**breach [3]** 79/20 94/8 94/14
**break [8]** 6/17 20/10 34/10 57/12 57/17 57/20 58/19 85/13
**Brian [2]** 5/10 13/21
**brief [8]** 18/10 18/19 19/22 19/25 28/13 36/18 36/22 99/8
**briefing [4]** 31/7 32/18 75/21 80/21
**briefly [1]** 80/19
**briefs [1]** 6/6
**brilliant [1]** 14/7
**bring [6]** 17/5 30/16 45/2 62/16 67/18 88/10
**bringing [5]** 36/9 58/1 58/11 74/23 77/12
**brings [1]** 26/7
**broad [2]** 7/23 82/4
**broader [3]** 18/4 63/15 87/9
**broadly [1]** 87/7
**brought [3]** 9/21 57/25 64/16
**Brown [1]** 11/9
**bucket [1]** 27/6
**budget [1]** 25/2
**build [5]** 12/11 12/18 14/5 27/23 63/3
**building [3]** 12/4 48/8 48/10
**bullet [2]** 18/14 18/19
**burden [3]** 25/12 52/3 53/24
**burdened [1]** 33/25
**burdens [3]** 16/2 33/14 54/3
**business [17]** 9/6 18/6 38/13 39/3 39/17 40/2 40/8 40/9 45/12 45/15 53/18 54/1 56/13 60/19 62/12 62/20 86/25
**businesses [22]** 8/23 10/14 10/25 10/25 17/16 21/6 23/17 23/17 36/13 39/2 39/4 39/22 45/12 45/13 45/21 49/10 53/25 60/9 61/25 83/5 84/1 84/2
**businesses' [1]** 62/9
**buts [1]** 81/1
**buy [1]** 16/22
**buyback [1]** 19/6
**buybacks [1]** 19/4


## C


**C [1]** 4/2
**CA [1]** 2/4
**CAA [82]**
**CAA's [12]** 8/25 15/6 15/8 15/15 19/13 29/20 33/7 40/18 69/2 80/9 82/24 93/1
**calculate [4]** 69/12 69/12 80/2 80/10
**calculated [16]** 46/13 65/4 76/7 77/9 78/6 78/8 78/22 79/4 80/3 90/18 90/22 91/3 91/15 91/16 92/23 94/11
**calculating [3]** 78/14 79/25 91/12
**calculation [4]** 60/15 66/21 79/8 89/15
**Caleb [4]** 2/2 4/15 19/1 28/9
**California [4]** 14/14 14/24 14/24 26/8
**California's [1]** 15/2
**call [4]** 4/5 43/18 76/19 85/12
**called [1]** 37/22
**came [5]** 47/13 49/7 60/7 67/13 69/23
**can [97]**
**can't [24]** 13/6 13/16 17/14 31/17 32/3 33/4 33/13 41/9 42/17 43/5 43/9 43/11 43/14 43/19 54/13 54/15 64/16 65/24 67/8 72/8 82/4 84/1 86/18 100/14
**Canada [2]** 49/15 59/11
**cannot [2]** 56/11 68/17
**capacities [1]** 96/17
**capacity [1]** 96/21
**cardboard [3]** 74/15 74/15 74/20
**care [5]** 22/21 37/21 38/10 75/13 97/15
**careful [1]** 63/21
**Carpenter [14]** 2/2 4/12 6/20 7/9 35/21 57/6 57/20 57/22 60/25 71/20 82/13 85/16 92/21 93/5
**Carpenter's [1]** 73/14
**carrier [2]** 81/2 81/5
**carries [1]** 50/15
**carte [2]** 89/8 89/11
**carte blanche [1]** 89/11
**Carter [2]** 8/13 63/18
**case [39]**
**cases [17]** 8/13 10/18 18/21 19/2 24/1 27/14 45/17 45/18 45/19 63/18 74/14 75/14 80/19 80/24 81/8 81/9 81/9
**category [1]** 81/21
**cause [1]** 102/5
**causing [2]** 39/13 87/7
**center [4]** 24/25 26/16 26/18 26/20
**centers [3]** 17/3 22/24 24/23
**cents [2]** 92/14 92/15
**certain [1]** 36/13
**certainly [4]** 6/10 16/8 31/8 89/18
**certified [1]** 102/7
**certify [1]** 102/3
**chain [3]** 12/19 61/5 92/4
**chains [5]** 17/21 18/3 25/4 26/24 62/5
**challenge [14]** 19/4 47/23 51/18 57/25 58/2 58/6 58/7 58/9 76/9 76/12 76/21 77/16 77/17 78/19
**challenged [1]** 39/21
**challenging [1]** 18/15
**chance [2]** 20/1 101/2
**change [4]** 22/3 65/3 65/11 66/14
**changed [2]** 48/21 96/7
**changes [2]** 62/18 89/15
**changing [1]** 17/21
**charge [11]** 10/5 23/13 24/5 24/5 26/3 36/13 43/21 44/13 87/17 89/16 89/20
**charged [1]** 12/8
**charges [4]** 14/21 14/21 19/9 24/7
**charging [4]** 14/9 28/5 63/2 87/22
**Charles [1]** 2/8
**cheaper [1]** 95/21
**check [7]** 29/19 29/21 29/22 29/24 30/1 80/17 93/17
**checking [1]** 35/14
**choice [2]** 15/18 84/3

C

**chooses [1]** 45/14
**Circuit [1]** 97/21
**circular [1]** 7/12
**circumstances [3]** 26/5 63/23 92/22
**cite [1]** 80/21
**cited [2]** 28/12 58/6
**citizens [2]** 14/8 14/9
**claim [28]** 10/18 11/11 27/3 28/11 33/3 47/22 51/18 53/14 70/12 70/17 70/20 70/25 71/4 71/12 71/15 71/17 71/23 72/3 72/6 72/8 72/12 96/24 96/25 97/9 97/10 97/14 101/15 101/15
**claims [20]** 8/21 10/19 11/15 15/14 15/19 20/20 27/9 30/8 33/16 51/6 53/6 53/8 53/9 71/2 71/5 71/16 72/4 72/7 82/10 96/22
**clarity [3]** 18/21 34/16 100/16
**classic [1]** 23/20
**classically [2]** 23/14 23/16
**clause [23]** 13/3 15/20 19/4 21/9 23/8 23/15 23/15 23/21 24/13 27/3 28/1 33/16 34/1 34/1 34/2 39/5 53/14 53/23 61/10 71/13 72/1 94/5 97/9
**clean [2]** 23/5 61/25
**clear [6]** 35/6 51/1 60/2 62/11 71/17 85/24
**clearly [1]** 69/3
**client [1]** 86/24
**client's [2]** 58/16 86/25
**close [1]** 68/17
**closely [1]** 63/24
**Coal [2]** 8/13 63/18
**collaborative [1]** 95/18
**colleague [1]** 59/2
**collect [1]** 88/11
**collected [1]** 74/3
**collection [2]** 16/13 74/4
**collector [1]** 15/17
**Colorado [1]** 14/14
**come [16]** 22/5 37/12 37/24 38/8 38/16 39/1 40/4 46/19 47/15 50/1 56/22 57/14 69/17 73/1 82/19 100/8
**comes [8]** 8/14 14/24 18/5 42/23 47/9 52/1 67/8 68/5
**coming [7]** 8/13 14/19 15/5 15/10 56/9 63/12 84/18
**comment [3]** 48/19 61/3 61/4
**comments [6]** 16/2 21/1 48/14 58/24 59/3 96/1
**commerce [33]** 7/21 13/3 15/19 19/4 20/5 20/18 21/9 23/8 23/15 23/15 23/21 23/24 24/1 24/8 24/13 25/6 25/6 25/8 27/3 33/16 34/1 34/2 53/14 53/23 53/24 54/4 61/7 61/10 61/16 61/19 71/13 72/1 97/9
**commission [6]** 4/25 29/9 30/12 49/10 70/10 96/18
**commissioners [1]** 30/17
**committee [4]** 35/7 35/9 35/16 48/17
**communities [1]** 48/18
**community [1]** 35/10
**companies [18]** 7/25 11/1 15/15 16/2 17/1 17/2 17/25 18/7 19/11 28/22 36/15 38/6 39/6 42/24 45/1 55/9 62/12 73/5
**company [6]** 17/18 19/10 43/25 44/24 52/24 55/2
**comparison [1]** 19/5
**compelled [1]** 33/6
**competent [1]** 79/18
**competing [1]** 9/5
**competition [2]** 11/3 45/3
**competitor [1]** 44/12
**competitors [6]** 7/25 10/17 11/8 41/15 44/4 44/10
**compiling [1]** 37/12
**complaint [1]** 52/13
**complete [2]** 30/20 87/8
**completely [3]** 25/3 74/17 81/24
**complex [1]** 24/22
**compliance [4]** 50/8 79/19 80/8 94/6
**complicated [2]** 43/12 69/18
**complies [3]** 47/2 47/10 47/12
**comply [6]** 60/3 62/13 62/16 68/6 69/3 81/3
**complying [2]** 50/5 68/5
**component [1]** 32/24
**comport [1]** 66/18
**comports [2]** 64/9 64/10
**composed [1]** 48/25
**comprehensive [3]** 6/5 34/23 37/14
**concede [2]** 54/20 71/21
**conceded [2]** 75/22 75/23
**concern [11]** 11/5 15/9 25/10 45/16 45/20 54/24 55/2 55/5 55/10 55/24 95/2
**concerns [3]** 25/9 46/2 87/2
**concluding [1]** 58/24
**conclusion [1]** 68/5
**condition [15]** 22/1 32/22 33/4 33/9 33/13 33/21 34/5 71/7 72/9 72/10 76/4 80/25 81/3 81/25 97/5
**conditioned [1]** 33/25
**Conditioning [1]** 19/23
**conditions [16]** 15/20 32/17 32/19 32/24 33/23 70/25 71/11 71/23 72/3 75/6 75/14 80/22 81/8 96/25 97/2 97/12
**conduct [3]** 20/15 62/22 62/24
**confer [1]** 99/2
**conference [9]** 7/24 68/11 98/23 99/8 99/10 99/12 99/15 99/18 99/25
**confidential [39]**
**confidentiality [8]** 46/4 49/17 49/18 49/20 49/21 51/14 51/19 51/22
**confined [1]** 22/22
**confirm [1]** 32/16
**conflict [1]** 21/14
**conflicting [5]** 14/20 14/21 22/6 22/8 27/4
**conformed [1]** 102/6
**confusing [1]** 46/22
**confusion [2]** 23/18 39/14
**connection [4]** 13/16 15/22 82/2 82/6
**consequence [1]** 14/13
**consider [1]** 35/8
**considered [2]** 10/22 31/21
**considering [1]** 14/16
**consisted [1]** 35/9
**consistent [2]** 93/21 93/22
**consisting [1]** 48/17
**consternation [1]** 39/14
**constitutes [1]** 94/13
**Constitution [2]** 50/8 77/18
**constitutional [29]** 7/13 8/8 8/21 11/14 12/24 15/14 16/8 20/23 21/8 22/3 22/20 27/9 30/8 30/14 30/23 30/25 31/13 31/14 32/11 32/20 32/21 32/23 33/19 39/20 41/7 70/11 71/5 75/16 77/22
**constitutionally [3]** 18/15 40/17 41/21
**consumer [2]** 12/20 24/5
**consumers [4]** 12/16 14/1 27/20 61/4
**Consumers' [8]** 28/9 28/11 28/16 29/3 29/6 29/8 29/12 30/3
**Consumers' Research [1]** 29/3
**contact [2]** 68/21 100/11
**contained [1]** 18/25
**contested [1]** 66/4
**context [2]** 34/19 43/16
**contexts [1]** 96/2
**continuation [2]** 79/20 94/7
**continue [6]** 15/8 28/7 32/2 54/25 55/2 56/22
**continued [1]** 92/10
**contract [1]** 33/24
**contracted [2]** 79/6 79/13
**contracted-for [2]** 79/6 79/13

## C

**contracts [1]** 64/2
**contrast [1]** 19/12
**contributes [1]** 43/21
**control [3]** 18/3 25/21 75/18
**controlled [1]** 7/25
**converted [1]** 21/14
**convinced [1]** 36/17
**copies [3]** 6/23 7/1 7/2
**copy [1]** 9/11
**corollary [1]** 41/1
**correct [12]** 30/9 32/20 41/22 41/23 58/13 65/18 70/14 70/15 79/10 98/11 100/25 102/4
**correctly [11]** 77/9 78/6 78/8 78/15 78/15 78/18 78/22 79/4 79/25 80/2 91/15
**cost [15]** 13/6 16/15 16/21 18/1 19/14 37/14 37/17 37/18 44/15 47/17 60/13 63/8 69/11 69/14 69/19
**costs [12]** 11/2 12/9 14/1 19/7 19/14 19/15 24/9 24/10 24/17 27/21 61/18 69/22
**Cottrell [1]** 97/22
**could [27]** 9/11 20/20 20/22 28/7 31/2 31/15 36/1 44/23 50/10 53/15 56/18 58/16 69/17 72/2 72/5 73/4 77/14 78/12 79/12 79/22 84/24 91/25 93/19 94/24 95/12 97/5 99/12
**couldn't [1]** 65/11
**council [3]** 48/24 48/25 49/2
**counsel [5]** 4/9 4/22 5/6 34/18 101/4
**count [1]** 93/9
**counted [3]** 93/7 93/20 95/8
**counterbalance [1]** 98/4
**counting [2]** 94/20 95/3
**countries [1]** 34/25
**counts [1]** 95/14
**county [2]** 19/6 19/11
**couple [6]** 14/18 17/11 59/2 59/5 60/6 63/11
**course [11]** 11/7 35/19 46/23 52/10 59/4 59/8 62/22 62/24 68/3 75/20 80/23
**court [35]**
**Courthouse [1]** 2/23
**courtroom [3]** 98/10 98/15 100/11
**courts [2]** 76/23 78/13
**covered [10]** 20/21 22/19 30/5 62/16 74/3 74/7 74/9 74/13 82/9 94/23
**covers [1]** 7/18
**create [1]** 14/20
**created [3]** 16/3 40/3 60/1
**creates [2]** 36/2 82/4
**creating [2]** 48/3 62/15
**criteria [1]** 29/5
**CRR [2]** 2/23 102/9
**crushing [1]** 61/24
**curious [1]** 11/11
**currently [1]** 44/19
**customer [2]** 16/12 16/19
**customers [9]** 10/14 13/24 14/3 14/11 14/23 14/23 15/1 22/8 24/10
**cut [4]** 8/21 13/14 22/2 71/1
**cuts [1]** 15/14
**cv [2]** 1/5 4/8
**cycle [1]** 62/21

## D

**D [5]** 2/7 4/2 13/21 23/9 60/25
**damage [1]** 54/6
**Darin [2]** 2/5 4/19
**data [4]** 9/4 37/12 74/18 91/14
**date [2]** 83/8 102/9
**David [3]** 2/2 4/12 7/8
**David Carpenter [1]** 4/12
**day [15]** 50/15 63/25 63/25 65/15 84/5 87/17 88/5 88/15 88/21 89/13 89/14 89/17 89/20 89/22 89/25
**days [5]** 88/4 88/4 101/8 101/9 101/11
**de [2]** 29/9 30/1
**de novo [1]** 29/9
**deadlines [1]** 98/25
**deal [6]** 17/7 35/20 39/14 61/21 61/23 96/14
**dealing [2]** 61/17 64/2
**dear [1]** 52/8
**decades [1]** 49/16
**December [1]** 48/14
**decide [9]** 51/19 76/23 76/24 76/25 77/7 77/9 78/2 78/5 78/8
**decided [3]** 32/5 35/20 92/13
**decides [3]** 47/9 47/11 77/2
**deciding [1]** 43/20
**decision [18]** 28/20 29/19 39/1 45/21 45/22 65/18 65/21 76/18 76/20 77/3 77/7 77/13 77/19 78/2 78/3 89/21 98/6 98/17
**decision-maker [3]** 65/21 78/2 78/3
**decision-makers [1]** 45/22
**decisions [4]** 45/21 45/23 45/25 49/25
**declaration [10]** 11/23 13/20 13/21 23/9 60/25 91/22 91/23 91/24 92/8 92/21
**declarations [4]** 5/23 10/8 87/3 93/16
**declare [1]** 28/24
**dedicated [1]** 49/6
**defendant [11]** 30/13 53/12 54/9 87/25 88/13 89/16 92/20 96/13 96/19 96/21 98/5
**defendants [15]** 1/8 2/7 4/22 4/24 6/11 9/8 9/12 19/3 30/11 53/4 54/8 54/11 70/9 96/15 96/17
**defendants' [5]** 5/17 54/5 87/20 91/1 96/11
**defense [1]** 100/17
**defined [1]** 39/8
**definitely [1]** 57/17
**delaying [1]** 98/8
**delegate [2]** 21/6 41/15
**delegated [2]** 32/1 77/2
**delegates [1]** 11/6
**delegating [2]** 8/9 44/1
**delegation [6]** 7/23 8/4 8/6 8/8 8/13 41/12
**delta [1]** 9/23
**demand [2]** 81/15 81/16
**demands [1]** 81/13
**demonstrate [1]** 74/1
**Dennis [3]** 2/23 102/8 102/9
**denominator [1]** 93/6
**Denton [1]** 33/4
**denying [2]** 76/12 97/8
**department [9]** 2/8 4/24 4/25 5/3 31/17 33/11 74/2 76/14 96/20
**depend [1]** 11/9
**dependent [1]** 15/15
**Depending [1]** 6/17
**depends [2]** 53/6 77/11
**deputy [1]** 100/11
**DEQ [118]**
**DEQ's [3]** 69/2 76/24 77/1
**DEQC [3]** 30/16 31/3 31/18
**describing [2]** 61/7 61/14
**description [1]** 81/23
**descriptions [1]** 34/19
**designed [4]** 21/12 24/17 36/13 61/18
**desire [2]** 22/1 22/2
**detail [4]** 9/8 18/19 59/19 70/22
**detailed [3]** 59/11 64/7 64/7
**details [2]** 69/4 101/13

## D

**determination [1]** 93/21
**determinations [1]** 41/19
**determine [4]** 19/14 37/17 41/17 60/15
**determined [2]** 37/2 60/13
**determines [1]** 10/4
**detrimental [1]** 54/1
**develop [1]** 81/17
**developing [1]** 46/15
**did [18]** 10/16 18/9 36/19 36/21 36/24 37/15 37/16 47/5 47/17 47/17 47/18 48/13 66/2 66/5 70/24 76/3 81/2 81/24
**didn't [8]** 29/16 36/22 52/20 77/13 82/20 92/9 93/9 95/4
**difference [2]** 69/4 80/23
**different [15]** 14/18 18/13 18/16 20/20 22/6 22/14 27/10 33/14 33/25 40/4 47/7 82/8 88/23 92/4 98/7
**difficult [1]** 34/4
**digitally [1]** 102/6
**dimensions [2]** 21/23 22/20
**direct [1]** 81/16
**directed [2]** 81/15 81/19
**directly [6]** 13/3 18/22 21/5 82/5 82/5 87/4
**director [4]** 30/13 53/12 96/19 100/3
**Directors [2]** 28/21 38/19
**disadvantage [3]** 44/9 44/12 45/11
**disagree [5]** 23/22 32/23 49/7 66/7 93/7
**disagrees [3]** 50/22 64/23 93/9
**disappearing [1]** 16/24
**disclaimer [1]** 55/5
**disclosed [1]** 8/25
**discovery [7]** 53/3 53/15 98/24 98/24 98/25 99/5 99/5
**discovery-heavy [1]** 53/15
**discretion [8]** 10/6 46/5 46/8 46/9 64/13 68/15 88/18 88/20
**discriminate [3]** 25/5 61/6 61/16
**discrimination [1]** 61/12
**discuss [1]** 42/16
**discussed [1]** 16/4
**discussing [1]** 75/25
**discussion [4]** 36/17 36/22 90/13 97/3
**discussions [1]** 52/23
**dismiss [14]** 5/18 8/7 30/11 30/23 59/6 70/9 70/11 70/16 70/18 71/12 96/10 96/11 97/8 97/16
**dismissing [9]** 30/7 71/11 71/17 71/23 96/11 96/15 96/22 96/23 97/8
**disposal [1]** 16/13
**dispose [2]** 20/8 20/11
**disposed [4]** 22/7 22/25 25/17 72/18
**disposes [1]** 26/12
**disposing [1]** 12/9
**disproportionate [1]** 25/12
**dispute [9]** 5/14 35/2 62/10 65/5 93/13 94/5 94/13 94/13 97/1
**disputed [2]** 10/9 92/10
**disputes [3]** 7/14 33/7 39/19
**distinguishable [1]** 28/17
**distinguishes [1]** 20/16
**distinguishing [1]** 29/11
**distributed [1]** 7/21
**distributing [1]** 74/16
**distribution [11]** 7/22 17/3 17/21 20/5 22/24 23/25 24/23 24/25 26/16 26/18 26/20
**distributor [1]** 25/19
**distributors [14]** 1/4 4/7 4/13 4/17 7/10 17/19 23/11 25/21 47/18 48/8 61/19 61/20 73/19 100/5
**DISTRICT [4]** 1/1 1/2 1/14 2/23
**diverse [1]** 44/24
**do [125]**
**Docket [5]** 5/17 5/18 18/11 96/11 97/18
**doctrine [3]** 33/17 45/16 51/4
**document [4]** 9/17 9/22 51/16 51/24
**documents [1]** 10/12
**does [32]** 17/24 24/16 25/5 29/8 34/16 38/20 40/11 43/11 43/12 47/4 55/24 60/3 61/6 65/8 65/10 66/17 66/18 68/6 68/10 69/3 73/8 75/5 87/14 88/4 89/2 89/2 91/18 92/20 96/6 96/8 99/23 100/8
**doesn't [23]** 22/15 28/5 29/7 32/24 34/3 43/3 44/12 51/22 52/13 54/12 54/14 55/15 62/18 62/19 64/11 64/20 66/20 68/12 70/21 74/9 76/8 76/13 81/11
**doing [15]** 16/9 16/9 20/6 37/24 40/17 42/10 55/19 62/21 64/4 68/8 69/3 69/5 78/18 80/13 80/13
**Dolan [3]** 21/25 81/9 81/14
**dollars [1]** 19/17
**don't [107]**
**done [15]** 16/7 16/7 16/10 21/8 21/11 21/11 21/15 21/16 21/18 23/4 31/3 51/7 52/11 76/6 101/10
**Donegan [1]** 96/15
**door [1]** 64/3
**Dormant [12]** 13/3 19/4 21/9 23/15 23/15 23/20 24/13 27/3 61/9 71/13 72/1 97/9
**double [9]** 35/14 92/6 93/7 93/9 93/20 94/20 95/3 95/8 95/14
**double-checking [1]** 35/14
**double-count [1]** 93/9
**double-counted [3]** 93/7 93/20 95/8
**double-counting [2]** 94/20 95/3
**double-counts [1]** 95/14
**double-reported [1]** 92/6
**down [7]** 17/8 23/7 24/10 31/20 56/20 56/25 93/17
**downstream [1]** 25/21
**dozens [1]** 73/17
**drill [1]** 23/7
**drinks [1]** 17/14
**drive [2]** 10/24 18/6
**drug [1]** 19/6
**due [20]** 8/4 8/10 8/12 12/25 15/19 28/1 28/3 28/11 33/15 34/1 34/3 41/12 45/17 48/2 51/23 71/13 72/1 82/25 83/11 97/10
**dug [1]** 46/25
**duplicated [1]** 92/1
**duplicative [3]** 14/21 27/3 27/4
**duplicity [1]** 15/3
**during [1]** 86/16

## E

**E [2]** 4/2 4/2
**each [9]** 8/21 15/19 21/5 60/16 60/16 69/14 73/5 80/20 99/2
**earlier [6]** 57/11 71/3 73/15 75/25 76/5 95/16
**easily [1]** 44/23
**echoed [1]** 19/22
**ecology [1]** 21/3
**economic [4]** 10/14 13/25 15/25 44/2
**economical [1]** 17/4
**economy [1]** 7/12
**effect [10]** 13/4 15/3 16/1 26/2 49/15 52/7 61/10 61/12 76/18 84/19
**effectively [2]** 58/8 77/20
**effort [2]** 24/7 60/8
**either [7]** 47/10 53/19 53/21 68/8 75/4 80/2 91/9
**electorate [1]** 45/23
**element [3]** 10/23 24/2 25/7
**Eleventh [3]** 30/8 70/12 96/23
**else [13]** 9/11 12/22 25/3 26/13 28/2 52/5 57/5 58/25 75/18 82/11 85/15 93/17 96/7
**elsewhere [3]** 13/18 23/13 81/19
**emphasis [1]** 63/19
**emphasize [1]** 63/3

E

**emphasized [1]** 81/14
**employee [1]** 20/4
**enacted [1]** 48/10
**encourage [1]** 6/1
**end [15]** 25/1 25/20 26/6 26/12 32/10 42/13 46/16 47/3 62/8 62/17 69/20 79/14 88/12 88/16 88/22
**end-user [2]** 26/6 26/12
**enforce [10]** 31/1 31/8 31/21 31/25 32/1 32/3 32/13 60/3 93/24 100/3
**enforcement [28]** 47/24 50/14 60/4 66/3 67/12 67/18 83/4 84/1 84/4 84/6 84/9 84/11 84/15 84/18 84/23 85/2 85/25 86/7 86/10 86/15 86/22 86/23 87/14 87/25 88/1 88/10 89/1 89/7
**enforcing [4]** 31/14 32/2 56/19 100/21
**enjoin [1]** 31/14
**enjoined [1]** 100/20
**enjoining [3]** 56/19 79/20 94/7
**enough [4]** 13/19 34/2 90/17 90/23
**enrich [1]** 42/24
**ensure [1]** 36/10
**ensuring [1]** 62/15
**enter [4]** 4/9 26/3 32/4 85/4
**entire [7]** 13/7 17/18 27/16 47/23 56/20 61/5 98/12
**entirely [2]** 40/4 91/19
**entities [4]** 8/9 11/7 39/16 45/25
**entitled [5]** 31/2 31/9 62/25 89/18 102/5
**entity [10]** 7/24 10/22 22/10 36/13 37/19 37/21 38/4 40/2 40/2 54/25
**enumerator [1]** 26/21
**environment [1]** 43/2
**environmental [9]** 4/24 4/25 11/18 14/20 22/9 30/12 70/10 96/18 96/20
**environmentally [1]** 17/9
**EPA [1]** 50/7
**EPR [23]** 7/19 13/16 15/23 16/10 16/20 18/11 18/16 19/3 19/18 24/4 25/2 35/20 36/22 36/25 38/3 41/2 49/14 59/22 69/6 80/10 80/11 87/9 96/1
**EPRs [2]** 36/18 43/15
**equal [5]** 70/17 70/19 82/11 96/24 97/1
**equities [4]** 56/5 98/2 98/3 98/19
**Era [1]** 45/19
**error [4]** 42/14 64/14 64/15 68/9
**especially [6]** 21/10 21/11 40/18 46/1 58/14 88/2
**essentially [6]** 23/16 45/16 79/7 85/6 90/23 99/5
**establish [3]** 53/23 61/15 62/21
**established [2]** 14/22 42/8
**estimate [2]** 19/14 101/12
**estimates [2]** 63/7 63/8
**et [2]** 1/7 4/7
**European [1]** 49/15
**evaluation [1]** 62/21
**even [30]** 13/8 13/14 19/14 20/14 25/3 25/15 25/19 26/3 33/10 36/4 41/18 48/8 51/25 54/6 64/5 64/20 66/25 71/20 71/24 72/3 74/19 75/15 75/20 76/3 79/23 81/22 81/24 83/24 90/17 97/5
**ever [2]** 41/6 46/22
**every [17]** 6/5 7/20 20/18 32/5 47/8 47/15 48/16 50/6 50/8 50/9 50/17 50/19 55/4 56/9 59/20 65/15 79/1
**everybody [3]** 95/21 95/23 101/16
**everybody's [1]** 90/14
**everyone [2]** 4/4 7/1
**everything [5]** 6/15 20/6 42/24 52/5 97/15
**evidence [9]** 25/23 42/11 42/20 44/18 44/22 53/16 61/13 72/23 94/17
**evidentiary [1]** 73/9
**exact [1]** 94/4
**exactly [6]** 8/13 14/17 36/13 43/24 63/16 92/15
**exaggeration [1]** 46/8
**example [13]** 19/2 33/12 35/24 53/23 74/15 75/25 76/6 81/1 91/22 92/11 92/12 93/4 93/15
**examples [1]** 37/23
**exceed [3]** 10/9 13/5 53/17
**exceeding [1]** 19/17
**except [2]** 17/7 95/5
**exempt [5]** 27/25 44/20 44/21 74/2 74/17
**exemption [3]** 73/25 74/21 74/22
**exemptions [4]** 73/17 73/21 73/22 73/23
**exercise [1]** 45/14
**exercised [1]** 88/20
**exhaustively [1]** 80/20
**exhibit [4]** 9/15 13/21 23/9 60/25
**exhibits [1]** 5/24
**exist [4]** 15/12 15/18 24/16 28/5
**exists [2]** 58/9 75/12
**exorbitant [6]** 8/16 10/11 11/21 11/22 11/25 20/12
**expect [1]** 54/2
**expected [1]** 86/9
**expecting [1]** 15/16
**expedited [2]** 82/23 99/5
**expeditiously [4]** 82/16 85/8 98/16 98/16
**expense [1]** 23/17
**expenses [2]** 44/3 95/22
**expensive [4]** 16/22 45/8 49/11 97/25
**experiment [1]** 22/13
**expert [1]** 55/12
**explain [1]** 24/20
**explained [2]** 76/2 93/15
**explicitly [2]** 12/8 37/11
**express [1]** 27/9
**expressed [1]** 66/13
**extent [2]** 25/5 100/2
**extraterritorial [1]** 13/4

F

**f [1]** 98/22
**faced [1]** 84/2
**facial [6]** 47/23 57/25 58/2 58/6 58/11 101/15
**facilities [1]** 64/1
**fact [11]** 26/11 36/9 40/24 42/11 46/25 51/17 61/2 62/23 62/24 68/13 96/1
**factor [1]** 10/16
**facts [5]** 45/5 47/25 50/12 58/1 72/24
**factual [2]** 61/7 61/14
**fail [1]** 72/7
**failed [1]** 90/11
**fails [1]** 82/7
**fair [2]** 34/2 87/19
**falls [2]** 32/19 71/4
**fantastic [1]** 19/25
**far [2]** 53/16 72/22
**fascinating [4]** 5/14 7/14 7/15 101/1
**favor [6]** 6/2 18/6 25/6 98/2 98/4 98/19
**FCC [11]** 28/2 28/9 28/18 28/20 28/22 29/8 29/19 29/20 63/14 63/15 63/17
**FCRR [2]** 2/23 102/9
**feasible [1]** 93/16
**features [1]** 29/11
**February [6]** 1/6 4/1 88/6 88/16 88/22 102/8
**February 6th [2]** 88/6 88/16
**federal [7]** 8/6 20/3 51/5 51/23 53/9 79/23 79/24
**federalist [1]** 22/11
**feds [1]** 41/13
**fee [44]**

## F


**fee-paying [1]** 51/25
**fee-setting [4]** 28/19 28/25 29/22 41/16
**feed [1]** 8/20
**feel [4]** 6/5 55/12 55/13 61/20
**feeling [1]** 53/25
**fees [111]**
**fees 40 [1]** 16/21
**fees is [1]** 73/13
**FELDON [5]** 1/7 4/7 53/12 96/19 100/3
**few [6]** 55/10 57/12 70/24 72/5 75/24 83/4
**field [2]** 21/18 55/13
**figure [6]** 37/16 55/25 56/4 62/7 100/19 101/11
**figured [4]** 37/13 37/15 69/14 69/15
**figuring [3]** 36/6 62/6 69/10
**file [7]** 11/12 11/13 50/7 50/23 51/2 52/9 52/12
**filed [5]** 5/19 5/23 9/15 19/22 92/8
**files [1]** 95/21
**final [6]** 28/19 29/19 50/7 50/17 65/18 65/21
**finally [1]** 29/7
**financial [12]** 15/6 47/3 47/4 50/6 50/20 50/22 55/4 55/19 69/21 73/22 82/18 82/24
**find [7]** 18/9 41/9 59/13 67/21 90/21 94/3 97/23
**finding [3]** 97/19 98/20 98/21
**fine [4]** 26/25 34/12 35/15 64/10
**firmly [2]** 98/9 98/14
**first [22]** 5/20 6/11 36/24 37/5 47/6 47/6 47/13 48/14 54/2 57/24 63/11 73/14 76/1 87/2 92/9 92/18 95/12 96/10 99/2 99/6 99/6 100/24
**fiscal [1]** 13/22
**fits [1]** 27/13
**five [9]** 28/17 29/10 29/18 29/18 48/4 92/14 92/15 101/8 101/9
**fix [6]** 35/5 35/5 36/1 67/17 68/8 68/9
**fixed [1]** 95/9
**flatly [1]** 49/25
**flavor [1]** 27/11
**flaws [1]** 27/8
**flesh [1]** 93/4
**flexibility [1]** 64/21
**floor [1]** 70/3
**focus [5]** 6/6 8/3 8/22 49/23 71/25
**focused [2]** 20/17 61/19
**folks [10]** 5/7 30/24 31/18 45/24 53/12 58/20 64/2 86/24 88/14 101/1
**follow [3]** 31/25 78/17 80/25
**follow-on [1]** 31/25
**followed [2]** 66/23 67/6
**following [3]** 28/17 79/8 94/25
**food [3]** 11/22 11/24 16/24
**foot [1]** 64/5
**force [1]** 71/7
**forced [3]** 33/9 72/12 93/14
**forcing [1]** 71/8
**foregoing [2]** 79/16 102/3
**form [4]** 14/1 33/5 72/16 97/6
**formed [1]** 16/1
**former [1]** 76/25
**formula [3]** 79/4 91/13 91/14
**forth [3]** 6/14 68/14 94/10
**forum [2]** 76/1 76/4
**forward [5]** 53/16 73/1 83/15 87/24 87/25
**foul [1]** 30/23
**found [1]** 13/20
**founding [1]** 15/12
**Fourth [1]** 29/4
**Fox [1]** 28/2
**framed [1]** 71/14
**framework [6]** 8/4 8/4 45/17 81/10 91/9 91/10
**Frankly [1]** 95/25
**free [2]** 27/24 38/16
**free-ride [1]** 38/16
**free-riders [1]** 27/24
**freely [1]** 37/25
**frequent [1]** 33/23
**frequently [2]** 10/9 10/11
**fresh [1]** 16/22
**friendly [1]** 17/9
**friends [1]** 17/13
**front [1]** 46/16
**Frost [2]** 33/12 81/1
**full [5]** 18/19 21/18 30/15 47/24 68/20
**full-time [1]** 68/20
**fully [4]** 20/1 71/21 98/25 99/9
**function [2]** 49/9 62/3
**fund [5]** 12/4 18/7 33/10 62/1 63/17
**fundamental [3]** 27/8 72/8 80/23
**funds [6]** 55/16 55/17 55/20 55/21 55/23 64/3
**funny [1]** 13/19
**further [8]** 8/3 31/19 70/21 70/22 80/3 80/18 94/18 96/8
**furthest [1]** 97/20
**future [1]** 12/5


## G


**G [4]** 4/2 67/5 90/19 90/25
**gained [1]** 71/11
**game [1]** 35/11
**garbage [1]** 61/23
**gather [1]** 38/3
**gave [1]** 93/4
**general [2]** 10/4 68/18
**generalities [1]** 9/19
**generally [1]** 68/4
**get [54]**
**gets [4]** 31/16 55/16 69/17 90/21
**getting [5]** 17/14 33/14 63/6 64/3 85/8
**give [15]** 18/14 31/11 57/8 61/23 73/8 73/9 73/9 76/3 78/10 83/4 83/7 89/10 92/9 99/6 101/5
**given [1]** 41/13
**gives [3]** 39/2 72/7 89/8
**giving [3]** 28/15 39/20 75/25
**Glisan [1]** 2/6
**global [1]** 21/3
**go [53]**
**goals [3]** 11/18 40/6 62/2
**goes [9]** 12/25 13/2 40/21 52/7 69/16 74/7 78/4 90/16 95/16
**going [100]**
**going-concern [2]** 55/5 55/10
**good [19]** 4/4 4/11 4/14 4/15 4/18 4/19 4/21 4/23 5/1 5/5 5/18 7/7 12/23 32/6 32/6 38/9 40/5 73/5 101/5
**goods [2]** 74/17 75/10
**got [8]** 20/8 26/9 30/12 32/21 52/23 67/5 92/15 101/4
**gotten [3]** 47/25 55/23 59/10
**government [1]** 63/21
**governments [4]** 14/6 27/17 35/17 64/2
**governor [1]** 49/3
**Grand [1]** 2/3
**grant [2]** 57/1 58/15
**granting [1]** 97/18
**grasp [1]** 20/21
**great [2]** 19/2 39/13
**grocery [1]** 16/22
**ground [3]** 63/6 63/10 64/8

**G**

**grounds [1]** 78/19
**group [4]** 16/1 41/15 44/1 68/16
**groups [2]** 48/15 48/19
**guess [8]** 16/14 16/15 34/14 41/8 42/13 68/15 86/21 94/9
**guys [1]** 31/15

**H**

**H [1]** 1/13
**had [21]** 7/4 11/5 16/2 20/1 26/25 33/3 35/16 36/23 48/19 48/20 63/7 63/8 75/18 76/9 80/25 82/1 82/10 82/15 90/13 97/3 98/22
**hadn't [1]** 80/15
**half [1]** 13/14
**hand [1]** 22/11
**handful [2]** 53/16 53/25
**handled [1]** 74/25
**handles [1]** 64/1
**hands [1]** 52/6
**happen [1]** 72/22
**happened [2]** 52/6 74/14
**happening [9]** 12/8 12/18 15/21 15/23 18/21 34/19 43/25 58/8 83/25
**happy [5]** 11/14 42/16 42/18 59/15 82/11
**hard [2]** 20/11 46/19
**harm [4]** 30/23 52/5 56/13 97/24
**Harned [1]** 5/10
**has [67]**
**hasn't [4]** 41/9 47/25 49/23 72/21
**have [229]**
**haven't [4]** 55/23 59/5 88/3 98/23
**having [9]** 20/10 46/1 46/24 62/5 64/21 65/13 65/14 84/3 90/13
**havoc [2]** 84/25 85/1
**Hawaii [1]** 14/15
**hazardous [1]** 23/5
**he [7]** 59/3 59/6 73/15 88/19 89/13 89/19 89/24
**he's [2]** 88/23 89/15
**head [3]** 30/16 32/12 67/22
**health [1]** 62/1
**hear [9]** 5/13 9/7 9/21 17/6 30/2 34/9 56/6 82/20 101/12
**heard [5]** 34/17 71/20 96/6 96/8 97/14
**hearing [7]** 1/11 3/2 7/5 13/20 38/11 59/16 60/7
**heart [1]** 97/10
**Heating [1]** 19/23
**heavy [2]** 52/3 53/15
**held [1]** 81/25
**help [2]** 12/4 23/16
**helpful [2]** 37/25 97/3
**her [2]** 36/22 96/20
**here [62]**
**here's [2]** 13/4 93/10
**Hernandez [1]** 31/22
**hey [5]** 16/14 17/14 17/22 92/5 95/7
**hidden [1]** 44/5
**high [1]** 9/19
**high-level [1]** 9/19
**higher [6]** 14/1 44/13 44/19 49/8 52/16 55/22
**highlight [2]** 73/24 81/7
**highways [2]** 81/4 81/5
**hinted [1]** 51/1
**his [1]** 35/21
**historically [1]** 16/10
**hit [1]** 11/21
**hold [4]** 81/24 84/8 84/14 101/9
**holding [1]** 66/7
**Home [1]** 19/24
**honestly [2]** 32/5 100/19
**Honor [32]** 4/11 4/15 4/19 5/9 6/21 7/3 7/8 7/13 7/23 8/11 20/21 30/9 34/12 40/10 41/22 59/1 67/22 70/7 70/15 71/3 72/2 73/24 79/10 80/17 82/10 82/14 84/17 85/17 85/19 91/19 100/16 101/17
**HONORABLE [1]** 1/13
**hook [1]** 33/22
**hopeful [1]** 101/10
**hopefully [1]** 88/14
**Horne [1]** 33/11
**hour [2]** 6/18 99/16
**how [63]**
**huge [1]** 52/24
**huh [2]** 55/18 94/21
**hundred [1]** 92/14
**hundreds [2]** 19/16 64/18
**hurt [1]** 10/17
**hypothetically [1]** 12/1

**I**

**I [388]**
**I'll [15]** 5/12 5/20 5/22 7/2 9/8 15/6 17/15 30/4 34/6 38/9 57/6 57/22 70/2 71/24 101/5
**I'm [45]**
**I've [10]** 5/22 8/2 30/5 41/10 41/14 41/21 76/2 87/10 90/11 96/7
**idea [5]** 46/21 56/7 56/11 60/7 75/16
**identified [3]** 7/23 19/13 92/3
**identify [2]** 19/20 91/22
**identifying [1]** 27/7
**ifs [1]** 81/1
**ignore [1]** 89/8
**Illinois [1]** 14/15
**illustrates [1]** 72/6
**imagine [1]** 31/17
**immediate [3]** 65/19 65/20 86/5
**immunity [1]** 11/8
**impact [6]** 10/14 13/24 53/25 61/3 62/22 62/23
**impacted [1]** 53/18
**impacts [3]** 8/23 13/22 14/4
**implement [1]** 40/6
**implementation [3]** 12/3 84/25 98/18
**implemented [4]** 34/24 51/3 58/9 69/7
**implementing [2]** 48/4 67/14
**implicitly [1]** 75/21
**important [4]** 34/21 39/3 40/25 95/15
**impose [2]** 20/12 71/6
**imposed [8]** 8/15 13/1 13/5 32/22 33/21 72/9 76/4 83/24
**imposes [1]** 14/24
**imposing [1]** 22/6
**impossible [2]** 72/25 73/7
**improper [2]** 27/14 93/24
**improperly [2]** 66/6 95/13
**improve [1]** 22/1
**improvements [2]** 16/6 81/19
**inaccurate [1]** 81/24
**incidentally [1]** 53/18
**inclined [2]** 31/10 99/5
**include [2]** 68/3 96/2
**included [2]** 70/18 93/10
**includes [3]** 48/6 48/7 62/14
**including [2]** 7/21 73/18
**income [1]** 19/10
**incorrect [1]** 93/20
**incorrectly [5]** 65/4 67/14 80/3 90/18 90/22
**increase [1]** 92/14
**independent [1]** 33/16

**I**

**index [2]** 3/1 37/17
**individual [15]** 30/11 33/3 35/22 35/25 36/4 36/5 41/19 44/15 53/25 60/16 63/1 64/1 64/13 70/9 95/3
**individuals [1]** 64/9
**industries [4]** 35/18 35/18 36/19 48/7
**industry [3]** 35/10 35/17 49/1
**inference [2]** 72/25 73/8
**inflation [1]** 12/21
**informal [2]** 65/16 76/9
**informally [3]** 65/24 66/12 76/15
**information [15]** 39/3 39/17 39/23 39/24 40/9 47/14 47/20 48/21 59/10 69/11 90/17 90/23 90/24 91/2 93/20
**infrastructure [4]** 12/11 14/6 27/16 33/10
**initiate [5]** 86/6 86/15 86/22 86/23 87/13
**injunction [17]** 5/16 30/15 31/12 32/12 52/2 56/19 57/2 58/15 73/10 84/20 84/22 85/4 85/7 93/23 95/13 97/18 100/2
**injunctive [5]** 79/18 87/9 90/7 94/6 95/6
**injured [1]** 83/7
**injury [4]** 54/19 54/20 56/1 56/5
**inputs [2]** 63/9 91/11
**insight [1]** 49/3
**instance [1]** 62/14
**instances [2]** 62/20 79/1
**Instead [1]** 12/18
**institute [2]** 19/23 86/10
**instrumentality [2]** 23/23 24/1
**integrated [1]** 18/2
**integration [1]** 11/1
**intended [2]** 12/10 95/17
**intent [3]** 61/6 61/9 61/15
**intentional [2]** 24/6 60/8
**interactions [1]** 64/8
**interest [5]** 36/5 38/20 44/2 69/2 69/2
**interested [2]** 48/18 61/24
**interesting [8]** 10/20 18/10 79/11 80/15 80/16 94/1 94/15 97/3
**interests [1]** 36/12
**interim [2]** 83/3 84/4
**interpretation [1]** 65/7
**interpretations [1]** 33/8
**interstate [11]** 15/17 16/2 24/8 25/6 53/24 54/4 60/8 60/9 61/6 61/16 61/19
**intrastate [2]** 25/6 25/8
**introduce [1]** 5/7
**inventory [1]** 6/5
**invite [1]** 4/9
**invoice [8]** 90/16 90/21 91/15 92/9 92/10 93/21 93/24 95/13
**invoices [8]** 31/21 32/4 83/10 83/11 83/13 83/25 84/2 89/9
**invoicing [4]** 42/7 63/1 68/13 86/2
**invoked [1]** 72/11
**involved [7]** 46/15 48/3 48/5 52/22 63/24 64/11 68/18
**involving [1]** 81/8
**irreparable [9]** 52/5 54/6 54/7 54/19 54/20 56/1 56/4 56/13 97/24
**irreparably [1]** 83/7
**is [400]**
**Island [1]** 14/15
**isn't [8]** 10/9 13/8 40/23 41/18 47/23 72/10 92/25 95/18
**issue [16]** 8/6 8/8 8/12 8/20 13/1 13/3 31/12 41/12 41/13 50/16 51/8 66/3 76/13 76/18 92/10 95/4
**issues [18]** 5/19 5/25 14/18 15/22 23/4 35/12 42/8 46/3 49/4 50/9 56/6 65/14 68/24 71/1 71/15 72/5 76/11 96/14
**issuing [3]** 50/13 76/15 84/19
**it [242]**
**it's [102]**
**its [20]** 7/11 10/5 10/17 14/24 15/7 15/12 15/16 28/24 28/25 37/1 37/22 40/11 41/4 43/1 44/9 49/13 61/12 61/12 61/25 72/8
**itself [6]** 49/22 64/10 76/2 79/14 79/14 80/7

**J**

**J [1]** 2/2
**Jennifer [1]** 5/3
**job [2]** 21/22 68/20
**join [7]** 72/13 72/15 74/10 74/20 75/11 75/22 76/2
**joining [3]** 36/11 62/14 75/17
**joking [1]** 6/25
**Jones [10]** 2/8 5/2 59/2 70/3 70/6 70/8 82/12 90/14 93/19 95/12
**judge [2]** 1/14 5/13
**judicial [9]** 21/1 33/5 50/23 76/1 76/4 93/15 93/19 95/11 95/20
**July [27]** 42/13 57/3 58/17 82/17 82/17 82/19 82/23 82/25 83/8 83/16 83/18 84/9 84/14 84/23 85/1 85/3 88/12 98/9 98/15 99/1 99/11 99/13 99/13 99/18 99/22 100/1 100/10
**July 1 [2]** 82/19 82/25
**July 13th [8]** 83/8 83/16 83/18 84/9 84/14 84/23 98/9 98/15
**July 13th will [1]** 85/1
**July 1st [4]** 99/13 99/18 99/22 100/1
**July 4th [1]** 99/11
**junction [1]** 31/22
**June [1]** 42/13
**jurisdiction [2]** 79/18 79/23
**just [63]**
**Justice [4]** 2/8 4/24 5/3 22/12

**K**

**Karen [2]** 5/10 96/16
**Karen Moynahan [1]** 96/16
**keep [11]** 6/14 10/17 28/25 37/22 39/18 40/7 40/11 41/3 42/25 57/16 95/19
**keeping [5]** 38/10 40/8 40/20 40/22 44/4
**kept [5]** 39/25 40/18 41/17 46/2 51/24
**key [1]** 10/2
**kind [9]** 17/24 21/12 21/15 24/12 42/23 60/19 64/21 68/9 93/13
**kinds [1]** 64/3
**know [61]**
**knowing [1]** 26/13
**knows [1]** 12/20
**Koontz [2]** 33/8 81/12

**L**

**labels [2]** 9/7 58/7
**laboratory [1]** 22/13
**lack [1]** 63/5
**land [5]** 81/8 81/11 81/12 81/20 82/2
**language [2]** 55/3 94/4
**lap [1]** 28/6
**large [10]** 7/25 9/1 15/15 17/1 21/3 44/2 45/13 45/25 60/20 60/22
**large-scale [1]** 44/2
**larger [4]** 11/1 18/7 44/21 44/24
**largest [1]** 38/6
**last [7]** 7/24 11/9 12/3 35/21 48/4 88/3 90/13
**late [1]** 82/17
**later [5]** 27/23 56/2 57/23 100/11 100/20
**launching [1]** 92/2
**law [33]** 12/2 15/12 21/7 29/11 30/3 35/5 36/8 37/11 38/25 39/1 39/8 39/18 40/3 48/3 50/5 50/16 52/7 53/22 58/9 61/22 62/9 62/18 62/19 64/10 67/25 68/5 68/6 69/3 74/9 79/8 80/10 80/11 96/22

L

**laws [5]** 14/13 14/16 16/3 51/22 62/14
**lawsuit [2]** 52/12 77/13
**lawsuits [1]** 95/22
**lawyers [1]** 5/13
**lay [1]** 18/18
**lead [2]** 30/12 42/15
**leader [1]** 43/20
**LEAH [2]** 1/7 96/19
**leaning [1]** 31/11
**least [15]** 9/4 10/16 21/7 23/16 28/17 31/20 36/20 52/14 65/22 70/16 71/21 73/17 75/15 82/7 84/4
**leave [7]** 9/12 26/4 26/5 70/2 84/3 96/13 97/12
**leaving [1]** 96/18
**left [7]** 10/6 19/13 20/24 23/19 25/25 53/7 70/13
**legal [1]** 66/14
**legislation [1]** 18/23
**legislature [2]** 38/22 61/15
**legitimate [1]** 62/2
**length [1]** 47/1
**lenses [1]** 27/10
**less [4]** 22/9 31/10 45/24 47/13
**let [26]** 5/6 5/20 6/10 6/11 6/14 6/14 12/1 18/9 27/2 30/4 30/6 32/16 34/6 36/16 37/4 45/20 57/6 57/13 57/23 73/9 78/20 80/17 84/8 86/2 93/4 94/3
**let's [11]** 12/12 19/4 23/7 25/18 34/9 49/21 57/20 58/19 87/23 87/24 99/12
**level [12]** 9/19 12/5 15/21 15/23 24/4 24/8 45/1 45/11 59/19 59/20 64/5 101/6
**liable [3]** 88/15 88/21 100/18
**life [1]** 62/21
**Lighting [1]** 19/24
**like [44]**
**likelihood [6]** 56/2 56/4 83/21 97/19 97/24 98/20
**likely [3]** 31/4 33/19 63/8
**limit [2]** 79/17 94/5
**limited [2]** 78/23 79/5
**limits [1]** 86/3
**line [4]** 24/1 27/13 31/23 55/1
**lines [1]** 9/23
**link [1]** 81/16
**liquidity [1]** 56/10
**list [1]** 47/15
**listening [1]** 67/15
**literally [4]** 20/18 27/17 48/4 73/16
**little [9]** 23/7 34/15 38/18 47/7 58/7 59/10 63/14 70/16 95/1
**LLP [2]** 2/3 2/5
**load [1]** 73/20
**local [7]** 14/6 23/17 24/4 24/8 27/17 35/17 64/1
**located [1]** 61/21
**logistical [1]** 24/22
**Loh [8]** 2/7 4/23 34/11 57/21 58/24 70/5 75/25 85/22
**Loh's [1]** 57/24
**long [8]** 14/12 14/16 36/18 49/5 64/9 64/18 85/3 85/7
**long-term [2]** 14/12 14/16
**longer [1]** 34/25
**look [15]** 9/22 17/8 19/5 20/2 29/16 30/21 43/7 46/11 46/12 57/13 62/5 63/9 83/15 91/14 93/7
**looked [5]** 29/16 41/9 46/16 69/15 73/21
**looking [6]** 28/16 29/14 50/12 55/14 93/1 98/1
**looks [2]** 63/13 67/16
**Los [1]** 2/4
**lost [2]** 52/23 87/10
**lot [16]** 16/14 21/13 27/7 34/18 34/19 37/16 38/5 38/15 43/11 46/9 49/5 52/10 56/8 58/1 84/24 100/9
**loud [1]** 9/24

M

**M [1]** 2/5
**made [5]** 6/6 28/20 29/19 45/25 63/23
**Maine [1]** 14/14
**maintaining [1]** 63/21
**major [4]** 21/2 23/2 23/4 28/12
**make [44]**
**maker [3]** 65/21 78/2 78/3
**makers [1]** 45/22
**makes [5]** 16/16 20/12 46/17 62/11 64/15
**making [4]** 45/11 49/24 52/21 61/25
**man [1]** 17/14
**manage [4]** 37/17 49/13 60/13 69/14
**managed [1]** 36/11
**management [2]** 27/18 34/25
**managing [1]** 44/15
**mandatory [4]** 31/12 31/22 31/23 96/2
**manifests [1]** 28/1
**Manufacturers [1]** 19/25
**many [10]** 5/23 5/24 18/12 18/12 18/13 18/21 26/25 27/1 45/3 73/18
**March [1]** 83/12
**March 6th [1]** 83/12
**margin [3]** 13/5 44/13 52/17
**margins [9]** 10/9 17/17 17/18 19/18 44/19 44/22 45/8 49/9 53/17
**Mark [1]** 96/16
**market [7]** 2/9 11/2 33/5 33/13 62/17 73/5 73/16
**markets [1]** 33/24
**Mary [3]** 4/5 98/11 99/12
**Maryland [1]** 14/14
**material [9]** 44/16 44/17 60/17 69/13 69/14 69/19 69/21 74/2 91/5
**material that [1]** 44/17
**materials [14]** 11/24 13/20 39/11 44/11 48/7 60/12 60/13 62/19 63/12 69/16 73/25 74/12 74/15 75/10
**math [2]** 90/24 92/23
**Matt [1]** 96/15
**matter [6]** 4/6 34/22 68/15 68/18 88/17 94/22
**matters [1]** 45/6
**mattress [2]** 16/14 16/15
**mattresses [1]** 19/19
**may [24]** 6/4 6/20 12/23 14/3 22/6 22/7 23/19 37/24 38/24 39/1 40/16 41/19 49/7 61/21 62/25 69/4 84/19 87/5 88/1 91/13 93/7 93/9 93/24 100/3
**maybe [14]** 17/22 22/15 23/12 24/9 24/10 39/14 39/14 55/14 71/21 79/23 82/25 93/3 99/10 99/13
**me [39]**
**mean [16]** 15/22 40/22 43/10 44/25 52/23 54/2 61/13 64/5 68/19 68/23 68/25 87/14 88/4 89/2 89/2 91/8
**meaningful [1]** 71/23
**means [7]** 74/5 76/10 78/15 86/22 89/11 90/6 90/10
**meantime [5]** 52/10 83/3 83/5 83/20 83/23
**Meanwhile [1]** 48/15
**meet [1]** 90/6
**meeting [2]** 42/16 42/19
**meetings [1]** 48/20
**members [35]**
**memoranda [1]** 5/22
**mentioned [3]** 29/4 53/3 63/2
**merely [2]** 98/21 101/15
**merit [1]** 90/1
**meritorious [1]** 33/20
**merits [5]** 52/4 53/5 57/3 76/25 77/6
**mess [2]** 48/23 99/11
**messed [1]** 42/4

## M

**method [1]** 62/11
**methodology [27]** 8/25 10/1 28/25 29/1 29/22 36/23 37/1 38/8 38/15 40/5 40/12 40/19 41/4 41/17 44/5 46/1 46/4 59/11 59/24 65/3 65/12 67/4 67/14 69/9 78/16 78/23 79/5
**methods [2]** 62/9 62/10
**MICHAEL [1]** 1/13
**mid [8]** 10/24 17/18 45/1 45/11 45/19 58/17 82/17 82/23
**mid July [1]** 58/17
**mid-1900s [1]** 45/19
**mid-level [2]** 45/1 45/11
**mid-sized [2]** 10/24 17/18
**might [11]** 6/8 12/5 15/9 16/14 25/23 38/13 49/8 54/8 56/20 61/20 66/15
**mill [1]** 18/6
**million [3]** 19/7 19/10 19/12
**mind [2]** 42/25 96/7
**minimum [1]** 58/8
**Minnesota [1]** 14/14
**minute [2]** 58/19 85/18
**minutes [2]** 57/13 72/5
**miscalculated [3]** 66/22 78/1 92/25
**miscounting [1]** 94/13
**misreading [1]** 66/16
**miss [1]** 36/24
**missed [1]** 29/13
**missing [8]** 28/14 30/18 30/22 38/23 43/11 43/23 43/24 75/3
**mission [1]** 38/21
**mistake [1]** 91/16
**mistaken [2]** 77/10 78/11
**misunderstanding [1]** 45/5
**mitigate [1]** 15/10
**mitigated [1]** 21/14
**Modernization [1]** 100/4
**modification [1]** 65/6
**modifications [1]** 62/19
**moment [2]** 57/8 96/13
**moment whether [1]** 96/13
**Monday [1]** 98/9
**money [22]** 27/17 27/19 38/15 47/18 54/7 54/8 54/10 54/14 54/14 54/16 56/8 56/9 56/11 56/21 69/22 69/23 81/13 81/15 81/18 82/4 83/17 83/20
**months [1]** 87/17
**months' [1]** 83/4
**Morath [1]** 96/1
**Morath's [2]** 18/10 36/17
**more [48]**
**morning [11]** 4/4 4/11 4/14 4/15 4/18 4/19 4/21 4/23 5/1 5/5 58/5
**most [9]** 8/8 31/8 40/25 50/21 59/19 59/22 71/6 71/25 99/16
**motion [14]** 1/11 3/2 5/16 5/17 5/20 8/7 52/2 59/6 70/16 70/17 96/11 97/8 97/16 97/17
**motions [3]** 5/15 71/1 96/10
**motivates [1]** 38/21
**motivation [1]** 10/17
**move [2]** 98/15 98/16
**movements [1]** 24/20
**moving [3]** 82/16 82/22 85/7
**Moynahan [1]** 96/16
**Mr [2]** 71/20 95/12
**Mr. [20]** 6/20 35/21 42/11 42/12 57/6 57/20 57/22 59/2 60/25 70/3 70/6 70/8 73/14 82/12 82/13 85/16 90/14 92/21 93/5 93/19
**Mr. Carpenter [10]** 6/20 35/21 57/6 57/20 57/22 60/25 82/13 85/16 92/21 93/5
**Mr. Carpenter's [1]** 73/14
**Mr. Jones [7]** 59/2 70/3 70/6 70/8 82/12 90/14 93/19
**Mr. Wild [2]** 42/11 42/12
**Ms [2]** 34/11 75/25
**Ms. [6]** 57/21 57/24 58/24 70/5 85/22 96/19
**Ms. Leah [1]** 96/19
**Ms. Van [5]** 57/21 57/24 58/24 70/5 85/22
**much [18]** 20/16 22/9 23/19 25/9 26/19 36/17 37/17 47/17 47/18 47/18 52/8 63/15 69/22 69/23 70/5 74/18 93/5 95/18
**multilayer [1]** 24/23
**multiple [7]** 14/2 14/3 15/4 15/4 22/20 25/13 48/15
**multiplied [1]** 93/10
**multiplying [1]** 91/4
**multistate [1]** 17/21
**municipalities [1]** 27/18
**my [34]** 6/11 9/3 13/14 16/13 16/15 16/21 16/24 21/22 28/15 29/14 29/17 30/25 31/17 34/17 37/5 40/10 40/25 41/6 43/18 47/7 57/10 59/2 67/22 71/25 79/25 80/17 92/16 96/7 100/10 100/11 100/14 101/5 101/6 101/12
**myself [1]** 100/12

## N

**N [1]** 4/2
**name [1]** 48/23
**named [1]** 96/17
**narrative [1]** 61/17
**nation [3]** 38/7 41/2 43/16
**national [17]** 1/4 4/6 4/13 4/16 7/9 15/21 15/23 16/8 21/17 21/18 22/4 22/5 23/3 23/4 43/18 43/20 100/4
**nationwide [1]** 44/25
**nature [2]** 7/15 63/6
**NAW [10]** 5/10 7/11 46/20 48/12 52/23 86/16 87/4 87/8 100/22 100/23
**NAW's [6]** 7/25 8/15 85/25 86/7 87/6 89/8
**near [1]** 69/7
**nearest [1]** 27/11
**necessarily [4]** 22/8 25/20 26/2 101/7
**necessary [4]** 7/22 11/23 20/13 23/25
**need [28]** 6/4 6/15 9/17 9/23 12/17 20/5 21/4 22/4 27/16 27/17 30/16 31/17 34/14 36/2 52/17 53/4 64/11 69/5 84/21 85/6 97/14 98/24 99/3 99/4 100/10 101/3 101/8 101/11
**needed [3]** 31/2 55/21 85/5
**needing [1]** 10/7
**needs [9]** 16/5 16/6 16/7 16/7 22/21 55/16 55/17 86/20 98/24
**nefarious [3]** 36/14 42/22 63/5
**negative [2]** 30/15 32/12
**negatively [1]** 53/18
**neither [2]** 7/6 7/12
**neutral [3]** 78/1 78/3 99/19
**Nevada [3]** 13/9 14/7 14/23
**never [5]** 10/12 10/13 41/10 41/14 41/21
**new [10]** 6/13 12/11 14/5 18/8 18/11 37/24 46/23 48/8 75/12 92/10
**next [2]** 17/15 41/6
**Nicole [1]** 42/15
**Nicole Portley [1]** 42/15
**Ninth [1]** 97/21
**Ninth Circuit [1]** 97/21
**no [52]**
**no enforcement [1]** 84/23
**no one [2]** 49/3 73/4
**No. [2]** 4/8 41/18
**No. 2 [1]** 41/18
**No. 3:25-cv-1334-SI [1]** 4/8
**Nollan [2]** 81/9 81/14
**Nollan-type [1]** 81/9
**non [5]** 12/19 29/10 41/20 42/2 44/20
**non-appealable [3]** 29/10 41/20 42/2

N

**non-exempt [1]** 44/20
**non-transparent [1]** 12/19
**nonbinding [1]** 41/25
**nondelegation [3]** 45/16 51/4 51/8
**None [1]** 48/8
**nonmembers [1]** 100/24
**nonprofit [7]** 28/19 37/19 37/21 38/1 38/5 40/2 43/25
**nontransparent [1]** 8/16
**normally [2]** 24/4 54/7
**not [242]**
**note [5]** 15/6 23/3 24/14 55/7 79/12
**notes [8]** 26/22 27/1 27/1 29/17 55/11 57/10 57/13 80/17
**nothing [7]** 28/2 44/6 44/10 79/16 86/25 94/4 98/4
**notice [5]** 13/2 21/1 31/11 42/19 66/3
**noticed [1]** 64/17
**notions [1]** 33/15
**Notwithstanding [1]** 79/16
**novo [2]** 29/9 30/1
**now [39]**
**nowhere [1]** 69/7
**number [1]** 7/17
**numbers [4]** 9/17 46/19 46/20 47/16
**numerator [1]** 93/5
**NW [1]** 2/6

O

**O [1]** 4/2
**objection [3]** 9/20 30/7 84/13
**obligated [2]** 74/13 83/24
**obligation [2]** 36/9 62/13
**obligations [5]** 19/15 80/10 86/1 87/3 87/6
**obscure [1]** 12/19
**obviate [2]** 84/21 85/6
**obviously [2]** 51/2 55/15
**off [7]** 16/24 38/16 42/12 42/23 63/6 63/10 67/22
**offer [1]** 87/13
**official [3]** 96/17 96/21 102/9
**often [1]** 19/17
**oh [11]** 16/13 26/17 32/6 32/6 46/21 49/9 49/23 52/8 56/12 68/15 68/21
**okay [29]** 9/13 16/14 16/15 26/17 30/6 32/9 34/11 37/8 41/23 54/18 55/12 57/5 59/17 67/4 67/21 67/24 73/11 75/3 84/8 86/8 87/16 89/24 90/4 90/9 91/18 94/16 96/10 97/15 99/22
**once [1]** 47/11
**one [40]**
**ones [2]** 44/20 80/24
**ongoing [2]** 48/22 48/24
**online [4]** 14/19 14/24 15/5 15/11
**only [21]** 16/25 25/16 37/1 40/14 41/25 53/11 56/17 64/7 64/24 65/1 66/8 66/14 72/13 72/17 75/17 78/3 81/14 83/4 86/12 89/4 96/21
**oOo [1]** 102/1
**open [2]** 4/3 101/9
**operate [9]** 10/24 17/2 17/3 37/3 40/20 60/19 63/16 64/6 81/2
**operated [1]** 42/6
**operates [3]** 40/11 44/25 63/17
**operating [7]** 17/16 24/7 25/8 25/13 64/5 68/4 68/6
**operation [3]** 62/9 62/10 62/12
**operations [3]** 55/21 55/21 63/25
**opinion [4]** 39/20 43/13 66/13 69/4
**opportunities [1]** 39/2
**opportunity [7]** 7/4 9/6 20/14 50/2 50/3 74/5 75/18
**opposed [4]** 21/6 37/22 64/24 72/11
**opposing [1]** 34/17
**option [11]** 41/25 72/13 73/13 75/8 75/9 75/11 75/16 75/17 81/6 95/7 95/9
**options [4]** 50/6 75/19 81/6 95/5
**order [21]** 5/17 18/7 20/4 31/1 31/10 31/13 31/20 50/7 50/9 50/17 64/19 76/11 76/13 76/15 76/19 76/19 76/20 77/15 77/15 77/20 80/1
**ordering [3]** 17/13 79/19 94/6
**orders [2]** 22/22 50/13
**OREGON [64]**
**Oregon's [1]** 62/14
**organization [1]** 73/4
**oriented [1]** 38/19
**original [1]** 102/5
**originally [2]** 6/9 41/11
**ORS [3]** 74/1 76/22 77/14
**other [76]**
**others [2]** 36/14 75/5
**otherwise [4]** 56/21 62/15 65/20 66/23
**our [26]** 6/18 11/14 11/19 15/14 15/19 18/18 21/3 22/23 23/17 27/16 28/13 34/25 35/23 39/15 39/15 52/9 62/7 65/7 66/13 73/3 73/3 73/4 76/14 78/1 79/8 88/16
**out [65]**
**outcome [1]** 81/23
**outrage [1]** 52/21
**outrageous [1]** 16/20
**outreach [1]** 68/19
**outset [3]** 8/24 63/7 63/8
**outside [2]** 25/11 27/6
**outstanding [1]** 101/4
**over [12]** 13/7 18/3 22/8 25/21 33/7 38/7 38/8 48/4 63/22 67/12 92/14 93/14
**overall [1]** 69/5
**overblown [1]** 54/25
**overcharged [2]** 27/23 27/24
**overlap [1]** 10/21
**overlapping [1]** 33/2
**overseeing [2]** 48/24 63/24
**oversees [1]** 59/23
**oversight [5]** 46/16 63/5 63/18 63/19 63/22
**owed [1]** 89/19
**own [10]** 14/25 39/17 44/3 62/15 72/8 74/6 75/10 75/13 91/14 97/6

P

**P [1]** 4/2
**p.m [1]** 99/20
**Pacific [1]** 33/4
**packaged [1]** 38/7
**packaging [22]** 7/22 11/20 11/22 11/23 20/3 20/5 20/7 20/9 20/10 20/12 20/13 21/3 23/23 23/25 24/24 43/20 48/6 52/22 59/23 62/18 73/20 74/16
**page [4]** 9/22 13/21 23/9 61/1
**page 18 [1]** 61/1
**pages [3]** 6/22 49/5 64/18
**paid [2]** 88/3 89/19
**paint [1]** 36/21
**pallet [1]** 73/19
**palletized [1]** 73/20
**paper [2]** 35/18 92/13
**papers [1]** 22/23
**paragraph [1]** 79/15
**Parker [1]** 11/9
**Parrott [1]** 5/3
**part [28]** 8/18 10/16 12/3 12/25 13/2 14/17 21/3 23/11 23/23 26/20 30/11 46/23 47/5 54/18 62/25 70/25 71/6 71/15 73/1 75/4 76/21 80/9 90/20 90/24 92/16 92/18 93/15 97/24
**partially [1]** 71/22
**participate [1]** 28/23
**participated [1]** 48/13

P

**participation [3]** 33/5 33/10 33/13
**particular [8]** 7/19 20/2 44/16 51/3 53/17 91/4 91/6 95/2
**particularly [4]** 8/20 13/10 73/18 92/1
**parties [4]** 28/3 84/22 85/2 85/5
**partly [1]** 72/6
**party [2]** 32/1 79/17
**passed [7]** 12/2 14/1 14/22 14/23 14/25 24/9 24/11
**passing [2]** 27/1 44/3
**past [2]** 36/25 87/16
**patchwork [1]** 22/5
**path [1]** 33/14
**pause [4]** 35/13 42/17 84/4 85/25
**pay [37]**
**paying [10]** 13/13 15/1 22/3 25/10 35/22 51/25 73/13 87/16 89/3 90/5
**pays [1]** 95/24
**penalties [5]** 84/5 87/22 89/3 89/4 100/18
**penalty [8]** 50/15 88/5 88/15 88/17 89/17 89/20 89/23 97/25
**pending [4]** 31/16 83/10 86/16 87/14
**people [26]** 15/18 21/12 24/7 24/11 25/13 26/23 27/22 27/25 33/9 35/10 36/9 37/13 39/11 42/9 43/1 48/3 48/5 48/6 48/7 62/6 63/20 68/20 69/15 84/17 87/5 92/2
**per [11]** 19/7 19/10 50/15 88/5 88/15 88/21 89/14 89/17 89/20 89/22 89/25
**perceived [1]** 52/18
**percent [5]** 16/21 17/17 17/17 72/17 92/14
**percentages [1]** 10/11
**perform [1]** 20/8
**performance [1]** 20/13
**Perhaps [1]** 85/14
**period [1]** 48/19
**permits [1]** 34/3
**permitting [2]** 81/8 81/11
**person [4]** 63/20 68/21 75/15 95/8
**personal [1]** 87/1
**persuade [1]** 67/8
**persuasive [1]** 6/4
**petition [1]** 50/23
**pharmaceutical [1]** 19/3
**phone [1]** 85/12
**PI [3]** 52/9 52/12 53/2
**pick [3]** 17/15 57/21 58/23
**picture [2]** 75/3 75/8
**piece [2]** 81/17 81/20
**Pike [4]** 23/18 24/14 24/16 27/6
**pizza [1]** 17/13
**plaintiff [28]** 1/5 2/2 4/9 4/13 4/16 4/20 5/6 5/19 5/20 6/10 6/11 7/9 51/1 52/3 53/4 71/14 75/20 80/20 86/4 86/13 86/13 88/2 91/18 97/4 98/3 98/4 98/19 101/14
**Plaintiff National [1]** 4/13
**plaintiff's [15]** 5/16 54/6 71/2 73/14 75/4 81/23 82/2 86/14 86/19 88/2 90/1 96/22 96/24 100/23 100/25
**plaintiffs [3]** 72/10 72/23 73/2
**plan [33]** 10/4 14/7 14/16 15/10 19/13 23/12 28/4 31/1 31/1 31/15 38/12 49/5 50/18 50/19 56/23 59/25 64/9 64/17 64/19 65/7 66/23 66/25 67/7 68/8 79/5 80/12 80/12 83/20 84/25 90/20 90/23 93/22 98/18
**plan's [1]** 66/21
**planning [1]** 52/12
**plans [5]** 10/13 50/17 59/21 64/18 67/3
**plastic [3]** 22/4 100/3 100/21
**plastics [5]** 15/24 21/2 21/7 35/18 40/7
**plausible [1]** 73/8
**please [6]** 4/5 4/22 80/1 95/1 99/2 101/5
**plot [3]** 36/14 42/23 63/5
**plugged [1]** 26/23
**point [24]** 7/3 10/2 16/10 16/18 18/14 18/22 21/15 23/3 31/14 32/6 32/7 47/25 51/6 54/6 58/5 59/18 60/4 62/4 63/15 80/16 81/11 81/22 87/12 95/11
**points [7]** 5/21 6/2 18/19 31/13 35/21 75/24 80/18
**police [1]** 62/3
**policy [2]** 12/23 24/12
**political [2]** 45/13 45/24
**polity [1]** 45/14
**polity's [1]** 45/15
**pollution [3]** 21/7 100/4 100/21
**Pork [5]** 23/19 23/19 24/14 24/15 62/11
**portion [1]** 13/25
**Portland [7]** 1/7 2/6 2/9 2/24 26/16 26/18 26/19
**Portley [1]** 42/15
**portrayed [1]** 46/21
**position [6]** 10/15 79/9 87/20 88/23 90/15 91/1
**positions [1]** 56/6
**possibility [3]** 56/12 56/13 73/13
**possible [3]** 20/7 61/4 97/25
**possibly [1]** 31/2
**potential [1]** 73/1
**potentially [2]** 21/12 101/9
**pound [1]** 20/10
**power [2]** 11/2 62/3
**PowerPoint [2]** 6/22 7/4
**powers [1]** 8/5
**practice [2]** 6/12 101/14
**pre [1]** 47/24
**pre-enforcement [1]** 47/24
**precedent [1]** 41/11
**precise [1]** 87/23
**precisely [2]** 49/14 89/2
**preclude [1]** 34/3
**predictable [1]** 18/1
**predicts [1]** 13/25
**preemption [1]** 21/18
**preference [1]** 99/23
**preferences [2]** 99/20 99/21
**prejudice [3]** 96/12 96/24 101/9
**preliminary [11]** 5/16 52/2 56/19 57/1 58/15 84/19 84/22 85/4 85/7 97/17 100/2
**premise [1]** 72/12
**prepared [1]** 99/1
**prescriptive [3]** 59/20 59/22 69/7
**present [1]** 39/24
**presentation [1]** 8/18
**presented [1]** 42/21
**pressing [1]** 9/8
**presumably [2]** 26/7 45/13
**presuming [1]** 15/16
**pretrial [6]** 99/8 99/10 99/12 99/15 99/18 99/25
**pretty [6]** 11/14 28/12 38/9 38/9 51/1 53/15
**prevail [1]** 52/4
**prevent [1]** 11/24
**preview [1]** 28/15
**previously [1]** 8/9
**price [5]** 10/11 11/6 14/4 41/4 41/16
**price-setting [3]** 11/6 41/4 41/16
**prices [8]** 12/20 13/9 14/2 23/13 25/2 40/6 83/23 87/7
**priority [3]** 43/10 100/8 100/12
**private [26]** 7/24 8/9 8/12 11/7 21/6 22/10 28/18 28/22 29/10 38/18 39/16 40/2 40/8 40/9 41/15 41/20 45/20 45/25 64/25 66/9 66/9 67/10 74/7 74/18 75/9 81/2
**private-sector [1]** 38/18
**privately [1]** 73/25
**PRO [31]** 36/2 36/11 36/12 40/3 40/15 41/3 56/17 60/3 60/5

## P

**PRO... [22]** 60/20 62/15 62/15 67/13 67/17 67/18 68/1 68/1 68/3 72/15 72/16 73/13 74/10 75/12 75/12 77/2 77/2 77/3 77/25 78/5 86/11 97/6
**PRO's [1]** 77/3
**probably [12]** 6/17 22/5 30/10 39/9 46/8 54/10 54/11 57/4 66/24 71/19 71/24 101/10
**problem [27]** 9/19 12/24 14/18 15/2 16/17 21/2 21/4 21/9 21/23 23/2 23/10 23/15 23/21 25/4 34/24 35/3 35/4 35/7 35/9 36/1 49/13 63/4 65/13 65/17 86/5 97/11 101/1
**problems [4]** 17/11 21/8 27/10 33/19
**Procedures [2]** 50/18 51/11
**proceed [1]** 6/20
**proceeding [1]** 66/4
**proceedings [8]** 1/12 58/22 85/21 86/22 86/24 89/7 95/19 102/4
**process [29]** 8/4 8/10 8/12 10/13 12/25 15/19 28/1 28/3 28/11 28/19 33/15 34/1 34/3 41/13 45/17 48/2 48/24 51/23 69/6 69/10 70/1 70/1 71/13 72/1 73/1 74/25 78/13 82/25 97/10
**processes [1]** 38/25
**produce [1]** 16/22
**producer [30]** 13/25 41/25 60/16 60/18 64/22 65/5 65/8 66/7 66/12 66/22 66/24 67/6 67/13 68/21 74/1 74/13 76/6 78/4 78/7 78/10 78/21 79/3 79/22 90/16 90/17 90/21 90/21 90/23 94/22 95/8
**producers [39]**
**product [28]** 7/19 7/19 7/20 10/1 10/12 13/7 13/8 13/15 16/18 16/21 16/25 18/4 18/20 19/17 19/19 20/18 20/18 25/20 26/12 38/7 41/3 44/24 49/9 72/18 73/21 74/3 74/8 94/23
**product-specific [1]** 20/18
**products [41]**
**Professor [3]** 18/10 36/17 96/1
**Professor Morath [1]** 96/1
**profit [7]** 17/18 40/2 44/13 44/19 44/22 45/8 52/17
**program [66]**
**programs [9]** 15/4 16/10 18/16 18/20 19/5 20/17 59/23 69/6 96/2
**Progressive [1]** 45/19
**project [2]** 18/8 19/12
**projects [1]** 33/10
**promptly [3]** 26/24 100/13 100/15
**properly [4]** 8/10 51/20 66/2 67/15
**property [4]** 81/17 81/18 81/20 82/6
**proportional [2]** 27/21 33/11
**proportionate [1]** 12/9
**proposition [1]** 28/3
**proprietary [3]** 9/4 9/10 28/25
**PROs [7]** 9/5 19/8 37/11 38/12 38/16 45/7 73/1
**protected [1]** 62/12
**protecting [1]** 43/1
**protection [5]** 70/17 70/20 82/11 96/24 97/2
**protectionist [1]** 24/12
**protective [1]** 39/6
**protest [1]** 83/14
**prove [4]** 25/25 52/3 54/3 74/24
**provide [6]** 18/20 34/15 59/15 74/6 74/23 87/8
**provided [3]** 39/9 74/4 98/5
**providers [1]** 44/2
**providing [2]** 75/9 95/13
**provision [6]** 49/17 49/18 49/20 49/22 51/14 79/13
**provisions [1]** 96/3
**public [25]** 9/1 12/11 12/23 14/4 22/1 22/1 27/16 37/23 38/1 38/2 38/4 38/20 39/10 45/22 48/16 48/19 48/20 50/2 51/15 51/16 51/24 59/12 60/15 74/5 81/4
**public-interest [1]** 38/20
**publicize [1]** 31/15
**publicly [1]** 55/9
**published [2]** 10/3 92/13
**pulling [1]** 48/5
**purely [2]** 25/8 60/10
**purportedly [1]** 47/22
**purpose [2]** 12/3 61/12
**purposes [1]** 53/23
**push [6]** 24/7 27/20 60/8 60/9 61/5 61/18
**pushed [2]** 12/19 42/12
**pushing [1]** 87/6
**put [8]** 24/24 35/7 37/14 49/10 53/16 72/23 88/22 93/20
**puts [1]** 23/25
**Putting [1]** 27/6

## Q

**qualifier [1]** 31/6
**quality [7]** 4/25 4/25 24/21 30/12 70/10 96/18 96/20
**quantity [2]** 38/13 38/14
**quarterly [1]** 29/23
**question [19]** 9/9 28/15 37/5 40/23 40/23 41/1 41/6 51/22 55/1 58/14 83/2 86/21 87/13 87/19 89/1 90/12 92/17 92/19 94/12
**questions [17]** 20/22 42/7 42/9 57/20 57/22 70/22 77/8 82/10 82/15 88/2 97/21 97/22 97/23 98/1 98/21 100/7 100/17
**quickly [1]** 82/23
**quite [1]** 23/18
**quote [2]** 21/25 79/15

## R

**R [1]** 4/2
**radio [2]** 37/23 38/1
**raise [9]** 10/6 13/9 27/17 27/19 27/19 32/16 51/5 51/8 77/22
**raised [3]** 92/5 92/8 95/4
**range [2]** 18/4 82/18
**rate [2]** 91/4 92/13
**rather [5]** 8/4 17/1 29/19 29/20 100/11
**rational [1]** 19/20
**rationales [1]** 71/2
**RDR [2]** 2/23 102/9
**re [1]** 13/19
**re-reading [1]** 13/19
**reach [2]** 42/6 85/5
**read [7]** 5/22 5/23 8/13 20/1 32/5 52/15 77/8
**reading [1]** 13/19
**ready [5]** 53/5 57/2 57/3 58/16 99/9
**realistically [1]** 25/18
**reality [6]** 45/9 52/20 61/7 61/14 61/22 68/23
**realize [2]** 82/17 101/14
**really [49]**
**reason [9]** 5/18 46/23 50/11 50/24 56/22 72/8 81/10 81/14 96/4
**reasonable [2]** 46/17 47/1
**reasonably [2]** 63/23 99/3
**reasons [7]** 22/18 24/16 27/22 39/4 72/6 76/1 82/8
**rebut [2]** 30/4 34/6
**rebuttal [1]** 57/23
**receive [1]** 68/19
**receiving [1]** 27/1
**recent [1]** 50/21
**recently [2]** 6/13 48/13
**recess [4]** 58/21 85/18 85/20 101/16
**recognized [2]** 24/15 62/2
**record [5]** 4/10 44/6 44/10 72/24 102/4
**records [4]** 26/9 26/19 51/15 51/16
**recoup [1]** 83/21
**recover [1]** 14/3

## R


**recyclability [1]** 16/6
**recyclable [1]** 11/20
**recycle [2]** 49/11 74/5
**recycled [2]** 36/7 73/25
**recycling [14]** 35/17 37/14 48/23 62/17 64/1 74/4 74/5 74/6 74/7 74/11 74/19 74/24 75/10 100/4
**reduce [2]** 38/13 43/20
**reduced [1]** 17/10
**reducing [2]** 14/4 44/3
**reduction [3]** 62/22 62/23 62/24
**refer [4]** 9/16 9/16 59/14 80/9
**reference [2]** 21/15 23/8
**referenced [2]** 24/15 37/15
**references [1]** 9/15
**reflect [1]** 61/6
**refrigeration [2]** 19/23 20/10
**refund [1]** 54/11
**refuse [1]** 76/20
**regardless [1]** 60/18
**regime [2]** 39/22 83/15
**regional [1]** 24/25
**regs [1]** 67/21
**regular [2]** 47/14 47/14
**regulated [1]** 28/3
**regulating [1]** 24/20
**regulation [2]** 23/5 59/20
**regulations [3]** 20/3 22/9 27/4
**regulators [2]** 18/23 21/5
**regulatory [5]** 10/13 31/24 34/23 39/16 39/24
**rejected [1]** 41/7
**rejects [1]** 47/10
**related [2]** 68/13 87/13
**relationship [1]** 19/20
**relative [1]** 16/15
**relevant [1]** 72/18
**relief [19]** 30/15 30/20 31/7 32/12 52/9 52/17 64/25 65/8 67/10 78/10 79/18 83/3 83/5 84/4 87/8 87/9 90/7 94/6 95/6
**rely [1]** 19/3
**remaining [1]** 96/21
**remarkable [1]** 11/17
**remedy [1]** 33/6
**remotely [1]** 99/17
**render [1]** 49/22
**renovate [1]** 27/16
**repeat [1]** 6/15
**repercussions [1]** 98/17
**replead [3]** 97/4 97/6 97/11
**reply [2]** 18/18 28/13
**report [12]** 15/7 47/6 47/6 47/8 47/13 50/6 50/22 55/1 55/4 55/20 82/18 82/24
**reported [2]** 60/14 92/6
**reporter [3]** 2/23 6/18 102/9
**reporting [5]** 27/4 64/15 92/1 92/2 93/17
**reports [8]** 47/4 47/4 47/14 47/14 50/1 50/20 59/25 69/21
**represent [2]** 48/6 48/7
**representation [1]** 85/11
**representatives [5]** 35/10 35/17 49/1 52/22 60/21
**represented [3]** 35/19 38/6 48/19
**represents [1]** 36/12
**request [2]** 31/19 51/16
**requested [2]** 16/1 42/12
**require [7]** 20/2 39/16 59/19 62/18 62/19 74/10 76/3
**required [11]** 15/11 20/3 20/3 28/4 39/23 42/17 48/9 60/20 61/9 76/2 78/17
**requirements [6]** 11/18 47/7 62/17 67/25 74/3 90/7
**requires [2]** 43/17 48/10
**requiring [1]** 84/20
**research [9]** 28/9 28/12 28/16 29/3 29/6 29/8 29/12 30/3 38/17
**reselling [1]** 26/18
**resells [1]** 26/8
**reserves [4]** 27/23 48/9 48/10 63/3
**residents [2]** 24/18 49/13
**resolution [2]** 85/8 94/5
**resolve [4]** 36/21 66/12 68/24 101/3
**resolved [2]** 65/24 87/15
**resonates [1]** 24/12
**respect [8]** 15/23 44/14 49/20 51/14 63/25 68/7 97/9 97/17
**respectfully [1]** 66/6
**respects [1]** 39/2
**respond [7]** 6/3 6/11 20/22 28/8 48/20 57/6 95/4
**responded [1]** 42/15
**responding [1]** 42/9
**response [18]** 6/13 17/6 18/14 42/14 45/13 45/15 45/24 54/5 54/12 57/24 58/2 60/24 85/23 92/8 92/9 93/2 93/18 94/18
**responsibilities [3]** 68/1 68/2 68/3
**responsibility [1]** 52/25
**responsible [4]** 35/23 89/11 89/14 92/4
**responsibly [3]** 36/6 36/7 36/11
**responsive [2]** 94/24 94/24
**restraining [3]** 5/17 79/20 94/7
**result [2]** 27/11 77/14
**resumed [2]** 58/22 85/21
**retailers [1]** 24/6
**retrospective [7]** 8/17 13/1 13/11 17/5 28/1 29/5 29/23
**review [9]** 7/4 21/1 29/9 30/1 50/23 93/15 93/19 95/11 95/20
**reviewed [1]** 46/13
**reviewing [1]** 47/8
**reviews [1]** 47/9
**rework [1]** 25/4
**Rhode [1]** 14/15
**rid [1]** 36/14
**ride [1]** 38/16
**riders [1]** 27/24
**right [72]**
**rights [1]** 77/22
**rise [1]** 73/8
**risk [4]** 14/20 88/4 88/21 89/12
**RMA [4]** 59/22 60/3 78/19 86/1
**RMR [1]** 102/9
**role [2]** 15/17 48/24
**Room [1]** 2/24
**roughly [1]** 33/11
**round [1]** 17/15
**rounds [1]** 17/14
**rubric [1]** 8/10
**rule [4]** 48/9 68/14 82/4 96/7
**rulemaking [3]** 48/16 48/17 48/17
**rulemakings [1]** 48/16
**rules [4]** 42/18 46/11 59/21 66/18
**ruling [2]** 32/8 89/25
**run [7]** 20/25 21/19 22/10 47/17 55/20 55/21 69/11
**running [4]** 45/7 45/7 45/10 65/15
**Ryan [1]** 2/2


## S


**s [2]** 4/2 102/8
**safety [3]** 11/24 20/4 62/2
**said [19]** 6/13 6/15 13/23 13/25 41/4 42/15 52/17 57/11 60/25 64/6 66/13 67/13 71/3 73/16 81/2 92/21 93/19 98/19 100/24
**sale [3]** 16/10 18/22 21/15
**sales [4]** 13/17 13/18 18/1 25/23

S

**same [9]** 27/11 63/16 79/14 81/10 81/21 82/1 82/5 82/6 84/19
**Sands [4]** 2/5 2/5 4/19 4/20
**Sara [2]** 2/7 4/23
**sat [1]** 52/6
**saw [1]** 11/5
**say [43]**
**say that [1]** 49/21
**saying [20]** 5/12 11/10 15/7 22/9 31/24 31/25 35/21 50/7 56/15 61/4 73/2 77/13 78/21 78/21 81/12 81/17 82/20 83/16 87/11 95/16
**says [25]** 7/13 16/13 27/16 30/2 31/13 34/17 46/7 51/17 57/6 65/6 66/6 66/7 66/8 67/7 67/8 76/14 77/19 78/2 78/4 79/16 80/4 80/10 80/14 94/4 95/12
**scale [1]** 44/2
**scary [1]** 34/18
**schedule [1]** 92/13
**scheduled [1]** 82/19
**schedules [1]** 59/24
**scheduling [1]** 68/11
**scheme [5]** 18/5 20/15 51/23 64/7 64/7
**scope [3]** 7/17 18/25 43/17
**screams [1]** 21/25
**screen [1]** 29/15
**seal [2]** 9/15 9/18
**sealed [1]** 9/22
**second [5]** 28/21 54/2 58/14 76/5 90/11
**secondary [2]** 7/21 23/24
**Secondly [1]** 36/24
**secret [5]** 9/4 28/25 39/8 46/2 95/19
**secrets [3]** 37/22 39/7 39/8
**section [2]** 56/23 79/17
**section shall [1]** 79/17
**sector [1]** 38/18
**secure [1]** 73/20
**see [34]** 5/18 6/23 10/18 16/20 17/10 19/22 21/16 23/18 29/11 32/11 34/10 36/19 36/22 37/1 38/5 50/2 50/3 66/9 66/11 69/20 71/22 78/9 91/14 92/7 92/12 93/5 93/17 94/9 94/17 95/17 97/7 98/4 99/2 99/6
**seeing [2]** 34/4 52/16
**seek [7]** 29/8 79/17 89/16 89/25 93/23 94/6 95/13
**seeking [1]** 89/3
**seem [1]** 58/1
**seems [6]** 18/6 28/16 32/18 38/18 40/3 94/14
**seen [4]** 41/10 41/14 41/21 55/13
**selected [2]** 28/22 29/20
**self [2]** 28/22 29/20
**self-selected [2]** 28/22 29/20
**sell [4]** 14/2 35/24 38/7 45/2
**seller [4]** 24/23 25/19 26/6 26/7
**sellers [1]** 25/21
**selling [7]** 10/10 10/11 13/16 20/2 25/22 26/16 74/12
**sells [1]** 26/11
**send [2]** 24/25 32/4
**sense [10]** 7/14 11/19 16/16 20/12 33/23 46/17 55/24 63/12 64/20 69/17
**sentence [1]** 79/16
**separate [4]** 5/18 71/15 71/18 71/20
**separation [1]** 8/5
**serious [8]** 34/24 35/3 35/4 97/21 97/22 97/22 98/1 98/21
**seriously [3]** 56/14 97/13 98/17
**service [1]** 74/4
**set [35]**
**set-up [1]** 41/3
**setter [1]** 15/17
**setting [12]** 8/25 11/6 11/16 13/11 17/5 28/19 28/25 29/22 33/7 41/4 41/16 41/16
**several [2]** 37/12 39/1
**shall [2]** 79/17 94/5
**share [3]** 37/23 37/25 73/6
**sharply [2]** 98/2 98/19
**she [3]** 18/11 36/19 100/20
**She's [1]** 96/21
**shelf [1]** 14/2
**shelves [1]** 16/25
**shielded [1]** 46/1
**shift [2]** 24/17 64/13
**shifting [1]** 64/12
**shipped [1]** 16/23
**short [5]** 6/25 18/2 42/19 57/19 86/5
**short-term [1]** 86/5
**shorten [1]** 99/4
**shortened [1]** 98/25
**shorter [1]** 22/2
**shortly [1]** 82/23
**shot [1]** 101/5
**should [11]** 22/5 24/16 28/4 30/10 32/2 34/14 37/21 39/9 91/3 93/6 97/13
**shouldn't [1]** 64/24
**show [9]** 10/8 44/6 44/10 52/7 65/10 74/6 74/25 90/6 97/4
**shows [2]** 42/11 42/20
**shutting [1]** 56/20
**SI [2]** 1/5 4/8
**side [6]** 6/2 6/13 25/15 26/23 61/2 61/4
**side's [2]** 6/3 6/8
**sides [1]** 101/4
**Sidley [3]** 2/3 4/12 4/16
**sign [1]** 15/18
**signature [3]** 102/6 102/6 102/6
**signed [1]** 102/6
**significant [4]** 10/23 32/11 60/22 84/5
**significantly [1]** 55/22
**signing [1]** 102/3
**Silvia [1]** 96/16
**Silvia Tanner [1]** 96/16
**similar [6]** 14/13 14/16 27/11 30/3 33/15 73/19
**SIMON [1]** 1/13
**simply [6]** 61/10 72/13 73/2 73/16 75/12 75/19
**since [2]** 5/19 86/18
**single [4]** 22/10 40/15 47/15 54/25
**sit [1]** 15/15
**sitting [1]** 17/1
**situation [17]** 18/5 24/19 33/8 41/10 45/9 47/24 48/12 53/1 56/24 61/8 67/16 68/23 77/12 77/12 87/8 94/15 94/20
**situations [3]** 91/21 91/25 92/5
**six [1]** 87/16
**sized [3]** 10/24 17/18 17/19
**slide [4]** 19/1 29/14 29/16 32/18
**Slowly [1]** 82/21
**small [3]** 17/19 49/10 61/24
**small-sized [1]** 17/19
**smaller [9]** 10/25 11/3 17/2 18/24 36/15 43/16 44/20 45/1 45/11
**smashed [1]** 11/25
**so [179]**
**so-called [1]** 37/22
**sold [6]** 7/20 13/18 23/1 24/22 26/10 26/19
**sole [1]** 96/19
**solution [7]** 16/8 21/17 21/20 21/21 22/4 22/5 43/18
**solutions [2]** 16/5 23/4
**solvency [1]** 15/15
**solves [1]** 86/5
**solving [1]** 65/17

**S**

**some [39]**
**somebody [4]** 6/12 9/11 26/11 50/22
**somehow [3]** 25/24 50/5 66/23
**someone [2]** 51/19 71/7
**someone's [2]** 33/4 64/19
**something [26]** 5/12 6/12 12/21 21/4 23/6 26/8 30/18 31/11 36/3 37/24 43/17 44/23 56/14 65/4 65/23 66/18 68/21 71/7 76/6 76/7 76/8 76/8 76/11 82/17 90/2 94/23
**somewhat [1]** 95/17
**somewhere [2]** 25/3 26/13
**soon [4]** 57/2 57/18 98/5 98/6
**sooner [1]** 100/11
**sophisticated [1]** 38/9
**sorry [6]** 35/14 66/13 67/9 78/3 91/12 94/3
**sort [13]** 8/5 11/9 12/4 16/24 34/18 38/20 46/21 53/3 64/15 71/4 72/5 72/7 75/21
**sorts [2]** 42/8 52/25
**sounding [1]** 42/23
**sounds [1]** 27/3
**South [1]** 2/3
**Southern [1]** 33/4
**Southern Pacific [1]** 33/4
**speak [2]** 15/9 86/18
**speaking [1]** 86/13
**species [1]** 8/12
**specific [22]** 7/19 9/17 11/18 18/20 20/18 20/22 44/17 46/11 46/12 52/16 57/19 60/13 69/16 70/1 74/22 81/16 81/20 86/1 91/11 91/12 92/23 97/4
**specifically [1]** 63/21
**specificity [1]** 47/16
**specifics [2]** 68/4 77/11
**speculative [4]** 56/15 56/16 60/10 83/18
**speed [1]** 46/24
**Spell [1]** 94/25
**spend [3]** 38/15 71/25 83/20
**spent [2]** 35/8 37/12
**spilling [1]** 22/8
**spoilage [1]** 11/24
**spread [2]** 13/7 18/4
**squarely [1]** 27/13
**squeezing [1]** 11/3
**stabilize [1]** 63/13
**stage [3]** 71/12 77/15 100/6
**stake [1]** 35/11
**stakeholders [3]** 35/9 48/18 49/1
**stand [4]** 11/15 31/20 72/8 77/19
**standards [2]** 14/20 78/16
**stands [3]** 28/3 32/19 71/4
**standstill [1]** 85/6
**start [7]** 5/12 12/4 21/2 75/12 89/4 98/23 99/9
**started [2]** 47/21 52/15
**state [75]**
**state legislature [1]** 38/22
**statement [1]** 61/14
**statements [1]** 22/12
**states [24]** 1/1 1/14 2/23 14/2 14/3 14/11 14/19 15/4 15/11 16/24 18/12 21/12 22/6 22/13 22/15 23/14 24/18 25/13 40/11 40/14 40/16 40/19 59/19 61/25
**statewide [1]** 36/3
**static [1]** 48/1
**stations [1]** 38/1
**statute [18]** 31/25 34/17 39/11 47/2 47/10 47/12 48/9 48/10 51/3 65/10 66/18 67/20 73/18 74/14 77/8 77/17 78/17 93/23
**statutes [2]** 46/11 59/21
**statutory [2]** 20/15 77/21
**stay [2]** 83/4 83/7
**stayed [1]** 31/16
**steering [2]** 35/7 35/16
**step [1]** 81/14
**steps [1]** 100/3
**still [13]** 11/21 13/15 21/9 21/13 24/14 44/21 48/22 71/8 86/9 86/10 88/7 88/24 90/25
**stipulation [1]** 90/11
**stop [1]** 68/12
**storage [1]** 20/5
**store [2]** 16/12 16/23
**straightforward [1]** 31/9
**stream [2]** 19/10 93/17
**Street [2]** 2/6 2/9
**strength [2]** 6/7 38/13
**strong [2]** 6/8 22/1
**strongest [4]** 6/2 6/3 6/8 28/8
**structure [3]** 8/19 18/24 34/23
**struggling [1]** 32/7
**stuck [1]** 29/9
**studies [3]** 37/15 37/16 69/15
**studying [1]** 8/2
**stuff [3]** 46/25 75/13 91/7
**subject [4]** 31/7 50/18 82/15 83/9
**subject to [1]** 83/9
**submit [6]** 16/2 33/6 39/2 39/11 39/16 48/13
**submitted [2]** 42/11 44/22
**substantial [5]** 10/16 56/2 97/19 97/23 98/20
**substantive [2]** 71/25 90/12
**subsumed [1]** 72/4
**succeed [3]** 68/25 69/1 69/2
**success [3]** 56/2 97/19 98/20
**successfully [1]** 39/21
**such [4]** 27/1 27/1 63/4 73/19
**suddenly [1]** 16/21
**sued [1]** 96/20
**sufficient [6]** 17/16 17/20 53/22 54/3 61/14 86/19
**suing [1]** 88/11
**Suite [1]** 2/6
**summer [1]** 82/17
**supplemental [1]** 92/7
**supplier [1]** 26/15
**suppliers [2]** 60/8 87/5
**supply [9]** 12/19 18/3 25/4 26/23 60/14 60/16 61/5 62/5 92/4
**support [4]** 7/11 7/12 82/16 82/22
**supported [1]** 15/12
**supporting [1]** 72/24
**supposed [3]** 13/17 46/12 46/13
**Supreme [2]** 21/25 81/13
**sure [17]** 5/13 13/12 18/18 22/21 36/6 40/25 46/9 50/25 57/9 59/4 78/20 83/1 84/16 90/14 94/19 98/22 99/9
**surprise [1]** 48/11
**survived [1]** 19/4
**sustainability [1]** 7/11
**sustainable [2]** 7/13 20/7
**SW [2]** 2/9 2/24
**system [13]** 12/18 21/18 22/12 24/17 27/8 37/14 37/17 39/15 46/24 47/17 63/9 63/17 69/10
**systems [1]** 74/19

**T**

**table [1]** 5/7
**tailored [1]** 11/17
**take [15]** 6/17 7/2 30/6 34/9 35/15 41/20 56/14 57/12 57/20 58/19 75/13 80/2 85/13 97/13 100/3
**takes [2]** 26/12 97/15
**taking [2]** 34/25 89/1

T

**talk [23]** 8/19 9/17 9/18 20/1 22/23 23/24 24/22 25/18 32/17 35/11 42/18 64/4 65/14 67/8 69/21 70/16 72/5 76/14 76/15 81/6 83/6 94/16 96/12
**talked [10]** 25/16 27/5 27/22 36/20 37/13 69/15 79/12 80/21 81/7 101/13
**talking [29]** 8/22 13/12 13/22 17/17 22/21 24/3 27/7 35/9 42/25 47/16 55/20 56/3 56/24 61/11 62/5 62/6 62/8 64/1 64/12 65/3 65/23 66/21 68/11 69/10 79/1 80/24 82/6 86/12 98/7
**talks [3]** 15/7 18/11 80/7
**Tanner [1]** 96/16
**targeted [1]** 20/17
**tariff [1]** 15/3
**tariffs [2]** 12/21 27/14
**tasked [1]** 43/1
**tax [4]** 12/10 12/14 15/17 27/15
**taxation [1]** 15/3
**taxes [1]** 27/19
**teams [1]** 42/9
**Television [1]** 28/2
**tell [8]** 6/3 12/16 28/14 30/22 37/4 37/8 71/24 91/20
**telling [2]** 6/7 38/11
**tells [2]** 47/10 98/1
**temporary [2]** 5/16 83/4
**Ten [1]** 85/18
**Ten-minute [1]** 85/18
**tension [1]** 24/3
**term [4]** 14/12 14/16 18/2 86/5
**terminology [2]** 8/3 48/1
**terms [2]** 48/2 64/8
**tertiary [4]** 7/21 23/24 74/15 74/20
**test [1]** 97/22
**tested [1]** 47/3
**than [27]** 8/4 13/15 17/1 20/9 22/2 22/9 26/6 26/14 29/19 29/20 36/14 38/20 44/13 44/19 44/22 45/8 47/14 49/8 50/14 52/17 55/22 78/9 86/13 86/19 86/24 95/21 100/11
**Thank [18]** 5/9 6/21 7/8 34/7 34/8 34/13 42/3 59/1 59/9 66/6 70/5 70/7 82/12 82/14 85/17 85/19 101/17 101/18
**Thanks [1]** 101/16
**that [729]**
**that's [109]**
**their [74]**
**them [40]**
**themes [1]** 33/2
**themselves [4]** 10/2 21/6 36/1 90/24
**then [82]**
**theoretical [1]** 95/11
**theory [2]** 13/25 75/15
**there [126]**
**there's [36]**
**thereafter [2]** 25/25 82/24
**thereby [2]** 14/3 31/14
**therefore [6]** 38/14 80/1 87/17 93/22 93/23 98/18
**these [47]**
**they [284]**
**they're [37]**
**they've [9]** 26/9 26/10 40/4 43/15 46/16 51/7 52/6 92/5 92/13
**thin [1]** 17/16
**thing [18]** 12/16 16/12 32/5 43/8 49/22 51/13 54/1 55/15 56/20 60/2 62/4 69/9 69/24 71/8 82/4 82/5 89/23 95/15
**things [20]** 35/23 36/21 39/5 43/12 44/4 50/2 50/3 52/11 52/18 52/25 53/21 55/13 55/14 60/6 69/5 70/24 73/20 81/12 90/19 100/13
**think [117]**
**thinking [3]** 8/9 37/23 55/8
**thinks [5]** 64/22 66/5 66/22 67/6 76/6
**third [5]** 2/24 28/24 32/1 71/21 75/11
**this [192]**
**thoroughly [1]** 28/13
**those [47]**
**though [4]** 11/16 36/16 71/24 97/5
**thought [7]** 24/9 41/12 65/11 80/15 83/19 95/12 100/24
**thousands [2]** 19/16 48/5
**threat [1]** 84/1
**three [5]** 15/12 82/7 84/24 98/8 101/11
**through [27]** 9/23 16/10 20/20 24/21 27/2 27/10 28/12 35/19 51/11 51/16 57/10 59/25 62/21 62/22 62/23 69/13 71/18 74/4 74/7 74/25 76/9 76/10 77/20 78/9 78/13 78/13 80/20
**tied [1]** 16/18
**time [20]** 32/5 34/4 35/15 36/18 42/10 48/14 50/6 50/8 50/9 50/12 51/18 68/19 68/20 82/25 85/15 87/15 87/18 90/11 95/22 99/4
**timing [4]** 6/17 68/14 99/21 99/23
**tip [2]** 98/3 98/19
**tips [1]** 98/2
**today [3]** 5/4 27/7 101/13
**together [6]** 24/24 35/7 37/14 48/6 72/19 73/4
**tonnage [4]** 60/14 60/16 63/12 91/4
**too [5]** 32/15 52/8 60/23 62/4 63/14
**top [4]** 27/25 38/6 52/25 67/22
**topics [1]** 16/3
**total [5]** 17/18 19/6 19/8 19/14 46/8
**totally [2]** 39/15 39/19
**touch [4]** 60/6 63/14 75/24 80/19
**touched [1]** 59/5
**touches [2]** 7/18 7/20
**towards [3]** 31/12 82/22 85/8
**tracking [1]** 26/1
**trade [6]** 9/4 28/25 37/22 39/7 39/7 39/8
**traded [1]** 55/9
**traditional [1]** 7/18
**transcript [3]** 1/12 102/4 102/5
**transit [1]** 20/11
**transparency [2]** 18/21 18/24
**transparent [5]** 12/15 12/19 16/11 25/9 69/25
**transportation [2]** 18/8 20/4
**transported [1]** 26/6
**transporting [1]** 74/16
**trash [1]** 35/1
**travel [1]** 99/16
**trial [41]**
**tried [1]** 13/24
**tries [2]** 22/14 22/15
**trigger [1]** 24/16
**trio [1]** 45/18
**trouble [1]** 90/13
**true [12]** 11/18 13/10 25/16 46/10 49/25 62/10 71/6 72/14 73/9 73/17 75/19 82/2
**truly [2]** 23/23 27/15
**try [5]** 9/6 22/13 22/16 97/11 100/13
**trying [10]** 22/19 31/20 49/12 49/12 55/25 56/3 61/22 62/1 66/11 68/24
**turn [1]** 80/9
**two [19]** 5/15 5/19 6/23 7/2 15/11 17/13 17/22 19/8 28/6 35/8 46/3 57/19 57/22 78/12 84/24 87/2 97/12 98/8 99/16
**two-year [1]** 28/6
**type [12]** 7/20 20/13 20/24 31/11 41/3 41/11 41/15 49/14 50/13 51/24 64/20 81/9
**types [3]** 18/13 62/19 69/16
**typical [3]** 6/12 19/18 20/17

## U

**Uh-huh [2]** 55/18 94/21
**ultimately [3]** 8/14 10/4 95/23
**unaware [1]** 60/1
**uncertainty [3]** 15/8 63/4 92/3
**uncommon [1]** 85/5
**unconstitutional [30]** 15/20 32/17 32/19 32/22 32/24 33/20 33/23 34/4 49/22 50/11 53/19 53/22 70/25 71/4 71/9 71/11 71/15 71/23 72/3 72/10 75/6 75/14 75/23 80/22 81/25 83/14 96/25 97/2 97/5 97/12
**under [44]**
**understand [22]** 5/24 9/7 13/12 21/23 23/10 23/14 33/18 38/21 43/9 43/14 43/15 43/19 50/14 50/21 61/20 69/18 75/2 78/20 87/11 90/9 90/14 91/10
**understanding [4]** 9/3 9/9 40/10 47/8
**understood [2]** 30/19 32/14
**undertake [1]** 60/4
**undue [1]** 53/24
**unfettered [2]** 46/5 46/8
**unhappy [1]** 93/1
**Union [1]** 49/15
**unique [1]** 25/12
**uniquely [1]** 10/25
**unit [1]** 20/10
**UNITED [3]** 1/1 1/14 2/23
**universal [1]** 63/17
**unless [1]** 25/24
**unlikely [1]** 83/16
**unpaid [1]** 89/19
**unprecedented [2]** 7/15 7/17
**unreasonable [1]** 33/14
**untangle [1]** 101/6
**until [4]** 6/15 48/13 89/19 89/25
**unused [1]** 19/5
**up [46]**
**updated [1]** 29/23
**upfront [1]** 8/22
**upheld [1]** 95/23
**upon [3]** 6/17 11/9 83/24
**upstream [3]** 25/19 26/15 87/5
**urgency [1]** 58/15
**us [8]** 5/4 8/6 24/1 61/23 67/16 78/5 83/21 83/24
**use [8]** 42/22 81/4 81/5 81/8 81/11 81/20 82/4 97/22
**used [4]** 17/2 62/20 73/20 74/16
**user [3]** 26/6 26/12 27/14
**using [1]** 11/20
**usurp [1]** 9/6
**utter [1]** 23/18

## V

**v [7]** 4/7 11/9 28/2 28/9 29/8 33/4 33/11
**value [1]** 43/15
**Van [7]** 34/11 57/21 57/24 58/24 70/5 75/25 85/22
**variety [2]** 18/17 36/19
**various [3]** 21/4 35/10 48/18
**Vermont [1]** 37/24
**versus [2]** 24/11 29/23
**vertical [1]** 11/1
**vertically [1]** 18/2
**very [40]**
**view [1]** 8/5
**views [1]** 9/3
**violates [4]** 51/3 51/23 77/21 80/1
**violating [1]** 78/18
**violation [4]** 66/4 66/21 77/17 77/18
**virtually [1]** 7/20
**vis [2]** 65/22 65/22
**vis-à-vis [1]** 65/22
**visibility [3]** 16/19 18/3 26/1
**volatile [1]** 17/20
**volume [2]** 13/14 19/9
**volumes [4]** 13/14 17/8 92/2 92/11
**voluntarily [1]** 89/16
**Von [2]** 2/7 4/23
**vs [1]** 1/6

## W

**W [3]** 2/23 102/8 102/9
**waiving [2]** 33/5 98/23
**walk [1]** 20/20
**walks [1]** 16/12
**want [60]**
**wanted [7]** 51/13 59/18 60/2 60/6 62/4 63/14 81/7
**wants [5]** 5/21 6/12 58/24 88/19 97/4
**warrant [1]** 22/2
**was [68]**
**Washington [3]** 14/9 14/15 26/9
**wasn't [2]** 11/11 63/19
**waste [6]** 22/4 23/5 27/18 34/24 43/20 61/25
**wasteful [1]** 20/9
**Water [1]** 23/5
**way [60]**
**ways [3]** 12/20 22/14 78/12
**we [203]**
**we'd [1]** 71/22
**we'll [7]** 14/8 17/22 22/10 34/10 57/21 66/9 96/12
**we're [17]** 8/7 9/14 20/2 23/16 27/7 27/7 31/9 31/24 42/25 47/16 49/9 64/12 68/16 71/10 74/11 74/12 85/7
**we've [9]** 20/21 22/18 27/22 30/12 41/9 56/3 61/17 75/21 97/13
**wealth [1]** 37/23
**Webb [1]** 96/16
**Wednesday [3]** 99/13 99/18 100/1
**week [3]** 88/13 90/11 98/12
**weeks [1]** 97/13
**weight [1]** 69/13
**welcome [7]** 4/14 4/18 5/1 5/7 5/11 97/6 99/17
**well [57]**
**went [5]** 25/23 37/13 69/13 69/22 69/23
**were [28]** 9/5 9/15 12/16 19/7 19/8 19/8 20/24 20/25 20/25 21/5 21/14 35/19 35/21 47/7 47/18 52/11 52/16 52/16 63/9 68/11 75/24 76/3 76/5 82/20 92/2 98/7 100/17 100/17
**weren't [1]** 87/16
**what [128]**
**what's [25]** 9/9 9/9 12/8 12/12 12/18 14/12 14/16 15/21 15/23 18/21 20/9 22/17 27/15 27/20 33/15 34/19 43/25 54/5 54/12 57/24 58/2 60/1 60/24 90/24 93/18
**whatever [6]** 46/6 48/1 57/6 57/14 68/7 79/24
**whatsoever [2]** 36/5 56/22
**when [43]**
**whenever [1]** 6/18
**where [53]**
**whether [35]**
**which [22]** 8/4 10/24 16/19 25/25 27/25 42/14 48/10 51/15 53/18 62/2 64/10 66/24 70/17 70/25 72/9 74/5 76/22 82/2 87/8 91/23 91/25 96/10
**while [6]** 9/14 10/25 11/3 20/7 85/12 87/14
**who [36]**
**Whoa [2]** 16/20 16/25
**whole [4]** 18/5 34/19 56/23 75/4
**WHOLESALER [6]** 1/4 4/7 4/13 4/17 7/10 100/5
**WHOLESALER-DISTRIBUTORS [6]** 1/4 4/7 4/13 4/17 7/10 100/5
**wholesalers [2]** 23/11 73/19

## W


**why [46]**
**wide [2]** 18/17 36/19
**Wild [7]** 5/10 13/20 13/21 23/8 42/11 42/12 60/25
**will [75]**
**win [3]** 83/17 89/5 100/17
**winding [1]** 56/25
**Winkle [5]** 11/23 91/22 91/24 92/7 92/21
**wins [2]** 87/25 88/13
**wish [1]** 34/6
**within [11]** 9/4 20/14 27/13 64/6 64/7 72/4 73/4 73/17 77/1 77/16 97/12
**without [10]** 9/19 10/7 13/2 20/18 90/1 93/14 96/12 96/24 101/3 102/5
**witnesses [1]** 101/12
**won't [8]** 9/18 54/11 66/24 70/22 85/3 85/4 88/10 88/11
**wonder [1]** 43/16
**Wonderful [1]** 6/23
**word [2]** 11/10 42/22
**words [2]** 34/18 66/22
**work [14]** 17/24 22/15 25/22 26/24 37/16 38/14 43/7 52/10 62/6 99/6 99/18 99/24 100/13 101/13
**working [1]** 43/16
**works [5]** 8/23 22/14 25/18 35/25 60/12
**world [1]** 38/8
**worldwide [1]** 44/25
**worried [1]** 9/10
**worry [4]** 17/10 17/22 22/9 56/1
**worth [2]** 18/16 72/4
**would [91]**
**wouldn't [5]** 26/7 36/2 56/7 66/17 78/25
**wrap [1]** 73/19
**wreak [2]** 84/24 85/1
**wrong [7]** 12/12 22/17 32/23 50/4 55/14 76/7 76/7
**wrongfully [1]** 33/24
**Wynne [1]** 15/2


## X


**X [3]** 9/22 50/11 68/21


## Y


**Y [1]** 50/11
**yeah [10]** 11/5 20/8 20/11 24/9 31/5 65/25 86/12 94/1 94/2 96/5
**year [11]** 12/3 18/1 18/1 19/7 19/10 28/6 42/12 47/5 47/15 56/9 98/8
**years [15]** 17/22 18/12 26/25 27/1 35/8 36/19 36/25 37/12 47/1 48/4 52/6 52/7 52/21 63/11 84/24
**years' [1]** 18/16
**yes [15]** 5/9 21/10 34/12 37/20 51/5 51/10 52/19 58/18 77/5 79/10 84/7 98/13 99/14 99/22 100/23
**yet [6]** 47/20 47/25 50/21 50/21 55/23 55/25
**yield [1]** 70/3
**you [263]**
**you'd [1]** 54/15
**You'll [1]** 17/10
**you're [29]** 5/7 11/10 21/13 28/5 30/22 31/13 32/7 32/22 40/7 41/5 43/24 55/19 56/15 58/1 58/11 65/23 71/8 71/19 71/24 73/22 74/23 78/21 82/6 83/16 85/25 89/1 89/6 97/6 100/9
**you've [6]** 6/6 6/15 20/1 20/8 32/1 64/17
**your [79]**
**Your Honor [20]** 4/11 7/3 7/13 7/23 8/11 20/21 30/9 34/12 40/10 41/22 67/22 70/15 71/3 72/2 73/24 79/10 80/17 82/10 84/17 91/19
**yours [1]** 86/25
**yourself [1]** 74/24
**yourselves [4]** 6/16 99/7 100/14 101/3


## Z


**Z [1]** 50/11
**zero [3]** 20/14 20/14 74/19


## à


**à [1]** 65/22