EXHIBIT B

DO NOT SIGN

# CIRCULAR ACTION ALLIANCE

## PARTICIPANT PRODUCER AGREEMENT

THIS PARTICIPANT PRODUCER AGREEMENT (the "**Agreement**") is entered into between Circular Action Alliance, including its affiliates and subsidiaries ("**CAA**") and:

[______________________________________________________________]

and its subsidiaries ("**Company**"). CAA and Company shall be individually referred to herein as a "**Party**" and collectively as the "**Parties**."

WHEREAS, Company may have obligations to participate in recycling and materials management stewardship programs in one or more jurisdictions within the United States under extended producer responsibility ("**EPR**") laws, including the California Plastic Pollution Prevention and Packaging Producer Responsibility Act, Colorado Producer Responsibility Program for Statewide Recycling Act, and Oregon Plastic Pollution and Recycling Modernization Act (as well as others); and

WHEREAS, EPR laws typically require the development of a producer responsibility organization to manage government-mandated fees that covered producers must pay to fund the costs associated with the take-back of Covered Materials, educating consumers and businesses on their responsibilities, and meeting targets and goals established under EPR laws; and

WHEREAS, CAA has been designated to serve as a producer responsibility organization in several states to aid producers in the implementation, administration, and management of such EPR laws; and

WHEREAS, the purpose of this Agreement is to set out the overarching terms and conditions under which Producers may elect to participate in various EPR Program(s) for which CAA serves as the designated producer responsibility organization, as well as the rights, obligations, and liabilities of Producers and CAA in connection therewith; and

WHEREAS, because of differences in each state's EPR laws, CAA will provide a state-specific addendum that will allow Producers to elect to participate in and be bound by the state-specific requirements once those are established.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Company and CAA agree as follows:

1. **Definitions.** Capitalized terms in this Agreement will have the following meanings unless a different definition is expressly provided for in an applicable State Addendum, in which case the different definition will apply solely with respect to that State Addendum.

1.1. "**Applicable EPR Law**" means Applicable Law relating to EPR in the jurisdictions in which CAA is the PRO, including but not limited to those Applicable Laws referenced in any State Addendum.

1.2. "**Applicable Law**" means all federal, state and local statutes, rules, guidelines, regulations, ordinances, codes, executive orders, and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof.

1.3. "**Authorized Representative**" means an employee, officer, agent or other representative of Company who has the authority to agree to this Agreement on behalf of Company.

1.4. "**Confidential Information**" has the meaning set forth in Section 4 of this Agreement.

1.5. "**Covered Material**" means the respective materials that are designated in Applicable EPR Law and subject to Producer Fees as identified in each State Addendum, including but not limited to paper, packaging, and food service ware.

1.6. "**Effective Date**" means the date on which both Parties have executed this Agreement.

1.7. "**EPR**" means extended producer responsibility.

1.8. "**Governmental Authority**" means any federal, state or local government, any political subdivision thereof or any other governmental, quasi-governmental, judicial, administrative, public or statutory instrumentality, authority, body, agency, bureau, commission, board, department or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

1.9. "**Governmental Communications**" means notices, interpretations, rulings, directives or other communications issued by a Governmental Authority pursuant to Applicable Law.

1.10. "**Participant**" means a Producer, including Company, that elects, subject to the terms and conditions of this Agreement, to participate in one or more of CAA's Programs under Applicable EPR Law by virtue of executing one or more applicable State Addendum.

1.11. "**Portal**" means a CAA platform, portal or website hosting information about the Programs and through which Producers may register to be Participants and through which a Participant will comply with reporting obligations and includes the Licensed Platform.

1.12. "**PRO**" means producer responsibility organization.

1.13. "**Producer**" means a producer that is registered as a Participant, or otherwise required under Applicable EPR Law to register, to participate in a Program for which CAA is the PRO.

DO NOT SIGN

1.14. "**Producer Fees**" means all fees owed to CAA as a result of Producer electing to be a Participant Producer pursuant to Applicable EPR Laws in accordance with the applicable Program Plan(s).

1.15. "**Producer Reports**" means information that a Participant is required to supply to CAA in order for the Producer and/or CAA to comply with Applicable EPR Law.

1.16. "**Program**" means EPR programs that apply to Covered Materials under Applicable EPR Law.

1.17. "**Program Plan**" means an EPR program plan submitted by CAA and approved by the applicable Governmental Authority pursuant to an Applicable EPR Law under which CAA has been approved or agreed to serve as the PRO.

1.18. "**State Addendum**" means an addendum to this Agreement that is subsequently assented to by the Parties at such time that Company elects to be a Participant in a specific state that sets forth state-specific policies, procedures, rules, and requirements applicable to Company and CAA for the states in which Company has elected to be a Participant. In the event of any conflict between a State Addendum and the terms of this Agreement, the terms of the State Addendum will control solely with respect to that State Addendum.

2. **CAA Obligations.** As a PRO, CAA will be responsible for the following functions consistent with Applicable EPR Law:

2.1. **Developing Program Plans.** Pursuant to the requirements of Applicable EPR Law, CAA shall be responsible for submitting a Program Plan to the relevant Governmental Authority where required by, and in accordance with, the Applicable EPR Law. Each Program Plan shall address the information required under the Applicable EPR Law, which may include, without limitation, details of how the Program will promote the collection and management of Covered Materials, eligible Program participants, the mechanism for securing and dispensing funds to cover administrative, operations, capital and compliance related costs of the Program, and fulfilment of periodic reports on the Program to relevant state authorities.

2.2. **Administration of Program Plans.** CAA shall be responsible for administering each Program, in accordance with Applicable Law. Such administration may include, without limitation:

2.2.1. Establishing, operating, and/or funding collection systems for Covered Materials and from eligible entities;

2.2.2. Provisioning and/or funding the collection, transport, and management of Covered Materials to and from eligible entities, as defined under Applicable EPR Law;

2.2.3. Educating and conducting outreach for the collection and management of Covered Materials;

DO NOT SIGN

2.2.4. Preparing and distributing annual reports and other reports required for compliance with Applicable EPR Law; and

2.2.5. Disbursing funds to cover administrative, operations, capital, and compliance related costs associated with implementing the Program Plan.

2.3. **Fee Setting.** CAA shall develop fee structures under the Program Plans in accordance with Applicable EPR Laws, taking into account comments from Producers and other stakeholders, which will be used to determine Producer Fees.

2.4. **Producer Services.** CAA shall provide certain services to Company in order to support the development and implementation of the Program Plans. Such services for the Program Plans in which Company is a Participant may include:

2.4.1. Creating, maintaining, and supporting a Portal through which Producers will register and through which Participants will comply with reporting obligations;

2.4.2. Publishing and maintaining guidance to assist Participants in understanding their obligations, including but not limited to reporting, recordkeeping, and fees;

2.4.3. Establishing policies and procedures for joining CAA, filing and amending reports, resolving disputes, and other topics selected by CAA; and

2.4.4. Establishing a Producer support center to respond to inquiries and provide assistance to Participants.

2.5. **Service Specification.** CAA represents and warrants that the Programs shall be administered and operated in material compliance with the specifications set forth in the Program Plans. CAA also represents and warrants that if CAA's administration and operation of a Program does not materially comply with the Program Plan specifications and/or Applicable EPR Law for that Program's state and Company notifies CAA that such material noncompliance resulted in Participant receiving notice from a Governmental Authority of Participant's actual or alleged failure to comply with Applicable EPR Law because of the Program's above-referenced non-compliance, CAA will: (1) notify the Governmental Authority in the state for such Program that CAA is responsible for the Program; and (2) attempt to negotiate with the Governmental Authority in an effort to protect CAA, Company and Participants from state actions, liabilities or penalties resulting solely from the Program's material non-compliance, including, where appliable, attempting to secure extensions of state deadlines, waivers of state penalties, or other relevant accommodation. In the event that Company becomes aware that any Programs do not conform to the foregoing warranties, Company shall notify CAA in writing of the nonconformity as soon as practical, but no later than fifteen (15) days of its first knowledge of such nonconformity. Upon CAA's receipt of such notification, CAA shall repair or re-perform the Program so that it is no longer subject to the nonconformity. If within the shorter of any cure period authorized under the Applicable EPR Law or thirty (30) days

DO NOT SIGN

of CAA's receipt of such notification, CAA is unable to repair or re-perform the Programs so that it conforms to the foregoing warranties, Company may elect to terminate its participation in the applicable Program Plan by terminating this Agreement and/or one or more State Addendums upon written notice to CAA. The rights and procedures of this paragraph set forth CAA's sole and exclusive liability, and Company's sole and exclusive remedy, for any breach by CAA of the warranties set forth in this Section and/or nonconformity of the Programs with their specifications in the relevant Program Plan.

3. **Company's Obligations.** Upon execution, Company agrees to the following obligations, recognizing that specific Producer Fees will not be required until Company assents to one or more State Addenda:

3.1. **General Company Obligations.**

3.1.1. Company will provide information that, to the best of Company's knowledge, is true, accurate, current, timely, and complete when submitting information or materials on the Portal, as a part of the Programs, or to CAA.

3.1.2. Company agrees that it shall be responsible and liable for the accuracy of its reported data, payment obligations, compliance with its own company policies and requirements as well as any acts or omissions of its Authorized Representative. Company shall inform CAA promptly upon becoming aware that information provided to CAA is not accurate or complete and shall as soon as reasonably practicable thereafter supply CAA with corrected information and a written statement explaining the inaccuracy or incompleteness, as applicable.

3.1.3. Company agrees that CAA and its affiliate organizations have the authority to establish policies, procedures, and rules reasonably designed for the administration, audit, and enforcement of the Programs, which will be developed in consultation with Participants. Subject to Section 14, Company agrees to be bound by all such policies, procedures, and rules including those included in the State Addenda assented to hereunder at any point during the Term.

3.2. **Reporting.**

3.2.1. Company shall, from and after the Effective Date and throughout the Term of this Agreement, produce and provide Producer Reports to CAA, as required under Applicable EPR Law. State-specific criteria for Producer Reports will be set forth in each State Addendum and may include, without limitation, information about the supply of Covered Material, source reduction, and use of recycled content, in each state where CAA is implementing or administering an Applicable EPR Law.

3.2.2. Company shall submit Producer Reports in the format and on the schedule specified in each applicable State Addendum agreed to in writing by the Parties or as determined by CAA in order to meet the requirements of Applicable EPR Law or the applicable Program Plans.

DO NOT SIGN

3.2.2.1. Company shall file Producer Reports covering the relevant periods set forth in each applicable State Addendum agreed to in writing by the Parties or as determined by CAA in order to meet the requirements of Applicable EPR Law or the applicable Program Plans.

3.2.2.2. Company shall provide any necessary updates to correct previously filed Producer Reports in a timely manner, and in any case no later than 30 days after becoming aware of the need for any correction.

3.2.2.3. All Producer Reports and the information contained therein shall be considered Confidential Information of Company pursuant to Section 4 of this Agreement and shall be subject to the protections therein, except as otherwise provided in Section 3.2.3 of this Agreement.

3.2.3. Company acknowledges that CAA is required by Applicable EPR Law to provide certain information to Governmental Authorities in the jurisdictions in which CAA is the PRO as part of its reporting obligations under Applicable EPR Law and to ascertain and verify the Producer Fees payable to CAA. Such information shall be set forth in each applicable State Addendum and/or the Program Plan. Disclosure of such information to applicable Governmental Authorities shall not be considered a breach of the confidentiality obligations set forth in Section 4 of this Agreement; provided that CAA does not disclose any more Confidential Information than is required by Applicable EPR Law or necessary to implement the applicable Program Plan in accordance with Applicable EPR Law.

**3.3. <u>Fee Obligations</u>.** Once Company has agreed to participate in one or more Programs by executing a State Addendum, Company agrees to remit to CAA, or to its designated representative, all Producer Fees imposed in accordance with the applicable Program Plan(s) in a timely manner in accordance with the payment deadlines established pursuant to the applicable Program Plan(s). Producer Fees will be established using a methodology developed in consultation with Producers, and this methodology may be updated from time to time in consultation with Producers. Producer Fee rates will be updated on an annual basis in accordance with the established methodology. Company acknowledges and agrees that the Producer Fees may also be changed from time to time by CAA or its affiliate organizations, provided that the Company shall receive at least ninety (90) days' notice before such Producer Fee changes take effect unless Applicable Law requires Producer Fee changes to take effect earlier.

**3.4. <u>Pre-CAA Obligations</u>.** For any period that Company is subject to an Applicable EPR Law prior to executing a State Addendum and has not fulfilled such obligations independently in accordance with such Applicable EPR Law, Company shall satisfy the general obligations, reporting obligations, recordkeeping obligations, and fee obligations set forth in this Section 3 and the applicable State Addendum with respect to the Applicable Program, subject to any late fees, fines, or penalties required by or imposed in accordance with the Applicable EPR Law.

DO NOT SIGN

4. **Confidentiality.**

4.1. **Confidential Information.** As used herein, the term "Confidential Information" means non-public, confidential, or proprietary information about a Party's business, assets or operations deemed by such Party to be of commercial or competitive value and not commonly known to others within such Party's industry. Examples of Confidential Information include, without limitation, any non-public, confidential, or proprietary information regarding a Party's business or technical processes, product designs, cost and other unpublished financial information, product and business plans, projections, trade secrets, intellectual property, know-how, inventions, methods and procedures for operation, marketing techniques, pricing, sales, product information or product specifications, product purchases, product evaluations, business prospects, customers, employees and relationships with vendors and suppliers.

4.1.1. Confidential Information shall not include information which the receiving party demonstrates by documentary evidence: (i) was known to the public at the time of its disclosure, or becomes known to the public after the disclosure through no fault of the receiving party; (ii) as evidenced by prior written documentation, was rightfully in its possession prior to the time of the disclosure and is not otherwise subject to a confidentiality obligation; (iii) as evidenced by prior written documentation, was developed by the receiving party independent of the disclosure by the disclosing party; or (iv) is disclosed pursuant to Section 3.2.3 or an applicable State Addendum.

4.2. **Confidentiality.** As a part of the Programs, CAA or Company may obtain or have access to Confidential Information of the other Party. With respect to the Confidential Information of the other Party, CAA and Company shall, and shall cause each of their respective employees, contractors, and agents to: (a) keep in confidence all such Confidential Information and limit the disclosure of such Confidential Information only to those individuals or entities who "need to know" such information for purposes of the performance of this Agreement or for participation in or operation of the Programs; (b) not use any such Confidential Information for any purpose other than the performance of this Agreement or for participation in or operation of the Programs; and (c) not disclose any such Confidential Information to any third party unless such disclosure is necessary or desirable for performance of this Agreement or for participation in or operation of the Programs and further, only when such disclosure is subject to an obligation of confidentiality materially similar to the requirements of this Agreement (in each case, as determined in the reasonable discretion of CAA). The protection afforded by this Agreement to Confidential Information is not intended to limit, and does not limit, in any way any of the protection provided to such Confidential Information under any Applicable Law. Subject to the foregoing and consistent with Section 3.2.3, Company acknowledges and agrees that certain disclosures by CAA of information of Company to another party, which may constitute the Confidential Information of Company, will be a necessary part of participation in the Programs and Company hereby acknowledges and agrees to such disclosures or information sharing, as set forth in Section 3.2.3, without any requirement

DO NOT SIGN

for additional notice or consent. Company further acknowledges and agrees that the obligations of confidentiality as provided herein are in addition to and do not supersede any existing confidentiality obligations contained in separate agreements between the Parties fulfilling the responsibility of a Producer. Each Party hereto will implement reasonable and appropriate administrative, technical and physical safeguards to protect the security, confidentiality and integrity of all Confidential Information such Party receives hereunder.

4.3. **Required Disclosures.** Notwithstanding Section 4.2 of this Agreement, either Party may disclose Confidential Information to the extent required under Applicable Law, including an order of any court or other governmental authority, or legal process. In such case, the Party shall endeavor to provide notice, if legally permitted, to the Disclosing Party of the disclosure of their Confidential Information in an effort to enable the disclosing Party to seek an appropriate protective order and/or contest the compelled disclosure.

4.4. **Destruction or Return of CAA's Materials.** Upon written request of CAA or the withdrawal of Company from CAA's Programs, Company shall promptly destroy or return CAA's Confidential Information. Notwithstanding the foregoing, Company will not be required to erase electronically stored Confidential Information that has been saved in accordance with its and its Representatives' respective ordinary electronic retention policies or back-up practices, on the condition that, except as otherwise required by Applicable Law, (a) personnel whose functions are not primarily information technology do not access such retained copies and (b) personnel whose functions are primarily information technology in nature access such copies only as reasonably necessary for the performance of their information technology duties. In addition, a Company may retain Confidential Information to the extent required to comply with law or governmental regulation, and their legal counsel may retain one copy of the Confidential Information in order to evidence compliance with the terms of this Agreement and shall only be used for the purpose for which it was retained. The return or destruction of Confidential Information will not relieve Company of its obligations under this Agreement.

5. **Dispute Resolution.** In the event a dispute arises out of or relating to this Agreement, Company and CAA agree to first make a good-faith effort to resolve such dispute themselves through designated representatives within thirty (30) days after written notice of the dispute was first given, or as otherwise agreed upon. If resolution cannot be reached by the Parties themselves within thirty (30) days, Company and CAA further agree to engage in non-binding mediation with a mediator (who, for the avoidance of doubt, may be selected from a mediation tribunal panel of neutrals) to be mutually agreed on by Company and CAA. The Parties agree to participate in mediation in good faith, including by cooperating to select a mediator and in scheduling the mediation proceedings. Mediation costs will be shared equally between the Parties. Mediation may be conducted remotely through a videoconference platform approved by the mediator and Parties. If resolution cannot be reached by the Parties through non-binding mediation, or the Parties fail to complete mediation within ninety (90) days of submission of the dispute to the mediator, either Party may pursue any remedies available to it under this Agreement, at law, in equity, or otherwise, including, but not limited to, instituting an appropriate proceeding before a court of competent jurisdiction. Notwithstanding the

DO NOT SIGN

foregoing, nothing in this Section 5 shall limit the ability of a Party to seek injunctive relief from a court of competent jurisdiction ordering compliance with this Agreement or enjoining and restraining the continuation of a breach of this Agreement.

6. **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to its conflict of laws principles to the extent no Applicable EPR Law applies to the issue, but otherwise will be construed in accordance with the laws specified in the applicable State Addendum governing the issue.

7. **Warranties and Representations.**

7.1. **Company's Warranties and Representations.** Company represents and warrants that (a) it is authorized to enter into the Agreement and perform its obligations hereunder; (b) the signatory for Company is authorized to execute the Agreement on behalf of Company; (c) to the best of Company's knowledge, Company has all required permits, licenses, and other governmental authorizations and approvals required or necessary for it to enter into this Agreement and to participate in the Programs; and (d) to the best of Company's knowledge, the Producer Reports and Producer Data provided by Company to CAA in connection with the Agreement are (i) accurate and complete, (ii) provided to CAA with any necessary consent, right, permission, license, clearance, or authority (including any further reasonable proof thereof (if requested by CAA)) to permit CAA to use such reports and data in connection with the performance of its obligations under the Agreement and the Programs, and (iii) shall not violate or infringe upon the copyright, trademark, trade secret, patent, publicity, privacy or other rights of any third party; (e) Company will comply with all Applicable Law related to its performance of its obligations hereunder and as a Producer; and (f) is and shall at all times during the Term remain duly organized, validly existing, and in good standing under the laws of the state of its organization.

7.2. **CAA's Warranties and Representations.** CAA represents and warrants to Company that (i) CAA has the full authority and right to enter into the Agreement, and that this Agreement constitutes a valid and binding agreement of CAA; (ii) CAA is and shall at all times during the Term of this Agreement remain, a PRO in all states covered by a State Addendum under this Agreement; (iii) CAA will comply with all Applicable Laws applicable to its performance of its obligations hereunder and as a PRO; (iv) to the extent CAA is required to deliver to a Governmental Authority information which CAA receives from Company, CAA will faithfully, accurately, and completely disclose all such information received from Company to the extent required by Applicable Law; (v) CAA will not sell or otherwise distribute or use the Producer Reports for any purpose other than to comply with the requirements of the relevant Programs or as otherwise permitted by this Agreement; (vi) CAA is and shall at all times during the Term of the Agreement remain a nonprofit corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code; and (vii) the terms and conditions which bind CAA and Company under this Agreement shall be the same set of terms and conditions which bind CAA to other Producers under their respective participant producer agreements, subject to the rights of Producers to accept or reject amendments proposed by CAA in accordance with Section 14 of the Agreement.

DO NOT SIGN

8. **Disclaimer.** EXCEPT FOR THE FOREGOING EXPRESS REPRESENTATIONS AND WARRANTIES BY CAA SET FORTH IN SECTION 2.5 AND SECTION 7 ABOVE, AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, CAA MAKES NO REPRESENTATIONS OR WARRANTIES ABOUT THE PROGRAMS, AND EXPRESSLY DISCLAIMS (TO THE FULLEST EXTENT OF THE LAW) ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. BECAUSE CAA'S IMPLEMENTATION AND OPERATIONS OF THE PROGRAM PLAN(S) ARE BASED IN LARGE PART ON PRODUCER REPORTS AND DATA, CAA MAKES NO REPRESENTATIONS AS TO THE RESULTS OF COMPANY'S PARTICIPATION IN SUCH PROGRAM PLAN(S) TO THE EXTENT ARISING OUT OF SUCH REPORTS OR DATA. IF THIS DISCLAIMER OF WARRANTY IS HELD TO BE UNENFORCEABLE BY A COURT OF COMPETENT JURISDICTION IN ANY MANNER, THEN ALL EXPRESS AND/OR IMPLIED WARRANTIES MANDATED BY SUCH COURT SHALL BE LIMITED IN DURATION AND SCOPE TO THE MAXIMUM EXTENT OF THE LAW.

9. **Limitation of Liability.** SUBJECT TO SECTION 2.5 AND EXCEPT FOR THE BREACH OF THE CONFIDENTIALITY OBLIGATIONS HEREIN, FRAUD, GROSS NEGLIGENCE, INTENTIONAL MISCONDUCT, OR AS OTHERWISE PROHIBITED BY APPLICABLE LAW, IN NO EVENT WILL CAA OR COMPANY BE LIABLE FOR ANY INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE PROGRAMS OR THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT, STRICT LIABILITY, OR OTHERWISE, EVEN IF CAA OR COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING SHALL NOT BE CONSTRUED TO LIMIT OR PRECLUDE THIRD PARTY INDEMNIFICATION CLAIMS. MOREOVER, SUBJECT TO SECTION 2.5, AND EXCEPT FOR THE BREACH OF THE CONFIDENTIALITY OBLIGATIONS HEREIN, A PARTY'S INDEMNIFICATION OBLIGATIONS, FRAUD, GROSS NEGLIGENCE, INTENTIONAL MISCONDUCT, A COMPANY'S PAYMENT OBLIGATIONS UNDER THE PROGRAMS, OR AS OTHERWISE PROHIBITED BY APPLICABLE LAW, THE TOTAL LIABILITY OF EITHER PARTY FOR ANY REASON WHATSOEVER RELATED TO THE AGREEMENT OR COMPANY'S PARTICIPATION IN THE PROGRAMS SHALL NOT EXCEED THE AMOUNT OF PRODUCER FEES PAID OR PAYABLE TO CAA IN THE 12-MONTH PERIOD PRECEDING THE CLAIM.

   THE COMPANY ACKNOWLEDGES THAT THE PRODUCER FEES CHARGED HEREUNDER REFLECT IN PART THE CAA'S RELIANCE ON THE LIMITATIONS AND DISCLAIMERS CONTAINED IN SECTIONS 8 AND 9 OF THIS AGREEMENT.

10. **Term & Termination.**

DO NOT SIGN

10.1. **Term.** This Agreement will take effect on the Effective Date. This Agreement and Company's active status in the Programs shall continue following the Effective Date until the Agreement is terminated pursuant to this Section 10.

10.2. **Termination by CAA.** Subject to the cure period set forth below, CAA may terminate this Agreement for breach by Company of a term or condition of this Agreement or violation of any requirements, guidelines, or rules for the Programs, including, without limitation, failure to keep required records, non-filing of Producer Reports, or non-payment of Producer Fees (as such terms are defined by the Programs, namely, all fees payable by a Company to CAA pursuant to the Programs at the then-current applicable rates). Prior to such termination, CAA shall give Company written notice of such breach, which if related to payment shall include the method of calculation of fees owed to provide a basis for the breach for nonpayment. Company shall have a period of sixty (60) days in which to effect a cure to such default. If such default is not cured within such sixty (60)-day period, then this Agreement shall terminate immediately without further notice.

10.3. **Termination by Company.** Company may terminate this Agreement immediately upon written notice to CAA in the event that it rejects a proposed amendment to the Agreement, provided that Company initiates a discussion of such proposed amendment (including any intent to reject the proposed amendment or terminate this Agreement) within thirty (30) days after such amendment is noticed by CAA.

10.4. **Mutual Termination Rights.** Company or CAA may terminate this Agreement upon providing to the other Party prior written notice of its intention to terminate (sixty (60) days' notice is required for termination by Company and one hundred eighty (180) days' notice is required for termination by CAA). In the event of termination pursuant to this provision, Company shall ensure it makes full payment of Producer Fees owing in current year (and in the following year if supply reporting cycle has already concluded for the following year, and any owing fee adjustments from previous years) within thirty (30) days of providing notice. Unpaid Producer Fees past this time frame may be forwarded to collections, as determined in CAA's sole discretion. CAA will notify the appropriate state agency of Company's cancelled registration under the Programs with a copy of such notice directed to the Company.

10.5. **Effect of Termination.** The provisions concerning confidentiality, warranty disclaimer, limitations of liability, waiver and severability, entire agreement, injunctive relief, and dispute resolution, and governing law will survive the termination of this Agreement for any reason.

11. **Waiver & Severability.** Failure to insist on strict performance of any of the terms and conditions of this Agreement will not operate as a waiver of any subsequent default or failure of performance. No waiver by either Party of any right under this Agreement will be deemed to be either a waiver of any other right or provision or a waiver of that same right or provision at any other time. If any part of this Agreement is determined to be invalid or unenforceable pursuant to Applicable Law including, but not limited to, the warranty disclaimers and the

DO NOT SIGN

liability limitations set forth above, then the invalid or unenforceable provision will be deemed superseded by a valid, enforceable provision that most clearly matches the intent of the original provision and the remainder of this Agreement shall continue in effect.

12. **Entire Agreement.** No joint venture, partnership, employment, affiliate, or agency relationship exists between Company and CAA as a result of this Agreement or participation in the Programs. This Agreement (together with any membership agreement, confidentiality agreement, Portal terms and conditions including the Online Terms of Use, and/or producer assistance agreement separately entered into between the Parties) represents the entire agreement between Company and CAA with respect to the subject matter herein, and supersedes all prior or contemporaneous communications and proposals, whether electronic, oral, or written between Company and CAA with respect to the Programs. This Agreement shall control notwithstanding any terms and conditions that may be contained in any proposal, acknowledgement, confirmation, invoice or other document received from Company or any act of Company in accepting this Agreement. No additional terms or conditions proposed by Company either orally or in writing shall be a part of this Agreement. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. Each party agrees that this Agreement may be electronically signed, and that any electronic signatures appearing on this Agreement are the same as handwritten signatures for the purposes of validity, enforceability, and admissibility.

13. **Assignment.** The rights and obligations of Company may not be assigned, transferred, or delegated without the prior written consent of CAA, which shall not be unreasonably withheld. CAA may assign, transfer, or delegate, in whole or in part, this Agreement or any of its rights or obligations under this Agreement without prior written consent of Company to an entity that (a) controls, is controlled by, or is under common control with, CAA, or (b) as permitted by Applicable EPR Law including the applicable Program Plan.

14. **Amendments.** Except as otherwise expressly stated in this Agreement, no amendment, supplement, or modification of this Agreement is binding unless executed in writing and signed by an authorized representative of each Party. Notwithstanding the foregoing, CAA may amend, supplement, or modify this Agreement as it reasonably determines is necessary to comply with amendments to Applicable Law or Governmental Communications, and CAA will provide the Company with written electronic notice of such amendment, supplement, or modification as soon as reasonably practicable. Such amendment, supplement, or modification shall automatically have effect from the date specified in the notice, which date shall be at least sixty (60) days from the notice, or the earlier date CAA reasonably determines is necessary to comply with Applicable Law, as so amended, or with such Governmental Communications. CAA shall make commercially reasonable efforts to consider and respond to (and, if appropriate, as reasonably determined by CAA, accommodate) reasonable written feedback related to such amendment, supplement, or modification received from the Company within thirty (30) days of receiving such feedback.

*[signatures appear on following pages]*

DO NOT SIGN

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed by their Authorized Representative as of the date written below.

---

**THIS IS A PREVIEW AGREEMENT ONLY.**
**It is not to be signed by producers. Contact Producer.Support@circularaction.org for a signable version.**

**For more information on registration, please visit: https://circularaction.org/registration**

DO NOT SIGN

DO NOT SIGN

## EXHIBIT A – ADDITIONAL TERMS FOR CAA PLATFORM

Participation in the Programs will require Company's access to a proprietary software-as-a-service platform licensed and made available by CAA (the "Licensed Platform" or "Services"). The following additional terms shall apply to Company's use and access of the Licensed Platform:

1. **Grant of License.** CAA grants to Company a limited, non-exclusive, revocable, non-sublicensable, non-transferable (subject to Section 2 of the Agreement) right to use and access the Licensed Platform during the Term, and to permit use and access by its authorized employees, personnel end users, and authorized agents and contractors (collectively, "Authorized Users"), solely for Participant's lawful business use in connection with the Program as permitted by CAA hereunder, subject to Company's full compliance with all terms and conditions of the Agreement.

2. **End User Terms.** Authorized Users will be required to accept certain end user licensing terms as a condition of their individual access to the Licensed Platform, as may be updated by CAA from time to time (the "End User Terms"). Company agrees to cause all Authorized Users to comply with the End User Terms, provided that in the event of any conflict between the End User Terms and the terms of this Agreement, the terms of this Agreement will control to the extent necessary to resolve the conflict.

3. **Additional Restrictions.** Company shall not: (a) use the Services to create any product, service, software, documentation, or other material that performs substantially the same functionality as or otherwise competes with the Services; (b) disassemble, decompile, reverse-engineer or use any other means to attempt to discover any source code, algorithms or trade secrets underlying the Services or any of its components; (c) encumber, sublicense, transfer, distribute, rent, lease, time-share or use the Licensed Platform in any service bureau arrangement or otherwise for the benefit of any third party; (d) adapt, combine, translate, create derivative works of or otherwise modify the Licensed Platform; (e) disable, circumvent, or otherwise avoid or undermine any security device, mechanism, protocol, or procedure implemented in the Services; (f) use or access the Services for any unlawful, fraudulent, deceptive, malicious, or otherwise harmful or injurious purpose; (g) remove, obscure, deface, or alter any proprietary rights notices on any element of the Services or accompanying documentation; or (h) use the Services in any manner which could damage, disable, overburden, or impair the Services or interfere with any third party's authorized use of the Services. Company will not utilize any software, hardware, or other tool to scan or monitor the Licensed Platform or CAA's servers or network infrastructure for the purpose of measuring or analyzing uptime, operating systems, virtual environments, or other installed applications, including without limitation for stress testing, load testing, or performance benchmarking. Company shall ensure its Authorized Users' compliance with the terms and conditions of the Agreement and the End User Terms. Without limiting any right or remedy of CAA, in the event of any breach for any Authorized User's breach thereof, Company shall take immediate corrective action to remedy the breach and prevent its recurrence.

4. **Suspension.** CAA reserves the right to suspend performance of and/or Company's or any Authorized User's access to any Services at any time: (i) immediately upon CAA's determination of any actual or suspected breach of the Agreement or violation of any Applicable Law by Company; or (ii) upon written notice to Company if CAA reasonably determines that its continued provision of such access would be in violation of any Applicable Law or otherwise expose either Party to the risk of liability from a third-party claim brought in connection with such access. Such suspension, limitation, or termination shall be in addition and without prejudice to any remedy available to CAA at law or in equity for Company's breach of the Agreement.

5. **Information Security Specifications.** With respect to any Producer Data in CAA's custody, possession, or control via the Licensed Platform in relation to this Agreement, CAA will implement and maintain the information security measures as set forth at https://circularaction.org/information-security.

DO NOT SIGN