Docusign Envelope ID: C4D007A9-1B15-8D81-802C-2A8A2BAD48EF

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,

Plaintiff,

AUTO CARE ASSOCIATION,

Proposed-Intervenor Plaintiff,

v.

JILL HUNSAKER RYAN, EXECUTIVE DIRECTOR OF THE COLORADO DEPARTMENT OF PUBLIC HEALTH & ENVIRONMENT, in her official capacity.

Defendant.

Case No. 1:26-cv03460

**DECLARATION OF SCOTT CANNON**

**DECLARATION OF SCOTT CANNON IN SUPPORT OF MOTION TO INTERVENE**

I, Scott Cannon, declare the following:

1. I am Scott Cannon, Vice President, Merchandise, at O'Reilly Automotive Stores, Inc. ("O'Reilly"). I submit this declaration in support of Auto Care Association's Motion to Intervene in the above-captioned matter. The following facts are within my own personal knowledge. If called upon as a witness, I could and would competently testify thereto.

**Background**

2. O'Reilly is a publicly held company incorporated and headquartered in the state of Missouri. O'Reilly operates nationally, including in Colorado. O'Reilly operates approximately

6,600 facilities nationwide, including 134 in Colorado. O'Reilly employs over 87,000 people in the United States.

3. O'Reilly is an auto-parts retailer that sells a broad range of both proprietary products and national-brand products, including replacement parts, automotive fluids, and accessories. For purposes of this Declaration, "proprietary products" are those for which O'Reilly is the brand owner and enters into agreements with suppliers to manufacture said products to be sold at retail by O'Reilly. By contrast, "national-brand products" are those for which an entirely separate third-party owns the brand and manufacturing responsibilities, with O'Reilly purchasing those products to sell to consumers. O'Reilly sells these products to individual retail consumers, jobbers, and professional installers through multiple channels, including physical retail locations and its e-commerce website.

4. O'Reilly relies on cross-state supply chains to produce and sell goods, including suppliers and retailers potentially subject to regulation by Colorado's EPR program. For its proprietary products, O'Reilly has entered into agreements with over 100 suppliers who manufacture these products on O'Reilly's behalf. In order to protect the viability of its supply chain, O'Reilly has built contingencies and redundancies into its supply chain, meaning that for any given product there may be multiple suppliers in multiple states and countries who manufacture the product and its packaging. Several factors, including fluctuations in consumer demand, cost of raw materials, and geographical considerations, impact ongoing relationships with suppliers, as well the product mix for which an individual supplier may be responsible.

5. O'Reilly does not control packaging decisions for every product it sells. As a retailer selling national-brand products, O'Reilly has no meaningful opportunity to influence packaging decisions, while at the same time bearing the initial burden of pricing decisions made

Docusign Envelope ID: C4D007A9-1B15-8D81-802C-2A8A2BAD48EF

by the entities owning the brand. For its proprietary products, O'Reilly may be able to influence packaging decisions based on the terms of its agreement with an individual supplier, but EPR laws are only one of many factors that influence relationships with suppliers and, therefore, packaging decisions. For example, each supplier may be subject to other, overriding considerations, such as product safety, compliance with hazardous material regulations, and availability of source materials.

6. O'Reilly has been a member of the Auto Care Association since 1994 and has had past representation on the Board of Directors.

**Participation in Colorado EPR**

7. O'Reilly understands that Colorado law interprets O'Reilly to be a "producer" for purposes of the Colorado EPR program.

8. As a producer under Colorado's EPR program, O'Reilly understands Colorado's interpretation to be that O'Reilly must register with and submit fees to two separate, private entities: Circular Action Alliance ("CAA") and Interchange 360 (previously known as the LPMA, or Lubricants Packaging Management Association).

9. O'Reilly registered with the CAA in Colorado in 2025, and has since provided reports and remitted corresponding payments to the CAA in both 2025 and 2026. O'Reilly registered with Interchange 360 in Colorado in 2026, and will provide reports and remit payments to Interchange 360 in the fourth quarter of 2026.

10. Determining whether certain products contain covered materials, whether O'Reilly qualifies as an obligated producer of those materials under Colorado's EPR program, and what portions of which packaging O'Reilly must report to CAA and Interchange 360 is difficult because

Docusign Envelope ID: C4D007A9-1B15-8D81-802C-2A8A2BAD48EF

(i) O'Reilly sells a product mix that includes private-label products manufactured by suppliers with which O'Reilly maintains contractual relationships (and for which O'Reilly understands that it is considered a "manufacturer" of said products under Colorado EPR laws because O'Reilly owns the brand under which said products are manufactured), as well as brands manufactured by and purchased from third-party national brands; (ii) O'Reilly manufactures some products that are interpreted to fall within the purview of Interchange 360, some that are interpreted to fall within the purview of CAA, and some that are not covered materials under the law; (iii) products are sold to different types of customers that may not be covered entities under Colorado's EPR program; and (iv) distribution occurs through complex supply chains subject to varied contractual arrangements.

11. Because O'Reilly retails both proprietary and national-brand products, its operations are particularly complex. For the reasons stated herein, the Colorado EPR program will negatively impact all national supply chains on which O'Reilly relies, but those impacts will manifest differently depending on whether the supply chain involves proprietary or national-brand products.

**Compliance and Operational Burden**

12. O'Reilly has expended substantial internal resources in efforts to comply with Colorado's EPR requirements. Specifically, O'Reilly (i) initiated an extensive internal project to understand the application of Colorado EPR laws to O'Reilly's business, including the extent to which O'Reilly is classified as a "producer" under said laws, the products for which O'Reilly is a retailer that are classified as "products" under the law, out of those products which contained "covered materials" under the law, and how the definitions and categories of covered materials imposed by Colorado differed from those imposed by other states with EPR laws; (ii) engaged

Docusign Envelope ID: C4D007A9-1B15-8D81-802C-2A8A2BAD48EF

over 100 suppliers to determine the weights of covered materials for each covered product, which involved individually weighing specific components used as packaging; (iii) designed and implemented new IT applications and processes to support reporting to the CAA and Interchange 360; (iv) designed and implemented internal policies and procedures to support recurring reporting obligations; and (v) initiated internal projects to comply with the bonus and malus regime that is part of the Colorado EPR law.

13. This burden is exacerbated by the requirement to report to two separate, private, third-party entities in CAA and Interchange 360. The distinction between products for which O'Reilly reports and remits fees to the CAA versus Interchange 360 is unclear, in large part because there is no collaboration between or uniform guidance issued by the two PROs, and neither PRO has demonstrated any willingness to provide guidance that might impact reporting and fee remittal to the other PRO. Accordingly, O'Reilly has been forced to exercise its judgment in classifying products as falling under one of the two PROs. Splitting reporting obligations between the two PROs is particularly burdensome because the two PROs require reporting in different formats and at different times, and calculate fees based on different methodologies that are opaque. For example, the CAA requires reporting of all covered materials based on weight of individual covered materials used for a product, whereas Interchange 360 initially required reporting based on the volume of the product itself, carrying the built-in presumption that products falling under Interchange 360 include some, but not all, liquid products. However, as of October 2026, Interchange 360 notified producers that it was completely changing its established reporting methodology such that it will be based on material type, while tripling fees in many instances. O'Reilly is not aware of any opportunity given to producers to provide input on or understand the basis for these sweeping changes.

Docusign Envelope ID: C4D007A9-1B15-8D81-802C-2A8A2BAD48EF

14. The burden imposed by Colorado's EPR program is extensive for a single state. This burden is magnified by the fact that O'Reilly must comply with EPR programs in at least six other states with more programs coming online each month. Each state program has its own product classifications, covered material definitions, producer definitions and obligations, and legal requirements.

**Fee Impacts**

15. O'Reilly filed reports with CAA in 2025 and 2026 and Interchange 360 in 2026. Said CAA reports contained data for 2024 and 2025, respectively, whereas reports for Interchange 360 contained data for 2024 through the third quarter of 2026. To date, CAA has invoiced O'Reilly for fees in excess of $350,000. O'Reilly has not received an invoice from Interchange 360, but anticipates fees to exceed $500,000.

16. These fees are set based on past data, using fee methodologies that are not available to O'Reilly, making it essentially impossible for O'Reilly to predict future fees or modify future behavior to avoid future fees.

17. To sustain profitability on many products, O'Reilly will be required to pass Colorado EPR fees on to customers, including customers in states other than Colorado and customers in states with no EPR packaging programs. Additionally, as a retailer, O'Reilly has seen proposed price increases from producers of national brands that O'Reilly sells to end consumers, which will require O'Reilly to increase prices that it charges to said consumers.

**Costs Incurred as a Result of Colorado EPR**

18. O'Reilly has incurred significant costs due to Colorado's EPR Program. In addition to program fees charged by the CAA and Interchange 360, O'Reilly has to date dedicated well over

Docusign Envelope ID: C4D007A9-1B15-8D81-802C-2A8A2BAD48EF

800 hours to achieve baseline compliance with Colorado EPR, without accounting for future efforts to recognize and account for pricing and supply chain disruptions caused by EPR compliance or to comply with source reduction incentives and penalties built into EPR laws. Additionally, because Colorado's EPR program remains in its early stages, overall financial impacts are practically impossible to forecast. For example, the recent overhaul by Interchange 360 of its reporting requirements and fees were not communicated in advance, providing O'Reilly and other producers with approximately two months to adjust its data collection and reporting approach and account for fees that have tripled for many material types. Historically, both Interchange 360 and the CAA have adjusted material types, reporting methodologies, and fees practically on the fly, with little to no apparent input from Colorado regulators, leaving producers scrambling to adjust their approach after having invested hundreds of hours to comply with the prior requirements. O'Reilly anticipates that these issues will be magnified as Colorado begins enforcing ecomodulation requirements, as it has been O'Reilly's experience that states with EPR programs require compliance (and payment of fees) before they have fully established the frameworks for their own programs, including components as significant as approving a PRO's program plan, which effectively acts as a separate set of regulations imposed on producers.

**Overall Business Impact and Irreparable Harm**

19. Colorado's EPR Program affects O'Reilly's ability to compete, serve customers, operate efficiently, make pricing decisions, and freely participate in markets.

20. O'Reilly has experienced, and will continue to experience, disruptions to business planning as a result of the Colorado EPR program. Nationwide decisions on product mix and packaging design that would normally be driven by safety and product presentation must now be driven by compliance with Colorado EPR regulations, particularly those based on source reduction

Docusign Envelope ID: C4D007A9-1B15-8D81-802C-2A8A2BAD48EF

incentives and penalties. Approximately 60% of the proprietary product SKUs sold by O'Reilly contain material that, if spilled, could present health or environmental concerns. Lightweighting or other packaging changes that are effectively required by the Colorado EPR program are not only impractical, but also potentially dangerous, for these products. However, there are no accommodations for these considerations in the Colorado EPR laws, meaning that O'Reilly likely faces increasing fees and penalties as source reduction goals in Colorado become more stringent through eco-modulated fees.

21. While O'Reilly provides critical services to the automotive after-market industry, it does not control the design or advancement of automotive technology. Historically, O'Reilly would respond directly to technological advancements, such as EV batteries and advanced automotive lubricants, but now must plan and design packaging decisions primarily based on compliance with Colorado EPR laws, which may not adapt to said technological advancements in a timely manner, impacting both safety and recyclability.

22. Obligations created under the Colorado EPR laws negatively impact business priorities beyond product protection and consumer safety. For example, much of the packaging inherent to smaller products is designed to assist in theft deterrence. Despite a national focus on reducing retail crime and its impact on consumer prices, downsizing packaging to comply with Colorado EPR regulations would necessarily weaken protections against retail theft.

23. O'Reilly, like other retailers, relies on packaging to drive consumer interest, which in turn impacts revenue generation and operational viability. For example, cargo control items such as ratchet straps are specifically packaged to emphasize quality and reliability. Compliance with Colorado EPR laws, particularly those that emphasize ecomodulation through material minimization and reduction of plastics, would negatively impact packaging design and consumer

Docusign Envelope ID: C4D007A9-1B15-8D81-802C-2A8A2BAD48EF

perception. By contrast, retailers who choose not to comply with ecomodulation requirements could maintain original packaging designs, thereby gaining a sales advantage. This issue becomes particularly troublesome because it is unclear at this point the extent to which packages must be redesigned to meet ecomodulation goals.

24. Because O'Reilly employs a complex supply chain, contracting with suppliers in multiple states and countries to manufacture its proprietary products, it cannot isolate costs stemming from compliance with Colorado EPR laws. Accordingly, these higher costs will result in price increases for proprietary products sold in states outside Colorado. Further, the ability of certain suppliers to adjust to new packaging requirements designed to reduce the weight of covered materials may result in a reduction of the number of available suppliers, disrupting the supply chain that O'Reilly relies on to serve its customers. Similarly, O'Reilly understands that that manufacturers of national-brand products face a similar supply-chain challenges, such that compliance with Colorado EPR laws may cause price increases in products sold in states other than Colorado as said manufacturers adjust to higher costs in Colorado resulting from EPR compliance in that state.

25. All of the harms described above are further amplified because O'Reilly has been specifically instructed by the Colorado Department of Public Health and Environmental Affairs ("CDPHE") that it interprets their EPR program to require O'Reilly to report and pay fees to both CAA and Interchange 360. O'Reilly specifically raised the issue with the CDPHE that Colorado EPR regulations do not permit more than one PRO until 2029. The CDPHE declined to address the discrepancy between said regulations and its operation of the EPR program, leaving O'Reilly with no options other than reporting and paying fees to both PROs or risking an expensive and damaging finding of noncompliance. Accordingly, because it is not always clear to which PRO a

Docusign Envelope ID: C4D007A9-1B15-8D81-802C-2A8A2BAD48EF

given product should be reported, the same product could have entirely different reporting and fee payment obligations depending on whether it is reported to CAA or Interchange 360. These differences could additionally cause a competitive disadvantage compared to similar national-brand products depending on to which PRO the manufacturer of that product chose to report.

26. O'Reilly's customers in Colorado and nationwide are likely to bear the ultimate burden of Colorado's EPR program, through increased costs, reduced product availability, and lessened product protection due to packaging changes effectively required by the program.

27. O'Reilly is not aware of any formal or official published method to appeal fees or receive refunds for fees unlawfully or otherwise inappropriately assessed to the company by Colorado, CAA, or Interchange 360. Instead, in O'Reilly's experience, fee disputes involve a series of informal communications with the PRO, with no certainty or continuity from one interaction to the next, and no apparent involvement on the part of Colorado. Instead, fee disputes appear to be left entirely to the private, third-party PROs to resolve at their sole discretion. It is O'Reilly's understanding that it is not until a PRO escalates, at its discretion, what it considers to be noncompliance to the CDPHE that O'Reilly has any meaningful opportunity to dispute a decision made by a PRO, and then only after the CDPHE has opted to penalize O'Reilly either through substantial daily fee penalties or by prohibiting O'Reilly from selling one or more covered products in Colorado.

**Verification and Signature**

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on this 10/13/2026 | 2:36 PM EDT day of October, 2026.

Docusign Envelope ID: C4D007A9-1B15-8D81-802C-2A8A2BAD48EF

Signed by:
Scott Cannon
B2CBF31B6D784B7...

**Scott Cannon**
Vice President – Merchandise
O'Reilly Automotive Stores