IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,

Plaintiff,

AUTO CARE ASSOCIATION,

Proposed-Intervenor Plaintiff,

v.

JILL HUNSAKER RYAN, EXECUTIVE DIRECTOR OF THE COLORADO DEPARTMENT OF PUBLIC HEALTH & ENVIRONMENT, in her official capacity.,

Defendant.

Case No. 1:26-cv-03460

**CORRECTED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Colorado's Producer Responsibility Program for Statewide Recycling Act, Title 25, Article 17, Part 7 of the Colorado Revised Statutes (the "Act") attempts to shift the cost of recycling in Colorado from taxpayers to companies that produce packaged consumer products. The Act's ostensible aim is to increase recycling, but its means are unconstitutional: it delegates core regulatory functions to multiple private parties, including without limitation Circular Action Alliance ("CAA") and Individual Program Plan ("IPP") administrators such as the Lubricants Packaging Management Association ("LPMA"), operating under the trade name Interchange 360, without sufficient governmental supervision or constitutional safeguards to prevent duplicative and burdensome regulation.

2. The approval of LPMA's IPP has already created overlapping compliance obligations for producers of automotive and petroleum products, and the Act places no limit on future approvals—meaning the fragmented regulatory landscape producers face today could expand into three, four, or more

concurrent private compliance regimes with each January 1 submission cycle. The Act discriminates against and disrupts interstate commerce, and it abridges businesses' freedom of speech. The resulting burden on the regulated community with little recourse in the statutory scheme itself has forced parties such as National Association of Wholesaler-Distributors ("NAW") and Auto Care Association to seek judicial relief.

3. The Act imposes recycling costs on companies it calls "producers" of "covered materials" through an extended producer responsibility ("EPR") scheme. The goal of the program is to use the money exacted from producers to expand recycling infrastructure and provide free recycling services across Colorado.

4. Under the Act, producers of covered materials must either participate in a program administered by a designated Producer Responsibility Organization ("PRO"), or, as an "alternative," submit an IPP for approval.

5. The Colorado Department of Public Health and Environment ("CDPHE") designated CAA as the initial PRO on May 1, 2023. Colo. Rev. Stat. § 25-17-708(2) expressly permits CDPHE to designate additional PROs after January 1, 2029.

6. The IPP route is not a realistic option for most businesses. An IPP must comply with substantially the same requirements as the PRO Program Plan including developing a plan addressing service-provider reimbursement, CDPHE oversight-cost contributions, alternative collection programs, and applicable recycling-rate arguments. Colo. Rev. Stat. § 25-17-705(8)(a). Further, the IPP must undergo the same advisory-board review and executive-director approval process. *Id.* § 25-17-705(8)(b).

7. To date, only one entity has obtained an approved IPP: LPMA, operating under the trade name Interchange 360. LPMA's IPP, approved by CDPHE in September 2025, covers packaging for petroleum and other automotive products, including containers for lubricating oil, antifreeze, exhaust fluid, windshield washer fluid, brake fluid, and similar products. The stated rationale for a separate

program is that containers for oil and similar products are contaminated with petroleum residue and cannot be recycled through ordinary curbside collection. However, several of the product categories (such as exhaust fluid and windshield ~~wiper~~washer fluid) are not petroleum-related but are nonetheless within the scope of LPMA's IPP.

8. But even for producers participating in LPMA's IPP, the result is not a true alternative to participation in CAA's program. In practice, it imposes an additional compliance obligation on top of the requirements already imposed by CAA.

9. After approving LPMA's IPP, CDPHE subsequently "informed CAA that producers of petroleum and automotive products must register directly with LPMA and should report their primary packaging associated with products on the LPMA Applicable Product List to LPMA. Any secondary packaging or paper products associated with these containers supplied to covered entities should be reported to CAA." CAA Colorado Program Plan at 100 (*Attachment A*).

10. A single producer selling a lubricant product in Colorado must therefore register with, report to, and pay dues to both LPMA and CAA for different portions of the packaging associated with the same product: LPMA for the primary container and CAA for secondary packaging and paper products. The member faces two private compliance regimes for one product sale—not an alternative compliance path, but a dual-obligation structure.

11. This outcome is a direct consequence of the Act's CAA-centered regulatory architecture. CAA conducted the statewide needs assessment, developed the five-year program plan, established the dues structure and eco-modulation framework, and contracted with service providers across the state. IPPs, by contrast, are addressed in a single subsection of the statute and a comparatively brief section of the regulations, and are treated within CAA's own plan as coordination matters rather than as coequal implementation structures. IPPs function as an afterthought to the CAA-centered framework—not a meaningful alternative integrated into the EPR system on equal footing—and as the LPMA experience

demonstrates, producers participating in an IPP cannot fully extricate themselves from the CAA-administered system.

12. The State does not itself run this sweeping program. The Act hands effective authority over the entire scheme to the PRO and IPP administrators subject to no meaningful state oversight. It requires producers to join a PRO and, where applicable, the IPP on non-negotiable terms as a prerequisite to selling their products in Colorado.

13. CAA and LPMA are not disinterested administrators of this system: their founding members are major national and multinational corporations, many of whom are themselves producers regulated under the Act, and their boards are controlled by representatives of some of those same corporations.

14. The Act's requirements have imposed a crushing burden on all industries, especially industries with a large distributor presence. EPR fees can exceed the producer's margin on a product or even a product's price, and the regulated community is given little notice with respect to the fee methodology or even the fee rates themselves.

15. The Act effectively vests private entities with the regulatory authority of a governmental agency but without the safeguards that attend actual government regulation. Even among federal agencies exercising sovereign authority, the law carefully delineates jurisdictional boundaries to prevent regulatory overlap and reduce the burden on interstate commerce. Here, by contrast, the Act creates no analogous division of authority among the private entities it empowers. The result is an unbounded system in which multiple private regulators can impose overlapping obligations on the same product, the same packaging, and the same producer—with no statutory mechanism to prevent the kind of duplicative burden that the separation of governmental regulatory authority is designed to avoid.

16. Producers are required to enter non-negotiable participation agreements with the PRO and, as applicable, IPP administrators, as a condition of participating in Colorado's EPR program, and such arrangements provide inadequate procedural protections or meaningful avenues to challenge fees and

other program requirements.

17. Further, the Act's definition of "producer" sweeps in many brand owners, manufacturers, and distributors, some of them Auto Care Association members. These entities must incur the associated regulatory burden and pay dues even if they have no control over the selection, design, or manufacture of most product packaging or how the product is ultimately received by the end consumer.

18. The Act forces producers to implement complex tracking and reporting systems covering entire supply chains. Each producer must track all packaging it uses for every product, including the specific packaging materials and the weight of each category of material used for each type of product. Tracking at this granular level is extremely costly and disrupts producer operations in many states, and is further complicated by the multiple compliance regimes to which producers can be subject with little government oversight or direction regarding how they intersect. These tracking and reporting requirements also force many producers' upstream and downstream supply chain members to incur additional costs.

19. Having to comply with even one state's EPR law creates a logistical nightmare that forces distributors to incur extensive costs, though it is currently difficult or impossible to identify the total dollar amount. Having to comply with multiple states' EPR laws makes the problem worse. A company that sells in multiple states must satisfy the requirements for its Colorado sales while also doing the same under other states' EPR laws. Among other differences, states have different definitions of "producer"—which means that the "producer" of a given product under one state's law might not be the "producer" under another state's law. States also have different, and complex, schedules of covered materials and differing fees for the same materials.

20. Colorado could have pursued its recycling goals without this complex and costly scheme—and without burdening interstate commerce. It could have funded its goals through taxes or imposed a fee at the point of sale in Colorado. But instead, the state shifted the burden upward in the supply chain—

overwhelmingly to businesses based in other states.

21. This scheme is not only devastating to producers individually, it is also unconstitutional. And because the Act places no limit on the number of private compliance regimes that can be approved, the burden producers face today is only the floor. Each additional PRO or IPP approved in the future will layer new registration requirements, distinct reporting formats, separate dues calculations, and independent participation agreements onto an already untenable compliance framework. The cumulative burden of these multiplying private regulators could render continued sales in Colorado cost-prohibitive for many businesses, particularly medium-sized producers and distributors that lack the resources to maintain parallel compliance infrastructure for a single state.

22. First, the Act imposes an unconstitutional condition by forcing businesses that wish to sell to Colorado consumers to sign non-negotiable participation agreements with a PRO and, as applicable, IPP administrators.

23. Second, the Act violates the Dormant Commerce Clause by discriminating against interstate commerce, and by severely burdening interstate commerce to achieve local benefits that could be attained without burdening interstate commerce.

24. Third, the Act violates producers' First Amendment rights to freedom of speech and association by compelling them to join CAA, or, as applicable, LPMA, and to fund their advocacy both for EPR laws as an effective means of increasing recycling and for these private entities as the dominant administrators of EPR programs. The compelled association multiplies with each new IPP or PRO approval, as producers may be forced to associate with multiple private organizations simultaneously and fund the advocacy of each.

25. Fourth, it violates the Due Process Clause of the Fourteenth Amendment, which forbids governments from delegating their regulatory power to self-interested private entities, whose leaders will then exert regulatory power over their competitors in the marketplace.

26. Auto Care Association files this lawsuit on behalf of its members, which include auto care wholesale distributors, manufacturers, retail parts stores, service and repair shops, importers and exporters, and business service providers, many of which are forced to register as "producers" with both CAA and LPMA, and any future additional approved IPPs or PROs, as applicable, and pay fees under the Act. Auto Care Association asks this Court to declare that the Act violates the Constitution on the grounds set out above and to enjoin its enforcement.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3) because the claims arise under the Constitution and laws of the United States. Auto Care Association brings claims under 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States.

28. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Colorado, and the Defendant responsible for administering the challenged law is located within this district.

## PARTIES

29. Auto Care Association is a not-for-profit national trade association whose members, many of whom conduct business in Colorado, manufacture, distribute, sell and install motor vehicle parts, accessories, tools, equipment, materials, supplies, and services. Founded as the Automotive Aftermarket Industry Association in 1999, the Auto Care Association is comprised of nearly 3,000 members and affiliate companies and represents approximately 150,000 businesses.

30. Many Auto Care Association members import, distribute, or supply packaged goods into Colorado and are subject to the Act's burdens.

31. Auto Care Association members that are "producers" under the Act were required to register with CAA by October 2026 and LPMA by July 2025. Those members began receiving dues invoices from

CAA and LPMA in 2026.

32. Auto Care Association members that are "producers" under the Act may be further subject to additional registration, reporting, and dues obligations to other IPP administrators or PROs that are approved in the future. The Act places no limit on the number of IPPs that CDPHE may approve, and permits additional PROs beginning in 2029. Each new approval could impose a separate compliance layer—additional registrations, incompatible data formats, distinct dues calculations, and independent audit requirements—without any statutory mechanism to coordinate among private regulators or cap the cumulative burden. For medium-sized producers and distributors, the prospect of maintaining parallel compliance systems for an ever-growing number of private entities makes continued participation in Colorado's market increasingly untenable.

33. Auto Care Association's primary mission is advocacy. Auto Care Association works to advance the interests of its members and to defend the critical role they play in the American economy and way of life.

34. Thus, Auto Care Association brings the claims set forth below on its members' behalf because those claims, and the injuries they seek to remedy, are directly germane to Auto Care Association's mission of advocating for and supporting its members.

35. It is unnecessary for any of Auto Care Association's members to participate as a party in this litigation because Auto Care Association seeks only declaratory and injunctive relief on its members' behalf.

36. Auto Care Association satisfies each requirement for associational standing: its members would have standing to sue in their own right, the interests Auto Care Association seeks to protect are germane to its organizational purpose, and neither the claims asserted nor the relief requested requires the participation of individual members in this litigation. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

37. Defendant Jill Hunsaker Ryan is the Executive Director of the CDPHE, the Colorado state agency charged with administering and enforcing the Act. Colo. Rev. Stat. § 25-17-705. Among other statutory responsibilities, CDPHE reviews and approves producer responsibility program plans and amendments, and is authorized under the Act to inspect and enforce the Act. *Id.* § 25-17-710. Defendant Ryan is sued solely in her official capacity.

## BACKGROUND AND FACTUAL ALLEGATIONS

### Legal Framework

#### A. The Act Mandates a Comprehensive EPR Program that Applies to Packaging for Most Consumer Products

38. Enacted in 2022, the Act mandates creation of a statewide recycling program for most consumer product packaging and most paper products sold in Colorado. Colo. Rev. Stat. §§ 25-17-703(13), 25-17-705.

39. The Act's stated goal is to increase the percentage of waste that Colorado recycles. *Id.* § 25-17-702(1)(c), (d). Also according to the Act, "[a]ll parties have the obligation to share in the responsibility to reduce negative impacts of end-of-use management for covered materials by building a system designed to minimize waste and to increase reuse and recycling of products and packaging." *Id.* § 25-17-702(1)(f).

40. But the Act does not pursue its stated goal of increasing the percentage of waste that Colorado recycles by simply giving Coloradans incentives to recycle or reduce waste.

41. Instead, it establishes a comprehensive EPR scheme operated by a private PRO and, where applicable, IPP administrators funded by companies it calls "producers"—those whose products are sold in Colorado using "covered materials" or who are part of those products' supply chain.

42. The Act replaces the local taxes, user fees, and subscription fees that previously funded recycling programs with fees paid by producers.

43. To comply with the Act, producers must undertake extremely burdensome, costly measures

that disrupt nationwide supply chains. They must also pay fees to the private PRO and, where applicable, IPP administrators, based on the products with "covered materials" that they sell and ultimately are sold in Colorado. The private PRO and IPP administrators then use those fees to fund free recycling services for Colorado residents and select businesses.

44. According to the CDPHE, the Act provides "[~~F~~f]ree recycling access–" for Colorado residents.[1] The Act thus transfers the cost of Colorado's recycling system from Colorado state and local governments (and their taxpayers) to companies that are part of the national supply chain—with, as explained below, significant costs borne by companies located outside of Colorado.

**B. The Act Adopts Very Broad Definitions of "Covered Materials" and "Producer"**

45. A company is subject to the Act's obligations if it is a "producer" of "covered materials." Colo. Rev. Stat. § 25-17-708(1). Under the Act, "covered materials" encompasses the packaging used in the vast majority of consumer goods, including, with certain exceptions, (i) all packaging material intended for single or short-term use for delivery to consumers at the point of sale, and (ii) most paper products. *Id.* §§ 25-17-703(13), (25)–(26).

46. The Act's definition of producer identifies the "person" in the supply chain responsible for paying producer responsibility dues to fund the recycling of covered materials. *Id.* § 25-17-703(30). It identifies the "producer" of a given product according to the following sequence. If the product is sold or distributed under the manufacturer's own brand, or without any brand, the manufacturer is the producer. *Id.* § 25-17-703(30)(a)(I). If the manufacturer does not own the brand under which the product is sold, then the brand licensee is the producer. *Id.* § 25-17-703(30)(a)(II). If the preceding two categories do not cover a company located in the United States, the producer is the product's importer. *Id.* §

[1] *See* screenshot captured Oct. 8, 2026 of CDPHE, New Statewide Recycling Plan Paves the Way for Free Recycling Access (*Attachment B*); *see also* Attachment A at ~~at~~ 19 (stating that Coloradans will receive recycling services at "no cost").

25-17-703(30)(a)(III). Finally, if none of these three categories applies, the producer is the company that "first distributes the covered material in or into" *Id.* § 25-17-703(30)(e).

47. The Act thus places primary responsibility on the owners of consumer brand names, though it also sweeps in companies throughout the supply chain. Consumer brands sold in Colorado are overwhelmingly national and owned by out-of-state companies.

48. The definition of producer thus concentrates the Act's financial obligations on companies that are headquartered or located primarily outside of Colorado and whose operations inherently depend on interstate commerce. The definition deflects responsibility away from in-state consumers, retailers, non-profits, and governmental organizations.

49. The Act exempts several large categories of businesses and organizations. The most significant categories are producers with less than $5,779,297 in annual gross revenue, *Id.* § 25-17-713(1)(a) (as adjusted annually by rule based on Consumer Price Index in 6 Colo. Code Regs. § 1007-2.1-1.8.2); producers with less than 1 US ton of covered materials sold or distributed within or into the state, *id.* § 25 17-713(1)(b); state and local governments, *id.* § 25-17-713(1)(c); nonprofit organizations, *id.* § 25-17-713(1)(d); retail food establishments licensed in Colorado, *id.* § 25-17-713(1)(f); and all construction companies, *id.* § 25-17-713(1)(g).

50. These exemptions force non-exempt "producers" to subsidize exempt producers by paying the exempt producers' share of recycling costs. The exempt producers that receive this subsidy are overwhelmingly Colorado entities. They also receive the benefit of the recycling services paid for by producers.

### C. The Act Delegates Regulatory Authority to Private Producer Responsibility Organizations and Independent Program Plan Administrators

51. Instead of directly implementing and supervising its new EPR program, Colorado has mandated the creation of—and delegated its sovereign authority to—unaccountable private parties,

primarily CAA as the approved PRO but also to IPP administrators such as LPMA.

52. The Act requires producers to establish—and requires every covered, non-exempt producer to participate in—a private PRO or, alternatively, to submit and obtain approval for an IPP. Colo. Rev. Stat. §§ 25-17-705(1)(a), (4), (8), 25-17-708(1).

53. PRO Plans and IPPs must obtain approval from CDPHE. *Id.* § 25-17-705(1)(b)(II).

54. The Act provides for the approval of only one PRO at the EPR program's outset. *Id.* § 25-17-705(1)(a)–(c). After January 1, 2029, CDPHE may approve additional PROs. *Id.* § 25-17-708(2)(a)–(b).

55. CDPHE's review of a PRO plan proposal is limited to determining that the proposal complies with the Act. *Id.* § 25-17-705(5)(b)(II). The Act does not authorize CDPHE to exercise any discretion with respect to approval of the initial exclusive private PRO.

56. The Act provides an ostensible "alternative" to joining a private PRO: a producer may create its own IPP that provides statewide recycling services for that producer's materials. *Id.* § 25-17-705(8)(a).

57. Only one IPP has been approved under the Act, created by the Lubricants Packaging Management Association to process automotive lubricant packaging, though the Act has no limit on the number of IPPs that can be approved.

**D. The Act and Regulations Do Not Provide a Meaningful Standard to Govern Dues**

58. The Act fails to provide standards for PRO or IPP administrator budgets or a mechanism for meaningful government oversight.

59. CAA and LPMA fund their budgets entirely through "producer responsibility dues." Colo. Rev. Stat. § 25-17-705(4)(i)(II); *see also* § 25-17-709(1)(a).

60. The Act authorizes the PRO to set "dues" amounts but fails to establish standards for setting those amounts, requiring only that dues "must vary by the type of covered material, whether or not the material is readily recyclable, and be based on the net recycling services costs for each covered material

in the state." *Id.* § 25-17-705(4)(i)(II).

61. IPPs are subject to the same vague standard: the Act requires IPPs to "[c]omply with the requirements of subsection (4) of this section, as applicable," *id.* § 25-17-705(8)(a)(I), which incorporates the identical dues language without providing additional methodology, formula, or objective standards.

62. The Act prescribes no methodology, no formula, and no objective standard by which CAA's or LPMA's fee determinations can be evaluated or challenged.

63. The regulations do not provide the missing standard. They require only that the private PRO's plan provide "a description of the process used to determine producer responsibility dues." 6 Colo. Code Regs. § 1007-2:1-18.5.2(C)(1).

64. The IPP regulation imposes even fewer constraints: Section 18.6 contains no analogous dues-methodology provision, requiring only that the IPP comply with the applicable requirements of section 705(4) and describe the producer's contributions to CDPHE oversight costs, service-provider reimbursement, and alternative collection programs. *Id.* § 1007-2:1-18.6.2.

65. The PRO Plan's discussion of dues adopts the Act's vague language:

> Dues will be calculated annually using CAA Colorado's methodology that integrates material costing indices accounting for Colorado's material-specific management costs, commodity revenues, and non-material expenses. The producer dues are based on the net recycling services costs for each covered material in the state and vary by the type of covered material and if it is readily recyclable.

*Attachment A* at 26 (emphasis added). *See* Colo. Rev. Stat. § 25-17-705(4)(i)(II) (stating that dues "must vary by the type of covered material" and "be based on the net recycling services costs for each covered material").

66. LPMA's IPP follows the same pattern, stating only that dues "will be structured to reflect the complexity and cost to manage each type of Automotive Container" and will be "updated to reflect any changes to program costs." LPMA IPP at 16 (*Attachment C*). The IPP provides no formula, no cost indices, and no material-specific cost allocation.

67. Initially, LPMA imposed a flat fee of $0.56 per gallon for all automotive containers without differentiating by material, packaging type, size, weight, or recyclability—the very dimensions the Act purports to require. *See* Colo. Rev. Stat. § 25-17-705(4)(i)(II). The Act also requires the private PRO to make annual fee increases, to "reflect changes in program costs and relevant plan revisions," without review by CDPHE. *Id.* § 25-17-705(4)(i)(III)(C). The regulations acknowledge that the private PRO has unilateral authority to impose annual increases without CDPHE approval in order "to align with the most recent sales information." 6 Colo. Code Regs. § 1007-2:1-18.5.3(B)(1)(b); *see also* Colo. Rev. Stat. § 25-17-709(2)(a)(V) (requiring the PRO to report, but not requiring approval of, dues increases or decreases).

68. The same is true for LPMA: its Board of Directors retains sole discretion over the Fees/Dues Schedule, with the IPP providing only for annual review and update "to reflect any changes to program costs." *Attachment C* at 16; LPMA Participation Agreement at 2 (*Attachment D*). Because the IPP incorporates the statutory annual-update requirement, *see* Colo. Rev. Stat. § 25-17-705(8)(a)(I), and the regulations exempt routine annual rate updates from plan-amendment review for the PRO, 6 Colo. Code Regs. § 1007-2:1-18.5.3(B)(1)(b), LPMA is under no greater obligation to obtain CDPHE approval before increasing dues.

69. Indeed, on October 2, 2026, LPMA notified its registered producers that effective January 1, 2027, "Interchange 360 will transition to a materials-based dues schedule in accordance with Colorado's Producer Responsibility Program for State-wide Recycling Act." The updated fee rates span from $0.84 per gallon to $1.88 per gallon depending on material type—representing an increase of over 300% for certain material types.

## Factual Background

### A. CAA: Structure, Governance, and Operations

70. On May 1, 2023, CDPHE designated CAA as the exclusive PRO. *Attachment A* at 28. CAA will remain the exclusive PRO for at least five years. *See* Colo. Rev. Stat. § 25-17-708(2)(a), (b) (providing

for possible additional PRO(s) beginning January 1, 2029).

71. CAA is a non-profit organization that, according to its website, "is operating as the single PRO" in six states that have passed similar EPR laws: "California, Colorado, Maryland, Minnesota, Oregon and Washington."[2] CAA established separate wholly-owned entities for each state, including "Circular Action Alliance Colorado LLC" to serve as Colorado's "representative stewardship organization." *Attachment A* at 40. CAA and Circular Action Alliance Colorado LLC are registered in Colorado as foreign entities.[3] The remainder of this Complaint refers to CAA and Circular Action Alliance Colorado LLC collectively as "CAA."

72. Large multinational corporations including Fortune 500 companies founded and govern CAA.. *Attachment A* at 40.

73. CAA's structure concentrates authority in these founding members. Its National Board of Directors consists of representatives of founding member companies. *Id.* at 40–41.

74. Neither CDPHE nor any other governmental entity has authority to appoint CAA board members or members of CAA management.

75. Neither CDPHE nor any other governmental entity has authority to remove CAA board members or members of CAA management.

76. Regional and mid-sized companies, including many of Auto Care Association's members, have minimal to no influence over CAA decisions. They have no representation on the CAA Board.

77. CAA submitted a proposed program plan on February 3, 2025, and a revised plan on June 30, 2025.

78. CDPHE reviewed the proposal, as did a "producer responsibility program for statewide

---

[2] *See* screenshot captured Oct. 8, 2026, of circularactionalliance.org, About Circular Action Alliance at 1 (*Attachment E*).

[3] *See* screenshot captured Oct. 8, 2026, of Colorado Secretary of State business records search results for "Circular Action Alliance" (*Attachment F*).

recycling advisory board" ("Advisory Board"), Colo. Rev. Stat. § 25-17-704(1), but that Board's role is limited to making recommendations to the executive director of CDPHE. After the Advisory Board recommended approval on August 14, 2025, CDPHE issued a letter on October 20, 2025, requesting additional amendments, which CAA addressed in a final plan submitted in November 2025.

79. Notably, a representative of the PRO is a required member of the Advisory Board, Colo. Rev. Stat. § 25-17-704(2)(a)(XIII)~~)~~, meaning that the PRO is providing recommendations to approve or reject its own plan to CDPHE.

80. CDPHE approved CAA's proposed plan in December 2025.

81. CAA's Plan establishes Colorado's first statewide system to recycle covered packaging materials and paper products—to be funded by producers for the benefit of Colorado residents and businesses.

82. The Plan creates a comprehensive framework that, among other things, retains and pays a statewide network of recycling service providers; plans public education campaigns; sets recycled content targets for key material categories; and describes, in general terms, the methodology CAA uses to determine the dues producers must pay.

83. CAA contracts with local governments and private haulers to provide recycling services, including curbside pickup, drop-off collection sites, and hauling and transfer operations. *Attachment A* at 49, 53–54, 60, 62–64, and 82–85.

84. CAA must provide these services at no charge to Colorado residences and eventually to qualifying non-residential locations, including the same small businesses that are exempt from the obligation to join and pay the private PRO. Colo. Rev. Stat. § 25-17-703(12) (defining "covered entities"); *id.* § 25-17-706(3)(a) (requiring the private PRO to provide free recycling services to "covered entities").

85. CAA's Colorado Program Plan funds CDPHE as well as the recycling program. Under the Act, CDPHE receives funding for its administration of the program from the PRO rather than through

legislative appropriation. The Act requires the private PRO's plan to include a funding mechanism for "[r]eimbursing the department . . . for its costs in administering and implementing this part 7." Colo. Rev. Stat. § 25-17-705(4)(i)(I)(F). CAA's plan meets this requirement but imposes two conditions on CAA's payment obligation: CAA reimburses only costs it considers "reasonable" under standards that it defines, and CAA pays only "[u]pon . . . verification of CDPHE's cost accounting." *Attachment A* at 98. CDPHE consented to these extra-statutory limitations.

86. Producers must register with CAA and accept the terms of a non-negotiable Participant Producer Agreement with CAA (*Attachment G*) and a Colorado Addendum to the CAA Producer Agreement (*Attachment H*). Producers must then report and pay dues into CAA as determined by CAA.

87. As of October 31, 2024, 1,594 companies had registered with CAA as producers. *Attachment A* at 41.

**B. LPMA: Structure, Governance, and Operations**

88. LPMA operates under the public-facing trade name "Interchange 360" and describes itself as a "national non-profit EPR compliance agency" and "member-based organization" for petroleum and petroleum-related products and packaging. LPMA Presentation to Advisory Board at 4 (*Attachment I)*. For Colorado specifically, LPMA organized a separate Delaware corporation, Lubricants Packaging Management (Colorado) Association, whose certificate of incorporation was filed on December 26, 2025. The remainder of this Complaint refers to LPMA, Interchange 360, and Lubricants Packaging Management (Colorado) Association collectively as "LPMA."

89. Large multinational petroleum corporations founded and govern LPMA. LPMA was incorporated in June 2024 in response to the passage of EPR laws in several states.

90. LPMA's structure vests significant authority in these founding members who largely control the Board of Directors. *See Attachment I* at 5-6.

91. Neither CDPHE nor any other governmental entity has authority to appoint or remove

LPMA board members or members of LPMA management.

92. No governmental entity is identified as having any role in appointing, removing, or overseeing LPMA's directors or officers.

93. LPMA submitted its initial IPP to the Advisory Board on December 31, 2024. The Advisory Board reviewed the proposal throughout January and February 2025, issuing amendment requests on February 14, 2025. LPMA submitted an amended IPP on April 15, 2025. On May 15, 2025, the Advisory Board recommended approval of LPMA's IPP with conditional updates.

94. Following public comment from May 20 to June 19, 2025, CDPHE issued letters on July 28 and August 21, 2025, requiring additional revisions. LPMA addressed these requirements in updated drafts submitted on August 11 and August 26, 2025. CDPHE approved LPMA's IPP on September 9, 2025—three months before approving CAA's plan in December 2025.

95. By approving LPMA's IPP and requiring producers to comply with it, CDPHE has allowed LPMA to function as a de facto independent PRO. LPMA exercises the core powers of a PRO—compelling participation, requiring reporting, setting and collecting dues, and making binding rules—before the Act permits an additional PRO to be considered after January 1, 2029. Colo. Rev. Stat. § 25-17-708(2)(a).

96. Regional and mid-sized companies, including many Auto Care Association members, have minimal to no influence over LPMA decisions. LPMA's Participation Agreement gives its Board sole authority to determine Producer Responsibility Dues, to determine which products appear on the Applicable Products List, and to amend the Agreement and all LPMA Rules, policies, and procedures. *Attachment D* at 2–3. No provision of the Participation Agreement grants regulated producers, including Auto Care Association members, any vote, veto, or approval right over these decisions.

**C. The Dual-Obligation Structure and Its Multiplying Burden**

97. In practice, however, the approval of LPMA's IPP has not relieved producers of their

obligations to CAA. CDPHE has made clear that impacted producers must register with, report to, and pay dues to both LPMA and CAA; not one or the other.

98. Auto Care Association members that manufacture, import, distribute, sell, or supply automotive products in Colorado face a burden distinct from that imposed on most other producers: they are subject to two private compliance regimes for different components of a single product's packaging.

99. Under CDPHE's directive, these members must register with and report to both LPMA and CAA; pay dues to both organizations on different components of the same product's packaging; comply with two separate sets of rules, policies, and participation agreements; and maintain records sufficient to allocate primary containers, secondary packaging, and paper products between the two regimes.

100. That dual obligation requires separate compliance systems, data collection, reporting calendars, portals, and internal controls. Members must track which packaging goes to which entity and reconcile two sets of fee calculations, audits, and enforcement demands, even though the packaging is introduced through one product transaction and moves through one national supply chain.

101. The resulting dual registration, reporting, and dues obligation is uniquely burdensome for many Auto Care Association members. They must maintain separate compliance systems, sign a separate participation agreement with differing provisions, carefully separate which packaging is reported to which entity using incompatible data formats,[4] and pay separate dues, risking duplicative reporting and fee payments—all for a single automotive or lubricant product whose primary container and associated secondary packaging move through the same supply chain. Even a single shipment of a single product could result in duplicative reporting and fee payment obligations between CAA and LPMA.

102. Auto Care Association members have no meaningful voice in either organization's

[4] CAA requires weight-based reporting in pounds across dozens of material categories, while LPMA requires volume-based reporting in gallons by product type. *See Attachment A* at 209; LPMA powered by Interchange 360, *Reporting Guidance: Colorado* (Oct. 2025) at 7 (*Attachment J)*.

governance.

103. This regulatory overlap caused by approval of LPMA's IPP is just the beginning; the Act allows for approval of unlimited IPPs that could impose an endless number of compliance regimes that Auto Care Association members will have no choice but to comply with at the risk of their business. Section 25-17-705(8) of the Act permits any producer to submit an IPP "each January 1 thereafter," with no statutory cap on approvals, and Section 25-17-708(2) authorizes additional PROs beginning in 2029. A producer whose products touch multiple material categories could therefore face three, four, or more overlapping private compliance regimes—each with its own registration portal, reporting format, dues methodology, and participation agreement—for sales within a single state.

### D. The Participation Agreements Impose Binding, Non-Negotiable Obligations on Producers Without Government Approval or Meaningful Procedural Protections

104. Neither CDPHE nor any government body is required to approve the participation agreements that CAA or LPMA require producers to sign as a condition of selling products in Colorado. The Act requires executive-director approval only of program plans and IPP proposals, not of the contractual terms imposed on individual producers. *See* Colo. Rev. Stat. § 25-17-705(4), (5). CAA's own Program Plan confirms that it, not CDPHE, "will develop a set of binding agreements and policies (Policies) that clarify producer obligations for registration, reporting and dues payments." *Attachment A* at 211. These "Policies" may address reporting timelines and categories, corrections, billing, payment timing, interest, liquidated damages for late payment, audits, and other compliance processes. CAA's Program Plan further provides that these compliance policies and processes will be submitted to CDPHE upon request," not for approval, but on request. *Id.* at 214. Likewise, LPMA's Participation Agreement incorporates by reference LPMA's "Rules," which are defined broadly to include "plans, policies, procedures, fees/dues schedules, bylaws, or other terms or conditions governing the Plan, the Program, or the Participant," yet none of those materials are subject to any requirement for governmental review or

approval. *Attachment D* at 3.

105. CAA's Colorado Addendum permits CAA to modify the obligations imposed on producers without meaningful producer consent. The Addendum provides that it "may only be amended in writing in the same manner as permitted by Section 14 of the Agreement." *Attachment H* at 10. The Addendum grants the producer a limited right to terminate the Addendum immediately if it rejects a proposed amendment, but only if the producer "initiates a discussion of such proposed amendment (including any intent to reject the proposed amendment or terminate this Colorado Addendum) within thirty (30) days after such amendment is noticed by CAA Colorado." *Id.* at 9. This is not a consent mechanism; it is a narrow exit right that requires the producer to terminate participation in the program, and therefore its ability to sell covered products in Colorado, as the only alternative to accepting the change.

106. Separately, CAA's Plan reserves the right to develop and periodically update internal "binding agreements and policies" governing registration, reporting, dues payment, audits, and compliance processes. *Attachment A* at 211. These policies are adopted by CAA alone; the Plan does not describe producer voting, approval, or negotiation as a condition of their adoption. While CAA's Program Plan amendments do require Advisory Board consultation and CDPHE approval, CAA's internal policies, procedures, and practices can be updated by CAA alone "as determined to be necessary or appropriate," without producer consent or government pre-approval. *Id.* at 214.

107. LPMA's Participation Agreement grants LPMA's Board of Directors the same type of ongoing, unilateral authority to change the obligations imposed on producers. Section 2.2(d) provides that "the LPMA has the authority to make Rules, policies or procedures in relation to the Plan, the Program, and any Products or Program Materials," and that "[t]his Agreement and/or LPMA's Rules may be amended from time to time by the LPMA's Board of Directors." *Attachment D* at 3. The Participant must agree in advance to "be bound by any applicable Rules, policies or procedures applicable to it and made by LPMA." *Id.* The Agreement contains no requirement that LPMA obtain the individual producer's

consent, a vote of affected producers, or government approval before any such amendment takes effect. The LPMA Board also has sole discretion to determine the Fees/Dues Schedule and to determine what products appear on the LPMA Applicable Products List, thereby controlling what materials trigger dues obligations. *Id.* at 2. The combined effect is that a private trade organization whose board is composed predominantly of representatives of the five petroleum companies that founded LPMA can unilaterally change the fees, reporting requirements, audit obligations, and compliance terms imposed on every producer participating in LPMA's program.

108. The CAA Colorado Addendum is structured as a contract of adhesion. Upon execution, the producer undertakes continuing obligations to report, pay, retain records, cooperate with audits, and comply with CAA Colorado's requirements and policies, requirements that may change as CAA updates them. CAA Colorado sets Producer Responsibility Dues annually "using a Dues Setting Methodology" that the individual producer has no role in approving. *Attachment H* at 6. The Addendum permits CAA to impose late charges of up to 1% per month, compounded monthly, on overdue dues. *Id.* at 7. It also permits CAA to assess an "inaccurate reporting charge, as liquidated damages and not as a penalty, in the amount of up to $5,000 or an amount equivalent to the Producer Responsibility Dues associated with the inaccurately reported Colorado Covered Materials, whichever is greater." *Id.* CAA may terminate for material breach after 60 days' written notice, and unpaid dues "may be forwarded to a collection agency, as determined in CAA Colorado's sole discretion." *Id.* at 9. Upon termination, CAA notifies CDPHE of the producer's cancelled registration, effectively barring the producer from lawful sales in Colorado. *Id.*

109. LPMA's Participation Agreement is similarly presented as a take-it-or-leave-it contract. The Participant must sign the Agreement as presented; LPMA then decides, "at the LPMA's sole discretion," whether to approve the Participant's participation. *Attachment D* at 4. The Agreement automatically renews for successive one-year terms unless the Participant provides at least 60 days' advance written notice of termination. *Id.* LPMA, by contrast, may terminate immediately if the Participant "fails to

comply with the LPMA's Rules and terms of this Agreement and such failure remains after 30 days" of a noncompliance notice. *Id.* The Participant may not assign or transfer the Agreement without LPMA's prior written consent, while LPMA reserves the right to assign any of its rights, including dues collection, to a subsidiary on 30 days' notice, and the Participant "agrees to be bound by and comply with" any Plans or Rules "created, managed administered, delegated to, or otherwise carried out" by such subsidiary. *Id.* at 6.

110. Both CAA and LPMA set producer fees without requiring producer consent, and the amounts are binding once set. CAA Colorado sets dues annually, and once set, the dues for a given program year "are final and not updated or adjusted" for that year. *Attachment H* at 6; *Attachment A* at 213. Under the LPMA Participation Agreement, "Producer Responsibility Dues" are "determined from time to time by the LPMA's Board of Directors." *Attachment D* at 2. LPMA's dues are retroactive: they are "payable from the respective effective date" on the Fees/Dues Schedule regardless of when the producer accepts the Agreement. *Id.* The Colorado regulations require the PRO to "solicit and incorporate input from all producers," when setting the annual schedule, 6 Colo. Code Regs. § 1007-2:1-18.5.4(D), but input is not consent, and neither the regulations nor the participation agreements condition the dues amount on producer approval.

111. Both agreements compel producers to open their books to these private entities. The CAA Addendum effectively requires five-year record retention, with CAA's right to audit relevant documents up to once per year, increasing to twice per year if a prior audit reveals a discrepancy exceeding the lesser of 5% of dues or $100,000. *Attachment H* at 5. If the audit reveals such a discrepancy, the producer, not CAA, bears the cost. *Id.* LPMA's Agreement requires the producer to maintain compliance records for five years, with records "open to inspection by the LPMA at any time." *Attachment D* at 5. These are the investigatory powers of a governmental regulator, exercised by private organizations that face no obligation to provide procedural due-process protections.

112. The participation agreements provide no meaningful avenue to challenge fees or other program requirements. CAA's Addendum channels all disputes, including disputes over the scope of the producer's obligations under the Colorado EPR Law, into "binding arbitration" and the parties "waive any right to appeal the decision, to the extent a waiver can be made under applicable law." *Attachment H* at 9–10. LPMA's separate Dispute Resolution Policy is even narrower: it applies only to disputes "regarding whether eco-modulation factors assessed on the Participant's final invoice comply with the Plan, the Act and the Regulation," and expressly provides that the producer's obligation to pay dues "is not stayed while the dispute resolution process set out in this Policy unfolds." LPMA Dispute Resolution Policy at 1–2 (*Attachment K*). Neither regime gives producers a right to challenge the overall fee methodology, the Board's exercise of its unilateral amendment authority, or the broader terms that CAA and LPMA impose as a condition of doing business in Colorado.

**E. Dues in Practice: Budget Opacity, Burden, and Lack of Judicial Review**

113. CAA projects annual budgets of hundreds of millions of dollars each year. The projected budget for the first program year of 2026 is $215 million to $267 million. The Plan predicts CAA growth of as much as 85 percent in just five years, reaching $300 million to $397 million by 2030. *Attachment A* at 176. After asserting unilateral "authority to determine the [dues-setting] methodology," *id.* at 180, CAA gives only a general description of that methodology. To set producer dues for a given year, CAA first estimates its total cost of fulfilling its obligations under the Plan, including the costs of paying recycling service providers, funding educational programs, and administering the program. It allocates those costs to producers based on the types and weights of covered materials each distributes into the state. In this process, CAA assigns each of the 61 categories of covered materials a base fee amount based on "material specific management costs." *Id.* at 181. For each covered material that a producer distributes into the state, CAA multiplies the base amount for that material by the weight of the materials the producer sold. The result is the producer's "base dues." Total "dues" on a producer's invoice consist of "base dues," with a

possible "eco-modulation" discount for putatively greener packaging changes. *Id.* at 180–84.

114. Thus, CAA does not calculate producer fees based on the marginal cost of handling disposal of each producer's materials. Rather, it imposes producer fees in an amount sufficient to provide the funds CAA needs to build out and maintain a statewide recycling program. *Id.* at 32, 37–38, 176 (Table 30).

115. CAA's Colorado Addendum further denies producers any meaningful recourse to challenge these fees. The Act and the regulations compel producers to pay the dues that the private PRO demands. Colo. Rev. Stat. § 25-17-709(1)(a); 6 Colo. Code Regs. § 1007-2:1-18.2.4(C). CAA's Addendum subjects producers that fail to pay dues on time to liquidated damages of up to 1% per month, compounded monthly, and enforcement referrals to CDPHE. *Attachment H* at 7–8.

116. CAA's Addendum bars producers from seeking judicial relief to challenge any action arising out of the Addendum, requiring them to submit all disputes to binding arbitration. *Id.* at 9–10. This arbitration requirement denies producers any meaningful opportunity to challenge CAA base dues or methodology. It also bars producers from challenging a CAA decision to expel them from the EPR program. The Addendum authorizes CAA to "terminate" a producer for any material breach, which CAA defines to include matters such as "failure to keep required records." *Id.* at 9. The arbitration provision then bars the terminated producer from challenging its termination in court. *Id.* at 9–10.

117. The only exception to CAA's arbitration requirement is for dues increases based on eco-modulation factors. CDPHE amended the initial implementing regulations to permit producers to challenge eco-modulation increases—and only eco-modulation increases—in an administrative forum. 6 Colo. Code Regs. § 1007-2:1-18.2.7. Under this provision, a producer can challenge an increase based on eco-modulation factors in a hearing before the Advisory Board for the producer responsibility program, of which a representative of the PRO is a statutory member, Colo. Rev. Stat. § 25-17-704. The Advisory Board issues a recommendation to the Director of the CDPHE Hazardous Materials and Waste Management Division, which issues a decision that is subject to judicial review. 6 Colo. Code Regs. §

1007-2:1-18.2.7(C), (D), (F).

118. But even this limited review process is inadequate. The regulations place the burden of proof on the producer, *id.* § 1007-2:1-18.2.7(C), and require the producer to pay the disputed increase before challenging it, *id.* § 1007-2:1-18.2.7(E). The regulations also do not identify a limiting standard governing a decision on the merits of the dues increase, referring only to the vague language contained in the "[CAA] Plan, IPP [if any], applicable regulations, guidance, or" the Act. *Id.* § 1007-2:1-18.2.7(C). Moreover, the Act does not provide this judicial review option for changes to base dues, which constitute the bulk of producer dues. The only possible adjustment to base dues is eco-modulation adjustments, which are limited to 10 percent of base dues. *Id.* § 1007-2:1-18.9.1(B).

119. When CDPHE proposed the regulatory amendment that allows producers to dispute CAA eco-modulation decisions through an administrative and judicial process,[5] CAA opposed the proposal—which illustrates the conflict of interest between CAA's governing members and most of the producers CAA governs. CAA argued that permitting its members even this limited right to challenge eco-modulation adjustments would increase CAA's expenses and create uncertainty. CAA even argued that CDPHE was exceeding the scope of its authority to make rules relating to CAA.

120. LPMA's fee structure and budget disclosures present distinct but equally serious deficiencies. In contrast to CAA's detailed multi-year budget, LPMA's budget disclosures are notably opaque. LPMA's approved IPP states only that "[a] preliminary estimate of annual revenues/expenses, to be refined once producers are registered and reporting to LPMA, is $1 to $3M" and that "[b]udgets will be adjusted annually or as needed." *Attachment C* at 24. The IPP caps LPMA's administrative costs at 5% of producer dues and requires reserves of three to six months' operating costs, but provides no detailed

[5] CDPHE, *Stmt. of Basis & Purpose & Specific Stat. Auth. ~~For~~for 6 Colo. Code Regs. 1007-2 Solid Waste Regulations,* PDF at 14 (Nov. 18, 2025) (pertaining to 6 Colo. Code Regs. 1007-2, pt. 1) (*Attachment L*).

cost breakdowns, program categories, or five-year projections. *Id.* at 16–17. LPMA's public website similarly lacks annual budget projections or itemized cost disclosures, leaving producers with no meaningful visibility into how their dues will be spent.

121. LPMA's Colorado fee structure independently demonstrates the defect in the Act's implementation. From implementation to January 1, 2027, LPMA is charging a single $0.56/gallon implementation fee for lubricant packaging, with no differentiation by material, packaging type, size, weight, or composition, rather than a rate that varies by the type of covered material, recyclability, and the net recycling services costs for each covered material in Colorado. Colo. Rev. Stat. § 25-17-705(4)(i)(II). LPMA has not disclosed the methodology, data, or cost allocation used to derive its $0.56/gallon rate. Without that information, neither producers nor CDPHE can determine whether the rate reflects any Colorado-specific net recycling services costs or whether the fee varies by the type or recyclability of the covered material, as the Act requires.

122. LPMA's disclosure that all dues collected from the program launch were directed to planning activities—including the EPR Plan, stakeholder engagement, an operational plan, IT, communications, legal, and administration—also raises a substantial question whether LPMA exceeded the five-percent limit on administrative use of producer responsibility dues. Colo. Rev. Stat. § 25-17-705(4)(i)(II).

123. Unlike CAA, LPMA's Participation Agreement does not require binding arbitration of disputes with producers. Under LPMA's IPP, LPMA may deliver a notice of non-compliance, after which the producer has 30 days to cure; if the failure remains uncured, LPMA may terminate the Agreement. *Attachment D* at 4. But the absence of a formal dispute-resolution mechanism in LPMA's Participation Agreement does not benefit producers—it simply means that producers subject to LPMA's IPP have no identified contractual process to challenge LPMA's fees, rules, or Board decisions before those obligations take effect.

124. Neither the Act nor the regulations set out a specific standard that limits CAA's or LPMA's imposition of dues. Producers cannot challenge CAA's base dues in court but must submit to binding arbitration on the terms CAA has imposed; LPMA producers have no identified contractual forum at all. A producer that fails to pay CAA dues on time, including while it is arbitrating the dues amount, is subject to an enforcement action and penalties.

125. The Act authorizes penalties of $5,000 for the first day of a first violation and $1,500 per day afterward. Colo. Rev. Stat. § 25-17-710(1)(a). Penalties for repeat violations rise to $20,000 for the first day followed by $6,000 for each subsequent day. *Id.* § 25-17-710(1)(c); 6 Colo. Code Regs. § 1007-2:1-18.11.3.

126. The Act requires the private PRO to track compliance with program requirements and "collaborate with the executive director [of CDPHE] to bring producers into compliance." Colo. Rev. Stat. §§ 25-17-705(4)(e), 25-17-709(2)(b). These statutory compliance-tracking and enforcement provisions apply to the PRO; neither the Act nor the regulations impose a parallel obligation on IPP administrators such as LPMA, but LPMA's Participation Agreement independently grants LPMA broad termination and enforcement authority over its producers. The result is that no producer—whether subject to CAA, LPMA, or both—has a meaningful avenue to seek judicial review of duplicative payments or dual compliance requirements as between the PRO and an IPP administrator.

### F. The Act Imposes Heavy Burdens on Auto Care Association Members and Interstate Commerce

127. The Act imposes "producer" status on many brand owners, manufacturers, and distributors for many of the products they handle, even when such entities do not control the packaging consumers receive at the point of sale. *See* Colo. Rev. Stat. § 25-17-703(25)(a) (defining "packaging material"). As a result, regulated producers are not always in a position to reduce packaging materials, or to benefit from eco-modulation reductions. For producers of automotive and petroleum products, this burden is compounded

by the requirement to register with and report to both CAA and LPMA for different components of the same product's packaging.

128. The Act imposes substantial costs on these Auto Care Association members, burdening their interstate operations.

129. It requires them to pay CAA and LPMA dues that can be so high they exceed the low margin that entities earn on these transactions.

130. CAA and LPMA dues are only a fraction of the costs the Act imposes. Producers must also incur the greater costs of making sweeping changes to their interstate operations to comply with the Act.

131. Each company must determine whether it is the "producer" under Colorado law for each of the thousands or millions of units of product it handles. Because the Act's tiered definition of "producer" is so complex, this process requires companies to coordinate extensively with manufacturers, suppliers, customers, and other potential producers to determine which entity bears responsibility as the producer.

132. For products for which a manufacturer, brand owner, or distributor is the "producer," that entity must identify the specific packaging materials used for each product and the weight of each material used. Such entities typically do not have this information readily available and often must engage in burdensome requests to suppliers or conduct physical analyses.

133. In many cases, critical downstream information such as the ultimate destination of those products is simply unavailable.

134. This request process requires some upstream suppliers to incur substantial costs to enable their downstream cohort to meet their obligations under the Act.

135. Once entities gather the necessary information to the extent available, they must calculate and report the weights of categories for materials used for each product sold into Colorado. Oftentimes this involves developing and applying estimation methodologies to fill in the gaps for information that is unable to be obtained and engagement of experts to undertake this exercise. These extensive reporting

requirements impose substantial additional costs.

136. Upstream entities such as manufacturers and distributors, who often bear the burden of producer obligations, often cannot know in advance whether units of product they sell ultimately will be sold in Colorado. These entities therefore must trace each unit of product to the extent possible—each retail-level box, for example—through their distribution channels to the ultimate point of sale.

137. These entities generally need to obtain this information from the downstream members of their supply chains. The downstream companies often must incur substantial costs to provide the tracking information needed for the upstream companies to meet their obligations under the Act. Or, downstream companies may refuse to provide the information, which can result in upstream companies overpaying CAA dues based on sales of products that were not ultimately sold in Colorado.

138. Auto Care Association members also incur higher costs in the form of higher prices charged by their suppliers. Where an upstream actor is the "producer" under the Act, that upstream actor is free to invoice downstream for the EPR-related costs.

139. To cover these dues and waterfall compliance costs, companies are forced to raise some of their prices or make costly packaging changes. For many products, companies cannot limit these price increases or packaging changes to products ultimately sold in Colorado. The result is price increases imposed on consumers in numerous states other than Colorado.

140. These complex processes are further complicated by several other states' ongoing adoption of EPR laws. To date, six other states have adopted similarly broad EPR statutes: California, Maine, Maryland, Minnesota, Oregon, and Washington. These statutes vary in their details, including their definitions of "covered material" and "producers" as well as their classifications of packaging materials.

141. The Act's requirements are especially burdensome to the many Auto Care Association members that are mid-sized companies. Among other disadvantages, these members are above the ~~miniscule~~minuscule threshold for the Act's small-business exemption. Yet, they lack the scale that allows

large producers to better absorb the additional labor, information technology, and related costs they must incur because of the Act. In addition, mid-sized companies generally have minimal in-house legal and compliance resources compared with larger companies like those on the CAA Board.

142. CAA's fee structure also creates incentives that cut against the Act's purpose and goals. For example, it does this by assessing dues based on packaging weight—rewarding producers for shifting to lighter but less-recyclable materials rather than for improving recyclability. *See Attachment A* at 183.

143. Adding to the above burdens, the Act and regulations require producers to maintain extensive records and provide them on demand. Colo. Rev. Stat. § 25-17-709(1)(b); 6 Colo. Code Regs. § 1007-2:1-18.1.5, -18.2.5. These records must be extremely detailed. They must include "all documents and records related to the calculation and payment of producer responsibility dues, recycling rates, collection rates, postconsumer-recycled-content rates, and any other materials necessary for the executive director to determine compliance with" the Act, which the producer must "make . . . available for inspection by the executive director" of the CDPHE. Colo. Rev. Stat. § 25-17-709(1)(b); *see also* 6 Colo. Code Regs. § 1007-2:1-18.2.5. CAA conducts annual audits of producer records. Colo. Rev. Stat. § 25-17-708(5); 6 Colo. Code Regs. § 1007-2:1-18.1.5(D); *Attachment A* at 27. LPMA similarly requires producers to maintain compliance records for five years, with records open to inspection at any time, and may conduct audits through chartered accountants, including random bale tracking to verify chain of custody. *Attachment D* at 5.

144. The Act imposes irreparable harm on Auto Care Association members, mandating compliance with a regulatory framework in which they face crushing burdens, exercise no consequential voice, and have no meaningful recourse.

## CLAIMS FOR RELIEF

### Count I
### 42 U.S.C. § 1983
### Violation of the Fourteenth Amendment Due Process Clause: Unconstitutional Conditions

145. Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

146. The Supreme Court "ha[s] said in a variety of contexts that the government may not deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (cleaned up). This "principle, known as the unconstitutional conditions doctrine, . . . vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Id.*

147. Colorado's EPR program violates this doctrine because the Act, as implemented by CDPHE, forces producers to submit to regulation by CAA, LPMA, and any other future PROs or IPP administrators, on terms those private entities dictate, including requirements to register, report, and pay dues and, for CAA participants, a waiver of the right to bring claims against CAA in state or federal court. As set forth above, forcing producers to submit to regulation by these self-interested parties, and denying producers meaningful judicial review of any disputes with them, violates the Due Process Clause. Making producers "agree" to that arrangement as a condition of selling to customers in the state thus imposes an unconstitutional condition.

148. Apart from the Due Process Clause, the Act also imposes an unconstitutional condition by forcing producers to waive their right to a federal judicial forum as a condition of doing business in that state. *See S. Pac. Co. v. Denton*, 146 U.S. 202, 207 (1892) (holding that this is constitutionally impermissible); *see also Koontz*, 570 U.S. at 607 (citing the forced waiver in *Denton* as an example of an unconstitutional condition).

149. In addition, forcing producers to pay dues to private PROs and IPP administrators is an

unconstitutional condition because it forces producers to pay for services in Colorado that have nothing to do with their own activities in Colorado. Such fees pay not only for the recycling of waste resulting from the products they sell in the places where they sell them; they also pay for recycling services everywhere else in Colorado, including the recycling of waste generated by exempt producers, and for a statewide education and outreach program. Thus, CAA dues do not bear even "rough proportionality" to the costs that producers' products impose on the state but instead are a means of "extortion" against distributors who exercise their right to engage in otherwise-lawful interstate commerce. *See Koontz*, 570 U.S. at 605–06.

150. Producers do not consent to these unconstitutional conditions; agreement to CAA's and LPMA's terms is forced upon them as a condition of engaging in interstate commerce. The only approved IPP, LPMA's, does not free producers from CAA obligations: a producer of automotive or petroleum products must still register with CAA and pay CAA dues for secondary packaging and paper products associated with the lubricant containers supplied to covered entities. LPMA therefore operates not as an alternative to CAA but as an additional compulsory regime layered on top of it. The Act places no ceiling on IPP approvals and expressly permits additional PROs after January 1, 2029, meaning the dual-obligation structure producers face today could expand into three, four, or more concurrent private compliance regimes—each exacting separate fees, each demanding distinct reporting, and each requiring participation agreements whose terms producers cannot negotiate. The cumulative effect is not merely incremental inconvenience; it is a multiplication of unconstitutional conditions that grows with every new approval. *See* Colo. Rev. Stat. §§ 25-17-705(8), 25-17-708(2).

151. Defendant could not impose any of these unconstitutional conditions directly and may not do so by adding the extra step of forcing producers to enter a putative agreement with a private party. With respect to constitutional rights, "what cannot be done directly cannot be done indirectly." *Cummings v. Missouri*, 71 U.S. 277, 325 (1866); *see also, e.g.*, *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 190 (2024) ("[A]

government official cannot do indirectly what she is barred from doing directly.”).

152. By imposing these unconstitutional conditions on producers, Defendant is harming Auto Care Association’s members, and Auto Care Association’s members will continue to suffer harm to their constitutional rights unless and until the Court enjoins enforcement of these conditions.

**Count II**
**42 U.S.C. § 1983**
**Violation of the Dormant Commerce Clause**

153. Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

154. Article I, Section 8, Clause 3 of the U.S. Constitution authorizes Congress to “regulate Commerce . . . among the several States.”

155. Among the reasons the Constitution’s Framers included this provision was to prevent states from imposing self-serving regulations that burden interstate commerce for parochial purposes. *Nat’l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023).

156. Toward that end, even where Congress has not spoken, the “Dormant” Commerce Clause forbids state actions that discriminate against or unduly burden interstate commerce. A state law per se violates the Commerce Clause if it directly discriminates against interstate commerce or favors local interests. *See id.*; *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994). Even a facially neutral state law violates the Commerce Clause if it imposes burdens on interstate commerce that clearly exceed the law’s putative local benefits. *Nat’l Pork Producers*, 598 U.S. at 377–78; *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

157. The Act violates the Dormant Commerce Clause in both ways.

158. First, the Act discriminates against interstate commerce to benefit local economic interests.

159. The Act incorporates this discrimination into its structure. The Act defines “producer” to target manufacturers that own national product brands—most often large national companies based outside

Colorado—and other companies upstream in product supply chains. The Act also grants exemptions that favor primarily in-state actors. It thus imposes costs more heavily on out-of-state producers than on the in-state producers with whom they compete.

160. For example, the favored in-state economic interests include Colorado "small business" producers, who are exempt from the Act's requirements but will receive free recycling services funded in significant part by out-of-state producers' PRO fees. *See* Colo. Rev. Stat. § 25-17-703(12) (defining "covered entities" to include small businesses); *id.* § 25-17-706(3) (requiring the PRO to fund recycling services for covered entities); *id.* § 25-17-713 (exempting businesses with less than $5 million in revenue from the Act's requirements).

161. The favored in-state economic interests also include Colorado taxpayers, who would otherwise be responsible for funding the recycling infrastructure. The Act impermissibly forces out-of-state producers to fund an in-state project for the benefit of state residents as the price of access to Colorado customers.

162. Second, the Act violates the Dormant Commerce Clause by imposing substantial burdens on interstate commerce that clearly exceed any local benefits the Act provides—particularly given that Colorado can obtain any such local benefits without burdening interstate commerce.

163. The Act burdens interstate commerce by imposing extensive compliance costs on producers, including Auto Care Association members, and inflicting broad consequential harms on interstate markets including higher prices in other states.

164. It burdens producers in several ways. One is by requiring them to pay fees based on the volume of "covered materials" attributed to them. These fees can exceed the margin that producers would earn on certain products. Aggravating this burden, CAA and LPMA determine those fees through opaque processes that provide little transparency into how costs are determined. In the case of CAA, producers are further burdened because they lack a meaningful opportunity to challenge those fee determinations in

court.

165. Those interstate burdens are multiplied by Colorado's dual-obligation structure. Producers operating nationally must navigate two overlapping compliance regimes within a single state—LPMA for primary lubricant packaging and CAA for secondary packaging and paper products associated with the same containers. The result is effectively the cost of complying with two states' laws burdening interstate commerce, except worse because it results from two private regimes.

166. For each affected product, an Auto Care Association member may need two registrations, two reporting systems, two participation agreements, two fee calculations, and two sets of audits and rules. This duplication multiplies data, legal, accounting, and operational costs throughout national supply chains and creates additional opportunities for conflicting classifications and enforcement demands. But the burden does not stop at two. Because the Act places no cap on the number of IPPs CDPHE may approve and expressly authorizes additional PROs after 2029, any producer whose products touch multiple material categories faces the real prospect of multiple concurrent private compliance regimes within Colorado alone—each layering additional registration portals, reporting protocols, fee schedules, and participation agreements onto an already overburdened interstate supply chain.

167. The Act also requires producers to comply with a labyrinthine, granular reporting regime enforced by a PRO and any approved IPP administrators. The reporting requirements force producers to obtain information from their suppliers about the composition and weight of packaging materials used for thousands of kinds of products, often generating millions of data points producers must process to compile the required information. It also requires them to track which of their thousands or millions of products ultimately reach consumers in Colorado. This requires producers to track products through their customers who sell the products further down the supply chain. Each additional approved IPP could impose its own distinct reporting format and material classifications, multiplying these already excessive burdens.

168. These complex tracking and reporting obligations disproportionately affect producers who are

out-of-state members of national or regional supply chains.

169. These burdens are multiplied by the need to coordinate the Act's requirements with requirements imposed by other states' EPR statutes. The various EPR statutes, including the Act, create a patchwork of inconsistent obligations that disrupt the uniformity of an inherently national market.

170. This regulatory framework imposes barriers to the free flow of packaged goods across state lines, unduly burdening the operation of a market that routinely crosses state lines and functions as a national supply chain.

171. These burdens on companies operating nationwide far exceed any putative local benefits. Speculative or marginal reductions of in-state waste cannot outweigh the significant disruption of the interstate market. The CAA Needs Assessment prepared under Colo. Rev. Stat. § 25-17-705(2) attributes predicted increases in recycling to improved recycling services and public education, not to the imposition of costs on producers.[6] Any recycling benefits could be achieved by simply taxing goods at the point of sale or through other direct funding by the state, and/or by regulating products sold in the state.

172. By enforcing the Act, Defendant, acting under color of state law, is depriving Auto Care Association's members of a right protected by the U.S. Constitution.

173. Defendant's enforcement of the Act has injured Auto Care Association's members and will continue to do so unless and until this Court enjoins it.

**Count III**
**42 U.S.C. § 1983**
**Violation of the First Amendment:**
**Compelled Speech and Association**

174. Plaintiff realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint.

175. The First Amendment protects "both the right to speak freely and the right to refrain from

[6] Colorado Needs Assessment (Jan. 27, 2025) at-10 (*Attachment M*).

speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

176. The First Amendment therefore protects individuals against being compelled to express viewpoints on political and ideological matters, *see Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018), and against being compelled to make statements of fact, *see Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797–98 (1988).

177. Similarly, the "[f]reedom of association" that the First Amendment protects "plainly presupposes a freedom not to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984).

178. Just as forcing someone to speak violates the First Amendment, compelling a person to subsidize another private party's speech "seriously impinges on First Amendment rights." *Janus*, 585 U.S. at 894. Thus, when the government mandates the payment of compulsory fees to a private organization that uses those fees to engage in speech, especially speech with "powerful political and civic consequences," this constitutes a form of compelled speech and association that imposes a "significant impingement on First Amendment rights." *Id.* at 893.

179. As explained above, the Act mandates that most Auto Care Association members become members of, and pay dues to, a private PRO or IPP administrator—namely, at this time and for the foreseeable future, CAA and LPMA.

180. CAA and LPMA use some of producers' mandatory dues money to engage in speech.

181. For example, CAA promotes the idea that EPR laws are an effective means of increasing recycling, minimizing waste, and improving the environment.

182. By its own admission, CAA "provide[s] [its] point of view on regulatory concepts" to States considering EPR legislation designed to enable those States to "hit the ground running when it's time to turn [an EPR] program on."[7]

[7] *See* M. Diane McCormick, *A Look Behind Producer Responsibility Organization*s, FlexPackVoice (Feb. 28, 2025) (quoting Olivia Barker, "spokesperson" for the CAA) at 5 *(Attachment*

183. And CAA expressly aims at a political goal: to establish itself as the dominant organization responsible for administering EPR laws across multiple states.

184. Similarly, "Implementing education and outreach" is one of the expressly enumerated categories that LPMA's dues may cover. The approved IPP describes a comprehensive, statewide education and outreach program focused on educating consumers about proper material handling, available recycling services, litter prevention, and the environmental and economic benefits of recycling.

185. Many businesses, including some Auto Care Association members, disagree with CAA's and LPMA's speech on these matters and do not wish to fund it. Although Auto Care Association and its members overwhelmingly support sustainability and the promotion of a circular economy, they disagree with CAA and LPMA's message that packaging EPR laws are an effective means of pursuing those interests. Nor do they believe that private organizations should function as a de facto interstate regulator.

186. The requirement that Auto Care Association members associate with CAA and LPMA and fund these messages violates Auto Care Association members' First Amendment rights against compelled association and compelled support for messages with which they disagree.

187. By enforcing the Act, Defendant, acting under color of state law, is depriving Auto Care Association's members of these First Amendment rights.

188. Auto Care Association's members have been injured and will continue to be injured unless and until this Court enjoins Defendant from enforcing the Act against Auto Care Association and its members.

**Count IV**
**42 U.S.C. § 1983**
**Violation of the Fourteenth Amendment Due Process Clause: Unlawful Delegation to Private Parties**

189. Plaintiff realleges and incorporates by reference the allegations contained in all preceding

---

*N*).

paragraphs of this Complaint.

190. Section 1 of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

191. This requirement of due process prohibits the government from delegating regulatory authority to private market participants without meaningful governmental control or oversight.

192. The Act violates the due-process rights of Auto Care Association's members in this way.

193. The Act delegates authority to CAA, as the only approved PRO, and LPMA as an IPP administrator to set terms, conditions, and fees for "producers" in the state.

194. CAA and LPMA are controlled in substantial part by representatives of companies that are competitors of producers, including Auto Care Association members, who are regulated under the Act.

195. CAA's and LPMA's "founding members" include some of the nation's largest companies that are themselves producers under the Act.

196. Most or all members of CAA's and LPMA's Board are representatives of their respective large founding member companies.

197. Some of those founding members and Board members are competitors of Auto Care Association's members, and some are retailers or suppliers who have an interest in having companies like Auto Care Association's members (that is, distributors) bear a larger share of the costs of the EPR program.

198. This creates irreconcilable conflicts of interest that the Due Process Clause forbids.

199. CAA's and LPMA's founding members are better able than most producers to absorb EPR fees or shift those fees onto others. The founding members thus may be more willing to impose and/or accept program features that have an outsized, unduly burdensome effect on others, such as higher total costs for a bigger program, or higher fees on some product types than on others.

200. An obvious conflict of interest arises to the extent that disputes or issues over fees may arise

between CAA or LPMA and a founding member or company represented on CAA or LPMA's Board; when such disputes are resolved in "insider" companies' favor, other producers must bear a relatively greater share of the program's costs.

201. Thus, a block of controlling, self-interested producers wields inordinate power and influence to regulate the terms of conducting business for an unwilling minority that includes Auto Care Association's members.

202. CDPHE does not meaningfully protect against CAA and LPMA regulating Board members' companies' competitors for the benefit of the Board members' companies.

203. As explained above, the Act provides only high-level guidance that does not sufficiently cabin CAA and LPMA's broad discretion in formulating ~~its plan~~their plans, with respect to both setting total system costs and allocating those costs to different material types.

204. CDPHE did not engage in any economic impact analysis to determine the impact of CAA's or LPMA's plan on different types of producers and products. The Department does not require approval for changes to CAA's or LPMA's fee schedule or individual fee adjustments.

205. In addition, disputes arising between CAA and Auto Care Association's members regarding base fee amounts must be resolved through confidential arbitration; there is no administrative appeal process or right to judicial review. Likewise, LPMA's IPP provides no administrative appeal process to challenge base dues or the underlying fee-setting methodology; LPMA's Dispute Resolution Policy is limited to disputes over eco-modulation factors and does not extend to base dues amounts.

206. The dual-obligation structure compounds the delegation problem. CDPHE has not merely delegated regulatory authority to CAA as the designated PRO; by approving LPMA's IPP and incorporating it into CAA's Program Plan, CDPHE has also delegated parallel authority to LPMA to determine which producers must register, what they must report, what dues they must pay, and what rules govern primary lubricant packaging.

207. Auto Care Association members are caught between these two private regulators. They must classify the packaging for one product across two regimes, transmit data separately, and pay each entity, but have no single governmental decision-maker or producer-specific process to resolve conflicting requirements or challenge either assessment. The dual delegation therefore multiplies the deprivation of property and liberty without meaningful governmental supervision or judicial review.

208. The dual CAA/LPMA structure illustrates the regulatory fragmentation that the Act invites, but LPMA's approval is only the beginning. Section 25-17-705(8) permits any producer to submit an individual program plan "each January 1 thereafter," with no statutory limit on how many IPPs the Executive Director may approve. Section 25-17-708(2) further permits CDPHE to designate additional PROs beginning January 1, 2029. Nothing in the Act requires coordination among these entities or limits the cumulative compliance burden on producers. A producer whose products implicate multiple material categories could therefore be subject to three, four, or more overlapping private regulatory regimes—each with its own registration, reporting formats, dues methodologies, audit requirements, and participation agreements—all within Colorado alone. The proliferation of private regulators, each exercising delegated governmental authority without meaningful state oversight, exponentially compounds the due-process violation.

209. The fee structure further compounds its due process problem by operating on a retrospective basis.

210. Due process demands that "regulated parties . . . know what is required of them so they may act accordingly." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

211. The Act further offends due process in failing to provide businesses like Auto Care Association's members adequate notice and opportunity to contest fees imposed under the Act during the invoicing process.

212. Because CAA assesses fees based on prior years' volumes, applying rates that are determined

only after the fact, businesses cannot accurately predict what their fees will be or conform their operations accordingly.

213. LPMA's fee structure presents a distinct but equally serious due process problem. LPMA requires producers to pay dues retroactive to July 1, 2024, regardless of when they execute the Participation Agreement. As a result, producers are subjected to financial obligations for a period during which they had no meaningful opportunity to review, evaluate, or challenge the terms governing those obligations.

214. By enforcing the Act, Defendant, acting under color of state law, is depriving Auto Care Association's members of their Fourteenth Amendment right against deprivation of property without due process of law.

215. Auto Care Association's members have been injured and will continue to be injured unless and until this Court enjoins Defendant from enforcing the Act against Auto Care Association and its members.

## REQUEST FOR RELIEF

Auto Care Association respectfully requests that this Court:

A. Declare that the Act imposes unconstitutional conditions in violation of the Due Process Clause of the Fourteenth Amendment by requiring producers, as a condition of doing business in Colorado, to waive their right to a federal judicial forum and to pay dues to private entities that bear no rough proportionality to the costs producers' products impose on the state;

B. Declare that the Act violates the Dormant Commerce Clause, including because the existing dual CAA/LPMA obligation multiplies the burdens imposed on interstate commerce and because the Act's authorization of unlimited additional IPPs and future PROs threatens to compound those burdens exponentially;

C. Declare that, by compelling producers to join CAA and, as applicable, LPMA and any future

approved PRO or IPP administrator, and to fund their speech on matters of public concern, the Act violates the First Amendment;

D. Declare that the Act violates the Due Process Clause of the Fourteenth Amendment because it gives economically self-interested private actors, including CAA and LPMA, the power to regulate their competitors without sufficient statutory standards or agency oversight;

E. Permanently enjoin Defendant from directly or indirectly implementing or enforcing the Act and regulations promulgated thereunder against NAW members and Auto Care Association members, including through CAA's Program Plan, LPMA's IPP, or any future approved PRO or IPP under the Act;

F. Declare that CDPHE's approval of LPMA's IPP and its incorporation into CAA's Program Plan were ultra vires and contrary to the Act, including ~~C.R.S.~~Colo. Rev. Stat. §§ 25-17-705(8)(a), 25-17-708(2)(a), and 25-17-705(4)(i)(II);

G. Award Plaintiff its attorneys' fees and costs under 42 U.S.C. § 1988; and

H. Award Plaintiff any other relief that the Court deems just and proper.

DATED: October 15, 2026

HOLLAND & KNIGHT LLP

/s/ Amir~~.~~ A. Shakoorian
Amir A. Shakoorian~~,~~ (Atty. Reg. No. 62545)
1801 California Street, Suite 5000
Denver, Colorado 80202
Amir.Shakoorian@hklaw.com

Rafe Petersen (~~pro hac vice~~Admission to the U.S. District Court for the District of Colorado forthcoming)
Maggie P. Pahl (~~pro hac vice~~Admission to the U.S. District Court for the District of Colorado forthcoming)
800 17th St., NW, Suite 1100
Washington, DC 20006
Rafe.Petersen@hklaw.com
Maggie.Pahl@hklaw.com

*Attorneys for Auto Care Association*