# Statements of Basis and Purpose and Specific Statutory Authority for 6 CCR 1007-2 Solid Waste Regulations

| ADOPTION DATE | TITLE OF AMENDMENT |
|---|---|
| 5/19/2026 | Amendment of Section 1.8 Producer Responsibility Authorization and Dollar Limit Exemption |
| 11/18/2025 | Amendment of Section 18 Producer Responsibility Regulations |
| 8/19/2025 | Amendment of Section 1.7.4 Solid Waste User Fee |
| 5/20/2025 | Amendment of Section 1.8 Producer Responsibility Authorization and Dollar Limit Exemption |
| 5/20/2025 | Amendment of Section 1.7.6 (Waste Tire Fee) and Section 10 (Waste Tire Regulations), and addition of new Section 10.14 regulations (Waste Tire Enterprise Board End Users Fund) |
| 11/19/2024 | Amendment of Section 10.12.5 (Rebate Amount) |
| 6/14/2024 | Amendment of Section 1.8 Producer Responsibility Authorization and Dollar Limit Exemption, and Addition of Section 18 Producer Responsibility Regulations |
| 5/21/2024 | Addition of Section 19 (Administration of the Closed Landfill Remediation Grant Program) |
| 2/20/24 | Section 14 Composting Regulations Amendments |
| 2/20/24 | Section 1.7.4 Solid Waste User Fee Amendments |
| 8/15/23 | Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Section 1.7.6 (Waste Tire Fee), Section 10.3.2 (Waste Tire Hauler Registration Requirements), 10.7.3 (Mobile Waste Tire Processors Registration Requirements), 10.11.8 (Waste Tire Fee Administration), 10.12.5 (Rebate Amount). |
| 5/16/23 | Addition of Section 1.8 Producer Responsibility Authorization and Dollar Limit Exemption, Placeholder for Section 18, Producer Responsibility Regulations, and Associated Addition to Section 1.2 Definitions |
| 11/15/22 | TENORM Amendments – Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – For Consistency with 6 CCR 1007-1, Part 20 |

| ADOPTION DATE | TITLE OF AMENDMENT |
|---|---|
| 11/15/22 | Waste Tire Amendments – Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Section 10.3.2 (Registration for Waste Tire Haulers), Section 10.3.3 (Waste Tire Hauler Decals), 10.7.3 (Mobile Waste Tire Processors Registration Requirements), 10.7.4 (Mobile Waste Tire Processor Decal), 10.12.2 (General Rules for End Users Applying for a Waste Tire Hauler Rebate), 10.12.5 (Rebate Amount). |
| 8/16/22 | Amendment of Section 4 Financial Assurance Regulations |
| 11/16/21 | Amendment of Section 10.12 (Waste Tire End Users Fund) |
| 11/16/21 | Amendment of Section 13 Medical Waste Regulations |
| 11/17/20 | Repeal of Section 18 Waste Grease Regulations and Associated Amendments |
| 8/18/20 | Amendment of 6 CCR 1007-2, Part 1, Section 10 – Waste Tire Amendments |
| 5/19/20 | Amendment of 6 CCR 1007-2, Part 1, Section 4 – Regulations Pertaining to Solid Waste Sites and Facilities – Amendments to Solid Waste Financial Assurance |
| 2/18/20 | Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Section 1.2 (Definitions), Section 10.3.2 (Registration for Waste Tire Haulers), Sections 10.5.8, 10.6.9, 10.8.9 (Facility Engineering Design and Operations Plan – Waste Tire Monofills, Waste Tire Processors, and Waste Tire Collection Facilities), Section 10.6.3 (Waste Tire Processors Registration Requirements), and Section 10.12.5 (Waste Tire End Users Fund Rebate Amount). |
| 10/15/19 | Waste Tire Amendments – Amendment of Section 1.2 (Definitions), Section 1.7.6 (Waste Tire Fee), Sections 10.3.5, 10.5.6, 10.6.7, 10.7.7, 10.8.7, 10.9.5 (Annual Report), Section 10.5.1 (General Waste Tire Monofill Standards), Section 10.11 (Waste Tire Fee Administration), and the Addition of Section 10.12 (Waste Tire End Users Fund) and Section 10.13 (Standards for End Users and Landowners of Waste Tire Bales). |
| 5/21/19 | Addition of Section 3.3.8 Training |
| 5/21/19 | Amendment of Section 1.7.3 Annual Fees |
| 2/19/19 | Amendment of Section 1.7.5 Waste Grease Annual Fees |
| 11/20/18 | Correction of Typographical Errors and Outdated References |

| ADOPTION DATE | TITLE OF AMENDMENT |
|---|---|
| 5/15/18 | Amendment of Financial Assurance Regulations – Deletion of Section 1.8; Addition of Section 4 |
| 5/15/18 | Amendment of Section 1.2 (Definitions) – Revision of Definitions for "Agricultural wastes" and "Composting"; Addition of Definition of "Anaerobic digestion"; and Deletion of '"Custom mill" definition |
| 5/15/18 | Amendment of Section 8.5.4 and Section 8.5.5 for Industrial Recycling Operations |
| 2/20/18 | Amendment of Section 1.7.3 (Annual Fees) |
| 10/17/17 | Repeal of Section 10.12 (Waste Tire End Users Fund) and Deletion of Section 1.2 Definition of Daily Cover |
| 10/17/17 | Amendment of Section 1.7.6 – Waste Tire Fee |
| 2/21/17 | Amendment of Section 9.1.2(B) – Elimination of Partial Exemption for Impoundments Managing Coal Combustion Residuals (CCR) |
| 1/15/16 | Deletion and Replacement of Existing Section 14 Composting Regulations with New Section 14 Composting Regulations; and the Associated Additions and Revisions to Section 1.2 Definitions |
| 11/15/16 | Amendment of Section 10 Waste Tire Regulations (Sections 10.4.2(J); 10.11.6; and 10.12.5) |
| 11/17/15 | Amendment of Section 10.12.5 (Rebate Amount) |
| 5/19/15 | Addition of Section 1.7.7 Regulations (Paint Stewardship Program Fees) and the Associated Additions to Section 1.2 Definitions |
| 11/18/14 | Deletion and Replacement of Existing Section 10 Regulation (Waste Tire Facilities and Waste Tire Haulers) with New Section 10 Regulations (Waste Tires); the Amendment of Section 16 (Materials Prohibited From Disposal); the Associated Additions and Revision to Section 1.2 Definitions; and the Repeal of 6 CCR 1007-2, Part 4 (Regulations Pertaining to the Waste Tire Processor and End User Reimbursement Program) |
| 8/19/14 | Deletion and Replacement of Existing Section 5.5 Regulations (Management of Asbestos-Contaminated Soil) with New Section 5.5 Regulations (Management of Regulated Asbestos Contaminated Soil (RACS)); the Addition of Appendix 5A (Sample Collection Protocols and Analytical Methodologies) and the Associated Additions and Revision to Section 1.2 Definitions<br><br>Regulatory Analysis for Section 5.5 Regulations |

| ADOPTION DATE | TITLE OF AMENDMENT |
|---|---|
| 8/19/14 | Addition of Section 1.7.6 (Waste Tire Fee) |
| 11/19/2013 | Solid Waste User Fee (SWUF) Amendment to Section 1.7.4 |
| 11/19/2013 | Amendment of Section 16.4.2 Retail Disposal System |
| 2/19/2013 | Amendment of Section 10 Regulations {Waste Tire Facilities and Waste Tire Haulers} and the Associated Revision of the Section 1.2 Definition of "End User") |
| | Regulatory Analysis for Section 10 Regulations |
| 2/19/2013 | Deletion and Replacement of existing Section 16 Regulations {Disposal of Motorized Equipment Wastes} with new Section 16 Regulations {Materials Prohibited from Disposal} and the Associated Additions and Revisions to Section 1.2 Definitions) |
| 11/20/2012 | Amendment of Section 10 Regulations {Waste Tire Facilities and Waste Tire Haulers} and the Associated Revision of the Section 1.2 Definition of "End User" |
| 11/20/2012 | Amendment of Section 18 Regulations {Waste Grease Transporters, Facilities, and Personal Users of Waste Grease} and the Associated Revision of the Section 1.2 Definitions of "Trap Grease" and "Waste Grease" |
| 5/15/2012 | Amendment of Section 1.7.4(A) {Solid Waste User Fee} |
| 2/21/2012 | Deletion and Replacement of Section 9 {Waste Impoundments} regulations and the Associated Revision of the Section 1.2 Definition of "Sludge" |
| 2/21/2012 | Deletion of Section 8 {Recycling} regulations and Replacement with new Section 8 {Recycling and Beneficial Use} regulations; and Associated Additions and Revisions to Section 1.2 {Definitions} |
| 2/21/2012 | Amendment of Section 1.7.4 {Solid Waste User Fee} |
| 12/16/2011 | Addition of Section 18 {Waste Grease} and Section 1.7.5 {Waste Grease Annual Fees}; and Associated Additions to Section 1.2 {Definitions}; Section 1.5.2 {Waiver Processes and Procedures} and Section 1.7.3 {Annual Fees} |
| 11/15/2011 | Amendment of Section 13.2.5(C) {Incorporation by Reference} |

| ADOPTION DATE | TITLE OF AMENDMENT |
|---|---|
| 8/16/2011 | Deletion of Section 13 {Infectious Waste} regulations and Replacement with new Section 13 {Medical Waste} regulations; Associated Additions and Revisions to Section 1.2, Definitions; and Modification of Section 7.1(D), Transfer Stations |
| 8/16/2011 | Amendment of Section 1.7.4(C) {Solid Waste User Fee – Allowable expenditures and reporting} |
| 5/17/2011 | Amendment of Section 1.7.2 {Document Review and Activity Fees}; and Amendment of Section 10 Regulations {Waste Tire Facilities and Waste Tire Haulers} |
| 2/15/2011 | Deletion of Section 10 (Scrap Tire Facilities) and Replacement with new Section 10 (Waste Tire Facilities and Waste Tire Haulers); Deletion of Section 15 (Waste Motor Vehicle Tire Haulers) and Reservation of Section 15; and Associated Additions, Revisions and Deletions to Section 1.2, Definitions |
| 11/16/2010 | Revision of Section 1.7.1 and Section 1.7.4: Solid Waste User Fee (SWUF) Amendments |
| 02/16/2010 | Revision of Section 1.2 Definitions to modify "Agricultural wastes" definition and to add a definition of "All-hazards event" |
| 08/18/2009 | Revision of Section 1.5.2 and Revision of Section 1.9.2 |
| 11/18/2008 | New Section 17, Commercial Exploration & Production Waste Impoundments; and associated additions to Section 1.2 Definitions, and revision of Section 9.1 |
| 11/18/2008 | Repeal and Replacement of Section 14 Composting regulations |
| 08/19/2008 | Revision of Section 1.7.3 |
| 02/19/2008 | Revision of Section 1.7 and Section 16.6.5 |
| 05/15/2007 | New Section 16, Disposal of Motorized Equipment Wastes, and associated additions to Section 1.2, Definitions |

**DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT**

**Solid and Hazardous Waste Commission**

**Hazardous Materials and Waste Management Division**

**6 CCR 1007-2, Part 1**

**STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR**

**Revisions to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Amendment of Section 1.8 (Producer Responsibility Authorization and Dollar Limit Exemption)**

**(Adopted by the Solid and Hazardous Waste Commission on May 19, 2026)**

**Basis and Purpose**

I. Statutory Authority

These regulations are promulgated pursuant to the authority granted to the Solid and Hazardous Waste Commission ("Commission") in Sections 25-17-713 and 25-17-705, Colorado Revised Statutes (C.R.S.). These regulations implement House Bill 22-1355 passed by the Legislature in 2022 and codified at 25-17-701 to 716, C.R.S.

Part 7 article 17 of title 25 C.R.S. includes the following authorizations:

> § 25-17-713(2), C.R.S. The Commission is authorized per Section 25-17-713(2) to "adjust by rule the dollar limitation set forth in subsection (1)(a) of this section on July 1, 2023, and on July 1 of each year thereafter, based on the percentage change in the United States Department of Labor's Bureau of Labor Statistics Consumer Price Index for Denver-Aurora-Lakewood for all items and all urban consumers, or its successor index."

II. The Producer Responsibility Program for Statewide Recycling

The Producer Responsibility Program for Statewide Recycling Act (the "Act"), § 25-17-701, *et seq.*, C.R.S., requires the Department of Public Health and Environment (the "department") to oversee the implementation and operations of a producer responsibility

program that requires producers to finance and provide statewide recycling services to covered entities for covered materials.

The Act requires the department to designate a producer responsibility organization (PRO) to lead the program while the department oversees the PRO's needs assessment, program plan and results as reported in an annual report on the program.

III. Purpose of Amendments to Section 1.8

The purpose of the amendments to Section 1.8 is to implement the statutory requirement directing the Commission to establish by rule the annual adjustment of the dollar limitation rule for producers exempt from the Producer Responsibility Program for statewide recycling. Specifically, Section 25-17-713(1)(a) establishes that a producer is exempt from the requirements of the Act if the producer is a person with less than five million dollars in realized gross total revenue, not including on-premises alcohol sales, during the prior calendar year. The producer exemption for dollar limitation is adopted in Section 1.8, *Producer Authorization and Dollar Limit Exemption*, specifically as Section 1.8.2, *Producer Exemption Dollar Limit*.

**Discussion of Regulatory Proposal**

I. Authorization

Section 25-17-713(2), C.R.S. directs the Commission to adjust by rule the dollar limitation set forth in Section 25-17-713(1)(a) C.R.S. on July 1, 2023, and on July 1 of each year thereafter, based on the percentage change in the United States Department of Labor's Bureau of Labor Statistics Consumer Price Index for Denver-Aurora-Lakewood for all items and all urban consumers, or its successor index.

II. General Provisions and Dollar Limit Exemption (Section 1.8.2)

The intent of Section 1.8.2 establishes that an exempted producer is a person with less than five million seven hundred seventy nine thousand, two hundred ninety-seven dollars ($5,779,297) in realized gross total global revenue, not including on-premises alcohol sales, during the prior calendar year. The 2026 producer dollar exemption rate was adjusted by the consumer price index rate of 2.6% from January 2025 to January 2026.

During the Commission's November 2025 rulemaking hearing, the definition of "Small Business" in Section 18.1.6 was amended to clarify that the small business exemption

applies to businesses with total annual gross "global" sales below the threshold, as adjusted by the Consumer Price Index. This amendment was implemented in response to numerous inquiries received by the department from producers regarding this specific exemption. To ensure alignment between the Producer Exemption Dollar Limit detailed in Section 1.8.2 and the definition provided in Section 18.1.6, the term "global" was incorporated into the regulatory language of Section 1.8.2.

**Stakeholder Involvement in the Process**

The department notified over 800 stakeholders by e-mail of the proposed revisions of these regulations. Stakeholders were given an opportunity to provide any comments during the April 6, 2026 stakeholder meeting, as well as in writing after the meeting.

The department utilized various methods to inform industry representatives, trade associations, local government agencies, local government agency associations, and other interested parties of the proposed regulatory revisions. These methods included:

1. Posting a Stakeholder Process Notification on the department's producer responsibility website to notify stakeholders of upcoming stakeholder meetings and related draft documents.

2. Establishing an email notification list which included all interested stakeholders including: local governments; registered recycling facilities; manufacturers; landfills and transfer stations; household hazardous waste ("HHW") collection centers; trade associations; business advocacy organizations; chambers of commerce; environmental and community nonprofits; compost operators; haulers of recyclable materials; producers; and other private operators and industry associations including the Recycle Colorado ("RC"), National Waste & Recycling Association ("NWRA"), Solid Waste Association of North America ("SWANA"), Colorado Municipal League ("CML"), Colorado Communities for Climate Action ("CC4CA"), and Colorado Counties, Inc. ("CCI").

3. Sending out stakeholder meeting email notices.

4. Holding one stakeholder meeting on April 6th to receive comments from stakeholders regarding the proposed revisions to the regulations. While a public comment and question period was held, no stakeholders provided comment. The department used teleconferencing so geographically diverse stakeholders could participate. Additionally, the department's website was utilized to post

notice of the stakeholder meeting and audio recordings of general stakeholder meetings. Eight stakeholders attended the stakeholder meeting.

During the stakeholder process, the department followed the procedures required by Executive Order Nos. 2 and 5 to notify local governments regarding the upcoming revisions to the solid waste regulations. As of the date of publishing this notice, no entities have responded to Executive Order No. 5.

**Issues Encountered During Stakeholder Process**

The department has not received comments on the proposed regulations to date. However, the department did receive one question via email from a stakeholder asking if the rulemaking would remain limited to CPI adjustment, or if it would expand to other rulemaking topics such as eco-modulation.

**Alternatives Considered and Why Rejected**

No regulatory alternatives were evaluated because the statute is prescriptive on what the regulations should contain.

**Cost Benefit Analysis**

A cost benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

### 6 CCR 1007-2 Part 1

### STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Addition of Section 18.9 (Producer Eco-modulation) and Amendment of Section 18 (Producer Responsibility Regulations)

**(Adopted by the Solid and Hazardous Waste Commission on November 18, 2025)**

**Basis and Purpose**

I. Statutory Authority

These regulations are promulgated pursuant to the authority granted to the Solid and Hazardous Waste Commission ("Commission") in the Producer Responsibility Program for Statewide Recycling Act (the "Act"), Sections 25-17-705(7) and 25-17-709(1)(d), Colorado Revised Statutes (C.R.S.). These regulations implement House Bill 22-1355 passed by the Legislature in 2022 and codified at Sections 25-17-701 to 716, C.R.S.

Section 709(1)(d) of the Act includes the following authorizations related to the proposed eco-modulation bonus schedule requirements within Section 18.9:

> By January 1, 2026, and each year thereafter, the executive director shall develop an eco-modulation bonus schedule that is designed to reduce the producer responsibility dues of producers that meet certain benchmarks established by the executive director by rule. The executive director shall consult with the organization and the advisory board in developing the eco-modulation bonus schedule. The organization shall reduce the producer responsibility dues of producers in accordance with the eco-modulation bonus schedule developed by the executive director.

Section 705(7) of the Act includes the following authorizations related to the proposed administrative changes within Section 18:

> The executive director shall enforce this part 7 in accordance with Section 25-17-710 and the commission shall promulgate rules in accordance with article 4 of title 24 as may be necessary for the administration of this part 7 and the enforcement of this part 7 pursuant to Section 25-17-710.

II. Purpose of Amendments to Section 18 Regulations

The purpose of revising Section 18 is to:

1. Remove the administrative burden for the department, producer responsibility organization ("PRO") and producers from submitting documents and records if they believe they are exempt for covered material;
2. Provide a pathway for a producer to dispute and resolve the final application of eco-modulation factors to the dues owed to the PRO and/or an individual producer of any alternative collection program;
3. Fix typos and small errors;
4. Clean up and add definitions to clarify the order of obligation for producers in Section 18.2; and
5. Add definitions to clarify the requirements in section 18.9.

The purpose of developing Section 18.9 is to:

1. Create criteria that a producer and a covered material must meet prior to receiving department incentives;
2. Outline the eco-modulation bonus schedule that is designed to reduce producer responsibility dues of producers that meet certain benchmarks that enhance system or environmental outcomes; and
3. Specify the requirements of the PRO and individual producers of an alternative collection program that will be implementing the department's eco-modulation bonus schedule.

**Discussion of Regulatory Proposal**

I. Authorization

Sections 25-17-703, 705, 710, and 713, C.R.S. direct the Commission to promulgate regulations towards implementing the program.

Section 25-17-709(1)(d), C.R.S. directs the department to develop an eco-modulation

bonus schedule that is designed to reduce the producer responsibility dues of producers that meet certain benchmarks established by the executive director by rule.

Section 25-17-705(7), C.R.S. also provides that "the commission shall promulgate rules in accordance with article 4 of title 24 as may be necessary for the administration of this part 7 and the enforcement of this part 7 pursuant to Section 25-17-710."

II. Definitions of Terms Used in this Section (Section 18.1.6)

The additions and changes proposed in Section 18.1.6 regarding definitions were added to:

1. Help clarify the eco-modulation benchmarks in Section 18.9; and
2. Help clarify the order of obligation for producers in Section 18.2.

**New definitions added include:**

"Benchmark": The standard a covered material or producer must meet to receive an eco-modulation incentive.

"Brand owner": The definition was added to better clarify which producer is obligated when the brand owner and manufacturer are separate entities, and clarify similar existing regulatory language in the producer order of obligation section.

"Certified compostable": The definition was added from SB23-253, as codified at Sections 25-17-801 *et seq.* C.R.S., to be more easily referenced in Section 18.9.

"Data year" means the calendar year or period for which a producer's supply data should be representative.

"Eco-modulation" and "eco-modulation bonus schedule": The definitions were added to better clarify the purpose of the eco-modulation bonus schedule in Section 18.9.

"Malus": The definition was added to clarify the difference between maluses and incentives developed by the PRO or an individual producer of an alternative collection program from incentives developed by the department.

"Postconsumer-recycled-content rate": This definition was left out of the 2024 rulemaking in error. This is defined in Section 25-17-703(28), C.R.S. and therefore, should be added to 18.1.6 definitions.

"Qualifying Material": This was defined to clarify the covered material that meets the benchmarks established in Section 18.9.2.

**Revised definitions include:**

"Compostable": A typo was fixed on one of the listed ASTM standards.

"Contamination": The definition of contamination was clarified to only include covered materials that are not certified compostable to ensure that the PRO would not be responsible for other types of contamination that occurs at compost sites, such as rocks, dirt and garden hoses. This helps clarify "inbound contamination rate."

"Inbound contamination rate": "Covered material" was changed to "contamination" to ensure that all contamination at material recovery facilities ("MRFs") are the responsibility of the PRO or individual producer of an alternative collection program.

"Reuse" or "Refill": "Five" was struck in the "reuse" or "refill" definition, since it was a typo and contrary to the term "multiple."

"Small business": "Global" was added to clarify that the small business exemption is for businesses that make less than the total annual gross "global" sales as adjusted by the Consumer Price Index. This was a result from the department receiving many producer questions on this particular exemption. This is consistent with existing department guidance.

III. Producers (Section 18.2)

The intent of the changes made in 18.2.2 was to clarify who the obligated producers are in internet transactions. The legislative intent was for there to be two different, but equally, obligated producers for internet transactions: (1) the producer of the primary packaging material which is used to directly protect and contain the product, and (2) the person that also packages the product for shipping (secondary packaging) to the consumer for an internet transaction.

The intent of the change made in Section 18.2.3 was to fix a grammatical error.

The intent of the removal in Section 18.2.5 was to remove the requirement for producers to submit records to the PRO when they are exempt and to remove the large administrative burden of reporting or managing records from exempt producers from the PRO.

## IV. Producer dues hearing (Section 18.2.7)

The intent of the addition of Section 18.2.7 "Producer dues hearing" was to provide producers with a public, transparent process to resolve alleged errors in their producer dues, specifically with regards to eco-modulation factors.

Section 18.2.7(A) sets out a timeline for a request for hearing and clarifies that a hearing follows the internal processes (informal dispute resolution) set out by the PRO.

Section 18.2.7(B) sets out the requirements for a hearing request (including proof of payment of dues) and specifies that the board administrator may dismiss a request which does not comply with these requirements. This section also provides a producer with the ability to request the hearing request information be kept as confidential business information according to the process already set out in Section 18.1.4.

Section 18.2.7(C) describes the hearing process and gives the Advisory Board the authority to review and make recommendations on the producer's hearing request based on the evidence submitted. The board administrator must work with the Board to set a hearing date and post notice of that hearing date. This section also allows the PRO or an individual producer of an alternative collection program to request party status at the hearing. The producer bears the burden of proof at the hearing and must demonstrate how the alleged error is contrary to statute, the regulations, or the applicable program plan. This section also allows the Board to make a recommendation on a hearing request even if the producer fails to attend the hearing.

Section 18.2.7(D) provides that the Director of the Hazardous Materials and Waste Management Division has the final decision-making authority and must make their decision after reviewing the Advisory Board's recommendation and within 45 days of receipt of this recommendation.

Section 18.2.7(E) explains that a producer's obligation to pay the dues assessed is not stayed by a hearing request and that should an error be found, a refund will be issued.

Section 18.2.7(F) permits judicial review of the decision of the Division Director under the requirements of the Administrative Procedure Act.

## V. Covered Materials - Minimum Recyclable List (MRL) (Section 18.3)

The intent of the changes in Section 18.3 was to remove the requirement of producers submitting records to the PRO when they are exempt to remove the large administrative

burden of reporting or managing records from exempt producers from the PRO. Under the previous regulations established in 2024, any entity looking to qualify for an exemption would need to submit documentation and receive approval prior to being exempt.

VI. PRO Funding Mechanism (Section 18.5.4)

The intent of the changes in 18.5.4 is to clarify the scope of the eco-modulation benchmarks in Section 18.9. This revision is necessary because the department only has the authority to develop an eco-modulation bonus schedule that reduces producer responsibility dues. The department does not have the authority to increase producer dues based on the bonus schedule.

VII. Eco-modulation Bonus Schedule Eligibility Criteria (Section 18.9.1)

The intent of Section 18.9.1 is to create baseline eligibility requirements for producers and their covered materials to be able to qualify for bonuses set forth in Section 18.9.2. This section also specifies that these requirements will be assessed by the PRO or individual producer of an alternative collection program in coordination with the department. In (A)(1) the qualifying material needs to be sold or distributed in Colorado of the applicable data year and may qualify for each year it meets the corresponding benchmark.

Additionally, as required by Section 18.9.1(A)(2), the producer must be compliant with the Act as determined by a producer's compliance status based on an active administrative order or civil action for injunctive relief. The intent is to only reward producers that are acting in good faith and are participating fully and responsibly in the program.

"(B)" of the eligibility criteria ensures that producers are only eligible for 18.9.2 bonuses equal to a reduction in base dues of 10% for each qualifying material. These do not include incentives or maluses that are applied by the PRO or individual producer of an alternative collection program. While this may not impact the bonus schedule now, since the bonuses could only add up to a 4% total, the department expects to recommend the Commission raise the percentages for each benchmark in future years as more data comes available. The 10% cap assures the PRO and individual producer of an alternative collection program that bonuses will not rise too drastically.

"(C)" indicates that benchmarks are not mandatory requirements for producers, rather optional incentives.

VIII. Benchmarks (Section 18.9.2)

The intent of the first paragraph of 18.9.2 is to ensure that the PRO or individual producer of an alternative collection program, provides producers a way to estimate their dues in advance of receiving their invoice.

The intent of the second paragraph is to ensure achieved bonus schedule incentives are applied to the 2028 invoices and all invoices thereafter.

(A) On-Package Sorting Instructions: The intent of this benchmark is to incentivize producers that follow the guidance of the PRO and/or the individual producer of an alternative collection program to provide clear, concise, and standardized information to the consumer on how to properly sort their covered material. On-package sorting instructions have been incentivized in Quebec's and France's producer responsibility programs. France now requires on-package sorting instructions utilizing their standardized Triman logo due to a 2022 law[1]. Under the department's benchmark, producers will not be eligible for this benchmark until their 2029 invoice, this allows the PRO and/or individual producer of any alternative collection program to develop criteria.

(B) Local End Use Benchmark: The intent of this benchmark is to incentivize producers that manufacture new covered materials on the MRL to be made of at least 20% postconsumer-recycled (PCR) content generated in the United States, and utilized by an end market business in Colorado. The 20% target aligns with CAA's proposed 2030 postconsumer-recycled content target for rigid plastic packaging[2]. This is the lowest percentage target out of any material on the MRL and allows the department to set one goal across material types versus different targets based on various materials. "End Market Business" is defined under the "Materials recovery facility" definition in section 18.1.6. The department had considered utilizing 20% PCR content generated in Colorado only, but recognized that this may be difficult for some producers to track and hence, expanded to United States content. The original intent was modelled off of Éco Enterprises Québec's (EEQ)[3] incentive to source local content, however, theirs was also in reference to virgin material. The department believes it important to incentivize end markets in Colorado.

---

[1] Decree No.2022-748 of April 29, 2022

[2] CAA's Draft Amended Program Plan - June 2025 (P25)

[3] EEQ is Quebec's PRO for paper and packaging EPR program

(C) Compostability Benchmark: Compostable packaging is penalized under the current recyclability criteria and therefore, will receive maluses associated with products that are not on either the MRL or Additional Materials List ("AML"). Compostable packaging is a contaminant for MRFs and can pose challenges for compost facilities. However, the statute explicitly contemplates compostable packaging as a legitimate recovery pathway if compost facilities can process it and can help bring in food scraps to those facilities. While the department does not intend to negate the maluses associated with compostable packaging, covered materials, that are certified compostable in accordance with ASTM (D6400, D6868, D8410 or any successor standards) and the labeling requirements set forth in SB23-253, will be eligible to receive a small eco-modulation incentive. Colorado will be leading the way with compostability benchmarks, but will serve to harmonize efforts with other producer responsibility states such as Minnesota[4] and California[5] both of which require all packaging to be recyclable or compostable by 2032.

(D) Case Study Benchmark: The intent of this benchmark is to provide pathways for producers to innovate packaging to perform better in recycling and composting systems, and/or to reduce or eliminate waste or toxicity. This benchmark avoids being overly prescriptive. This allows for producers to experiment with new and more efficient ways of managing the end of life of their packaging. A producer would need to initially submit a proposal, receive a recommendation and approval from the PRO and the department before beginning a case study. They would then need to complete the case study and report out to receive the incentive. In order to specifically support Colorado's recycling operations, this case study would need to take place in Colorado or take place in the United States, but be paired with investment(s) in Colorado. Lastly, the incentive shall not exceed the individual producer's contributions to carry out the study. The incentive would be granted for the data year it was published and approved by the PRO/or alternative collection program. This benchmark was based on EEQ's case study bonus.

## IX. PRO and Alternative Collection Program Requirements (Section 18.9.3)

The intent of this section is for the PRO or individual producer of an alternative collection program to:

(A) Assess producer participation, effectiveness and practicality of the benchmarks

4 Minn. Stat. § 115A.144-115A.1463

5 Cal. Pub. Res. Code. § 41821.5

developed in Section 18.9.2 and after baselines have been established and report on their findings in their annual report;

(B) Develop on-package sorting instructions criteria by October 1, 2027. The two-year delay on on-package sorting instructions is intended to provide the PRO and individual producer of an alternative collection program time to develop guidance and criteria for this benchmark;

(C) Develop and publish guidance for the case study benchmark by October 1, 2026; and

(D) Develop guidance and determine the verification processes for the benchmarks in 18.9.2, and receive approval from the department prior to October 1, 2026.

**Stakeholder Involvement in the Process**

The department notified over 700 stakeholders by e-mail of the proposed revisions of these regulations. Stakeholders were given an opportunity to provide any comments during the three stakeholder meetings, one advisory board meeting as well as in writing after each stakeholder meeting.

Over the course of the three stakeholder meetings, the department had 200 total participants attend virtually, including producers, industry associations, local government, service providers, consultants, non-governmental organizations (NGOs), and other solid waste industry representatives.

The department utilized various methods to inform industry representatives, trade associations, local government agencies, local government agency associations, and other interested parties of the proposed regulatory revisions. These methods included:

1. Posting a Stakeholder Process Notification on the department's producer responsibility and rulemaking pages to notify stakeholders of upcoming stakeholder meetings and related draft documents.

2. Providing stakeholders information regarding stakeholder meetings and providing all instructions to access the draft regulations by e-mail. Stakeholders were notified via Constant Contact as early as June 25th to register for the meetings. This stakeholder contact list consisted of over 700 recipients, including: local governments; registered recycling facilities; manufacturers; landfills and transfer stations; household hazardous waste ("HHW") facilities; trade associations; business advocacy organizations; environmental and

community nonprofits; compost operators; haulers of recyclable materials; producers; and other private operators and industry associations including the Recycle Colorado ("RC"), National Waste & Recycling Association ("NWRA"), Solid Waste Association of North America ("SWANA"), Colorado Municipal League ("CML"), Colorado Communities for Climate Action ("CC4CA"), and Colorado Counties, Inc. ("CCI").

3. Notifying all known interested parties by email prior to the release of the first draft of the revisions to the regulations.

4. Sending out stakeholder meeting email notices that included the latest draft revisions to the regulations.

5. Holding three stakeholder meetings on: August 20, 2025; September 3, 2025; and September 24, 2025 to receive comments from stakeholders regarding the department's proposed regulations for Section 18.9. Key stakeholder questions and/or issues are compiled and discussed in the Key Issues Encountered During Stakeholder Process section of this document. The department used an online webinar platform with language interpretation and teleconferencing so geographically diverse stakeholders could participate. Additionally, the department's website was utilized to post updates to the regulation revision process, iterative versions of support and working documents, and audio recordings of the stakeholder meetings.

6. Notifying the advisory board and members of the public during the Producer Responsibility Advisory Board meetings.

7. Presenting at the September 10 #55 advisory board meeting on the proposed rules. There were 83 members of the public in attendance in addition to the advisory board. During the meeting there were also opportunities for public comment, where 3 members of the public spoke on eco-modulation.

During the stakeholder process, the department followed the applicable process and procedures required by Executive Order No. 5 to notify local governments regarding the upcoming revisions to the Solid Waste Regulations. As of the date of publishing this notice, no entities have responded to Executive Order No. 5.

**Issues Encountered During Stakeholder Process**

As Colorado is the only state in the nation to promulgate regulations for implementing eco-modulation bonuses, the department received numerous comments on the

proposed rules under Section 18 during the stakeholder process. A summary of the notable stakeholder comments submitted to the department are summarized below.

The department received several clarifying questions during the stakeholder meetings specific to the timeline of public comment/filing/promulgating as well as the justification for low bonus percentages. The department extended the public comment period beyond the original thirty day public comment period to ensure stakeholders had sufficient time to submit feedback. With the final producer dues still under development for the first year of the program, the department felt it was necessary to start with a cautious approach for establishing the maximum bonus rate schedule not to exceed 4% of base dues, along with the PRO's eco-modulation malus and incentive rate factors.

The department also received fifty-seven emailed comments from organizations, and another 189 from individual members of the public. Most of the email comments covered multiple topics, or sections. Comments were received from organizations such as: A1 Organics, Alliance for Automotive Innovation, American Chemistry Council (ACC), American Distilled Spirits Alliance (ADSA), American Forest & Paper Association (AF&PA), AMERIPEN, Association of Plastic Recyclers (APR), Biodegradable Products Institute (BPI), Boulder County, Braskem, BSH Home Appliance Corporation (BSH), CAA, Can Manufacturing Institute (CMI), Carton Council, City of Northglenn, Consumer Brand Association (CBA), Flexible Packaging Institute (FPA), Food Packaging Institute (FPI), EcoCycle, Glass Packaging Institute (GPI), GreenLatinos, Household & Commercial Products Association (HCPA), Imperial Dade, North Pacific Paper Company (NORPAC), PakTech, Perkins Coie, Pressurized Cylinder Industry Association (PCIA), RR Donnelley, Schinner, Swire Coca-Cola, United States Bakery (USB), UPSTREAM, Window & Door Manufacturers Association (WDMA), Wine Institute and others.

The majority of the 189 comments received from members of the public touched on the same one to three topics and were close to identical emails. Many of the public comments submitted asked the department to set new requirements on toxic constituents in packaging when promulgating requirements on the eco-modulation bonus criteria. The department needs to further research this complex subject and consult with experts on toxicology and packaging materials before a regulatory requirement can be proposed. Due to the limited timeframe with the January 1, 2026 eco-modulation deadline established in the Act, and the complexity of this issue, the department was not able to address this topic during the current rulemaking.

The department followed up with some stakeholders via email on their recommended language and also set up several meetings with some stakeholders who provided

feedback to better understand and talk through suggested edits.

Based on the feedback provided, five definitions were further modified to provide clarity and nine definitions were added.

The comments primarily pertained to eco-modulation benchmarks developed in Section 18.9.2 and the corresponding criteria for producers and covered materials in 18.9.1 and the requirements for the PRO and individual producers of alternative collection programs in 18.9.3. There were also a number of comments that pertained to the 18.2.7 producer dues section, the definitions sections or were generally related to Section 18 as a whole.

Notable additions or removals based on stakeholder feedback include:

- Extended the original public comment period from 30 to 45 days. Supported by AMERIPEN.

18.1.6 Definitions:

- Added "certified compostable" definition from SB23-253. Supported by AF&PA.
- Defined and clarified "brand owner" with support from AMERIPEN and CAA.
- Updated the definition of "eco-modulation" and "eco-modulation bonus schedule" to include the purpose of preventing, minimizing or reducing negative environmental, social, economic and health impacts of covered materials. This was supported by 26 NGOs and Colorado businesses. AF&PA questioned this decision, stating that it is difficult to quantify and that they are not addressed in the eco-modulation factors. AMERIPEN opposed it.
- Clarified in the definition of "eco-modulation bonus schedule" that incentives are optional due to feedback from PakTech.
- Defined "qualifying material" to further clarify the covered materials that are eligible for benchmarks in Section 18.9.2 and replaced original language within section 18.9. Suggested by CAA. Similar concerns were also expressed on "stock keep unit/covered material component" language from AF&PA, AMERIPEN and FPI.

18.2.5 and 18.3

- The PRO requested the striking of the language that producers must submit documents and records to the PRO if they believe they are exempt. The department agreed that was an unnecessary administrative burden to the PRO. HCPA supported. UPSTREAM disputed this decision.

18.2.7 Producer Dues Hearing

- The department added an administrative hearings process for resolving disputes regarding producer dues set by the PRO or an individual producer of an alternative

collection program to address due process concerns. Some stakeholders supported the addition of this process and some stakeholders raised concerns.

- AF&PA, GreenLatinos and Imperial Dade supported the changes, stating it would add transparency to a largely internal process. Some of these stakeholders requested the department remove the requirement for producers to participate in the dispute resolution process in contract before submitting a request for hearing.
- CAA opposed the changes, stating the changes would increase their budget, create uncertainty, and was outside the scope of the rulemaking. CAA requested the department remove this section entirely.
- Other stakeholders asked clarifying questions about the section or made suggestions to change the section, but did not express support or concerns.
- In response, the department clarified that the producer dues hearings process only applied to eco-modulation and added a requirement that the producer submit proof of payment of dues to address CAA's concerns regarding financial uncertainty. The department also clarified that the hearings process applied to LPMA.

18.5.4 PRO Funding Mechanism

- Removed "or increased." to better align with statute intent on the eco-modulation bonus schedule. Supported by AF&PA.

18.9.1 Eligibility Criteria:

- Added "each" to (A) to specify that bonuses apply to each applicable data year and are ongoing incentives versus one-time/intended for new or optimized products only. Clarified based on comments from ACC, AMERIPEN, Boulder County and Perkins Coie. Changed "program year" to "data year". Based on feedback from NORPAC, Schinner and USB. Clarified that PRO/alternative collection program will be assessing criteria of the benchmarks in coordination with the department, based on feedback from AMERIPEN.
- (A) Expanded the eligibility criteria to include both covered materials on the AML and covered materials that are not on either the MRL or the AML for specific benchmarks The intent of opening up the criteria on these benchmarks is to ensure that: 1. sorting instructions can benefit consumers and prevent contamination, regardless of whether or not it is on the MRL and, 2. innovation can occur through case studies, and that there are pathways for covered materials to make their way to the MRL or AML. This was supported by ADSA, AMERIPEN, APR, Boulder County, CAA, FPI, PCIA and a number of advisory board members participating in the stakeholder process in their personal capacities. There was no opposition to this decision.
- Specified that a producer is not in compliance with the Act if the producer is subject to a final administrative order, based on feedback from AMERIPEN.
- Adjusted phrasing to read "bonuses equal to a reduction in base dues…" in section 18.9 to better clarify how incentives are being applied to producer dues, due to feedback from CAA.
- Clarified that all bonus benchmarks are not mandatory, due to feedback from PakTech.

18.9.2 Benchmarks

- Changed the date to read "no later than January 31, 2028" to specify when the PRO and individual producer of an alternative collection program should apply bonuses to producer dues. This was based on feedback from CAA.
- Multiple stakeholder comments urged Colorado to harmonize with other state level requirements for implementing eco-modulation criteria, including AF&PA, Alliance for Automotive Innovation and PCIA. The department removed and simplified a number of their initial concepts i.e., compostable field testing, product concentration; and extended the timeline on the on-package sorting instruction benchmark in order to make time and space for future harmonization with other jurisdictions.
- Reduced the number of benchmarks and instead plans to scale benchmarks over time. Supported by APR, PCIA and Swire Coca-Cola.
- On Package Sorting Instructions:
    - Delayed on-package sorting instructions benchmark bonuses to be applied to invoices in January 2029. Supported by CAA and Imperial Dade. Opposed by AMERIPEN.
- Local End Use Benchmark:
    - Provided clarity to the Local End Use Benchmark, by clarifying the postconsumer-recycled must be utilized by an end user in Colorado, removing requirement that the PCR must be generated in Colorado for ease of tracking. Based on feedback from AMERIPEN, APR, CAA, GPI, HCPA, Imperial Dade, Perkins Coie and others.
    - Lowered the local end user benchmark from 30% to 20% based on APR feedback and others.
- Removed concentration benchmark, supported by AMERIPEN and CAA.
- Case Study Benchmark:
    - Clarified that a producer or group of producers may submit case study proposals, based on feedback from AMERIPEN, Carton Council, CBA and FPA.
    - Clarified parameters and created a system to verify case study projects prior to being implemented based on feedback from APR and Carton Council.
    - Limited case studies that take place in Colorado or are specifically paired with investments within Colorado. This was based on feedback from ADSA, AF&PA, CAA, GPI, NORPAC, Schinner and USB.
    - Added clarification that the incentive be awarded the year the final report is published, based on feedback from AF&PA and FPA.
    - Added additional language that a producer may not receive a reduction if they have already received funding from the PRO/alternative collection program for the same applicable activity. This was based on feedback from AF&PA, AMERIPEN and Carton Council.
    - Include PRO/alternative collection program review and department approval on case studies. Supported by Carton Council.
    - Removed examples of case study projects, based on comments from CAA and FPA.

18.9.3

- Added that the PRO/alternative collection program evaluates the practicality of the bonus schedule, based on feedback from ACC.
- Simplified the language around on-package sorting instructions to be less ambiguous and prescriptive, supported by AMERIPEN, CBA, and FPA.
- Developed a requirement for the PRO and individual producer of an alternative collection program to develop guidance criteria for the case study benchmark, based on feedback from AMERIPEN and FPA.
- Added language that requires the PRO and individual producer of an alternative collection program to develop guidance on determining verification processes for benchmarks in 18.9.2 and to receive approval from the department, based on feedback from AF&PA and Imperial Dade. Supported by AMERIPEN.
- Removed the requirement that internal guidance must be conducted through a technical committee, based on feedback from CAA.

## Alternatives Considered and Why Rejected

The department received a number of suggested alternatives and additions to the eco-modulation benchmarks. A comment we received from many stakeholders was that the PRO and individual program already had many eco-modulation factors to implement in their first year and allowing them to focus on implementation was of utmost importance, prior to providing more complexity with CDPHE eco-modulation bonuses. The notable requests and considerations are as follows:

1. Timing of eco-modulation rules:

   CAA recommended establishing future eco-modulation rules before July 1. In future years, the department plans to open up rulemaking to coincide with the annual adjusted producer exemption dollar limitation which must occur before July 1 each year.

   Timing of implementation of the rules:

   ADSA requests the department to provide at least a twelve month notice before any methodological changes take effect in order to give producers predictability to plan and comply effectively, while also expressing that bonuses should not be delayed until 2027. Based on feedback from stakeholders and the reality of a tight timeline, the department has the eco-modulation bonuses beginning guidance in the end of 2026 and invoices in 2028 to allow the PRO and alternative collection program time to develop and publish guidance and criteria on verification processes. This also allows a fair playing field for all producers to prepare for the upcoming incentives.

2. Certified compostable definition:

   The department received feedback from CAA, that the "Certified Compostable" definition creates confusion given how "compostable" is defined in the Act. "Certified compostable" is defined in §25-17-803, C.R.S. and helps to provide clarity to the eco-modulation benchmarks. The department does not have rulemaking authority to clarify "certified compostable."

3. Post-consumer recycled content rate definition:

   AF&PA expressed concern over the definition of "postconsumer-recycled-content rate" including "within or into the United States market territory." They stated that it might be restrictive to manufacturers and that mills don't differentiate where recycled content comes from when making new materials. This definition was directly pulled from the Act and the department is not authorized to remove the U.S. territory specification.

   APR recommended defining "postconsumer recycled content" to align with international standards established under ISO 14021:2016[6] and Washington[7]. The definition provided includes materials that are out-of-scope. The definition would need to comply with the intent of the Act and be consumer-facing covered materials.

4. Reuse and refill definitions:

   GreenLatinos expressed desire for the "reuse" or "refill" definition to align with PR3's definition, which states that a container must withstand at least 45 uses. The statute definition in §25-17-703(43)(b), states "Was intended to be used for its original purpose at least five times". This definition cannot be changed through rulemaking.

5. Internet transaction, dual obligation of producers:

   In 18.2.2, Imperial Dade and Perkins Coie expressed concerns that obligating both the producer of the product packaging and the shipping packaging equally may introduce unnecessary complexity, and could discourage implementation of eco-modulation. RR Donnelley also expressed concerns on the internet transaction regarding use of branded packaging for shipping. This requirement is set in statute and cannot be changed. The department also believes that obligation to both the producer of the product packaging and shipping packaging is necessary, since in many scenarios, the producer of the product packaging does not have control over the shipping packaging and vice versa. These are often separate producers with separate dues.

---

6 International Organization for Standardization 14021:2016
7 RCW 70A.245.010

6. Reporting on exempt reusable and refillables:

   UPSTREAM requested that producers of reusable and refillable packaging must submit documents and records if they believe they are exempt in Sections 18.2.5 and 18.3. This was suggested when the department struck the identical language that producers must submit documents and records to the PRO if they believe they are exempt. Reusables and refillable packaging are not covered materials because they are not packaging material under statute. Therefore, the department does not have the authority to make this change.

7. Delayed timeline of producer dues and reporting:

   The department received a request to delay the requirement for producers to register with the PRO until July 31, 2026. However, the Act states that producers are required to participate in the program by July 1, 2025 and subsequently pay producer responsibility dues to the PRO by January 1, 2026. In addition, by January 1, 2026, and each year thereafter, the executive director shall develop an eco-modulation bonus schedule. Thus, the department does not have the discretion to change these statutory deadlines.

8. Remove or modify Section 18.2.7, producer dues hearing

   APR, CAA and CBA expressed concerns about the addition of a new section authorizing a producer dues hearings into the third draft of the regulations and the department's presentation on the new language at the third informal stakeholder meeting. These entities also expressed concern of the added burden for the advisory board, CAA staff, producers, and the department with this provision and ultimately included a request to remove the language in Section 18.2.7.

   Other stakeholders including HCPA, NORPAC, RJ Schinner and USB requested the department expand the scope of producers eligible for hearings, including modifying Section 18.2.7 to remove the requirement that a producer must first go through CAA's dispute resolution process which includes internal, informal dispute resolution and then arbitration, prior to appealing dues to the department.

   Imperial Dade expressed appreciation for the producer dues appeal process but noted concerns with the Advisory Board evaluating producer dues appeals as this new role may fall outside the scope of the Board's authority under the Act and noted that producer dues appeals should be evaluated by the department rather than members of the Advisory Board.

   The department has developed a transparent, efficient, and fair administrative hearings process for resolving disputes regarding producer dues set by the PRO or an individual producer of an alternative collection program. This process addresses legal concerns regarding the binding arbitration with no right to judicial review proposed in the PRO's

contracts with producers. The process is available to all producers who receive eco-modulated dues, does not require significant resources to engage in, and is thus equitable to all producers. Additionally, Oregon's regulations also provide for a similar process to resolve disputes between the PRO and recycling depot or drop off centers. *See* OAR 340-090-0640(1)(b)(D).

The administrative hearings process is necessary to provide producers with the opportunity to correct potential miscalculations of the eco-modulation factors in front of two impartial tribunals, the Advisory Board, and the Director of the Hazardous Materials and Waste Management Division. The process permits the Advisory Board to make the initial recommendation, with the Division director making the final decision. This process does not conflict with the Act or the Administrative Procedure Act ("APA"), which permits an agency to preside over a hearing because the Board is an agency under the definition set by the APA and because the Division Director has the final decision making authority.

Further, the regulations set out an aggressive timeline for the administrative hearing, while balancing the required notice timelines in the APA. Overall, the process should take no more than 120 days. The regulations also allows producers to request judicial review, an option which is not allowed through the PRO's process. The judicial review process will be based on administrative record, allowing the case to proceed toward the merits efficiently. How quickly the PRO or individual of an alternative collection program and producer proceed through the dispute resolution process is beyond the department's control.

The regulations include a number of guardrails to ensure that producers do not use hearing requests to delay the program, use the process to increase dues for others, or create significant financial uncertainty beyond the uncertainty already present in the program due to producers who have not registered or may not pay dues regardless of the availability of an administrative hearing. The hearings process is also only applicable to the eco-modulation factors and not the base dues. The hearings process requires producers to first engage in internal dispute resolution with the PRO or an individual producer of an alternative collection program and does not allow a producer withhold disputed dues. Such a step is necessary to allow an opportunity to resolve the dispute and if not, narrow down the dispute. And, producers must provide proof of payment of the disputed dues with their hearings requests.

The process is within the scope of the rulemaking because the department noticed the change during the informal stakeholder process before requesting the Commission submit a formal notice of proposed rulemaking. Further, the draft hearings regulations are solely focused on the application of the eco-modulation factors. Finally, the department posted the proposed hearings regulations on September 19, 2025 or almost two months before the Commission held its rulemaking hearing, leaving ample time for additional stakeholder feedback beyond the time already provided through the informal

stakeholder process.

9. Strike section 18.3's second paragraph:

The paragraph describes that the category lists in Section 18.3.1 are not all-inclusive. PakTech expressed concerns that this leaves the list open to interpretation and that if the department does not intend to create a material list it should be stricken. Otherwise, if it's the PRO's responsibility the section PakTech believes this should be amended to indicate this. The department determined that this paragraph follows intent in statute. The covered material list is subject to change by law because there is a mechanism to request exemptions.

10. Overly Prescriptive:

The Alliance for Automotive Innovation and FPA claimed that the department's draft rules were overly prescriptive compared to those promulgated in other states. The statute requirement for the department to develop an eco-modulation bonus schedule is highly unusual internationally. Typically, the PRO is the only entity establishing eco-modulation schemes. However, per the Act, by January 1, 2026, the executive director shall develop an eco-modulation bonus schedule that is designed to reduce the producer responsibility dues of producers that meet certain benchmarks.

11. Delay eco-modulation:

AF&PA urged the department to delay eco-modulation incentives until the program has more time to mature. While the department will not delay eco-modulation bonuses based on the requirements set forth in the Act, the department has developed minimal percentage bonuses for the four benchmarks to allow the program to mature. The department must fulfill the required date of January 1, 2026 for eco-modulation rules as required by the Act. Additionally, producers will not see these changes to their invoice until at least January 2028.

12. On-package sorting instructions – Avoid additional labeling requirements:

The Toy Association views the state-specific labeling requirements as problematic since producers have no control as to where their products end up through the supply chain. The Toy Association also mentioned that the European Union (EU) filed suit against France's mandate on the grounds that it violates the "free movement of goods" principle within the EU, since this has become quite costly for members. Unlike France's Triman symbol standards, the department's on-package sorting instructions benchmark is not a mandate, rather an incentive. The PRO and alternative collection program will be creating the criteria, and will have two years to do so, which allows them to create criteria that harmonizes national standards and through other states that have producer responsibility programs.

13. Utilization of domestic postconsumer recycled material/concerns around state specific benchmark:

ADSA, AF&PA, APR, Canopy, FPA, FPI, HCPA, Imperial Dade, Swire Coca-Cola, the Toy Association, WDMA and the Wine Institute expressed support for CDPHE to incentivize domestic/regional postconsumer-recycled material/end markets and/or concern that the local end user benchmark is too state-specific. Some also expressed that this may result in adoption of packaging with lower amounts of PCR overall. CAA will address an eco-modulation factor related to high levels of postconsumer recycled material use (§25-17-705(4)(i)(IV)(C)). Therefore, the department determined it duplicative to address this through the department's bonus schedule and does not believe that this will result in an increase in virgin material over PCR as expressed by some stakeholders. The intent of the local end use bonus is to incentivize the use of PCR in-state.

There was also a request from APR that the local end use benchmark be broadened to include remanufacturing out-of-state for Colorado-sourced recycled content. Based on other concerns from AF&PA and CMI, the department recognizes that by expanding the incentive to manufacturing out-of-state may pose challenges for tracking state-specific PCR content for various covered material types, in addition to becoming more duplicative with CAA's PCR factor. The intent of the local end use benchmark was to incentivize local end use of PCR content.

In the same vein, AF&PA prefers an approach on recycling rate to be industry utilization of recycled material rather than at an individual product level and suggested that incentivizing certain products over others in the paper industry could have negative consequences since recovered fiber relies on complex, cross-border, circular supply chains. The department's bonus incentive on local end use content remains small and will likely not impact the paper industry in this first year since there are no known mills currently in Colorado.

ASDA and the Wine Institute requested a graduated PCR content benchmark, citing concerns around wine bottle stability, and worker/consumer safety, especially around carbonated alcoholic beverages. AF&PA, Carton Council and CBA wanted PCR rates to be practically achievable and vary by material type. AMERIPEN and APR requested that the percentage be lowered to 10% and/or scaling the bonuses with the amount of PCR incorporated. The 20% PCR target aligns with CAA's proposed 2030 postconsumer-recycled content target for rigid plastic packaging[8]. This is the lowest percentage target out of any material on the MRL (10% lower than glass) and allows the department to set one goal across material types versus different targets based on various materials. As

---

8 Pg 25 of CAA's Draft Amended Program Plan - June 2025

the data becomes available after the first year of the program, the department may consider adjusting to better serve the realities of producers.

AMERIPEN requested that producers be awarded for all benchmarks retroactively, but specifically the local end use benchmark since California law requires the PRO to grant producers credit for use of PCR between 2013-2022. The department will not be granting incentives retroactively for any benchmarks.

14. Dormant Commerce Clause:

Stakeholders ADSA, AMERIPEN, Carton Council, CBA and the Wine Institute expressed concerns regarding the dormant commerce clause as it pertains to the local end user benchmark. The local content benchmark is not a state tax which burdens interstate commerce. It is solely an optional incentive, and therefore, this is not in violation of the Dormant Commerce Clause.

15. Increased concentration:

This benchmark was originally added by the department prior to public comment. After it received the least amount of support from stakeholders, the advisory board and stakeholder discussion identified that this needed additional development for proper implementation, and the department chose to remove it. AF&PA and the Carton Council also requested that this apply to solids products as well as liquids. Perkins Coie requested that it should be reimplemented after it was removed. The department's decision to remove this benchmark was due to the fact that CAA can address this through their required eco-modulation factor related to source reduction (§25-17-705(4)(i)(IV)(A)) and would like to prevent duplicity. Therefore, the department can work with CAA to address this in future years or can introduce this benchmark at a later date which will allow the department to meet other public comment requests which were to limit the number of initial benchmarks.

16. Compost certification standards:

A1 Organics expressed that current ASTM D6400/D6868 are dated and lack strong safeguards for PFAS, additives and real-world disintegration and suggested the department use more protective and performance-based standards such as the ones established by the EU and Compost Manufacturing Alliance (CMA) approved.

BSH also encouraged the department to align compostability standards with internationally recognized compostability standards such as ISO, EU and Bureau de Normalisation du Quebec (BNQ).

The department cannot endorse one third party certification over another and is limited to the statutory definitions in HB22-1355 and SB23-253. That said, the department will

continue to seek ways to increase stringency in compostable packaging standards as the program progresses.

17. Compostability Benchmark

Field Testing:

The department explored including field testing as a requirement for an incentive for compostable packaging. From doing more research, the new ASTM testing methods D8618 and D8619 are strictly procedural requirements for field testing and reporting, they do not set any standards for compostability. While a facility in Colorado could test to determine if a product was accepted at their site, the department does not view that as a reliable measure of compostability for all sites in Colorado. The department wants to research this concept further before implementing it into rule and work to ensure that eco-modulation can raise the bar on accepted compostable packaging. The department received feedback on the compostability field testing concept from A1 Organics, BPI, BSH and the City of Northglenn. AF&PA and AMERIPEN supported the removal of the field testing.

Compostable products as a contaminate:

Some stakeholders such as APR, Carton Council, FPI, and the Toy Association wrote in to oppose the compostability benchmark in its entirety. One expressed concerns that this benchmark is not equitable to all materials. Others expressed that compostable products are ineffective, and contaminate the recycling stream, and are not desired by compost facilities. Due to this, compostables will be malused heavily based on the fact that they are not on the MRL or AML. They also expressed that this will be incentivizing something that is already mandated in law, that the benchmark is an administrative burden and an additional cost to the extended producer responsibility system. AF&PA cautioned that the state statute labeling requirements do not harmonize with other extended producer responsibility (EPR) states which adds additional complexity for products. However, statute explicitly contemplates compostable packaging as a recovery pathway if compost facilities can process it. Therefore, the department did not choose to remove this benchmark. The department has intentionally kept this incentive low at 1% to ensure compostable packaging is not unfairly incentivized at the start of the program. Producers are not required to participate in the eco-modulation bonuses.

Too State-Specific:

The Toy Association expressed that state-specific packaging requirements are difficult and costly to implement and on small toy packages there is little printable space that is used for safety warnings for young children. The compostable labeling requirement is a state mandate outside of the eco-modulation incentives.

Providing documentation for certified compostable products and packaging:

A1 Organics requested that the department require verified/certified third-party documentation of compostability. The requirements in 18.9.3(D) will require the PRO and individual producer of an alternative collection program to develop verification processes. Producers will need to submit verification in order to be eligible for the benchmark. Secondly, third party certification is already required for all compostable materials pursuant to §25-17-801, C.R.S., outside of the eco-modulation bonus incentive.

18. Case study benchmark:

AF&PA, Carton Council, GPI and Molson Coors expressed support for bonuses being awarded retroactively to previously conducted case studies. The department will not be awarding incentives retroactively. The intent is to incentivize future innovation.

ACC, CBA, Perkins Coie, and UPSTREAM disagreed with the department's decision to include the provision that case study bonus shall not exceed the cost to carry out the study, stating that it may not be considered a meaningful financial incentive for producers. The department chose to include this necessary cap on the incentive that can be granted. The intent of the case study benchmark is to also encourage studies that result in more sustainable end-of-life packaging, and will ultimately help producers move products away from maluses and towards incentives and/or less producer dues for their covered materials. Therefore, the incentive provided by the department is the first incentive in what will hopefully lead to improved covered materials.

FPA encouraged the department to only offer case study incentives limited to packaging redesign, similar to that of EEQ. The department expects packaging redesign to be addressed in PRO's and individual producer of an alternative collection program eco-modulation factors. The department's intent is to provide innovation in studies that expand into areas past packaging redesign.

AF&PA, Carton Council and CBA state that case studies may cause unnecessary costs to all producers and that this may be duplicative with CAA's plan to identify and prioritize investments for improvements and innovation. The case study benchmark provides a process for producers to bring project proposals to PRO or individual producer of an alternative collection program, rather than the projects being brought forth by the PRO or individual producer of an alternative collection program.

ACC requested that the department remove "toxicity" language from the case study benchmark, stating that it is beyond the scope of the Act and leaves the benchmark vague and unenforceable. The department disagrees with this interpretation. The intent of §25-17-702 is to have a positive impact on the environment and public health. Producers that can address toxicity in their products through the case study benchmark,

after proposing their concept to the PRO/alternative collection program may be eligible for an incentive.

ACC and CBA are concerned that the case study benchmark lacks protections for sensitive business information. The protections outlined in section 18.1.4 apply to the case study benchmark.

19. Increasing the percent of base dues:

Many stakeholders including 26 NGO's, AF&PA, AMERIPEN, APR, Boulder County, GPI, Perkins Coie and WDMA expressed concern regarding the low percent incentive of the bonus schedule, expressing that the incentives will not be effective in behavior change at such a low percent and/or that the incentive should equate to an equivalent reduction in processing costs for MRFs. On the other hand, AMERIPEN expressed that bonuses should be limited in size.

The department chose to keep the incentives minimal due to the following factors. The PRO and individual producer of an alternative collection program have eight eco-modulation factors to account for in statute in addition to the four benchmarks developed by the department. These are on top of the already adjusted base dues that will promote sustainable packaging. Additionally, the PRO and the individual producers of an alternative collection program will also need to develop criteria and guidance to manage the benchmarks developed by the department as well as the PRO's eight factors required in statute. For the success of the program, it is vital that incentives developed by the department remain small until there is refined data to better understand how the incentives will impact producer dues.

20. Future Benchmarks Ideas Offered:

Toxicity was the topic the department received the most public comment on, specifically from individual members of the public, the 26 NGO's and Colorado businesses, ADSA, GPI, and the Wine Institute. These stakeholders request the department to include criteria and/or benchmarks for packaging that reduces or eliminates toxicity. A1 Organics provided language that would align with EU PFAs limits for food-contact compostable packaging. The department needs more time to evaluate standards and applicable thresholds on toxicity in packaging, and plans to further explore this topic, its intent within statute and its relevance to the program in future rulemakings.

UPSTREAM and GPI encouraged the department to adopt bonuses for reuse and refill, for example for producers transitioning to reusables or those who voluntarily report their reusables. And conversely, ADSA and the Wine Institute expressed that any refill or reuse eco-modulation factor would disadvantage out-of-state producers and alcohol producers due to highly regulated and flammable products, and therefore asks the department to acknowledge this disparity in any future refill and reuse incentives..

ADSA and the Wine Institute requested benchmarks on sustainable farming practices, timely due payments, minimal water usage or reduced pollution.

PakTech requested incentives on use of responsible end markets and that the department incentivize third party certification for recyclability for plastic products to claim recyclability.

ACC and Braskem requested that the department develop a benchmark for renewable or bio-based feedstock that can demonstrably reduce lifecycle impacts.

ADSA requested that the department incorporate a benchmark that would incentivize recycling of small-format containers.

A1 Organics requested a benchmark for finished compost procurement. If a producer purchases or funds pathways for finished compost in Colorado from source-separated organic streams that include certified compostables within Colorado. This project incentive could potentially be accomplished through a case study benchmark.

The department determined that it should focus on the four current benchmarks for next year and explore adding benchmarks as the program develops, as data becomes more available and the PRO's eco-modulation factors have gone fully into effect.

Alternatively, other stakeholders such as HCPA expressed that four is still too many eco-modulation benchmarks from the department and that this could result in a significant resource burden on the PRO. The department has collaborated closely with CAA to make changes, such as extending their runway to implement the benchmarks or removing benchmarks altogether, that will allow CAA to successfully manage the department's eco-modulation bonuses.

## Cost Benefit Analysis

A cost benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) - Section 1.7.4, Solid Waste User Fee

**(Adopted by the Solid and Hazardous Waste Commission on August 19, 2025)**

**Basis and Purpose**

I. Statutory Authority

Section 25-16-104.5(1.7)(a) C.R.S. and Section 25-16-104.5(1.7)(a)(II) C.R.S. authorizes the Solid and Hazardous Waste Commission (the Commission) to promulgate rules to establish the solid waste user fee, a portion of which provides funds to the Hazardous Substance Response Fund (HSRF), created by 25-16-104.6, C.R.S, to cover the Colorado Department of Public Health and Environment's costs to implement its responsibilities under the Comprehensive Response Compensation and Liability Act, also known as Superfund, and to provide matching funds and cover future maintenance costs under Section 25-16-103, C.R.S.

II. Purpose of revised regulations:

The Remediation Program is expected to experience a budget shortfall in the hazardous substance response fund in fiscal year 2026 and the fee increase is needed to help mitigate this budget shortfall for the program. The purpose of these revisions to Section 1.7.4 of 6 CCR 1007-2 Part 1 (the Regulations) is to increase the Hazardous Substance Response Fund's portion of the solid waste user fee authorized in Section 25-16-104.5(1.7)(a)(II) C.R.S. from the $0.05 per cubic yard to $0.16 per cubic yard beginning on January 1, 2026. The hazardous substance response fund portion of the solid waste user fee will increase again starting July 1, 2026 from $0.16 to $0.23 and from July 1, 2027 from $0.23 to $0.28.

To offset the overall increase to the solid waste user fee, the Solid Waste Program

portion of the solid waste user fee will be reduced starting January 1, 2026 through June 30, 2027 from $0.17 to $0.12. Starting July 1, 2027, the Solid Waste Program portion of the solid waste user fee will increase from $0.12 to $0.15.

## Discussion of Regulatory Proposal

The Remediation Program is responsible for the state's cost share of remedial actions conducted under the Comprehensive Environmental Response, Compensation and Liability Act, also known as Superfund. For many Superfund sites, after remediation is complete, long-term O&M activities must be performed to ensure the remedies are properly maintained and functioning as intended, to protect human health and the environment. These efforts vary based on the specific Superfund site, but often include operation and maintenance of water treatment plants and groundwater treatment systems, landfill cap monitoring and maintenance, maintenance of surface water diversions and groundwater containment systems, institutional control inspections and administration, and other similar activities, as well as associated personnel costs.

The state is responsible for ten percent of all remedial actions taken at Superfund sites in Colorado that do not have a financially viable responsible party. The state is also responsible for one hundred percent of all operation and maintenance costs associated with the long term management of all completed remedies where there is no viable responsible party. Both the state 10% cost share and the 100% costs associated with long term operation and maintenance are fully funded through the hazardous substance response fund portion of the solid waste user fee assessed on the disposal of waste.

Between FY 25 and FY 26, the state obligations for the state cost share and long term operations and maintenance are anticipated to be roughly $5.4M annually. Starting in FY 26, these costs are expected to increase to $6.4M. The current projection for state obligations for CERCLA activities payable through the HSRF over the next 10 years is over $91 million.

### Chart 1: HSRF Total Estimated Expenditures



The Hazardous Substance Response Fund (HSRF) is funded through a portion of the solid waste user fee which is assessed on the disposal of waste. The HSRF brought in about $2.1 million in total revenue in Fiscal Year 2023-2024. The HSRF portion of the solid waste user fee between July 1, 2024 and June 30, 2025 was $0 as this portion of the fee was diverted to the Solid Waste and Materials Management Program to help offset a budget shortfall in that program. This fee returned to $0.05 beginning July 1, 2025 based on prior Solid and Hazardous Waste Commission action.

### Hazardous Substance Response Fund Balance

The HSRF supports approximately ten FTE in the Remediation Program. One FTE is dedicated to the implementation of the natural resource damage and restoration program. Nine FTE are responsible for the oversight, management and implementation of response actions under the Comprehensive Environmental Response Compensation and Liability Act.

The Hazardous Substance Response Fund portion of the solid waste user fee has never been increased. Most recently, in 2024, the Hazardous Substance Response Fund portion, $0.05 of the solid waste user fee, was set to $0.00 for one year through June 30, 2025 to help the Solid Waste Program generate necessary revenue to raise the solid waste fund out of a deficit and to assist with backfilling positions being held vacant due to a negative fund balance.

Under the current fee structure, the HSRF is projected to go deficit in Fiscal Year 2025 by about $270k as the estimated revenue will exceed planned expenditures. The estimated revenue for Fiscal Year 2026 includes the transfer of $6 million general funds to the HSRF.

### Chart 2: HSRF Financial Projections Status Quo



**Table 1: HSRF Financial Projections Status Quo**

| Fiscal Year | Beginning Balance | Revenue | Transfers | Expenditures | Ending Balance |
|---|---|---|---|---|---|
| 2024-25 | $779,729 | $974,283* | $5,500,000** | $7,524,836 | ($270,824) |
| 2025-26 | ($270,824) | $2,356,567 | $6,000,000+ | $8,411,372 | ($325,628) |
| 2026-27 | ($325,628) | $2,356,567 | $0 | $8,299,160 | ($6,268,221) |
| 2027-28 | ($6,268,221) | $2,356,567 | $0 | $8,900,516 | ($12,812,170) |
| 2028-29 | ($12,812,170) | $2,356,567 | $0 | $10,336,911 | ($20,792,514) |
| 2029-30 | ($20,792,514) | $2,356,567 | $0 | $11,004,898 | ($29,440,845) |

* Includes estimated amounts collected for the Attorney General's Office and interest.
** Estimated transfer from the Hazardous Substance Site Response Fund authorized by HB24-1418.
\+ Transfer of $6m from the General Fund to the HSRF authorized by SB25-255.

The Remediation Program requires additional funds to mitigate the budget shortfall in the Hazardous Substance Response Fund. In order to mitigate the budget shortfall, the Remediation Program requests a $0.06 per cubic yard increase to the Solid Waste User Fee beginning January 1, 2026 for a total solid waste user fee of $0.31. The Remediation Program requests an additional $0.07 per cubic yard increase starting July 1, 2026 for a total solid waste user fee of $0.38 followed by a third increase of $0.08 increase starting July 1, 2027 for a total solid waste user fee of $0.46. The proposed increase is estimated to keep the HSRF solvent through Fiscal Year 2030. During this time the Division will continue to work on a long term fiscal sustainability plan.

**Chart 3: HSRF Financial Projections with Proposed Fee Increase**



**Table 2: HSRF Financial Projections with Proposed Fee Increase**

| Fiscal Year | Beginning Balance | Revenue | Transfers | Expenditures | Ending Balance |
|---|---|---|---|---|---|
| 2024-25 | $779,729 | $974,283* | $5,500,000** | $7,524,836 | ($270,824) |
| 2025-26 | ($270,824) | $3,907,957* | $6,000,000+ | $8,411,372 | $1,225,761 |
| 2026-27 | $1,225,761 | $7,433,843 | $0 | $8,299,160 | $360,444 |
| 2027-28 | $360,444 | $8,844,197 | $0 | $8,900,516 | $304,125 |
| 2028-29 | $304,125 | $10,818,694 | $0 | $10,336,911 | $785,908 |
| 2029-30 | $785,908 | $10,959,729 | $0 | $11,004,898 | $740,739 |

* Includes estimated amounts collected for the Attorney General's Office and interest.
** Estimated transfer from the Hazardous Substance Site Response Fund authorized by HB24-1418.
+ Transfer of $6m from the General Fund to the HSRF authorized by SB25-255.

**Solid Waste Program Fund Balance**

With the one year increase of the additional $0.05 from the HSRF, the Solid Waste Program generated the necessary revenue to raise the solid waste fund out of a deficit. Additionally, the Solid Waste Program backfilled positions that were vacant due to the previous negative fund balance. The proposed decrease to the Solid Waste Program should allow the Solid Waste Program to maintain current staffing levels.

The proposed changes are shown in the chart below. From January 1, 2026 - June 30, 2026, the solid waste user fee will be:

| Solid Waste User Fee | Cubic Yard Rate | Ton Rate |
|---|---|---|
| Solid Waste Program<br>§ 25-16-104.5(1.7)(a)(I) | $0.12 | $0.40 |
| Hazardous Substance Response Fund<br>§ 25-16-104.5(1.7)(a)(II) | $0.16 | $0.53 |
| Department of Law<br>§ 25-16-104.5(1.7)(a)(III) | $0.03 | $0.10 |

| | | |
|---|---|---|
| Total SWUF<br><br>**Note:** Does not include the C3 fee as defined in § 25-16-104.5(3.9) | $0.31 | $1.03 |

Beginning July 1, 2026, the solid waste user fee will be:

| Solid Waste User Fee | Cubic Yard Rate | Ton Rate |
|---|---|---|
| Solid Waste Program<br>§ 25-16-104.5(1.7)(a)(I) | $0.12 | $0.40 |
| Hazardous Substance Response Fund<br>§ 25-16-104.5(1.7)(a)(II) | $0.23 | $0.77 |
| Department of Law<br>§ 25-16-104.5(1.7)(a)(III) | $0.03 | $0.10 |
| Total SWUF<br><br>**Note:** Does not include the C3 fee as defined in § 25-16-104.5(3.9) | $0.38 | $1.27 |

Beginning July 1, 2027, the solid waste user fee will be:

| Solid Waste User Fee | Cubic Yard Rate | Ton Rate |
|---|---|---|
| Solid Waste Program<br>§ 25-16-104.5(1.7)(a)(I) | $0.15 | $0.50 |
| Hazardous Substance Response Fund<br>§ 25-16-104.5(1.7)(a)(II) | $0.28 | $0.93 |

| | | |
|---|---|---|
| Department of Law § 25-16-104.5(1.7)(a)(III) | $0.03 | $0.10 |
| Total SWUF<br><br>**Note**: Does not include the C3 fee as defined in § 25-16-104.5(3.9) | $0.46 | $1.53 |

## Issues Encountered During Stakeholder Process:

The Hazardous Materials and Waste Management Division will be conducting four stakeholder meetings to present the proposed changes to the Solid Waste User Fee. An initial stakeholder meeting was held on January 23, 2025 and an additional stakeholder meeting was held on March 27, 2025. The Division provided an informational briefing to the Commission in February. From the discussions and issues raised, together with the Division's development of a solvency plan, the proposed rule was revised. An additional stakeholder meeting was held on June 30, 2025. A second stakeholder meeting is scheduled for July 29, 2025. Any issues encountered during the stakeholder process will be addressed prior to the August 19, 2025 rulemaking hearing.

## Regulatory Alternatives

No other regulatory alternatives were evaluated.

## Cost/Benefit Analysis

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

**DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT**

**Solid and Hazardous Waste Commission**

**Hazardous Materials and Waste Management Division**

**6 CCR 1007-2 Part 1**

**STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR**

**Revisions to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Amendment of Section 1.8 (Producer Responsibility Authorization and Dollar Limit Exemption)**

**(Adopted by the Solid and Hazardous Waste Commission on May 20, 2025)**

**Basis and Purpose**

I. Statutory Authority

These regulations are promulgated pursuant to the authority granted to the Solid and Hazardous Waste Commission ("Commission") in Sections 25-17-713 and 25-17-705, Colorado Revised Statutes (C.R.S.). These regulations implement House Bill 22-1355 passed by the Legislature in 2022 and codified at 25-17-701 to 716, C.R.S.

Part 7 article 17 of title 25 C.R.S. includes the following authorizations:

> § 25-17-713(2), C.R.S. The Commission is authorized per Section 25-17-713(2) to "adjust by rule the dollar limitation set forth in subsection (1)(a) of this section on July 1, 2023, and on July 1 of each year thereafter, based on the percentage change in the United States Department of Labor's Bureau of Labor Statistics Consumer Price Index for Denver-Aurora-Lakewood for all items and all urban consumers, or its successor index."

II. The Producer Responsibility Program for Statewide Recycling

The Producer Responsibility Program for Statewide Recycling Act (the "Act"), § 25-17-701, *et seq.*, C.R.S., requires the Department of Public Health and Environment (the "department") to oversee the implementation and operations of a producer responsibility program that requires producers to finance and provide statewide recycling services to covered entities for covered materials.

The Act requires the department to designate a producer responsibility organization (PRO) to lead the program while the department oversees the PRO's needs assessment, program plan and results as reported in an annual report on the program.

III. Purpose of Amendments to Section 1.8

The purpose of the amendments to Section 1.8 is to implement the statutory requirement directing the Commission to establish by rule the annual adjustment of the dollar limitation rule for producers exempt from the Producer Responsibility Program for statewide recycling. Specifically, Section 25-17-713(1)(a) establishes that a producer is exempt from the requirements of the Act if the producer is a person with less than five million dollars in realized gross total revenue, not including on-premises alcohol sales, during the prior calendar year. The producer exemption for dollar limitation is adopted in Section 1.8, *Producer Authorization and Dollar Limit Exemption*, specifically as Section 1.8.2, *Producer Exemption Dollar Limit.*

**Discussion of Regulatory Proposal**

I. Authorization

Section 25-17-713(2), C.R.S. directs the Commission to adjust by rule the dollar limitation set forth in Section 25-17-713(1)(a) C.R.S. on July 1, 2023, and on July 1 of each year thereafter, based on the percentage change in the United States Department of Labor's Bureau of Labor Statistics Consumer Price Index for Denver-Aurora-Lakewood for all items and all urban consumers, or its successor index.

II. General Provisions and Dollar Limit Exemption (Section 1.8.1 and Section 1.8.2)

The intent of Section 1.8.1 is to highlight that the dollar limit exemption for producers shall be adjusted by the Commission by July 1 each year through an annual consumer price index (or CPI) adjustment to the dollar limit exemption of producers. Section 1.8.1 is being updated to clarify that the index is released in February of each year for the annual consumer price index between January 2024 and January 2025.

The intent of Section 1.8.2 establishes that an exempted producer is a person with less than five million six hundred thirty two thousand, eight hundred forty-three dollars ($5,632,843) in realized gross total revenue, not including on-premises alcohol sales, during the prior calendar year. The 2025 producer dollar exemption rate was adjusted by the consumer price index rate of 2.3% from January 2024 to January 2025.

**Stakeholder Involvement in the Process**

The department notified over 400 stakeholders by e-mail of the proposed revisions of these regulations. Stakeholders were given an opportunity to provide any comments during the April 15, 2025 stakeholder meeting, as well as in writing after the meeting.

The department utilized various methods to inform industry representatives, trade associations, local government agencies, local government agency associations, and other interested parties of the proposed regulatory revisions. These methods included:

1. Posting a Stakeholder Process Notification on the department's producer responsibility website to notify stakeholders of upcoming stakeholder meetings and related draft documents.

2. Providing industry representatives and local government representatives information regarding stakeholder meetings and providing all draft documents and discussion materials by e-mail.

3. Establishing an email notification list which included all interested stakeholders including: local governments; registered recycling facilities; manufacturers; landfills and transfer stations; household hazardous waste ("HHW") collection centers; trade associations; business advocacy organizations; chambers of commerce; environmental and community nonprofits; compost operators; haulers of recyclable materials; producers; and other private operators and industry associations including the Recycle Colorado ("RC"), National Waste & Recycling Association ("NWRA"), Solid Waste Association of North America ("SWANA"), Colorado Municipal League ("CML"), Colorado Communities for Climate Action ("CC4CA"), and Colorado Counties, Inc. ("CCI").

4. Notifying all known interested parties by email prior to the release of the draft of the revisions to the regulations.

5. Sending out stakeholder meeting email notices that included the latest draft revisions to the regulations. The emails were sent directly to local county governments and industry representatives on March 14, 2025, and also to the following organizations for distribution: CCI, CML, and Colorado SWANA ("CO SWANA"). All of these organizations report to local government constituents and industry representatives involved in matters pertaining to solid waste.

6. Holding one stakeholder meeting on: April 15 to receive comments from stakeholders regarding the proposed revisions to the regulations. The department used teleconferencing so geographically diverse stakeholders could participate. Additionally, the department's website was utilized to post updates to the regulation revision process, stakeholder comments, iterative versions of support and working documents, and audio recordings of general stakeholder meetings. Key stakeholder questions and/or issues will be compiled and discussed under the "Issues Encountered During Stakeholder Process" section of this document.

During the stakeholder process, the department followed the procedures required by Executive Order Nos. 2 and 5 to notify local governments regarding the upcoming revisions to the solid waste regulations. As of the date of publishing this notice, no entities have responded to Executive Order No. 5.

### Issues Encountered During Stakeholder Process

The department has not received comments on the proposed regulations to date.

### Alternatives Considered and Why Rejected

No regulatory alternatives were evaluated because the statute is prescriptive on what the regulations should contain.

### Cost Benefit Analysis

A cost benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

### 6 CCR 1007-2

### STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2), Part 1: Section 1.7.6 (Waste Tire Fee), Section 1.2 (Definitions); Section 1.3.2; and Section 10 (Waste Tire Regulations).

**(Adopted by the Solid and Hazardous Waste Commission on May 20, 2025)**

**Basis and Purpose**

I. Statutory Authority

Section 30-20-1401(2), C.R.S. gives the Solid and Hazardous Waste Commission (the "Commission") the authority to promulgate waste tire regulations in order to implement and enforce Section 30, Article 20, Part 14, C.R.S.

II. Purpose of revised regulations:

Senate Bill 24-123 created the Waste Tire Management Enterprise Board (the "Enterprise Board") or the "Board") at the Colorado Department of Public Health and Environment ("CDPHE") to take over the management of the Waste Tire End Users Fund rebate program from the Solid Waste and Materials Management Program. The Enterprise Board will begin on July 1, 2025. The following sections of the Colorado Solid Waste Regulations (6 CCR 1007-2) will be revised and updated:

- Section 1.2 (Definitions) adds the definition of the Enterprise Board;
- Section 1.3.2 (Scope and Effective Date) sets a repeal date for Section 10.12;
- Section 1.7.6 (Waste Tire Fee), changes will be made for the ending of the current Waste Tire Fee on June 30, 2025, and the start of the new Administration Fee that will begin on July 1, 2025;
- Section 10.5 (Standards for Waste Tire Monofills) will be updated with the new state closure date of July 1, 2034 for Waste Tire Monofills;
- Updates will be made in Sections 10.3 (Standards for Waste Tire Haulers), 10.4

(Standards for Generators of Motor Vehicle and Trailer Waste Tires), 10.6 (Standards for Waste Tire Processors), and 10.8 (Standards for Waste Tire Collection Facilities) on when registered facilities can beneficially use waste tires;

- Sections 10.6 and 10.8 will eliminate the requirement for a closure certification report that is signed and sealed by a Colorado Registered Professional Engineer;
- Section 10.7 (Standards for Mobile Waste Tire Processors) will have a new form for pre-approval of mobile waste tire processing;
- Section 10.11 (Waste Tire Fee Administration) will be updated to change the collection frequency of the waste tire fee from monthly to quarterly;
- Section 10.12 (Waste Tire End Users Fund) will be updated for the management of the current End Users Fund rebate program;
- Section 10.13 (Standards for End Users and Landowners of Waste Tire Bales) will be updated with additional requirements for the end use of waste tire bales;
- Section 10.14 (Waste Tire End Users Fund) will be added to the Section 10 Waste Tire regulations for the Enterprise Board's management of the End Users Fund rebate program, including the approval of rebate applications, compliance reviews of applicants, and determining funding levels.
- Section 8.6 - Table 3: Pre-Approved Beneficial Use Table has been updated to add capacity limits for the amount of whole waste tires and waste tire bales that can be used as a beneficial use.

## Discussion of Regulatory Proposal

Section 1.3.2 creates a repeal date of January 1, 2026 for Section 10.12. The new Enterprise Board will be taking over responsibilities managing the End Users Fund rebate program. Section 10.12 will be replaced with the new Section 10.14.

Section 1.7.6 (Waste Tire Fees), changes will be made for the ending of the current Waste Tire Fee on June 30, 2025, and the start of the new Administration Fee on July 1, 2025. The current fee will change from $.55 to $.50 per replacement tire sold that will be deposited to the Waste Tire Administration Fund. The Administration Fee collected will now be due to the Department on a quarterly basis as opposed to monthly.

Section 1.2 (Definitions) adds the definition of Enterprise Board to the regulation.

General edits will be made throughout Section 10 (Waste Tires) for consistency of titles, capitalization, and punctuation.

Section 10.3.1 (E) (Standards for Waste Tire Haulers) is being added to require registered Waste Tire Haulers gain approval from the Department before they can beneficially use waste tires. This is to ensure that the beneficial use system is not abused by a Waste Tire Hauler to avoid the cost of the delivery of waste tires to a registered destination facility.

Section 10.3.2 (K) (Registration for Waste Tire Haulers) is being modified to give the Department the ability to cancel a registration if a facility is under a compliance order. This gives flexibility in the case where it poses a risk to public health and safety to have a facility continue to manage tires until they return to compliance or discontinue operating.

Section 10.4.2 (M) (General Standards for Generators of Motor Vehicle and Trailer Waste Tires) is being added to require that registered Waste Tire Generators gain approval from the Department before they can beneficially use waste tires. This is to ensure that the beneficial use system is not abused by a Waste Tire Generator to avoid the cost of using a waste tire hauler for the delivery of waste tires to a registered destination facility.

Section 10.4.3 (G) (Waste Tire Generator Registration Requirements) is being modified to give the Department the ability to cancel a registration if a facility is under a compliance order. This gives flexibility in the case where it poses a risk to public health and safety to have a facility continue to generate waste tires until they return to compliance or discontinue operating.

Section 10.5.1 (M) (General Waste Tire Monofill Standards) is being updated with the new state closure date of July 1, 2034 that was changed in Senate Bill 24-123.

Section 10.5.2 (G) (Waste Tire Monofill Registration Requirements) is being modified to give the Department the ability to cancel a registration if a Waste Tire Monofill is under a compliance order. This gives flexibility in the case where it poses a risk to public health and safety to have a facility continue to manage tires until they return to compliance or discontinue operating.

Section 10.6.2 (N) (General Standards for Waste Tire Processors) is being added to require that a Waste Tire Processor gain approval from the Department before they can beneficially use waste tires. This is to ensure that the beneficial use system is not abused by a Waste Tire Processor to avoid the cost of processing waste tires.

Section 10.6.3 (G) (Waste Tire Processors Registration Requirements) is being modified to give the Department the ability to cancel a registration if a Waste Tire Processor is under a compliance order. This gives flexibility in the case where it poses a risk to public health and safety to have a facility continue to manage and process waste tires until they return to compliance or discontinue operating.

Section 10.6.10 (B) (6) (Closure and Post-Closure Care of Waste Tire Processor Facilities) is being modified to eliminate the requirement for a closure certification report to be signed and sealed by a Colorado Registered Professional Engineer. It is an unnecessary burden and cost for a Waste Tire Processor to provide certification from a Colorado Registered Professional Engineer for the closure certification report as the closure of a Waste Tire Processor facility is a clean closure (waste tires are removed from the facility).

Section 10.7.2 (H) (General Standards for Mobile Waste Tire Processors) is being modified to add a new form for pre-approval of mobile waste tire processing. This will enable the Department to be aware of, approve and obtain the required information and records of the mobile processing. In the past the language in the regulation was too vague and the Department was not consistently notified of mobile waste tire processing being conducted. The Department would not learn of mobile waste processing activities until after the fact, when the annual reports from the Mobile Waste Tire Processors were submitted and received by the Department the following year.

Section 10.7.3 (J) (Mobile Waste Tire Processors Registration Requirements) is being modified to give the Department the ability to cancel a registration if a Mobile Waste Tire Processor is under a compliance order. This gives flexibility in the case where it poses a risk to public health and safety to have a facility continue to manage tires until they return to compliance or discontinue operating.

Section 10.8.2 (M) (General Standards for Waste Tire Collection Facilities) is being added to require that Waste Tire Collection Facilities gain approval from the Department before they can beneficially use waste tires. This is to ensure that the beneficial use system is not abused by a Waste Tire Collection Facility to avoid the cost of using a waste tire hauler for the delivery of waste tires to a registered destination facility.

Section 10.8.3 (G) (Waste Tire Collection Facility Registration Requirements) is being modified to give the Department the ability to cancel a registration if a Waste Tire Collection Facility is under a compliance order. This gives flexibility in the case where it poses a risk to public health and safety to have a facility continue to manage tires until they return to compliance or discontinue operating.

Section 10.8.10 (B) (6) (Closure and Post-closure care of Waste Tire Collection Facilities) is being modified to eliminate the requirement for a closure certification to be signed and sealed by a Colorado Registered Engineer. It is an unnecessary burden and cost for a Waste Tire Collection Facility to provide the certification from a Colorado Registered Professional Engineer for the closure certification report as the closure of a Waste Tire Collection Facility is a clean closure (waste tires are removed from the facility).

Section 10.9.3 (G) (End User Registration Requirements) is being modified to give the Department the ability to cancel a registration if an End User is under a compliance order. This gives flexibility in the case where it poses a risk to public health and safety to have an End User continue to manage tires until they return to compliance or discontinue operating.

Section 10.11 (Waste Tire Fee Administration) is being updated to comply with the requirements of Senate Bill 24-123 and refer to the requirements of the collection of the Waste Tire Administration Fee. Senate Bill 24-123 changes and other changes in this Section include:

- Section 10.11.2 changes how the fees collected will now be due to the Department quarterly as opposed to monthly and renaming of the forms that the retailer must complete based on how fees are collected (single store or multiple stores).
- Section 10.11.3 adds a grace period for payment before the Department may asses a compliance action against the retailer or forwarding the collection of fess to a collections agency.
- Section 10.11.8 revises the fee statement required on every receipt/invoice from the purchase of a new vehicle or new trailer tire.
- Section 10.11.8 (2) updates the new fee change to $.50 effective July 1, 2025.
- Section 10.11.8 (3) adds that the Enterprise Board must notify the Department of any changes to the annual fee by September 30th of each calendar year.

Section 10.12.1 (C) (3) (General Rules for End Users Applying for a Waste Tire Hauler Rebate) is being modified to remove language requiring End Users to provide weight tickets as required proof, and replacing the language with “other requested documentation” to give more flexibility in the documents accepted by the Department as proof of waste tires hauled from rural counties to receive a rebate.

Section 10.12.1 (C) (5) (General Rules for End Users Applying for a Waste Tire Hauler Rebate) is being added to clarify who is considered eligible for a Waste Tire Hauler rebate.

Table 10-12-.01 (Eligible End Users and Retailing for the End User Fund) adds an additional scenario that End Users are not eligible for a rebate if they are end using the same tire derived product they are applying for a rebate on their own property. This reduces the risk of tire derived products not being moved off a Waste Tire Processor or End Users property for the sole reason to benefit from the rebates. In addition, Type B tire shreds are being added to comply with the change made in Senate Bill 24-123 allowing this type of tire derived product to be eligible for a rebate.

Section 10.12.2 (C) (4) (Timing of Rebate Applications) End User application requirements are being modify to clarify that applications that are postmarked by the Department’s deadline would be accepted for review by the Department. Language is also being updated for those applicants who hand-deliver their application to the Department’s mailroom. This provides more clarification to the applicant to meet the deadline date as set by the Department.

Section 10.12.4 (A) (4) and (B) (4) (Appeals Process) are being added to provide further clarification in the appeals process of postmarked documents delivered to the Department’s mailroom.

Section 10.12.5 (D) (Rebate Amount) is being reserved. Paragraph (D) formerly required that 25% of the expected annual rebate amount to be held in reserve before paying the first quarterly rebate. This language is no longer needed since the program was implemented in 2020.

Section 10.13 (Standards for Beneficial Users of Waste Tire Bales) is being updated to

change "End Users and Landowners" to "Beneficial Users" to clarify who is subject to this section when beneficially using waste tire bales on their property.

Section 10.13 (C) (Standards for Beneficial Users of Waste Tire Bales) is being updated for certain registered waste tire facilities (Waste Tire Haulers, Waste Tire Processors, Waste Tire Generators and Waste Tire Collection Facilities). These facilities will not be pre-approved to end use waste tire bales on their properties, and will need to go through a beneficial use determination assessment per Section 8.6. This language change will assist the Department in determining if these facilities are using the waste tire bales beneficially and not for the purpose of improperly managing or stockpiling waste tires at their property.

Section 10.13 (I) (Standards for Beneficial Users of Waste Tire Bales) being added requiring Beneficial Users to keep areas clean of litter and vegetation around waste tire bales to minimize potential fuel sources that can risk a fire onsite.

Section 10.13 (J) (Standards for Beneficial Users of Waste Tire Bales) is being added to require a Beneficial User of waste tire bales to notify the Department and the local government within 30 days of placement and extends to all uses listed in the Section 8.6 Pre-Approved Beneficial Uses List Table 3. This amendment will help ensure that the Department and local government is aware of the waste tire bales being utilized and that there are no local ordinances in place restricting their usage.

Section 10.14 (Waste Tire End Users Fund) is being added to the Section 10 Waste Tire regulations for the Enterprise Board's management of the waste tire rebate program, including the approval of rebate applications, compliance reviews of applicants, and determining funding levels. It is the same process from Section 10.12 the Department has used in the past, but it changes the language from "Department" to "Enterprise Board", as the Enterprise Board will be taking over management of the program starting in January 2026. It also revises funding sources from the Waste Tire Administration, Enforcement, Market Development and Cleanup Fund to the Enterprise Fund.

The following regulations being added to Section 10.14 are not part of the existing Section 10.12 regulations. These regulations are being added to Section 10.14 to help the Enterprise Board better manage the program:

> Section 10.14.5 (C) (Rebate Amount) language indicates that the current per ton rates approved by the Commission in 2024 will remain in effect until the Enterprise Board sets new per ton rates for 2026.
>
> Section 10.14.5 (D) (Rebate Amount) if the rebate rates exceeds the balance of the End User Fund, the Enterprise Board must reduce the per ton rates as to not cause a deficit in the Enterprise Fund.

Section 10.14.5 (E) (Rebate Amount) states that the Enterprise Board must approve per ton rates by November 1st of each year to be effective in January of the following calendar year. This will give the waste tire industry enough time to plan for the following year as the Department has learned from the waste tire industry that they need ample time to change their records, billing, forms, etc. to prepare for the new per ton rates.

10.14.6 (F) (Enforcement) to ensure a fair end user application approval cycle, a statement has been added for any board member, applying for a rebate and who is under a compliance action by the Department must recuse themselves from final approval for that rebate cycle.

10.14.7 (Non-compliance of Waste Tire End User and Retailer Applicants) is being added to the regulation as the Department has a non-compliance policy in place and it gives guidance on how to determine non-compliance for applicants. The policy previously went through a stakeholder process for approval. It keeps decisions consistent and fair and lets the applicant understand the requirements. Adding this section to the regulations will help guide the Enterprise Board during the review process for applications, and continue to keep things consistent and fair.

10.14.8 (Non-compliance Review Procedure) describes the breakdown of the non-compliance process to make the determination of when an applicant is considered out of compliance and the ability for the Enterprise Board to approve or deny an application. It will keep decisions consistent and fair.

10.14.9 (Non-compliance denial decision matrix) is a table to provide direction to the Enterprise Board determining eligibility and give notification to applicants who are out of compliance if their rebate will be approved or denied.

10.14.10 (Submittal of False Documentation) is being added to describe how to handle any applicant who submits fraudulent documentation and how the applicant can be ineligible for future participation in the End Users Fund rebate program.

Section 8.6 Table 3: Pre-Approved Beneficial Use Table is being updated to add capacity limits for the amount of whole waste tires and waste tire bales that can be used as a beneficial use. The Beneficial Use of Whole Waste Tires on Agricultural Land is being modified to add a condition on use so the maximum pre-approved allowable amount of waste tires for beneficial use is 500 waste tires per property. The pre-approved amount for waste tire bales at a property is a maximum of 200 waste tire bales. Property owners who want to end use over 500 waste tires or 200 waste tire bales at a property must obtain the issuance of Beneficial Use Determination from the Department. This is to ensure that properties are not abusing the beneficial use system and that waste tires and waste tire bales are not brought to a property in lieu of avoiding the cost of using a waste tire hauler for the delivery of waste tires to a registered destination facility.

**Questions Encountered During Stakeholder Process:**

Q1. If the waste tire fee is collected quarterly, will the End User Rebate timeline be affected or pushed back?
A1. It will not impact the End Users Rebates. The rebates will remain quarterly.

Q2. Will local governments be included in the beneficial use assessment?
A2. Those submitting a beneficial use assessment should verify with local governmental agencies if the use of waste tires for beneficial use is allowed in their jurisdiction. The Department is not familiar with all local ordinances on land use restrictions. An applicant should contact the Department to review what the requirements are prior to submitting a beneficial use assessment. The local governmental agencies will be notified on any approved beneficial use assessment.

Q3. What enforcement tools do you have available for non-compliant Waste Tire Generator inspections (at a local level)?
A3. The waste tire regulations are the tools for doing an inspection and enforcing at the local level. The counties and state have dual authority on the waste tire regulations and the county can move forward to do enforcement. The county can also get assistance from the Department if needed.

Q4. What does a county do if there is an inspection refusal?
A4. If the county is not able to do enforcement, they can contact the Department for assistance.

Q5. When a processor has been removed from registration for compliance issues, can they use waste tires beneficially? A time span would be helpful.
A5. The Waste Tire Processor will need to have a beneficial use determination completed before they use the tires as beneficial use. It should be done prior to closure. The Waste Tire Processor would need to go through the process in Section 8.6 of the Colorado Solid Waste Regulations (6 CCR 1007-2) for the beneficial use determination. No time span would be set as long as the waste tires are being used for beneficial use. The timeframe for removal of the waste tires is if/when the waste tires are no longer being used as beneficial use.

Q6. If a Waste Tire Hauler gets their registration revoked, can they use their waste tires the next day for beneficial use?
A6. It would depend on the circumstance, and the Waste Tire Hauler will need to go through a beneficial use determination/assessment and also check with their local jurisdiction. Since disposal fees were previously collected for the waste tires, the Waste Tire Hauler should Section 8.6 and Section 10.13 Standards for Beneficial Users of Waste Tire Bales.

Q7. If a landfill is permitted for use shredded waste tires as alternate daily cover, will a company still have to do a beneficial use approval?
A7. A landfill permitted by the Division for the use of shredded waste tires as alternate daily (ADC) does not need to also obtain a beneficial use approval for the use of shredded

waste tires as ADC. A beneficial use approval would only be required for the use of whole waste tires.

Q8. What does the Department define as a "public safety" issue? Can we get a couple of examples of that definition?

A8. Waste tires are a fire risk and can harbor mosquito-borne diseases if not managed properly. The safe removal of the waste tires will result in environmental and health benefits by reducing hazardous materials from the environment. Designation facilities have to have plans in place for fire issues, vector control, etc., which is why it is important to take tires to approved facilities, which can handle issues that may arise.

Q9. What is the notification process for letting facilities know that the Waste Tire Fee is changing and what can counties do to help assist in this?

A9. Any time there is a Waste Tire Fee change, announcements are sent via email, the Department website, and the online payment system. Outreach is done prior to the Waste Tire Fee being changed. If the Department has returned emails, they find another way to do outreach. A facility also has the ability to update their contact information via Department website. A county can have that facility call the Department for assistance if a facility has issues with the current Waste Tire Fees.

Q10. Will the section 30-20-1403 language change as well, the language required on the customer receipts? Is there a difference between the Enterprise Fee and the Administration Fee?

A10. The new language is taken from Senate Bill 24-123. Receipts will need to be updated by July 1, 2025. The statute doesn't indicate how much the Waste Tire Fee is. The Administration Fee is set by the Commission. The Waste Tire Management Enterprise Board will be setting their own Enterprise Fee for their program. Currently of the $0.55 Waste Tire Fee, $0.50 goes towards the Waste Tire Program and $0.05 cents go towards the End Users Rebate Program. The Waste Tire Fee will end and the Administration Fee will start July 1, 2025 at $0.50 per replacement tire. In January 2026, the Waste Tire Management Enterprise Board will set their own fees for the enterprise program (which includes end user grants, enterprise staffing, etc.). The Enterprise Fee will be unknown until this fall (as the first board meeting will not be held prior to July). The maximum Enterprise Fee that can be assessed is $2.50 per replacement tire. The Waste Tire Management Enterprise Board will be required to set the Enterprise Fee by the end of September to give the Department time to notify the retailers should an additional fee be added to the currently proposed $.50 per replacement tire sold.

Q11. Can individual businesses charge the customer a waste tire disposal fee at whatever price they deem appropriate so long as $.55 is sent to the Department for the Waste Tire Fee?

A11. That is correct, the Department only sets the Waste Tire Fee, not the price of a business's services.

Q12. Is there any protection against facilities charging a prohibitively high waste tire disposal fee in order to encourage customers to voluntarily take their tires?

A12. There is not, the Department does not restrict the prices a business may set for their services. The Department only determines the Waste Tire Fee / Administration Fee. The

Department does not have authority to restrict waste tire disposal fees generally charged by the industry.

Q13. What types of businesses are eligible for the End User Rebates?
A13. Rebates are given to those end using tire-derived products such as alternative daily cover, molded products, landscaping material or tire derived fuel. Table 10.12 of the Colorado Solid Waste Regulations (6 CCR 1007-2) lists the types of tire-derived products that are accepted based on a tiering system. If there are questions concerning eligibility, a company can contact the Department.

Q14. What is the size of a waste tire bale? How many waste tires are in a waste tire bale?
A14. Waste tire bales are either 3x3 feet or 4x4 feet, depending on the baler equipment that is being used. A waste tire bale is approximately one ton in weight. If using just passenger waste tires, it's generally 88 waste tires.

Q15. Who is responsible for reporting the quantity of waste tire bales on a property to the Department? Is it the individual landowner, the Waste Tire Processor or the local government agency?
A15. The individual landowner is responsible for reporting the quantity of waste tires bales on his/her property to the Department.

Q16. Is the reporting of waste tire bales end use only required for those eligible for the End Users Fund rebate?
A16. No, the reporting is not only required for those eligible for the End Users Fund rebate. The Department is required to report to the state legislature every year on the end use of waste tires in the state. This reporting is required regardless whether or not an End Users Fund rebate is issued for the end use of waste tires.

Q17. How would a landowner know about the reporting requirement of the end use of waste tire bales if they are not participating in this stakeholder process?
A17. Hopefully the landowner is being notified by the Waste Tire Processors that are bringing the waste tire bales to the landowner's property, or the landowner is doing their research with their local governmental agencies who may restrict the use of waste tire bales. The landowner should verify if their local government allows for the end use of waste tire bales prior to waste tire bales being brought and utilized on the landowner's property.

Q18. If a Monofill decides that they have an end use for pyrolysis, and are using the waste tires that have been acquired on their site over the years, would this keep them from being eligible for the End Users Fund rebate?
A18. The intent of the proposed regulation is to ensure Waste Tire Processors who are also registered as an End User do not take advantage of the End Users Fund rebate program by pretextually end using large numbers of waste tires on their own property. The proposed regulation excludes the end use of tire-derived fuel, landfill alternative daily cover, permitted civil engineering uses at a landfill, or whole waste tires for energy recovery or a fuel substitute at a permitted facility. Other end uses under this proposed regulation would not be eligible for an End Users Fund rebate if the end user is a Waste Tire Processor attempting to end use tires on site.

Q19. Does the End User have to be a different company than the Waste Tire Processor to be eligible for the End Users Fund rebate?

A19. The proposed regulation prohibits a Waste Tire Processor from receiving a rebate for certain end uses on site. This prohibition is agnostic to how the businesses may be named, organized, or incorporated.

Q20. Is an End User eligible to be part of the Waste Tire Management Enterprise Board? How would that work if an End User is on the Waste Tire Management Enterprise Board, wouldn't that be a conflict of interest?

A20. The eligibility of End Users to participate on the Waste Tire Management Enterprise Board was not specifically defined in Senate Bill 24-123. SB 24-123 specified that the Waste Tire Management Enterprise Board include representatives engaged in the recovery, recycling, reuse, and management of waste tires, including a tire retailer, a waste tire collection facility, a waste tire processor, and a waste tire hauler. Section 24-18-108.5, C.R.S. says board members must not perform an official act, which may have a direct economic benefit on a business or other undertaking in which such member has a direct or substantial financial interest.

Q21. Any views on Senate Bill 25-117, which would eliminate the Waste Tire Management Enterprise Board and Enterprise Fee?

A21. The Department is aware of the new proposed bill. If the bill passes and becomes law this will alter the regulations proposed by the Department. The Department will maintain its current suite of proposed regulatory changes until this bill, or another, if passed, alters the law. (**Note**: Senate Bill 25-117 was not passed by the assigned legislative committee. This vote took place after the last stakeholder meeting was held).

## Regulatory Alternatives

No other regulatory alternatives were evaluated.

## Cost/Benefit Analysis

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

### 6 CCR 1007-2

### STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) - 10.12.5 (Rebate Amount).

**(Adopted by the Solid and Hazardous Waste Commission on November 19, 2024)**

<u>Basis and Purpose</u>

I. <u>Statutory Authority</u>

Section 30-20-1401(2), C.R.S. gives the Solid and Hazardous Waste Commission (the Commission) the authority to promulgate waste tire regulations in order to implement and enforce Section 30, Article 20, Part 14, C.R.S.

Section 30-20-1405, C.R.S. requires the Commission to annually set the amount of the rebate on a per-ton basis.

II. <u>Purpose of revised regulations:</u>

The purpose of revising 6 CCR 1007-2 Part 1 (the Regulations) is to set the End User fund per ton rebate rates for 2025.

<u>Discussion of Regulatory Proposal</u>

Section 10.12.5 (B) (Rebate Amount) was modified to change the year to 2025 and adjust the per ton rates. Based on current End Users account funds, participation in the rebate program, the per ton rates for the three tiers will be changed.

The proposed regulations set the 2025 per ton waste tire end user rebate rates as follows:

A. Tier 1: $100 per ton;

B. Tier 2: $50 per ton;

C. Tier 3: $25 per ton; and

D. Waste Tire Hauler: $25 per ton.

The rates will be in effect for end uses that occur through December 31, 2025. The Waste Tire Enterprise Board, in consultation with the Solid and Hazardous Waste Commission, will set the rebates for waste tire end uses that occur beginning January 1, 2026.

**Issues Encountered During Stakeholder Process:**

Stakeholders were notified by e-mail of the revision of the regulations. Stakeholders were given an opportunity to provide any comments.

The Department responded to the following questions:

1. What is the Waste Tire Enterprise Board? Who will they report to? Answer: The Waste Tire Enterprise Board (the "board") is and operates as a government-owned business within the Department. The board will collect an enterprise fee starting July 1, 2025. This fee will fund future end user rebates starting in 2026. The board will provide an annual report each year to the state legislature on the grants and rebate program.
2. What other enterprise boards currently exist at the Department? Answer: The Colorado Circular Communities Enterprise Board was recently established in the Division of Environmental Health and Sustainability. There are two additional enterprise boards within the Air Pollution Control Division.
3. What will be the makeup of the Waste Tire Enterprise Board? Answer: The board will have nine members representing different entities from the waste tire industry (e.g. tire retailer, waste tire collection facility, waste tire processor and a waste tire hauler). There will also be two Department representatives. The Department executive director will appoint the board members.
4. Why is the stakeholder meeting being held online instead of in person as was done in the past? Who were the stakeholders notified of this meeting? Answer: The Department has held stakeholder meetings online for the last several years. The Department follows the current process to notify stakeholders of upcoming meetings through the Department website as well as through a stakeholder email list. Those notified of the August 28, 2024 stakeholder meeting included waste tire end users, waste tire monofills, landfill operators, waste tire industry consultants, Department staff, and local governmental agencies. The Department will consider holding future meetings in person based on the scope of any proposed regulation changes.

5. When will the formation of the Waste Tire Enterprise Board start? How will applications be distributed? Answer: The process to start putting together the board has already started. The Department is currently working to hire a board administrator. The Department's goal is to have the board in place by late 2024 or early 2025. The application process will be online on the Department's website.

## Regulatory Alternatives

No other regulatory alternatives were evaluated.

## Cost/Benefit Analysis

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

**DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT**

**Solid and Hazardous Waste Commission**

**Hazardous Materials and Waste Management Division**

**6 CCR 1007-2 Part 1**

**STATEMENT OF BASIS AND PURPOSE
AND SPECIFIC STATUTORY AUTHORITY FOR**

**Revisions to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Amendment of Section 1.8 (Producer Responsibility Authorization and Dollar Limit Exemption) and Amendment of Section 18 (Producer Responsibility Regulations)**

**(Adopted by the Solid and Hazardous Waste Commission on June 14, 2024)**

**Basis and Purpose**

I. Statutory Authority

These regulations are promulgated pursuant to the authority granted to the Solid and Hazardous Waste Commission ("Commission") in Sections 25-17-713 and 25-17-705, Colorado Revised Statutes (C.R.S.). These regulations implement House Bill 22-1355 passed by the Legislature in 2022 and codified at 25-17-701 to 716, C.R.S.

Part 7 article 17 of title 25 C.R.S. includes the following authorizations:

> § 25-17-713(2), C.R.S. The Commission is authorized per Section 25-17-713(2) to adjust by rule the dollar limitation set forth in Subsection (1)(a) of this section on July 1, 2023, and on July 1 of each year thereafter, based on the percentage change in the United States Department of Labor's Bureau of Labor Statistics Consumer Price Index for Denver-Aurora-Lakewood for all items and all urban consumers, or its successor index.
>
> § 25-17-705(7), C.R.S. The executive director shall enforce this part 7 in accordance with section 25-17-710 and the commission shall promulgate rules in accordance with article 4 of title 24 as may be necessary for the administration of this part 7 and the enforcement of this part 7 pursuant to section 25-17-710.

II. The Producer Responsibility Program for Statewide Recycling

The Producer Responsibility Program for Statewide Recycling Act (the "Act"), § 25-17-701, *et seq.*, C.R.S., requires the Department of Public Health and Environment (the "department") to oversee the implementation and operations of a producer responsibility program that requires producers to finance and provide statewide recycling services to covered entities for covered materials.

The Act requires the department to designate a producer responsibility organization (PRO) to lead the

program while the department oversees the PRO's needs assessment, program plan and results as reported in an annual report on the program.

III. Purpose of Amendments to Section 1.8 and Section 18 Regulations

The purpose of the amendments to Section 1.8 is to implement the statutory requirement directing the Commission to establish by rule the annual adjustment of the dollar limitation rule for producers exempt from the Producer Responsibility Program for statewide recycling. Specifically, Section 25-17-713(1)(a) establishes that a producer is exempt from the requirements of this Part 7 if the producer is a person with less than five million dollars in realized gross total revenue, not including on-premises alcohol sales, during the prior calendar year. The producer exemption for dollar limitation is adopted in Section 1.8 Producer Authorization and Dollar Limit Exemption, specifically as Section 1.8.2 Producer Exemption Dollar Limit.

The purpose of Section 18 is to implement the statutory requirement directing the Commission to establish by rule the regulatory requirements through the following categories: 1) general provisions including program specific definitions, 2) producer requirements, 3) the PRO requirements, 3) covered materials under the program, 4) covered entities, 5) individual program plan requirements, 6) additional producer responsibility organization requirements, 7) education and outreach requirements, 8) reimbursement requirements, and 9) inspection, enforcement and penalties.

The regulations proposed in Section 18 will apply to the persons regulated under the Act, specifically producers of covered materials (packaging materials and paper products) and the PRO designated by the department.

**Discussion of Regulatory Proposal**

I. Authorization

Section 25-17-713(2), C.R.S. directs the Commission to adjust by rule the dollar limitation set forth in Section 25-17-713(1)(a) C.R.S. on July 1, 2023, and on July 1 of each year thereafter, based on the percentage change in the United States Department of Labor's Bureau of Labor Statistics Consumer Price Index for Denver-Aurora-Lakewood for all items and all urban consumers, or its successor index.

Sections 25-17-703, 705, 710, and 713 of the Act, C.R.S. direct the Commission to generally administer the program.

II. General Provisions and Dollar Limit Exemption (Section 1.8.1)

The intent of Section 1.8.1 is to highlight that the dollar limit exemption for producers shall be adjusted by the Commission by July 1 each year through an annual consumer price index (or CPI) adjustment to the dollar limit exemption of producers, and Section 1.8.2 defines that the exempted producer is a person with less than five hundred six thousand, two hundred ($5,506,200) in realized gross total revenue, not including on-premises alcohol sales, during the prior calendar year.

III. General Provisions (Section 18.1)

The intent of Section 18.1 is to describe the general provisions. In Section 18.1 there are six subsections, starting with 18.1.1 general provisions, which is the purpose and authority, followed by Section 18.1.2

scope and applicability, 18.1.3 referenced materials and computation of dates, i.e., if a deadline falls on a holiday or a weekend, 18.1.4 confidentiality - proprietary information - records requests, and recordkeeping, 18.1.5 production of records, and audits. Under this section producers are required to produce records within ten business days or the timeline specified by the department, whichever is later. Most of the language in this section is fairly standard across all solid waste regulations, although there was particular attention paid to the confidentiality of proprietary information in this proposed rulemaking due to the importance for service providers to maintain confidentiality with their financial information. Section 18.1.6 covers all proposed definitions incorporated within Section 18.

IV. Producers (Section 18.2)

The intent of Section 18.2 is to outline the statutory requirements for an obligated producer, or obligated person, who are not otherwise exempt. This includes the scope and applicability (18.2.1), which requires obligated producers to join, pay membership fees, and provide information to the PRO or any additional PRO.

The order of obligation for producers (18.2.3) is included to provide clarity in determining who is obligated for each of the following types of producers: producer of of products using packaging materials and producers of unfilled food and beverage packaging materials, producer of packaging material used in an internet transaction, producer of paper products, producer of service packaging, producer of any other covered materials, and franchisee/franchisors.

Producer exemptions (18.2.4) describe who is not obligated to participate, and includes small businesses, small producers (less than one ton of material generated annually), state/local government, non-profits, agricultural employers with less than $5 million in annual revenue, certain retail food establishments, and construction companies/contractors.

Under the producer requirements (18.2.5), producers are required to register and participate in a PRO, and pay producer dues.

The recordkeeping, reporting, and production of records (18.2.6) requirements mirror the requirements outlined in 18.1.

The restriction on fees (18.2.7) says that a person shall not charge any kind of point-of-sale or point-of-collection fee to consumers to recoup its costs in meeting the obligations of or complying with the Act.

V. Covered Materials - Minimum Recyclable List (Section 18.3)

The intent of Section 18.3 is to describe covered materials and the minimum recyclable list which includes the covered materials categories (18.3.1), exempt materials (18.3.2), recyclable material categories (18.3.3), and the minimum recyclable list, additional material list (18.3.4).

Covered material categories (18.3.1) are detailed first and are broken out into: packaging materials, paper products, compostable packaging material, and "other" material. Exempt materials (18.3.2) are outlined, which includes: statutorily exempt materials, commission-exempted materials, and food or beverage packaging materials intended for reuse or refill. The commission-exempted materials subsection describes that the commission may exempt other materials by rule, based on an analysis by the PRO of the operational and financial impacts of the proposed changes and after consultation with the advisory board, but at this time the department is not requesting any material-specific exemptions.

Recyclable Material Categories (18.3.3) are then further broken out, and the purpose for these categories is to guide the updating of the minimum recyclable list and additional materials list, and to establish recycling and collection rate targets for the program. There are several sub-categories of recyclable materials not included in rule, as they are subject to change as product design changes and as markets shift, so the Department thought it best to keep the sub-categories in the PRO's program plan.

The Minimum Recyclable List (MRL) (18.3.4) details the proposed list of covered materials from the needs assessment. This subsection also includes the assessment criteria to establish that list; additional materials collected through other means, or the additional materials list (or AML); the process to make updates to the MRL, and the PRO's requirements as it pertains to the MRL and AML, which is to provide convenient and equitable access to recycling services for these materials, at no charge, to covered entities, and to reimburse service providers for the recycling services costs to provide recycling services for these materials.

VI. Covered Entities (Section 18.4)

The intent of Section 18.4 is to describe who the covered entities are in the program, or who is to receive access to universal statewide recycling services at no cost. In 18.4.1, covered entities are described, which includes residential and non-residential locations identified in the final plan, as well as tribal nations who can opt into the program per SB22-104 as codified at 2-2-803, C.R.S. 18.4 applies to covered entities who are eligible to receive services under the Act. Participation in this program, as specified under Section 18.4, is not obligated by any covered entity.

VII. Producer Responsibility Organization (Section 18.5)

The intent of Section 18.5 is designed to help the PRO understand and comply with their statutory requirements in the Act. Section 18.5 has seven subsections, so it's one of the largest sections of this rulemaking. In 18.5.1 the needs assessment requirements are described, which includes advisory board coordination (A) and statutory deliverables, or specified areas of study. Then Section 18.5.1 describes updates to the needs assessment (B) which must be done every five years, in consultation with the advisory board, be reported to the department, and be used to update the program plan proposal. There is also a waiver option that the PRO can request from the department to not update the needs assessment.

In 18.5.2, the plan proposal requirements are detailed, which includes: advisory board coordination (A). The PRO is required to consult with the advisory board in the development of the plan proposal prior to its submission, including in the development of the cost formulas for reimbursements to service providers, and is also required to consult with the advisory board on amendments to the plan proposal and the amended plan proposal. The PRO must submit the plan proposal to the advisory board by February 1, 2025, and the advisory board must review and recommend that the department approve or reject the plan proposal or amended plan proposal.

Section 18.5.2 then covers the plan proposal requirements (B), which is to only address recycling services for residential covered entities and to describe a process and timeline, beginning no later than 2028, to expand recycling services to applicable nonresidential covered entities, as identified in the needs assessment. The plan proposal must cover a period of five years and must be updated and submitted to the advisory board on or before February 1 and every five years thereafter. Any updated plan proposal must address recycling services for both residential and any applicable nonresidential covered entities, as

identified in the needs assessment. The PRO must solicit and consider input from the advisory board and provide opportunity for additional stakeholder input throughout the plan proposal and updating processes.

Then the producer responsibility dues requirements (C) in the plan proposal are covered, which includes a description of the process used to determine producer responsibility dues, including a de minimis level in which no dues are charged and an optional flat rate for producers below a certain size to minimize the administrative and reporting costs of the producers and the PRO. It also includes the requirement for the PRO to describe a plan that outlines, if the PRO ceases to exist or ceases to administer the program, how any producer responsibility dues that have not been used to implement the program will be transferred to another PRO designated by the department.

The calendar requirements (D) allow the advisory board 90 days after the February 1, 2025 submittal deadline to either provide any recommended amendments to the plan proposal to the PRO or, if the advisory board does not have any recommended amendments, forward the plan proposal to the department, then if amendments are suggested, the PRO must provide responsive answers to the advisory board's recommendations within 60 days, then the advisory board must forward the amended plan proposal to the department with its recommendation for approval or rejection within forty-five days. Within eight days the department must post the plan proposal on the department's website and provide public notice. Within 120 days the department must either approve the plan proposal or amended plan proposal or reject the plan proposal or amended plan proposal.

In order to be approved (E), the plan proposal must fully address all criteria required by statute, the advisory board must review the plan proposal for compliance with Part 7, and if approved by the department, the department must designate and publish the plan proposal as the final plan on the department's website.

If the plan proposal is rejected (F) by the department because it fails to comply with the requirements specified in the Act, the department must notify the PRO of the rejection and the reasons for the rejection. The PRO must then submit a new plan proposal to the advisory board within sixty days after receiving the department's rejection, which will then be reviewed by the advisory board, may be modified and must be approved or rejected by the department.

Section 18.5.3 delineates the final plan implementation (A) of all criteria identified in the final plan which is to begin no more than six months after the department approves the plan and amendments (B) which requires the PRO to use the findings of the updated needs assessment to create an updated plan proposal for advisory board review. There is an option for a provisional approval of a plan amendment if the PRO needs to change the dues structure rapidly due to financial urgency. Department-requested amendments (C) which allows the department, at least sixty days prior to the deadline to submit the annual report, to request that the PRO submit an amendment to the final plan to address a specific concern or aspect of the plan. If any amendments are requested, the PRO is required to operate under the existing plan until advisory board consultation and department approval have occurred.

Section 18.5.4 describes the PRO's funding mechanism requirements (A), eco-modulation factors (B), special assessments for improving collection and recycling (C), and annual updates to producer responsibility dues schedule (D). The PRO must be funded by producer dues, and the PRO must establish a funding mechanism that does not exceed the direct and indirect costs of implementing the program. It includes a surplus money clause for any surplus money generated by the program to be placed back into the program, a financial reserve with a minimum of three months' operating costs and a maximum of six months operating costs, and includes the right for the department to issue a waiver to the

surplus and financial reserves if the PRO demonstrates the waiver would be fiscally prudent. The PRO's funding mechanism must include eco-modulation factors, which are incentives that decrease producer dues and malluses that increase producer dues as required by statute. A producer or group of producers of a covered material may request a special assessment paid by the producers of that covered material to cover system improvements that improve the collection and recycling of that covered material or facilitate the addition of the covered material to the list of readily recyclable materials. The PRO is required to update the producer responsibility dues schedule annually, and the updates are required to reflect changes in program costs and relevant plan revisions that have been considered by the producers.

Section 18.5.5 covers the annual report, which requires the PRO to submit the annual report to the advisory board before March 31 of the second year of the program's implementation, and by March 31 each year thereafter. The PRO's annual report must describe the progress of the program and comply with all of the requirements of section 709 of the Act.

Section 18.5.6 describes the recordkeeping and annual financial audit, which requires the PRO to comply with all of the recordkeeping and audit requirements in Section 18.1.5.

Section 18.5.7 describes the PRO's requirement to comply with any additional PRO coordination plan, and describes the requirement for the PRO to consult with the additional PRO while the additional PRO is developing a coordination plan. If the coordination plan conflicts with the final plan or any other plan approved by the department pursuant to the Act, the provisions of the coordination plan prevail. A coordination plan approved or ordered by the department is valid until revoked or until a new coordination plan is approved or ordered by the department.

VIII. Individual Program Plan Requirements (Section 18.6)

The intent of Section 18.6 is to outline the individual program plan (IPP) requirements, and includes the calendar, alternative collection programs, plan approval, plan implementation, plan amendments, recording keeping and financial audits and reporting. Section 18.6 applies to producers who are operating under a department-approved IPP. IPPs come into play when a producer requests to participate in the program outside of the PRO's program plan through an alternative collection program. The possible reason for a producer wanting to do this is if they produce a covered material but their material does not make it onto the Minimum Recyclable or Additional Materials List, but they still want to get their material recycled and back into the supply chain.

Producers implementing an IPP are still bound to all of the same requirements as the PRO. The calendar (18.6.1) describes that a producer must (A) notify the department in writing of its intent to submit an IPP proposal by January 1, 2024, and by each January 1 thereafter; and (B), on January 1, 2025, and each January 1 thereafter, as an alternative to participating in the program, a producer may submit to the advisory board in writing an IPP proposal.

The IPP proposal must include an alternative collection program (18.6.2) that describes: (A) how the producer participating in the individual program plan proposal will contribute to the costs of the department in overseeing the program, (B) how the producer will reimburse service providers, and (C) describe any alternative collection programs run by the producer and its recycling rates.

Section 18.6.3 states that the advisory board shall review and make recommendations on, and the department must approve or reject, any IPP proposals.18.6.4 describes that after the department approves the IPP proposal, the department will designate the IPP proposal as the plan that the producer

is authorized to implement and administer as an alternative to participating in the program.

Any amendments (18.6.5) to the IPP must be submitted to the advisory board for review and recommendation to the department, and the department will approve or reject. 18.6.6 requires producers operating under an IPP to comply with all requirements in Section 18.1.5 and to comply with the reporting requirements (18.6.7) of Section 18.2.6.

IX. Additional Producer Responsibility Organization (Section 18.7)

The intent of Section 18.7 is to help additional PROs understand and comply with the statutory requirements. Section 18.7 pertains to any additional producer responsibility organization. Section 18.7 describes the department's authority to designate an additional PRO if the department, in coordination with the advisory board, determines that the designation of the additional producer responsibility organization is necessary to increase recycling rates, expand recycling services to covered entities that are not covered under the final plan, or provide recycling services for a specific type of covered material. This section subsequently details the calendar (which begins on January 1, 2029 for a nonprofit organization to request that the department designate an additional PRO), and then describes the requirement for a coordination plan, program implementation, annual reporting and recording keeping and financial audits of any additional PRO.

X. Education and Outreach (Section 18.8)

The intent of Section 18.8 is to detail the requirements and methodology for the PRO's statewide education and outreach plan, and the requirement for the PRO to coordinate with the advisory board on the development of the plan. In 18.8.1, the PRO's education and outreach plan must be designed to increase the recycling and reuse of covered materials, provide clear and concise recycling instructions that are consistent statewide and accessible for all demographic groups, and in 18.8.2 the plan's proposed methodology must include criteria for evaluating and reporting on the effectiveness of the plan. Finally in 18.8.3 the PRO must consult with the advisory board and other entities providing recycling education in the state on the development and distribution of education outreach services and materials.

XI. Eco-Modulation (Section 18.9)

Section 18.9 is being reserved for producer eco-modulation rates which will be developed later in the program. Eco-modulation rates will be initially developed within the PRO's program plan. The Commission will develop rules pertaining to eco-modulation once the program plan is underway and prior to the date specified within the Act of January 1, 2026.

XII. PRO Reimbursement to CDPHE (Section 18.10)

The intent of Section 18.10 is to detail the PRO's requirement to reimburse the department for all of its expenses related to the program implementation, administration and enforcement of the program. Reimbursement begins by August 1, 2026 and continues every August 1 thereafter. Annual costs reimbursed by the PRO will be prorated by the department to reflect contributions from producers participating in IPPs.

XIII. Inspection, Enforcement, Penalties, (Section 18.11)

The intent of Section 18.11 is to explain the inspection, enforcement, and penalties, including inspections (18.11.1), compliance advisories and conferences (18.11.2), penalty orders, amounts, requests for

hearings, and stays (18.11.3), and injunctive relief (18.11.4). The four subsections in 18.11 include fairly standard language regarding inspection, compliance advisories, penalty orders, and injunctive relief. The most unique piece is regarding the penalty amounts, which are detailed in statute, and include: for a first violation, an initial penalty of five thousand dollars for the first day of each violation and one thousand five hundred dollars per day for each day the violation continues; for a second violation committed within twelve months after a prior violation, an initial penalty of ten thousand dollars for the first day of each violation and three thousand dollars per day for each day the violation continues; and for a third or subsequent violation committed within twelve months after two or more prior violations, an initial penalty of twenty thousand dollars for the first day of each violation and six thousand dollars per day for each day the violation continues. These penalties are all established in statute and are simply being incorporated into rule.

**Stakeholder Involvement in the Process**

The department notified over 400 stakeholders by e-mail of the proposed revisions of these regulations. Stakeholders were given an opportunity to provide any comments during the five stakeholder meetings, as well as in writing after each meeting.

Over the course of the six stakeholder meetings, the department had 595 total participants show up virtually, including producers, industry associations, compliance and law firms, local government, service providers, consultants, NGOs and other solid waste industry representatives.

The department utilized various methods to inform industry representatives, trade associations, local government agencies, local government agency associations, and other interested parties of the proposed regulatory revisions. These methods included:

1. Posting a Stakeholder Process Notification on the department's producer responsibility website to notify stakeholders of upcoming stakeholder meetings and related draft documents.

2. Providing industry representatives and local government representatives information regarding stakeholder meetings and providing all draft documents and discussion materials by e-mail.

3. Establishing an email notification list which included all interested stakeholders including: local governments; registered recycling facilities; manufacturers; landfills and transfer stations; household hazardous waste ("HHW") collection centers; trade associations; business advocacy organizations; chambers of commerce; environmental and community nonprofits; compost operators; haulers of recyclable materials; producers; and other private operators and industry associations including the Recycle Colorado ("RC"), National Waste & Recycling Association ("NWRA"), Solid Waste Association of North America ("SWANA"), Colorado Municipal League ("CML"), Colorado Communities for Climate Action ("CC4CA"), and Colorado Counties, Inc. ("CCI").

4. Notifying all known interested parties by email prior to the release of the first draft of the revisions to the regulations.

5. Sending out stakeholder meeting email notices that included the latest draft revisions to the regulations. The emails were sent directly to local county governments and industry representatives, and also to the following organizations for distribution: CCI, CML, and Colorado

SWANA ("CO SWANA"). All of these organizations report to local government constituents and industry representatives involved in matters pertaining to solid waste.

6. Holding six stakeholder meetings on: December 20, 2023; December 21, 2023; January 10, 2024, January 11, 2024 and February 13, 2024; and April 2, 2024 to receive comments from stakeholders regarding the department's proposed primary regulations for the Producer Responsibility Program for Statewide Recycling. Key stakeholder questions and/or issues are compiled and discussed under the following section of this document. Work group meetings were held to discuss specific topics such as the definition of producer and the retail food establishment exemption. The department used teleconferencing so geographically diverse stakeholders could participate. Additionally, the department's website was utilized to post updates to the regulation revision process, stakeholder comments, iterative versions of support and working documents, and audio recordings of general stakeholder meetings.

During the stakeholder process, the department followed the procedures required by Executive Order Nos. 2 and 5 to notify local governments regarding the upcoming revisions to the solid waste regulations. As of the date of publishing this notice, no entities have responded to Executive Order No. 5.

**Issues Encountered During Stakeholder Process**

The department received numerous comments on the proposed rules under Section 18 during the stakeholder process. A summary of the notable stakeholder comments submitted to the department are summarized below.

The department received two clarifying questions during the stakeholder meetings specific to confidentiality of information provided to the department, and about the federal government exemption. Those comments were from Republic Services and One World Resources.

The department also received twenty-eight emailed comments, each covering multiple topics, or sections. Looking at each of those questions separately, a total of 103 topic-specific comments were received. Comments were received from organizations such as American Forest & Paper Association, Food Packaging Institute, AMERIPEN, American Chemistry Council, Serlin Haley, World Wildlife Fund, Circular Action Alliance, UPSTREAM, American Coatings Association, EcoCycle, and others.

In addition to email exchanges of updated proposed draft language in response to comments, the department also set up several meetings with some stakeholders who provided feedback to better understand and talk through suggested edits.

Forty-five of the comments pertained to definitions, and as a result, 26 definitions were further modified to provide clarity, one definition was added, and two definitions were stricken.

Of the 58 topic-specific comments, they primarily pertained to either adding or removing contradictory or extraneous language from the draft, or making small administrative changes to the rules, and, as a result, thirty different subsections of the proposed rules were modified.
Notable changes based on stakeholder feedback include:

1. 18.1.3 Adding nationally recognized organizations to referenced materials.

2. 18.1.4 Clarifying the subject of who proprietary information will not be released to, and adding

additional language from the hazardous waste regs describing that the department may share information with the PRO if there is no dispute from the party that submitted it.

3. 18.1.5 Adding a timeline of 10 business days to respond to requests to produce; records and the requirement for the annual audit to be included in the annual report.

4. 18.2.2 Adding clarity of obligated producer in case of franchise.

5. 18.2.3 Adding additional language to describe obligations of producers.

6. 18.2.5 Including a registration requirement with future additional PROs, and adding a registration deadline of October 1, 2024.

7. 18.3.3 Adding an introductory explanatory paragraph.

8. 18.3.4 Adding additional explanation for additional materials list updates, and including worker safety to the assessment criteria for establishing the material lists.

9. 18.5.4 Adding a department waiver for the PRO's requirement to maintain a financial reserve.

10. 18.7.3 Describing the PRO's requirement to comply with any coordination plan.

11. Drafting an order of obligation for determining who the producer is.

12. Adding additional clarity for internet transactions to describe that there are two obligated producers; and

13. Refining the language for producers of paper products to ensure there is no double-paying or dual obligation in the chain of custody of those products.

Notable administrative fixes include:

1. Replacing "shall" with "must" throughout.

2. Including Saturdays (along with Sundays and holidays) for deadline rollovers.

3. Re-numbering of subsections for accuracy after amendments were made.

**Alternatives Considered and Why Rejected**

No regulatory alternatives were evaluated because the statute is prescriptive on what the regulations should contain.

**Cost Benefit Analysis**

A cost benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

**DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT**

**Solid and Hazardous Waste Commission**

**Hazardous Materials and Waste Management Division**

**6 CCR 1007-2 Part 1**

**STATEMENT OF BASIS AND PURPOSE**

**AND SPECIFIC STATUTORY AUTHORITY FOR**

**Revision to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Addition of Section 19, Administration of the Closed Landfill Remediation Grant Program**

**(Adopted by the Solid and Hazardous Waste Commission on May 21, 2024)**

## Statutory Authority

These regulations are promulgated pursuant to the authority granted to the Solid and Hazardous Waste Commission (the "Commission") in Section 30-20-124, C.R.S. (the "Statute"), created by House Bill (HB) 23-1194, and passed by the legislature in 2023. These proposed regulations were developed in response to HB 23-1194 in which the General Assembly created the closed landfill remediation grant program (the "Grant Program") and directed the Commission to promulgate rules for the administration of the Grant Program by June 1, 2024.

## Overview of the Statute

The Grant Program was created to assist local governments in paying for closed landfill remediation and maintenance costs for the closed landfills they own. HB 23-1194 effectively codified the Grant Program in 30-20-124, C.R.S., creating the Grant Program fund. The Statute directs the Colorado Department of Public Health and Environment (the "Department") to oversee the administration of the fund. Additionally, HB 23-1194 directs the Commission to promulgate rules for the administration of the Grant Program, specifying uses of Grant Program funds and the minimum criteria that must be included in the rules. Another key provision of the Statute is the creation of an advisory committee (the "committee") to review grant applications and advise the Department on the award of grants and the evaluation of grant applications. Per the Statute, the Grant Program funding is only available to local governments that own a closed landfill.

## Overview of the Proposed Regulations

A new Section 19 is being added to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) (the "Regulations") to meet the requirements of HB 23-1194 and the Statute. The intention in drafting Section 19 is to keep the rules as flexible and inclusive as the Statute and available funding allows. The Department does not wish to unnecessarily limit the conditions for which grant funding might be available, beyond such limitations already set in the Statute. Section 19 contains criteria for applicant eligibility, cost eligibility and application evaluation. Section 19 also includes procedures for application submittal, application review, and grant award and grant recipient reporting requirements. Section 19 contains all of the elements required in the Statute.

The Statute establishes minimum requirements for the Grant Program. The Statute requires the Commission and the Department to give priority to grant applications that concern mitigating or remediating actual risk. The Statute also requires that the Grant Program rules include criteria for evaluating grant applications and awarding grants. The Statute does not define "actual risk," therefore, in drafting Section 19, the Department identified the need to add definitions in Section 19.1.3 describing what constitutes high and medium risk to provide clarity on the types of conditions at closed landfills that would be given priority for grant funding in the event that the amounts of funds requested in applications exceed available grant funds. Other additions for providing priority for grant funding include proximity to a disproportionately impacted community and multi-year projects that have previously received approval or partial approval of applications.

The Statute describes uses of Grant Program funds, and Section 19 includes and expands on these criteria in describing "cost eligibility criteria." Having cost eligibility criteria in Section 19 will allow the Department and the committee to review applications more effectively. In drafting Section 19, the Department identified the need to add definitions in Section 19.1.3 for eligible costs and for reasonable costs. A significant addition to Section 19.3, the Cost Eligibility Criteria, is to allow for testing of potentially affected drinking water sources in proximity to a closed landfill. Other significant additions to Section 19.3 include costs to design, acquire, install, startup, operate, and maintain equipment used for remediation, including monitoring, and costs to restore or replace a private or public potable water supply. While not specified in the Statute, the Department maintains such costs are consistent with the purposes of the Statute relative to identifying and remediating risks from closed landfills. Similarly, the word "mitigation" was added to multiple subsections of Section 19.3 in recognition of the fact that reducing the exposure attributable to a groundwater release from a closed landfill can be an important factor in achieving risk reduction and is therefore consistent with the purposes of the Statute.

With respect to the committee operations, the Department has included some basic operational parameters in Section 19 consistent with the Statute. Examples of these are the minimum frequency of committee meetings, publishing the meeting schedule online, an initial Department review for completeness prior to applications being referred to the committee, the opportunity for applicants to present at committee meetings, and the requirement for the committee to provide recommendations to the Department. These are deemed to be basic and necessary procedures to facilitate committee operations. Nevertheless, Section 19 leaves sufficient flexibility such that the committee may develop additional policies and operating procedures as it sees fit.

With respect to the Department operations, the Department included some basic operational parameters in Section 19 consistent with the Statute. Examples of these include a timeline and frequency for publishing a request for applications for the grant cycle (Section 19.5.1), how application results are

communicated, how grant amounts are determined (Section 19.6.4), and how grant funds are paid to the grant recipient (Section 19.7).

## Stakeholder Process

In response to HB 23-1194, the Department initiated the process to include administration of the Grant Program in the Regulations. The Department held three stakeholder meetings on Section 19, which were well attended. These meetings were held on January 22, 2024, February 5, 2024 and March 18, 2024. During these meetings, the Department presented background information about the Grant Program, proposed Section 19, developed revisions to Section 19, and engaged with a variety of different stakeholders, including local government officials, elected officials, and consultants. In conjunction with these stakeholder meetings, the Department solicited three rounds of written comments on Section 19 and made multiple revisions of Section 19 in response to stakeholder comments received.

## Issues Encountered During the Stakeholder Process

### Applicant Opportunity to Present to the Committee

The original Section 19 left it to the discretion of the committee on a per-application basis as to whether the applicant would be asked to present information during committee meetings. The Grant Program is for the benefit of local governments that own closed landfills, and these entities represent a broad spectrum of financial ability, ranging from small towns of a few hundred residents up to large well-resourced counties and cities. The Department was averse to drafting the rule in such a way as to mandate that all applicants are required to present to the committee, out of concerns that such a requirement could put under-resourced communities at a disadvantage. However, a local government stakeholder commented that they felt it was important to have the opportunity to present their application directly to the committee. After receiving the same comment on the first two versions of Section 19, the Department has revised Section 19 to provide an unequivocal opportunity for applicants to present to the committee. Section 19.6 is worded so that presenting to the committee is not a mandate, but an opportunity that applicants can make use of if they choose to do so, and is an equal opportunity for all applicants.

A similar comment was provided during a stakeholder meeting asking why participation by an applicant at the committee meeting is not mandatory. Reasons the Department doesn't believe attendance should be mandatory include: Local governments may have limited resources and may not be able to attend the meeting; there may be circumstances in remote areas that prevent an applicant from attending; there may be costs for having a "representative" available such as having a consultant present; there may be no questions for applicants and the committee may plan to approve the application in its entirety; and requiring attendance at the committee meetings would be a requirement of applicants above and beyond what the Statute requires and is not consistent with the purpose of the Statute, which is intended to help local governments with limited resources and not to add resource-related barriers to participation in the program. In cases where an applicant is asked to be present to answer questions the committee has regarding the application and the applicant does not attend, the committee would ultimately have to decide if enough information exists to make a recommendation for funding.

### Reasonableness of Costs

A stakeholder provided comments urging the Department to include detail on what constitutes a reasonable cost. The stakeholder proposed a definition of the term "reasonable cost", and in response, the Department largely accepted that suggestion, with minor wording changes.

Timelines and Procedures

A stakeholder provided comments indicating the level of detail provided in Section 19.5 for Application Submittal was not sufficient per the Statute. The Statute requires the rules to include timelines and procedures by which an eligible local government may apply for a grant. The Department believes that specific details about timelines and procedures are more appropriate in the details specified for each individual grant cycle as the Grant Program processes develop to accommodate local government's needs, and will be communicated in requests for applications. The Department revised Section 19.5 to include an initial date and frequency to release requests for applications, specifying when applications can be received, and that complete applications must be submitted on the form(s) and template(s) provided in the request for applications on or before the due date as indicated in the request for applications for the grant cycle.

Department Reporting to the Committee

A stakeholder provided comments urging the Department to modify the rules to state that the Department will provide a detailed, comprehensive report to the committee for each grant application for transparency and public awareness. The Department did not include the Department's preparation of detailed, comprehensive reports in Section 19 because the committee is required to review the applications per the criteria set forth in the rules and provide recommendations to the Department. The rules require the Department to ensure the committee receives a complete application. The Department will consult with the committee during committee meetings. During the committee meeting, the Department expects to provide details the committee will need about the funds available and details about the complete applications to help streamline the discussion. This is not a detailed report on each application, but rather a summary of the objective requirements in the rules (for example, do the costs meet eligibility criteria). The Department does not evaluate on behalf of the committee. If there is a difference between the committee recommendations and the Department's decision to award grant funds, the Department will specify the reason for the difference per Section 19.6.1(A).

**Alternatives Considered and Why Rejected**

No other regulatory alternatives were considered.

**Cost Benefit Analysis**

A cost benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

### STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Section 14.

**(Adopted by the Solid and Hazardous Waste Commission on February 20, 2024)**

**Basis and Purpose**

I. Statutory Authority

Section 30-20-109 C.R.S. gives the Solid and Hazardous Waste Commission (the Commission) the authority to promulgate solid waste regulations in order to implement and enforce Section 30, Article 20, Part 1, C.R.S. In addition, Section 30- 20-109(2)(d) gives the Commission the authority to establish criteria by rule as to when a certificate of designation is not required for composting site and facilities.

II. Purpose of revised regulations:

The purpose of these revisions to Section 14 of 6 CCR 1007-2 Part 1 (the Regulations) is to increase food waste diversion opportunities by increasing allowable Type 2 feedstock volumes for Conditionally Exempt Small Quantity facilities, and allowing certain Class I facilities to accept food waste from offsite locations. A standard operator training requirement is included for Class I, II, and III facilities. The requirements for sampling, storage, and use of finished compost and soil amendments have also been updated to be more protective of human health and the environment.

**Discussion of Regulatory Proposal**

In Section 14.1.4(A) the volume of Type 2 feedstocks for Conditionally Exempt Small Quantity Composting Operations is increasing to 20 cubic yards, and the distinction for in-vessel composting is being removed.

In Section 14.1.5 the existing compliance schedule is being replaced to reflect the changes proposed by this revision. Compliance is required within twelve months of the effective date of this revision for the operator training requirements in Sections 14.2.4(K)(1), 14.3.5(K)(1), and 14.4.5(K)(1). Additionally, facilities with an EDOP must update their sampling plans to reflect the changes within 14.6(D) within 12 months of the effective date of this revision.

In Section 14.2.1, which applies to Class I Compost Facilities, the following changes are being proposed:

14.2.1(B)
Under the proposed revisions, a Class I compost facility may accept up to 5,000 cubic yards of Type 1 feedstocks, source separated organics, food residuals and food processing vegetative waste from offsite sources. Previously, this facility type could only process food waste that was generated onsite.

14.2.1(C)
This section is being modified to include as a Class I compost facility any agriculturally zoned compost facility that accepts Type 1 feedstocks, source separated organics, food residuals and food processing vegetative waste from offsite, and composts them together with agricultural materials generated onsite. This facility can have no more than 5,000 cubic yards of source separated organics onsite and in-process at any given time, and must be composted in an area of two acres or less.

14.2.1(D)
The section pertaining to an agriculturally zoned composting operation, formerly in 14.2.1(C), has moved here.

Section 14.2.3 addresses Class I Composting Facility Design Requirements. Under the proposed changes, surface water controls 14.2.3(A)(2)(b) have been modified to allow for alternate contact water management systems, and clarifications in sections 14.2.3(A)(2)(c), 14.2.3(A)(2)(d), and 14.2.3(A)(2)(e) have been made as to which features are considered engineered. Subsection 14.2.3(B) has been modified to only apply to facilities accepting manure, mortalities, and animal materials. These changes are intended to allow for more diverse management of contact water, while still being protective of ground and surface water.

Section 14.2.4(C) has been changed to allow certain Class I composting facilities to accept Type 2 feedstocks, which corresponds to the addition of food residuals and food processing vegetative waste to the list of acceptable materials for facilities under 14.2.1(B) and 14.2.1(C).

Section 14.2.4(K), which covers personnel training, now requires that the new operations allowed under Section 14.2.1(B) and 14.2.1(C) have a certified operator. This modification is important to ensure operators are familiar with the various technical requirements for properly operating a composting facility. Proper training will help prepare operators respond to issues in a timely and effective manner, which will ensure better protection of human health and the environment.

In Section 14.3.5(B) (Financial Assurance) the language has been changed so that Class II composting facilities are not required to include financial assurance cost estimates in the EDOP, and can instead be submitted under separate cover. Cost estimates are not typically required until the closure plan, a component of the EDOP, has been approved. Because of this, it is preferred that they not be included within the EDOP.

Section 14.3.5(K) (Personnel Training) requires that all Class II operations have a certified operator.

In Section 14.4.5(B) (Financial Assurance) the language has been changed so that Class III composting facilities are not required to include financial assurance cost estimates in the EDOP, and can instead be submitted under separated cover.

Section 14.4.5(K) (Personnel Training) requires that all Class III operations have a certified operator.

The Section 14.6 (Sampling of Finished Compost and Soils Amendments) are as follows:

14.6(D) – Finished compost must now be sampled for both fecal coliform and Salmonella. Sampling has revealed that some compost may pass one of the indicators, but fail for the other. Testing for both standard pathogens ensures that the material has been properly and effectively composted and will ensure the protection of human health and the environment.

14.6(J) – Finished compost may only be stored in areas identified in the facility's operations plan. This ensures that finished compost is not potentially being stored in a manner where it might be contaminated by unprocessed or unfinished materials.

14.6(K) – Soil amendments may not be distributed without meeting Section 14.6(C) requirements, and if they have not met unrestricted use criteria, they must be stored in a manner that is protective of human health and the environment and complies with facility operations plans. Liquid soil amendment storage on the ground is subject to Section 9 of the regulations, which applies to liquid storage of solid waste. Additional engineering controls may be required by the Department.

## Issues Encountered During Stakeholder Process:

One stakeholder meeting was held on September 25, 2023, and comments from the public were accepted until October 31, 2023. The only comments suggesting any changes are as follows:

1) The United States Compost Council, which recommended that the operator training requirement be increased to specifically require operator's to obtain the United State Compost Council's Certified Compost Operation Manager credential.

2) Bob Yost from A1 Organics recommended that the requirement to test for both pathogens be reevaluated once the EPA changes the 503 testing requirements for biosolids, which is the basis for Colorado's finished compost testing requriements.

While these comments were considered, no changes to the proposed rules were made.

## Regulatory Alternatives

No other regulatory alternatives were evaluated.

## Cost/Benefit Analysis

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Section 1.7.4, Solid Waste User Fee

**(Adopted by the Solid and Hazardous Waste Commission on February 20, 2024)**

**Basis and Purpose**

I. Statutory Authority

Section 25-16-104.5(1.7)(a) C.R.S. and Section 25-16-104.5(1.7)(a)(I) C.R.S. authorizes the Solid and Hazardous Waste Commission (the Commission) to promulgate rules to establish the solid waste user fee to cover the Colorado Department of Public Health and Environment's costs to implement the solid waste management program under Section 30-20-101.5, C.R.S.

II. Purpose of revised regulations:

The Solid Waste and Materials Management Program is expected to experience a budget shortfall in the solid waste management fund in fiscal year 2024 and the fee increase is needed to help prevent a budget shortfall for the program in fiscal year 2025. The purpose of these revisions to Section 1.7.4 of 6 CCR 1007-2 Part 1 (the Regulations) is to increase the solid waste management fund's portion of the solid waste user fee authorized in Section 25-16-104.5(1.7)(a)(I) C.R.S. from $0.13 per cubic yard to $0.22 per cubic yard for one year beginning on July 1, 2024. Beginning on July 1, 2025, the solid waste management fund's portion will decrease to $0.17 per cubic year. During the one year period from July 1, 2024 to June 30, 2025, the Hazardous Substance Response Fund's portion of the solid waste user fee will drop from $0.05 per cubic yard to $0.00.

**Discussion of Regulatory Proposal**

The Solid Waste and Materials Management Program is funded through the solid waste user fee assessed on the disposal of waste, document review fees, and annual facility fees. With the exception of the general fund money appropriated to the department in HB 23-1194 to fund one full time employee (FTE) to implement the Closed Landfills Remediation Grant Program and a small amount of general fund money appropriated to support 0.4 FTE to implement SB 23-253, Standards For Products Represented as Compostable, the Solid Waste and Materials Management Program is fully funded through fees. The program receives funding through a few different fee types: the solid waste user fee, annual facility fees from solid waste disposal sites and facilities that do not pay the solid waste user fee, the waste tire fee, the paint stewardship fee, and document review fees.

The Solid Waste Program brought in about $3.5 million in total revenue in Fiscal Year 2022-2023. Ninety-eight percent of the total revenue (i.e., $3.4 million) was generated by tipping fees.



**Solid Waste Management Fund Balance**




The solid waste management fund supports 23 FTE. Twenty FTE are responsible for the implementation of the Regulations Pertaining to Solid Waste Disposal Sites and Facilities, 6 CCR 1007-2 (the solid waste regulations) Part 1 and the Solid Waste Act §§ 30-20-100.5 C.R.S. *et seq.*, at solid waste disposal sites and facilities. Three FTE are dedicated to recycling and waste diversion efforts through data collection and enforcement of the solid waste regulations at recycling facilities. Staff that perform document reviews for solid waste facility designs, groundwater monitoring reports, or other documents submitted for review by solid waste facilities are mostly funded though the solid waste user fee with a smaller percentage of their funding generated through document review fees. The Solid Waste Program charges $125 per hour, as approved by the Solid and Hazardous Waste Commission, to review permitting documents.

Due to a sweep of $363,243 in 2020 by the legislature to support COVID relief efforts, recent obligations to conduct groundwater monitoring at small landfills and performing document reviews at no cost to small landfills, the solid waste management fund experienced a budget shortfall of about $98,000 in state Fiscal Year 2023. Due to the budget shortfall, the solid waste program is holding 3 positions vacant. One vacant position is a solid waste inspector position, and the other 2 are solid waste permitting positions. As shown below, document review backlog times increased in FY 2023 due to the lack of the 2 permitting staff.

**Average number of elapsed days document types are in backlog (based on document complexity)**




The Solid Waste and Materials Management Program's other funding sources are adequate to support the remaining 7 FTE at this time.

The Solid and Hazardous Waste Commission last approved an increase to the solid waste user fee for the solid waste management fund in 2010 to support the Solid Waste and Materials Management administrative functions.




In an effort to create a positive cash balance in the solid waste management fund, the solid waste user fee will increase a total of $0.04 from $0.21 per cubic yard to $0.25 per cubic yard of waste disposed in solid waste facilities in July 1, 2024. Additionally, from July 1, 2024 through June 30, 2025, the entire portion of Hazardous Substance Response Fund (HSRF) of the solid waste user fee, or $0.05 per cubic yard, will drop to zero and will instead be shifted to the solid waste program. The proposed changes are shown in the chart below.

From July 1, 2024 to June 30, 2025, the solid waste user fee will be:

| **Solid Waste User Fee** | **Cubic Yard Rate** | **Ton Rate** |
|---|---|---|
| Solid Waste Program § 25-16-104.5(1.7)(a)(I) | $0.22 | $0.73 |
| Hazardous Substance Response Fund § 25-16-104.5(1.7)(a)(II) | $0.00 | $0.00 |
| Department of Law § 25-16-104.5(1.7)(a)(III) | $0.03 | $0.10 |
| Total SWUF<br>Note: Does not include RREO fee as defined in § 25-16-104.5(3.9) | $0.25 | $.83 |

Beginning on July 1, 2025, the solid waste user fee will be:

| **Solid Waste User Fee** | **Cubic Yard Rate** | **Ton Rate** |
|---|---|---|
| Solid Waste Program<br><br>§ 25-16-104.5(1.7)(a)(I) | $0.17 | $0.57 |
| Hazardous Substance Response Fund<br><br>§ 25-16-104.5(1.7)(a)(II) | $0.05 | $0.17 |
| Department of Law<br><br>§ 25-16-104.5(1.7)(a)(III) | $0.03 | $0.10 |
| Total SWUF<br><br>Note: Does not include RREO fee as defined in § 25-16-104.5(3.9) | $0.25 | $.83 |

**Issues Encountered During Stakeholder Process:**

The Hazardous Materials and Waste Management Division conducted two stakeholder meetings to present the proposed changes to the Solid Waste User Fee. An initial stakeholder meeting was held on October 27, 2023 and an additional stakeholder meeting was held on November 28, 2023. The Hazardous Materials and Waste Management Division did not encounter any issues during the stakeholder process.

Two counties in Colorado (Denver County and Pitkin County) retain the Hazardous Substance Response (HSRF) portion of the solid waste user fee pursuant to § 25-16-104.5(1.7)(2)(a.5) C.R.S., which allows local governments to retain the fee assessed at their government-owned landfills to fund response activities at sites on the national priority list. Because the HSRF portion of the fee will decrease the local revenue to $0.0 from July 1, 2024 to June 30, 2025, the department reached out to Denver County and Pitkin County to discuss the one-year pause in collection of the fee. Both counties understood the Division's position and were okay with the one-year pause in collection of the fee.

## Regulatory Alternatives

No other regulatory alternatives were evaluated.

## Cost/Benefit Analysis

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) - Section 1.7.6 (Waste Tire Fee), Section 10.3.2 (Waste Tire Hauler Registration Requirements), 10.7.3 (Mobile Waste Tire Processors Registration Requirements), 10.11.8 (Waste Tire Fee Administration), 10.12.5 (Rebate Amount).

**(Adopted by the Solid and Hazardous Waste Commission on August 15, 2023)**

<u>Basis and Purpose</u>

I. <u>Statutory Authority</u>

Section 30-20-1401(2), C.R.S. gives the Solid and Hazardous Waste Commission (the Commission) the authority to promulgate waste tire regulations in order to implement and enforce Section 30, Article 20, Part 14, C.R.S.

II. <u>Purpose of revised regulations:</u>

The purpose of revising 6 CCR 1007-2 Part 1 (the Regulations) is to change the waste tire hauler and mobile waste tire processor registration requirements, and to set the Waste Tire Fee and the End User fund per ton rebate for 2024.

<u>Discussion of Regulatory Proposal</u>

In Section 1.7.6 (B) (Waste Tire Fee) the Waste Tire Fee was changed from $1.25 to $.55 per replacement tire sold. The change is required per 30-20-1403 C.R.S. The amount deposited into the End Users Fund (30-20-1405 C.R.S.) will be changed from $.75 per replacement tire sold to $.05 per replacement tire sold. The proposed rate change is due to the reduction of the Waste Tire Fee. The department will continue to receive $.50 per tire to maintain the current administration of the Waste Tire Program.

In Section 10.3.2 (B) (Waste Tire Hauler Registration Requirements) a provision was added requiring the Waste Tire Hauler to certify submission of the Annual Report for the prior year as required by Section 10.3.5.

Section 10.3.2 (C) (Waste Tire Hauler Registration Requirements) was modified to codify procedures that the Department already implements regarding Waste Tire Hauler Certificates of Registration, including denying the Form WT-1H application and not renewing the Waste Tire Hauler Certificate of Registration of a person who fails to submit or complete all of the information on the Waste Tire Hauler renewal form (Form WT-1H), or denying the Form WT-1H application and not renewing the Waste Tire Hauler Certificate of Registration of a person who fails to submit or complete the Commercial Waste Tire Hauler Report Form (Form WT-4).

In Section 10.7.3 (C) (Mobile Waste Tire Processors Registration Requirements) a provision was added that the Mobile Waste Tire Processor must certify submission of the Annual Report for the prior year as required by Section 10.7.7.

Section 10.7.3 (D) (Mobile Waste Tire Processors Registration Requirements) was modified to codify procedures that the Department already implements regarding Mobile Waste Tire Processor Certificates of Registration, including denying the Form WT-1M application and not renewing the Mobile Waste Tire Processor Certificate of Registration of a person who fails to submit or complete all of the information on the Mobile Waste Tire Processor renewal form (Form WT-1M), or denying the Form WT-1M application and not renewing the Mobile Waste Tire Processor Certificate of Registration of a person who fails to submit or complete the Mobile Waste Tire Processor Annual Reporting Form (Form WT-8).

In Section 10.11.8 (2) (Waste Tire Fee Administration) the text was changed from $1.25 to $.55 for the Waste Tire Fee for the required language printed on a consumer's receipt or invoice when they purchase new replacement tires.

Section 10.12.5 (B) (Rebate Amount) was modified to change the year to 2024. Based on current End Users account funds, participation in the rebate program, and the rate change of the Waste Tire Fee, the per ton rates for the three tiers will be changed. The proposed regulations set the 2024 per ton waste tire end user rebate rates as follows:

A. Tier 1: $50 per ton;

B. Tier 2: $25 per ton;

C. Tier 3: $12.50 per ton; and

D. Waste Tire Hauler: $12.50 per ton.

## Issues Encountered During Stakeholder Process:

Stakeholders were notified by e-mail of the revision of these regulations. Stakeholders were given an opportunity to provide any comments.

No questions were asked during the stakeholder meeting.

## Regulatory Alternatives

No other regulatory alternatives were evaluated.

## Cost/Benefit Analysis

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

**DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT**

**Solid and Hazardous Waste Commission**

**Hazardous Materials and Waste Management Division**

**6 CCR 1007-2 Part 1**

**STATEMENT OF BASIS AND PURPOSE
AND SPECIFIC STATUTORY AUTHORITY FOR**

**Revision to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) - Addition of Section 1.8 Regulations (Producer Responsibility Authorization and Dollar Limit Exemption), Placeholder for Addition of Section 18 (Producer Responsibility Regulations), and Associated Additions to Section 1.2 (Definitions)**

**(Adopted by the Solid and Hazardous Waste Commission on May 16, 2023)**

## Statutory Authority

These regulations are promulgated pursuant to the authority granted to the Solid and Hazardous Waste Commission in Section 25-17-713, C.R.S. These proposed revisions to the regulations were developed in response to House Bill (HB) 22-1355, passed by the legislature in 2022, in which the General Assembly directed the Commission to adjust the Producer's dollar limitation exemption by the consumer price index annually by July 1.

## Overview of the Act

House Bill (HB) 22-1305 effectively codified this program in 25-17-701, C.R.S., by directing the Department of Public Health and Environment (the "Department") to oversee the implementation and operations of a producer responsibility program that requires producers to finance a program that provides statewide recycling services for covered materials. While the producer responsibility program is responsible for the operations and management of a statewide recycling program, the Department is required by the Act to oversee the producer responsibility organization's program plan and results.

## Overview of the Proposed Regulations and Definitions

Section 1.2 (Definitions) is being amended by adding the definition of "Producer" as defined in Section 25-17-703 (30) C.R.S. While the division sees a need for adding a more detailed definition of a "producer" to provide additional clarity on which specific entities will be subject to the Act and regulations, the Division views this as a complex issue that will require further stakeholder input. Because the current stakeholder and rulemaking process has a limited timeframe to achieve the July 1, 2023 deadline to set and adjust the consumer price index dollar limitation exemption rate, the regulatory definition of a

producer which refines and clarifies the statutory definition of a producer will be addressed in detail during the 2024 stakeholder process and rulemaking.

Section 1.8 (Producer Responsibility Authorization and Dollar Limit Exemption) is being added to include the Commission's authorization pursuant to Section 25-17-713 (2) C.R.S. to adjust by rule the dollar limitation set forth in Section 25-17-713(1)(a) C.R.S., based on the percentage change in the United States Department of Labor's Bureau of Labor Statistics Consumer Price Index (CPI) for Denver-Aurora-Lakewood for all items and all urban consumers, or its successor index.

Section 1.8.2 Producer Exemption Dollar Limit is also being added which describes that as of July 1, 2023, a producer is exempt from the requirements of Sections 25-17-701 - 25-17-716, C.R.S., and Section 18 if the producer is a person with less than five million three hundred twenty thousand dollars ($5,320,000) in realized gross total revenue, not including on-premises alcohol sales, during the prior calendar year.

Section 18 is being amended as a placeholder for the upcoming producer responsibility regulations.

**Stakeholder Process**

In response to HB 22-1355, the division initiated the process to include the producer dollar limitation exemption in the program regulation. The division held a stakeholder meeting on March 7, 2023. This meeting was part of a successful regulation review process, during which the department engaged with a stakeholder group that included local governments; registered recycling facilities; manufacturers; landfills; transfer stations; household hazardous waste ("HHW") collection centers; trade associations; business advocacy organizations; chambers of commerce; environmental and community nonprofits; compost operators; producers; and other private operators and industry associations including Recycle Colorado ("RC"), Solid Waste Association of North America ("SWANA"), Colorado Municipal League ("CML"), Colorado Communities for Climate Action ("CC4CA"), and Colorado Counties, Inc., and other Colorado Department of Public Health and Environment ("CDPHE") division representatives.

**Stakeholder Feedback, Questions and Answers on the Proposed Rules**

Seventy-three (73) participants registered for the March 7, 2023 stakeholder meeting, of which forty-four (44) attended in real-time. We received feedback and questions from eight participants, which has been compiled for consideration, and in summary, included:

- *I want to see producer responsibility succeed. Provide clarification around the definition of producer, it should include the federal government.*
- *{unrelated to rulemaking} What will be covered in the material list, and how will contaminated containers be handled?*
- *I want to express my gratitude to CDPHE for their hard work in rolling out this program. We look forward to participating in making the program a success and upcoming stakeholder engagement processes.*

- *Is the revenue dollar exemption for producers based on CO state revenue or total revenues? Does that include products and services (e.g. spa/hair)?*
- *{unrelated to rulemaking} Is there a video that describes recycling guidelines?*
- *A broader interpretation of revenue (to include revenue from services) will have a massive impact on how many producers are obligated versus not.*
- *{unrelated to rulemaking} Have you chosen the PRO yet? What is the timeline for that?*

**Stakeholder Process Result**

The stakeholder meeting was conducted to allow for a systematic line-by-line review of the proposed amendments to the Regulations. Stakeholder consensus was achieved on all proposed amendments being presented to the Commission for adoption, and there was consensus that another stakeholder meeting was not warranted. Stakeholders were asked to provide their input on a variety of issues related to the inclusion of definitions, regulatory authority, and applicability of the producer responsibility program for statewide recycling program. Based on neutral feedback received from stakeholders, the division retained the original draft version of the Rules and Regulations Governing the Producer Responsibility Program for Statewide Recycling, and associated definitions. Adoption of the updated and revised Regulations, and associated definitions, 6 CCR 1007-2 will ensure that Colorado's producer responsibility program remains in compliance with C.R.S. 25-17-713, while continuing to facilitate the development of a statewide recycling program.

**Alternatives Considered and Why Rejected**

No other regulatory alternatives were considered.

**Cost Benefit Analysis**

A cost benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission Hazardous

## Materials and Waste Management Division

**6 CCR 1007-2**

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – For Consistency with 6 CCR 1007-1, Part 20

**(Adopted by the Solid and Hazardous Waste Commission on November 15, 2022)**

**Basis and Purpose**

I. Statutory Authority

Section 30-20-109, C.R.S. gives the Solid and Hazardous Waste Commission (the commission) the authority to promulgate regulations for the design and operation of solid waste disposal sites and facilities. This authority includes provisions related to the management of solid waste that contains or potentially contains technologically enhanced naturally occurring radioactive material (TENORM).

II. Purpose of revised regulations:

The purpose of the revised regulations is to make changes to the solid waste regulations for conformance with 6 CCR 1007-1, Part 20 (the Part 20 TENORM Regulation) promulgated by the Board of Health in December 2020. The Part 20 TENORM Regulation affects any solid waste facility that manages, or potentially receives, non-exempt TENORM. In addition, the Part 20 Rule has sector-specific requirements for several types of solid waste facilities.

**Discussion of Regulatory Proposal**

For the purpose of aligning with the Part 20 TENORM Regulation, several changes to the Solid Waste Regulations (6 CCR 1007-2, Part 1) are proposed. These are referred to by their section numbers. First, TENORM related definitions are added to Section 1.2. Second, Section 2.1.2 is amended such that all solid waste disposal sites and facilities required to have waste characterization plans will include waste screening provisions for TENORM constituents in those plans. Furthermore, for each type of solid waste facility addressed specifically in the Part 20 TENORM

Regulation, the pertinent requirements from Part 20 are proposed for direct adoption in the Solid Waste Regulations. Section 12 on the management and disposal of drinking water treatment residuals is proposed for deletion because its provisions for TENORM characterization have now been superseded by the Part 20 TENORM Regulation, and because its provisions for landfilling of sludge have been superseded by Section 3 of the Solid Waste Regulations. Only one site permitted under Section 12 is still operating and it will not be required to be re-permitted under Section 3. Finally, for the subset of Section 9 waste impoundments that manage potential TENORM waste, those facilities would need to modify their closure plans to account for TENORM constituents.

Exempt and non-exempt TENORM are terms used but not explicitly defined in these proposed, revised regulations. The term "exempt TENORM" as used in this revision refers to TENORM materials that qualify for exemption under Section 20.4 of the Part 20 TENORM Regulation. "Non-exempt TENORM" refers to TENORM materials that do not qualify for exemption under Section 20.4.

"Industry-specific TENORM radionuclides" refers to the industry-specific radionuclides that may be used for characterizing potential TENORM generated by each industry or operation. This list may be found in Table A.1.1 (Industry-specific Radionuclides for TENORM Characterization) of the GUIDANCE FOR IMPLEMENTATION OF THE FINAL RULE "REGISTRATION AND LICENSING OF TECHNOLOGICALLY ENHANCED NATURALLY OCCURRING RADIOACTIVE MATERIAL (TENORM)" 6 CCR 1007-1 PART 20, Addendum A: TENORM Characterization.

Description of Local Government Involvement in the Stakeholder Process

Executive Order D 2011-005 (EO-5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO-5 Internal Communication Form – Conception Phase that was transmitted to local governments. These regulations would impact any county or municipality that operates a commercial landfill. Additionally, local governments that operate commercial compost facilities or section 9 impoundments would be affected to the extent that these waste management units manage potential TENORM. The Department maintains contact lists for solid waste facility owners and operators, and these were used to invite entities who operate these types of facilities (including local governments) to stakeholder meetings held for these different sectors.

## Issues Encountered During Stakeholder Process:

The National Waste and Recycling Association (NWRA) was the sole commenter during both written comment periods of the proposed rulemaking stakeholder process. The first set of comments resulted in changes to the proposal. The second set of comments showed that the NWRA's issues were mostly resolved, with two exceptions being as follows.

First, NWRA recommended, for simplicity's sake that the Part 20 TENORM Regulation requirements be referenced, not repeated, in the Solid Waste Regulations. The Division considered this option but decided against it, reasoning that it is arguably more user-friendly to have the pertinent requirements repeated in the Solid Waste Regulations, rather than forcing solid waste sites to read two different sets of rules simultaneously to obtain the full scope of requirements. Additionally, including the TENORM provisions in the Solid Waste Regulations is necessary for the Solid Waste and Materials Management Program (Program), as the primary regulator of solid waste facilities and the entity that approves the Engineering Design and Operations Plans that will incorporate requirements related to TENORM, to have the ability to enforce these requirements.

Second, the NWRA highlighted what they perceive as a disconnect with groundwater monitoring and remediation requirements in the Part 20 Regulation itself. Since this rulemaking is solely for the purpose of consistency with the existing Part 20 Regulation, making changes to the underlying Part 20 Regulation is outside the scope of this rulemaking.

**Regulatory Alternatives**

No other regulatory alternatives were evaluated.

**Cost/Benefit Analysis**

A cost / benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) - Section 10.3.2 (Registration for Waste Tire Haulers), Section 10.3.3 (Waste Tire Hauler Decals), 10.7.3 (Mobile Waste Tire Processors Registration Requirements), 10.7.4 (Mobile Waste Tire Processor Decal), 10.12.2 (General Rules for End Users Applying for a Waste Tire Hauler Rebate), 10.12.5 (Rebate Amount).

**(Adopted by the Solid and Hazardous Waste Commission on November 15, 2022)**

**Basis and Purpose**

I. Statutory Authority

Section 30-20-1401(2), C.R.S. gives the Solid and Hazardous Waste Commission (the Commission) the authority to promulgate waste tire regulations in order to implement and enforce Section 30, Article 20, Part 14, C.R.S.

II. Purpose of revised regulations:

The purpose of revising 6 CCR 1007-2 Part 1 (the Regulations) is to change the waste tire hauler and mobile waste tire processor registration renewal date, and set the End User fund per ton rebate.

**Discussion of Regulatory Proposal**

` In Section 10.3.2 (F) (Registration for Waste Tire Haulers), the submittal date for the Certificate of Registration renewal application for a Waste Tire Hauler (Form WT-1H) was changed from an annual renewal to every odd numbered year renewal. Waste Tire Haulers will only have to renew their Waste Tire Hauler registration every two years instead of every consecutive year. This will provide Waste Tire Haulers with a reduction of having to submit a waste tire hauler renewal every consecutive year. It will also reduce the Department's administrative burden of processing waste tire

hauler registration renewals every consecutive year. With an effective date in 2022, currently registered waste tire haulers will submit a hauler renewal registration Form WT-1H by March 1, 2023. The next submittal of Form WT-1H will be due by March 1, 2025, and so forth each odd numbered year.

Section 10.3.3 (C) (Waste Tire Hauler Processor Decals) was modified to include temporary decals and to refer to the renewal application (Form WT-1H). Starting in 2023, the Waste Tire Hauler decal will be valid until April 15, 2025, and so forth every odd numbered year.

In Section 10.7.3 (F) (Mobile Waste Tire Processors Registration Requirements), the submittal date for the Certificate of Registration renewal application for a Mobile Waste Tire Processor (Form WT-1M) was changed to every odd numbered year. Mobile Waste Tire Processors will only have to renew their Mobile Waste Tire Processor registration every two years instead of every consecutive year. This will provide Mobile Waste Tire Processors with a reduction of having to submit a mobile waste tire processor renewal every consecutive year. It will also reduce the Department's administrative burden of processing mobile waste tire processor registration renewals every consecutive year. With an effective date in 2022 the rule will require the submittal of Form WT-1M by March 1, 2023 for existing mobile waste tire processors. Mobile waste tire processors will be required to submit renewal registrations by March 1, 2025, and so forth each odd numbered year.

Section 10.7.4 (C) (Mobile Waste Tire Processor Decal) was modified to refer to the renewal application (Form WT-1M). The Mobile Waste Tire Processor decal will be valid until April 15, 2025, and so forth each odd numbered year.

Section 10.12.1 (C) (General Rules for End Users Applying for a Waste Tire Hauler Rebate) was modified due to the change of the Department of Local Affairs ("DOLA") web address. DOLA publishes county population figures each year that the department uses to determine what counties are considered rural (under 60,000 residents). Only waste tires hauled from rural counties are eligible for a rebate from the fund.

Section 10.12.5 (B) (Rebate Amount) was modified to change the year to 2023. Based on current End Users account funds and participation, the per ton rates for the three tiers will remain the same. The proposed regulations set the 2023 per ton waste tire end user rebate rates as follows:

A. Tier 1: $80 per ton;

B. Tier 2: $40 per ton;

C. Tier 3: $20 per ton; and

D. Waste Tire Hauler: $20 per ton.

**Issues Encountered During Stakeholder Process:**

Stakeholders were notified by e-mail of the revision of these regulations. Stakeholders were given an opportunity to provide any comments.

No questions were asked during the stakeholder meeting.

**Regulatory Alternatives**

No other regulatory alternatives were evaluated.

**Cost/Benefit Analysis**

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division
## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) - Appendices (Table of Contents), Section 4.6.4 (Surety Bonds Guaranteeing Performance or Payment) and Appendix A (Wording for Financial Assurance Mechanisms).

**(Adopted by the Solid and Hazardous Waste Commission on August 16, 2022)**

## Basis and Purpose

I. Statutory Authority

These amendments to 6 CCR 1007-2, Part 1 are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in § 30-20-104.5, C.R.S and § 30-20-109, C.R.S.

II. Purpose of revised regulations

The purpose of Section 4.0 of the solid waste regulations is to provide assurance that funds will be available to the Department when needed for adequate closure and post-closure of, and corrective action at, solid wastes disposal sites and facilities should the owner and operator become financially insolvent. These regulations require the owners and operators to secure financial instruments to demonstrate adequate coverage until a release is granted by the department.

The proposed changes to the financial assurance regulations is to correct typographical errors, revise deadlines to improve timeliness for annual reporting requirements. Update the list of allowable mechanisms, and enhance terms and conditions for both insurance and surety bond mechanisms.

## Discussion of Regulatory Proposal

1) **Table of Contents - Appendices - Appendix A - Amended**
Proposed correction of Appendix A title as it appears in the Table of Contents. This will replace "Financial work sheet" with "Financial Assurance Instrument" as specified in Appendix A.

2) **Section 4.5.1 - Annual Inflation - Amended**
This section requires the owner or operator to annually revise the closure, post-closure, and any corrective action cost estimate for inflation and must submit this

estimate sixty (60) days prior to the anniversary date of the establishment of the financial instruments for the department approval.

*Proposed revisions will standardize the annual inflation submission deadline to April 15th.*

3) **Section 4.6.1 Allowable Financial Assurance Mechanism - New**
This section identifies the various mechanisms that the owner and operators may use to demonstrate financial assurance.

*Proposed revisions to Section 4.6.1 (D) will add an alternative instrument, Cash Deposit Holding Account, which the owner and operator may use to demonstrate financial assurance.*

4) **Section 4.6.4 Surety Bonds Guaranteeing Performance or Payment - Amended**
Subsection 4.6.4 (F) states the surety may cancel the bond by sending notice of cancelation by certified mail, or another trackable delivery service, to the owner or operator and to the department. A cancelation may not occur until one hundred twenty (120) days after the notice of cancelation has been received by both the owner or operator and the department, as evidenced by return receipts.

*Proposed revisions will add specific contact information for whom the cancelation notices must be sent.*

5) **Section 4.6.5 Insurance - Amended**
Subsection 4.6.5 (J) requires the insurer to cancel the policy by sending notice of cancellation by certified mail, or another trackable delivery service, to the owner or operator and the department.

*Proposed revisions will add specific contact information for whom the cancelation notices must be sent.*

Subsection 4.6.5 (K) requires the owner and operator to obtain a replacement mechanism is the insurer cancels the policy.

*Proposed revision will require the owner and operator to replace the financial assurance mechanism before the end of the 120-day period.*

*Proposed addition of Subsection 4.6.5 (P) to require the owner and operator to provide a copy of the insurance policy and endorsements as requested by the Department.*

6) **Appendix A - Financial Assurance Instrument Language - Amended**
Section III. Surety Bond and Section IV. Performance Bond amended to align with the proposed changes described in Section 4.6.4 (F) in list item number 4 above.

Section V. Insurance amended to align with the proposed changes described in Section 4.6.5 (J) in list item number 4 above.

Section VII. Approved Wording for Cash Deposit Holding Account

## Issues Encountered During Stakeholder Process:

Virtual stakeholder meeting on April 4, 2022:

- An invitation was extended to 105 people, including internal employees, Surety Bond firms, Insurance companies, and Solid Waste Landfill owner/operators. Only 49 people registered for the meeting out of a total of 105.
- The deadline for feedback/questions/concerns was April 13, 2022.
- 23 comments, questions, and concerns were received.

Questions/Comments/Concerns/Answers

1) Section 4.5.1 - Annual Inflation - Amended:

Q: Could the annual inflation rate increase be posted on the CDPHE website and sent out with The new regulation changes?

A: These rates are posted on the Solid waste financial assurance page. In the future, we plan to send all facilities annual notices of rate change and reminders for the annual submission.

Q: The annual inflation revision will now be due by April 15th. Would we provide the new financial assurance instrument at the same time?

A: Yes, the revised mechanism should be submitted to us and we will extend the proposed deadline from April 15th to April 30th. The idea of this deadline is that if the U.S. Department of Commerce provides the implicit price deflator by the end of February, we will post it on our website the first week of March. Then the facility should have ample time to update their mechanism.

Q: The interpretation of the current provision was during the active life of the solid waste disposal site and facility, the owner or operator must annually revise the closure, post- closure, and any corrective action cost estimate for inflation and must submit this estimate for department approval.

A: If you have specific questions about the FA or need to confirm numbers, we can have those conversation prior to adjusting the mechanism. If it's just an annual inflation adjustment, then the mechanism should be submitted by April 30th. In practice, facilities seldom submit the update separately from the modified instrument, preferring to include it in their yearly inflation adjustment.

Q: We might give our cost estimate but until [a facility] knows that the State approves a certain amount we won't get the bond in that new amount until we know it's correct and agreed upon by both the State and the company.

A: There are a few facilities who present the proposed cost estimates prior to adjusting the mechanisms. Other facilities will adjust the mechanism and submit it to the division. If there are changes in construction of new cells or other landfill facilities that increase or decrease financial assurance cost requirements. Note that this is not an annual adjustment but rather an actual recalculation of the cost estimate using current unit costs and operational assumptions. Please work with the solid waste program permitting staff in this regard.

Q: Since there appeared to be varying interpretations among the regulated community regarding the timing for submitting the financial assurance instrument,

would it be helpful to clarify in Section 4.5.1 when the instrument should be provided to the department?

A: The division has agreed to amend the language and share it to our stakeholders prior to the Commission Meeting on May 16th to better explain what needs to be submitted.

Q: It might also be helpful if the Financial Assurance renewal requirement is part of a checklist on the annual permit renewal forms. I have permits in multiple States and in all of them, except Colorado, the required updated Financial Assurance is always mentioned in the renewal paperwork.

A: Program will add a reminder to the Waste Tire Facility Annual Report which is due March 1st. For landfill inspections, the Financial Assurance is already included in the checklist.

Q: Are we trying to get everyone to the April 30th deadline by 2023?

A: Owners/operators using the local government financial test are not required to meet the April deadline. This is because, in 2020, we proposed changes to the local government financial test, and so those annual submissions are due to us seven (7) months after fiscal year end has closed.

2) <u>Section 4.6.4 Surety Bonds Guaranteeing Performance or Payment - Amended:</u>

Q: Concern for CDPHE's added language/requirements for insurance/bond companies that is not now a standard is that there will be additional cost from those providers to meet these requirements. Has that been researched on your end?

A: Amending existing terms and agreements would make it so the bonds would all need to go through new approval processes. If the bonding company objects to the language they will issue notice that they are giving 30 days notice that they will no longer provide the bond and at that point we would have to look for another company to write the bond that may very well charge higher rates for the bonds. There is an additional cost to the principal whenever the bond amount increases. CDPHE will remove the proposed language requiring CDPHE approval prior to bond cancellation. We will improve the contact information for where the cancelation notices must be sent, rather than requiring CDPHE approval prior to bond cancellation.

3) <u>Section 4.6.5 Insurance - Amended:</u>

Q: A question from our financial folks (captive insurance) is it's not typical to include a regulatory body as an additional insured as it's mostly seen, for example, in the case of a landlord being an additional insured on a renter's policy. In our policies and here's an excerpt from one of our policies that we have for, I believe, all of our Colorado sites under the terms of the policy for the coverages, "to pay on behalf of the insured to any authorized party at the direction of the regulatory body only those reasonable and necessary expenses for which the insured becomes legally obligated", and that would be for both closure and post-closure costs. So, it's believed that we have the adequate assurances in our language and the policy to cover that and it seems like an additional requirement that our folks have typically have not seen.

A: Naming CDPHE as an additional insured seems to place a greater burden on regulated entities and their insurers. This proposed change has been removed from the regulations.

2nd Virtual stakeholder meeting on June 6, 2022:

- An invitation was extended to 105 people, including internal employees, Surety Bond firms, Insurance companies, and Solid Waste Landfill owner/operators. Only 28 people registered and only 18 people attended the meeting.
- The deadline for feedback/questions/concerns was June 20, 2022.
- Only one comment was received prior to the stakeholder meeting.

Questions/Comments/Concerns/Answers

1) Section 4.6.5 Insurance - Amended:

Q: We noticed that you've retained the requirement to replace an insurance policy within 7 days after cancelation. Could you explain why CDPHE retained this short window? We are surprised at this timing, given the many steps needed to secure a new financial assurance mechanism, and given the much longer windows, in the current regulations, to secure new financial assurance after the cancelation of other mechanisms.

A: The seven-day period is unrealistic to secure a new mechanism and we propose new language: 4.6.5 (K) If the insurer cancels the policy, the owner or operator must obtain replacement financial assurance as required in Subsection 4.6.1 (D) before the end of the 120-day period.

## Regulatory Alternatives

No other regulatory alternatives were evaluated.

## Cost/Benefit Analysis

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Section 10.12 (Waste Tire End Users Fund).

**(Adopted by the Solid and Hazardous Waste Commission on November 16, 2021)**

**Basis and Purpose**

I. Statutory Authority

Section 30-20-1401(2), C.R.S. gives the Solid and Hazardous Waste Commission (the commission) the authority to promulgate waste tire regulations in order to implement and enforce Section 30, Article 20, Part 14, C.R.S.

Section 30-20-1405, C.R.S. requires the commission to annually set the amount of the per-ton monthly rebate paid to end users and haulers of waste tires.

II. Purpose of revised regulations:

The purpose of the revised regulations is to update the waste tire end user quarterly rebate amount for calendar year 2022 based on the criteria set forth in 30-20-1405 (4) C.R.S.

The commission shall annually set the amount of the rebate, by rule, on a per-ton basis, and the department shall pay the set rebate amount for each ton of qualified tire-derived product. The commission shall calculate the rebate to equal, but not exceed, the amount of the anticipated income transferred into the fund during each succeeding twelve-month period. The department is required to allocate the rebates based on three tiers of end uses.

Tier 1: Full rebates going to crumbed rubber end uses and end uses that completely destroy the waste tire for the purpose of energy recovery or other clean technologies as defined and approved by the commission by rule;
Tier 2: Fifty percent of the full rebate going to end uses such as molded products and rubber mulch; and
Tier 3: Twenty-five percent of the full rebate going to tire bale end uses and end uses for alternative daily cover and tire-derived aggregate that meet the ASTM standard D6270.

The proposed regulations sets the 2022 per ton waste tire end user rebate rates as follows:

A. Tier 1: $80 per ton;

B. Tier 2: $40 per ton;

C. Tier 3: $20 per ton; and

D. Waste Tire Hauler: $20 per ton.

**Discussion of Regulatory Proposal**

The commission determined the per ton rate for the three tiers and the Waste Tire Hauler rebate based on the current balance in the End Users Fund and participation in the program from calendar year 2020 and 2021. The commission believes the current balance is higher than anticipated due to the following factors:

1. Forecasting was done prior to Covid outbreak, which impacted normal business operations of the applicants and resulting in less requests for end user funds than anticipated.
2. Sweeping of fund balance by the state legislature in July 2020 which delayed the scheduled start of the program.
3. Compliance status of some of the applicants, lowering participation in the program.
4. A requirement that twenty-five percent of the expected annual rebate amount be held in reserve before paying the first quarterly rebate.

The commission used this information to determine per-ton rates that would provide rebates to applicants for their tire-derived products to be competitive with non-waste tire products and to create more participation in the program to help with the state's waste tire recycling rates.

The commission is proposing to increase the end user fund rebate rates based on the existing balance in the fund, a projected increase in demand for end user rebate rates compared to 2021, and the projected funds available for 2022.

Description of Local Government Involvement in the Stakeholder Process

Executive Order D 2011-005 (EO-5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO-5 Internal Communication Form – Conception Phase that was transmitted to local governments. These regulations would impact any county or municipality that are a Waste Tire Hauler, Waste Tire Monofill, Waste Tire Collection Facility, and/or a Waste Tire End User.

**Issues Encountered During Stakeholder Process:**

A stakeholder asked about who is eligible for the waste tire hauler rebate. The statute and parallel provision of the solid waste regulations limits rebate eligibility of Waste Tire Haulers to only those who are registered as an End User in addition to being a registered Waste Tire Hauler and only for waste tires originating from rural counties. The waste tires must be hauled from a rural county (less than 60,000 residents) to the End User facility. The applicant must provide proof that the waste tires that were hauled from the rural county were beneficially end used.

**Regulatory Alternatives**

No other regulatory alternatives were evaluated.

**Cost/Benefit Analysis**

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

### Statement of Basis and Purpose and Specific Statutory Authority for

Modification to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Modification of Section 13, Medical Waste

**(Adopted by the Solid and Hazardous Waste Commission on November 16, 2021)**

## Basis and Purpose

I. Statutory Authority

These modification are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302(4.5) and 30-20-109, C.R.S.

II. Purpose of modification of the Section 13 regulations:

The purpose of these amendments to the Section 13 regulations is to update the regulations applicable to medical waste treatment and temporary storage facilities. Section 13 has not been modified since 2011 and since that time, some aspects of the existing regulations have become outdated.

## Discussion of Regulatory Proposal

I. Certificate of Designation Required (Section 13.3)

Paragraph 13.3.1(B) of this section is being modified to require that medical waste generators that self-treat their waste on-site must notify the Department about their self-treatment activities. This new requirement is a one-time notification requirement that must be provided prior to initiating medical waste treatment operations. Those facilities that already treat their own medical waste will be required to notify the Department within 90 days of the effective date of the new rules.

Paragraph 13.3.2 of this section is being modified to remove the Certificate of Designation requirement for facilities that consolidate and temporarily store medical waste prior to hauling to a treatment or disposal facility.

II. Standards for Commercial Medical Waste Storage Facilities (Section 13.5)

This section is being modified to remove the Certificate of Designation requirement for Commercial Medical Waste Storage Facilities.

III. Engineering Design and Operation Plan Requirements for Commercial Storage and Treatment Facilities (Section 13.7)

Paragraph 13.7.2(C)(4) of this section is being modified to add the requirement for Commercial Treatment Facilities to conduct radioactive material scanning of incoming waste.

IV. General Provisions – Incorporation by Reference (Section 13.2.5)

The incorporation by reference provisions of Section 13.2.5 are being modified, including updating the existing reference to 2011 editions of incorporated by reference materials in the Section 13 regulations to the latest versions in effect at the time of the November 16, 2021 rulemaking hearing.

V. Standards for Medical Waste Disposal (Section 13.9)

Paragraphs 13.9.3(D) and 13.9.3(E) of this section are being revised to update the reference to the US Drug Enforcement Administration (DEA) regulations. The requirements previously located at 21 CFR 1307.21 were removed pursuant to a final rule published in the Federal Register on September 9, 2014 {79 FR 53520-53570}, and replaced with new regulations at 21 CFR Part 1317 for the disposal of controlled substances.

**Issues Encountered During Stakeholder Process:**

No issues were encountered during the stakeholder process.

**Regulatory Alternatives**

No other regulatory alternatives were evaluated.

**Cost/Benefit Analysis**

A cost benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

**DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT**

**Solid and Hazardous Waste Commission**
**Hazardous Materials and Waste Management Division**

**6 CCR 1007-2**

**STATEMENT OF BASIS AND PURPOSE**
**AND SPECIFIC STATUTORY AUTHORITY FOR**

Repeal of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) - Section 18 (Waste Grease Transporters, Facilities, and Personal Users of Waste Grease) and associated amendments. Amendment of Waste Grease Regulations - Repeal of waste grease transporter and facility regulatory requirements.

**(Adopted by the Solid and Hazardous Waste Commission on November 17, 2020)**

## Basis and Purpose

I. Statutory Authority

The amendments to 6 CCR 1007-2, Part 1 are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in § 30-20-123, C.R.S.

II. Purpose of retracted regulations

The purpose of repealing 6 CCR 1007-2 Part 1, Section 18 (the Regulations) Waste Grease transporters, Facilities and Personal Users of Waste Grease and the associated sections is to align and update the regulations with House Bill 20-1374, which was signed on June 29, 2020. House Bill 20-1374 repeals 30-20-123 CRS and the authorization of the Waste Grease Program as implemented under Section 18 of the regulations.

## Discussion of Regulatory Proposal

Section 18 (Waste Grease Transporters, Facilities and Personal Users of Waste Grease) is being deleted, removing the regulatory requirements pertaining to the transporters, facilities, and personal users of waste grease. The repeal removes the Section 18 requirements, including the general standards and provisions such as registration, annual reporting, financial assurance and record keeping for entities that transport and store waste grease.

Annual waste grease registration decals that expire will not be renewed. In addition, annual reports, beginning with calendar year 2020, will no longer be required. The division will no longer issue manifests to track waste grease or require waste grease

haulers to obtain financial assurance. Section 1.2 is being amended by deleting the following definitions that are associated with the Section 18 waste grease regulations:

"Collect"; "Manifest"; "Personal use of waste grease as biofuel"; "Personal use of waste grease other than for use as biofuel"; "Process"; "Registrant"; "Source of waste grease"; "Store"; "Transport" ; "Trap grease" ; "Waste grease" ; "Waste grease facility" ;"Waste grease generator"; "Waste grease transporter"; and "Yellow grease".

Section 1.5.2 is being amended to remove a citation of Section 18 regarding the wavier process and procedures established within the regulations.

Section 1.7.5 Waste Grease annual fees are deleted due to the requirements for the repeal of the waste grease program.

Section 4.1.2 (K) is being amended to remove a citation of Section 18 regarding the financial assurance requirements that previously applied to waste grease operators under Section 18.

Section 8.1.4(C) is being amended to remove the exemption regarding waste grease recycling.

## Issue Encountered During the Stakeholder Process

Stakeholders were notified of the repeal of HB 20-1374 by e-mail in July 2020. On July 16, 2020 the Division held an online stakeholder meeting with a Question & Answer session to discuss the repeal of the Section 18 Waste Grease regulations and the impact to stakeholders. Twenty-two (22) stakeholders participated in the discussion. Manifesting waste grease was the main topic discussion. The Division offered to keep the manifest available online until the end of 2020. Transporters and facilities can use the online manifest as a template to create their own business manifests. POTWs and waste grease facilities may still require manifesting of the waste grease. POTWs and waste grease facilities stated that they would discuss how to move forward with a new manifesting system.

## Description of Local Government Involvement in the Stakeholder Process

Executive Order D 2011-005 (EO5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO5 - Internal Communication Form - Internal Conception Phase which was transmitted to local governments. The repeal of the waste grease program regulations will have a minimal impact to any county or municipality. Illegal disposal of waste grease remains a violation of the Colorado solid waste act and regulations.

## Regulatory Alternatives

No other regulatory alternatives were evaluated because the repeal of the waste grease program is a requirement of HB 20-1375.

## Cost/Benefit Analysis

A cost benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

### 6 CCR 1007-2

### STATEMENT OF BASIS AND PURPOSE
### AND SPECIFIC STATUTORY AUTHORITY FOR

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) - Section 10.3.2 (Registration for Waste Tire Haulers), Section 10.3.3 (Waste Tire Hauler Decals), 10.7.3 (Mobile Waste Tire Processors Registration Requirements), 10.7.4 (Mobile Waste Tire Processor Decal), Table 10-12-.01 (Eligible End Uses and Retailing for the End Users Fund) and Section 10.12.5 (Waste Tire End Users Fund Rebate Amount).

**(Adopted by the Solid and Hazardous Waste Commission on August 18, 2020)**

**<u>Basis and Purpose</u>**

I. <u>Statutory Authority</u>

Section 30-20-1401(2), C.R.S. gives the Solid and Hazardous Waste Commission (the Commission) the authority to promulgate waste tire regulations in order to implement and enforce Section 30, Article 20, Part 14, C.R.S.

II. <u>Purpose of revised regulations:</u>

The purpose of revising 6 CCR 1007-2 Part 1 (the Regulations) is to update waste tire hauler and mobile waste tire processor registration requirements and set the End User fund per ton rebate.

**<u>Discussion of Regulatory Proposal</u>**

Section 10.3.2 (B)(3) (Registration for Waste Tire Haulers) was modified to add that a Waste Tire Hauler applicant include an email address. This change will allow the Division to contact the Waste Tire Hauler about the status of their application and to

notify the Waste Tire Hauler about completing the annual waste tire hauler renewal application and Waste Tire Hauler Annual Report.

Section 10.3.2 (B)(7) (Registration for Waste Tire Haulers) was removed to no longer require that a Waste Tire Hauler applicant submit a current vehicle registration for each vehicle used by the Waste Tire Hauler to haul waste tires. The vehicle registration information that was required (license plate number, state in which the vehicle is registered, the Vehicle Identification Number ("VIN"), the make/model and year, and the registered owner) is not necessary. The Division is no longer collecting vehicle registration information for the following reasons:

- The Division has been collecting vehicle registration information since the Division initially started registering Waste Tire Haulers. The collected vehicle registration information has never been used by the Division for administrative or enforcement reasons. The other information required in the Certificate of Registration application is sufficient to meet the Division's regulatory responsibilities.
- It is an unnecessary burden for a Waste Tire Hauler to provide the vehicle registration every year for the Waste Tire Hauler renewal registration. It takes considerable time for a Waste Tire Hauler with a large fleet of vehicles to provide the vehicle registration information through the Division's registration or renewal registration system.
- For the second year in a row, the Division has received complaints about the less than user-friendly waste tire hauler online registration renewal system, which includes the Waste Tire Hauler having to access through a separate url link for each vehicle's registration information. The removal of the vehicle registration information requirement will make the Waste Tire Hauler renewal registration a more user-friendly process.
- There are over 230 registered Waste Tire Haulers with the Division, and it takes considerable staff time to ensure that the vehicle information requirement is being met. It also takes a lot of staff time to enter/correct the vehicle information in the registration database and issue decals with the license plate number.

The Certificate of Registration for a Waste Tire Hauler expiration date in Section 10.3.2 (D) (Registration for Waste Tire Haulers) was changed to April 15 instead of March 15. Because the renewal application due date was changed to March 1, this change will allow the Division the same amount of time to process and issue registrations.

Section 10.3.2 (F) (Registration for Waste Tire Haulers) was modified to match the April 15 expiration date set in Section 10.3.2(D).

The Waste Tire Hauler renewal application due date in Section 10.3.2 (G) (Registration for Waste Tire Haulers) was changed from February 1 to March 1 to align with the Waste Tire Hauler Annual Report due date and to avoid the confusion of different due dates for the Waste Tire Hauler registration renewal and the annual report.

Section 10.3.3 (C) (Waste Tire Hauler Decals) was modified to match the April 15 expiration date set in Section 10.3.2.

Section 10.7.3 (C) (Mobile Waste Tire Processors Registration Requirements) was modified to add that a Mobile Waste Tire Processor applicant include an email address. This change will allow the Division to contact the Mobile Waste Tire Processor about the status of their application and to notify the Mobile Waste Tire Processor about completing the annual mobile waste tire processor renewal application and Mobile Waste Tire Processor Annual Report.

The Certificate of Registration for a Mobile Waste Tire Processor expiration date in Section 10.7.3 (F) (Mobile Waste Tire Processors Registration Requirements) was changed to April 15 instead of March 15. Because the renewal application due date was changed to March 1, this change will allow the Division the same amount of time to process and issue registrations.

Section 10.7.3 (G) (Mobile Waste Tire Processors Registration Requirements) was modified to match the April 15 expiration date set in Section 10.7.3 (F).

The Mobile Waste Tire Processor renewal application due date in Section 10.7.3 (H) (Mobile Waste Tire Processors Registration Requirements) was changed from February 1 to March 1 to align with the Mobile Waste Tire Processor Annual Report due date and to avoid the confusion of different due dates for the Mobile Waste Tire Processor registration renewal and the annual report.

Section 10.7.4 (C) (Mobile Waste Tire Processor Decal) was modified to match the April 15 expiration date set in Section 10.7.3.

Table 10-12-.01 (Eligible End Uses and Retailing for the End Users Fund)

A scenario was added to the eligible end use table for manufacturing tire-derived products (molded products, wattles, etc.) using rubber mulch. While the end use table does not contemplate every potential scenario under which an End User or Retailer may qualify for a rebate under the End Users Fund, the Department suggested this change because it has received inquiries from some End Users about whether certain kinds of end use qualify them for a rebate. Currently the table only specifies that rebates are available to those who manufacture products with crumb rubber (less than 1/4 inch rubber material that is wire and fiber free). This update clarifies that End Users of tire-derived products made from rubber mulch size material (1/4 inch to 3 inches that is wire and fiber free) are eligible for Tier II rebate.

Section 10.12.5 (Waste Tires End Users Fund Rebate Amount)

Section 30-20-1405(4)(a) requires the Commission to set the amount of the rebate annually. With limited data due to rebates just starting in 2020, more information will be needed to determine whether a change in the per-ton rates is appropriate. Therefore, the per-ton rates for rebates will remain the same for 2021.

## Description of Local Government Involvement in the Stakeholder Process

Executive Order D 2011-005 (EO-5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO-5 Internal Communication Form - Draft & Conception Phase that was transmitted to local governments. These regulations would impact any county or municipality that are a Waste Tire Hauler, a Mobile Waste Tire Processor, and/or a Waste Tire End User.

## Issues Encountered During Stakeholder Process:

1. A stakeholder submitted a comment asking if the added scenario was just a clarification on the end use of rubber mulch and molded products being eligible under the Tier II per ton rate. The Commission is adding this scenario to clarify that the end use of waste tire rubber mulch sized material in the manufacturing process with a demonstrated sale would qualify for a Tier II per ton rebate.
2. A stakeholder contacted the department asking the reason for the new scenario added to the End Users Table. The Commission is adding this scenario to clarify that the end use of waste tire rubber mulch sized material in the manufacturing process with a demonstrated sale would qualify for a Tier II per ton rebate.
3. A stakeholder asked about how the COVID-19 outbreak and response impacted waste tire fee collection. The department explained that waste tire fee collection was down from this same time last year. With the reduced amount of waste tire fees collected and the requirement that 25% of the waste tire fees collected be held in reserve prior to issuing the first round of rebates, the department anticipates that those approved for a rebate will receive a reduced per ton rate than what is currently approved in the regulations.
4. A stakeholder asked if the definition of rubber mulch was correct in the Statement of Basis and Purpose. The Commission said that the definition is correct, that rubber mulch is defined as 1/4 inch - 3 inch in size that is wire and fiber free.

Stakeholders were notified by e-mail of the revision of these regulations. Stakeholders were given an opportunity to provide any comments.

## Regulatory Alternatives

No other regulatory alternatives were evaluated.

## Cost/Benefit Analysis

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission Hazardous

## Materials and Waste Management Division
6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) - Section 4 (Table of Contents), Section 4.6.7 (Local Government Financial Test) and Section 4.6.9 (Local Government Guarantee).

**(Adopted by the Solid and Hazardous Waste Commission on May 19, 2020)**

### Basis and Purpose

I. Statutory Authority

These amendments to 6 CCR 1007-2, Part 1 are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in § 30-20-104.5, C.R.S and § 30-20-109, C.R.S.

II. Purpose of revised regulations:

The purpose of the current Part 4 of the solid waste regulations is to provide assurance that funds will be available to the Department when needed for adequate closure and post-closure of, and corrective action at, solid wastes disposal sites and facilities should the owner and operator become financially insolvent. These regulations require the owners and/or operators to estimate the costs of closure, post-closure and corrective action assure financial responsibility for those costs through any of nine mechanisms: trust fund, letter of credit, surety bond, insurance, corporate financial test, local government financial test, corporate guarantee, local government guarantee, and certificate of deposit.

The purpose of revising 6 CCR 1007-2 Part 1 (the Regulations) is to provide clarity and remove language found to be irrelevant in subsections.

### Discussion of Regulatory Proposal

**Modifications to Section 4.6.7 - Local Government Financial Test**
Section 4.6.7 allows local governments that own and/or operate a solid waste disposal site

to use a financial test to demonstrate financial assurance for closure, post-closure and corrective action cost up to a specified maximum limit. As it currently stands, local governments are required to submit multiple forms of documentation which determines whether they pass or fail the financial test. To simplify this process, the CDPHE will require the submission of the Comprehensive Annual Financial Report (CAFR). The overall suggested changes will enhance the efficiency of the submission/review process and the cumbersome administrative processes that burden local government owners and operators.

The proposed rule changes consist of amending and clarifying criteria associated with the four components outlined below:

1. Financial Component
   Based on this section, the local government must satisfy either the bond rating requirement or the financial ratio alternative. The proposed changes would be to eliminate the subsections (1)(a)(b)(i)(ii) and (3)(a)(b)(c)(d).

2. Public Notice Component
   This section states that the local government must disclose, within its annual budget or financial report, the estimated costs of its closure, post-closure, and corrective action obligations. The proposed changes are to provide clarity and remove language found to be irrelevant in subsection (B).

3. Recordkeeping and Reporting Requirements
   A local government must review its financial situation every year and must demonstrate they have the means for closure, post-closure, and corrective action costs. The local government must also place this information into the facilities operating record. The proposed changes are to provide clarity and remove language to be found irrelevant in subsection (C).

4. Calculation of Cost to be Assured
   Currently, the financial test limits the amount of closure, post-closure, and corrective action costs for which a local government may demonstrate financial assurance through the use of the test, in proportion to a local government's financial capacity as represented by its annual revenues. The proposed changes would be to eliminate the subsections (D)(1)(2)(3).

**Eliminate Section 4.6.9 - Local Government Guarantee**

Section 4.6.9 allows local governments to guarantee the closure, post-closure and corrective action costs of other solid waste disposal site owners and operators through the use of the financial test. The local government guarantor would assume responsibility for the obligations of the owner or operator if the owner or operator fails to do so, and provide proof that it passes the financial test requirements. However, if a privately owned facility fails to operate its landfill appropriately, this would be a financial risk to the local government. The proposed changes would be to eliminate this entire section.

## Description of Local Government Involvement in the Stakeholder Process

Executive Order D 2011-005 (EO5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. Stakeholders were notified by e-mail of the revision of these regulations. We hosted one Stakeholder meeting to discuss the proposed changes on January 16, 2020. Stakeholders were given an opportunity to provide any comments. These amendments would impact local government and municipalities that own and operate a solid waste disposal site and facility, and currently use the local government finanical test (Section 4.6.7) or local government guarantee (Section 4.6.9) of the Solid Waste Regulations.

## Issues Encountered During Stakeholder Process:

We received positive feedback on the proposed changes from the Stakeholders. There was one suggestion to change the submission deadline from six to seven months after the local government fiscal year-end.

## Regulatory Alternatives

No other regulatory alternatives were evaluated.

## Cost/Benefit Analysis

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

**6 CCR 1007-2**

**STATEMENT OF BASIS AND PURPOSE
AND SPECIFIC STATUTORY AUTHORITY FOR**

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Section 1.2 (Definitions), Section 10.3.2 (Registration for Waste Tire Haulers), Sections 10.5.8, 10.6.9, 10.8.9 (Facility Engineering Design and Operations Plan – Waste Tire Monofills, Waste Tire Processors, and Waste Tire Collection Facilities), Section 10.6.3 (Waste Tire Processors Registration Requirements), and Section 10.12.5 (Waste Tire End Users Fund Rebate Amount).

**(Adopted by the Solid and Hazardous Waste Commission on February 18, 2020)**

**Basis and Purpose**

I. Statutory Authority

Section 30-20-1401(2), C.R.S. gives the Solid and Hazardous Waste Commission (the Commission) the authority to promulgate waste tire regulations in order to implement and enforce Section 30, Article 20, Part 14, C.R.S.

II. Purpose of revised regulations:

The purpose of revising 6 CCR 1007-2 Part 1 (the Regulations) is to correct a typographical and section reference error, to further clarify the current requirements of 6 CCR 1007-2 Part 1, and to add language from Senate Bill 19-198 that was inadvertently omitted from 6 CCR 1007-2 Part 1.

**Discussion of Regulatory Proposal**

The definition of three year rolling average is being revised to include waste tire processors. A waste tire processor is type of recycler because a waste tire processor processes a waste tire into a tire-derived product. Adding waste tire processors to the definition clarifies that a waste tire processor is subject to the three year rolling average requirement and links the definition to Section 10 of the Regulations.

The amended Section 10.3.2 (C) (Registration for Waste Tire Haulers) clarifies when the Department will issue a Certificate of Registration and corresponding Waste Tire Hauler decals. This subsection is broken out into two parts to address: 1) A new applicant applying to register as a Waste Tire Hauler; 2) An existing Waste Tire Hauler registrant. A new Waste Tire Hauler applicant would not be required to submit the Commercial Waste Tire Hauler Annual Report Form (Form WT-4) at the time of application submittal as the applicant would not have any waste tire hauler activities to report on. To avoid the March 15 expiration date of the Waste Tire Hauler's Certificate of Registration, an existing Waste Tire Hauler registrant is required to renew their Waste Tire Hauler registration by February 1 by submitting a Waste Tire Hauler renewal registration. The existing Waste Tire Hauler must also submit Form WT-4 by March 1. The Department will only issue a Certificate of Registration to a Waste Tire Hauler if a complete and timely Waste Tire Hauler renewal registration and complete and timely Form WT-4 has been submitted.

The annual report reference in Section 10.3.2 (C) was corrected, as this Section incorrectly referenced 10.3.6 (Waste Tire Hauler Self-Certification) instead of 10.3.5 (Annual Report).

Sections 10.5.8 (Waste Tire Monofill), 10.6.9 (Waste Tire Processor), and 10.8.9 (Waste Tire Collection Facilities) were modified to no longer require that the Engineering, Design and Operations Plan - Fire Prevention, Training and Firefighting Plan be written by a "qualified professional." This change was made because the Fire Prevention, Training and Firefighting Plans the Department has received for review have been written by the facility or the facility's consultant. These people are typically not familiar with the local fire code requirements that relate to tire storage and tire processing. To assure that the Fire Prevention, Training and Firefighting Plan will meet the local fire department/local fire jurisdiction fire code requirements, the Fire Prevention, Training and Firefighting Plan must now be approved by the local fire department/local fire jurisdiction or in areas where no fire code exists, by the Colorado Division of Fire Prevention and Control in the Department of Public Safety.

A typographical error in Section 10.6.3 (B) (Waste Tire Processors Registration Requirements) was corrected by adding the missing form number to the referenced form (Form WT-1).

Section 10.12.5 (Rebate Amount) adds the language requiring that twenty-five percent of the expected annual rebate amount be held in reserve before paying the first quarterly rebate. This is required by 30-20-1405(5)(b), C.R.S.

## Description of Local Government Involvement in the Stakeholder Process

Executive Order D 2011-005 (EO-5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing

mandates. The Department completed an EO-5 Internal Communication Form - Draft & Conception Phase that was transmitted to local governments. These regulations would impact any county or municipality that are a Waste Tire Hauler, Waste Tire Monofill, Waste Tire Processor, Waste Tire Collection Facility, and/or a Waste Tire End User.

**Issues Encountered During Stakeholder Process:**

Stakeholders were notified by e-mail of the revision of these regulations. Stakeholders were given an opportunity to provide any comments. Only one comment was received. This comment identified an error that related to the inadvertent striking out of the section numbering and title for section 10.8.9 (A)(3)(d). The Department corrected this error.

**Regulatory Alternatives**

No other regulatory alternatives were evaluated.

**Cost/Benefit Analysis**

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

**6 CCR 1007-2**

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Section 1.2 (Definitions), Section 1.7.6 (Waste Tire Fee), Sections 10.3.5, 10.5.6, 10.6.7, 10.7.7, 10.8.7, 10.9.5 (Annual Report), 10.5.1 (General Waste Tire Monofill Standards), Section 10.11 (Waste Tire Fee Administration), Section 10.12 (Waste Tire End Users Fund), and 10.13 (Standards for End Users and Landowners of Waste Tire Bales).

**(Adopted by the Solid and Hazardous Waste Commission on October 15, 2019)**

**Basis and Purpose**

I. Statutory Authority

Section 30-20-1401(2), C.R.S. gives the Solid and Hazardous Waste Commission (the Commission) the authority to promulgate waste tire regulations in order to implement and enforce Section 30, Article 20, Part 14, C.R.S. These regulations implement Senate Bill 19-198 ("SB 19-198" or "the Bill") which modified Part 14. The Legislature passed SB 19-198 in 2019.

II. Senate Bill 19-198

Section 1 of SB 19-198 includes definitions of several terms.

Section 2 of the Bill amends Section 30-20-1403, C.R.S. to give the Commission the authority to set a Waste Tire Fee at an amount not to exceed two dollars on the sale of each new tire. The Waste Tire Fee will become effective on January 1, 2020, and continue through December 31, 2025. The Commission has the authority to adjust the Waste Tire Fee on an annual basis. Per SB 19-198, the Waste Tire Fee will be reduced automatically to $0.55 on January 1, 2024.

Section 3 of SB 19-198 includes new rules for the Waste Tire Administration, Enforcement, Market Development and Cleanup Fund.

Section 4 of the Bill reestablishes the End Users Fund in Section 30-20-1405, C.R.S. The End Users Fund will provide quarterly rebates to in-state End Users, retailers that sell tire-derived products, and End Users who are also a Waste Tire Hauler and haul waste tires from rural counties. This section gives the Commission the authority to set the amount of the rebate annually on a per-ton basis. The rebates will be paid out based on the tiering system.

Section 5 of SB 19-198 limits the circumstances under which the Department can waive requirements in 30-20-1415 (1)(j) and (1)(k), C.R.S. for waste tire monofill operators and owners.

Section 6 of the Bill includes an appropriation for the 2019-20 state fiscal year.

Section 7 states that the Act is subject to a referendum petition.

III. Purpose of revised regulations:

Section 1.2 (Definitions) is being amended to add, modify, and delete some of the definitions to reflect new statutory definitions in Section 1 of SB 19-198 and to define terms that are necessary for effective implementation of the Bill.

Section 1.7.6 (Waste Tire Fee) is being amended to increase the Waste Tire Fee amount from $0.55 to $1.25 on the sale of each new motor vehicle tire and new trailer tire. The Waste Tire Fee is not a new fee as House Bill 14-1352 automatically set the rate at $0.55 when the previous End Users Fund and Market Development Fund was repealed (effective January 1, 2018). Funds collected through the Waste Tire Fee will be split between the Waste Tire Administration, Enforcement, Market Development and Cleanup Fund and the End Users Fund.

Changes in sections 10.3.5 (Waste Tire Haulers), 10.5.6 (Waste Tire Monofills), 10.6.7 (Waste Tire Processors), 10.7.7 (Mobile Waste Tire Processors), 10.8.7 (Waste Tire Collection Facilities), and 10.9.5 (End Users) require Annual Reports to be submitted to the Department by March 1 of every year.

Section 10.5.1(P) incorporates the limitation on waivers for owners and operators of Waste Tire Monofills of Section 5 of SB 19-198 into the regulations.

Section 10.11 (Waste Tire Fee Administration) modifies documentation requirements for persons selling new motor vehicle or new tire trailers and requires, consistent with Section 2 of SB 19-198, disclosure of collection of the Waste Tire Fee on receipts for every new tire purchased.

Section 10.12 (Waste Tire End Users Fund) establishes the rules and procedures for the End Users Fund and End User rebates.

Section 10.13 (Standards of End Users and Landowners of Waste Tire Bales) establishes rules for the safe and responsible usage of waste tire bales by End Users and/or landowners.

## Discussion of Regulatory Proposal

The passage of SB 19-198 requires the addition, revision and deletion of several definitions in Section 1.2 for the Solid Waste Regulations (6 CCR 1007-2, Part 1).

The following new definitions are being added to Section 1.2:

1. Alternative Daily Cover
2. ASTM Standard D6270
3. Beneficial User (as applied in Section 10)
4. Crumb Rubber
5. Rubber Mulch
6. Rural County
7. Ultimate Customer

The following existing definition is being modified in Section 1.2:

1. Waste Tire Bale

The following existing definition is being deleted from Section 1.2, as there are two definitions for the same term.

1. End User (removing first reference in Section 1.2)

The amended Section 1.7.6 requires retailers of new motor vehicle tires and new trailer tires to collect a Waste Tire Fee in an amount of $1.25 on the sale of each new motor vehicle tire and new trailer tire and to remit the Waste Tire Fee to the Department by the 20th of each month. The Waste Tire Fee is set at $1.25 to cover funds needed for the administration for the Waste Tire Administration, Enforcement, Market Development and Cleanup Fund and the End Users Fund and to pay End User rebates. The Waste Tire Fee will be split and deposited into the funds effective January 1, 2020 as follows:

1. Waste Tire Administration, Enforcement, Market Development and Cleanup Fund: $0.50
2. End Users Fund: $0.75

Sections 10.3.5 (Waste Tire Haulers), 10.5.6 (Waste Tire Monofills), 10.6.7 (Waste Tire Processors), 10.7.7 (Mobile Waste Tire Processors), 10.8.7 (Waste Tire Collection Facilities), and 10.9.5 (End Users) were modified to move the required submittal date of the Annual Report to the Department from April 1 to March 1 each year. The Annual Report information is used to generate reporting to the legislature and predict end use rates. The Commission believes the current due date of April 1 does not give Department staff adequate time to prepare a legislative report or predict end use rebate rates. Every year there are entities who either fail to submit a required Annual Report or who fail to submit an accurate Annual Report by the due date. It takes the Department time to pursue enforcement actions against these entities, which may or may not result in the filing of an accurate annual report. Moving up the report date should provide

sufficient time for the Department to determine whether the Commission needs to consider adjustments to the End User per ton rates.

Section 10.5.1(P) adds provisions regarding the issuance of waivers to Waste Tire Monofills. The Department can waive requirements related to the storage and management of waste tires in a monofill, but Section 5 of SB 19-198 added a requirement that the Department seek public comment before doing so. Section 5 also limited the Department's authority to issue a waiver. The Department cannot issue a waiver unless the owner or operator of the Waste Tire Monofill "has demonstrated that it has achieved a net reduction on an annual basis in the number of waste tires in the monofill or unless an emergency event of limited duration such as a fire or flood, as defined by the Commission, has occurred." The Commission is adding those requirements to the regulations and defining "emergency event" to include tornadoes and other instances of an uncontrollable natural force or human caused disaster. Waste Tire Monofills can accept waste tires as a result of these types of events, even if they would be otherwise be prevented from doing so under the requirements in 30-20-1415(1)(j) and (1)(k), C.R.S.

Section 10.11.7 allows retailers to provide documentation other than receipts to demonstrate compliance with Section 10.11 and 30-20-1043(1)(a), C.R.S. It can be an unnecessary burden for each retailer of new motor vehicle/trailer tires to keep every new tire receipt. Other documentation, such as transaction records or invoices, can serve to provide information on new tire sales.

Section 10.11.8 adds the language in 30-20-1403(1)(a)(IV), C.R.S. requiring retailers to include a specific statement on every invoice for new tires. The statement discloses the Waste Tire Fee to consumers.

Section 10.12 outlines the rules regarding the End Users Fund and the rebates. The previous subsection 10.12 was removed from Section 10 in 2018 when the End Users Fund was repealed in January 2018. The main sections to the subsection include:

1. The general rules each applicant must follow to be eligible for a rebate.
2. The general rules based on type of applicant applying (End User, Retailers of tire-derived products, and End Users applying for a Waste Tire Hauler rebate).
3. An eligibility table (Table 10-12.01) to clarify eligibility for End Users and Retailers to participate in the End Users Fund.
4. Procedures for applicants to apply for rebates from the End Users Fund.
5. An explanation of the process the Department will use to review and approve or deny the submitted applications.
6. A discussion of the appeals process when applicants feel the Department erred in denying an applicant's application.
7. A per ton rebate amount for the three tiers and for hauling of waste tires from rural counties (explanation below).
8. An explanation of how the Department will manage enforcement issues for applicants.

The Commission determined the per ton rate for the three tiers and the Waste Tire Hauler rebate based on the following steps:

1. Review of data submitted to the Department from the WT-4 (Colorado Commercial Waste Tire Hauler Annual Report) and WT-5 (Waste Tire Facility Annual Report) forms. These reports provide data on the end use of waste tires and tire-derived products on an annual basis. Each year the Department generates an annual report to the legislature regarding the reuse and recycling of waste tires in Colorado.
2. The "*Colorado Office of the State Auditor Waste Tire Processor and End User Program Performance Audit, June 2014*" report. This report recommends that the Department not set a per ton rate that exceeds the cost of any tire-derived product eligible for a rebate.
3. A report titled *"Tire-Derived Products Representative Manufacturing Costs, November 2014"* prepared by Tetra Tech, Inc. and TAG Resource Recovery. This report provides manufacturing costs for several tire-derived products in Colorado.
4. Discussions the Department had with the states of Utah, Oklahoma, and Louisiana pertaining to their rebate programs and the per ton rates they use for similar tire-derived products.

The Commission used this information to determine per ton rates that would: (1) provide rebates to applicants and tire-derived products to be competitive with non-waste tire products; and (2) keep the Waste Tire Fee as low as possible for consumers.

Section 10.13 establishes standards for End Users and landowners of waste tire bales. These standards address several problems that are unique to waste tire bales and are appropriate and necessary in order to carry out the Commission's duty to promulgate rules related to the implementation and enforcement of C.R.S. Section 30, Article 20, Part 14 (Strategies for Waste Tires). Part 14 establishes the policy of the State "to pursue proposals for recycling and other beneficial use of waste tires in lieu of storage or landfill disposal, and . . . to encourage the development of techniques for resource recovery, recycling, and reuse of waste tires and to provide for the management of waste tires." 30-20-1401(1), C.R.S. The Commission thus believes that it is necessary to set standards to ensure that waste tire bales are being put to beneficial use.

This subsection requires End Users or landowners to maintain the integrity of waste tire bales. Broken waste tire bales pose a hazard to the environment and public health. Failure to address broken waste tire bales constitutes improper disposal of waste tires in violation of 30-20-1414, C.R.S. Broken waste tire bales must be repaired or removed from the property for disposal within 90 days of discovery. The Commission believes that 90 days is sufficient time for End Users and landowners to comply with Section 10 regulations when a waste tire bale fails.

This subsection also requires that beneficial use of waste tire bales be approved by the Department prior to placement or, in the alternative, fall within the Department's pre-approved beneficial uses for waste tire bales. The Department's Pre-Approved Beneficial Uses Table 3 lists waste tire bales for use as containment, livestock sheds

and windbreaks. The Commission's assumption is that the pre-approved uses for the waste tire bales are used for agricultural land and livestock. The Department will consider adding additional pre-approved waste tire bale uses to Table 3 on a case by case basis.

This subsection also states that End Users or landowners must remove any waste tire bales which are no longer serving a beneficial use within 120 calendar days. End Users must also cancel their End User registration within 90 days of the removal of all waste tire bales.

Section 10.13(D) states that the Department may notify local fire departments the location of waste tire bales in their jurisdiction. The Department has responded to waste tire bales that have caught fire and has witnessed the damage these fires cause to local communities. Waste tire bale fires cannot be extinguished easily and will release chemicals into the air, soil and ground water. Local fire departments may be able to respond more quickly and effectively to a waste tire bale fire if they know of the bales beforehand.

Finally, Section 10.13(G) states that End Users or landowners who have received rebates are ineligible for waste tire cleanup funds. Once waste tire bales exceed their beneficial use function, the tires become a waste tire again and are subject to Section 10 regulations. If the Department has paid End User rebates for the waste tire bales to be end used, the Commission believes that the citizens of Colorado should not pay for the clean-up and/or removal of discarded waste tire bales. In the instance of a change of ownership or an emergency situation, the Department will evaluate the situation on a case by case basis in order to determine whether using cleanup funds is appropriate.

Description of Local Government Involvement in the Stakeholder Process

Executive Order D 2011-005 (EO-5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO-5 Internal Communication Form – Conception Phase that was transmitted to local governments. These regulations would impact any county or municipality that are a Waste Tire Hauler, Waste Tire Monofill, Waste Tire Processor, Mobile Waste Tire Processor, Waste Tire Collection Facility, and/or a Waste Tire End User.

**Issues Encountered During Stakeholder Process:**

1. A stakeholder asked whether the "Good Standing" letter generated by the Secretary of State's office for a business or person in Colorado must be submitted with each application. The Commission feels a "Good Standing" certificate is not required for every application, but the Department will check the Secretary of State's website to confirm that those businesses or persons who are required to be registered are listed and in good standing.
2. A stakeholder asked a question about Section 8.6.2 (E) and why is it referenced in the Section 10.12 regulations. This section refers to the criteria solid waste must meet to be

used for a beneficial use in lieu of disposal. The Commission believes that any tire-derived products that are end used should meet this criteria in order to receive a rebate from the End Users Fund. Adding this language will link the beneficial use of waste tires and tire-derived products to the rebate program.

3. A stakeholder asked a question about how the Commission will be able to track those waste tires removed from an illegal waste tire site are not paid for twice, once by the Waste Tire Administration, Enforcement, Market Development, and Cleanup Fund and again for a rebate from the End Users Fund. The Commission understands that the Department tracks any waste tire removed from these sites to the final destination, normally a Waste Tire Processor, Waste Tire Collection Facility or a Waste Tire Monofill. The Department will modify the purchase order or contract with the Waste Tire Hauler to stipulate that those tires are not eligible for a rebate from the End Users Fund.
4. A stakeholder asked whether Section 10.12.1(B)(2) requires an End User to comply with all local environmental requirements or just the local requirements for the end use of the tire-derived product. This language refers to local requirements on end use. The Commission feels it is up to the End User to determine whether the anticipated end use of the tire-derived product is allowed in any jurisdiction it is being end used. Sections 10.12.3(B) and 10.12.6(D) speak to the issue of compliance with state or federal environmental laws and regulations.
5. Stakeholders asked why waste tires used in a waste tire bale need to be at least cut in half in order to qualify for a rebate. The Commission interprets the word "destroyed" to require destruction of waste tires such that they no longer have their original form or structure. Whole waste tires are typically used in the processing of a waste tire bale. The Commission believes cutting a waste tire at least in half meets SB 19-198 requirement that a waste tire be "destroyed" in order to be eligible for a rebate. Several stakeholders agreed with this interpretation.
6. A stakeholder asked if using the average weight of a waste tire would be sufficient means for the waste hauler rebate. Waste Tire Haulers typically do not weigh their trucks as they collect waste tires. Instead waste tires are tracked individually with manifests and other reporting. The Commission feels the use of weight tickets is the most accurate way to determine the per ton rate for purposes of the rebate. The regulations allow other verifiable forms of documentation instead of weight tickets, as long as it is approved by the Department's internal audit unit and/or the Colorado Attorney General's Office.
7. A stakeholder asked when a subcontractor would be considered an ultimate customer. A subcontractor would be the ultimate customer if they are end using the tire-derived product for its final intended use. The subcontractor would need to be registered as an End User to qualify for a rebate from the End Users Fund.
8. A stakeholder asked if power plants who end used fuel created through the process of pyrolysis would be eligible for a rebate from the End Users Fund. The Commission believes this would be a tire-derived fuel and would be eligible for a Tier I rebate.
9. Questions were asked about who is eligible when crumb rubber is used to make rubber mats to be sold in the retail market. The Commission believes the manufacturer of the mats (or other molded products) would be eligible for the rebate as long as they demonstrate those mats have been sold and moved offsite.
10. Several stakeholders asked why a minimum ton amount was being used in order for an applicant to be eligible for a rebate. The Commission believes a minimum is necessary due to concerns about the time and effort the Department expends in order to process applications and distribute funds.

11. Stakeholders asked why the Department included language on applicants not being eligible for hauling, retail sale or end use of tire-derived products when the Department is conducting a waste tire cleanup using funds from the Waste Tire Administration, Enforcement, Market Development, and Cleanup Fund. The Commission feels that any activity, whether a waste tire cleanup or other grants or projects, should not cause the Department to pay more than once on the hauling, retail sale, or end use of any waste tire or tire-derived product.
12. Stakeholders asked whether an applicant would only be ineligible for a rebate when an environmental compliance issue happens with the end use of a tire-derived product, or whether any environmental compliance issue, even if not directly related to the end use of the tire-derived product, would make an applicant ineligible. The Commission feels failure to comply with any federal or state environmental law, rule or regulation could subject the application to denial for that period or longer, depending on the infraction.
13. Many stakeholders had concerns about whether an application would be denied if a subsidiary or parent company was out of compliance with state or federal environmental laws, rules or regulations. The Commission understands that the Department previously had guidance on this issue and that the Department will revisit that guidance.
14. Stakeholders asked why there is not a cap on the per ton rate for Tier I rebates. The Bill does not institute a cap on any tier amount.
15. Stakeholders asked how rebates would be paid out if there is a shortage of funds to meet what has been approved. The Bill directs the Department to pay out proportional rebates when there are not enough funds to cover what was approved. This means all applicants would be reduced by the same percentage so everyone approved who receive an equal reduction in their approved rebate.
16. A stakeholder asked why an applicant cannot reapply for a rebate when there is a shortage in the End Users Fund and the Department does not pay out full rebates to all approved applicants. The Commission said due to fiscal rules, the Department cannot go back to previous periods and readjust rebate payments. The Commission feels once final rebates are paid, adjustments cannot be made unless a calculation or Department error occurred.
17. Stakeholders asked why the Commission chose the word "may" and not "must" in Section 10.13(D) when discussing contacting the local fire jurisdiction when waste tire bales are placed on any property for end use. The Commission understands that most waste tire bales are used in agricultural settings for purposes of containing livestock and livestock feed. Therefore, fire codes that would apply to densely populated areas might not be applicable or relevant to open fields. Local fire districts may be notified when the number of waste tire bales being placed on a property warrants notification such that those agencies need to be aware of the presence and number of waste tire bales. The Commission feels that rather than requiring notification of local fire districts regarding the placement of waste tire bales in each instance, the rule should allow the Department to notify local fire departments of waste tire bale placement when circumstances or site conditions warrant notification.
18. A stakeholder asked if the definition for "Alternative Daily Cover" could include language that sets a maximum amount that could be used as cover at a landfill. The stakeholder had concerns that landfills could take advantage of the program by applying more than necessary to apply for a larger rebate amount. The Commission feels the definition should remain as written in the regulations. The Department has regulatory authority over landfills and can limit alternative daily cover use in the landfill's Engineered Design

and Operation Plan. The Department can also inspect these facilities to ensure compliance with those limits.

19. A stakeholder asked why a waste tire had to be cut in half if used in a waste tire bale to be eligible for a rebate if the definition of a "Waste Tire Bale" does not indicate that. The reason the waste tires need to be cut at least in half is to comply with the requirement that tires for which a rebate is paid out are "destroyed," as required by 30-20-1405 (5)(II)(e). If an End User wanted to use waste tires for a waste tire bale without cutting them at least in half they could, but that End User would not be eligible for a rebate from the End Users Fund. Cutting the waste tire in half could also help keep waste tires from broken or disassembled bales from being re-baled and getting another rebate from the End Users Fund.
20. Several stakeholders asked to set the definition of "Crumb Rubber" to include up to less than one-fourth inch in size of the material. The Commission decided to define "Crumb Rubber" as sizes less than one-fourth inch to meet current industry and ASTM standards.
21. Stakeholders asked why the Department was asking for the maximum amount allowed by SB 19-198 ($.50) of the Waste Tire Fee in order to administer the Waste Tire Program. A rate of $.50 will ensure that the program can maintain current staffing, administer grant programs, manage the revived End Users Fund, and fund market development activities and programs. The Commission notes that per SB 19-198, the Department will see an automatic decrease in this portion of the fee from $.55 to $.50 on January 1, 2020. The Bill does have a mechanism to move funds from the Waste Tire Administration, Enforcement, Market Development and Cleanup Fund to the End Users Fund if the Department's expenditures are below what is being collected into the Fund (30-20-1404). The Department will review whether the $.50 rate should be adjusted on an annual basis, based on projected future expenditures.
22. Stakeholders asked how a waiver for a Waste Tire Monofill would be viewed if the markets for the end use of waste tires were to fall significantly below what is being generated each year and waste tires inventories accordingly increased throughout the state. The stakeholder asked whether such an event could constitute an "emergency event of limited duration" pursuant to 30-20-1415. The Commission does not feel a drop in the end use of waste tires in the state would constitute an "emergency event of limited duration."
23. A stakeholder asked whether a Waste Tire Monofill with an existing waiver that included a stipulation that a Waste Tire Monofill could receive more waste tires into the facility than was end used or processed, would be precluded from receiving another waiver in the future. The statute prevents the Department from issuing a waiver to a facility that has not at least achieved a "net reduction" in the number of waste tires in the monofill. A Waste Tire Monofill must meet the "net reduction" requirement on an annual basis in order to be eligible for a waiver in the following year, regardless if a waiver was in place or not.
24. A stakeholder asked whether a Waste Tire Monofill had to meet a net reduction on annual basis in order to receive a waiver, or whether the Department believe it would just be one of the factors considered when deciding if a waiver could be granted. The statute requires that a Waste Tire Monofill must show a net reduction (that is, at least one more tire end used or processed than what was received into the Waste Tire Monofill) in order to be considered for a new waiver.

25. A stakeholder asked about the term “annual basis” and questioned whether the Department would look back at one year of activity at a Waste Tire Monofill to determine whether there had been a “net reduction,” or will the Department will look at more than one year to determine if the “net reduction” goal has been met at the facility. The Commission interprets “annual basis” to mean that the Department should look one year back from the date the waiver is requested to determine whether there has been a net reduction.
26. A stakeholder asked whether an “Ultimate Customer” can also be an End User. The Commission considers the “Ultimate Customer” the person who is buying a tire-derived product from a retailer who intends to use the tire-derived product for its intended use. In this scenario, an “Ultimate Customer” is not eligible to receive a rebate from the End Users Fund, but the retailer would be.
27. A stakeholder asked whether the 10 ton minimum applied to the amount sold to an “Ultimate Customer,” or whether the minimum applies per application. The minimum of 10 tons applies per application. An application must have at least 10 tons per quarter period to be eligible for a rebate.
28. A stakeholder asked how the Commission determined the $1.25 Waste Tire Fee. The Commission considered the needs of the Department to administer the Waste Tire Program, which includes staffing, grant programs, enforcement activities, and other program needs. As previously discussed, the Commission believes that $.50 per tire is appropriate for these activities. Based on the projected end use of tire-derived products, the projected number of replacement tires to be sold, the per ton rates set for each of the three tiers and the Waste Tire Hauler rebate, and an estimate of additional funds needed to help mitigate any funding issues and distribute full rebates, the Commission believes that $.75 is an appropriate amount to be allocated per tire to the End Users Fund.
29. A stakeholder asked what was considered when setting the per ton rates for the separate tiers. The Commission considered the costs to manufacture tire derived products, what other states with similar programs were providing in the form of rebates, findings in the Colorado Office of the State Auditor Performance Audit completed in 2014, and discussion with stakeholders on how the end use of tire-derived products will be impacted by reestablishment of the rebate program. The Commission feels the tier rates will both support the current needs of the tire-derived product markets and help incentivize more use of current tire-derived products, while assisting in the development of new tire-derived products in the state.
30. A stakeholder submitted a comment asking who is eligible to apply for a Waste Tire Hauler rebate. Per 30-20-1405(2)(b), only End Users who also are registered as a Waste Tire Hauler would be eligible to apply for the rebate.
31. A stakeholder submitted a comment asking why silage covers were excluded from the Tier III rebates. The statute (30-20-1405(5)(e)(III)) does not include silage covers in Tier III.
32. A stakeholder submitted a comment asking whether End Users of alternative daily cover and tire-derived aggregate be impacted should ASTM Standard D6270 be amended. The Commission feels that any End User would need to comply with the amended standard in order to be eligible for a rebate for the end use of those impacted tire-derived products.
33. A stakeholder asked if the Commission had reached out to individual stakeholders to ask them what their costs were to process or end use tire-derived products in order to determine the per ton rates. Individual processors and end users were not asked to

provide this type of information since it is considered confidential. The Commission used the annual reports, the Colorado Office of the State Auditor Waste Tire Processor and End User Program Performance Audit, the Tire-Derived Products Representative Manufacturing Costs report, and discussion with other states who have similar rebate programs to determine the per ton rates.

34. One stakeholder felt that section 10.13 "singled out" or discriminated against End Users of waste tire bales. The Commission notes that the processing of waste tires and the end use of all tire derived products are regulated at various levels, in order to ensure the successful processing and safe use of each product. For example, cement kilns are required to meet stringent permitting and air quality standards in order to burn whole and shredded waste tires as tire derived fuel. Landfills have to meet solid waste permitting and Engineering, Design and Operations Plan requirements in order to utilize tire shreds for alternative daily cover. All of these end uses (and others) are subject to inspection by the waste tire program, as well as other Department regulatory programs. The Commission notes that before this rule, there were no regulations specific to waste tire bales.

    The Commission feels minimum standards should be in place to protect human health and the environment since waste tire bales are unique in the sense that they are a temporary use of waste tires. Once waste tire bales break or are no longer beneficially used, they are considered waste tires, not a tire-derived product. Because rebates encourage the end use of waste tire bales, the Commission has a responsibility to prevent the improper disposal of waste tires upon breakage and reduce the risk that bales pose to human health and the environment.

35. A stakeholder expressed concern that waste tire bales were being "singled out" in section 10.13 when it came to potential fires and asked why other End Users weren't called out in this section for burning waste tires for fuel. Other End Users who burn waste tires or tire derived fuel are highly regulated by other divisions within Department. Adding waste tire bale regulations to including the possibility of notifying local fire districts when waste tire bales are being end used protects the public health and environment by allowing local fire districts to prepare for a potential emergency.
36. Stakeholders submitted a comment asking whether greenhouse gas emissions could be a factor in determining the per ton rate for the three tiers. SB 19-198 did not give the Commission authority to consider greenhouse gas emissions in setting the per ton rates.

## Regulatory Alternatives

No other regulatory alternatives were evaluated.

## Cost/Benefit Analysis

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division (HMWMD)

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

**Amendment of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Addition of Section 3.3.8 Training**

**(Adopted by the Solid and Hazardous Waste Commission on May 21, 2019)**

Statement of Basis and Purpose:

These amendments to 6 CCR 1007-2, Section 3, are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Section 30-20-109, C.R.S.

The purpose of these amendments is to add a new subsection 3.3.8 to Section 3 to establish training requirements applicable to specific facility personnel identified in Section 3.3.8(A)(1) that work at a solid waste landfill in the State of Colorado.

Background

The Regulations Pertaining to Solid Waste Sites and Facilities (the Regulations), 6 CCR 1007-2, currently address training of landfill personnel in a very limited fashion. Section 2.1.2(B)(3) is the only section that includes a training requirement – and this section only requires workers be trained to recognize hazardous wastes and polychlorinated biphenyl (PCB) wastes to prevent disposal of these materials in landfills. Section 2.1.2(B)(3) was added to Colorado's regulations when very similar requirements were promulgated in the federal solid waste rules - Subtitle D of the Resource Conservation and Recovery Act in 1992.

Many landfills in Colorado have been implementing effective training programs for a long time. Anecdotally, the Hazardous Materials and Waste Management Division has found via inspections of landfills over the years that the presence of an effective training program ties directly to better compliance with regulatory requirements and EDOP requirements. This makes perfect sense. However, many landfills have never developed or implemented training programs. As a result, compliance at many landfills is poor. Landfills do not, by themselves, protect human health and the environment. That protection only comes when the employees know the requirements and ensure those requirements are implemented. As such, the Commission believes that adding these proposed training regulations is overdue.

Discussion of the Regulatory Proposal

Training Program and Training Plan – The proposed regulations, in Section 3.3.8(A), require each landfill to develop a training program that ensures that specific facility personnel identified in Section 3.3.8(A)(1)

are thoroughly trained in facility operations relevant to the work they do at the facility. Section 3.3.8(B) requires that the training program include a written training plan that defines the initial and continuing training that specific facility personnel at the landfill will receive. The goal of this training is to ensure that the landfill facility complies with all regulatory requirements and all EDOP requirements which protects human health and the environment.

Additional Prohibited Wastes (Section 3.3.8(B)(1)) - Since 1992, industry awareness regarding the proper disposal of hazardous waste has increased significantly and the use of PCBs has essentially been phased out. However, there are a number of additional wastes that are specifically prohibited by state law or by the regulations (liquid waste, electronic waste, lead acid batteries, used oil, whole waste tires). In addition, there are wastes that have the potential to impact human health and the environment when disposed in a solid waste landfill (e.g., asbestos wastes, medical wastes). Acceptable wastes are specified in a waste characterization and disposal plan included in the facility's Engineering Design and Operations Plan (EDOP) issued by the Division. The EDOP may also include specific provisions for how, when and where some of these riskier wastes will be managed. This points to the need for personnel at solid waste landfills to be a) trained to recognize a broader list of wastes in addition to hazardous waste and PCB wastes, and b) trained to know how certain wastes can be managed at the facility.

The Importance of the EDOP (Section 3.3.8(B)(2)) – Section 3 of the Regulations defines the standards by which landfills must operate. The EDOP for each landfill site and facility incorporates those standards but adds many site-specific aspects for implementation of the regulatory standards. It is therefore vital that personnel designing, building, and operating landfills are familiar with the regulatory requirements and with the requirements of their EDOP. This familiarity must come from a systematic and repeating training program that covers the general regulatory requirements and the site-specific EDOP requirements. Knowledge of, and compliance with, the EDOP is the key to ensuring that operations are conducted in a compliant manner that ensures protection of human health and the environment.

Documentation (Section 3.3.8(C)) - The last element of these proposed training regulations include documentation requirements. The new regulations will require owners or operators of solid waste landfills to maintain the names, job titles and job duties for specific facility personnel identified in Section 3.3.8(A)(1). The new regulations will also require documentation of the type of initial and continuing training for all facility personnel who have job duties related to the management of solid waste and/or who may respond in the event of an emergency. Finally, documentation that these training requirements have been met must be maintained on-site and available at the time of an inspection.

These new training regulations are not expected to be onerous requirements and many landfill facilities have already implemented training requirements that meet these new regulations.

Stakeholder Process

A stakeholder meeting regarding this proposed rulemaking was held on March 6, 2019. The Commission also received public comments as part of the rulemaking hearing. In response, the Division modified paragraph (A)(1) of Section 3.3.8 in the proposed rulemaking to include a definition of "facility personnel" that are subject to the Section 3.3.8 training requirements. "Facility personnel" is not intended to include consulting staff or other off-site personnel who are contracted to perform work at the landfill.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division (HMWMD)

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

**Amendment of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Amendment of Section 1.7.3 Annual Fees**

**(Adopted by the Solid and Hazardous Waste Commission on May 21, 2019)**

Statement of Basis and Purpose:

These amendments to 6 CCR 1007-2, Section 1.7.3, are made pursuant to the authority granted to the Solid and Hazardous Waste Commission (the "Commission") in Section 30-20-109(2.5), C.R.S.

The purpose of these amendments to Section 1.7.3 is to establish revised annual fees for facilities that are not required to pay Solid Waste User Fees. Annual fees are established in Section 30-20-109(2.5)(a), C.R.S., and the Solid Waste User Fee is established in Section 25-16-104.5, C.R.S.

Background

All persons who dispose of solid waste at an "attended solid waste disposal site" in Colorado are required to pay a Solid Waste User Fee. § 25-16-104.5(1.5) and (1.7)(a), C.R.S. "Attended solid waste disposal site" is defined in Section 25-16-102(1), C.R.S. as a site established in Article 20, Title 30, Part 1, C.R.S., at which an attendant is present during normal hours of operation. Because the Solid Waste User Fee is based on volume, an attendant's presence is typically necessary to account for the amount of solid waste that is being disposed of. The term "attended" also includes facilities where access is limited, monitored and tracked by card keys or gate codes or other access codes.

"[S]olid waste disposal sites and facilities that are not required to pay [the Solid Waste User Fee]" are subject to "annual fees" set by the Commission pursuant to Section 30-20-109(2.5)(a), C.R.S.[1]

Annual fees established under this section are limited to five thousand dollars per year per facility, and "must be uniform among owners of the same type of, and similarly sized facilit[ies]." Annual fees must take into account the Colorado Department of Public Health and Environment's (the "Department") level of effort in regulating the facilities and are used to carry out its "duties and responsibilities concerning

---

[1] There is a slight disconnect between the key terms "attended solid waste disposal site" and "solid waste disposal sites and facilities" in 30-20-101(8) and 25-16-102(1). However, the Commission believes it is reasonable to conclude that an "attended solid waste disposal site" would be equivalent to an attended "solid waste disposal site and facility."

solid waste management." § 30-20-109(2.5)(c), C.R.S. Monofills which contain coal combustion products are exempt from annual fees. § 30-20-109(2.5)(a), C.R.S.

This rule impacts the following solid waste disposal sites and facilities, which are subject to annual fees:

- Solid waste disposal sites and facilities which are not "attended" pursuant to Section 25-16-102(1), C.R.S., including landfills and monofills in post-closure care and sites performing cleanup or corrective action, as well as sites where a person is disposing of their own waste on their own property Section 30-20-102(3), C.R.S.;

- Facilities with waste impoundments;

- Other types of solid waste facilities including incinerators, composting facilities, medical waste facilities;

- Inactive facilities which have not commenced closure, but have not been accepting any waste for a period of one year or more.

Discussion of the Regulatory Proposal

In February 2008, the Solid and Hazardous Waste Commission promulgated annual fee regulations in Section 1.7.3 as a result of the passage of House Bill 07-1288. This legislation authorized the assessment of annual fees to be paid by solid waste facilities that are not subject to the volume-based fee charged at operating landfills and other solid waste disposal sites and facilities, also known as the Solid Waste User Fee. After a stakeholder process in 2007, annual fees were established for all applicable facilities at a rate of $1,000/year. Since that time, the regulation has been changed several times, but the basic rate of $1,000/year has remained the same.

In 2012, when the Section 9 (Waste Impoundments) regulations were promulgated, the Commission included the following text in the Statement of Basis and Purpose:

> The $1,000/yr [annual] fee will be changed into a tiered scheme based on the ongoing effort of the Solid Waste Program to inspect and otherwise track each type of facility. The new annual fee will include, but not be limited to, consideration of the solid waste generation rate at the facility, the type/toxicity of waste generated, and whether the facility is a Type A or Type B facility. When the fee is changed, it will require a rule by the Solid and Hazardous Waste Commission. It is the Commission's intent to begin that process and stakeholder involvement after this Section 9 is promulgated. Until then, all annual fees for facilities only regulated by Section 9 (i.e., not subject to other solid waste fees except the hourly fee) will be waived.

This 2012 excerpt illustrates that the Commission believed that a tiered system for annual fees for certain types of facilities was preferred. However, no tiered system was previously adopted.

In summary, the rule makes the following changes:

1. Overall, this rule maintains annual fees of $1,000/year for most types of active solid waste disposal sites and facilities that do not pay the SWUF. It decreases the annual fees to $500/year for all inactive facilities. It also adds several types of facilities to those that are required to pay the annual fee. And finally, it decreases or eliminates the annual fee for some low risk facility types.

2. Section 1.7.3(A) – This change combines the original Section 1.7.3(A)(3) into Section 1.7.3(A)(1); and combines the original Section 1.7.3(A)(4) into Section 1.7.3(A)(2). In the previous regulations, annual fees were split into "annual operating fees" (subsections (1) and (2)) and "post-closure fees" (subsections (3) and (4)). Upon review, the Commission does not believe this is needed and this section can be shortened and simplified without any loss of clarity.

3. Section 1.7.3(A)(1) – This change removes the phrase "not subject to" and replaces it with "not required to pay." This change will improve consistency between Section 1.7.3 and 30-20-109(2.5)(a), C.R.S., which states that annual fees may only be established for "solid waste disposal sites and facilities" that are "not required to pay" the Solid Waste User Fee. The Commission interprets this language to mean that annual fees may be established for sites and facilities which are exempt from the Solid Waste User Fee (such as unattended sites and facilities), as well as sites and facilities which are not required to pay the Solid Waste User Fee because they are not actively accepting waste from producers or other persons disposing of solid waste.

4. Section 1.7.3(A)(1)(a) – This change aligns with the previously-described change. It combines existing Section 1.7.3(A)(1)(h)(ii) and Section 1.7.3(A)(3)(j)(ii). This change simplifies language pertaining to the annual fee for unattended, active landfills. This portion of the rule <u>does not change</u> the existing annual fee amounts for this group of facilities. It is intended that this category of facilities would include drinking water treatment facilities disposing of their own sludge in an on-site monofill.

5. Sections 1.7.3(A)(1)(b) – This section of the rule is the same as the current Sections 1.7.3(A)(3)(a) and (b) which have been eliminated.

   The Commission intends that this section would only include landfills that remain in post-closure. Once the Hazardous Materials and Waste Management Division (the Division) determines in writing that post-closure care and monitoring can end at a closed landfill, this annual fee would no longer be charged. In addition, the Commission intends that this section would include sites where a) an entity's own waste has been disposed on their property and has closed in-place and entered post-closure care and monitoring, b) an illegal disposal site has been allowed to close in-place and entered post-closure care and monitoring, and c) other sites that remain in post-closure care and monitoring such as sites undergoing corrective action. The footnote in the regulation also makes clear that monofill facilities that contain only coal combustion products are exempt from the annual fee, consistent with the exemption in Section 30-20-109(2.5)(a), C.R.S. The footnote also exempts unattended landfills in post-closure care and maintenance that are owned by municipalities. All of the facilities in this category are very small and owned by very small towns where payment of a $500/year annual fee would be overly burdensome. This portion of the rule proposal represents an overall <u>fee decrease</u>.

   It should be noted here that any type of solid waste disposal site and facility that closes with waste remaining in place becomes a closed landfill. Therefore, the Commission intends that any solid waste disposal site and facility that closes with waste in place and enters post-closure care and maintenance will become subject to this category of annual fee so long as post-closure care and maintenance is required.

6. Sections 1.7.3(A)(1)(c) and (d) – This change adds two tiers of annual fees for facilities with waste impoundments where the impoundments are only receiving waste generated on-site (one's own waste on one's own property). (Waste impoundments receiving wastes generated off-site are subject to the Solid Waste User Fee.) The lower tier is for facilities with one or more Type A impoundments and no type B impoundments. The fee for this tier of facilities would be $0. Type A impoundments contain very low risk wastes and the Division does not spend a lot of time and effort providing oversight, assistance, and enforcement at these locations. The upper tier is for facilities with one or more Type B impoundments, which contain higher risk materials and, as a result, require more oversight, assistance and enforcement from the Division. Type B impoundment facilities would be charged a facility-wide annual fee of $1,000/year. Given that annual fees have been waived for waste impoundments since 2008, the proposal for Type B impoundments to pay an annual fee could be viewed as a <u>fee increase</u>. On the other hand, not charging Type A impoundments any annual fee could be viewed as either a <u>fee decrease or no increase in fees</u>.

7. Section 1.7.3(A)(1)(e) and (f) – This change is consistent with other changes aimed at simplifying Section 1.7.3(A). Annual fees for solid waste incinerator facilities and medical waste facilities were previously in Section 1.7.3(A)(1)(d) and (e), respectively, and Section 1.7.3(A)(3)(f) and (g), respectively. Because Sections 1.7.3(A)(1) and Section 1.7.3(A)(3) are being combined, the fees for these facilities now appear in Section 1.7.3(A)(1)(e) and (f). This portion of the rule does not change the existing annual fee amounts for solid waste incinerators and medical waste facilities.

8. Section 1.7.3(A)(1)(g) – This rule combines fees for composting facilities into one section and adds three tiers for composting facilities, which align with the three classes of composting facilities found in Part 14 (Composting) of the regulations.

    a. Class I composting facilities would have an annual fee of $0. These facilities compost only vegetative wastes and other low-risk materials and have maximum allowable on-site volumes of feedstock and in-process materials. Since these facilities do not consume large amounts of Division staff time, the Commission believes no annual fee is necessary.

    b. Class II composting facilities have a new proposed fee of $100. In addition to accepting vegetative wastes and other low risk materials and having the same material volume limits as Class I facilities, Class II facilities can accept manure. Because Class II facilities represent slightly higher risk, and consume relatively small amounts of Division staff time, this rule proposes an annual fee of $100.

    c. Class III composting facilities represent the highest risk and, as a result, have the highest proposed annual fee of $1,000. Class III facilities can accept riskier materials including biosolids, and have no maximum allowable on-site volumes of feedstocks or material in process. These facilities represent a significant effort by the Division providing oversight, assistance, and enforcement, and therefore a fee of $1,000/year is appropriate.

    Overall, this part of the proposal also represents a fee decrease, since all of these facilities were previously paying a $1,000 annual fee.

9. Section 1.7.3(A)(1)(h) - This section adds a category of annual fees for inactive facilities, including unattended inactive facilities, that have not been accepting any waste for a period of one year or more and are, therefore, not paying the Solid Waste User Fee. These facilities have not been required to commence closure due to market conditions, pending site improvements or other reasons, but represent a category of facility that consumes quite a bit of Division staff effort. The annual fee for these facilities is $500. This portion of the rule represents a fee increase, as these facilities are not currently assessed an annual fee. If a facility becomes active again they would begin paying the Solid Waste User Fee and a portion of the last year's annual fee payment would be refunded depending on the date the facility re-opened.

10. Section 1.7.3(A)(2) – These changes clarify when the annual fee applies.

11. Section 1.7.3(A)(3) – This paragraph clarifies that facilities conducting activities that fall under more than one annual fee category presented in section 1.7.3(A)(1)(a) through (h) owe the annual fee associated with each activity. For example, if a facility is a drinking water treatment facility that has both Type B impoundments and an on-site alum sludge monofill (an unattended landfill), that facility would owe an annual fee of $2,000/year.

12. Section 1.7.3(B) – These changes describe a) that payment of the annual fee will follow receipt of an invoice from the Department, and b) the consequences for when annual fees are not paid, consistent with § 30-20-109(2.7), C.R.S.

DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

Solid and Hazardous Waste Commission

Hazardous Materials and Waste Management Division

6 CCR 1007-2

STATEMENT OF BASIS AND PURPOSE
AND SPECIFIC STATUTORY AUTHORITY FOR

Part 1 – Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2)
Amendment of Waste Grease Regulations – Modification of waste grease transporter and facility annual fees requirements

**(Adopted by the Solid and Hazardous Waste Commission on February 19, 2019)**

**Basis and Purpose**

I. Statutory Authority

These amendments to 6 CCR 1007-2, Part 1 are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in § 30-20-123, C.R.S.

II. Purpose of revised regulations

The Waste Grease Fund and registration fees were created in § 30-20-123, C.R.S. to provide funding to cover the Department's cost to implement the waste grease regulatory requirements. The Department has accrued a balance each year that is greater than the program administrative costs and needs to lower the annual registration fees for waste grease transporters and facilities.

III. Discussion of Regulatory Proposal

Annual Waste Grease Facility and Transporter Fees

The current fees charged to waste grease transporters and facilities pursuant § 30-20-123, C.R.S. and Section 1.7.5 of the solid waste regulations were estimated in 2012 as an estimate of Department cost to implement the regulatory requirements for Section 18, Waste Grease Transporters, Facilities, and Personal Users of Waste Grease. The Department has since found that the fees paid by waste grease registrants exceeds the cost to implement the program. The purpose of this change to the regulation is to lower the annual waste grease transporter and facility fees in Section 1.7.5 of the solid waste regulations to be in line with the cost to implement the program.

Section 1.7.5 will be changed to reflect a drop in annual registration fees for waste grease transporters from $570 per vehicle annually to $280 per vehicle annually. The

annual registration fees for waste grease facilities will drop from $1,140 to $700 annually.

## Issues Encountered During the Stakeholder Process

No issues were encountered during the stakeholder process.

## Description of Local Government Involvement in the Stakeholder Process

Executive Order D 2011-005 (EO5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO5 – Internal Communication Form – Internal Conception Phase which was transmitted to local governments. The revised recycling regulations will have little effect on local governments.

## Cost/Benefit Analysis

A cost benefit analysis will be performed upon request.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division (HMWMD)

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

**Amendment of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Correction of Typographical Errors and Outdated References**

**(Adopted by the Solid and Hazardous Waste Commission on November 20, 2018)**

**Basis and Purpose**

These amendments to 6 CCR 1007-2, Part 1 are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302(4.5) and 30-20-109, C.R.S.

**Discussion of Regulatory Proposal**

These amendments correct typographical errors and outdated references that exist in the Colorado Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2). The amendments being adopted at this time include the following:

1) Revision of the definition of "Ground water protection standard" in Section 1.2 of the Regulations. The reference to "5 CCR 1002-8" is being replaced with a reference to the current location of the Water Quality Control Commission regulations at "5 CCR 1002". The Water Quality Control Commission regulations previously found at 5 CCR 1002-8 (Surface Water/Classification and Numeric Standards for River Basins/Ground Water) were divided into 5 CCR 1002-31 through 1002-42 when separate classifications and numeric standards were adapted for the various river basins in Colorado.

2) Revision of Section 1.9.2 (Enforcement) and Section 1.9.4 (Judicial Enforcement Actions) . Paragraph (F) of Section 1.9.2 and Paragraph (B) of Section 1.9.4 are being amended to reflect the maximum penalty amount that may be assessed for violation of Colorado solid waste disposal requirements, in accordance with Section 30-20-113(5) of the Colorado Solid Wastes Disposal Sites and Facilities Act. The penalty amount was increased from $2,000 to $10,000 by HB09-1056. Paragraph (F) of Section 1.9.2 is also being amended to clarify that Section 30-20-113(5) authorizes a compliance order issued by the Division to include an administrative or civil penalty.

3) Revision of Section 5.5.7. Paragraph (E)(2)(e)(ii) of Section 5.5.7 is being amended to replace the incorrect reference to section "5.5.7(E)(2)" with the correct reference to "5.5.7(E)(3)" regarding the requirement for "downwind floating samples".

4) Revision of Section 7.2.2. Paragraph (B)(4) is being amended by replacing "allowing" with ""allowed".

5) Revision of Section 9.3.5. Paragraphs (H) and (I) in Section 9.3.5 are being renumbered as paragraphs (F) and (G).

DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

Solid and Hazardous Waste Commission

Hazardous Materials and Waste Management Division

6 CCR 1007-2

STATEMENT OF BASIS AND PURPOSE
AND SPECIFIC STATUTORY AUTHORITY FOR

Part 1 – Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2)
Amendment of Financial Assurance Regulations – Deletion of Section 1.8 of the regulations; Addition of Section 4 to the regulations

**(Adopted by the Solid and Hazardous Waste Commission on May 15, 2018)**

**Basis and Purpose**

I. Statutory Authority

These amendments to 6 CCR 1007-2, Part 1 are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in § 30-20-104.5, C.R.S and § 30-20-109, C.R.S.

Statement of Basis & Purpose

The purpose of the current Part 1.8 and the future Part 4 of the solid waste regulations is to provide assurance that funds will be available to the Department when needed for adequate closure and post-closure of, and corrective action at, solid waste disposal sites and facilities should the owner and operator become financially insolvent. These regulations require the owners and/or operators to estimate the costs of closure, post-closure and corrective action and assure financial responsibility for those costs through any of nine mechanisms: trust fund, letter of credit, surety bond, insurance, corporate financial test, local government financial test, corporate guarantee, local government guarantee, and certificate of deposit.

These changes to the financial assurance regulations are a result of, and response to, concerns of the Department after many years of program implementation. Vulnerabilities in the existing regulations that have been exposed by research done by EPA's Environmental Financial Advisory Board (EFAB), and effects of the 2008 economic recession. The proposed regulatory changes were developed with the help of a series of five stakeholder meetings at which comments were received from interested parties, discussed, and incorporated as appropriate. Work on the regulatory language may continue up to the rulemaking hearing date.

**Discussion of the Regulatory Proposal**

This rulemaking proposes to make the solid waste financial assurance requirements a stand-alone section of the regulations by moving the requirements from Section 1.8 to Section 4, which is currently empty. This simplifies Section 1 of the regulations, gives appropriate emphasis to the financial assurance requirements, and makes the solid waste regulations consistent with the hazardous waste regulations where financial assurance requirements are in a separate section.

~~I.~~ The significant changes proposed in this rulemaking fall into the five groups listed below, all of which are discussed in the following sections:

1. Clarification of the role of the local governing authority,
2. Elimination of pay-in periods for new non-landfill facilities,
3. Adding requirements for financial assurance coverage of corrective action liabilities,
4. Eliminating requirements for stand-by trusts, and
5. Strengthening the requirements for insurance and captive insurance companies.

1. <u>Clarification of the role of the local governing authority</u>

The role of the local governing authority is prominent and vital in the current Regulations Pertaining to Solid Waste Sites and Facilities. This is true in the existing Section 1.8, where the local governing authority is involved with the Department in many review and consultation processes and decision points. While our experience has been that the local governing authorities have less expertise in financial assurance than Department staff and almost always default to agreement with Department positions, local governing authority stakeholders opposed having their role significantly diminished. On the other hand, the regulated community was concerned that, if the role of the local governing authority remained unchanged from the previous regulations, regulated entities could find themselves in a situation where the Department had approved their financial assurance mechanism or updated cost estimates, but the local governing authority never indicated a decision. This would leave the regulated entity at risk in terms of the adequacy of their financial assurance. To solve this problem, proposed regulations define two levels of local governing authority involvement. The higher level of local governing authority involvement is "consultation." Consistent with the Colorado Solid Wastes Disposal Sites and Facilities Act, the draft regulations include a consultation role for the local governing authority in a) all approvals of new financial assurance, including initial financial assurance for new solid waste disposal sites and facilities and any subsequent financial assurance for corrective action, b) all instances where financial assurance is being terminated for any solid waste disposal sites and facilities (except those instances where one financial assurance mechanism is being terminated in favor of a new or different mechanism), and c) in approving situations where a single financial assurance mechanism is being used to cover multiple solid waste disposal sites and facilities which may be owned by different owners or operators. An invitation for local governing authority consultation will come from the Department and will require an affirmative response from the local governing authority by a date set by the Department. The lower level of local governing authority involvement is "notification." Notifications may come from the Department or the owner or operator and will not require an affirmative

response from the local governing authority. In the event a local governing authority has a concern about any matter in a notification, they may request consultation with the Department. The Department is always available for any local governing authority questions or concerns regarding any aspect of financial assurance and is willing to consult with local governing authority upon request.

2. Elimination of pay-in periods for new non-landfill facilities

It is clear from the federal financial assurance regulations for solid waste that allowance of a pay-in period for trust funds was intended for use by landfills. The problem is that the current state financial assurance regulations do not limit pay-in period to landfills, but allow the use of pay-in periods for all solid waste disposal sites and facilities. This has created current situations where a solid waste disposal site and facility reaches a point where it can present its maximum closure risk, but is still many years from full-funding of its trust fund.

Pay-in periods for financial assurance trust funds are appropriate for solid waste disposal sites and facilities that accumulate closure and post-closure liabilities slowly. Most disposal facilities (landfills and monofills) would fit in this category because as new cells are constructed and filled, which can take many years, closure and post-closure liabilities expand slowly. Conversely, risk does not accumulate slowly at other types of solid waste disposal sites and facilities such as impoundments, waste treatment facilities, and compost facilities. These facilities typically reach capacity quickly, long before any pay-in period has accumulated the needed financial assurance protection. If these facilities were to become financially insolvent, the Department would not have access to sufficient capital to cover closure, post-closure and corrective action costs.

This regulatory proposal allows all current solid waste disposal sites and facilities that have pay-in periods to continue to operate under those pay-in schedules, unless the facility does not comply with the pay-in schedule. This proposal will also continue to allow new landfills and monofills to use pay-in periods. However, the proposal eliminates pay-in periods for other solid waste disposal sites and facilities such as new impoundments, waste treatment facilities, and compost facilities.

3. Adding requirements for corrective action coverage with financial assurance

When solid waste disposal sites and facilities have a confirmed release of contaminants to the environment that requires monitoring or remediation, corrective action is required. Depending on the severity of the release, corrective action could be limited to monitoring the contamination to ensure that it naturally attenuates over time, or the corrective action may involve complicated and costly remediation projects. The Department must be able to pay these costs if the owner and/or operator become financially insolvent. Therefore, the Department must be able to call upon adequate financial assurance to complete the corrective action liabilities.

4. Eliminating requirements for stand-by trusts

In the years since these regulations were promulgated, Colorado has developed alternatives to, and no longer needs, stand-by trust accounts for receipt of financial assurance funds. This will eliminate the account set-up and administration fees paid for these accounts, which are expensive.

5. Strengthening the requirements for insurance and captive insurance companies

**A. Requirements for Insurers.**

These proposed regulations strengthen the requirements for insurers. The insurer must, at a minimum, be licensed to transact the business of insurance in the State of Colorado, attain a rating of A- or better from A.M. Best, be eligible to provide insurance as an excess or surplus lines insurer of more than $100 million in one or more States, and submit a copy of the proposed insurance policy to the Department for review before it is in full force and effect.

The Department has chosen to utilize an A.M. Best rating to assure that the insurer has the financial strength to secure their liabilities. A.M. Best is a third-party rating agency that evaluates all insurers and is one of the top rated third-party agencies to provide their type of analysis and research. A rating of A- means that the insurer has a very good financial prognosis and is not at risk of becoming financially insolvent. An insurer will also have to demonstrate that they have at least $100 million or greater in capital and surplus beyond the liability of their outstanding policies. This will assure that the liability covered by the policy will be guaranteed even if other outstanding policies are paid in full. The Department is also requiring an owner and/or operator to submit the insurance policy to the Department before it is approved for financial assurance. This will ensure that the policy coverage adequately meets the required needs of the closure, post-closure and/or corrective action at the solid waste disposal site and facility before the policy is bound.

**B. Requirements for Captive Insurance Companies.**

These regulations also strengthen the requirements for captive insurance companies. Captive insurance is insurance issued by a wholly-owned subsidiary of the company being insured. The financial health of the captive insurance company is closely tied with the parent company, so if the company encounters financial difficulties there is no guarantee that the captive insurance company would retain the necessary resources to fund any closure, post-closure, and corrective action liabilities they may have.

The Department has had concerns about captive insurance for some time. These concerns include the following:

1. A lack of independence, and thus the transfer of risk, between the captive insurance subsidiary and the insured parent company.
2. A lack of consistent requirements for captive insurance companies with regard to minimum capitalization thresholds, reserves, and encumbrances on reserves.

3. A general lack of Department expertise in monitoring and reviewing the financial status of captive insurance companies and their parent companies.
4. The financial viability of companies (and their captive insurance companies) can change very rapidly.

To address these concerns, and to address comments received from stakeholders, the Department sought additional outside expertise on captive insurance from the Colorado Division of Insurance (part of the Department of Regulatory Agencies); the Vermont Department of Financial Regulation, and the U.S. Environmental Protection Agency. That input is very much appreciated.

For captive insurance, the same requirements have been that were added for all insurers, as explained above. In addition, requirements have been added that the captive insurance company be domiciled in a jurisdiction accredited by the National Association of Insurance Commissioners (NAIC) and be in good standing with the domiciliary regulator. Further, the captive insurer must give the Department at least 180 days of notice before cancelling a captive insurance policy.

In working with stakeholders, the Department had originally proposed that all captive insurance companies be domiciled in Vermont because Vermont regulates more captive insurance companies than any other state and has developed regulations that keep pace with, and effectively control, the industry. For many years, Vermont has been widely viewed as the "gold standard" in captive insurance regulation. However, after feedback from stakeholders, as well as from the Division of Insurance, these regulations allow captive insurance companies to be domiciled in an NAIC accredited jurisdiction and be in good standing with the domiciliary regulator. This accounts for the more rigorous national standards that have developed over the past few years, including in Colorado.

These regulations also require that if the captive insurance company fails to provide a Certificate of Good Standing, or its equivalent, issued by the domiciliary regulator, the owner and operator shall submit notification to the Department, at which point a different approved mechanism would need to be secured. The 180-day notice allows the Department to work with the company to put another approvable financial assurance mechanism in place before the captive insurance policy lapses.

~~H.~~ In addition to these significant changes, the following issues were discussed with stakeholders:

1. Section 4.2.1(D): Stakeholders asked why owners and operators would not be allowed to incorporate a zero cost into their financial assurance cost estimates for solid wastes that might have an economic value. That is to say, if the Department has to call on the financial assurance to enable cleanup and closure of a solid waste disposal site and facility, and there are solid wastes on-site that might have re-sale or re-use value to another entity, should the cost estimate for financial assurance be able to take that value into consideration at least to the extent that disposition of that material would have a

zero-cost impact to the closure of the facility? This proposal was not incorporated in these regulations for several reasons:

a. Market values of these waste materials are usually dynamic, unpredictable, and hard for the Department to verify;
b. The market value of these waste materials are often over-estimated by the owner and/or operator;
c. Many times even processed materials viewed by the owner/operator as a product do not have market value and are instead a closure liability; and
d. Neither the Department nor the third party performing closure will have the time or expertise to dispose of materials from a site that might have positive or non-negative value.

2. Section 4.6.2(B): Stakeholders asked why investments with trust fund monies need to have "no" risk of losing principle value versus having a "low" risk. Trust fund money can be invested in a manner that achieves rates of return that cover inflation, but have essentially no risk of losing the underlying principle of the fund. This can be done by investing in high grade corporate bonds, treasury bonds, and even Certificates of Deposit. Such investments can be structured to remain fully insured by the FDIC. Any loss of the underlying principle represents inadequate financial assurance and places the owner/operator in a non-compliant status.

The remainder of the changes in the proposed rulemaking are clarifications and readability improvements.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division (HMWMD)

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

**Amendment of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Section 1.2 Definitions – Revision of the definitions of "Agricultural wastes" and "Composting", Addition of the definition of "Anaerobic digestion"; and deletion of definition of "Custom mill"**

**(Adopted by the Solid and Hazardous Waste Commission on May 15, 2018)**

**Statement of Basis and Purpose:**

Statutory Authority

These amendments to 6 CCR 1007-2, Part 1 are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in § 30-20-109, C.R.S.

Discussion of Regulatory Proposal

I. Changes to the definition of "Agricultural Wastes"

In Colorado law, "agricultural wastes" are specifically exempted from those materials that are solid waste. The statute, in § 30-20-101(6)(b)(II), C.R.S., states that ""Solid Waste" does not include: . . Agricultural wastes." However, the term "agricultural wastes" is not defined in statute.

To clarify and improve the definition, it is necessary to delete the words *"solid wastes"* in the first phrase of the definition and replace it with the phrase *"discarded or residual plant materials or animal materials."* Using the term "solid waste" in the definition of a term that describes a material that is not "solid waste" creates confusion.

The phrase *"on land zoned agricultural by local requirements."* is being stricken. Agricultural wastes can be generated on land that is not necessarily zoned "agricultural." Wastes such as manures and crop residues can be generated on residentially, commercially, and even industrially zoned land. The phrase *"that directly result (from the raising of crops or livestock) has been added for emphasis and clarity.* Additionally, agricultural wastes may be used for other purposes such as animal feed or animal bedding. Therefore, the phrase "*or are used for other agricultural purposes*" has been added.

Agricultural wastes are excluded from regulation as solid waste even if they undergo processing or treatment. This means, for instance, that anaerobic digestion using only agricultural wastes as inputs would generate only agricultural wastes along with the methane gas that is used on-site or sold. On the other hand, food processing generally starts with agricultural products, not agricultural wastes. Therefore, food processing wastes would be solid wastes even if they are applied to soils for fertilizer, soil conditioners, or compost.

In all-hazard events or depopulation events caused by such things as blizzards, or diseases such as bird flu, burial pits are sometimes necessary to deal with the large numbers of animal carcasses. The Colorado Department of Agriculture (CDA) is the lead regulatory agency overseeing the response to these events. By policy and per a Department memorandum of understanding with CDA, such carcasses and carcass by-products remain agricultural wastes even if they are disposed of in or on the land and are not used as a fertilizer, soil conditioner, or compost. The flexibility to use burial pits as part of the response to such events needs to be preserved.

II. Changes to the definition of "Composting"

The definition of "composting" is being changed in two places. First, vermicomposting is being added as an additional type of composting. Vermicomposting is a method of using worms to transform organic waste into a nutrient-rich fertilizer. Though a small niche in the composting industry, vermicomposting is a well-established and traditional composting method. Second, the phrase *"of piles and windrows"* is being removed from the definition because not all composting utilizes piles and/or windrows.

III. Addition of a definition for "Anaerobic Digestion"

As anaerobic digestion becomes an increasingly common treatment for organic waste streams, the Department is getting many inquiries about how and when the process will be regulated. While the term "anaerobic digestion" does not currently appear in the Solid Waste regulations, anaerobic digestion of solid waste, for the intended purpose of biogas creation, could be regulated by various combinations of Section 2 (minimum standards), Section 8 (beneficial use), Section 9 (surface impoundments), Section 14 (composting), and Section 18 (waste grease), depending on the design and operation of the facility. Anaerobic digestion of materials that are solid wastes also creates liquid, semi-solid and solid digestates which remain solid wastes until the Department determines such wastes meet applicable fertilizer, soil amendment, compost, or beneficial use criteria. Anaerobic digestion at domestic wastewater treatment works will remain regulated by the Water Quality Control Division because domestic sewage is excluded from regulation as solid waste. The proposed definition comes from the American Biogas Council's definition of anaerobic digestion.

IV. Deletion of the definition of "Custom Mill"

The definition of Custom Mill is being deleted from Section 1.2 of the Solid Waste regulations because the term is never used within the regulations and because Custom Mills are not regulated by the CDPHE, but are instead regulated by the Department of Natural Resources in their Division of Mine Reclamation and Safety.

Cost/Benefit Analysis

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Revisions to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) –Revisions to Section 8 Recycling and Beneficial Use Regulations

**(Adopted by the Solid and Hazardous Waste Commission on May 15, 2018)**

**Basis and Purpose**

I. Statutory Authority

The Solid Waste Act ("the Act") requires the Department to regulate solid waste management within the State. The Act requires the Department to develop, implement and continuously improve, as necessary, policies and procedures for carrying out its statutory responsibilities. § 30-20-101.5(2), C.R.S.

The Act defines solid waste as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial or commercial operations or from community activities." § 30-20-101(6)(a), C.R.S. Solid wastes disposal means "the storage, treatment, utilization, processing, or final disposal of solid wastes." § 30-20-101(7), C.R.S. A person may only dispose of solid waste at a solid wastes disposal site and facility that has received a certificate of designation from the local governing body having jurisdiction. § 30-20-102, C.R.S.

The Act provides the minimum criteria solid waste recycling facilities must meet to remain exempt from the requirement to obtain a Certificate of Designation. § 30-20-102(5), C.R.S. states "Any site and facility operated for the purpose of processing, reclaiming, or recycling recyclable materials shall not be considered a solid wastes disposal site and facility and shall not require a certificate of designation as a solid wastes disposal site and facility; except that, after an initial accumulation period specified by rule, such a site or facility shall maintain documentation that proves recyclable materials are being recycled at the site at a rate that approximately equals the rate at which recyclable materials are being collected. The solid and hazardous waste commission shall promulgate rules to specify what time periods and volumes of recyclable materials constitute operations that qualify for this exemption and to define what materials shall be deemed to be recyclable materials for the purposes of this subsection (5); except that such rules shall not define the term "recyclable materials" to include materials that are likely to contaminate groundwater or create off-site odors as a

result of processing, reclaiming, recycling, or storage prior to recycling. This subsection (5) does not apply to activities regulated under § 25-8-205 (1) (e), C.R.S."

§ 30-20-102(5), C.R.S. grants the Solid and Hazardous Waste Commission the authority to specify by rule the initial accumulation periods, material types and quantities that a recycling facility may import and remain exempt from the requirement to obtain a Certificate of Designation.

II. Purpose of revised regulations

The purpose of revising Sections 8.5.4 and 8.5.5 of the Solid Waste Regulations is to update the regulations applicable to industrial recycling operations. The proposed revisions are only applicable to new industrial recycling facilities that begin operations after the effective date of these regulatory changes. The need to revise these regulations stems from challenges the Division has encountered from the regulated community under the existing regulations.

Under the existing regulations, new industrial recycling facilities do not have to seek Division approval of their registration form and operations plan prior to accepting recyclable material at the facility and are allowed to accumulate an unrestricted amount of recyclable materials on-site for an entire year before recycling activities begin. The current one year accumulation period was intended to allow facilities to collect enough inventory so their equipment can efficiently process recyclable materials with minimal down-time. However, some recyclable materials can be generated at very fast rates and the inventory necessary to allow the efficient processing of these materials can be accumulated in a much shorter time frame. Additionally, market conditions and pricing, particularly for high-volume materials, can quickly change. Any changes to market conditions and pricing not favorable to a commodity can result in the abandonment of large volumes of recyclable materials by new and/or poorly capitalized operators. When recyclable materials are abandoned, the Division does not have the financial means necessary to clean up the abandoned recycling facility because recycling facilities are statutorily exempt from having to provide financial assurance.

The revisions to Section 8.5.4 of the Solid Waste Regulations specify the type of registration form an owner/operator of an industrial recycling facility must submit, require Department approval of the registration form prior to receiving recyclable materials at a facility, and set forth what information needs to be included as part of the registration form. The revisions to Section 8.5.5 of the Solid Waste Regulations clarify the type of operations plan that needs to be submitted as part of the registration, specify the information that must be included in an Industrial Recycling Facility Operations Plan, require an owner/operator to set forth the proposed initial accumulation period and maximum volume and weight to be collected during the initial accumulation period in an Industrial Recycling Facility Operations Plan, and require an owner/operator to obtain approval of the operations plan prior to importing recyclable material.

The Department believes that by having the ability to review and approve the registration form and operations plan (which includes the initial accumulation period that must not exceed 365 days and maximum weight and volume to be accumulated during the initial accumulation period) prior to allowing an industrial recycling facility to accept recyclable materials, the problems created by changing market conditions and facility abandonment can be avoided.

The proposed changes also provide the Division the opportunity to approved different accumulation periods for different materials within the same recycling facility. This is an

important addition because not all recyclable materials have the same demand and a facility may need to accept a specific amount of material before an end user can efficiently utilize the material as a manufacturing feedstock.

**Discussion of Regulatory Proposal**

I. Section and Subsection Titles

The existing structure of Section 8 remains the same with minor modifications made to Sections 8.5.4 and 8.5.5.

II. Scope and Applicability (Sections 8.5.4 and 8.5.5)

The requirement to submit a registration form and operations plan for Division review and approval and the requirement to submit an initial material accumulation plan as part of the Industrial Recycling Facility Operations Plan will only apply to new owners/operators of industrial recycling facilities registering after the effective date of this regulation revision. Industrial recycling facilities are facilities that accept non-municipal solid waste for recycling. Typical industrial recycling operations subject to Section 8.5 include: industrial wastewater recyclers and recyclers of various other types of construction and demolition debris.

**Description of Local Government Involvement in the Stakeholder Process**

Executive Order D 2011-005 (EO5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO5 – Internal Communication Form – Internal Conception Phase which was transmitted to local governments. The revised recycling regulations will have little effect on local governments.

**Issues Encountered During Stakeholder Process**

No issues were encountered during the stakeholder process.

**Regulatory Alternatives**

No other regulatory alternatives were evaluated.

**Cost/Benefit Analysis**

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division (HMWMD)

### 6 CCR 1007-2

### STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

**Amendment of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Section 1.7.3 (Annual Fees)**

**(Adopted by the Solid and Hazardous Waste Commission on February 20, 2018)**

**Basis and Purpose**

This amendment to 6 CCR 1007-2, Section 1.7.3 is made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302(4.5) and 30-20-109, C.R.S.

The purpose of this amendment to Section 1.7.3 is to remove Part 7 transfer stations and Part 8 recycling facilities from the list of solid waste facilities that are assessed an annual fee. Currently, transfer stations are subject to an annual fee of $1,000 and recycling facilities are subject to an annual fee of $150.

**Background**

The Section 1.7.3 Annual Facility Fee mechanism was developed as part of the HB 07-1288 legislative stakeholder process, and was implemented pursuant to the directives of Section 30-20-109(2.5), C.R.S. Pursuant to § 30-20-109(2.5), C.R.S., the Solid and Hazardous Waste Commission (the "Commission") shall promulgate rules pertaining to the assessment of annual fees and document review and activity fees to offset program costs from solid waste disposal sites and facilities. In accordance with § 30-20-109(2.5)(a), C.R.S, annual fees shall be established for solid waste disposal sites and facilities that are not required to pay solid waste user fees (SWUF) imposed pursuant to § 25-16-104.5, C.R.S. The annual fee shall be uniform among owners of the same type of, and similarly sized, facility, and shall consider the Department's level of effort in regulating the facilities.

As part of the stakeholder process, a significant majority of the stakeholders in both the legislative and regulatory processes supported the development and implementation of an annual facility fee for solid waste sites and facilities not subject to the SWUF. Through interactive stakeholder negotiations and statewide discussions, an annual facility fee of $1,000/year was established for each facility type identified in Section 1.7.3. However, after additional stakeholder concerns were raised indicating that the $1,000/year fee per facility was too burdensome for some recycling facilities, the fee for recycling facilities was reduced to $150/facility/year.

The Division has recently discovered that inclusion of transfer stations and recycling facilities in the list of facilities subject to the Section 1.7.3 annual fees is in direct conflict with the Solid Waste Act. The wording of § 30-20-109(2.5), C.R.S. called for the establishment of annual fees for "solid waste disposal sites and facilities." However, sections 30-20-102(5) and 30-20-102(7), C.R.S. specifically state that recycling facilities and transfer stations "shall not be deemed to be a solid waste disposal site and facility."

**Summary of Regulatory Proposal**

To correct the existing conflict with the statutory language, this amendment to Section 1.7.3(A)(1) and 1.7.3(A)(3) removes Part 7 transfer stations and Part 8 recycling facilities from the list of solid waste facilities that are assessed an annual fee.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

### 6 CCR 1007-2

### STATEMENT OF BASIS AND PURPOSE
### AND SPECIFIC STATUTORY AUTHORITY FOR

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) - Section 10.12 (Waste Tire End Users Fund) and Section 1.2 Definitions

**(Adopted by the Solid and Hazardous Waste Commission on October 17, 2017)**

<u>**Basis and Purpose**</u>

I. <u>Statutory Authority</u>

Section 30-20-1405, C.R.S. requires the Solid and Hazardous Waste Commission to promulgate rules governing administration of the rebate program.

II. <u>Purpose of repeal of regulation:</u>

The purpose of repealing 6 CCR 1007-2 Part 1, Section 10.12 is due to the repeal of the End Users Fund (30-20-1405, C.R.S.) per House Bill 14-1352 on January 1, 2018. These Regulations will no longer be needed once the final Waste Tire End Users rebates are approved, which will occur by March 1, 2018.

The definition of "Daily cover" in Section 1.2 of the regulations is also being deleted as part of this rulemaking, as the definition is only applicable to waste tires and the Section 10.12 regulations.

<u>**Discussion of Regulatory Proposal**</u>

The Department administers the Waste Tire End Users Fund rebate program per 6 CCR 1007-2 Part 1, Section 10.12. The End Users Fund (30-20-1405, C.R.S.) is scheduled to be repealed on January 1, 2018. The End Users Fund receives 65% of every $1.50 collected of the Waste Tire Fee (30-20-1403, C.R.S.). Once the End Users Fund is repealed, funding will no longer be available for rebates. Due to Waste Tire End Users Fund applications being received after the January 1, 2018 repeal date, these Regulations must remain in place until March 1, 2018 to process the final rebates for the funds collected through the end of 2017.

Description of Local Government Involvement in the Stakeholder Process

Executive Order D 2011-005 (EO-5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO-5 Internal Communication Form - Conception Phase that was transmitted to local governments. Local governments who participated in the rebate program will no longer be subject to these regulations.

**Issues Encountered During Stakeholder Process:**

Stakeholders were notified by e-mail of the repeal of these regulations. Stakeholders were given an opportunity to provide any comments. A few comments were received, but no major issues were identified.

**Regulatory Alternatives**

No other regulatory alternatives were evaluated.

**Cost/Benefit Analysis**

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Services.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

**6 CCR 1007-2**

**STATEMENT OF BASIS AND PURPOSE
AND SPECIFIC STATUTORY AUTHORITY FOR**

Amendment to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) - Section 1.7.6 (Waste Tire Fee)

**(Adopted by the Solid and Hazardous Waste Commission on October 17, 2017)**

**Basis and Purpose**

I. Statutory Authority

Section 30-20-1403, C.R.S. requires the Solid and Hazardous Waste Commission to set the Waste Tire Fee at $0.55, effective on and after January 1, 2018.

II. Purpose of new regulation:

Section 1.7.6 (Waste Tire Fee) is being amended to reduce the Waste Tire Fee Amount from $1.50 to $0.55 on the sale of each new motor vehicle tire and new trailer tire. This fee is not a new fee as the Commission previously set the Waste Tire Fee at $1.50 on August 19, 2014 (effective September 30, 2014). This amendment complies with the directive of HB14-1352 and Section 30-20-1403, C.R.S., which requires that the Waste Tire Fee be reduced to $0.55 beginning January 1, 2018.

**Discussion of Regulatory Proposal**

The amended section 1.7.6 requires retailers of new motor vehicle tires and new trailer tires to collect a Waste Tire Fee in an amount of $0.55 on the sale of each new motor vehicle tire and new trailer tire and remit the fee to the Department by the 20th of each month. The fee will continue to be collected on all new automobile, trailer, truck, motor home, and motorcycle tires. The $.55 fee is not a new fee as retailers are currently collecting a $1.50 fee on the sale of each new motor vehicle tire and new trailer tire and remitting the fee to the Department.

Description of Local Government Involvement in the Stakeholder Process

Executive Order D 2011-005 (EO-5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO-5 Internal Communication Form - Conception Phase that was transmitted to local governments. Local governments who purchase new motor vehicle or new trailer tires will continue to have to pay the Waste Tire Fee, which will be reduced to $0.55.

**Issues Encountered During Stakeholder Process:**

A stakeholder meeting was not held for setting the fee at $0.55 due to the fact that the fee reduction is required by Section 30-20-1403, C.R.S. Prior to the effective date of the new fee amount, the Department will contact retailers of new motor vehicle tires and new trailer tires about the new fee amount that must be collected on the sale of each new tire.

**Regulatory Alternatives**

No other regulatory alternatives were evaluated.

**Cost/Benefit Analysis**

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Services.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division (HMWMD)

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

**Amendment of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Section 9.1.2(B) – Elimination of partial exemption for waste impoundments managing coal combustion residuals (CCR)**

**(Adopted by the Solid and Hazardous Waste Commission on February 21, 2017)**

**Basis and Purpose**

This amendment to 6 CCR 1007-2, Section 9.1.2(B) is made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302(4.5) and 30-20-109, C.R.S.

The purpose of this amendment to Section 9.1.2 is to eliminate the partial exemption at Section 9.1.2(B) for waste impoundments that manage and contain coal combustion residuals (CCR).

**Background**

On February 12, 2012, the Solid and Hazardous Waste Commission (the "Commission") adopted new Section 9 (Waste Impoundments) regulations for surface impoundments managing solid waste. The purpose of the 2012 amendments was to update the existing Section 9 regulations that were promulgated in 1984.

The 2012 amendments included a partial exemption at Section 9.1.2(B) for impoundments that manage and contain coal combustion residuals (CCR impoundments) from the requirements of Section 9.1.9 (Timing of Submittal of an Engineering Design and Operation Plan); Section 9.2 (Requirements for Type A Waste Impoundments); and Section 9.3 (Requirements for Type B Waste Impoundments).

At the time of the Commission's adoption of the 2012 amendments, EPA was still evaluating comments on their proposed rule on whether to require that CCR impoundments be managed under national solid waste standards or under hazardous waste standards. Pursuant to Section 9.1.2(B), CCR impoundments were provided an exemption based on an assumption that impoundments potentially subject to the proposed rule of the U.S. Environmental Protection Agency (EPA) published in the Federal Register on June 21, 2010 {75 FR 35127} would be regulated by the state under a pending CCR-specific regulation.

On April 17, 2015, the EPA published a final rule {80 FR 21302-21501} in the Federal Register to regulate CCR as solid waste under Subtitle D of the Resource Conservation and Recovery Act (RCRA). The April 17, 2015 final rule established nationally applicable minimum criteria for the disposal of CCR in landfills and surface impoundments.

Following issuance of the federal rule, the Hazardous Materials and Waste Management Division (the "Division" or "HMWMD") initiated a stakeholder process for the development of applicable state regulations for the management of CCR. As part of the stakeholder process, the Division issued draft Section 19 regulations on January 4, 2016, and held four stakeholder meetings between January and April 2016 to discuss the proposed regulations.

On June 10, 2016, the Division received a letter from the Colorado Utilities Coalition with extensive comments and proposed changes to the Division's draft Section 19 regulations. The Colorado Utilities Coalition's letter represented all of the power utilities in Colorado that would be affected by the proposed regulations.

After consideration of the comments received during the stakeholder process, the Division decided to suspend its efforts on the rulemaking process for the proposed Section 19 regulations. The stakeholders agreed to this suspension of efforts.

**Summary of Regulatory Proposal**

This amendment to Section 9.1.2(B) eliminates the partial exemption for waste impoundments that manage CCR. CCR facilities and waste management units will continue to be regulated under Sections 1,2, 3 and 9 of the state Solid Waste Regulations (6 CCR 1007-2). Existing state-approved Engineering Design and Operations Plans (EDOPs) will remain in effect and are not superseded by the federal CCR rule. The Division will continue to work with facilities to consider proposed modifications to the existing EDOPs to better integrate and avoid possible inconsistencies between provisions in state-approved EDOPs and requirements of the federal CCR rule.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Revisions to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) –Deletion and Replacement of Existing Section 14 Solid Waste Composting Regulations, and the Associated Additions and Revisions of Section 1.2 Definitions

**(Adopted by the Solid and Hazardous Waste Commission on November 15, 2016)**

**Basis and Purpose**

I. Statutory Authority

The Solid Waste Act ("the Act") requires the Department to regulate solid waste management within the State. The Act requires the Department to develop, implement and continuously improve, as necessary, policies and procedures for carrying out its statutory responsibilities. § 30-20-101.5(2), C.R.S.

The Act defines solid waste as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial or commercial operations or from community activities." § 30-20-101(6)(a), C.R.S. Solid wastes disposal means "the storage, treatment, utilization, processing, or final disposal of solid wastes." § 30-20-101(7), C.R.S. A person may only dispose of solid waste at a solid wastes disposal site and facility that has received a certificate of designation from the local governing authority having jurisdiction. § 30-20-102, C.R.S. However, the Act states the Commission "may specify types of composting facilities, by size, volume, or other suitable criteria that provide equivalent protection of public health and the environment that would not be required to obtain a certificate of designation." § 30-20-102(8), C.R.S.

Because compost feedstocks may include a variety of solid wastes, including sludges and other discarded materials, composting facilities are solid waste disposal sites and facilities. These amendments to the Solid Waste Regulations have been promulgated pursuant to the Commission's authority under section 30-20-109, C.R.S. and establish standards for solid wastes disposal sites and facilities engaged in composting operations and determine what composting facilities are exempt from the certificate of designation requirement.

II. Purpose of revised regulations

The purpose of revising Section 14 of the Solid Waste Regulations is to repeal the existing Section 14 composting regulations, and replace them in their entirety with a restructured version that:

(1) clarifies the types of composting activities which Section 14 applies to;
(2) specifies and expands the types of composting operations that are exempt from Section 14;
(3) restructures the composting facility classes to align with feedstock types and places requirements within each specific classification; and
(4) provides reduced engineering and design requirements for yard waste only composting facilities.

These revisions stem from many communities expressing a desire to compost on a very small scale at community gardens and behind restaurants, and some municipalities expressing interest in composting yard waste generated from city maintenance operations. A Section 14 revision is necessary to permit these composting activities that are believed to have very minor risk to the environment. Additionally, the US Composting Council issued a Model Compost Rule in April of 2013 that was generated by industry and government officials throughout the United States to aid state governments in creating compost facility rules. On May 14, 2014, the Rocky Mountain Organics Council provided a white paper encouraging the Department to develop composting facility rules similar to the US Composting Council's model rule.

**Discussion of Regulatory Proposal**

I. Changes to the Section 14 regulations require the addition and revision of some existing definitions. These changes, summarized below, will be incorporated into Section 1.2 of the Solid Waste Regulations (6 CCR 1007-2, Part 1).

The following definitions are being added to Section 1.2:

1. Animal Waste
2. Backyard Composting
3. Commercial Composting Facility
4. Compostable Products
5. Food Processing Residuals
6. Food Processing Vegetative Waste
7. Food Residuals
8. Mixed Solid Waste
9. Source Separated Organics
10. Vegetative Waste
11. Woody Materials

The following definitions are being modified in Section 1.2:

1. Agricultural Wastes
2. Green Waste
3. Other Compatible Materials
4. Yard Waste

The following definition is being deleted from Section 1.2, as this term is no longer used in the solid waste regulations:

1. Animal Material

II. Section and Subsection Titles

Section 14 was restructured so that:

1. The composting facility classes are labeled from the least amount of regulatory requirements to the most. This aligns with the feedstock types which are labeled the least harmful to the most potential for harm to human health and environment.
2. Two facility class types were removed because the solid waste regulatory requirements were identical for both types.
   a. Previous Class I and II facilities are now Class III Facilities.
   b. Previous Class IV and V Facilities are now Class I Facilities and are combined with yard waste composting facilities.
3. The regulatory requirements for each facility class are identified within the section that applies to each class to eliminate the need to reference multiple sections throughout Section 14.
4. Each section contains a scope and applicability subsection specifically outlining which types of activities are subject to the following portion of the regulation.

III. Scope and Applicability (Section 14.1.1)

The updated Section 14.1.1 describes the applicability of Section 14 and provides an overview of the nature of the Department's shared authority for regulating solid waste management activities with the local governing authority. The scope and applicability also points out the necessity for obtaining a CD from the local governing authority prior to operating a composting facility.

IV. Compost Feedstock Types (Section 14.1.2)

This section was updated to include Source Separated Organics which is a term frequently used in the composting industry and refers to compostable material that has been separated from non-compostable material at the point of generation. Manure was reclassified from a Type 1 feedstock to a Type 2 feedstock to remain consistent with both the USCC's model regulations and to line up commercial manure composting facilities with the new Class II composting facilities.

Animal food processing residuals are reclassified from Type 2 to Type 3 feedstocks because small quantity conditionally exempt composting facilities are permitted to accept Type 2 feedstocks and animal food processing residuals should only be handled by trained composting personnel.

V. General Exemptions (Section 14.1.3)

This updated Section 14.1.3 describes the types of composting activities that are exempt from Section 14. The revisions update the agricultural waste exemption to better align it with the regulatory definition of agricultural waste. Pursuant to this updated rule, a person may move agricultural waste from the site of generation and maintain the agricultural waste exemption so long as no solid waste is added to the agricultural waste.

VI. Conditional Exemptions (Section 14.1.4)

A new category for conditionally exempt small quantity composting facilities was created to allow restaurants, schools, small quantity commercial composters and community gardens to compost onsite and import small quantities of materials. Conditions are placed on conditionally exempt small quantity composting facilities to maintain records to show that they are not subject to the remainder of the composting regulations. The conditionally exempt small quantity composting facility category is split into two separate categories: commercial and non-commercial. The commercial facilities must register with the Department, report quantity of feedstock composted annual and test the finished product according to the testing requirements in Section 14.6. The non-commercial facilities need only to keep track of the feedstock imported. Both types of conditionally exempt small quantity composting facilities must comply with all other local, state and federal regulations.

Under this exemption, a facility can have a maximum of 100 cubic yards of Type 1 feedstock in-process or onsite and a maximum of 5 cubic yards of Type 2 feedstock in-process or onsite or up to 10 cubic yards of Type 2 if composting in-vessel.

VII. Compliance Schedule

Class II and III facilities were required to document compliance with the 2008 revision to Section 14. Not all facilities complied with this requirement. Any facility that did not receive approval from the Division and/or local governing authority after 2008 is required to submit a revised engineering design and operation plan (EDOP) to the Department and the local governing authority, for review and approval, documenting how the facility is in compliance with this revision of Section 14. Those facilities with approved EDOP's after 2008 do not need to resubmit their EDOP for review and approval.

VIII. Class I Composting Facilities (Section 14.2)

The Class I composting facility classification was restructured so that the previous Class IV facilities, Class V facilities and new Type 1 only composting facilities fall into the same class. The previous Class IV and V facilities had nearly identical requirements in the 2008 revision which are protective requirements when applied to Type 1 composting facilities. This revision lines up Class I facilities with accepting Type 1 feedstock, with the exception of institutional composting (previous Class IV) and agricultural composting (previous Class V) which is a desire of the stakeholders.

The Class I requirements offer reduce regulatory requirements for Type 1 feedstock composting operations that have up to 50,000 cubic yards of Type 1 feedstock onsite or in process at any given time. Previously, Type 1 feedstock composting facilities needed to submit an EDOP to the Department for review and approval. These revisions provide Type 1

composting facilities the opportunity to submit a detailed registration, financial assurance and maintain a detailed composting plan onsite for Department inspection.

IX. Class II Composting Facilities (Section 14.3)

The revised Class II composting facility requirements are identical to the previous Class III facility requirements.

X. Class III Composting Facilities (Section 14.4)

For this revision, the previous Class I and Class II composting facilities were aggregated into one category, the new Class III. The new Class IIIs can accept Type 1, 2 and 3 feedstock. Class III facilities have identical requirements to the previous Class I and II facility requirements. They are required to have an EDOP approved by the Department and local governing body, to obtain financial assurance and to obtain a CD from the local governing body.

XI. Pilot Projects (Section 14.5)

The revision of the composting regulations applies a case-by-case approach to regulating composting pilot projects. This revision expands the allowable pilot period length from one year to two years and states that pilot project must demonstrate that they will be as protective as the requirements for the corresponding facility class for the materials accepted. The new pilot provisions provide the option for composting research at academic institutions under reduced regulatory requirements and removes the financial assurance requirement.

XII. Sampling of Finished Compost and Soil Amendments (Section 14.6)

The revised finished compost sampling section is identical to the previous sampling section except the new sampling section includes an option for meeting alternative testing criteria because some facilities compost to create soil amendments rather than finished compost. In these cases, these facilities may not meet the pathogen reduction requirements, but they may use the soil amendments on their own property or distribute to agricultural businesses that are accustomed to handling manures and other agricultural wastes that contain elevated concentrations of fecal coliform.

**Description of Local Government Involvement in the Stakeholder Process**

Executive Order D 2011-005 (EO5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO5 – Internal Communication Form – Internal Conception Phase which was transmitted to local governments. The amended composting regulations will have little effect on local governments.

**Issues Encountered During Stakeholder Process**

The Department initiated a stakeholder process in May 2015 and hosted meetings with stakeholders. The following issues arose during the fifteen month long stakeholder process.

Applicability of the Rule to facilities composting but not creating compost

There are scenarios where an applicant expressed the desire to process solid wastes using composting methods, but create a soil amendment rather than a compost product. These conversations begged the question of whether Section 14 should apply to persons composting solid waste or to persons that produce compost. To resolve this question, the Department and stakeholders looked to the definitions already existing in the Solid Waste Regulations. The Solid Waste Regulations define composting as "the biological process of degrading organic materials that is facilitated and controlled through intentional and active manipulation of piles and windrows. These manipulations may include but are not limited to grinding, mixing of feed stocks and bulking materials, addition of liquids, turning of piles, or mechanical manipulation." 6 CCR 1007-2, § 1.2. The Department and stakeholders agreed that Section 14 should not be limited to the creation of compost, but should apply to persons who compost solid waste and that this Regulation should regulate persons processing solid waste to create soil amendment.

Agricultural Exemption

The agricultural exemption and the manner in which the Department regulates persons processing agricultural waste was an important topic of discussion during the 2008 Section 14 revision process and during the current regulation revision. The Act exempts "agricultural waste" from the definition of "solid waste." § 30-20-101(6)(b)(II), C.R.S. Therefore, a facility that manages only agricultural waste is not a solid waste disposal site and facility and is not subject to the Solid Waste Regulations. This exemption has been known as the "agricultural exemption," and has allowed individuals to compost waste resulting from the raising of crops and animals on agriculturally zoned land at the location of generation without having to comply with the regulatory requirements regarding design and operations plans, closure and post-closure plans, financial assurance, monitoring composting process, and testing finished product. Compost produced by owners or operators under this agricultural exemption can be sold or distributed as finished compost to the public without needing to meet any requirements of the Solid Waste Regulations.

The Act does not define "agricultural wastes." Instead, that term is defined in the Solid Waste Regulations to mean, in relevant part, "all solid wastes resulting from the raising of crops or animals on land zoned agricultural by local requirements, including animal manures, that are returned to the soils as fertilizer or soil conditioners." 6 CCR 1007-2, § 1.2. The phrase "returned to the soils" creates some ambiguity because it is not clear whether this means "returned to the same soils from which they were generated," or "returned to any soils." The Department historically interpreted this phrase to mean "returned to the same soils," a more limited interpretation, with the result being that the transport of agricultural waste to any other property rendered the waste no longer agricultural waste and making the receiving site a solid waste disposal site. During the stakeholder process, the Division and the stakeholders agreed to the more permissive interpretation that would result in agricultural waste maintaining that designation even if moved to other another property. The result of this is that the processing of only agricultural waste at *any site* is not subject to the Solid Waste regulations so long as that waste is returned to the soil as fertilizer or soil conditioner.

Class I Agricultural Composting Facility versus Conditionally Exempt Agricultural Composting Facility

This revision has two agricultural composting categories. The first type of agricultural composting facility is conditionally exempt from the composting regulations (Section 14.1.4 (B)). Such a facility imports just enough wood chips, tree branches, sawdust and/or leaves to effectively compost the agricultural waste generated onsite. These facilities may only distribute their compost to other agriculturally zoned properties.

The second classification specific to agricultural composting is Class I. Class I applies to composting on agriculturally zoned properties. Such a facility may import other vegetative waste (including pre-consumer food waste) but only in effective quantities to effectively compost the agricultural waste generated onsite. Class I facilities may distribute their finished compost to any person.

Conditionally exempt small quantity composting facilities

The 2008 version of Section 14 provided a "backyard" composting exemption which the Department began applying to various scenarios that were not intended to be exempt under the backyard composting exemption. Representatives of community gardens, restaurants and schools voiced their concerns about being in violation of the Regulations while attempting to compost food scraps and yard waste in small quantities. The Department also heard from small businesses in mountain communities that collect less than 1 cubic yard per week of food waste from restaurants and homes and compost at their property. Discussions with these composters led to the development of 2 exempt classifications in Section 14.1.4 for small, non agricultural composters and non-backyard composters.

1. Conditionally Exempt Small Quantity Composting Facilities

   This exemption applies to people composting vegetative waste and food waste, but is limited to 100 cubic yards of Type 1 and up to 5 cubic yards of Type 2 and an additional or 100 cubic yards of Type 1 and up to an additional 10 cubic yards of Type 2 when composted in-vessel.

   These composting operations are required to maintain records of feedstocks composted to document their compliance with this exemption.

2. Conditionally Exempt Small Quantity *Commercial* Composting Facilities

   This exemption applies to people composting vegetative waste and food waste *commercially*, but is limited to 100 cubic yards of Type 1 and up to 5 cubic yards of Type 2, or 100 cubic yards of Type 1 and up to an additional 10 cubic yards of Type 2 when composted in-vessel.

   A definition for commercial composting was created to describe Facilities composting commercially, meaning they are charging for composting service and/or selling their finished product are required to register with the Department. Subsequent to registration, each small quantity composting facility must submit an annual report on the quantity of material composted and compost generated.

Restructuring of Section 14, Composting Facilities

Section 14 is now restructured so that feedstock types better align with facility classifications. In the 2008 version of Section 14, Class I composting facilities compost Type 3 feedstocks, and Class V composting facilities compost Type 1 feedstocks. Under the revised Regulation, Class 1 facilities compost Type 1 feedstocks. The Commission hopes that the new structure will result in less confusion to newcomers to the composting industry.

The revised Regulation also combines the previous Class IV and V facilities into one category with facilities that only compost type 1 feedstock (vegetative waste). This means that yard waste composting facilities will be able to compost up to 50,000 cubic yards of material by submitting a registration, closure plan and obtaining financial assurance rather than having an engineering design and operations plan approved by the Department. The Commission hopes that by reducing the requirements for yard waste composting, there will be a greater number of yard waste composting facilities around the state.

The 2008 version of Section 14 provided requirements for each class of composting facility in different sections of the Regulations. For instance, Class I composting facility requirements are found in Sections 14.2.1, 14.3, 14.4, 14.5, 14.6, 14.7, 14.8, and 14.9. The revised Regulation provides all requirements for each class in one section and only references the sampling and testing requirements in a separate section. The Commission's goal is to streamline the Regulations so each user has confidence that they are incorporating all of the requirements into their composing plan or Engineering Design and Operations Plan.

Point of compliance for meeting odor requirements

Stakeholders asked if the standard for eliminating offsite odors is applied at the CD boundary or the property boundary. There are many different possible scenarios, but the point of compliance, or the area where odors can extend the farthest from the facility, should be identified in the EDOP. While reviewing an EDOP, the Division will apply the property boundary as the farthest point that odors can extend from the composting operation.

Pathogen reduction requirements – 15 (24 hour) days

The initial draft of this revision contained a requirement that a windrow composting facility verify a temperature of at least 131 degrees Fahrenheit for a minimum of fifteen (15) –twenty four (24) hour days or longer. The twenty four (24) hour day requirement was added to clarify that taking a single temperature reading does not constitute one day per the fifteen day requirements. The Department requires two temperature readings above 131 degrees Fahrenheit to verify that one day of pathogen destruction has occurred. The 24 hour day language was removed after stakeholders voiced concern about new requirements and the Department does not have documentation showing that facilities are not meeting the 15 days above 131 degrees Fahrenheit as required.

Pathogen reduction-alternative testing criteria

Some composting facilities create soil amendments instead of a mature, finished compost, and they do not meet pathogen reduction requirements intentionally. These facilities instead partially compost because they can keep more nitrogen in their soil amendments which are valuable nutrients. This revision includes a provision in Section 14.6.(C) allowing facilities to request and alternative testing scheme so that they may keep making amendments that are not compost.

Low Permeability Workpad Requirements

The Department performed a literature review of studies that evaluated contact water (leachate) at composting sites. The Department conducted the review to determine if there are certain types of composting facilities that should be exempt from the requirement to evaluate their site to determine if a low permeability workpad is necessary. The 2008 version of Section 14 contains a requirement for facilities to evaluate onsite soils, operational procedures, feedstocks and workpad design to determine if groundwater impacts are likely. If the evaluation indicates that groundwater impacts may occur, the Department may require a low permeability workpad area to manage contact water generated from composting operations. Every study that evaluated contact water showed constituent concentrations that exceeded the groundwater standards, so the low permeability workpad evaluation requirement was left in the revision.

Initial drafts of the proposed 2016 amendments provided three prescriptive scenarios that could substitute for a low permeability workpad. The initial drafts also included a fourth option, similar to the evaluation requirement in Section 14.3.1(C) of the existing regulations, for a facility to demonstrate that groundwater could be protected in using alternate engineering methods. All of these options are similar to the workpad requirements found in the USCC's model regulations. These options were removed from the proposed amendments after stakeholders commented that the options were too stringent. The proposed amendments include language similar to the existing low permeability workpad evaluation requirement in Section 14.3.1(C) of the current regulations and do not pose any new requirements.

**Regulatory Alternatives**

No other regulatory alternatives were evaluated.

**Cost/Benefit Analysis**

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Services.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

**6 CCR 1007-2**

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Revisions to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Sections 10.4.2 (J), 10.11.6, and 10.12.5 (B)

**(Adopted by the Solid and Hazardous Waste Commission on November 15, 2016)**

**Basis and Purpose**

I. Statutory Authority – House Bill 14-1352

Section 30-20-1409, C.R.S. requires waste tire generators to maintain records related to the generation of waste tires, as pursuant to the authority granted to the Solid and Hazardous Waste Commission in section 30-20-1403, C.R.S.

The amendment to the waste tire fee requirement is made pursuant to the authority granted to the Solid and Hazardous Waste Commission in section 30-20-1403, C.R.S.

Section 30-20-1405, C.R.S. requires the Commission to annually set the amount of the per-ton monthly rebate paid to end users of waste tires.

II. Purpose of the proposed regulations:

The purpose of revising section 10.4.2 (J) of the solid waste regulations (6 CCR 1007-2, Part 1) is to require that waste tire generators keep documentation/records for three (3) years for all waste tires generated, including waste tires that are generated at a waste tire generator location and self-hauled by the waste tire generator in quantities of nine (9) waste tires or less to a waste tire destination facility (e.g., another waste tire generator, waste tire processor, waste tire collection facility, waste tire monofill, and/or approved beneficial user of whole waste tires).

The modification of Section 10.11.6 of the solid waste regulations (6 CCR 1007-2, Part 1) would change the reporting frequency to the Department of Public Health and Environment (the Department) for those who aggregate monthly waste tire fees for multiple stores from annually to monthly.

Section 10.12.5 (B) of the solid waste regulations (6 CCR 1007-2, Part 1) sets the Waste Tire End Users Fund (the Fund) per-ton rebate rate at $70.

## Discussion of Regulatory Proposal

Clarifying language that requires waste tire generators to keep documentation/records for all waste tires generated and the disposition of all waste tires, including waste tires that are self-hauled by waste tire generators in quantities of nine or less waste tires at a time, was added to section 10.4.2 (J) for the following reasons: 1) to minimize the illegal disposal of waste tires in Colorado by ensuring that all newly generated waste tires are accounted for and are properly recycled or dispositioned; 2) to achieve more accurate tracking of waste tire generation; 3) to identify discrepancies between the number of new tires sold and the number of waste tires generated; and 4) to reconcile waste tire fee accounts with actual waste tire generation. Waste tire generators that self-haul loads of nine (9) or less waste tires at a time can use Form WT-10 (Waste Tire Generator – Transporting of 9 or Less Waste Tires at a Time Form) or use an alternate method of documentation that documents where the waste tires were delivered.

Changing the reporting frequency to the Department in section 10.11.6 for those who aggregate monthly waste tire fees for multiple stores from annually to monthly would: 1) ensure that the proper waste tire fee has been collected each month for each store; 2) allow for quicker identification of overpayment and applying credit faster; 3) achieve more accurate tracking of new tire sales; and 4) reconcile waste tire fee accounts with actual waste tire generation.

The proposed section 10.12.5 (B) requires the Department to payout a per-ton rebate rate of $70 for approved applications submitted by End Users, Retailers, and certain Processors of tire-derived products and waste tires. If the amount of rebates exceeds the amount available in the Fund, the Department will pay the rebate at a reduced per-ton basis that will not cause a deficit in the Fund.

## Description of Local Government Involvement in the Stakeholder Process

Executive Order D 2011-005 (EO-5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO-5 Internal Communication Form – Conception Phase that was transmitted to local governments. The new regulation will only impact local governments who generate waste tires or apply for a rebate from the Fund for the end use of tire-derived products or waste tires.

**Issues Encountered During Stakeholder Process:**

The Department held two stakeholder meetings via teleconference on July 26, 2016 for the changes to sections 10.4.2 (J) and 10.11.6. The Department also contacted by email ~1,640 waste tire generators and ~75 individuals who aggregate monthly waste tire fees for multiple stores. The Department responded to the following questions:

1. If a waste tire generator already uses a registered waste tire hauler and keeps the uniform waste tire manifest (Form WT-2) provided by the hauler, would additional documentation in addition to Form WT-2 be required? Answer: No, additional documentation would not be required.
2. Would customers who elect to not leave their waste tires as the tire shop and instead take their own waste tires be required to document where their waste tires would go? Answer: No, this regulation would not impact customers who choose to keep their own waste tires.
3. Would waste tire generators who self-haul nine or less waste tires to a waste tires destination facility be required to undergo an application process to do this? Answer: No, a waste tire generator would be required to be registered with the Department as a waste tire generator and use Form WT-10 (Waste Tire Generator – Transporting of 9 or Less Waste Tires at a Time Form) or use an alternated method of documentation that documents where the waste tires were delivered.
4. Can records of where the waste tire generator self-hauled nine or less waste tires at a time be kept electronically? Answer: Yes.
5. What evidence is there that improvement/protection to the public's health and the environment will be increased/augmented by the administrative burden of generating more paperwork and tracking the hauling of nine or less waste tires by waste tire generators: Answer: The proposed regulation requires documentation that indicates where the nine or less waste tires that are self-hauled by waste tire generations were delivered. The present regulations do not have a documentation requirement for waste tire generators who self-haul nine or less waste tires at a time which makes it difficult for the Department and Department contractors who conduct waste tire generator inspections on the Department's behalf to determine if these waste tires were actually delivered to a waste tire destination facility or if they were disposed of illegally.
6. When would the monthly reporting requirement for those who aggregate monthly waste tire fees take effect? Answer: It would not take effect until the regulations are passed and on the effective date of the regulation. Those who aggregate monthly waste tire fees will be notified by the Department on the new regulation change and the starting date that Form WT-9 would be required to be submitted monthly.

The per-ton rebate rate of $70 was vetted during an August 24, 2016 stakeholder process. The Department provided a forecasting spreadsheet that contained the following information:

1. Forecasting on a per ton basis tire-derived products and/or waste tires to be end used, sold, or processed in calendar year 2017. This information was collected from End Users, Retailers, and Processors who participated in the Fund in calendar 2015 and with new applicants who were not participating in the program in 2015.
2. Projected funds available in calendar year 2017 base on remaining funds from calendar year 2016 and waste tire fees collected during fiscal year 2016.
3. Projected rebate payouts based on forecasted tons and a per-ton rate of $70.
4. Projected monthly fund balances based on projected revenues and rebate payouts.
5. Projected Fund spending authority throughout calendar year 2017.

6. Historical data breakdown of end used tons approved by the Fund over the last three calendar years.

The Department wants the rebate amount set at the highest per-ton amount that will not exceed the forecasted Fund balance. The current year spending authority for FY 2017 may need to be adjusted to continue the per-ton rate of $70 uninterrupted. Based on the projected fund balance and forecast provided by those are currently participating in the program, the Fund can support a per-ton rate of $70.

Many stakeholders disagreed with setting the per-ton rate at $70. The stakeholders feel it should be set at a per-ton rate of $80, which is the per ton rate limit set in statute.

Some of the reasons stakeholders wanted the per-ton rate at $80 were:

1. Forecasts provided by the Department in the past were not accurate, which has caused a large balance in the Fund.
2. Since the Fund is set to repeal on January 1, 2018, stakeholders wanted to ensure that all funds would be distributed to stakeholders prior to the program ending.
3. Many of the processors indicated there was not the working capacity in the state to generate the forecasted tons calculated by the Department.
4. Some argued that with the Fund ending, there would be a slowdown in usage in the state, meaning there would be less tons applied for, thus allowing for a bigger per ton rate.
5. Although a per-ton rate of $80 may potentially exhaust funds faster, the stakeholders were not concern that the per-ton rate could fluctuate starting mid-calendar year 2017.

The Department, after consideration of the stakeholders comments, feel that a per-ton rate of $70 would be the most conservative rate that would equalize, but not exceed, funds available to generate consistent rebates during calendar year 2017.

The stakeholders understand that if the forecast of tons end used, sold, or processed exceeds projections, the spending authority is not adjusted, or if the Fund balance or waste tire fees collected are lower than expected, the per-ton rate of $70 may be reduced or may be unavailable.

**Regulatory Alternatives**

No other regulatory alternatives were evaluated.

**Cost/Benefit Analysis**

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Services.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

### 6 CCR 1007-2

### STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

## Amendment of Section 10.12.5 (Rebate Amount)

**(Adopted by the Solid and Hazardous Waste Commission on November 17, 2015)**

**Basis and Purpose**

I. Statutory Authority – House Bill 14-1352

Section 30-20-1405, C.R.S. requires the Commission to annually set the amount of the per-ton monthly rebate paid to end users of waste tires.

II. Purpose of new regulation:

This new regulation sets the per-ton rebate amount at $80.

**Discussion of Regulatory Proposal**

The proposed section 10.12.5 requires the Department of Public Health and Environment (the Department) to payout a per-ton rate of $80 for approved applications submitted by End Users, Retailers, and certain Processors of tire-derived products and waste tires. If the amount of rebates exceeds the amount available in the Fund, the Department will pay the rebate at a reduced per-ton basis that will not cause a deficit in the Fund.

**Description of Local Government Involvement in the Stakeholder Process**

Executive Order D 2011-005 (EO-5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO-5 Internal Communication Form – Conception Phase that was transmitted to local governments. The new regulation will only impact local governments who apply for a rebate from the Fund for the end use of tire-derived products or waste tires.

**Issues Encountered During Stakeholder Process:**

The per-ton rate of $80 was vetted during a two month stakeholder process. The Department provided a forecasting spreadsheet that contained the following information:

1. Forecasting on a per ton basis tire-derived products and/or waste tires to be end used, sold, or processed in calendar year 2016. This information was collected from End Users, Retailers, and Processors who participated in the Fund in calendar year 2014.
2. Projected funds available in calendar year 2016 based on remaining funds from calendar year 2015 and historical waste tire fees collected during fiscal year 2015.
3. Projected rebate payouts based on forecasted tons and a per-ton rate of $80.
4. Projected monthly fund balances based on projected revenues and rebate payouts.
5. Projected Fund spending authority throughout calendar year 2016.
6. Historical data breakdown of end used tons approved by the Fund over the last three calendar years.

During the stakeholder process it was discovered the spending authority set by the Joint Budget Committee (JBC) was lower than the 65% that is allocated to the Fund per HB 14-1352. The JBC will be adjusting the spending authority in calendar year 2016 to reflect the increased per-ton rate.

The Department and stakeholders want the rebate amount set at the highest per-ton amount that will not exceed the forecasted Fund balance or the spending authority. The tons end used, sold, and/or processed in calendar year 2015 came in lower than projected, causing the Fund to have a larger than expected balance. Based on the projected fund balance and adjusted spending authority, the Fund can support a per-ton rate of $80. The stakeholders understand that if the forecast of tons end used, sold, or processed exceeds projections or if the Fund balance or waste tire fees collected are lower than expected, the per-ton rate of $80 may be reduced or may be unavailable.

**Regulatory Alternatives**

The Department and the stakeholders discussed setting the per ton rate lower than $80 based on the previous spending authority set by the JBC. Because the spending authority is being adjusted and there is sufficient funding forecasted for calendar year 2016, the per-ton rate will be set at $80. Other alternatives were not considered because section 30-20-1405(5) mandates that rebates be generated from the Fund until the scheduled sunset date of January 1, 2018.

**Cost/Benefit Analysis**

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Services. The Department and stakeholders evaluated fiscal impacts during the legislative stakeholder process and determined, based on the forecasting spreadsheet, the Fund could support a per-ton rate of $80.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

**6 CCR 1007-2 Part 1**
**STATEMENT OF BASIS AND PURPOSE**
**AND SPECIFIC STAUTORY AUTHORITY FOR**

**Revision to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Addition of Section 1.7.7 Regulations (Paint Stewardship Program Fees) and Associated Additions to Section 1.2 (Definitions)**

(Adopted by the Solid and Hazardous Waste Commission on May 19, 2015)

**Basis and Purpose**

I. Statutory Authority

These regulations are promulgated pursuant to the authority granted to the Solid and Hazardous Waste Commission in Section 25-17-404(4), C.R.S. These regulations are a direct result and implementation of SB14-029, passed by the legislature in 2014.

II. The Architectural Paint Stewardship Act

The Architectural Paint Stewardship Act (the "Act") requires the Department of Public Health and Environment (the "Department") to oversee the implementation and operations of a product stewardship program for the collection, transportation and management of postconsumer paint. While the paint industry stewardship organization is responsible for the operations and management of postconsumer paint, the Department is required by the Act to oversee the stewardship organization's program plan and annual results as reported in an annual report on the program. The addition of part 4 article 17 of title 25 C.R.S. includes the following obligation of the Department to be incorporated into the solid waste regulations:

> § 25-17-404(4). When submitting a paint stewardship program plan, a revised plan, or an annual report, as required by Section 25-17-405, C.R.S. one or more producers or a stewardship organization contracted by one or more producers shall pay a paint stewardship program plan fee, revised plan fee, or annual report fee in an amount that the commission has established or adjusted by rule.

III. Purpose of Proposed Section 1.7.7 Regulations

The purpose of the proposed Section 1.7.7 regulations is to implement the statutory requirement directing the Solid and Hazardous Waste Commission to set a paint stewardship program plan fee, revised plan fee, or annual report fee by rule and the associated definitions.

Section 2 of SB14-029 appropriated $84,045 for fiscal year 2015 to cover Department costs associated with the implementation and oversight of the paint stewardship program, and $9,108 for the purchase of legal services. The established annual sum for the paint stewardship cash fund will go towards the Department's expenses to review and provide oversight of the annual report, program plan, and revised plan. Rather than billing the paint stewardship organization for a specific fee per each document that is required at different times, the Department will aggregate all fees associated with the review of the annual report, program plan, and revised plan to be assessed as a single annual fee. The annual fee will be adopted in Section 1.7 Annual Fees, specifically as Section 1.7.7 Paint Stewardship Program Fees.

**Discussion of Regulatory Proposal**

I. New and Modified Definitions

The proposed Section 1.7.7 regulations require new definitions. These changes summarized below will be incorporated into Section 1.2 of the solid waste regulations (6 CCR 1007-2, Part 1). The proposed definitions are taken verbatim from the definitions in the Act with the exception of adding the word "paint" to clarify the definition of "stewardship organization." This is a necessary clarification as the Department anticipates there will likely be additional stewardship organizations for other types of materials included in the solid waste definitions in the future.

The following definitions are being added to Section 1.2:

1. Architectural paint
2. Paint producer
3. Paint stewardship organization
4. Paint stewardship program

II. Authorization

Section 1.7.7(A) references the statutory authority pursuant to Section 25-17-404(4), C.R.S. that directs the Department to collect fees necessary for implementation and oversight of the paint stewardship program, including oversight of the paint stewardship organization plans and annual reports. Pursuant to Section 25-17-408, C.R.S., all fees collected under Section 25-17-404(4), C.R.S., shall be transferred to the State Treasurer to be credited to the paint stewardship program cash fund.

III. Applicability

Section 1.7.7(B) highlights when the paint stewardship annual fees are effective, what the annual fees apply to, who is subject to the annual fees, and what the total sum of the annual fees is.

This section clarifies that the paint product stewardship organization, or one or more paint producers operating outside of a paint product stewardship organization, are subject to the fees established for each program plan, revised plan and annual report submitted to the Department. While it is expected that only one product stewardship organization will manage the paint stewardship program for all paint producers in Colorado, the regulations account for the possibility of more than one entity providing a paint stewardship program.

**Stakeholder Involvement in the Process**

The Department held three stakeholder meetings between January and March of 2015 to receive comments from stakeholders regarding the Department's Proposed Paint Stewardship Program fee regulations and the paint stewardship draft program plan submitted by PaintCare Inc. ("PaintCare"). PaintCare is a 501(c)(3) non-profit organization created by the American Coatings Association - the primary trade association for the paint and coatings industry.

The Department established an email notification list which included all interested stakeholders including: local governments; registered recycling facilities / paint re-manufactures; landfills and transfer stations; household hazardous waste ("HHW") collection centers; HHW and hazardous waste transporters; and other private operators and industry associations including the Colorado Association for Recycling ("CAFR"), Solid Waste Association of North America ("SWANA"), Colorado Municipal League, and Colorado Counties, Inc.

During the stakeholder process, the Department followed the procedures required by Executive Order No. 5 to notify local governments regarding the upcoming revisions to the solid waste regulations. All municipal and county governments who responded to the Executive Order No. 5 survey that asked to be included in the stakeholder process were added to the email distribution list for notification of all meetings and related regulatory documents.

During the stakeholder meetings, many of the discussions and questions raised by stakeholders were focused on the paint stewardship program plan and objectives submitted by PaintCare. Primary interest included who would be a collection facility, transporter and a processor. Further, stakeholders were interested in how each of these would be selected and worked into the stewardship program. The stakeholders had very few questions related to the draft regulations including the assessment fee. Prior to and during the stakeholder process, the Department believed the regulations and fees would apply to the assessment fee. Following the stakeholder meetings, the Department was advised the fees apply only to reimburse the Department for internal costs associated with reviewing the program plan, revised plan and annual report submittals.

## Alternatives Considered and Why Rejected

The Department's first draft regulations focused on setting the point of sale assessment fees for the paint stewardship program. However, following advice from the Colorado Attorney General's Office, the Division revised its interpretation of the Act's requirements and amended the Regulations to only address program fees pursuant to 25-17-404(4), C.R.S. The Department was advised of the revised interpretation after the Department held the three stakeholder meetings. However, interested parties will be able to review and comment on the assessment fees during on-going plan review meetings.

## Cost Benefit Analysis

A cost benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

**Solid and Hazardous Waste Commission**

**Hazardous Materials and Waste Management Division**

**6 CCR 1007-2**

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Revisions to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Deletion and Replacement of Existing Section 10 (Waste Tire Facilities and Waste Tire Haulers) with New Section 10 Regulations (Waste Tires), Revision of Section 16 Regulations (Materials Prohibited from Disposal) and the Associated Additions, Deletions and Revisions to Section 1.2 Definitions

Repeal of the Regulations Pertaining to the Waste Tire Processor and End User Reimbursement Program (6 CCR 1007-2, Part 4), Section 1 Rules for Reimbursements from the Processors and End Users Fund

(Adopted by the Solid and Hazardous Waste Commission on November 18, 2014)

**Basis and Purpose**

I. Statutory Authority

The amendments to 6 CCR 1007-2, Section 10: Waste Tires, Section 16: Materials Prohibited from Disposal and Section 1.2: Definitions, and the deletion of 6 CCR 1007-2, Part 4, the Regulations Pertaining to the Waste Tire Processor and End User Reimbursement Program are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in sections 30-20-109, C.R.S. and 30-20-1401(2), C.R.S., and section 30-20-1405(3)(c), C.R.S. These regulations are a direct result of, and implementation of, House Bill (HB) 14-1352, passed by the legislature in 2014.

II. House Bill 14-1352

House Bill 14-1352 repealed and reenacted the State's waste tires laws, moving them into the Solid Waste Act ("the Act"). The HB 14-1352 also transferred all waste tire program regulatory authority to the Department of Public Health and Environment (the Department). The Department's existing solid waste enforcement authority applies to waste tires.

III. Purpose of revised regulations:

The purpose of revising Sections 1.2, 10 and 16 is to implement the requirements of HB 14-1352 by establishing waste tire rules going forward to replace those in effect as of July 1, 2014. Prior to the proposed revisions, Section 10 of the Solid Waste Regulations applied specifically to Waste Tire Facilities and Waste Tire Haulers. The proposed regulations were drafted using the existing framework and construct of the original regulations and include new standards for mobile waste tire processors, the management of used tires, and the administration of the waste tire fee. Section 10 will also include regulations pertaining to administration of the Waste Tire End Users Fund, which were previously located in the Regulations Pertaining to the Waste Tire Processor and End User Reimbursement Program (6 CCR 1007-2, Part 4).

**Discussion of Regulatory Proposal**

I. The Section 10 regulations require the addition, revision and deletion of some existing definitions. These changes, summarized below, will be incorporated into Section 1.2 of the Solid Waste Regulations (6 CCR 1007-2, Part 1).

The following new definitions are being added to Section 1.2:

1. Applicant
2. Authorized signature
3. Beneficial user
4. Buffings
5. Commission
6. Daily cover
7. Mobile Processor
8. Motor vehicle
9. Public project
10. Pyrolysis
11. Recapped or retreaded tire
12. Retailer (as used in section 10 of the Regulations)
13. Trailer
14. Used Tire
15. Waste Tire Bale

16. Waste Tire Cleanup Program
17. Waste Tire Generator
18. Waste Tire Processor

The following existing definitions are being modified in Section 1.2:

1. Collection facility
2. End User
3. Residentially generated
4. Retailer (as used in Section 16 of the Regulations)
5. Tire
6. Tire-Derived Product
7. Waste Tire
8. Waste Tire Collection Facility
9. Waste Tire Hauler
10. Waste Tire Monofill
11. Wholesaler

The following existing definitions are being deleted from Section 1.2, as these terms no longer appear or are irrelevant in the new Regulations:

1. Fleet Service Facility
2. Passenger tire equivalents
3. Processor
4. Tire (as used in Section 16 of the Regulations)
5. Waste Tire Facility

II. Section and Subsection Titles

The title of Section 10 was updated to incorporate all waste tire provisions within one section of the Regulations. A new title for Section 10.4 (Standards for Generators of Motor Vehicle and Trailer Waste Tires) was added to conform to HB 14-1352. New Sections 10.7 (Standards for Mobile Waste Tire Processors), 10.10 (Standards for Management of Used Tires), 10.11 (Waste Tire Fee Administration) and 10.12 (Waste Tire End Users Fund) were added to conform to HB 14-1352.

All references to waste tires were removed from Section 16 and Section 16 waste tire subsections that conform to HB 14-1352 were incorporated into Section 10.

III. Scope and Applicability (Section 10.1)

The updated Section 10.1 describes the applicability of Section 10, and now includes all persons who sell new motor vehicle or trailer tires.

Updated language was added to the existing subsection 10.1.3 exemptions. Previous exemptions in this subsection that were removed or updated and new exemptions that were added include:

1. Removed the exemption for the transport of used tires due to the addition of subsection 10.10 (Standards for Management of Used Tires).
2. Removed the exemption for transportation of waste tires by a private citizen.
3. Updated household hazardous waste roundup, community cleanup, other one-time waste tire collection event language was added to reflect new waste tire terminology.
4. Clarified the requirements for the beneficial use of waste tires.
5. Standardized the waste tire storage limits for owners/operators of solid waste landfills, transfer stations, and recycling facilities who separate waste tires out from the solid waste stream.
6. Standardized the waste tire storage limits for government entities that store waste tires as part of their road-side cleanup activities.
7. Added a provision and requirements for the acceptance of unmanifested waste tires from unregistered haulers.

IV. General Provisions (Section 10.2)

This section states operations that are covered by the multiple parts of Section 10 must comply with all applicable sections. As provided in Section 10.2.2, the Department's intent is to avoid imposing duplicate or overlapping obligations on entities that are covered by multiple parts of Section 10.This section also specifies the limitations on the disposal of waste tires and incorporates waste tire due diligence language that was previously in Section 16.

Persons registered pursuant to Section 10 historically have not paid annual fees (Annual Fee) as required in Section 1.7.3 because the Waste Tire Program and Waste Tire Administration, Enforcement, and Cleanup Fund, the End Users Fund and the Waste Tire Market Development Fund are funded by the $1.50 Waste Tire Fee. An exemption from the Annual Fees for persons registered pursuant to sections 10.3, 10.4, 10.6, 10.7, 10.8 or 10.9 was added for clarification. Waste Tire Monofills and solid wastes sites and facilities with a Certificate of Designation are not exempt from the Annual Fee requirement.

Language regarding the enforcement of Section 10 through the Department's enforcement authorities was added.

V. Standards for Waste Tire Haulers (Section 10.3)

This section was updated to include a provision allowing Waste Tire Haulers to pick up waste tires from an unregistered person or site exempted from Section 10 if a manifest is generated and the waste tires are delivered to an approved waste tire destination

facility. Additionally, the time frame to notify the Solid Waste Program in the event of a fire or other emergency involving waste tires was updated and the waste tire storage limits were updated to reflect new storage limit requirements.

Waste Tire Hauler registration, decal, and manifest changes include:

1. Updated Certificate of Registration Form names.
2. Removed the $10,000 surety bond requirement.
3. Language was added regarding when a Waste Tire Hauler is required to notify the Department.
4. Removed revocation of the Certificate of Registration language.
5. Added language regarding cancellation of a Certificate of Registration if a person is no longer hauling waste tires.
6. Revised decal placement requirements.
7. Added decal requirement for contracted commercial freight carriers.
8. Updated manifest requirements by removing the requirement for the actual number of waste tires by category, allowing electronic manifests, requiring information about contracted commercial freight carriers, and accounting for waste tires that originated from an illegal waste tire site, private property, or a unregistered waste tire hauler, per the exemption added in subsection 10.1.3 for acceptance of waste tires from unregistered waste tire haulers.
9. Added a thirty (30) day requirement for Waste Tire Haulers to provide a manifest copy to the generator/source of waste tires from date of delivery of waste tires to the destination facility.

Waste Tire Hauler annual report requirements were updated by removing the surety bond verification, removing the passenger tire equivalent language and requiring the reporting of the total amount of waste tires accepted from persons exempted from Section 10.

Self-certification language was added that allows the Department to require Waste Tire Haulers to furnish additional information concerning compliance with the regulatory requirements.

Notwithstanding this or any other self-certification requirement under these rules, persons desiring to make self-disclosures under the Policy Regarding Implementation of Colorado Environmental Audit Privilege and Immunity Law shall still qualify for protection under the Policy provided any such self-disclosures are made prior to receipt of the annual self-certification form from the Department.

VI. Standards for Generators of Motor Vehicle and Trailer Waste Tires (Section 10.4)

The section's title was updated to incorporate the new term for Waste Tire Generators. Persons subject to this section will continue to include tire retailers, wholesaler and fleet service facilities that generate waste motor vehicle or trailer tires. Additionally, the

updated applicability provides examples of the types of business that are sources of waste tires.

This section was updated to include: the updated storage limit of no more than fifteen hundred (1,500) waste tires on site at any one time; the ability for Waste Tire Generators to accept waste tires; and the requirement that a Waste Tire Generator who sells replacement tires must not refuse from a customer waste tires of the same general type and quantity.

Waste Tire Generator registration, decal, and manifest changes include:

1. Certificate of Registration application requirements were updated to include the requirement that any person who commercially generates motor vehicle or trailer waste tires must register as a Waste Tire Generator.
2. Language was added requiring a Waste Tire Generator to notify the Department if they are selling new tires.
3. Removed revocation of the Certificate of Registration language.
4. Added language regarding cancellation of a Certificate of Registration if a person no longer generates waste tires at their registered location.
5. Removed the three (3) year expiration date for a Certificate of Registration and facility decal.
6. Updated manifest requirements to allow Waste Tire Generators to accept more than ten (10) waste tires without a manifest, per the exemption added in subsection 10.1.3 for acceptance of waste tires from unregistered waste tire haulers, and to allow Waste Tire Generators to offer their waste tires for mobile processing. The change to the Waste Tire Hauler manifest requirements may result in a Waste Tire Generator not receiving a properly completed Uniform Waste Tire Manifest from the Waste Tire Hauler at the time of waste tire pickup by the Waste Tire Hauler. The Waste Tire Hauler now has up to thirty (30) days from delivery of the Waste Tire Generator's waste tires to the destination facility to provide a manifest copy to the Waste Tire Generator.

This section also replaced the requirement for fencing of at least six (6) feet with the requirement to implement security measures that preclude public entry.

Self-certification language was added that allows the Department to require Waste Tire Generators to furnish additional information concerning compliance with the regulatory requirements.

Notwithstanding this or any other self-certification requirement under these rules, persons desiring to make self-disclosures under the Policy Regarding Implementation of Colorado Environmental Audit Privilege and Immunity Law shall still qualify for protection under the Policy provided any such self-disclosures are made prior to receipt of the annual self-certification form from the Department.

With the removal of the Waste Tire Generator Certificate of Registration date and corresponding registration renewal requirements, the self-certification will be used to update Waste Tire Generator information and gather additional information concerning compliance with the regulatory requirements. Because the majority of Waste Tire Generators also sell new motor vehicle or new trailer tires, the Waste Tire Generator self-certification will also be used to determine compliance with the Waste Tire Fee requirements of section 1.7.6 (Waste Tire Fee) and 10.11(Waste Tire Fee Administration).

VII. Standards for Waste Tire Monofills (Section 10.5)

This section was updated to include Certificate of Designation requirements for a Waste Tire Monofill which include both an Engineering and Design and Operations Plan (EDOP) and a Waste Tire Inventory Reduction Plan. This section also replaced the requirement for fencing of at least six (6) feet with the requirement to implement security measures that preclude public entry.

The 75%/three year rolling average requirement was replaced with the Waste Tire Inventory Reduction Plan requirement. The Waste Tire Inventory Reduction Plan requires that Waste Tire Monofill owners/operators must on an annual basis, for every one (1) tire received, end use at least two (2) waste tires, or process at least two (2) waste tires into tire-derived product. The owner/operator of a Waste Tire Monofill may claim Confidential Business Information (CBI) or trade secret for any information submitted in the Waste Tire Inventory Reduction Plan. The procedures for asserting CBI claims are established under Colorado law, and the Department does not intend to create any further burden on the owner/operator to show CBI status than that existing under current law.

The Regulation adopts the change to the statute concerning the dates after which an owner/operator of a Waste Tire Monofill must not place any waste tires into monofill storage (after January 1, 2018) and when Waste Tire Monofills must close (by July 1, 2024). Clarification regarding when a Waste Tire Monofill can ship whole waste tires to an end user was added.

Waste Tire Monofill registration, decal, and manifest changes include:

1. Updated Certificate of Registration application requirements.
2. Language was added regarding when an owner/operator of a Waste Tire Monofill is required to notify the Department.
3. Removed revocation of the Certificate of Registration language.
4. Removed the three (3) year expiration date for a Certificate of Registration and facility decal.
5. Added language regarding cancellation of a Certificate of Registration if a person no longer operates a Waste Tire Monofill at their registered location.
6. Updated manifest requirements to allow owners/operators of Waste Tire Monofills to accept more than ten (10) waste tires without a manifest, per the

exemption added in subsection 10.1.3 for acceptance of waste tires from unregistered waste tire haulers, and to allow Waste Tire Monofills to offer their waste tires for mobile processing. The change to the Waste Tire Hauler manifest requirements may result in an owner/operator of a Waste Tire Monofill not receiving a properly completed Uniform Waste Tire Manifest from the Waste Tire Hauler at the time of waste tire pickup by the Waste Tire Hauler. The Waste Tire Hauler now has up to thirty (30) days from delivery of the waste tires to the destination facility to provide a manifest copy to the source of the waste tires.

Waste Tire Monofill annual reporting requirements were updated to allow the reporting of waste tires by actual count or by weight in tons. The owner/operator of the Waste Tire Monofill must report the total amount of waste tires accepted from unregistered waste tire haulers in the required annual report, and the owner/operator of a Waste Tire Monofill must report compliance with his/her Waste Tire Inventory Reduction Plan.

Self-certification language was added that allows the Department to require Waste Tire Monofills to furnish additional information concerning compliance with the regulatory requirements.

Notwithstanding this or any other self-certification requirement under these rules, persons desiring to make self-disclosures under the Policy Regarding Implementation of Colorado Environmental Audit Privilege and Immunity Law shall still qualify for protection under the Policy provided any such self-disclosures are made prior to receipt of the annual self-certification form from the Department.

VIII. Standards for Waste Tire Processors (Section 10.6)

Unlike in the previous Regulation, this section applies only to Waste Tire Processors; End Users have their own separate requirements in Section 10.9. Waste tire processing is not subject to the Section 8 recycling requirements or annual fee requirements of Section 1.7.3. A Waste Tire Processor that recycles materials other than waste tires is subject to the requirements of Section 8 and the Section 1.7.3 Annual Fee for a recycling facility. This section also replaced the requirement for the fencing of at least six (6) feet with the requirement to implement security measures that preclude public entry.

The 75%/three-year rolling average recycling rate still applies to waste tire processing. Every year, starting after an initial one-year accumulation period, Waste Tire Processors must have, over the past three (3) years, processed 75% of the average of what the Waste Tire Processor had in inventory at the end of years one through two plus the amount of waste tires received in year three. A Waste Tire Processor that is also registered as a Waste Tire Monofill is exempted from this requirement, but the Waste Tire Monofill must comply with its Waste Tire Inventory Reduction Plan. The Waste Tire Inventory Reduction Plan requires that Waste Tire Monofill owners/operators must, on an annual

basis, for every one (1) tire received, end use at least two (2) waste tires, or process at least two (2) waste tires into tire-derived product.

This section was updated to add a waste tire storage limit for a Waste Tire Processor's facility that is not also registered as a Waste Tire Monofill. The waste tire processing facility must not have at any one time more than the lesser of: a maximum of one hundred thousand (100,000) waste tires; the amount allowed by the local government; or the amount of waste tires anticipated in the Waste Tire Processors financial assurance instrument. Clarification regarding when a Waste Tire Processor can ship whole waste tires to an end user was added.

Waste Tire Processor registration, decal, and manifest changes include:

1. Updated Certificate of Registration application requirements.
2. Language was added regarding when a Waste Tire Processor is required to notify the Department
3. Removed revocation of the Certificate of Registration language.
4. Added language regarding cancelling a Certificate of Registration if a person no longer operates as a Waste Tire Processor at their registered location.
5. Removed the three (3) year expiration date for a Certificate of Registration and facility decal.
6. Updated manifest requirements to allow Waste Tire Processors to accept more than ten (10) waste tires without a manifest, per the exemption added in subsection 10.1.3 for acceptance of waste tires from unregistered waste tire haulers. The change to the Waste Tire Hauler manifest requirements may result in a Waste Tire Processor not receiving a properly completed Uniform Waste Tire Manifest from the Waste Tire Hauler at the time of waste tire pickup by the Waste Tire Hauler. The Waste Tire Hauler now has up to thirty (30) days from delivery of the waste tire waste tires to the destination facility to provide a manifest copy to the source of the waste tires.

Waste Tire Processor annual reporting requirements were updated to allow the reporting of waste tires by actual count or by weight in tons. A Waste Tire Processor must report the total amount of waste tires accepted from unregistered waste tire haulers and document compliance with the 75%/three-year rolling average recycling rate in the annual report.

Self-certification language was added that allows the Department to require Waste Tire Processors to furnish additional information concerning compliance with the regulatory requirements.

Notwithstanding this or any other self-certification requirement under these rules, persons desiring to make self-disclosures under the Policy Regarding Implementation of Colorado Environmental Audit Privilege and Immunity Law shall still qualify for protection under

the Policy provided any such self-disclosures are made prior to receipt of the annual self-certification form from the Department.

IX. Standards for Mobile Waste Tire Processors (Section 10.7)

This section sets new standards for Mobile Waste Tire Processors. The general provisions of this section state that mobile waste tire processing is not subject to the Section 8 recycling requirements or the Annual Fee requirements of Section 1.7.3. Mobile Waste Tire Processors must meet general standards, including: processing waste tires only on property not leased or owned by the Mobile Waste Tire Processor, only processing waste tires that already exist on the property where waste tire mobile processing is to occur, obtaining permission from the local government prior to beginning waste tire processing, notifying the Department at least fourteen (14) days prior to beginning processing, and not processing waste tires at a location for more than thirty (30) consecutive days unless the location is registered as a Waste Tire Processor or Department approval is granted. The Mobile Waste Tire Processor must also develop and comply with an Engineering and Design and Operations Plan (EDOP).

Mobile Waste Tire Processor registration, decal, manifest, and annual reporting sections were added and include:

1. A registration system for Mobile Waste Tire Processors, including obtaining a Certificate of Registration which is valid until March 15th of the following year. The Certificate of Registration may be canceled if mobile waste tire processing no longer occurs.
2. A requirement to display a Department issued Mobile Waste Tire Processor decals.
3. A manifest system to ensure that waste tires processed by Mobile Waste Tire Processors are accounted for and that manifests (Form WT-7) are created and provided to the Waste Tire Generator/source within thirty (30) days of completion of mobile processing.
4. A requirement that all Mobile Waste Tire Processors establish and maintain financial assurance in the amount of $10,000, unless they maintain financial assurance as a Waste Tire Processor, Waste Tire Collection Facility or a Waste Tire Monofill.
5. A requirement to submit the Mobile Waste Tire Processor Annual Reporting Form (Form WT-7) by April 1st of each year.

Self-certification language was added that allows the Department to require a Mobile Waste Tire Processor to furnish additional information concerning compliance with the regulatory requirements.

Notwithstanding this or any other self-certification requirement under these rules, persons desiring to make self-disclosures under the Policy Regarding Implementation of Colorado Environmental Audit Privilege and Immunity Law shall still qualify for protection under

the Policy provided any such self-disclosures are made prior to receipt of the annual self-certification form from the Department.

X. Standards for Waste Tire Collection Facilities (Section 10.8)

This section was updated to replace the requirement for fencing of at least six (6) feet with the requirement to implement security measures that preclude public entry. Clarification regarding when a Waste Tire Collection Facility is allowed to ship whole waste tires to an end user was added.

Waste Tire Collection Facility registration, decal, and manifest changes include:

1. Updated registration application requirements.
2. Language was added regarding when an owner/operator of a Waste Tire Collection Facility is required to notify the Department.
3. Removed revocation of the Certificate of Registration language.
4. Language was added regarding cancellation of a Certificate of Registration if a person no longer operates as a Waste Tire Collection Facility at their registered location.
5. Removed the three (3) year expiration date for a Certificate of Registration and facility decal.
6. Updated manifest requirements to allow the owners/operators of Waste Tire Collection Facilities to accept more than ten (10) waste tires without a manifest, per the exemption added in subsection 10.1.3 for acceptance of waste tires from unregistered waste tire haulers, and the allowance of Waste Tire Collection Facilities to offer their waste tires for mobile processing. The change to the Waste Tire Hauler manifest requirements may result in a Waste Tire Collection Facility not receiving a properly completed Uniform Waste Tire Manifest from the Waste Tire Hauler at the time of waste tire pickup by the Waste Tire Hauler. The Waste Tire Hauler now has up to thirty (30) days from delivery of the waste tires to the destination facility to provide a manifest copy to the source of the waste tires.

Waste Tire Collection Facility annual reporting requirements were updated to allow the reporting of waste tires by actual count or by weight in tons. The owner or operator of a Waste Tire Collection Facility must report the total amount of waste tires accepted from unregistered waste tire haulers in the required annual report.

Self-certification language was added that allows the Department to require Waste Tire Collection Facilities to furnish additional information concerning compliance with the regulatory requirements.

Notwithstanding this or any other self-certification requirement under these rules, persons desiring to make self-disclosures under the Policy Regarding Implementation of Colorado Environmental Audit Privilege and Immunity Law shall still qualify for protection under

the Policy provided any such self-disclosures are made prior to receipt of the annual self-certification form from the Department.

XI. Standards for End Users (Section 10.9)

The general provisions of this section apply to End Users who end use more than ten (10) tons of tire-derived product or who end use whole waste tires for energy or fuel in any one State fiscal year. The general provisions require that End Users use a registered Waste Tire Hauler or Mobile Waste Tire Processor for shipment or mobile processing of waste tires. This general provision does not apply to End Users who ship tire-derived product off site.

End User registration, manifest, and annual reporting sections were added and include:

1. A system for registering as an End User, including obtaining a Certificate of Registration. The Certificate of Registration may be canceled if end use no longer occurs at their registered location.
2. Requiring retention of manifests provided by a Waste Tire Hauler for shipment of waste tires. Manifests are not required for tire-derived product.
3. A requirement to submit the Waste Tire Facility Annual Reporting Form (Form WT-5) by April 1st of each year.

XII. Standards for the Management of Used Tires (Section 10.10)

New requirements were added which apply to any person who commercially accumulates, stores, transports, or dispenses used tires. These requirements also apply to Waste Tire Generators who sell used tires and used tire shops that sell new tires but do not generate waste tires. Written criteria that distinguish waste tires from used tires must be developed and maintained at the site where used tires are accumulated, stored, and/or dispensed and in any vehicle used to transport used tires. The written criteria must be provided to the Department upon request. Waste tires and used tires must be clearly identified, per the written criteria, and used tires must be organized in a manner that allows inspection of each individual used tire. The written criteria may be designated as Confidential Business Information (CBI) or trade secret.

XIII. Waste Tire Fee Administration (Section 10.11)

A new section was added for the administration of the Waste Tire Fee. Effective July 1, 2014, HB 14-1352 transferred all regulatory authority for the Waste Tire Fee from the Department of Revenue (DOR) to the Department. The $1.50 fee is not a new fee. The fee is used for waste tire administrative functions, end user rebates, and grant funding.

The $1.50 fee must be collected on the sale of each new tire and applies to the sale of new motor vehicle tires and new trailer tires. New motor vehicle and new trailer tires include the following, but not limited to: all tires used on passenger cars, trucks and

vehicles, low speed electric vehicles (per Section 30-20-1402, C.R.S.), motorcycles and motor scooters licensed to travel on roads, semi trucks and semi trailers, any trailer towed behind a vehicle, motor homes, mini vans, campers, buses, medium-duty trucks, fleet vehicles, new and used cars sold by a car retailer if existing tires are changed out for new tires, and online sales of new tires. The fee does not apply to retreaded tires, used tires, tires used for agricultural equipment (e.g., tractors, bailers, and harvesters), off-the-road (OTR) vehicles, (e.g., golf carts, All Terrain Vehicle (ATV), dirt bikes), Segways, wheelchairs, garden equipment, mining equipment, construction equipment, bicycles, airplanes, or toy vehicles.

XIV. Waste Tire End Users Fund (Section 10.12)

A new subsection was added to manage the End Users Fund rebate program and incorporate applicable rules for this program that currently exist in the Waste Tire Processor and End User Reimbursement Program (6 CCR 1007-2, Part 4), Section 1 Rules for Reimbursements from the Processors and End Users Fund. Section 1 of 6 CCR 1007-2, Part 4 will be repealed as part of this rulemaking because of incorporation of this new subsection into Section 10 of the Regulations.

Minor changes regarding application procedures, the appeals process, deadlines for applications, and processing of applications were made.

Major changes and additions to this program, as it existed in 6 CCR 1007 Part 4, include:

1. Retailers of tire-derived products are now eligible for a rebate from the End Users Fund.
2. Processors are only eligible for a rebate from the End Users Fund when they process waste tires into tire-derived products that they sell and move offsite to an out-of-state End User.
3. The rebate will only be paid one time for the end use, retail sale or processing of the tire-derived product.
4. An annual per ton rate will be used to determine the rebate for approved tons from the End Users Fund.
5. Processors, Retailers, and/or End Users are not eligible for a rebate if funding was provided by the Waste Tire Administration, Enforcement, and Cleanup Fund to clean up an illegal waste tire site.
6. An eligibility table (Table 10-12.01) was added to clarify eligibility for End Users, Retailers and Processors to participate in the End Users Fund.
7. End using tire bales (a) in an engineered, permanent structure stamped and sealed by a Colorado Registered Professional Engineer, is eligible for a rebate, and (b) installed for end use on agricultural land using galvanized steel baling wire and installed to facilitate tire bale stability and longevity, using applicable design standards, as allowed by state laws and regulations and local ordinances (including fencing, windbreaks, and corrals) is also eligible for a rebate.

8. The minimum amount of tons of waste tires end used to be eligible to participate in the End Users Fund was reduced from fifty (50) tons per fiscal year to ten (10) tons per fiscal year.
9. Language was adjusted regarding ineligibility to participate in the End Users Fund for those who knowingly or intentionally submit false information to the Department.
10. Language was added that states the Department may deny a rebate if an applicant is out of compliance with any State or Federal environmental law, rule or regulation.

Tire-derived products or whole waste tires that are being end used should have economic value. The Commission feels that End Users should provide, when requested by the Department, documentation which establishes that tire-derived products or whole waste tires were purchased or provide other proof that demonstrates that the tire-derived products or whole waste tires have economic value.

**Description of Local Government Involvement in the Stakeholder Process**

Executive Order D 2011-005 (EO5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO5 – Internal Communication Form – Internal Conception Phase which was transmitted to local governments. The amended regulations will have little effect on local governments unless the local government generates, accumulates, stores, transports, dispenses, or processes waste tires, used tires or tire-derived product, sells new motor vehicle or trailer tires, or applies for a rebate from the End Users Fund.

**Issues Encountered During Stakeholder Process:**

1. Some stakeholders asked why the beneficial use requirements for waste tires are located in the Section 8 Recycling and Beneficial Use regulations instead of in the Section 10 Waste Tire regulations. Section 8 regulates recycling, a broad category that includes beneficial use. Waste tire processing is a form of recycling. However, the legislature has determined that because the waste tire stream presents unique challenges, requirements unique to waste tires are necessary. Although the legislature created unique requirements for waste tire generators, haulers, processors, end users, monofills and collection facilities, it did not create unique requirements for beneficial use of waste tires. Therefore, beneficial use of waste tires – an act distinct from the End Use of waste tires or tire-derived product – is still regulated in Section 8.

2. A question arose regarding whether warranty tires – that is, tires that a retailer returns to the wholesaler or manufacturer – are waste tires. The Commission feels that warranty tires and tires with a manufacturing defect that are returned to the wholesaler or

manufacturer for credit or return do not fall under the definition of a waste tire because the manufacturer or wholesaler, rather than the retailer, ultimately makes the determination if the tire is usable or should be discarded.

3. Some stakeholders wanted to add tire retread businesses to the applicability list for Waste Tire Generators in Section 10.4. The Commission did not add tire retread businesses to the list because the Waste Tire Generator definition is not all inclusive. If a retread business makes the determination that a motor vehicle or trailer tire cannot be retreaded, then the tire is a waste tire. The retread business would therefore be a Waste Tire Generator subject to all the requirements of Section 10.4.

4. Some stakeholder asked whether it is possible for a corporation, business, or government agency that has registered under their corporation, business, or government agency with multiple Waste Tire Hauler registrations (e.g., corporation A has five (5) stores and each of these five (5) stores are registered as Waste Tire Haulers because they haul more than ten (10) waste tires at a time) to complete only one Commercial Waste Tire Hauler Annual Report Form (Form WT-4) for all of the Waste Tire Haulers registered under their corporation/business instead of completing a separate Form WT-4 for each Waste Tire Hauler location. Rather than addressing this situation in the Regulations, the Department will modify Form WT-4 to allow the completion of one Form WT-4 for corporations, businesses, or government agencies that have multiple Waste Tire Hauler registration locations. Each Waste Tire Hauler registration location must be listed and accounted for on the form.

5. Some stakeholders were concerned that under the previous regulations, parties who tracked tire amounts in tons rather than in actual counts could apply a formula to convert tonnage to estimated tire amounts in their annual report. Some stakeholders felt the conversion could lead to errors by the person completing the form. To address this concern, the new regulation allows reporting by actual weight in tons. The Department will convert waste tire amounts reported in tons to an estimated tire count.

6. Some stakeholders expressed confusion over whether compliance with Section 10 requirements exempted parties from compliance with laws or regulations concerning certificates of designation (CDs). To address this concern Section 10.5 .1(A) makes clear that in addition to the Section 10 requirements, persons owning or operating a Waste Tire Monofill must maintain a CD pursuant to Section 1.3. Additionally Section 1.7.3, Section 1.8, Section 2 and Section 3 clearly state requirements for Solid Waste Disposal Sites and Facilities.

7. An issue arose during the stakeholder process concerning Section 30-20-1410, C.R.S. which prohibits the sale of used tires if the used tire would violate Section 42-4-228, C.R.S. tire safety standards. Section 42-4-228, C.R.S. requires tires driven on roads to be in a safe condition. Violation of Section 42-4-228, C.R.S. is a traffic offense and law enforcement officers enforce these requirements. Some stakeholders argued the

Commission should adopt a robust used tire management regime, making the Hazardous Materials and Waste Management Division the regulator of tire safety in the State. Other stakeholders argued this section is overly broad because it prohibits common practices such as sales of certain used tires to jurisdictions without the Section 42-4-228, C.R.S. standards as well as the sale of certain used tires to be recycled by beneficial users, Waste Tire Processors and Waste Tire End Users. The Commission determines the purpose of Section 30-20-1410, C.R.S. is to assist the Department in distinguishing waste tires, which it regulates, from used tires, which it does not. As such, Section 10 does not adopt an elaborate used tire management regime. The Department will develop and make available guidance to help the used tire seller distinguish a waste tire from a used tire.

8. Some stakeholders expressed concern the Department would not collect the Waste Tire Fee from online retailers of new tires. The Commission believes that the Department has the authority to collect the Waste Tire Fee on online sales of new motor vehicle or new trailer tires from out of state parties that sell new motor vehicle or new trailer tires to persons who live in Colorado.

9. Some stakeholders asked why there are two Waste Tire Fee Forms on the Department website for submitting the Waste Tire Fee payment. The Department is accepting payment of the Waste Tire Fee either electronically or by mail. The Waste Tire Fee Form must be included with the payment. Two versions of the Waste Tire Fee Form are available online: one for online payment and one for payment by mail. The forms are identical except for the addition of the mailing address on the payment by mail form and the online form has a submit button for online submittal.

10. Stakeholders discussed reducing the minimum of fifty (50) tons per fiscal year to ten (10) tons per fiscal year for applicants to be eligible to apply for a rebate from the End Users Fund. The Commission decided to reduce the minimum number of tons to be eligible to apply for a rebate from fifty (50) tons to ten (10) tons to allow more participation in the End Users Fund. The Department and stakeholders agreed that allowing more low volume processors, retailers and/or end users of tire-derived products would stimulate more market development for these products.

    An applicant may apply for a rebate once they reach the combination of processing, retail sales or end use of ten (10) tons of tire-derived products or whole waste tires for fuel or energy recovery within the current state fiscal year. For example: an applicant who end uses two (2) tons in July, four (4) tons in August, zero (0) tons in September and four (4) tons in October can apply in November for a rebate for the entire ten (10) tons end used that fiscal year. In this example, the applicant would receive the rebate amount calculated for October. Each applicant must reach this minimum every state fiscal year prior to being eligible to participate in the End Users Fund. Once the minimum amount has been applied for, and approved by the Department, the applicant cannot combine applications going forward for that fiscal year; they must apply each month for any amount that is processed, sold by a retailer, or end used.

11. Stakeholders questioned which processing, retail sales, or end uses of tire-derived products and whole waste tires would be eligible for a rebate from the End Users Fund. The Department, working with the stakeholders, developed an eligibility table (Table 10-12.01) showing which processes, retail sales, or end uses of tire-derived products and whole waste tires are eligible for rebates. This table determines which activities are eligible for which category of end use, processor or retailer rebate pursuant to the End User, Processor, and Retailer definitions. The table also lists several scenarios which are not eligible for a rebate from the End Users Fund. This table does not create any new rights; it only specifies processes, retail sales and end uses that are eligible for rebates from the End Users Fund. The Department has the discretion to determine eligibility for any activity not included in the table.

12. Some stakeholders wondered what would happen if two or more applications that are deemed eligible for a rebate for the same tire-derived product or whole waste tires that are received at the same time by the Department. The Commission has determined that the Department should notify each applicant that more than one application was received for the same tire-derived product or whole waste tires and that the impacted applicants must notify the Department within two (2) business days of notification which application(s) would be withdrawn. If a notification is not received by the Department within two (2) business days all received applications will be denied.

13. Another issue was the change in eligibility for the end use of tire bales. The Commission has determined that tire bales shall remain eligible for rebates if used (a) in an engineered, permanent structure that has been stamped and sealed by a Colorado Registered Professional Engineer; or (b) installed for end use on agricultural land using galvanized steel baling wire and installed to facilitate tire bale stability and longevity, using applicable design standards, as allowed by state laws and regulations and local ordinances (including fencing, windbreaks, and corrals).

    To be eligible for a rebate from the End Users Fund, an applicant will need to submit an End Users Tire Bale Approval Form, available on the Department's website, along with proof the structure was stamped and sealed by a Colorado Registered Professional Engineer.

    This determination does not restrict the processing, selling or end use of tire bales, as long as the tire bales continue to be considered a beneficial use by the Department and local laws and ordinances allow for their end use in the location they are installed.

14. Stakeholders questioned why there is a requirement for applicants participating in the End Users Fund to provide estimated forecasts of future processing, retail sales or end use of tire-derived products or whole waste tires. Due to changes in HB 14-1352, the Department must set the same per ton rate for a twelve (12) month period. The same per ton rate is intended to provide more market certainty for applicants so they can better forecast their budgeting and use of tire-derived products. For the Department to be able to

set a per ton rate, having forecast information from those actively participating the End Users Fund allows the Department a more accurate picture to set a rate that allows market stability. The Commission has determined that this information is needed for the Department to set a per ton rate that meets the requirements of HB 14-1352.

15. A few stakeholders expressed concern about the term "applicant" in section 10.12.6 which states that applicants who knowingly or intentionally provide false information to the Department are prohibited from receiving future rebates from the End Users Fund. Specifically, some stakeholders were concerned that their companies would be held liable for actions of "rogue employees." It is the intention of the Commission that only culpable parties be prohibited from receiving rebates under these Rules.

16. Some stakeholders questioned why pyrolysis is considered an end use and not a process.

    Senate Bill 13-252, Section 40-2-124, C.R.S. defines pyrolysis:

    > "Pyrolysis" means the thermochemical decomposition of material at elevated temperatures without the participation of oxygen.

    Section 1.2 adopts this definition. For purposes of Section 10, pyrolysis of waste tires or tire-derived product means to convert waste tires or tire-derived product into other components with economic value – typically gas, oil and carbon based products. The Commission has determined that pyrolysis is an end use, and would be eligible from the End Users Fund based on Table 10-12.01.

17. Some stakeholders questioned - how materials created by the method of pyrolysis will be treated for the purposes of eligibility for a rebate from the End Users Fund. Pyrolysis is considered an end use, as defined in Section 30-20-1401(4) (c), C.R.S.:

    > Consumes tire-derived product or uses tire-derived product in its final application or in making new materials with a demonstrated sale to a third-party customer.

    The Commission deems those companies who purchase materials from a company who used pyrolysis to create those materials to be not eligible for a rebate from the End Users Fund.

18. Another issue arose regarding how a retailer was going to be defined for the purpose of eligibly for receiving a rebate from the End Users Fund. Per Section 30-20-1405 (2)(b), C.R.S., the Department shall use moneys in the End Users Fund to provide rebates to in-state:

    > Retailers who sell tire-derived product…

    The Commission has determined that retailers of tire-derived products are retailers who sell small quantities of tire-derived products to customers who will use the tire-derived

product for its ultimate use. For example, a retailer selling landscape mulch made of processed waste tires to a residential customer who will install the landscape mulch on their own property is eligible to receive a rebate. Retailers will need to provide proof of retail sales tax being collected from the ultimate customer or provide proof that the ultimate customer is exempt from paying retail sales tax. Retailers of tire-derived products must have a current retail sales tax license to be eligible to participate in the End Users Fund.

19. Another issue encountered concerned a rebate for waste tires located at an illegal waste tire site that received funds from the Administration, Enforcement and Cleanup Fund. Specifically, if those tires are processed onsite, should the processing of those same waste tires also be eligible for a rebate from the End Users Fund? The Commission has determined such processing should not be eligible to receive a Processor rebate because the Processor is already receiving state money from another fund to process and remove the waste tires. This would be the same for Retailers who sell the tire-derived product processed from these illegal sites. Conversely, if a person receives money from the Administration, Enforcement and Cleanup Fund to remove waste tires from an illegal waste tire site and subsequently processes those waste tires offsite, they would be eligible for the Processor rebate (if sold to an out-of-state End User) because the Administration, Enforcement and Cleanup Fund would be funding only the removal of those waste tires, not the subsequent processing. End Users would be eligible for a rebate for the end use of those processed waste tires as long as they are not financially benefiting from the cleanup of the waste tires. The Commission feels that the Department should make every effort when awarding a grant to cleanup waste tires from an illegal waste tire site to ensure that the same waste tire is not eligible for both a rebate from the End Users Fund and reimbursement from the Administration, Enforcement and Cleanup Fund and the End Users Fund.

20. Factors used to determine the per ton rate of $40 for the next twelve (12) months beginning January 2015. The Commission considered several factors in determining setting the per ton rate:

- The audit findings from the Colorado Office of the State Auditor (Department of Public Health and Environment: Waste Tire Processor and End User Program June 2014 Performance Audit) stated that the Department should not pay rebates in excess of the cost of processing or end using tire-derived products. House Bill 14-1352 prohibits the Commission from setting a tiered per ton rate.

- The Department and stakeholders used a forecasting spreadsheet that included the following information:
  - Breakdown of approved tons over the last fiscal year by End User, Retailer and Processor. Tons approved that are not eligible under the current statute were removed.

- Forecast of potential end use of tons from applicants who did not participate or were limited in their participation in the End Users Fund during the last fiscal year.
- Projections of revenues based on the previous three years' historical rates.

Based on these factors, the Commission has determined that the Department will pay a rebate of $40 per ton for the next twelve (12) months.

**Regulatory Alternatives**

No other regulatory alternatives were evaluated.

**Cost/Benefit Analysis**

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Services.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

**Revision to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) –Deletion and Replacement of Existing Section 5.5 Regulations (Management of Asbestos-Contaminated Soil) with New Section 5.5 Regulations (Management of Regulated Asbestos Contaminated Soil (RACS)); the Addition of Appendix 5A (Sample Collection Protocols and Analytical Methodologies) and the Associated Additions and Revisions to Section 1.2 Definitions**

**(Adopted by the Solid and Hazardous Waste Commission on August 19, 2014)**

### Basis and Purpose

I. Background

The State Board of Health[1] promulgated a revision to Section 5 of the Solid Waste Regulations in 2006 in order to address asbestos contamination in soil. The Air Quality Control Commission has promulgated Regulation No. 8, The Control of Hazardous Air Pollutants, Part B, The Control of Asbestos (Regulation No. 8), in order to protect public health and the environment during asbestos abatement and control projects dealing with facility components. Regulation No. 8 deals with Asbestos Containing Material (ACM)[2] which is defined as containing greater than 1% asbestos. One of the reasons for the promulgation of the revision to Section 5 of the Solid Waste Regulations was to address sites with soil contaminated with asbestos at levels that are less than 1%, and where the asbestos contamination is not related to the presence of a facility component, and thus not specifically regulated under Regulation No. 8.

In 2004, the Environmental Protection Agency (EPA) Office of Solid Waste and Emergency Response (OSWER) issued a directive stating that disturbance of materials that contain less than 1% asbestos can result in concentrations of airborne asbestos above acceptable exposure criteria. The OSWER directive clarified that the 1% threshold for ACM is not health based. Rather, the 1% threshold was established in the 1973 National Emissions Standards for Hazardous Air Pollutants (NESHAPS), where the intent of the threshold was to ban the use of materials that contain significant quantities of asbestos, but to allow the use of materials with small quantities of asbestos (less than 1%) used to enhance the materials effectiveness. All subsequent EPA regulations included the 1% threshold, and the 1990 NESHAPS revisions retained the 1%

[1] The Board of Health previously had authority to promulgate rules for solid waste disposal sites and facilities. This authority was transferred to the Solid and Hazardous Waste Commission in July of 2006.

[2] Asbestos Containing Material (ACM) is an existing term defined in Federal regulation (40 CFR 61 Subpart M) and State regulation (5 CCR 1001-10, Part B, and Section 1.2 of the Solid Waste Regulations 6 CCR 1007-2, Part 1).

threshold stating that it was related to the detection limits of the phase contrast microscopy (PCM) analytical method. The OSWER directive recommends that EPA Regions develop risk-based, site-specific action levels to determine if EPA response actions are necessary when materials with less than 1% asbestos are found at a site. The OSWER directive is supported by research conducted by EPA and others, which demonstrates that high airborne fiber concentrations can be generated during disturbance of soil/debris with less than 1% asbestos, even with 0.001% asbestos.

Both the current Section 5.5 and the proposed revisions regulate asbestos, a known carcinogen. Disturbance of asbestos contaminated soil releases previously static asbestos fibers into the air. This release of asbestos fibers into the air, where they can be inhaled, is a public health risk. In fact, the risk from the inhalation of asbestos fibers is known to be greater today than when the existing regulations were passed in 2006. More recent studies indicate that the inhalation of asbestos fibers cause more types of illness and more severe illness than was understood in 2006[3]. Additional information in the recent developments in asbestos related disease can be found with the Solid and Hazardous Waste Commission in the administrative record for this rulemaking.

Section 5.5 of the Solid Waste Regulations (Section 5.5) and Regulation No. 8 were drafted for different applications, and therefore require different approaches to successfully mitigate asbestos hazards and protect human health and the environment. Regulation No. 8 addresses removal of ACM on facility components where the concentration of asbestos is greater than 1% of the material in question. Abatement conducted under Regulation No. 8 involves the disturbance of ACM within a negative pressure containment and utilizes air monitoring to "clear" this containment prior to re-occupancy by the public. The typical site regulated under Section 5.5 contains many of the exact same materials that are currently required to be removed prior to demolition under Regulation No. 8. Under Regulation No. 8 these materials are removed, contained, transported and disposed in a manner that is protective of both the workers and the public. Section 5.5 projects typically contain broken and crumbled pieces of asbestos containing material that are known to release asbestos fibers during demolition activities. Materials in the ground that are already broken and crumbled are likely to have already released asbestos fibers into the surrounding soils. Asbestos containing materials that are likely to release fibers must be managed properly to prevent the release of fibers and the resulting unacceptable exposure to the public through the inhalation of asbestos fibers. This is the very reason that the Board of Health promulgated the existing regulation. Section 5.5 is intended to protect public health outside of the regulated work area (RWA) from a known carcinogen, asbestos fibers.

---

[3] Alexander BH, Raleigh KK, Johnson J, Mandel JH, Adgate JL, et al. (2012). Radiographic Evidence of Nonoccupational Asbestos Exposure from Processing Libby Vermiculite in Minneapolis, Minnesota. Environmental Health Perspectives 120:44-49.

NAS (2006). National Academy of Sciences. Asbestos: Selected Cancers. The National Academies, Institute of Medicine, Committee on Asbestos: Selected Health Effects. Washington, DC: The National Academies Press, p 340.

Rohs AM, Lockey JE, Dunning KK, Shukla R, Fan H, Hilbert T, et al. (2008). Low-Level Fiber-induced Radiographic Changes Caused by Libby Vermiculite: A 25-year Follow-up Study. American Journal of Respiratory and Critical Care Medicine. Volume 177: 630-637.

Straif K, Benbrahin-Tallaa L, Baan R, Grosse Y, Secretan B, El Ghissassi F, et al. (2009). Special Report: Policy. A Review of Human Carcinogens – Part C: metals, arsenic, dusts, and fibers. Lancet Oncology 10(5):453-454.

When developing Section 5.5 the Division evaluated the OSWER directive and research which demonstrated that a health-based threshold for asbestos in soil cannot be established without conducting a site-specific risk assessment. Therefore, Section 5.5 addresses the management of asbestos contamination independent of concentration, and establishes a risk management approach aimed at limiting the potential for airborne exposure through engineering controls. Management of asbestos-contaminated soil (ACS) conducted under Section 5.5 involves disturbance of asbestos in an outdoor open air environment without containment. Air monitoring is used in Section 5.5 to verify the effectiveness of the engineering controls being employed at the site during soil disturbing activities. In contrast, air monitoring is utilized in Regulation No. 8 to determine clearance of a containment, for the purposes of re-occupancy.

Regulation No. 8 allows some types of ACM to remain in a building during demolition. Any debris that is not removed from a site after demolition is solid waste subject to the Solid Waste Regulations. Any remaining ACM and/or soil impacted by asbestos are subject to Section 5.5. However, if the ACM or soil contaminated by asbestos is determined to be the result of an improper demolition, the regulatory authority remains with the Air Pollution Control Division (APCD) as a spill response to be conducted under Regulation No. 8. Alternatively, when asbestos is present at a site without readily identifiable facility components and no improper demolition can be ascertained, which is often the case with historic disposal locations, the management of asbestos is conducted under Section 5.5.

There may be situations where abatement of a facility component subject to Regulation No. 8 is co-located in an area of ACS (not associated with a facility component) subject to Section 5.5. In these instances, both regulations could apply concurrently or individually.

III. <u>Statutory Authority</u>

These proposed modifications are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Section 30-20-109, C.R.S.

The specific authority for these rules is provided in Section 30-20-109, C.R.S. ("The solid and hazardous waste commission shall promulgate rules and regulations for the engineering design and operation of solid waste disposal sites and facilities . . ."); and Section 25-15-302(4.5), C.R.S. ("the commission shall adopt rules concerning solid waste disposal sites and facilities in accordance with part 1 of article 20 of title 30, C.R.S.). Section 5.5 of the Regulations Pertaining to Solid Waste Sites and Facilities, 6 CCR 1007-2, Part1 (Solid Waste Regulations) applies to solid waste disposal sites and facilities where soil disturbing activities expose: 1) debris as defined in Section 1.2 of the Solid Waste Regulations, or 2) disturbs or exposes RACS, including soil or ash known to contain asbestos fibers through documented evidence.

Section 30-20-101, C.R.S. defines solid waste as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial or commercial operations or from community activities." Solid waste disposal is defined as "the storage, treatment, utilization, processing, or final disposal of solid wastes" and solid waste disposal site and facility is defined as "the location and facility at which the deposit and the final treatment of solid wastes occur." The proposed definition of "debris" is a subset of solid waste subject to the Solid Waste Regulations, and properties where debris is present are solid waste disposal sites. ACM that has been discarded or disposed is debris, and is specifically defined in the Solid Waste Regulations as asbestos waste, meaning "any asbestos-containing material whether it contains friable or non-friable asbestos, that is not intended for further use."

Therefore, all debris, including all ACM debris, is subject to the broad requirements of the Solid Waste Regulations. Section 5.5 establishes additional requirements that apply only to the subset of solid waste that includes asbestos or ACM debris in soil, defined as ACS.

II. Purpose of Revising the Regulations

The primary purpose of Section 5.5, and its associated definitions, is to prevent exposure to asbestos fibers resulting from disturbance of ACS. The purpose of the Section 5.5 revision is to update the ACS regulations based on the Hazardous Materials and Waste Management Division's (the Division's) and stakeholders' experience gained from implementing the regulation since its promulgation in 2006. Consistent with the initial regulatory process, the Division confirmed: 1) the risk associated with ACS is from the inhalation of airborne fibers, and 2) it is virtually impossible to correlate the concentration of asbestos in the soil with the measured concentration of asbestos fibers in air. In addition, the Division and stakeholders learned that it is virtually impossible to control every fiber all the time to completely eliminate potential exposures. However, practical and implementable engineering controls, if applied properly, can be effective in controlling the release of asbestos fibers. Therefore, the proposed revisions to Section 5.5 and the associated definitions are aimed at improving the management of ACS, while maintaining protectiveness of human health and the environment.

The Division and stakeholders have learned several lessons through the implementation of Section 5.5. Key among the lessons learned is that the engineering controls used by owners and operators, if applied properly, can be effective at controlling potential asbestos emissions generated by soil disturbing activities at sites with ACS. Since the primary risk associated with asbestos is from the inhalation of asbestos fibers, then engineering controls that successfully control or eliminate emissions of those fibers will protect human health and the environment. This information led to the development of a best management practices (BMP) approach to managing sites with ACS. The resulting BMPs established the minimum requirements necessary for proper management of ACS; therefore, the Division and the majority of stakeholders agreed that the BMPs should become minimum requirements under Section 5.5. At the request of the City and County of Denver (CCOD), the term "minimum requirements" was subsequently changed to "standard requirements." The standard requirements: 1) eliminate the requirement for a work plan to be submitted by providing an immediately implementable work plan; 2) eliminate the time and cost associated with Division review of work plans; 3) expedite project implementation; and 4) provide a predictable framework for developing and implementing site specific work plans.

Alternately, the proposed regulations also include a risk based project management approach for facilities that wish to choose this approach. The risk based approach is predicated on managing a project so receptors at the point of exposure are not exposed to a concentration of airborne asbestos fibers greater than $1X10^{-6}$ for a given project scenario. In addition, the proposed regulations include both default risk based concentrations and a process for owners and operators to develop project specific risk based concentrations.

**Discussion of Regulatory Proposal**

I. New and Modified Definitions

The proposed Section 5.5 regulations require new definitions and the modification of some existing definitions. These changes summarized below will be incorporated into Section 1.2 of the Solid Waste Regulations (6 CCR 1007-2, Part 1).

The following definitions are being added to Section 1.2:

1. Adjacent Receptor Zone
2. Air Monitoring Specialist (AMS)
3. Ancillary Worker
4. Area of Contamination (AOC)
5. Certified Asbestos Building Inspector (CABI)
6. Debris
7. Friable asbestos-containing material (Friable ACM)
8. Geofabric
9. Low Emissions Methods
10. Non-Regulated Asbestos Contaminated Soil (Non-RACS)
11. Project
12. Project Specific RACS Management Plan (PSRMP)
13. Qualified Project Monitor (QPM)
14. RACS Determination
15. Regulated Asbestos Contaminated Soil (RACS)
16. Regulated work area (RWA)
17. Risk-Based Air Threshold
18. Staging
19. Standard Operating Procedure (SOP)
20. Stockpiling
21. Storage
22. Visible
23. Visual Inspection

The following definitions are being modified in Section 1.2:

1. Adequately wet
2. Asbestos
3. Asbestos-containing material (ACM)
4. Asbestos-contaminated Soil (deleted and replaced with RACS)
5. Friable asbestos waste
6. Mechanical
7. Soil-disturbing activities
8. Visible emissions

## II. Scope and Applicability

Although the proposed regulations were drafted using the framework and construct of the original regulations, there are significant changes to the scope of Section 5.5 and to management options used at sites with ACS. Section 5.5 currently applies to owners or operators of properties where ACS is disturbed; where ACS is defined as soil containing any amount of asbestos, and the trigger into the regulation is knowledge, or reason to know/believe, of ACS to be disturbed. The proposed revisions to Section 5.5 replace ACS with regulated asbestos contaminated soil (RACS)[4]; where RACS is determined based on the probability for ACM to release asbestos

[4] The term "asbestos-contaminated soil" (ACS) in the current regulation has been replaced with the term "regulated asbestos contaminated soil" (RACS) in the revisions to Section 5.5. Therefore, in this Statement of Basis

fibers. Further, the proposed revisions to Section 5.5 remove the "reason to know/believe" trigger, and replace it with a requirement that a person who disturbs or exposes RACS must either manage it in a protective manner, or cover it to eliminate exposure. The proposed Section 5.5 has two primary applicability triggers, debris and RACS. The owner/operator may choose to use the debris trigger prior to RACS being identified in order to reduce costs through a reduction in the amount of time a Certified Asbestos Building Inspector (CABI) must be onsite. If the debris trigger is used, a person who disturbs or exposes debris must make a RACS determination. Both the debris and RACS triggers require that all RACS that is disturbed or exposed be managed or covered in accordance with Section 5.5. The tiered applicability trigger contained in Section 5.5.1 was developed at the stakeholders' request to allow for different project and liability management approaches.

The proposed revisions to Section 5.5 retain the standard operating procedures (SOPs) and pre-approved work plan options, and establish new standard requirements (Section 5.5.7) that can be implemented in lieu of a work plan or SOP, thus eliminating the need for plan submittal. If owners or operators wish to propose work practices that deviate from the standard requirements set forth in Section 5.5.7, they may submit the proposed work practices in a work plan or SOP for Division consideration. Alternatively, a waiver from one or more of the requirements set forth in Section 5.5 may be requested following the Waiver Process and Procedures set forth in Section 1.5 of the regulations.

The revisions to Section 5.5 retain the current exemptions for: 1) asbestos abatement conducted under Regulation No. 8; 2) spill response conducted under Regulation No. 8; 3) ambient occurrences of asbestos (i.e., background); and 4) de minimis projects involving less than 1 cubic yard of RACS disturbance using low emissions methods. The existing exemption for projects conducted by a home owner on their primary residence was expanded to include any residence not used to generate income. An exemption for Non-RACS has been added to Section 5.5, for ACM that does not have the propensity to release asbestos fibers; however, Non-RACS must be disposed of as non-friable asbestos waste, in accordance with Section 5.2, and must be addressed during a remediation project where the owner/operator is seeking a No Further Action or No Action Determination. In addition to the exemption for Non-RACS, the applicability of Section 5.5 was changed from material that contains any amount of asbestos to ACM, which is material that contains greater than 1% asbestos. Therefore, materials that contain less than 1% asbestos are exempt from Section 5.5. The only exception to this is soil or ash with non-visible asbestos based on documented evidence, due to the high potential for unacceptable exposures to asbestos fibers during disturbance.

**Stakeholder Involvement in the Process**

The Division is proposing to revise the regulations (Section 5.5) and the definitions associated with soil disturbing activities at sites with RACS. The initial stakeholder meeting was held on October 5, 2011. Stakeholders were provided a draft of the proposed regulations prior to the meeting. The Division determined that the stakeholders had numerous issues with the existing and proposed regulations. Further, the Division determined that the stakeholders would be best served by developing three stakeholder groups: 1) general stakeholder, 2) best management practices and 3) risk evaluation. This approach afforded the opportunity for select stakeholders with special interests and/or specialized experience to participate in the appropriate group(s).

---

and Purpose, the term ACS is used when discussing past or current issues and requirements, while the term RACS is used when discussing future requirements under the proposed revisions.

This approach facilitated the independent work of the BMP group and the risk evaluation group. Another benefit of this approach was to work and report on issues concurrently thereby saving time and stakeholder fatigue. The following describes the Division's effort to work with and reach out to stakeholders.

I. <u>Extent of Agency Consultation with Owners, Operators, Consultants, and Local Government Representatives</u>

The Division utilized various methods to inform individual industry representatives, industry trade associations, local government agencies, and local government agency associations of the proposed regulatory revisions. These methods included:

1. Posting a Stakeholder Process Notification Request Form on the Division's website to notify stakeholders of upcoming stakeholder meetings and related draft documents.

2. Providing industry representatives and local government representatives information regarding stakeholder meetings and providing all draft documents and discussion materials by e-mail.

3. All known registered owners, operators, consultants and interested parties were notified by email prior to the release of the first draft of the revisions to the regulations.

4. The Division sent out stakeholder meeting email notices that included the latest draft revisions to the regulations and the Statement of Basis and Purpose. The emails were sent directly to local county governments and industry representatives, and also to the following organizations for distribution: Colorado Counties, Inc. (CCI), Colorado Municipal League (CML), and Colorado SWANA (CO SWANA). All of these organizations report to local government constituents and industry representatives involved in matters pertaining to solid waste.

5. The Division hosted 33 general, 9 BMP and 10 risk evaluation stakeholder meetings during the twenty-two month drafting process from October 2011 to July 2013. Stakeholders frequently submitted questions to the Division about the revisions throughout the process. The questions received by the Division were addressed in subsequent stakeholder meetings to share with the group, and also directly to the stakeholder proposing the question by email, or phone conversation. Key stakeholder questions and/or issues are compiled and discussed under the following section of this document. Work group meetings were held to discuss specific topics such as the development and evaluation of BMP and the risk evaluation process. The Division used teleconferencing so absent or distant stakeholders could participate. Additionally, the Division's website was utilized to post updates to the regulation revision process, stakeholder comments, iterative versions of support and working documents, and audio recordings of general stakeholder meetings.

6. The Division hosted four additional stakeholder meetings after the Commission continued the rulemaking process to July 15, 2014 following the February 18, 2014 hearing. The same process outlined above was followed for the additional meetings. CCOD and others provided comments during the stakeholder process. These

comments and letters in addition to commissioner suggestions were used to help form the agendas for the stakeholder meetings.

## II. Issues Encountered During the Stakeholder Process

Stakeholders identified numerous issues associated with implementation of the existing Section 5.5 regulations. The following concerns and questions were raised by stakeholders during the regulatory revision and drafting process.

1. Stakeholders expressed concerns that the Division's inspectors regulated through guidance instead of the explicit regulatory requirements. This issue was discussed at length with the stakeholders. The Division explained that solid waste sites and facilities have a great deal of variability. The solid waste regulations contain a significant amount of flexibility in order to accommodate site specific variability and unique circumstances. However, the stakeholders indicated a preference for increased regulatory specificity.

   The Division explained that increased regulatory specificity would result in decreased regulatory flexibility. Further, the Division emphasized that one of the primary reasons the regulations were successful was because of their flexibility to accommodate a wide variety of sites and circumstances. Regardless, the stakeholders wanted more regulatory specificity. Therefore, the Division sought to eliminate vague regulatory language, thus the proposed regulations contain standard requirements that apply to all sites where RACS is disturbed.

2. A few stakeholders have stated that the increased cost of implementation of the current regulation (in contrast to a simple dirt work project) was disproportionate to the increased level of protection for human health and the environment. There were significant discussions regarding the cost of implementing the existing regulation compared to excavation projects conducted prior to passage of the existing Section 5.5 regulations and associated definitions. The Division clearly indicated that cost comparisons would be based on the costs associated with implementing the existing regulations compared to the proposed regulations, not the proposed or existing regulations compared to the absence of any regulations. There were also significant discussions about the opportunities to save money based upon experience gained from implementing the regulations over the last eight years. Stakeholders brought forward three examples of costs incurred though implementation of the existing Section 5.5 regulations: 1) disposal, 2) oversight, and 3) air monitoring.

   The primary source of increased costs associated with disposal under Section 5.5 activities are: 1) the cost of water to ensure that the ACS is "adequately wet", 2) the disposal cost caused by the increased water weight, 3) the cost of plastic liners used as leak tight containers, 4) disposal as ACS instead of as construction demolition debris or contaminated soil, and 5) the cost of transport and disposal of ACS with visible friable ACM, due to the limited number of landfills permitted to accept friable asbestos. The Division and stakeholders learned a lot about water application during implementation of the existing Section 5.5. The definition of adequately wet in the current regulation states:

> **"Adequately wet"** means sufficiently mix or penetrate with liquid to completely prevent the release of particulate material and fibers into the ambient air. If visible emissions are observed coming from asbestos-contaminated soil or asbestos-containing material, then the material has not been adequately wetted. However, the absence of visible emissions is not sufficient evidence of being adequately wet.

Successful implementation of this definition properly controls the release of asbestos fibers from ACS. However, utilizing this definition, soil was sometimes wetted to the point of becoming a slurry. In some circumstances much more water was being applied than necessary to control asbestos fiber emissions. This over-wetting had several negative unintended consequences: 1) liners wrapping the soil ruptured upon disposal at the landfill, 2) operational difficulties at the landfills, and 3) an increase of the landfill disposal fee.

The Division proposed a revised "adequately wet" definition to address overwatering issues while still preventing or controlling asbestos fiber emissions:

> **"Adequately wet"** means sufficiently wet to minimize or eliminate visible emissions of dust and/or debris within the Regulated Work Area (RWA) and prevent the release of visible emissions from leaving the RWA in accordance with Section 5.5 of these Regulations. The observance of visible emissions, outside of the RWA, of dust and/or debris is an indication that soils are not adequately wet.

Application of the revised definition of "adequately wet" should reduce the amount of water applied to RACS. The associated water application practices should result in: 1) improving the integrity of the liners wrapping soil during landfill disposal activities, 2) reduced landfill operational issues associated with handling and managing slurry-like soil, 3) reduced water purchase fees, and 4) reduced disposal costs from excess water weight.

In addition, the definition uses a prevent "visible emissions" standard that can be readily implemented and evaluated during field operations. While the definition is not based on completely preventing all asbestos fibers from leaving the RWA, the Division's experience is that when water (or amended water[5]) is applied appropriately to ACS, visible and non-visible emissions are controlled. Therefore, the release of asbestos fibers is minimized by preventing visible emissions from leaving the RWA. The intent of the prevent visible emissions standard in the rule is to create a standard for the purpose of minimizing the release of asbestos fibers from the RWA.

During the additional meetings stakeholders expressed the desire to regulate the management of RACS to allow visible emissions to leave the RWA but still be protective of public health. Public health protection was incorporated into the proposed definition of adequately wet by adding risk based threshold air monitoring as a tool to

---

[5] Due to the hydrophobic nature of some types of asbestos and associated matrices, it is often necessary to amend water with a surfactant. To address this issue, the revisions to Section 5.5 include a requirement to use amended water when disturbing friable ACM.

determine if visible emissions leaving the RWA are at levels protective of human health. The proposed definition follows:

> "**Adequately wet**" means sufficiently WET TO MINIMIZE VISIBLE EMISSIONS OF DUST AND/OR DEBRIS WITHIN THE REGULATED WORK AREA (RWA) AND EITHER:
>
> a. PREVENT THE RELEASE OF VISIBLE EMISSIONS FROM LEAVING THE RWA, IN ACCORDANCE WITH SECTION 5.5 OF THESE REGULATIONS; OR
>
> b. DEMONSTRATE THAT ASBESTOS FIBERS ARE NOT LEAVING THE RWA ABOVE RISK-BASED AIR THRESHOLDS.
>
> THE OBSERVANCE OF VISIBLE EMISSIONS, OUTSIDE OF THE RWA, OF DUST AND/OR DEBRIS MAY BE AN INDICATION THAT SOILS ARE NOT ADEQUATELY WET.

3. A few stakeholders expressed concern that the Division was inconsistent with other State and Federal regulations by requiring management of materials that contain asbestos at concentrations below 1%. However, the definition of "asbestos-containing waste materials" in NESHAPS, 40 CFR 61 Subpart M, includes "regulated asbestos-containing material wastes and materials contaminated with asbestos." The Subpart M definition does not include a threshold of 1% for materials contaminated with asbestos, and therefore applies to materials contaminated with any amount of asbestos. The Subpart M definition illustrates the fact that Federal regulations include requirements for proper management of materials contaminated with less than 1% asbestos. Additionally, OSHA does not use 1% as a threshold for worker protection. OSHA requirements apply to all work involving asbestos, regardless of the concentration of the material. OSHA requires the management of asbestos materials that can generate an airborne concentration above 0.01f/cc (OSHA PEL) regardless of the concentration of asbestos in the material. Therefore, the Division's requirement to manage materials contaminated with asbestos, even at concentrations below 1%, is consistent with other established regulations. Further, OSHA regulates work place exposures to asbestos, but does not regulate exposures to the general public. Section 5.5 is necessary to protect the public from potential exposure to asbestos fibers during the disturbance of asbestos in soil.

4. A few stakeholders suggested that the Division should only regulate soil containing friable ACM, and that all non-friable ACM should be exempt from regulation under Section 5.5. However, the Division believes that exempting all non-friable ACM from the management requirements of Section 5.5 would not be protective of public health. Because the risk associated with exposure to asbestos is due to the inhalation of asbestos fibers, it is necessary to manage asbestos in a manner that minimizes or eliminates the generation of airborne asbestos fibers. The proposed revisions to Section 5.5 would apply only to RACS; where RACS determinations are based on the probability for ACM to release asbestos fibers. This determination is similar to the requirements for the management of Regulated Asbestos Containing Material (RACM) under NESHAPS and Regulation No. 8, which include requirements for the inspection and proper management of non-friable ACMs that have a high probability to release asbestos fibers. In the proposed revisions the Division has sought to bring the

regulations more closely in line with other established regulations, specifically NESHAPS and Regulation No. 8, and in doing so has provided some relief by specifically categorizing certain materials that do not have a high probability to release fibers into the proposed definition of Non-RACS. Materials that fall under the definition of Non-RACS are exempt from management under the proposed revision to Section 5.5, and only require proper disposal in accordance with the current Section 5.2 of the regulations. Further, by using ACM as the basis for RACS, the Division has moved away from regulating material that contains any amount of asbestos to material that contains greater than 1% asbestos. The only exception to this is soil or ash with non-visible asbestos based on documented evidence, due to the high potential for unacceptable exposures to asbestos fibers when this material is disturbed.

Following is a comparison of materials that are RACM under NESHAPS and Regulation No. 8, and materials that would be RACS under the proposed Section 5.5:

| RACM under NESHAPS | RACS under Proposed Section 5.5 | Comparisons |
|---|---|---|
| 1) Friable asbestos material<br><br>2) Category I non-friable ACM that has become friable<br><br>3) Category I non-friable ACM that will be or has been subjected to sanding, grinding, cutting, or abrading<br><br>4) Category II non-friable ACM that has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material | Soil, ash, or debris (plus 6 inches in all directions) containing:<br><br>1) Friable asbestos containing materials<br><br>2) Asbestos containing materials that have been broken/resized/damaged, and have a high probability of becoming crumbled, pulverized, reduced to powder, or releasing fibers from the forces expected to act upon the material, as determined by a CABI in the field. The following asbestos-containing materials are RACS (included below)<br><br>3) Soil or ash known to contain non-visible asbestos based on documented evidence | 1) Friable asbestos materials or previously non-friable materials that have been rendered friable are regulated under both constructs<br><br>2) Asbestos containing materials, specifically non-friable materials, that either have already become, or will become damaged, crumbled, broken, and/or rendered friable are regulated under both constructs<br><br>3) Soil or ash that is known to contain non-visible asbestos based on documented evidence would fall under material contaminated by asbestos and would be considered to be asbestos containing waste material, and thus regulated under NESHAPS although not specifically under the umbrella of RACM. Hence, the Division included these materials in the scope of RACS. This same rationale also applies to the "plus 6 inches" of soil or |

| | | |
|---|---|---|
| | | other matrix that is considered RACS in the opening of the RACS definition. |

The definition of RACS parallels NESHAPS and Regulation No. 8 definitions of Regulated Asbestos Containing Material (RACM). RACM and RACS are parallel, and materials that are not RACM will not be RACS. The definition of RACS includes a list of specific materials that are considered RACS in certain instances, if they satisfy the criteria of the rebuttable presumption. These example materials, included for the purpose of clarification, were inserted based upon stakeholder requests, and were developed with stakeholder input. The Division has added a rebuttable presumption to Section 1.2 which clarifies that RACS is limited to non-friable materials that have been broken/resized/damaged, and have a high probability of becoming, crumbled, pulverized, reduced to powder, or releasing fibers from the forces expected to act upon the material, as determined by a CABI in the field. The list of materials that will automatically be considered to be RACS under the proposed revision are:

1. Asbestos cement materials
2. Plaster
3. Brittle caulking, glazing, and sealants
4. Powdery Concrete Masonry Unit (CMU) sealant
5. Powdery floor leveling compound
6. Drywall/wallboard and associated joint compound material
7. Firebrick
8. Deteriorated non-friable materials that are in poor condition due to weathering, mechanical impact, fire damage (by evidence of ACM within an ash layer) or other factors
9. Other material as determined by the Department, at the request of the person disturbing debris, to have a high probability to release fibers

It is important to note that the materials listed above must be broken/damaged/re-sized and have a high probability to release asbestos fibers in order to meet the definition of RACS and therefore be regulated under the proposed Section 5.5. Additionally, all of the above listed materials would fall under the definition of Category II non-friable materials and would be regulated under NESHAPS and Regulation No. 8 in one of the two following ways:

1) Typically, these specific materials are found in a condition of being broken, damaged, crumbled, resized, or pulverized from forces that have previously impacted the materials (e.g., depositing and/or compacting during their placement on or in the ground).
2) If intact, these materials would be considered to have a high probability to release fibers from the forces expected to act upon them during the course of a normal excavation project using heavy equipment.

The definition of RACS was further modified during the additional stakeholder meetings to add specificity regarding exactly what materials were included in RACS and those not included. Key stakeholder issues addressed by the revised RACS

definition include language specifying: 1) the "RACS determination" was defined and added to Section 1.2 of the regulations, 2) the RACS determination was made by a CABI in the field, 3) the RACS determination was made on exposed materials at the time of soil disturbance, 4) that the materials previously identified in item "h" of the RACS definition were combined with the item "4" in the proposed definition resulting in the following:

> Deteriorated non-friable ACM(s) that are in poor condition resulting in a high probability to release fibers due to weathering, historical mechanical impact, fire damage (by evidence of ACM within an ash layer) or other factors as determined in the field by a CABI(s) through a RACS determination;

This last change was made because some stakeholder viewed the previous item "h" as a reopener to include all other types of materials, which was not the original intent.

However, if the materials in the list above are intact when they are discovered, then the materials may possibly be managed in a manner that will not result in the material having a high probability to release fibers (e.g., careful hand removal). In situations where the listed materials are intact when they are discovered, these materials would not be regulated as RACS (they would be Non-RACS). This approach, requested by stakeholders, remains protective, and could be very useful for smaller more isolated accumulations of ACM. During the additional meetings, the stakeholders indicated that there was some confusion regarding Non-RACS materials and material characteristics, and which management procedures can be used to ensure that materials remain Non-RACS. Therefore the definition of Non-Regulated Asbestos Containing Soil (Non-RACS) was modified to add clarity and specify that the conjunction between conditions 1 and 2 is "or" and not "and" as evidently interpreted by a number of the stakeholders.

Asbestos cement materials are one subset of Category II non-friable materials that deserve special attention. These materials have a high probability of releasing fibers if they are impacted (broken, crumbled, pulverized) by heavy equipment removing the material during the renovation or demolition of a structure, or if they will be impacted during excavation. Therefore, even though asbestos cement materials are usually considered to be non-friable they are still regulated under NESHAPS and Regulation No. 8 as RACM due to their high probability to release fibers. It is clear under NESHAPS and Regulation No. 8 that once these materials are crumbled they fall under the definition of RACM as Category II non-friable asbestos. The Division has taken the position that the terms "crumbled" and "broken" are synonymous when applied to asbestos cement materials. The EPA has issued guidance that the broken edges of asbestos cement materials are typically friable (EPA 340/1-90-018), and that the broken edges should be rubbed to see if it produces powder. The generation of powder from asbestos cement materials indicates that these materials are friable when broken and result in their regulation under NESHAPS and Regulation No. 8 as RACM. Alternatively, the Division is leaving the friability of asbestos cement materials to be determined in the field by a CABI, but does consider this material to be regulated as RACS independent of the CABI's friability determination if the material is broken or crumbled. The ability to manage and dispose of broken and crumbled material as non-friable, rather than friable, results in significant cost savings.

Although expected to be rare occurrences, discoveries of asbestos cement materials that are intact (not broken, damaged, crumbled, pulverized, or reduced to powder) and can be managed without breaking, damaging, crumbling, pulverizing, or reducing the material to powder would not be regulated as RACS under the proposed Section 5.5. This is equivalent to NESHAPS in which these materials may also be considered to be non-RACM and managed as such.

5. Stakeholders indicated that the engineering controls used to prevent or eliminate asbestos fibers releases were effective. Several stakeholders provided air monitoring data from their ACS project sites. This information, along with data from other sites reviewed by the Division, indicates that engineering controls, when used correctly, are effective at controlling the release of asbestos fibers.

   The Division and stakeholders have learned that air monitoring detections of asbestos fibers are typically attributable to site management activities. For example, the Division observed repeated detections at some sites following: 1) initial project start-up, 2) a change in work crews, 3) a change in work practices, 4) a change in climate conditions such as increased wind speed, and/or 5) a change in material type. This information was considered when drafting the work practices and air monitoring requirements included in the proposed revision of Section 5.5.

6. Section 5.5.7 of the existing regulations lists the requirements for the disposal of ACS under three categories: 1) ACS with visible non-friable asbestos, 2) ACS with visible friable asbestos, and 3) ACS with no visible asbestos. Currently, Section 5.5 requires disposal of ACS with any amount of friable ACM as friable asbestos waste. This requirement can result in an entire load of primarily soil, or other landfill debris, being disposed of as friable asbestos waste due to the presence of a small amount of friable ACM. However, when considered on a per load basis, it is unlikely that a load of ACS would contain enough asbestos to exceed one percent content by weight, area or volume when composited with the balance of material being managed. The Division established the current disposal requirements in order to protect public health and the environment during transport and disposal of ACS. After further evaluation and discussion with stakeholders, the Division has determined that RACS with small quantities of friable ACM can be disposed as non-friable asbestos waste. RACS being disposed of as non-friable asbestos waste materials will still be transported in a leak tight container, and will be managed at the landfill in a manner protective of public health and the environment.

   Some stakeholders expressed a preference for disposal of ACS with less than one percent asbestos, per disposal load, as non-asbestos waste. However, the Division recognizes the need for landfills to comply with all applicable regulations, protect the general public disposing of solid waste at landfills, and ensure the protection of landfill employees. Based on general stakeholder feedback and discussions with landfill owners and operators, the Division determined that it is appropriate to base disposal decisions on the total amount of friable ACM in a disposal load of soil. Allowing disposal to be based on the total amount of friable ACM provides a balance between the relief associated with the cost of disposal of friable asbestos waste, and the protection of public health, while keeping the landfills in compliance with other state and federal regulations. The proposed Section 5.5.8 requires that soil containing less than one

percent of friable ACM in a disposal load (based on visual estimation through continuous inspection) be packaged in a leak tight container and disposed of in accordance with Section 5.2 of the regulations. This allows for soil containing less than one percent friable ACM, per disposal load, to be disposed of as non-friable asbestos waste. RACS with one percent or greater friable ACM, based upon the total load, must be disposed of as friable asbestos waste, in accordance with Section 5.3 of the regulations. All RACS must be managed and packaged in accordance with Section 5.5, including adequate wetting and disposal in a leak tight container, unless alternate packaging is approved by the Division and the receiving facility.

7. Some stakeholders have suggested that the Division is regulating "every fiber, everywhere, all the time," or is using a single fiber threshold to trigger the requirements of Section 5.5. In reality, the current and proposed Section 5.5 do not include a threshold concentration of asbestos in soil since there are no requirements to sample or otherwise characterize the amount or distribution of asbestos in soil. Additionally, the Division believes that Section 5.5 provides a balanced approach to managing the potential risks associated with the disturbance of ACS. The risk associated with ACS is from the inhalation of airborne fibers, and it is extremely difficult to correlate the concentration of asbestos in the soil to a measured concentration of asbestos fibers in air. Rather than require a site-specific risk assessment be conducted at every property with ACS, to determine the potential risks associated with every individual type of ACS disturbance, Section 5.5 establishes risk management practices to be implemented. Short of conducting work in a negative pressure containment, it is very difficult to verify that all fibers released during ACS management are being controlled. Therefore, the Division can not realistically regulate every fiber released when ACS is disturbed. Section 5.5 establishes practical, implementable, and cost-effective engineering controls to be used in an open-air environment. When applied properly, these practical and implementable engineering controls are very effective in controlling or preventing the release of asbestos fibers. However, the regulation is not intended to control "every fiber, everywhere, all the time."

8. The proposed revisions to Section 5.5 establish minimum requirements for air monitoring during RACS disturbance. Air monitoring is conducted during RACS disturbance to determine the effectiveness and/or adequacy of the engineering controls. Project experience gained during implementation of the current regulation was used to develop a progressive air monitoring approach based on: 1) retaining a screening level of air monitoring to verify engineering control effectiveness, 2) retaining verification analysis on a subset of screening samples to determine asbestos content, and 3) reducing the air monitoring requirements and frequencies based on demonstrated engineering control effectiveness. If air monitoring demonstrates that engineering controls are not effective/adequate, the collected data is the basis for modification of the engineering controls. Adjusting the engineering controls is an iterative process based on air monitoring data, and not an automatic violation of the regulations. Air monitoring is not intended for clearance or the evaluation of risk, unless the owner/operator chooses a risk-based threshold for adequately wet compliance. Based on stakeholder discussion and consideration, it was agreed that for short duration projects, air monitoring results would not be available quickly enough to make decisions or modifications to engineering controls. Therefore, the Division and stakeholders agreed that air monitoring would not be required for projects with a duration of less than 2 days of

RACS disturbance. In order to discourage potential misuse of this exemption from air monitoring at short duration projects (i.e., by conducting RACS disturbance projects in 2-day increments), the project location and duration must be defined on the RACS project notification form.

9. Some stakeholders raised the concern that Section 5.5 has increased liability for consultants conducting Phase I Environmental Site Assessments (Phase I ESA). To limit their liability, some consultants are including a general statement in their Phase I ESAs that there is a potential that ACS may be present on the property, even when there is no documentation or other evidence suggesting the presence of ACS. This can create an unfounded concern for property owners, potential purchasers and developers.

   Section 5.5 does not create a duty to investigate the potential presence of ACS at a property; rather, it requires proper management of ACS if exposed and disturbed. Section 5.5 does not require the extent of ACS be characterized or remediated. If there are no plans to disturb an area of ACS, the requirements of Section 5.5 are not triggered.

   The ASTM standard for Phase I ESAs and the EPA's "Standards and Practices for All Appropriate Inquiries" apply to releases and threatened releases of hazardous substances, pollutants and contaminants, as defined by the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA[6]). The CERCLA definitions of "hazardous substance" and "pollutants or contaminants" are broad, and include releases or threatened releases of asbestos (i.e., ACS) as a recognized environmental condition (REC). However, it is unclear why consultants would include a general statement that ACS may be present if there is no evidence to support this statement. Further, since Section 5.5 does not create a duty to investigate for ACS or remediate ACS, it seems unnecessary to include such a statement unless there is evidence documenting the presence or potential presence of ACS. It is the role of the environmental consultant to understand the scope and limitations of pertinent regulations and advise their clients accordingly. It may be that outreach is needed to further educate environmental consultants regarding the requirements and limitations of Section 5.5. In addition, the Division is planning training and outreach once the regulations are finalized in hopes that this topic can be more specifically addressed.

10. Stakeholders expressed concerns that the current Section 5.5 does not include clear criteria for exiting the management requirements of Section 5.5. These concerns have been addressed in the proposed revisions to Section 5.5. Under the proposed revision to Section 5.5.1 Applicability, the initial trigger into the regulation either occurs when debris is exposed or disturbed, or when RACS is exposed or disturbed. When using the debris trigger, Section 5.5.1 requires that a visual assessment of the debris be made to determine if RACS is present. If RACS is present, the management requirements set forth in Section 5.5 apply to all RACS disturbance. If RACS is not present, the management requirements of Section 5.5 do not apply. However, management of solid waste still must comply with the applicable requirements of the Colorado Solid Wastes Disposal Sites and Facilities Act and its implementing regulations.

---

[6] 42 USC 9601

The proposed revisions include procedures that allow for a project to exit out of Section 5.5 when soil disturbing activities no longer involve RACS. These procedures include removal of RACS plus an additional amount of soil/other matrix material and visual confirmation that all RACS has been removed. After RACS removal and visual confirmation, if there is no independent documented evidence of the presence of non-visible asbestos, then the remaining material would not be RACS and not subject to Section 5.5. Soil disturbing activities may then proceed without following the management requirements of Section 5.5 unless or until additional RACS is encountered.

11. There was a discussion during the stakeholder process about the placement of Non-RACS on the surface for reuse. As provided in Section 5.5.2, Non-RACS is exempt from the requirements of Section 5.5, but must be disposed as non-friable asbestos waste in accordance with Section 5.2. This is necessary because Non-RACS is still solid waste containing ACM and is therefore asbestos waste. Onsite disposal of Non-RACS must comply with the solid waste disposal requirements of the Colorado Solid Wastes Disposal Sites and Facilities Act and its implementing regulations. Onsite reuse of Non-RACS must comply with the Beneficial Use requirements of Section 8.6 of the regulations. If Non-RACS is handled in a manner such that the material becomes RACS, it must be managed in accordance with the requirements of Section 5.5.

12. Some stakeholders have raised questions regarding the Division's authority to establish requirements to protect individuals not covered by the Occupational Safety and Health Act of 1970 (OSHA). One specific example at issue is a truck driver who transports ACS to a landfill, but is not directly involved in soil disturbing activities.

Under the Colorado Solid Wastes Disposal Sites and Facilities Act, the Division has the authority to regulate the proper management of solid waste such as asbestos. Further, Section 30-20-101.5, C.R.S. declares that the Division shall "protect human health and the environment in a manner that… (d) protects the environmental quality of life for affected residents." Although the Occupational Safety & Health Administration (OSHA)[7] also has authority to regulate asbestos exposure in all construction work,[8] the Division's authority is independent of OSHA.

There are many examples of differing regulations between OSHA and Federal/State regulations. One example is the differing standards for indoor air contamination, such as the exposure limits set for vapor intrusion.[9] OSHA standards are generally not risk-based. Instead, the General Duty Clause of OSHA 5(a)(1) states, "Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."

In the example of a truck entering the RWA, depending on the asbestos disturbance occurring in the RWA, OSHA may require the truck driver to wear the appropriate respiratory protection[10] and possibly follow through with the necessary

---

[7] 29 U.S.C. 651, *et. seq.*
[8] 29 CFR 1926.1101(a) & 1910.12(b)
[9] http://www.epa.gov/superfund/sites/npl/Vapor_Intrusion_FAQs_Feb2012.pdf (See pg. 31).
[10] 29 CFR 1926.1101(e)(3) & 1101(e)(4) & 1926.1101(h)

decontamination procedures. Regardless, the Division has its own independent authority to regulate the management of waste in order to protect the human health and environment. There are numerous instances when the Solid Wastes Disposal Sites and Facilities Act and its implementing regulations regulate the management of waste, which also involves worker safety.

If state statutes and regulations provide authority over an issue that overlaps with OSHA regulations, i.e., waste or public health, the state laws are not superseded or secondary to OSHA.

The Division considers individuals that have not been informed of potential exposures, have not been provided training required by OSHA, and that have not been provided the appropriate PPE to be ancillary workers or members of the public. Section 5.5 includes a requirement that soil disturbing activities cease whenever ancillary workers or members of the public enter a RWA.

13. Some stakeholders had concerns about the role and authority a CABI has during projects conducted under Section 5.5, and requested that the Division state within the regulation that CABI judgment would not be challenged by the Division. Stakeholders also expressed a concern about Division enforcement where the CABI has performed their duties with "reasonable care" and RACS was missed.

The role of a CABI on projects conducted under the current and the proposed Section 5.5 is to inspect for, and to identify suspect ACM, to determine the friability of materials, and, in the proposed regulations, to make RACS determinations. Additionally, CABIs conduct visual inspection for the purpose of determining the percentage of friable ACM within a disposal load. CABIs also inspect for visual clearance for the purpose of exiting management requirements under Section 5.5. Additionally, CABIs collect samples of suspect-ACM, ACM, ACS, and soil to determine the asbestos content of those materials.

The Division will not waive or limit its enforcement authorities. However, as long as CABIs follow established regulatory requirements, industry protocol, and make all reasonable efforts to conduct their duties consistent with all applicable requirements, the Division typically seeks to correct identified issues within the scope of the project.

The concepts of industry protocol and reasonable care were discussed at length during the additional stakeholder meetings. There currently is no "industry standard" for performing the type of work identified in the proposed regulation. In fact, the proposed regulations will be the criteria by which the industry standards will be developed. Likewise, stakeholders informed the Division that "reasonable care" was a very defensible legal term. The difficulty with reasonable care is that while it may be a defensible term it does not lend itself to being a field implementable term. One such example is depicted below where certain stakeholders objected to the use of the term "thorough" in the following paragraph which was modified as noted:

> If debris is exposed that only contains metal, glass, plastic, wood, and/or bare concrete with no associated material suspected of being asbestos-containing material (ACM) (such as sealants, adhesives, mastics, coatings, adhered materials,

> or resins), then Section 5.5 is not applicable. ~~The visual inspection shall be conducted in a manner sufficient to provide thorough inspection of the debris being disturbed, while maintaining the safety of the inspector~~. The person(s) conducting the visual inspection must be a Qualified Project Monitor (QPM) or a Certified Asbestos Building Inspector (CABI).

In addition to the modified text the term "visual inspection" was defined and added to Section 1.2

While stakeholders appreciated the legal defensibility of the term "reasonable care", they requested specific implementable regulatory language so they could determine when they were in compliance or not in compliance. No one phrase was universally applicable to the term reasonable care because it was used as a concept. Therefore the Division worked with stakeholders to develop specific implementable regulatory language in multiple situations.

In an effort to meet industry half way while not waiving the Division's inspection and enforcement authorities, the following language was developed and placed in the proposed regulations. Section 5.5.7 (C)(1)(c) states:

> Except as provided in (d) below, incidental occurrences of visible emissions leaving the RWA shall be managed by evaluating site conditions and engineering controls for each occurrence of visible emissions, and immediately implementing any identified engineering control revisions necessary in order to prevent future occurrences of visible emissions. All instances of visible emissions leaving the RWA shall be documented as required in Section 5.5.7(L) of this regulation.

Although added to address CCOD concerns about enforcement, CCOD initially rejected this language. However, other stakeholders strongly supported its inclusion in order to provide a defined level of enforcement discretion and relief to stakeholders.

The Division has also built in provisions in Section 5.5.7(H)(1) for incidental discovery of RACS during the management of materials initially determined not to be RACS. This procedure provides for proper identification and subsequent management of incidental discoveries of RACS once identified. The Division incorporated this procedure with the understanding that it may be difficult to identify all RACS generated during a soil disturbing project. As long as a CABI or QPM is performing their duties in a diligent manner, and the RACS is properly managed once identified, the Division would evaluate the facts and merits of each site and incidental occurrences of RACS in determining an appropriate resolution.

The provisions in Sections 5.5.7(C) and 5.5.7(H)(1) account for the nature of asbestos contaminated soil and the continuous operation of these projects. The provisions in Section 5.5.7(C) recognize that sudden changes in conditions may result in unanticipated operational upsets which, once addressed, may not result in enforcement. Further the provisions in Section 5.5.7(H)(1) recognize that while a CABI is conducting a visible inspection when making a RACS determination or during the stockpiling of

material that it may not be possible to identify all of the RACS material. The regulations were developed with input from many stakeholders to address the safety needs of the CABI and the practical limits of inspecting a solid mass of material.

The definition of "visible inspection" specifically addresses the need to maintain the safety of the person performing the inspection. The Division understands that maintaining a safe distance during the inspection may inhibit the observation of some RACS material. However, the procedures for conducting visible inspections and making RACS determinations together provide a process and criteria for the safe identification of RACS. The regulations also recognize the physical limitation of not being able to see inside a solid mass of soil, rocks and solid waste. Therefore, Section 5.5.7(H)(1) was developed to account for the discovery of incidental pieces of RACS even with the best efforts of a CABI. Once the RACS is identified and managed appropriately the incidental occurrences may not result in enforcement.

14. Stakeholders expressed a concern that under the current regulation the boundaries of the area where Section 5.5 applies is unclear. To provide clarity on this issue the following terms were defined in the proposed revisions to Section 5.5:

- "Project" means any soil disturbing activity that involves RACS within a planned geographic area(s) of disturbance, as defined in the "Notification of Regulated Asbestos Contaminated Soil Disturbance" form for that specific management or remediation scope, starting from the time of first RACS disturbance and continuing through final RACS removal or stabilization and final demobilization. A project may include one or more RWAs, and start dates and stabilization dates for individual RWAs within a project may be different.

- "Regulated work area (RWA)" as used in Section 5.5 of these regulations means the portion(s) of a site at which soil disturbing activities involving RACS occur.

15. Currently, Section 5.5 is applicable based on "reason to know" or "reason to believe" that ACS is present in soil being disturbed. Stakeholders expressed a concern that the current language is too vague and ambiguous. Some stakeholders expressed a desire to use an actual knowledge standard or a due diligence checklist specific to ACS. However, based on consultation with the Attorney General's Office (AGO), the Division rejected the use of an actual knowledge standard because it is legally unenforceable. The use of a due diligence checklist was also determined to be problematic, resulting in enforcement and interpretation issues. Further discussion resulted in a consensus between the Division and a majority of the stakeholders that Section 5.5 applicability would be revised to require that any person that disturbs debris, or encounters debris during soil disturbance, determine whether the debris contains RACS. The applicability of Section 5.5 was refined again during the additional stakeholder meetings. The proposed Section 5.5 now has two primary applicability triggers, debris and RACS. The owner/operator may choose to use the debris trigger prior to RACS being identified in order to reduce costs through a reduction in the amount of time a CABI must be onsite. If the debris trigger is used, a person who disturbs or exposes debris must make a RACS determination. Both the debris and RACS triggers require that all RACS that is disturbed or exposed be

managed or covered in accordance with Section 5.5. The presence of RACS is determined based on visual evidence of ACM or documented evidence of non-visible asbestos in soil or ash. The use of "documented evidence" provides clarity while maintaining a constructive knowledge standard.

The inclusion of "documented evidence" in Section 5.5 applicability language, and in the definition of RACS, does not create a duty to sample or otherwise characterize a site to determine if asbestos is present. Further, the removal of RACS (ACM plus 6 inches of surrounding soil) in accordance with the procedures in Section 5.5.7 (which includes removal of RACS plus additional material), would not independently result in there being documented evidence of non-visible asbestos in the material remaining after RACS removal. If there is no independent documented evidence of the presence of non-visible asbestos, then the remaining material would not be RACS and not subject to Section 5.5. However, if samples are collected which demonstrate the presence of asbestos, Section 5.5 would apply during disturbance of the sampled material.

16. Some stakeholders expressed a desire to eliminate air monitoring requirements, or only require air monitoring using Phase Contrast Microscopy (PCM) analysis rather than Transmission Electron Microscopy (TEM) analysis. The primary route of exposure to asbestos fibers is inhalation, and because projects conducted under Section 5.5 are not performed in containment, the Division believes that air monitoring is necessary as a means to evaluate whether or not the work practices, including engineering controls, utilized during a RACS disturbance project are effective in controlling the presence of airborne asbestos. Further, in order to evaluate potential asbestos emissions, air monitoring must include TEM verification on at minimum subset of samples.

PCM is a low magnification (up to 400 times magnification) optical microscopic method used to distinguish fibrous material from non-fibrous material. PCM cannot distinguish asbestos fibers from other types of fibers, as the optical characteristics of a fiber cannot be determined. The PCM method is further limited by the fact that only fibers that have diameters >0.25 μm can be detected. Specific method protocols mandate that only fibers that are ≥5 μm in length and that have aspect ratios of ≥3:1 are counted. Therefore, short thin fibers are not detected using PCM.

TEM is a high magnification (approximately 20,000 times magnification) electron microscopic method used to detect and positively identify asbestos fibers. TEM allows for the analysis of the crystalline structure of asbestos minerals through electron diffraction, and the elemental composition of the asbestos mineral through energy dispersive X-ray analysis; thereby allowing positive identification of asbestos fibers.

The analytical resolution of TEM is generally 0.1 μm in width, as compared to the resolution for routine PCM of 0.25 μm. Therefore, short thin fibers that are not detected using PCM will be detected using TEM. In addition, fiber size distribution and mineralogy data can only be obtained using TEM. TEM provides a method for objective verification that work practices/engineering controls are effective in the prevention of airborne asbestos fibers escaping the RWA.

A screening approach using PCM, where all samples are analyzed by PCM and a subset of samples are confirmed by TEM, is a cost effective approach appropriate for

evaluating the effectiveness of work practices. Air sampling conducted for the purpose of risk assessment or exposure evaluation would require that all samples be analyzed by TEM. This approach is consistent with the current standard of practice for site characterization used by EPA.

17. Stakeholders requested that air monitoring requirements include a reduced frequency of TEM analysis for projects where engineering controls have been demonstrated to be effective based on initial air monitoring data. Stakeholder discussions resulted in a majority consensus that the frequency of TEM analysis may be reduced after five (5) days of RACS disturbance with no asbestos detections demonstrating the effectiveness of engineering controls/work practices. The reduced frequency of TEM analysis, from daily to once every five (5) days, results in an 80% reduction in samples analyzed by TEM, and the associated costs. However, daily TEM analysis must resume if asbestos is detected during the period of reduced TEM analysis, as this would indicate that the engineering controls/work practices are not effective in preventing asbestos fibers from leaving the RWA. Daily TEM analysis must also resume if there are changes in site conditions, friability of the material, or work practices. Additionally, any PCM analysis indicating a heavy concentration of fibrous material (>0.01 f/cc) would necessitate follow-up analysis by TEM.

18. Stakeholders requested that the Division provide clarification regarding the required response to detections of asbestos in air monitoring samples (analyzed by TEM), and when Division involvement is required. Discussions between the Division and stakeholders resulted in a majority consensus that the Division shall be notified of all asbestos detections by TEM, followed by the submission of an emissions control plan evaluating the reason for the detection and actions taken to prevent future releases. If there are three (3) consecutive asbestos detections or ten (10) detections in a single project, consultation with the Division is required to determine if standard requirements are being implemented appropriately and/or if additional controls are necessary. These requirements are detailed in the minimum requirements for air monitoring in Section 5.5.7.

19. Stakeholders requested clarification regarding the requirements for RACS left in place. The requirements for RACS left in place depend on whether RACS is being managed or remediated. Management of RACS under Section 5.5 does not trigger a requirement to characterize or remove all RACS; however, remaining RACS that has been exposed must be stabilized and/or covered. For RACS remediation projects, where the owner/operator seeks a "No Further Action" or "No Action Determination" from the Division, all RACS must be removed or an environmental covenant will be required if any RACS is left in place. The stabilization and cover requirements for RACS exposed during management also apply to RACS exposed during remediation that will not be removed.

The owner/operator has the option to demonstrate that material left in place is not RACS. This option applies to RACS management and remediation projects. For projects involving only RACS with ACM, where there is no documented evidence of asbestos fibers in soil or ash, visual verification by a CABI would be necessary to demonstrate that no RACS remains in place. For projects where there is documented

evidence of asbestos fibers in soil or ash, sampling would be required in addition to visual verification by a CABI.

20. Stakeholders requested clarification regarding the amount of material that requires management under Section 5.5. The definition of RACS includes the asbestos material plus six inches of surrounding soil or other non-asbestos material. Section 5.5.7 outlines procedures for exiting the requirements of Section 5.5 that include the removal of RACS and surrounding material. For example, hand removal of RACS includes the removal of the RACS plus six inches of surrounding material, resulting in the removal of the asbestos plus 12 inches of surrounding material. The procedures in Section 5.5.7 for removal of RACS and surrounding material replace the current Section 5.5.2(A) which provides a mechanism for soil containing only non-friable ACM to be considered non-asbestos contaminated if the non-friable ACM is removed from the soil prior to disturbance. The proposed Section 5.5.7 expands on the applicability of the procedure to all ACM, regardless of friability, allowing for removal of a "pocket" of RACS and surrounding material. After RACS removal and visual confirmation, if there is no independent documented evidence of the presence of non-visible asbestos, then the remaining material would not be RACS and not subject to Section 5.5.

21. Stakeholders have requested clarification regarding the applicability of Section 5.5 to site characterization. Section 5.5 applies to soil disturbing activities that involve debris that is subsequently determined to be RACS. There is no exemption for soil disturbance conducted during site characterization. Section 5.5.2 does include an exemption for de minimus projects involving the disturbance of less than one cubic yard of total RACS using low emissions methods; however, the decontamination and disposal requirements of Section 5.5 must still be followed. Section 5.5 applies in its entirety to all projects involving the disturbance of RACS greater than one cubic yard, including site characterization, management, and remediation.

22. Stakeholders posed numerous questions regarding 1) reuse of ACS and 2) reuse of soil generated at ACS sites from areas where the soil is not known to be ACS. The disposal requirements of Section 5.5 were expanded to provide clear criteria for reuse and disposal. Section 5.5.8 (previously Section 5.5.7) includes criteria for reuse of RACS within the footprint of the area of concern (AOC) from which it was generated, and reuse outside the AOC, either onsite or offsite, by submitting a plan for beneficial reuse. Any plan for offsite reuse of RACS must be approved by the owner of the property where RACS is proposed for reuse. Section 5.5.8 includes minimum cover requirements for RACS reuse and may also require an environmental covenant to be placed on the property for areas where RACS is reused.

    Section 5.5.8 includes a provision that soil that remains onsite after RACS removal (in accordance with the minimum requirements in Section 5.5.7) is not considered RACS and may be appropriate for onsite and offsite use if it does not contain any other regulated material.

23. There were questions raised during the stakeholder process whether detections of asbestos fibers (by TEM analysis) indicate potential exposures of concern to individuals occupying homes or other structures adjacent to (within 150 feet) an area of RACS disturbance. Based on risk based exposure scenarios developed by the risk assessment

work group during the stakeholder process, infrequent, short duration, and low concentration fiber releases correlate to a relatively low risk of exposure to asbestos. Although it is not possible to fully evaluate potential exposure risks without conducting a site specific risk assessment, it is reasonable to correlate frequent asbestos fiber releases, high concentration fiber releases, or extended periods of fiber release to an increased risk of exposure to asbestos. The elevated exposure risk is the basis for the requirement in Section 5.5.7 for consultation with the Division if there are three (3) consecutive asbestos detections or ten (10) detections in a single project.

24. Some stakeholders expressed concerns regarding costs associated with having a CABI onsite during soil disturbance at sites with a potential for ACM to be encountered, or at sites where debris had been encountered, but where no ACM had been encountered. Stakeholders further suggested that some tasks that have been traditionally conducted by CABIs do not require asbestos inspector training and thus could be performed by other qualified individuals. Discussions between the Division and stakeholders resulted in a majority consensus to establish a new position called a "Qualified Project Monitor" (QPM). QPMs must meet specific training and experience requirements and have the authority to make prompt decisions related to the management of materials suspected of containing asbestos. A QPM shall not perform tasks specifically required to be conducted by a CABI, such as inspection and identification of RACS, sample collection, or visual clearance, unless the QPM is also a CABI. However, after removal of RACS in accordance with Section 5.5.7, and in the absence of debris, a QPM may make a determination that RACS has been removed and the remaining material is not subject to Section 5.5. If a QPM is performing the duties of a CABI, the QPM must be independent of the general contractor, as required by Section 5.5.3(D). Any individual that meets the training and experience requirements for a QPM (Section 5.5.3(C)) and has the authority to make required decisions may perform the duties of a QPM.

25. Stakeholders requested clarification of the term "low emission methods" used in the exemption for de minimis projects. A proposed definition for this term was added to Section 1.2, which states "low emissions methods" means soil disturbing activities that will not result in visible emissions without the use of wet methods." Examples of low emissions methods include careful hand removal, slow and controlled mechanical removal, and use of direct push drilling methods.

26. Stakeholders requested clarification regarding what constitutes an emergency under Section 5.5.4, allowing disturbance of RACS without fully complying with the minimum requirements of Section 5.5.7. Section 1.2 defines "Emergency" as "an unexpected situation or sudden occurrence of a serious and urgent nature that demands immediate action and that constitutes a threat to life or health, or that may cause major damage to property.

27. Stakeholders requested clarification regarding the applicability of Section 5.5 to bulk materials with asbestos content less than 1% (i.e., non-ACM). The proposed definition of RACS in Section 1.2, is "soil, ash or debris containing ACM, and soil or ash known to contain non-visible asbestos based on documented evidence." Soil, ash or debris that contains only non-ACM bulk material is not RACS, and therefore not subject to Section 5.5. However, non-ACM bulk material is solid waste subject to the disposal requirements of the Regulations.

28. Stakeholders requested the Division include a grandfather clause to allow SCMPs and SOPs that were approved under the current regulation to be used to comply with the proposed regulation. The Division has added language to Section 5.5.5 that would allow a SCMP or SOP "approved prior to the effective date of the amended regulation, and that complies with the substantive requirements of the regulation prior to amendment" to remain in effect. The Division included "that complies with the substantive requirements of the regulation prior to amendment" to address plans that may have included a one-time variance from Section 5.5 requirements, or that were subsequently determined not to comply with Section 5.5. The Division does not intend to review all existing approved plans to determine compliance with the current version of Section 5.5.

29. Stakeholders requested clarification regarding the applicability of the covenant requirements of § 25-15-320, C.R.S. to RACS or Non-RACS left in place. Under § 25-15-320, C.R.S., an environmental covenant, or notice of environmental use restriction, is required when the Department makes a remedial decision at a remediation project that results in residual contamination that is not protective of all uses, or that incorporates an engineered structure. Projects conducted under the Voluntary Cleanup Program (VCUP) are not subject to the requirements of § 25-15-320, C.R.S. Section 5.5 does not change the applicability of § 25-15-320, C.R.S.

30. Stakeholders requested clarification regarding the requirement in Section 5.5.1(B)(7) to retain onsite, or make available for inspection, records of RACS vs. Non-RACS determinations. Field notes documenting in-field determinations are considered records. If samples are collected to make RACS determinations, the analytical reports are also records that must be retained and made available for inspection.

31. Some stakeholders raised an issue about including the term "minimize" in several areas of the regulation. The majority of the stakeholders requested that the language in the regulation be as specific as possible. In addition, several stakeholders requested that the Division not regulate through guidance as previously discussed. The Division has included the term "minimize" when referring to visible emissions within the RWA. This was intentionally done to allow some minimal visible emissions when RACS material was initially being managed. However, the Division disagrees with the use of "minimize" in other areas of the regulation, without specific performance criteria, because of the subjective nature of this term.

If the Division utilized the term "minimize" it would have to require specific criteria in the Regulation or in approved plans. The specific criteria may include the establishment of a baseline and/or allowable safe conditions, measurement of deviation from the baseline/safe conditions, evaluations of the effectiveness of efforts to return to baseline/safe conditions, evaluation of additional activities and efforts that may be used to return to baseline/safe conditions.

32. A few stakeholders raised the hypothetical fact pattern of a trespasser disturbing soil which uncovers asbestos or ACM. Stakeholders requested clarification regarding who would be held responsible for compliance with Section 5.5. If the trespasser is known and viable, the Division would follow its Enforcement Response Policy and require the trespasser abate any public health threats. In addition, 5.5.1(A) specifically assigns

liability to "Any person who disturbs debris or exposes debris during a soil disturbing activity…" If the trespasser is unknown or unable to perform remediation, the Division would require the property owner and/or operator to abate the health threat as efficiently as possible. If the property owner and operator did not cooperate in abating the public nuisance, the Division would follow the "Solid Waste Enforcement Response Policy." Each trespasser situation is unique and the Division's response will be calibrated to the facts.

**Alternatives Considered and Why Rejected**

Various alternatives were considered and discussed with the stakeholders. The Division considered alternatives in both Section 1.2 definitions and Section 5.5 regulatory requirements.

Based on initial stakeholder requests, two alternatives evaluated were the development of a BMP approach and a risk evaluation process. Development of the BMP approach resulted in the establishment of minimum requirements necessary for proper management of asbestos-contaminated soil. Therefore, the BMP approach became the standard requirements included in Section 5.5.7. The risk assessment work group evaluated exposure scenarios and toxicity values and developed a methodology for evaluating risk. The risk assessment approach remains available under the proposed regulations. However, the majority of the stakeholders agreed that, implementation of the risk approach was determined to be costly and time consuming due to the amount of sampling and analysis that would be required. In addition, the results from the risk assessment approach would provide only a limited ability to reduce the engineering controls required under the proposed Section 5.5. Further, including detailed requirements for the risk approach within the proposed regulation would reduce flexibility and limit the ability to incorporate evolving research and science related to asbestos-contaminated soil. During the development of the risk evaluation process, the majority of the stakeholders and the Division concluded that detailed requirements for the risk-based approach did not fit well into a regulatory framework, and would be best addressed through guidance to allow for site specific considerations.

Other alternatives considered include:

1. Do nothing - This alternative would result in the current Section 5.5 remaining in effect. This alternative was not acceptable to stakeholders seeking relief from existing requirements of Section 5.5. This alternative was also not acceptable to stakeholders and the Division because it would not provide the additional specificity that stakeholders were seeking. In addition, the Division wanted to address the fact that some stakeholders felt they were being regulated through guidance by providing additional specificity in the regulations.

2. City and County of Denver (CCOD) proposal - An alternative BMP matrix was proposed by CCOD that would establish a pick-list of controls and management practices to be chosen by the owner/operator during disturbance of ACS. The alternative BMP matrix would also allow an owner/operator to increase or decrease ("trigger up/trigger down") the level of controls based on conditions encountered. The Division met with CCOD on several occasions in an attempt to further develop the alternate BMP matrix. Additionally, the alternate BMP matrix was presented to the larger stakeholder group. The alternative BMP matrix was ultimately rejected by the Division and the larger stakeholder group due to the following:

a) The alternative BMP matrix lacked the specificity and clarity to be implementable or enforceable.
b) Under the alternative BMP matrix, the requirements for proper management of ACS are at the discretion of the owner/operator, and therefore the Division would have no ability to ensure the proper management of ACS.
c) Under the alternative BMP matrix, compliance with the BMPs is determined by self auditing rather than through independent oversight or monitoring. Therefore, short of direct Division oversight, there would be no mechanism to ensure compliance with the regulations.
d) The alternative BMP matrix included either no air monitoring or monitoring only by PCM, which does not distinguish asbestos fibers from other fibers. Therefore, there would be no mechanism to positively determine if asbestos fibers were being released from the RWA. In addition, the response criteria in the alternate matrix would allow a substantial amount of fiber release episodes prior to any action being taken. The Division felt that a system of checks and balances including the positive identification of asbestos fibers through the use of TEM analysis should be required to demonstrate that projects operating under the regulation were utilizing the correct engineering controls and are being protective of public health.
e) The alternative BMP matrix was presented in a manner that created an "illusion of choice" rather than accurately reflecting the stepwise process necessary to properly manage ACS. Therefore the matrix would not be easily implementable in the field, and would likely lead to improper management of ACS.
f) The "trigger up/trigger down" provisions of the alternative BMP matrix assumes that BMPs are being properly implemented and are working as intended, and that the necessary controls are always in place. To the contrary, problems encountered during ACS management often center around improper or insufficient implementation of work practices or inadequate controls in place.
g) The alternative BMP matrix "trigger up/trigger down" thresholds were not explicitly provided. Again, this would lead to problems with implementation and enforcement of the matrix.
h) The alternative BMP matrix functioned as a pick-list rather than a decision matrix, and did not include all available management options that had been discussed in the larger BMP workgroup.
i) The alternative BMP matrix was a significant departure from previous stakeholder input on BMPs. The larger stakeholder group preferred the BMP approach developed by the BMP workgroup because it was more straight forward and implementable, and reflected broad stakeholder consensus.

3. <u>Rescind existing regulation</u> - This alterative was proposed by a few stakeholders, but was rejected by the Division based on the evaluation of alternatives made prior to the promulgation of Section 5.5 by the Board of Health in 2006. Prior to the promulgation of Section 5.5, asbestos contaminated soil was not specifically addressed by regulations. The Division addressed the need to protect public health at asbestos contaminated properties on a case-by-case basis under other existing regulations and statutes. This resulted in a very inefficient, cumbersome, expensive, and time consuming enforcement process. A second alternative considered prior to the promulgation of Section 5.5 was to include regulation of ACS within Air Quality Control Commission Regulation No. 8. Regulation No. 8 primarily covers abatement of asbestos materials used in structures.

The Division, in consultation with the Air Pollution Control Division, decided that the Solid Waste Regulations were a more appropriate location for the regulation of ACS because 1) the Division is very familiar with soil cleanups and remediation generally, and 2) ACS are soils containing solid waste and management of the soils is dissimilar from normal asbestos abatement performed in/on buildings or intact underground utility structures.

4. Use of a 1% asbestos threshold – A few stakeholders requested that the Division regulate only ACM and/or soil containing greater than 1% asbestos. This alternative was previously evaluated during the 2006 rule-making prior to promulgation of the current regulation by the Board of Health. This alternative was rejected both in 2006 and during the current rulemaking process because of the following:

The relationship between the concentrations of asbestos fibers in soil and the concentration of asbestos fibers released into the air is complex. The most critical factor in determining the level of airborne concentrations is the degree of mechanical disruption. Therefore, asbestos concentrations in air cannot be used to predict concentrations of asbestos in soil or vice-versa. Although the acceptable risk-based air concentration value, based on the USEPA Integrated Risk Information System (IRIS) cancer slope factor, is 0.000004 fibers/cc [at a risk level of 1E-06 (1 in a million)][11], the concentration of asbestos in soil corresponding to 0.000004 fibers/cc in air is not known at this time. However, it has been demonstrated that asbestos content as low as 0.001 % in soil can generate airborne respirable asbestos concentrations greater than 0.1 fiber/mL (0.1 fiber/cc), thus exceeding the OSHA Permissible Exposure Limit (PEL) (Addison et al., 1988).

The Division believes that disturbance of soil with asbestos contamination at levels less than 1% could present unacceptable risks to public. This determination is primarily based on the following evidence:

1) EPA OSWER Directive 9345.4-05 (EPA, 2004) which states, "Recent data from the Libby site and other sites provide evidence that soil/debris containing significantly less than 1 percent asbestos can release unacceptable air concentrations of all types of asbestos fibers (i.e., serpentine/chrysotile and amphibole/tremolite)."

2) Findings from several studies demonstrate the presence of a complete exposure pathway and/or the generation of airborne fibers at unacceptable levels of risk, from trace levels (i.e., less than 1%) of asbestos in soil, where there is enough activity to stir up soil and cause asbestos fibers to become airborne. As noted in examples given below:

   - Simulated Asbestos Release In Glove – Box Experiments – "Mixtures of asbestos in dry soils with asbestos content as low as 0.001% can produce airborne respirable asbestos concentrations greater than 0.1 fiber/mL…"[12]
   - Simulated Asbestos Release In Activity-Based Personal Monitoring –

[11] EPA (1988). Integrated Risk Information System (IRIS) file for Asbestos (0371). Available at www.epa.gov/IRIS.

[12] Addison et al., 1988; *The Release of Disturbed Asbestos Fibers from Soil. IOM (Edinburgh) Report TM/88/14.*

> Elevated levels of asbestos at 0.066 fibers/cc were observed during rototilling a garden in Libby which contained less than 1% asbestos (EPA, December 2001; Dr.Weis Memo[13]).

Copies of these documents can be found with the Solid and Hazardous Waste Commission in the administrative record for this rulemaking.

Therefore, based on current risk information regarding asbestos, there is no known safe level of airborne asbestos. This makes establishing a concentration of asbestos in soil, which would result in an acceptable concentration of airborne asbestos, very difficult. Therefore, the Division chose to take an approach that requires proper management of soil contaminated with asbestos only if it is disturbed. The alternative to the Division's approach is one that requires a costly and time consuming program of sampling, analysis, and risk assessment to determine a concentration of asbestos in soil that would result in an acceptable risk-based concentration of airborne asbestos if the soil were disturbed. The Division believes its approach is less burdensome and more straight-forward, particularly at sites with small amounts of asbestos where the cost of sampling, analysis, and risk assessment would likely far exceed the cost of controls that need to be put in place without conducting a risk assessment, and that would likely have to be implemented after the risk assessment is complete.

Neither the current nor the proposed revision to Section 5.5 include a threshold concentration of asbestos in soil or requirements to sample or otherwise characterize the amount or distribution of asbestos in soil. Further, there are no requirements in the proposed regulations to remove or remediate soil contaminated with asbestos. Rather, the regulations require proper management if soil contaminated with asbestos is disturbed. The Division chose the current regulatory approach partly because of the problems inherent in sampling and analysis of asbestos in soil. The Division believes that requiring sampling and analysis, followed by a risk assessment to determine the concentration in soil that could be handled without appropriate controls, is more burdensome than requiring proper management of soil contaminated with asbestos during disturbance.

Risk assessments can be conducted on a site-specific basis; however, this process can be expensive and time-consuming, and therefore may not be appropriate for many projects, especially those of limited scope, those under tight budgets, and those with short development timetables. Due to the burdensome nature of conducting risk assessments, the Division does not believe that it is appropriate to require that a risk assessment be conducted at every site with soil contaminated with asbestos. The Division believes that the chosen approach of requiring proper management of soil contaminated with asbestos, if it is disturbed, is the most efficient and cost effective for most sites.

---

[13] EPA (December 2001), Weis Memo to Paul Peronard: Re: "Amphibole Mineral Fibers in Source Materials in Residential and Commercial Areas of Libby Pose Imminent and Substantial Endangerment to Public Health." Libby Site, Montana. USEPA Region 8; December 20, 2001.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

**6 CCR 1007-2**

## REGULATORY ANALYSIS

for

**Proposed Amendments to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part I), Section 5.5, Management of Asbestos-Contaminated Soil, and Section 1.2, Definitions**

**1. A description of the classes of persons who will be affected by the proposed rule, including classes that will bear the costs of the proposed rule and classes that will benefit from the proposed rule.**

The proposed revisions to Section 5.5 affect entities that disturb asbestos-contaminated soil, including property owners, asbestos abatement contractors, builders/developers, construction contractors, environmental consultants, federal agencies and facilities, utility companies and contractors, local health departments, and state agencies and facilities involved in property redevelopment or construction. These entities would bear the cost of compliance with the requirements for proper management of asbestos-contaminated soil; however, it is anticipated that the proposed revisions will result in cost savings when compared to existing requirements. The Division believes the proposed revisions: a) protect public health and environment while providing relief, where possible, from existing requirements; b) establish a streamlined, straight forward approach to management of asbestos-contaminated soil; and c) clarify ambiguities in the existing regulations.

**2. To the extent practicable, a description of the probable quantitative and qualitative impact of the proposed rule, economic or otherwise, upon affected classes of persons.**

The proposed revisions to Sections 5.5 clarify management techniques to be employed whenever asbestos-contaminated soil is disturbed. These techniques include asbestos sampling, air monitoring, emissions control, access control, equipment decontamination, and proper disposal of soil and contaminants. Each of these requirements, when

appropriately implemented, has a monetary cost that is borne by affected entities. The existing Section 5.5 already requires these measures; therefore, there are no added costs anticipated due to the proposed revisions. Instead, the proposed revisions include relief from some of the existing requirements, resulting in anticipated cost reductions. These reductions are discussed in detail in the Cost Benefit Analysis. The beneficial impacts of the rules include ensuring appropriate management of asbestos-contaminated soil and exposures to the public at sites where asbestos-contaminated soil is disturbed.

**3. The probable costs to the agency and to any other agency of the implementation and enforcement of the proposed rule and any anticipated effect on state revenues.**

The revisions to the existing Section 5.5 have no added costs to this agency and no other agencies should be affected. In addition, there should be no effect on state revenues.

**4. A comparison of the probable costs and benefits of the proposed rule to the probable costs and benefits of inaction.**

For the proposed revisions to Section 5.5, inaction would continue the *status quo*; sites where asbestos-contaminated soil is disturbed would continue to be subject to the current regulations. The proposed revisions include relief from some of the existing requirements, which are anticipated to reduce costs. A Cost Benefit Analysis (CBA) was prepared as part of this rulemaking process. The CBA presents: 1) major cost drivers in the current Section 5.5 regulations, 2) the proposed revised Section 5.5 regulations, and 3) an estimated cost differential between current and proposed regulations. The regulatory areas evaluated in the CBA include the impact of: 1) changing the definition of "adequately wet," 2) changing the definition of "asbestos contaminated soil," 3) changing the applicability of the regulations, 4) changing the air monitoring requirements, 5) changing the material characterization parameters for disposal at a landfill, 6) changing the material reuse options, and 7) including minimum requirements in the regulations that function as a default plan. Promulgation of the proposed revisions is expected to benefit affected entities through cost savings in the categories identified in the CBA.

**5. A determination of whether there are less costly methods or less intrusive methods for achieving the purpose of the proposed rule.**

The revisions to the existing Section 5.5 are the result of stakeholder requests to revisit the current regulatory requirements. The revisions include several areas of relief that are anticipated to result in cost savings, while at the same time protecting public health and the environment. The modifications included in the CBA described in #4 above indicate anticipated cost savings in each of the seven categories identified in the CBA. The Division believes there are no less costly or less intrusive methods for achieving the purpose of the proposed revisions.

6. **A description of any alternative methods for achieving the purpose of the proposed rule that were seriously considered by the agency and the reasons why they were rejected in favor of the proposed rule.**

At the request of stakeholders, the Division considered adding Best Management Practices (BMPs) and a risk-based approach to the existing approaches for managing asbestos-contaminated soil. As the risk-based approach was further evaluated, stakeholders and the Division agreed that the risk-based approach did not fit into a regulatory framework, and instead would be best addressed through guidance to allow for site specific considerations. A stakeholder work group was convened to draft BMPs, which addressed various aspects of asbestos-contaminated soil management. The resulting BMPs established the minimum requirements necessary for proper management of asbestos-contaminated soil; therefore, the Division and stakeholders agreed that the BMPs should become minimum requirements under Section 5.5. These minimum requirements: a) eliminate the requirement for a work plan to be submitted; b) provide an immediately implementable work plan; c) eliminate the time and cost associated with Division review of work plans; d) expedite project implementation; e) the minimum requirements provide a predictable framework for developing and implementing work plans. The Regulations also afford the opportunity for site specific work plans.

7. **To the extent practicable, a quantification of the data used in the analysis; the analysis must take into account both short-term and long-term consequences.**

The Division used stakeholder input, experience, and information gained through the implementation of the current Section 5.5 at a variety of sites across the State in the analysis of the proposed revisions. In addition, the Asbestos Program within the Air Pollution Control Division was consulted. The short and long term consequences of the proposed revisions are: a) maintaining protection of public health; b) continued safe management and appropriate disposal of asbestos-contaminated soil; and c) anticipated decreases in costs to affected entities for management and removal of asbestos-contaminated soil.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission/Hazardous Materials and Waste Management Division

### 6 CCR 1007-2

**Cost Benefits Inputs, Assumptions, Evaluation, and Cost Differential:**

Section 5.5 of the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1; Regulations) was promulgated in 2006. The stakeholder process for the proposed revisions to Section 5.5 started on October 5, 2011. During the initial meeting a couple of the stakeholders requested the Division perform a cost benefit analysis. Further, a couple of stakeholders further requested the cost benefit analysis compare the cost of implementing a construction project not subject to Section 5.5 of the regulations to a similar construction project subject to the proposed Section 5.5 of the regulations. In response, the Division indicated that the requested cost benefit was part of the 2006 rulemaking process and not part of the current regulatory revision process. The Division agreed to perform a cost benefit analysis between the current and proposed Section 5.5 Regulations.

The following table presents: 1) major cost drivers in the current Section 5.5 regulations, 2) the proposed revised Section 5.5 regulations, and 3) an estimated cost differential between current and proposed regulations. The regulatory areas evaluated in this cost benefit analysis include the impact of: 1) changing the definition of "adequately wet," 2) changing the definition of "asbestos contaminated soil," 3) changing the applicability of the regulations, 4) changing the air monitoring requirements, 5) changing the material characterization parameters for disposal at a landfill, 6) changing the material reuse options, and 7) including minimum requirements in the regulations that function as a default plan . The Division recognizes that the current Section 5.5 increased the cost of construction projects that were not previously subject to Section 5.5 requirements. The Division is proposing to modify the existing regulations based on experience gained from implementing the regulations over the last seven years. The modifications included in this cost benefit analysis resulted in cost savings in each of the seven categories identified above. The Division recognizes that individual project costs will vary depending on a variety of factors and negotiated prices. This evaluation used representative project related costs.

| Current Regulation | Proposed Regulation | Cost Differential |
|---|---|---|
| **Adequately wet** | **Adequately wet** | **Cost Differential** |
| "**Adequately wet**" means sufficiently mix or penetrate with liquid to completely prevent the release of particulate material and fibers into the ambient air. If visible emissions are observed coming from asbestos-contaminated soil or asbestos-containing material, then the material has not been adequately wetted. However, the absence of visible emissions is not sufficient evidence of being adequately wet. | "Adequately wet" means sufficiently wet to minimize or eliminate visible emissions of dust and/or debris within the regulated work area and prevent the release of visible emissions from leaving the Regulated Work Area (RWA). The observance of visible emissions, outside of the RWA regulated work area, of dust and/or debris is an indication that soils are not adequately wet.<br><br>The proposed regulations are predicated on controlling the risk of inhaling asbestos fibers and confining emissions to the RWA, work based on active field observations, resulting in a reduction in water usage. | Estimated Cost Differential:<br>The amount of water used per project varies depending on the type of soil, solid waste, and other environmental and site specific conditions. These variables and factors make the amount of water used per project difficult to predict. The proposed regulations are expected to reduce cost by: 1) reducing staff time dedicated to "mixing and penetrating" activities, 2) limiting overwatering which increased the weight and cost of the material being disposed, and 3) reducing the amount of water required per project. The water cost savings is estimated at $0.15/yd^3$. |
| "**Asbestos-contaminated soil**" means soil containing any amount of asbestos. | "Regulated Asbestos Contaminated Soil" ("RACS")" means soil, ash or debris (plus 6 inches in all directions of surrounding soil or other matrix material):<br><br>The proposed regulations are based on managing the potential risk from inhaling asbestos fibers in contrast to managing soil with "any amount of asbestos." The proposed RACS approach has several key advantages as follows: 1) RACS focuses on materials that have a high potential to release fibers, such as: friable asbestos materials, non-friable asbestos containing materials that have a high propensity to release fibers, and handling | "Estimated Cost Differential:<br>The proposed regulations are expected to reduce the amount of time and costs for each of the items listed below:<br>1) Cost savings per day of CABI on site: $55/hr;<br>2) Time savings by allowing removal of RACS and continuation of the project not subject to Section 5.5; This proposed change will reduce costs by not requiring all associated management and air monitoring costs identified below;<br>3) RACS removal with surrounding soil eliminates sampling. Cost of |

| | | |
|---|---|---|
| | practices that could cause nonfriable materials to release fibers, 2) the proposed approach utilizes Certified Asbestos Building Inspector's (CABI's) training, experience, and professional judgment to make in-field/real-time determinations of material type and condition, 3) the proposed approach will also allow the visual removal of RACS, with the surrounding soil, and the remaining soils will not be subject to Section 5.5, until such time that more RACS is encountered, and 4) the proposed regulations includes an exemption for non-friable asbestos containing materials that do not have a high propensity to release fibers. | sampling: \$12 - \$15/PLM<br>4) RACS removal with surrounding soil reduces disposal of RACS will reduce disposal cost: Est. \$300/yd³ (100yds), \$75/yd³ (100-1,000yds), \$65/yd³ (1,000+ yd³)<br>5) While difficult to quantify due to the site specific variability in the type of ACM managed during projects, the revised regulations will not require management under Section 5.5 of non-friable materials that do not have a high propensity to release fibers. |
| **Applicability** | **Applicability** | **Cost Differential** |
| The requirements apply to property with asbestos-contaminated soil at which soil-disturbing activities are occurring or planned for any area containing asbestos-contaminated soil. The requirements are triggered when the owner or operator has reason to know of asbestos-contaminated soil at a site or observed material that is suspected of containing asbestos, or has reason to believe that visible asbestos may be encountered. This approach is predicated on a reason to believe and may cause the implementation of Section 5.5 requirements when no asbestos contaminated soil is known to be present. | If debris is disturbed or encountered during soil disturbance, a Qualified Project Monitor (QPM) must observe soil disturbing activities and determine if suspect asbestos containing material is encountered. Currently many of the Section 5.5 soil management plans require the use of a CABI when solid waste is encountered. The proposed regulations recognizes that many solid wastes do not include asbestos containing material, asbestos materials that have a propensity to release asbestos fibers, or involve handling practices that will release asbestos fibers. The proposed approach will allow the use of a QPM and reduce the number of days and hours that a CABI is required to be onsite. The proposed approach is based on visual observations identifying when suspect asbestos containing material is encountered. | The proposed regulations are expected to reduce the number of days that a project is subject to the Section 5.5 regulatory requirements. Each day of not being subject to Section 5.5 may reduce project costs, not including disposal costs, as identified below:<br>1) CABI: \$55/hr or \$440/day;<br>2) Air Monitoring: \$830/day;<br>3) Elimination of asbestos contaminated soil management and disposal costs ranging from \$60/yd³ to \$350/yd³. ; and<br>4) Elimination of watering unregulated soils is approximately \$0.15/yd³<br>5) More reuse of soils reduces costs as depicted below. |

| | | |
|---|---|---|
| | Therefore, the owners/operators do not have to prematurely implement the Section 5.5 requirements. Since the regulations are applicable upon the disturbance or observation of suspect asbestos containing material, they will still minimize the release of asbestos fibers and remain protective of human health and the environment. | |
| **Air Monitoring** | **Air Monitoring** | **Cost Differential** |
| An air monitoring plan is required that demonstrates dust-control measures to ensure the safety of people in and around the work area and prevent release of asbestos fibers outside the work area. The air monitoring plan shall include a contingency plan for immediate work stoppage, or modification of dust control measures, in the event that approved measured or visible dust limits, as defined in the air monitoring plan, are exceeded in or around the work area. The typical asbestos contaminated soil management plan includes, on a daily basis: 4 ordinal samples, 2 area equivalent on-personnel samples and 2 downwind floaters samples collected and analyzed via PCM. Follow up TEM analysis of the two highest PCM samples is also typical. | Air monitoring is required to verify the effectiveness of the engineering controls and ensure they are minimizing the release of, and/or exposure to, asbestos outside of the RWA. The regulations incorporate a tiered air monitoring approach providing less frequent air monitoring given demonstrated effectiveness of work practices. The regulations include work practices specific to mechanical and/or hand disturbance of RACS including measures to prevent the release of visible emissions outside of the RWA. The air monitoring requirements are progressive depending on the method of disturbance, friability of material, and presence of receptors. Air monitoring is not required for hand disturbance of RACS, and air monitoring is not required for RACS projects of two days or shorter duration. This is allowed because the analytical results will not be received in time to affect changes in engineering controls. | The proposed regulations incorporate several key changes to the air monitoring requirements as follows:<br>1) Projects of 2 days or fewer require no air monitoring: Cost savings based against the current regulations is approximately $1,660.<br>2) Projects with a 150' buffer (i.e., no adjacent receptors) require no air monitoring: Cost savings based against the current regulations is approximately $4,150/every 5 days.<br>3) Single and Multiday non-friable and friable projects will have an estimated cost savings from reduced TEM and PCM samples/analysis, of $155/day ($775/5 day) and $40/day ($200/5 day) respectively.<br>The cost estimates for current, proposed non-friable, proposed friable single, less than 5 day, and greater than 5 day are provided below |

**Current Regulations**

| # | Activity | Cost | | Tot | |
|---|---|---|---|---|---|
| 8 | PCM | $ | 20 | $ | 160 |
| 2 | TEM (+/-) | $ | 75 | $ | 150 |
| 8 | AMS - Hrs | $ | 65 | $ | 520 |
| | | Per Day | | $ | 830 |

**Current**

| # | Activity | Cost | | Tot | |
|---|---|---|---|---|---|
| 40 | PCM | $ | 20 | $ | 800 |
| 10 | TEM (+/-) | $ | 75 | $ | 750 |
| 40 | AMS - Hrs | $ | 65 | $ | 2,600 |
| | | 5 Day | | $ | 4,150 |

**Disposal Cost:**

The current regulations list the requirements for the disposal of ACS under three categories: 1) ACS with visible non-friable asbestos, 2) ACS with visible friable asbestos, and 3) ACS with no visible asbestos. Currently, Section 5.5 requires disposal of ACS with *any* amount of friable ACM as friable asbestos waste. This results in an entire load being disposed of as friable asbestos waste due to the presence of a small amount of friable ACM.

**Proposed Non-Friable <5 Day**

| Activity | | Cost | | Tot | |
|---|---|---|---|---|---|
| 4 | PCM | $ | 20 | $ | 80 |
| 1 | TEM (+/-) | $ | 75 | $ | 75 |
| 8 | AMS - Hrs | $ | 65 | $ | 520 |
| | | Per Day | | $ | 675 |

**Proposed Non-Friable > 5 Day**

| Activity | | Cost | | Tot | |
|---|---|---|---|---|---|
| 20 | PCM | $ | 20 | $ | 400 |
| 5 | TEM (+/-) | $ | 75 | $ | 375 |
| 40 | AMS - Hrs | $ | 65 | $ | 2,600 |
| | | 5 Day | | $ | 3,375 |

**Disposal Cost:**

The proposed regulations approach the issue of disposal on a per load basis. If a volume of debris contains less than 1% of friable ACM per load, based on visual estimation through continuous inspection, and the debris is all assumed to be RACS, then a CABI is not required to make a friable ACM determination. This provision is based on the premise that soil is the primary matrix and the debris and/or RACS is only a portion of the total load being managed or disposed. This approach will still remain protective because: 1) landfills will be notified of the material content and source, 2) landfill employees are trained to manage these materials in a safe manner, 3) the landfill is a permitted, controlled and managed disposal setting, 4) general public is prevented from co-disposing of materials at landfills, and 5) the materials will be buried in a timely manner.

**Proposed Friable < 5 Day**

| Activity | | Cost | | Tot | |
|---|---|---|---|---|---|
| 6 | PCM | $ | 20 | $ | 120 |
| 2 | TEM (+/-) | $ | 75 | $ | 150 |
| 8 | AMS - Hrs | $ | 65 | $ | 520 |
| | | Per Day | | $ | 790 |

**Proposed Friable > 5 Day**

| Activity | | Cost | | Tot | |
|---|---|---|---|---|---|
| 30 | PCM | $ | 20 | $ | 600 |
| 10 | TEM (+/-) | $ | 75 | $ | 750 |
| 40 | AMS - Hrs | $ | 65 | $ | 2,600 |
| | | 5 Day | | $ | 3,950 |

**Cost Differential**

The proposed regulations may have an estimated reduced disposal cost as follows :

1) Less material will require disposal as friable asbestos waste. This will allow for disposal of RACS and surrounding matrix at more and closer landfills.
2) Reduced hauling costs: $100/hour
3) Reduced liner costs: $100-$200/ liner. RACS requires 1 liner versus material disposed of as friable asbestos waste. Cost saving of staff not watching the loading and lining activities $65/hr.
4) Less material subject to Section 5.5 with potentially avoided excavation, loading, hauling, and disposal combined costs ranging from $60/yd^3$ to $350/yd^3$.

| | | |
|---|---|---|
| **Material Reuse:** | **Material Reuse:** | **Cost Differential:** |
| Section 5.5.7 states " (D) Soils that are not asbestos-contaminated, based on analysis showing no detectable amounts of asbestos, may be replaced into the disturbed area as needed, used as fill, or disposed as solid waste." Therefore, even the onsite reuse of soil requires sampling. | The proposed regulations allow the reuse of materials on-site under the following constructs:<br>1) Onsite reuse of RACS within the originally impacted area with appropriate cover and environmental covenant;<br>2) Beneficial use of RACS outside of the originally impacted area may be approved by the Department pending approval of a beneficial use plan, appropriate cover and environmental covenant;<br>3) RACS soils that are clean of ACM and subsequently verified clean via visual inspection and sampling may be reused without restriction.<br><br>These approaches recognize the potential geotechnically sound properties of RACS impacted soils as fill materials with specific restrictions and criteria including covers, environmental covenants and an evaluation of the beneficial merits of RACS impacted soils while still being protective. | Estimated Cost:<br>The proposed regulations may reduce the cost of asbestos contaminated soil projects by:<br>1) Reducing or eliminating the need to transport contaminated soil for disposal; Haul truck approx $100/hr<br>2) Reducing or eliminating the disposal cost of contaminated soil estimated at between $65.00 - $300.00 per cubic yard for non-friable RACS;<br>3) Reducing or eliminating the cost of sampling soil for "clean verification": Cost Approx. $12 - $15 /sample and<br>4) Reducing or eliminating the cost of clean fill material; |
| **Plan Development** | **Plan Development** | **Estimated Cost** |
| The current regulations do not contain a default plan. Therefore owners and operators must develop SOPs or a site specific plan prior to commencing soil disturbing activities with or suspected to contain asbestos contaminated soil. The current regulations contain regulatory requirements, but not guidance on | The proposed regulations include minimum requirements that serve as a default plan. Facilities may elect to follow the default requirements and go directly to project implementation following notification, without waiting for Department review or approval. In addition, the proposed regulations allow for the development of standard operating | Estimated cost saving for eliminating plan development is approximately $2,000 to $4,000. |

| | | |
|---|---|---|
| developing a plan. Although, the Department, in conjunction with stakeholders, developed the guidance document to support the current regulations, the regulated community has alleged that the Department was regulating their projects via fiat through the guidance. Therefore, the regulated community and stakeholders requested that the Department develop directly implementable regulatory requirements. | procedures and a site specific management plan.<br><br>The minimum requirements that serve as a default plan were developed with stakeholder input as means to expedite the implementation of RACS projects. The minimum requirements: 1) eliminate the requirement for a plan to be developed and submitted for Division review and approval; 2) provide an immediately implementable plan; 3) eliminate the time and cost associated with Division review of plans; 4) expedite project implementation; 5) the minimum requirements provide a predictable framework for developing and implementing site specific management plans. The minimum requirements eliminate regulating via guidance: and are deemed to be protective of potential receptors. | |

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

**6 CCR 1007-2**

**STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR**

Addition to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) –Section 1.7.6 (Waste Tire Fee)

**(Adopted by the Solid and Hazardous Waste Commission on August 19, 2014)**

**Basis and Purpose**

I. Statutory Authority – House Bill 14-1352

The addition of 6 CCR 1007-2, section 1.7.6: Waste Tire Fee, is made pursuant to the authority granted to the Solid and Hazardous Waste Commission in section 30-20-1403, C.R.S. These regulations are a direct result of, and implement the requirements of, House Bill (HB) 14-1352, passed by the legislature in 2014, transferring the authority to collect the Waste Tire Fee from the Department of Revenue to the Department of Public Health and Environment (the Department) and requiring the Commission to set the amount of the Waste Tire Fee. This fee is not a new fee as the Department of Revenue was previously responsible for collecting the fee.

II. Purpose of new regulation:

This new regulation sets the Waste Tire Fee at $1.50.

**Discussion of Regulatory Proposal**

The proposed section 1.7.6 requires retailers of new motor vehicle tires and new trailer tires to collect a waste tire fee in an amount of $1.50 on the sale of each new tire. The fee will be collected on all new automobile, trailer, truck, motor home, and motorcycle tires. The $1.50 fee is not a new fee as the Department of Revenue was previously responsible for collecting the fee.

## Description of Local Government Involvement in the Stakeholder Process

Executive Order D 2011-005 (EO-5), "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The Department completed an EO-5 Internal Communication Form – Conception Phase that was transmitted to local governments. The new regulation will have little effect on local governments as the Waste Tire Fee applies to retailers of new motor vehicle tires and new trailer tires.

## Issues Encountered During Stakeholder Process:

The $1.50 fee amount was vetted during the year-long legislation development stakeholder process. The waste tire industry understands and accepts the $1.50 waste tire fee as necessary to support Colorado's waste tire management activities. All of the revenue forecasts and stakeholder discussions supported continuing the $1.50 collected by the Department of Revenue. In addition, the fiscal note accompanying HB 14-1352 used the $1.50 per new tire as the fee amount to calculate fiscal impacts. Therefore, the legislative stakeholders and legislators are expecting the Waste Tire Fee to be $1.50 to support the activities identified in HB14-1352.

## Regulatory Alternatives

The Department and the stakeholders considered setting the fee lower than $1.50. This alternative was not adopted because the Department needs the full $1.50 to administer the Waste Tire Program and to fund the Waste Tire Administration, Enforcement, and Cleanup Fund, the End Users Fund, and the Waste Tire Market Development Fund as anticipated by the HB 14-1352 legislative stakeholder process. Further, the fiscal note accompanying HB 14-1352 relied upon the $1.50 to evaluate fiscal impacts.

## Cost/Benefit Analysis

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Services. The Department and stakeholders evaluated fiscal impacts during the legislative stakeholder process and determined the $1.50 fee was the minimum amount needed to support the legislative requirements of the Waste Tire Program.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division (HMWMD)

**6 CCR 1007-2**

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR AMENDMENT TO SECTION 1.7.4

**(Adopted by the Solid and Hazardous Waste Commission on November 19, 2013)**

### Basis and Purpose

The Hazardous Materials and Waste Management Division (HMWMD) has prepared an amendment to Section 1.7.4 of the Regulations Pertaining to Solid Waste Sites and Facilities ("the Regulations"). This amendment to 6 CCR 1007-2, Section 1.7.4 is made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302 and 30-20-109, C.R.S. The purpose of this amendment to Section 1.7.4 is to eliminate administrative and rulemaking processes that are not required by Senate Bill 13-050, which increased the Recycling Resources Economic Opportunity funding annually from 2014 through 2016.

### Amendment of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Section 1.7.4

### Background

In 2013, the legislature passed Senate Bill 13-050 changing the Recycling Resources Economic Opportunity (RREO) user fee. The bill provided an annual incremental increase of the RREO user fee from 2014 through 2016. The RREO user fee is collected as part of the Solid Waste User Fee (SWUF). The SWUF is volume based and funds four elements including: 1) the Solid Waste Program, 2) the Hazardous Substance Response Fund, 3) the Department of Law, and 4) the RREO program . The Solid and Hazardous Waste Commission is authorized, with limitations, to set the fund amounts for the first three components of the SWUF. The Colorado state legislature establishes the RREO user fee amount.

Section 1.7.4 of the Regulations includes a table depicting the SWUF breakdown with a disclaimer that the fee amount does "not include the $0.07/ yd$^3$ RREO fee…" The proposed amendment deletes the reference to the actual RREO user fee amount because: 1) the fee amount will change annually based on C.R.S. 25-16-104.5 et. seq., 2) the RREO user fee amount is set by the legislature, and 3) the statute does not require the RREO user fee amount to be included in the Regulations. No stakeholder process was convened for this regulatory change because this is a conforming change with C.R.S. 25-16-104.5 et. seq.

**Amendment to the Solid Waste User Fee**

The Division is proposing to delete the depicted RREO amount in Section 1.7.4 of the Solid Waste Regulations because the RREO user fee is not required by statute to be included in the Regulations, and removing the RREO user fee listing will ease the administrative burden of annually updating the regulations to identify the statutory fee increase.

**DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT**

**Solid and Hazardous Waste Commission**

**Hazardous Materials and Waste Management Division (HMWMD)**

**6 CCR 1007-2**

**STATEMENT OF BASIS AND PURPOSE**
**AND SPECIFIC STATUTORY AUTHORITY FOR**
**AMENDMENT TO SECTION 16.4.2**

**(Adopted by the Solid and Hazardous Waste Commission on November 19, 2013)**

**Basis and Purpose**

The Hazardous Materials and Waste Management Division (HMWMD) has prepared amendments to Section 16.4.2 of the Regulations Pertaining to Solid Waste Sites and Facilities ("the Regulations"). This amendment to 6 CCR 1007-2, Section 16.4.2 is made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302 and 30-20-109, C.R.S. The purpose of this amendment to Section 16.4.2 is to align the regulatory language with Senate Bill 09-289, which modified the language related to tire retailers so that they may not refuse to accept from customers, at the point of transfer, waste tires of the same general type and number.

**Amendment of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Section 16.4.2**

**Background**

Senate Bill 09-289 amended Section C.R.S. 30-20-1007 as follows:

> A retailer selling replacement tires in the state may **NOT REFUSE TO** accept from customers, at the point of transfer, waste tires of the same general type and in a quantity at least equal to the number of new tires purchased. ~~if offered by customers.~~

Subsequent regulatory modifications resulted in the following language:

> A retailer selling replacement tires in the State may accept from customers, at the point of transfer, waste tires of the same general type and in a quantity at least equal to the number of new tires purchased, if offered by customers.

A recent review by the Legislative Legal Services (LLS) noted a discrepancy between the statutory language and the regulations. LLS subsequently indicated that the regulations needed to be modified to align with the specific statutory language.

**Amendment to Section 16.4.2**

The Division is therefore proposing to make the following change to the first sentence of Section 16.4.2:

A retailer selling replacement tires in the State may **NOT REFUSE TO** accept from customers, at the point of transfer, waste tires of the same general type and in a quantity at least equal to the number of new tires purchased~~, if offered by customers~~.

The regulatory change was directed by LLS and conforms to the specific language of the statute. Therefore, no stakeholder process was convened for this regulatory change.

Similarly, no alternatives were considered because the regulation was modified to conform to the specific statutory language.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Amendments to the Section 10 Regulations (Waste Tire Facilities and Waste Tire Haulers) and the Associated Revision of the Section 1.2 Definition of "End User"

**(Adopted by the Solid and Hazardous Waste Commission on February 19, 2013)**

**Basis and Purpose**

I. Statutory Authority

These amendments to 6 CCR 1007-2, Section 10: Waste Tire Facilities and Waste Tire Haulers and Section 1.2: Definitions are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302 and 30-20-109, C.R.S. The revision of the Section 1.2 definition of end user is a direct result of House Bill 12-1034, passed by the legislature in 2012.

II. House Bill 12-1034 and 10-1018

House Bill (HB) 12-1034 amended Section 25-17-202 of the Colorado Revised Statutes (C.R.S.) by revising the definition of end user. HB 12-1034 also modified the Processor and End User Fund requirements of Section 25-15-202.5 (1) of the C.R.S. by requiring a processor of waste tires to end use the tire-derived product or process waste tires into tire-derived product for an end use and move the tire-derived product off-site. Also under the Processor and End User Fund section, Section 25-17-202.9 (1.5) was amended that the Department would identify other markets in Colorado that are able to eliminate illegal tire dumping and to recycle or reuse waste tire in newer technologies.

HB 10-1018 extensively modified many sections of the C.R.S., including Sections 25-17-202 and 204 and added Sections 25-17-202.6, 205, 206, and 207. HB 10-1018 resulted in new Section 10 regulations (Waste Tire Facilities and Waste Tire Haulers).

III. Purpose of revised regulations:

The purpose of revising Sections 1.2 and 10 is to implement the requirements of HB 12-1034, add clarifying exemption language for solid waste landfills, transfer stations, and recycling facilities that divert waste tires from the solid waste stream and government road side cleanup activities, removing waste tire hauler decal inconsistencies, and standardizing annual reporting submittal dates.

**Discussion of Regulatory Proposal**

I. For consistency with definitional changes made pursuant to HB 12-1034, the definition of "End User" in Section 1.2 of the solid waste regulations (6 CCR 1007-2, Part 1) is being modified to include tire-derived product.

II. Scope and applicability (Section 10.1)

The exemption for a person who operates a vehicle that is primarily engaged in the collection of solid wastes other than waste tires was expanded to include vehicles of local, state and federal government agencies. Specific examples of solid waste were removed from the exemption, as the broad language of "solid waste" includes, but is not limited to, municipal solid waste, construction and demolition debris, and solid waste collected during road-side cleanup activities or projects. This exemption does not apply if waste tire hauling is part of a person's primary business or government operations.

Exemption language for waste tires from household hazardous waste roundup events, community cleanup events, and other one-time occasional collection events was clarified to define the type of hauler able to transport the waste tires and the type of facility that can accept the waste tires.

Within Section 10.1.3 is an exemption for Solid Waste Landfills, Transfer Stations, and Recycling Facilities that divert waste tires out of the solid waste disposal stream. This exemption was clarified by allowing Solid Waste Landfills, Transfer Stations, and Recycling Facilities that separate tires out of the solid waste streams to remove waste tires that come in with other solid waste without having to register as a Waste Tire Collection Facility. Solid Waste Landfills, Transfer Stations, and Recycling Facilities agencies that exceed the exemption's storage limits would be subject to Waste Tire Collection Facility requirements.

An exemption was added to allow government agencies to store waste tires as part of roadside cleanup activities without having to register as a Waste Tire Collection Facility.

Local, state and federal government agencies that exceed the exemption's storage limits would be subject to Waste Tire Collection Facility requirements.

III. Standards for Waste Tire Haulers (Section 10.3)

The issuance of a facility decal to a Waste Tire Hauler was removed from Section 10.3.3 (Waste Tire Hauler Decals) as this was an inadvertent overreach of the Department's authority. A Waste Tire Hauler decal for their facility will be issued and valid until March 15 of the following year. A Waste Tire Facility decal would still be issued if the Waste Tire Hauler registered as a Waste Tire Facility (Tire Retailer, Wholesaler, or Fleet Service Facility, Waste Tire Monofill, Waste Tire Processor, Waste Tire End User, Waste Tire Collection Facility).

A storage limit of less than 500 waste tires stored outside and no more than 1000 waste tires total at the Waste Tire Hauler's site waste added because there was only a storage time limit of less than ninety (90) days. The ninety (90) days storage time limit will remain to accommodate Waste Tire Haulers in areas of the state to deliver their tires to a waste tire destination facility.

IV. Standards for Tire Retailers, Wholesalers, and Fleet Service Facilities (10.4)

A correction was made in the storage requirements in 10.4 (F) by removing the or, which allows a Tire Retailer, Wholesaler, or Fleet Service Facility to store less than 500 waste tires outside and no more than 1000 waste tires total at their facility without becoming a Waste Tire Collection Facility.

V. Standards for Waste Tire Haulers (Section 10.3), Waste Tire Monofills (Section 10.5), Waste Tire Processors and End Users (Section 10.6), and Waste Tire Collection Facilities (Section 10.7)

Clarification language was added allowing a Waste Tire Hauler to pick up tires from a person or private citizen who is exempted from Section 10 and for Waste Tire Monofills, Waste Tire Processors and End Users, and Waste Tire Collection Facilities to accept waste tires from a person or private citizen who is exempted from Section 10.

The date for Waste Tire Monofills, Waste Tire Processors and End Users, and Waste Tire Collection Facilities to submit an annual report, Waste Tire Facility Annual Reporting Form (Form WT-5), to the Department was moved from May 1st to Aprils 1st of each year. The Department made this revision to standardize when all waste tire reports are due (the Commercial Waste Tire Hauler Annual Report Form WT-4 due date was also move to April 1st). This change also allows the Department adequate time to contact facilities who have not submitted Forms WT-4 and WT-5 by the submittal due date and receive late Forms WT-4 and WT-5 for review and inclusion of data into the Annual Report that is due July 1 to the Transportation Legislation Review Committee.

## Stakeholder Involvement in the Process

Executive Order D 2011-005, "Establishing a Policy to Enhance the Relationship between State and Local Government" (EO5) requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The EO5 - Internal Communication Form was completed and explained the reason for the rulemaking and how the rulemaking would affect local governments.

I. Department reasoning supporting the need to issue regulation amendments

The statutory changes adopted pursuant to HB 12-1034 require the Solid and Hazardous Waste Commission to revise the Section 1.2 definition of end user. The Department also wants clarifying exemption language for road side cleanup activities that many local governments engage in, removing waste tire hauler decal inconsistencies, and standardizing annual reporting submittal dates.

II. Potential impacts to local governments

The HB 12-1034 amendments to §25-17-202 and these amendments to Section 1.2 of the solid waste regulations revised the definition of end use and will require some local governments (e.g., county landfill that uses tires shreds as alternate daily cover) to register as a Waste Tire End User and comply with Section 10 End User requirements.

The exemption in Section 10.1.3 for a person who operates a vehicle that is primarily engaged in the collection of solid wastes other than waste tires was clarified to include vehicles that are primarily engaged in the collection of solid wastes other than waste tires. This exemption allows local governments to collect and transport roadside cleanup solid waste, including waste tires, resulting from local government road-side cleanup activities. This exemption does not apply if waste tire hauling is part of the local government's primary operations.

The exemption in Section 10.1.3 allows government owned/operated Solid Waste Landfills, Transfer Stations, and Recycling Facilities to separate tires out of the solid waste streams to remove waste tires that come in with other solid waste without having to register as a Waste Tire Collection Facility. Government owned/operated Solid Waste Landfills, Transfer Stations, and Recycling Facilities agencies that exceed the exemption would be subject to Waste Tire Collection Facility requirements.

A new exemption in 10.1.3 was added to allow government agencies to store waste tires as part of road-side cleanup activities without having to register as a Waste Tire Collection Facility. Local government agencies that exceed the exemption storage limits would be subject to Waste Tire Collection Facility requirements.

Local governments that are registered as a Waste Tire Monofill, Waste Tire Processor, Waste Tire End User, or Waste Tire Collection Facilities would have to submit the Waste Tire Facility Annual Reporting Form (Form WT-5) to the Department by April 1st instead of May 1st. Local governments that are registered as a Waste Tire Hauler would have to submit the Commercial Waste Tire Hauler Annual Report (Form WT-4) to the Department by April 1st instead of March 1st.

III. Extent of Agency consultation with representatives of local governments affected

The Department's Hazardous Materials and Waste Management Division, Solid Waste and Materials Management Program completed a EO-5 that was submitted to the Office of State Planning and Budgeting (OSPB) for local government notification, through OSPB's online notification system.

**Issues Encountered During Stakeholder Process:**

1. One issue that arose during the stakeholder process is how the current definition of "tire" is counter-intuitive because it states that recapped tires – objects that look like and are used as tires – are actually not tires (25-17-202(1)(f), C.R.S.). This seems counter to common sense and undermines the state's regulatory authority over recapped tires because recapped tires are not a waste until after the tire's useful life span and therefore Section 10 doesn't appear to apply to them. This illogical definition also affects the Processor End User Grant Program because recapped tires are not tires eligible for reimbursement from the waste tire Processor End User Grant Program. This creates an unnecessary burden for processors and end users who manage recapped tires in the same fashion as they manage non-recapped tires who anticipate applying for reimbursement from the Processor End User Grant Program.

2. Another issue encountered during the stakeholder process dealt with a waste tire facility's (e.g., Waste Tire Processor, Waste Tire Monofill, or Waste Tire Collection Facility) ability to accept waste tires from someone who is not registered as a Waste Tire Hauler (e.g., a private citizen) and does not provide a manifest to the waste tire facility accepting the waste tires. The amended language of 10.5.5 (A), 10.6.5 (A) and 10.7.5 (A) clarifies how a waste tire facility can accept waste tires without an accompanying manifest from a person or private citizen who is exempt from Section 10 requirements. Because these persons and private citizens are exempt from Section 10 requirements, the Commission cannot require the use of a specialized manifest.

**Regulatory Alternatives**

No other regulatory alternatives were evaluated.

**Cost/Benefit Analysis**

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Services.

**Regulatory Analysis**

A regulatory analysis for this rulemaking will be prepared and made available to the public in accordance with § 24-4-103(4.5), C.R.S.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## REGULATORY ANALYSIS

for

Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Amendments to the Section 10 Regulations (Waste Tire Facilities and Waste Tire Haulers) and the Associated Revision of the Section 1.2 Definition of "End User"

February 19, 2013

I. **A description of the classes of persons who will be affected by the proposed rule including classes that will bear the costs of the proposed rule and classes that will benefit from the proposed rules**:

These amendments affect waste tire haulers and waste tire facilities (tire retailers, wholesalers, fleet service facilities, waste tire monofills, waste tire processors and end users, and waste tire collection facilities) regulated pursuant to the requirements of 6 CCR 1007-2, Part 1, Section 1.2 (Definitions) and Section 10 (Waste Tire Facilities and Waste Tire Haulers).

As of December 27, 2012, the Hazardous Materials and Waste Management Division's (HMWMD) waste tire registration breakdown was as follows:

Waste Tire Haulers- 79
Waste Tire Processors – 17
Waste Tire End Users – 15
Waste Tire Monofills – 3
Waste Tire Collection Facilities – 18
Retailer/Wholesaler/Fleet Service Facility – 1628

This program is funded by a one dollar and fifty cents ($1.50) fee charged for each new tire sold in Colorado. The $1.50 collected by tire retailers on the sale of each new tire entirely supports the waste tire program and waste tire program funding allocations set forth by House Bill 10-1018 and 25-15-202 (3)(a), C.R.S. Those who purchase new tires in the state bear the costs of the program.

Beneficiaries from the proposed rule include government agencies, solid waste landfills, transfer stations, and recycling facilities, waste tire collection events and private citizens. The proposed rule expands current exemption language that reduces or eliminates waste tire hauler and waste tire facility requirements for those that meet the new exemptions.

Others who benefit are retailers/wholesalers/fleet service facilities and waste tire haulers. A correction in the proposed rules allows a tire retailer, wholesaler, or fleet service facility to store a set amount of waste tires at their facility without becoming a waste tire collection facility. Waste tire haulers also benefit as the proposed rule change gives waste tire haulers an additional month to complete the Commercial Waste Tire Hauler Annual Report (WT-4).

The proposed rule will require an end user to register with the Department and comply with Section 10.6 Standards for Waste Tire Processors and End User, which includes financial assurance. The proposed rule could also affect waste tire haulers who may exceed the proposed rule's waste tires storage limit for waste tire hauler. Waste tire haulers who exceed the waste tires storage limit would require a waste tire hauler to become a waste tire collection facility and comply with the waste tire collection facility requirements of Section 10.7 Standards for Waste Tire Collection Facilities, which include operation plans and financial assurance. Also, the regulation change requires those facilities required to submit a Waste Tire Annual Report (WT-5) to submit the WT-5 a month earlier.

II. **<u>To the extent practicable, a description of the probable quantitative and qualitative impact of the proposed rule, economic or otherwise, upon affected classes of persons:</u>**

The revisions and updates to the existing Section 10 regulations present little or no qualitative or quantitative impacts to affected entities.

The affected entities (government agencies, solid waste landfills, transfer stations, and recycling facilities) that benefit from the rule changes will see a reduction in costs (e.g., not having to obtain financial assurance as a waste tire hauler or waste tire collection facility or develop waste tire facility operation plans) due to the exemptions for situations where an entity does not have to comply with waste tire hauler (Section 10.3 Standards for Waste Tire Hauling) or waste tire collection facility (Section 10.7 Standards for Waste Tire Collection Facilities) requirements.

The revision of the Section 1.2 definition of end user is a direct result of House Bill 12-1034 that was passed by the legislature in 2012. An end user of tire-derived product for a commercial or industrial use will be required to register with the Department and comply with Section 10.6 Standards for Waste Tire Processors and End User requirements. The magnitude of the added costs would depend on the financial assurance an end user is required to have in place.

Waste tire haulers who exceed the proposed rule's waste storage limit of less than 500 waste tire haulers stored outside and no more than 1000 waste tires total stored at the

waste tire hauler's site would become a waste tire collection facility and subject to the requirements of Section 10.7 Standards for Waste Tire Collection Facilities. The magnitude of the added costs would depend on the financial assurance a waste tire collection facility is required to have in place and for associated costs for developing waste tire facility operation plans.

III. **The probable costs to the agency of the implementation and enforcement of the proposed rule and any anticipated effect on state revenues:**

No additional costs to the agency are anticipated. No additional FTE have been added to administer the revised regulations. There will not be any change to revenues collected under this fund by these regulations.

Government agencies will benefit from the rule changes as governments will see a reduction in costs (e.g., not having to obtain financial assurance as a waste tire hauler or waste tire collection facility or develop waste tire facility operation plans) due to the exemptions for situations where an entity does not have to comply with waste tire hauler (Section 10.3 Standards for Waste Tire Hauling) or waste tire collection facility (Section 10.7 Standards for Waste Tire Collection Facilities) requirements.

IV. **A comparison of probable costs and benefits of the proposed rule to the probable costs and benefits of inaction:**

The proposed change to the Section 1.2 definition of end user reflects the statutory amendments mandated pursuant to HB 12-1034. Failure to promulgate regulatory changes would not change the fact that the statutory changes are already in effect. Therefore, inaction would create a scenario where the regulations conflict with the statute, presenting the likelihood of litigation over confusing contradictions in the law.

The HMWMD believes there are no benefits to inaction. No alternatives were considered as this definition change was mandated by HB 12-1034. The result of this change is that an end user of tire-derived product for a commercial or industrial use will be required to register with the Department and comply with Section 10.6 Standards for Waste Tire Processors and End User requirements. Costs for complying with end user requirements include the added cost for financial assurance.

For the proposed additions to Section 10, the added exemption language allows governments to collect and transport road-side cleanup solid waste, including waste tires, resulting from government road-side cleanup activities without having to register as a waste tire hauler. Additionally, a new exemption allows government agencies to store waste tires collected as part of road-side cleanup and solid waste landfills, transfer stations, and recycling facilities that divert waste tires out of the solid waste disposal stream to store a set number of waste tires at their facility without complying with Section 10.7 Standards for Waste Tire Collection Facilities. There are no new costs associated with the addition of exemption language. Failure to adopt this exemption will result in the continuation of these entities to register as waste tire haulers and obtain a $10,000 surety bond.

Adding clarifying language to Section 10 will allow waste tire haulers to pick up waste tires from a person or private citizen who is exempted from Section 10 and for waste tire monofills, waste tire processors, and waste tire collection facilities to accept waste tires from a person or private citizen who is exempted from Section 10. There are no new costs associated with the addition of this exemption language. Failure to adopt this exemption will result in the continuation of limiting resources for exempted persons and private citizens to properly recycle or dispose of their waste tires.

Waste tire haulers who exceed the new waste tire storage limits will have to comply with the waste tire collection facility requirements of Section 10.7 Standards for Waste Tire Collection Facilities. Costs for complying with waste tire collection facility requirements would include the added costs for financial assurance and for associated costs for developing waste tire facility operation plans. Failure to adopt this regulatory change will result in the continuation of a lack of a waste tire storage limit in the current regulations. The current regulations allow waste tire haulers to store an infinite number of waste tires for up to 90 days at their waste tire hauler facility without any waste tire facility operation plans that address emergency response, fire prevention training and firefighting and vector control.

V. **A determination of whether there are less costly methods or less intrusive methods for achieving the purpose of the proposed rule:**

No less costly methods or less intrusive methods were identified during the stakeholder process conducted for this rulemaking because these amendments were developed to address the statutory requirements mandated by HB12-1034 and changes proposed by stakeholders.

VI. **A description of any alternative methods for achieving the purpose of the proposed rule that were seriously considered by the agency and the reasons why they were rejected in favor of the proposed rule:**

No alternative methods for achieving the purpose of the proposed rule were identified or seriously considered by the Department during the stakeholder process for this rulemaking because these changes are mandated by changes to the statute.

VII. **To the extent practicable, quantification of the data used in the analysis; the analysis must take into account of both short-term and long-term consequences:**

The Department expects some short-term administrative adjustments as industry adapts to the new requirements due to the passing of HB 12-1034 and the new amendments to Section 10. The Department expects some long term benefits to include an increase in waste tire road-side cleanups and more options for exempted persons and private citizens to properly recycle or dispose of their waste tires.

**DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT**

**Solid and Hazardous Waste Commission**

**Hazardous Materials and Waste Management Division**

**6 CCR 1007-2 Part 1**
**STATEMENT OF BASIS AND PURPOSE**
**AND SPECIFIC STATUTORY AUTHORITY FOR**

**Revision to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Deletion and Replacement of existing Section 16 Regulations (Disposal of Motorized Equipment Wastes) with New Section 16 Regulations (Materials Prohibited from Disposal) and Associated Additions and Revisions to Section 1.2 Definitions**

**(Adopted by the Solid and Hazardous Waste Commission on February 19, 2013)**

**Basis and Purpose**

I. Statutory Authority

These modifications are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 30-20-109 C.R.S.. These modifications to the Solid Waste Regulations 6 CCR 1007-2, Part 1 are a direct result of 25-17-301 Part 3 C.R.S.

II. House Bill

Senate Bill 12-133 requires the Department to implement a statewide landfill ban for residentially generated electronic devices, or components of an electronic device by July 1, 2013. The addition of part 3 to article 17 of title 25 includes the following to be incorporated into the solid waste regulations:

**§25-17-303** By July 1, 2013 a person shall not dispose an electronic device or a component of an electronic device in landfill in this state; except that a board of county commissioners for a county that does not have at least two electronic waste recycling events per year or an ongoing electronic waste recycling program that serves residents of the county may, by majority vote of the commissioners and in compliance with the requirements of the section, exempt its residents from the ban established by this section.

**§25-17-305(2)** A waste hauler, as that term is defined in section 30-20-1001 (16) C.R.S., or owner or operator of a landfill or transfer station does not violate this part 3 if the hauler, owner, or operator has made a good faith effort to comply with this part 4 by posting and maintaining, in

a conspicuous location at the waste hauler's facility, transfer station, or the landfill, a sign stating that electronic devices will not be accepted at the facility, transfer station, or landfill.

III. Purpose of revising the regulations

The sole purpose of revising Section 16 of the solid waste regulations is to implement the electronic waste landfill ban as required per SB 12-133. Prior to the proposed revisions, Section 16 of the solid waste regulations applied specifically to motorized vehicle waste prohibited from disposal at solid waste sites and facilities. The modifications to Section 16 will include a framework approach to serve as a platform for classifying materials prohibited from disposal and to specify the associated regulations.

**Discussion of Regulatory Proposal**

I. New and modified Definitions

The proposed revisions to Section 16 require new definitions. These changes summarized below will be incorporated into Section1.2 of the solid waste regulations (6CCR 1007-2, Part 1).

The following definitions are being added to Section 1.2:

1. Consumer
2. Electronic device
3. Good faith effort
4. Minimum access
5. Peripheral
6. Waste electronic device

The following definition(s) are being modified in Section 1.2:

1. Collection facility

II. Section 16.1 Scope and applicability

The introductory section lays the foundation for the materials prohibited from disposal within the regulations. The list of materials currently subject to Section 16 is provided with reference to the specific citation of where the applicable requirements are set forth within the section. General provisions in subsection 16.1.2 are laid out to clarify that land disposal includes placing, discarding, or disposing of the listed wastes within Section 16 is prohibited. Also clarified in the general provision is that solid waste disposal site and facilities are not allowed to accept the listed wastes within Section 16 except for the purpose of collection to send offsite for recycling.

IV. Section 16.5 Management of residentially generated waste electronic devices

This subsection implements the requirements of SB 12-133 by banning residentially generated electronic waste from disposal. Section 16.5.1 also states how and where residents generating electronic waste shall properly manage their material through recycling facilities or collection services.

V. Exemptions

The exemption aspect of Section 16.5 details the ability for counties to opt-out of the landfill ban requirement only in circumstances where there is no existing infrastructure, or means of providing collection for waste electronics recycling within the geographic boundaries of the county.

VI. Good faith effort Requirements

Counties must first demonstrate a good faith effort by contacting electronics waste recyclers to provide at a minimum two collection events per year; or have an ongoing electronics waste recycling program available within the county. If neither option is possible, the board of county commissioners may by majority vote of the commissioners exempt its residents form the electronic waste landfill ban. The exemption from the landfill ban is valid for no more than two years and requires the county to perform another good faith effort to find one of the two options for recycling prior to reinstating the exemption from the landfill ban.

Section 16.5.3 details the specific actions required by counties prior to proceeding to vote out of the electronic waste landfill ban. The minimum requirements of the good faith effort include contacting CDPHE for assistance on electronic recyclers or reviewing the Departments webpage on electronic recyclers, contacting recycling and waste associations and recyclers for e-waste collection events, coordinating with the local landfill for collection of e-waste, and coordinating with municipalities or surrounding counties for regional collection opportunities.

VII. Used electronic device management standards

To expand and promote access to electronic recycling, common sites associated with electronics will be allowed to collect waste electronics. All sites collecting electronic waste referred to as a "collection facility" must properly manage the material to prevent any negative impacts to human health and the environment. This includes proper storage, handling, and management of the waste electronic material indoors or at a minimum covered from the elements. All sites collecting, processing, and storing residentially generated waste electronic waste must also meet all applicable solid waste recycling facility regulations and universal waste regulations.

VIII. Disposal site signage

As required by SB 12-133, all solid waste disposal site and facilities including all landfills, transfer stations, and waste hauler facilities must post in writing at the point of entry that electronic waste is not accepted at the facility for land disposal. By posting that electronic waste

is not accepted, the facility is making a good faith effort to divert material prohibited from disposal and will be regarded as complying with the landfill ban. All solid waste disposal site and facilities shall update their signs posted at the point of entry for materials prohibited from land disposal to include residentially generated electronic waste by July of 2013.

IX. Waste Characterization Plans

Section 16.6 requires all solid waste disposal site and facilities to update their waste characterization plans to incorporate the modifications to Section 16. All plans must be updated by July 1 2013 to include residentially generated waste electronic devices as defined in the solid waste regulations as prohibited from land disposal.

**Stakeholder Involvement in the Process**

I. Extent of Agency Consultation with the Recycling Industry and Local Governments Representatives

Prior to the stakeholder session, the Department's Hazardous Materials and Waste Management Division, Solid Waste and Materials Management Program utilized the procedures required by Executive Order 5 to contact all local governments regarding the upcoming revisions to the solid waste regulations. All municipal and county governments who responded to the Executive Order 5 survey that asked to be included in the stakeholder process were added to the emailing contact list for notification of all meetings and related regulatory documents. Local government organizations such as the Colorado Municipal League and Colorado Counties Inc were also notified about the stakeholder process and received all updates throughout the drafting process.

The Department contacted by email all registered recycling facilities in addition to industry associations including the Colorado Chapter of the Solid Waste Association of North America (SWANA), and the Colorado Association for Recycling (CAFR) regarding the Section 16 updates and stakeholder process.

Throughout the stakeholder process the Division corresponded with participants by sending out monthly stakeholder meeting email notices and included the most recent draft revisions to the regulations. The Division will also provide teleconferencing, and webinar presentation when needed, for all stakeholders outside the Denver metropolitan area to participate in the stakeholder meetings remotely.

II. Issues Encountered During Stakeholder Process

*Question: What are the penalties for dumping electronics waste and how will such penalties be enforced?*

*Answer:* Illegal disposal of solid waste, including abandoning electronic waste is a direct violation of the Colorado Solid Waste Act and is subject to a penalty of up to $10,000 per day. The disposal ban of electronic waste applies at the residential level and any fines

assessed will be subject to the generator of illegally disposed waste. Waste haulers shall not collect any visibly noticeable waste electronic device left by a resident for disposal. Due to worker safety concerns, electronic waste commingled within waste shall not be separated out by waste haulers.

---

*Question: What constitutes as a collection facility for electronic devices?*
*Answer:* A collection facility is any type of operation that receives electronic waste for end of life management but does not perform any processing or dismantling of electronic waste. Common collection facilities may include retail stores where electronics are sold, thrift and consignment stores, computer repair stores, local government offices, household hazardous waste collection sites, and other collection points.

---

*Question: Many smart phones have a screen size greater than four inches; are they included under the definition of electronic device and subject to the disposal ban?*

*Answer:* As determined in the legislative session, all forms of telephones are exempt from the definition of a waste electronic device and the requirements of SB-133. By exemption, all telephones, including smart phones with screen sizes that meet the definition of a video display device greater than 4 inches still remain exempt from the landfill ban.

---

*Question: Why does the disposal ban only apply to residential electronic waste?*

*Answer:* As stated in the bill summary, the SB-133 prohibits the disposal of certain consumer electronic devices in landfills. A "consumer", as defined in the SB-133 is a person who has purchased an electronic device primarily for personal or home business use. The Department interprets the definition of consumer to apply at the residential level. Additionally, all non-residentially generated electronic waste is already subject to the hazardous and universal waste regulations, and cannot be disposed of in a solid waste landfill. Applying SB-133 to the residential level closes the gap of electronic waste prohibited from disposal at solid waste landfills.

---

*Question: Is a county required to fund and develop a collection facility if there are no recyclers or private collection facilities accessible within a County?*

*Answer:* While a county is not required to fund a permanent collection facility, they are required to perform a good faith effort to provide access to electronics recycling if there is not at least two temporary e-waste collection events per year or one permanent collection site within the county. A county may use existing resources such a county landfill as a collection facility. Retailers who offer take back programs or offer recycling of electronic waste count as a permanent collection facility within a county. Counties

that need assistance with developing two recycling collection events per year may contact the Department or the Colorado Association for Recycling for assistance.

---

*Question: Can a landfill that is located within a county subject to the electronic waste disposal ban accept and dispose of electronic waste generated from an outside the county that is exempt from the electronic waste disposal ban?*

*Answer:* A landfill that accepts waste from other counties has no way of controlling an outside counties waste stream and recycling collection infrastructure. Therefore, a landfill may accept waste generated from an outside county that has electronic waste included. While the landfill may not accept electronic waste generated within its own county due to its residents being subject to a disposal ban, it may accept waste including electronics form a county that is exempt from the disposal ban. If the landfill is a regional facility serving multiple counties, it would severe as a regional benefit to consider developing a electronic waste collection center to divert electronic waste from surrounding counties that may not have adequate recycling infrastructure.

---

*Question: Do waste haulers need to separate out electronic devices from the trash that they pick up? What happens if e-waste makes it way to a landfill disposal cell?*

*Answer:* As stated in SB-133, waste haulers are not required to separate electronic devices from waste that they haul or receive for disposal. If a visibly noticeable electronic device is set out with trash but is not mixed within the trash, the hauler should leave behind the electronic device with a note that the electronic device cannot be accepted and must be recycled. A waste hauler or operator of a transfer station or landfill are not in violation of the electronic waste landfill ban if they comply with the good faith effort requirements of the bill. The good faith effort requires disposal sites and facilities to post and maintain signage at the facility stating that electronic devices will not be accepted for disposal. Waste haulers are asked to notify customers by a flyer or on their bill that electronic devices are not to be disposed of in their trash.

---

*Question: Radios are included under the regulatory definition of a waste electronic device, does this include commercial radios?*

*Answer:* Commercial radios are not included under the waste electronic device landfill ban as the definition pertains to only consumer electronic devices. Only residential radios, televisions, computers, etc. are subject to the ban.

---

**Alternatives Considered and Why Rejected**

During the initial review of SB-133, the Department considered adding a new section to the Solid Waste Regulations specifically dealing with the electronic waste disposal ban. Due to Section 16 of the Solid Waste Regulations already pertaining to materials prohibited from disposal, the Department instead revised Section 16 from applying to only automotive waste prohibited from disposal to a framework approach of all materials prohibited from solid waste disposal. This revision allows the Department future flexibility. If additional materials become subject to a landfill ban, the framework revision allows them to be incorporated within Section 16 rather than continually adding additional Sections to the Solid Waste Regulations.

While developing the regulations, the Department considered wording the applicability of electronic devices prohibited from disposal to include all waste electronic devices regardless of generation point. Following a review of the Bill Summary, it was determined that the disposal ban was specific to consumer electronic devices rather than all electronic devices. Based on the definition of a consumer within Statute, the Department narrowed the scope of electronic devices subject to the landfill ban to specifically apply to personal or home business use electronics, commonly referred to as residential generated electronics.

**Cost Benefit Analysis**

A cost benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Amendments to the Section 10 Regulations (Waste Tire Facilities and Waste Tire Haulers) and the Associated Revision of the Section 1.2 Definition of "End User"

**(Adopted by the Solid and Hazardous Waste Commission on November 20, 2012)**

**<u>Basis and Purpose</u>**

I. <u>Statutory Authority</u>

These amendments to 6 CCR 1007-2, Section 10: Waste Tire Facilities and Waste Tire Haulers and Section 1.2: Definitions are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302 and 30-20-109, C.R.S. The revision of the Section 1.2 definition of end user is a direct result of House Bill 12-1034, passed by the legislature in 2012.

II. <u>House Bill 12-1034 and 10-1018</u>

House Bill (HB) 12-1034 amended Section 25-17-202 of the Colorado Revised Statutes (C.R.S.) by revising the definition of end user. HB 12-1034 also modified the Processor and End User Fund requirements of Section 25-15-202.5 (1) of the C.R.S. by requiring a processor of waste tires to end use the tire-derived product or process waste tires into tire-derived product for an end use and move the tire-derived product off-site. Also under the Processor and End User Fund section, Section 25-17-202.9 (1.5) was amended that the Department would identify other markets in Colorado that are able to eliminate illegal tire dumping and to recycle or reuse waste tire in newer technologies.

HB 10-1018 extensively modified many sections of the C.R.S., including Sections 25-17-202 and 204 and added Sections 25-17-202.6, 205, 206, and 207. HB 10-1018 resulted in new Section 10 regulations (Waste Tire Facilities and Waste Tire Haulers).

III. Purpose of revised regulations:

The purpose of revising Sections 1.2 and 10 is to implement the requirements of HB 12-1034, add clarifying exemption language for solid waste landfills, transfer stations, and recycling facilities that divert waste tires from the solid waste stream and government road side cleanup activities, removing waste tire hauler decal inconsistencies, and standardizing annual reporting submittal dates.

**Discussion of Regulatory Proposal**

I. For consistency with definitional changes made pursuant to HB 12-1034, the definition of "End User" in Section 1.2 of the solid waste regulations (6 CCR 1007-2, Part 1) is being modified to include tire-derived product.

II. Scope and applicability (Section 10.1)

The exemption for a person who operates a vehicle that is primarily engaged in the collection of solid wastes other than waste tires was expanded to include vehicles of local, state and federal government agencies. Specific examples of solid waste were removed from the exemption, as the broad language of "solid waste" includes, but is not limited to, municipal solid waste, construction and demolition debris, and solid waste collected during road-side cleanup activities or projects. This exemption does not apply if waste tire hauling is part of a person's primary business or government operations.

Exemption language for waste tires from household hazardous waste roundup events, community cleanup events, and other one-time occasional collection events was clarified to define the type of hauler able to transport the waste tires and the type of facility that can accept the waste tires.

Within Section 10.1.3 is an exemption for Solid Waste Landfills, Transfer Stations, and Recycling Facilities that divert waste tires out of the solid waste disposal stream. This exemption was clarified by allowing Solid Waste Landfills, Transfer Stations, and Recycling Facilities that separate tires out of the solid waste streams to remove waste tires that come in with other solid waste without having to register as a Waste Tire Collection Facility. Solid Waste Landfills, Transfer Stations, and Recycling Facilities agencies that exceed the exemption's storage limits would be subject to Waste Tire Collection Facility requirements.

An exemption was added to allow government agencies to store waste tires as part of roadside cleanup activities without having to register as a Waste Tire Collection Facility. Local, state and federal government agencies that exceed the exemption's storage limits would be subject to Waste Tire Collection Facility requirements.

III. Standards for Waste Tire Haulers (Section 10.3)

The issuance of a facility decal to a Waste Tire Hauler was removed from Section 10.3.3 (Waste Tire Hauler Decals) as this was an inadvertent overreach of the Department's authority. A Waste Tire Hauler decal for their facility will be issued and valid until March 15 of the following year. A Waste Tire Facility decal would still be issued if the Waste Tire Hauler registered as a Waste Tire Facility (Tire Retailer, Wholesaler, or Fleet Service Facility, Waste Tire Monofill, Waste Tire Processor, Waste Tire End User, Waste Tire Collection Facility).

A storage limit of less than 500 waste tires stored outside and no more than 1000 waste tires total at the Waste Tire Hauler's site waste added because there was only a storage time limit of less than ninety (90) days. The ninety (90) days storage time limit will remain to accommodate Waste Tire Haulers in areas of the state to deliver their tires to a waste tire destination facility.

IV. Standards for Tire Retailers, Wholesalers, and Fleet Service Facilities (10.4)

A correction was made in the storage requirements in 10.4 (F) by removing the or, which allows a Tire Retailer, Wholesaler, or Fleet Service Facility to store less than 500 waste tires outside and no more than 1000 waste tires total at their facility without becoming a Waste Tire Collection Facility.

V. Standards for Waste Tire Haulers (Section 10.3), Waste Tire Monofills (Section 10.5), Waste Tire Processors and End Users (Section 10.6), and Waste Tire Collection Facilities (Section 10.7)

Clarification language was added allowing a Waste Tire Hauler to pick up tires from a person or private citizen who is exempted from Section 10 and for Waste Tire Monofills, Waste Tire Processors and End Users, and Waste Tire Collection Facilities to accept waste tires from a person or private citizen who is exempted from Section 10.

The date for Waste Tire Monofills, Waste Tire Processors and End Users, and Waste Tire Collection Facilities to submit an annual report, Waste Tire Facility Annual Reporting Form (Form WT-5), to the Department was moved from May 1st to Aprils 1st of each year. The Department made this revision to standardize when all waste tire reports are due (the Commercial Waste Tire Hauler Annual Report Form WT-4 due date was also move to April 1st). This change also allows the Department adequate time to contact facilities who have not submitted Forms WT-4 and WT-5 by the submittal due date and receive late Forms WT-4 and WT-5 for review and inclusion of data into the Annual Report that is due July 1 to the Transportation Legislation Review Committee.

**Stakeholder Involvement in the Process**

Executive Order D 2011-005, "Establishing a Policy to Enhance the Relationship between State and Local Government" (EO5) requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The EO5 - Internal Communication Form was completed and explained the reason for the rulemaking and how the rulemaking would affect local governments.

I. Department reasoning supporting the need to issue regulation amendments

The statutory changes adopted pursuant to HB 12-1034 require the Solid and Hazardous Waste Commission to revise the Section 1.2 definition of end user. The Department also wants clarifying exemption language for road side cleanup activities that many local governments engage in, removing waste tire hauler decal inconsistencies, and standardizing annual reporting submittal dates.

II. Potential impacts to local governments

The HB 12-1034 amendments to §25-17-202 and these amendments to Section 1.2 of the solid waste regulations revised the definition of end use and will require some local governments (e.g., county landfill that uses tires shreds as alternate daily cover) to register as a Waste Tire End User and comply with Section 10 End User requirements.

The exemption in Section 10.1.3 for a person who operates a vehicle that is primarily engaged in the collection of solid wastes other than waste tires was clarified to include vehicles that are primarily engaged in the collection of solid wastes other than waste tires. This exemption allows local governments to collect and transport roadside cleanup solid waste, including waste tires, resulting from local government road-side cleanup activities. This exemption does not apply if waste tire hauling is part of the local government's primary operations.

The exemption in Section 10.1.3 allows government owned/operated Solid Waste Landfills, Transfer Stations, and Recycling Facilities to separate tires out of the solid waste streams to remove waste tires that come in with other solid waste without having to register as a Waste Tire Collection Facility. Government owned/operated Solid Waste Landfills, Transfer Stations, and Recycling Facilities agencies that exceed the exemption would be subject to Waste Tire Collection Facility requirements.

A new exemption in 10.1.3 was added to allow government agencies to store waste tires as part of road-side cleanup activities without having to register as a Waste Tire Collection Facility. Local government agencies that exceed the exemption storage limits would be subject to Waste Tire Collection Facility requirements.

Local governments that are registered as a Waste Tire Monofill, Waste Tire Processor, Waste Tire End User, or Waste Tire Collection Facilities would have to submit the Waste Tire Facility Annual Reporting Form (Form WT-5) to the Department by April 1st instead of May 1st. Local governments that are registered as a Waste Tire Hauler would have to submit the Commercial Waste Tire Hauler Annual Report (Form WT-4) to the Department by April 1st instead of March 1st.

III. Extent of Agency consultation with representatives of local governments affected

The Department's Hazardous Materials and Waste Management Division, Solid Waste and Materials Management Program completed a EO-5 that was submitted to the Office of State Planning and Budgeting (OSPB) for local government notification, through OSPB's online notification system.

**Issues Encountered During Stakeholder Process:**

1. One issue that arose during the stakeholder process is how the current definition of "tire" is counter-intuitive because it states that recapped tires – objects that look like and are used as tires – are actually not tires (25-17-202(1)(f), C.R.S.). This seems counter to common sense and undermines the state's regulatory authority over recapped tires because recapped tires are not a waste until after the tire's useful life span and therefore Section 10 doesn't appear to apply to them. This illogical definition also affects the Processor End User Grant Program because recapped tires are not tires eligible for reimbursement from the waste tire Processor End User Grant Program. This creates an unnecessary burden for processors and end users who manage recapped tires in the same fashion as they manage non-recapped tires who anticipate applying for reimbursement from the Processor End User Grant Program.

2. Another issue encountered during the stakeholder process dealt with a waste tire facility's (e.g., Waste Tire Processor, Waste Tire Monofill, or Waste Tire Collection Facility) ability to accept waste tires from someone who is not registered as a Waste Tire Hauler (e.g., a private citizen) and does not provide a manifest to the waste tire facility accepting the waste tires. The amended language of 10.5.5 (A), 10.6.5 (A) and 10.7.5 (A) clarifies how a waste tire facility can accept waste tires without an accompanying manifest from a person or private citizen who is exempt from Section 10 requirements. Because these persons and private citizens are exempt from Section 10 requirements, the Commission cannot require the use of a specialized manifest.

**Regulatory Alternatives**

No other regulatory alternatives were evaluated.

**Cost/Benefit Analysis**

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Services.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Deletion of Yellow Grease From Section 18 (Waste Grease Transporters, Facilities, and Personal Users of Waste Grease) and the Associated Revision of the Section 1.2 Definitions of "Trap Grease" and "Waste Grease"

**(Adopted by the Solid and Hazardous Waste Commission on November 20, 2012)**

**Basis and Purpose**

I. Statutory Authority

These amendments to 6 CCR 1007-2, Section 18: Waste Grease Transporters, Facilities, and Personal Users of Waste Grease and Section 1.2: Definitions, are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Section 30-20-109, C.R.S. These regulation amendments are a direct result of Senate Bill 12-077, passed by the legislature in 2012.

II. Senate Bill 12-077

Senate Bill (SB) 12-077 amended section 30-20-113 of the Colorado Revised Statutes (C.R.S.) by removing requirements for any person who collects, transports, stores, processes, or disposes of yellow grease. SB 12-077 also revised section 30-20-123 by removing yellow grease from the definition of grease, revising the definition of trap grease, and removing the Colorado Department of Public Health and Environment's (the "Department") authority to regulate any yellow grease that is not intercepted by and contained in grease traps or grease interceptors.

III. Purpose of revising the regulations:

The purpose of revising Sections 1.2 and 18 is to implement the requirements put in place by SB 12-077. Section 1.2 is being amended to incorporate the revised SB 12-077 definitions of trap grease and grease (which is referred to in Section 1.2 as waste grease). Sections 18.1.1 and 18.1.2 are also being amended to remove yellow grease from the Section 18.1 Scope and Applicability requirements for waste grease transporters and waste grease facilities.

Sections 18.1.6 and 18.3.4 are being revised to address concerns identified by the Office of Legislative Legal Services (OLLS) during its review of the Section 18 regulations.

**Discussion of Regulatory Proposal**

I. For consistency with the definitional changes made pursuant to SB 12-077, the definitions of "Trap grease" and "Waste grease" in Section 1.2 of the solid waste regulations (6 CCR 1007-2, Part 1) are being modified to delete the reference to yellow grease.

II. Scope and applicability (Section 18.1)

Yellow grease is being deleted from sections 18.1.1 and 18.1.2 because the waste grease requirements no longer apply to yellow grease. Sections 18.1.1 and 18.1.2 were the only provisions of the section 18 regulations that referred specifically to yellow grease.

III. Exemptions (Section 18.1.6)

Section 18.1.6 (B) is being modified by adding language pursuant to section 30-20-123(10), C.R.S. to specify that the exemption from regulatory oversight applies both to persons not engaged in the business of collecting, transporting, or disposing of grease and to persons who are not knowingly collecting, transporting, or disposing of waste grease.

The registration exemptions in sections 18.1.6 (E) and (F) regarding the acceptance of waste grease by infrequent waste grease collection events and household hazardous waste collection facilities are being removed. OLLS's concern regarding these exemptions was that there is no statutory provision for temporary events. Pursuant to section 30-20-123(3), C.R.S., the requirement to register would be triggered whenever a grease roundup event or a househould hazardous waste collection facility accepts waste grease from private citizens, and the amount of waste grease collected meets the minimum regulated amount of 55-gallons. The exemptions at Section 18.1.6(E) and (F) of the regulations were intended for the collection of yellow grease. With the removal of yellow grease from the Section 18 requirements, these exemptions are no longer applicable, and are being deleted at this time.

IV. Manifest Requirements (Section 18.3.4)

Section 18.3.4 (D)(1) is being modified by adopting language pursuant to section 30-20-123(3)(c)(I)(D), C.R.S. requiring a source's facility registration number, if applicable, on the manifest.

**Stakeholder Involvement in the Process**

Executive Order D 2011-005, "Establishing a Policy to Enhance the Relationship between State and Local Government" (EO5) requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing mandates. The EO5 - Internal Communication Form was completed and explained the reason for the rulemaking and how the rulemaking would affect local governments.

I. Department reasoning supporting the need to issue regulation amendments

The statutory changes adopted pursuant to SB 12-077 require the Solid and Hazardous Waste Commission to revise the Section 1.2 definitions of trap grease and waste grease and to remove yellow grease from the Section 18 requirements.

II. Potential impacts to local governments

The SB 12-077 amendments to sections 30-20-113, §30-20-123, C.R.S. and these proposed amendments to Section 18 of the solid waste regulations remove yellow grease requirements for any person who collects, transports, stores, processes, or disposes of yellow grease. The section 30-20-113 and 30-20-123, C.R.S. and Section 18 requirements still apply to local governments if the local government transports trap grease, arranges for the transportation or disposal of trap grease, or is a waste grease facility that handles trap grease.

III. Extent of Agency consultation with representatives of local governments affected

The Department's Hazardous Materials and Waste Management Division, Solid Waste and Materials Management Program completed an EO-5 that was submitted to the Office of State Planning and Budgeting (OSPB) for local government notification, through OSPB's online notification system.

**Issues Encountered During Stakeholder Process:**

No issues were encountered during this stakeholder process.

**Regulatory Alternatives**

No alternatives to these rules were considered because these rules are strictly the result of statutory amendments.

**Cost/Benefit Analysis**

A cost-benefit analysis has not been done for these regulations as the regulations are strictly the result of statutory amendments.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division (HMWMD)

### 6 CCR 1007-2

### STATEMENT OF BASIS AND PURPOSE
### AND SPECIFIC STATUTORY AUTHORITY FOR

### AMENDMENT OF REGULATIONS PERTAINING TO SOLID WASTE SITES AND FACILITIES (6 CCR 1007-2 PART 1) – SECTION 1.7.4(A)

**(Adopted by the Solid and Hazardous Waste Commission on May 15, 2012)**

**Basis and Purpose**

This amendment to 6 CCR 1007-2, Section 1.7.4 is made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302 and 30-20-109, C.R.S.

This amendment revises paragraph (A) of Section 1.7.4 to specify that operators of attended solid waste disposal sites should begin collecting the reduced Solid Waste User Fee (SWUF) adopted at the February 21, 2012 Solid and Hazardous Waste Commission (Commission) **starting July 1, 2012**.

On February 21, 2012, the Commission adopted amendments to Section 1.7.4 that reduced the fee collected for the Hazardous Substance Response Fund (HSRF) from sixteen cents per cubic yard ($0.16/yd$^3$) to five cents per cubic yard ($0.05/yd$^3$). The HSRF fee was reduced to bring the HSRF fund below the ten million dollar fund balance that is statutorily-required pursuant to § 25-16-104.6, C.R.S. Written notice of the reduction to the HSRF/SWUF was provided by the Division to solid waste stakeholders, including solid waste facilities and local governments, on December 16, 2011.

This amendment revises paragraph (A) of § 1.7.4 to specify that operators of attended solid waste disposal sites should begin collecting the reduced Solid Waste User Fee starting July 1, 2012.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

**Addition to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Deletion and Replacement of Section 9, Waste Impoundments, and the Associated Revision of the Section 1.2 Definition of "Sludge"**

**(Adopted by the Solid and Hazardous Waste Commission on February 21, 2012)**

## Basis and Purpose

I. Statutory Authority

These amendments to 6 CCR 1007-2, Section 9: Waste Impoundments (Section 9), are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302(4.5) and 30-20-109, C.R.S.

II. Senate Bill 89-181

The Hazardous Materials and Waste Management Division (the Division, HMWMD) is the state agency responsible for activities related to the federal "Resource Conservation and Recovery Act" (RCRA). RCRA contains requirements for the management of hazardous waste and solid waste. Because hazardous waste and solid waste management can affect water quality, pursuant to the 1989 amendments to Section 25-8-202(7), C.R.S. (Senate Bill 89-181), the Division is an implementing agency of the water quality standards and classifications adopted by the Colorado Water Quality Control Commission (WQCC), particularly for the protection of ground water.

To implement these statutory requirements, the Division, the WQCC, and the Water Quality Control Division (WQCD) entered into a Memorandum of Understanding (MOU), most recently revised in July, 2008. This MOU defines the responsibilities of each party. One of the responsibilities specifically defined for the Division is that the

Solid Waste Program will regulate facilities that are discharging wastewaters containing solid waste into engineered land-based units, including surface impoundments and specifically including wastewater impoundments at drinking water treatment facilities. Another responsibility for the Division is extensive coordination with the WQCD to ensure efficient and effective regulatory control of facilities discharging wastewaters meeting the definition of "solid waste." Under the 2008 MOU, discharges of wastewater containing solid waste to groundwater from an engineered unit will be subject to technical review by the Solid Waste and Materials Management Program under the certificate of designation process, in which the local governing body is the permitting authority. A site where the owner is discharging his/her own wastewater containing solid waste to ground water from an engineered unit on his/her own land does not require a certificate of designation. In this case, the owner must submit an engineering design and operation plan, subject to review and approval by the Solid Waste and Materials Management Program. Wastewater discharges to land that do not involve an engineered unit are considered land application of wastewater, and are still subject to a Colorado Discharge Permit System (CDPS) permit issued by the WQCD. The WQCD remains the sole regulatory authority over discharges to surface water.

Prior to the July 2008 revisions to the MOU described above, solid waste surface impoundments at water treatment utilities were regulated by the WQCD through the Design Criteria for Potable Water Systems and accepted through the WQCD design review and inspection processes and, where necessary, discharge permits. However, the Solid Waste Program had statutory and regulatory authority as well, though that authority was not implemented due to the WQCD programs. Sometime before July, 2008, the WQCD became concerned about language in SB89-181, now in Section 25-8-202(7)(b)(II), which says,

> "Neither the commission (WQCC) nor the division (WQCD) shall require permits for, or otherwise regulate, other activities subject to the jurisdiction of the implementing agencies, unless the commission finds, after notice and public hearing, that: . . . . (C) The implementing agency fails to provide reasonable assurance that compliance with this subsection (7) has been obtained through its own programs"

This language indicates that solid waste surface impoundments can only be regulated by the WQCD if the Solid Waste Program fails to implement its statutory and regulatory authority. The Department determined that the best resolution for this problem was to modify the MOU ensuring that solid waste surface impoundments would be regulated by the Solid Waste Program.

This amended Section 9 fully and completely implements the Division's solid waste requirements and the water quality control requirements of the WQCC and the WQCD for surface impoundments that contain or manage solid waste. WQCD staff have been extensively involved in the development of this amended Section 9.

III. Purpose of new regulations:

The purpose of these new regulations is to update the regulations applicable to surface impoundments that manage solid waste. The existing Section 9 was promulgated in 1984. It was largely applied to commercial oil and gas produced water/brine evaporation facilities and little attention was given to other types of waste impoundments. Since that time, many aspects of the existing regulations have become outdated. For example, under the current Section 9, an impoundment located in an area without shallow groundwater is allowed unrestricted seepage, which can be contradictory to the Division's mandate as an implementing agency for the WQCC's Regulation 41. Another antiquated provision of the current Section 9 is that Class II impoundments must estimate seepage rate based on mass balance calculations which we now know are subject to a high degree of uncertainty, and therefore, too inaccurate to be used to implement the WQCC's Regulation 41. Additionally, construction quality assurance requirements in the current Section 9 are no longer comparable to newer requirements in other sections of the Solid Waste Regulations that apply to other types of solid waste disposal sites and facilities. It is useful to note here that impoundments used for the storage, treatment or disposal of hazardous waste are regulated under 6 CCR 1007-3, Parts 264-265, Subpart K.

There are several other important purposes for this new Section 9. Consistent with Section 30-20-101.5(1), the Solid Waste Program is tasked to protect human health and the environment. To that end, these new Section 9 regulations will:

A. Protect ground water at a facility with solid waste impoundments:

Solid waste disposal sites and facilities are, in accordance with 6 CCR 1007-2, Sections 2.1.4, 2.1.15, and Appendix B, required to protect ground water. This new Section 9 protects ground water by tying the design and operating requirements to the waste stream characteristics and the local geologic and hydrologic setting. If the waste stream meets all groundwater standards at the influent to the impoundment and/or the local geology and hydrology contribute to ensuring that ground water standards can be met at points of compliance, then robust impoundment design may not be necessary to protect ground water quality. Conversely, if the waste stream has concentrations of constituents above a Colorado Basic Groundwater Standard that could lead to exceedances of a standard at the point of compliance, then the design and operation of the waste impoundment must be sufficient to prevent contaminant concentrations in ground water from exceeding the standards at points of compliance. Additionally, a site where the local geology/hydrogeology is conducive to contaminant movement in the subsurface will weigh in favor of a robust liner design.

B. Protect nearby surface water:

In most cases, protection of surface water in close proximity to waste impoundments will be achieved through compliance with ground water standards. Adequate waste impoundment design will prevent impacts to nearby surface water.

Direct discharges from the waste impoundment to surface water will be subject to the WQCD permitting authorities and will not be subject to the Solid Waste Act or Regulations. CRS 25-8-202(7) vests the WQCD with the sole authority to regulate discharges to surface water. This means that any point source discharge to surface water from a waste impoundment will be exempt from Section 9 Regulations. However, the HMWMD is an implementing agency for WQCC Regulation 41 with respect to groundwater discharges from a waste impoundment. It is, therefore, the understanding of this Commission that WQCD will not issue CDPS permits for discharges to groundwater from waste impoundments. Should there be a question as to the jurisdictional boundaries between HMWMD and WQCD on this issue, this Commission should be made aware of the issue so that it can be addressed and clarification obtained.

C. Protect Human Health

This new Section 9 protects human health directly and indirectly. It indirectly protects the general public because it protects ground water and surface water to which people in the vicinity may be exposed. It protects human health directly in several ways. First, the new Section 9 requires access controls for all impoundments such that trespassing is prevented. In addition, Type B impoundments also must implement contingency plans if off-normal events occur to mitigate any risk that those events may cause the public.

It should be noted that Section 9 applies only to impoundments managing solid waste. If a facility has removed sludges or other solid wastes from impoundments and are managing these wastes in piles or other units at the facility, other sections of the solid waste regulations must be considered and implemented if applicable. Managing sludges or other solid wastes in non-compliant configurations simply for convenience or cost savings is not allowed.

**Discussion of Regulatory Proposal**

This amended Section 9 is the result of an extensive stakeholder process lasting more than three years. This process involved WQCD staff, Solid Waste staff, drinking water treatment facilities, power utilities, environmental groups, local governments, and consultants. Many important issues were identified by the stakeholders, the resolution of each is presented later in this Statement of Basis and Purpose.

I. <u>This amended Section 9:</u>

A. Defines the scope and applicability of the regulations in Section 9.1.1.

1. Clarifies that the regulations apply to all waste impoundments where storage, treatment, utilization, processing, or deposit and final treatment of solid waste occurs.

2. Clarifies that Sections 1 and 2 of the Solid Waste Regulations apply to waste impoundments unless otherwise specifically noted within the Section 9 regulations.

B. Defines an extensive list of exemptions to the regulations in Section 9.1.2.

1. Statutory Exemptions: The statutory exemptions are included at the request of stakeholders in order to make the regulation more user-friendly. This category of exemptions includes impoundments containing materials are not solid wastes pursuant to the statutory definition. This category is comprised of the exemptions in 9.1.2(A) (7), (8), (10), and (13). Sections 1 and 2 of the Solid Waste Regulations do not apply to these impoundments.

2. Regulatory Exemptions for HMWMD-regulated impoundments: These exemptions apply when other regulatory programs in the Division offer equivalent protection. This category is comprised of the exemptions listed in 9.1.2(A)(2), (5), (9), and (12). Sections 1 and 2 of the Solid Waste Regulations <u>DO</u> apply to these impoundments.

   Note: With respect to exemption 9.1.2(A)(5), tanks are usually self-supporting and have cement or metal sides and bottoms and do not meet the definition of waste impoundments (9.1.2(A)(5)) so have been exempted from this Section 9. Currently, there is no stand-alone regulation for tanks storing solid waste. However, the terms "tank" and "tank systems" are defined in Section 1 of the Solid Waste Regulations. Minimum standards for all solid waste sites and facilities, which would include tanks and tank systems storing solid waste, are defined in Section 2. Therefore, the Division looks to Sections 1 and 2 when regulating tanks and tank systems storing solid waste.

3. Regulatory Exemptions for non-HMWMD-regulated impoundments: These exemptions apply when other regulatory programs outside the Division offer equivalent protection. This would include exemptions listed in 9.1.2(A)(1), (11), (14), (16), and (17). Sections 1 and 2 of the Solid Waste Regulations do not apply to these impoundments.

4. Other Exemptions:

   a. Section 9.1.2(A)(6) exempts impoundments that hold water that is in the process of being treated, and whose primary purpose is water treatment or recovery and not waste treatment, storage, or disposal. These basins may contain solid waste, but they are primarily water processing units. Examples are water recovery basins and filter backwash ponds that recycle water for further treatment. These impoundments, while exempt from Section 9, are not subject to WQCD permitting, but remain under solid waste authority. However, the Division believes the *de minimus* amount of solid waste managed in these impoundments does not present risk to human health and the environment. A sludge drying bed, by contrast, serves primarily as a waste management unit, and therefore would be regulated under Section 9. In some cases, a facility may have multiple backwash ponds. Each backwash pond could periodically be taken off-line to dry-out the contained sludge prior to removal – thereby temporarily acting as a drying bed. However, if water treatment and not sludge treatment is the primary purpose of the backwash pond and most of the time it perform a water treatment role, then that pond would be exempt under Section 9.1.2(A)(6). This same principle would apply to all types of water treatment impoundments. Sections 1 and 2 of the Solid Waste Regulations do not apply to these impoundments.

   b. Raw water impoundments containing untreated source water or water recovered from dewatering activities elsewhere in a facility do not contain solid waste and have, therefore, been exempted (9.1.2(A)(3)). Sections 1 and 2 of the Solid Waste Regulations do not apply to these impoundments.

   c. Secondary containment around tanks or piping must be emptied and cleaned immediately and, as such, would not present a risk to ground water (9.1.2(A)(4)), so has been exempted. Sections 1 and 2 of the Solid Waste Regulations do not apply to these impoundments.

   d. Impoundments that are used for temporary or emergency storage of solid waste for periods less than 30 days (9.1.2(A)(15)) are exempted from Section 9 because the short duration of storage would not present an excessive risk to ground water. The Division would assess, on a case-by-case basis, whether post-storage sampling would be necessary to confirm that no environmental effects occurred. Sections 1 and 2 of the Solid Waste Regulations do not apply to these impoundments.

   e. Section 9.1.2(A)(18) provides for exempting waste impoundments on a case-by-case basis. This category of exemptions is intended for unanticipated situations that present minimal potential for environment threat.

5. Partial Exemption: Section 9.1.2(B) provides a partial exemption for impoundments that manage and contain coal combustion residuals (CCR impoundments) from Sections 9.1.9, 9.2, and 9.3. CCR impoundments are potentially subject to the proposed rule from the U.S. Environmental Protection Agency (EPA), published at 75 Fed. Reg. 35127 (June 21, 2010). EPA is currently evaluating comments on this proposed rule and will either require that CCRs be managed under national solid waste standards or under hazardous waste standards. Either way, it is possible that money expended to bring CCR impoundments into compliance with this new Section 9 may be wasted if EPA's decision subsequently requires even more conservative retrofitting. Once EPA's decision is made, Section 9 will be modified as necessary for CCR impoundments.

C. Defines those types of impoundments that have been pre-classified as Type A impoundments in Section 9.1.3.

D. Defines an effective date for the regulations in Section 9.1.4.

E. In Section 9.1.5, defines six new terms unique to Section 9 (ancillary equipment, demonstration plan, existing facility, facility, site setting, and BSGW/Appendix B) and revises one term in Section 1.2 (sludge). In addition, Section 9 refers to the main definition section in Section 1.2 for other necessary definitions.

The definition of "BSGW/Appendix B" needs some explanation because stakeholder questions have arisen around the use of the BSGWs that appear in WQCD Regulation 41 and how those standards will be coordinated with Appendix B of the Solid Waste Regulations. A lot of information on this topic is presented in Section II.6 (Question 6 under Section II) of this Statement of Basis and Purpose.

F. In Section 9.1.6, defines two classes of solid waste impoundments, both of which must be protective of groundwater: Type A impoundments and Type B impoundments.

1. Type A impoundments pose no risk to groundwater resources because of the low-threat nature of the wastes managed (i.e. the liquid meets Basic Standards for Groundwater as it is placed in the impoundment) and/or the favorable hydrogeology inherent to the site which will allow the Basic Standards for Groundwater to be met at the point(s) of compliance. Type A impoundments need no engineering or operational controls to achieve ground water standards at the point(s) of compliance.

2. Type B impoundments pose some risk to groundwater resources because of the concentration of constituents in the influent waste stream to the impoundment is above one or more of the Basic Standards for Groundwater, or the local hydrogeology is not favorable. Because of the risks posed, Type B

impoundments are assumed to need engineering controls such as liners and/or operational controls to control the wastes managed in the impoundment such that ground water standards can be met at the point(s) of compliance.

A two-tier impoundment classification recognizes the low-risk nature of many waste impoundments. Low risk impoundments need minimal regulatory control and oversight to be protective of human health and the environment. However, some impoundments present higher risks and must be subject to more extensive requirements. In addition, it must be recognized that the classification of a particular impoundment may change through time if the nature of the waste managed therein changes. A Type A impoundment could become a Type B impoundment and vice versa.

G. In Section 9.1.7, defines compliance schedules for certain types of impoundments:

1. A short compliance schedule prioritizing facilities with high concentration sludges being managed in waste impoundments which present the highest risk to ground water and surface water resources is defined in Section 9.1.7(A). This allows the Department to work with these facilities earlier bringing higher risk impoundments into compliance first. (See Figure 3 at the end of this document)

2. An alternate compliance schedule for impoundments subject to closure under the Clean Air, Clean Jobs Act (HB10-1365), is defined in Section 9.1.7(C). This avoids needless classification and potential retrofitting for impoundments that will be closing in the near-term future. However, the alternate schedule requires that a written notice be provided to the Division containing the schedule for planned closure. A closure plan must be submitted to the Department within 24 months. This schedule assures these impoundments can be identified early and the operators commit to a closure schedule. (See Figure 3 at the end of this document)

3. For all other impoundments, the regulation directs in Section 9.1.7(B) that the compliance schedules in Sections 9.1.8 and 9.1.9 must be followed. However, in Section 9.1.7(D), the regulation allows for operators to propose an alternate compliance schedule to the Department for review and approval. (See Figure 3 at the end of this document)

H. In Section 9.1.8, defines a classification methodology to determine impoundment class for existing impoundments.

1. Step 1 in the classification process (Section 9.1.8(A) is submittal of an Inventory and Preliminary Classification Report (IPCR). This report proposes a classification for all impoundments for which the facility has adequate information. For impoundments without adequate information, the IPCR can be a short and simple statement of that fact. The report summarizes the available information and uses that information to support a classification proposal. The

Division reviews and approves the IPCR. The IPCR must be submitted to the Department within 12 months of the effective date of these regulations. However, small drinking water treatment facilities (those serving less than 10,000 people) are allowed to ask for up to 24 additional months to submit an IPCR. (See Figure 3 at the end of this document)

2. Step 2 in the classification process (9.1.8(B) is submittal of a Demonstration Plan for all impoundments at a facility for which adequate classification information is not available. The Demonstration Plan includes a scope of work and schedule for collecting the missing necessary information. Once approved by the Division, the facility implements the Plan and reports back to the Division in a Demonstration Report. The Demonstration Report will propose a classification for all remaining impoundments at the facility that were not classified in the Inventory and Preliminary Classification Report. The Division reviews and approves the Demonstration Report. The Demonstration Plan must be submitted to the Department within 12 months of the approval date for the IPCR. However, small drinking water treatment facilities (those serving less than 10,000 people) are allowed to ask for up to 12 additional months to submit an IPCR. (See Figure 3 at the end of this document) Section 9.1.8(B)(1) presents the various components that would be included in a Demonstration Plan as necessary to complete impoundment classification.

The crux of Section 9 lies in determining which type(s) of waste impoundment is present at a facility. Once an impoundment is classified, then the appropriate regulatory requirements for that impoundment can be determined in the new regulations. To be clear, classification of an existing or future impoundment is only a function of two things: 1) characteristics of the waste stream and 2) characteristics of the local geology and hydrogeology. Both of these factors can affect the concentrations of contaminants at the points of compliance. The classification of an existing or future impoundment is not dependent on design elements like impoundment liners or ground water detection monitoring systems. Rather, required design elements result from the impoundment classifications. The objective is to make sure that existing facilities are not bumped to a higher classification level simply because they are over-engineered. This would have the effect of punishing a facility for taking a cautious approach to environmental protection.

Because impoundment classification is so important, the Division has developed Figure 1 (attached at the end of this Statement of Basis and Purpose) to be used in conjunction with Section 9. Figure 1 is a flowchart that goes through the classification decision-making logic that is embodied in the regulations.

In addition, the Division has developed Figure 2 (attached at the end of this Statement of Basis and Purpose), which is a table that presents the regulatory requirements for each classification category that are embodied in the regulations.

In addition, it is necessary to point out that classification of a given impoundment may change if the waste managed in the impoundment changes.

I. In Section 9.1.9, defines the timing for submittal of an Engineering Design and Operations Plan (EDOP). For all Type B impoundments at new and existing facilities, facility operators are required to submit an EDOP for Department approval. The EDOP describes how the facility will comply with all applicable requirements in the Solid Waste Regulations, including requirements in Section 9, but also applicable requirements from Sections 1 and 2. (See Figure 3 at the end of this document)

J. Section 9.2 defines requirements for Type A waste impoundments.

1. Design and construction: Type A impoundments are inherently protective and therefore are assumed not to require engineered waste containment in order to protect groundwater. Therefore, the only design and construction requirements are for access control and stormwater control.

2. Operating, recordkeeping and reporting: Operational requirements are commensurate with risk. Therefore, there are no operational requirements for Type A waste impoundments.

3. Financial assurance: The solid waste statute requires financial assurance be established by all solid waste sites and facilities. Financial assurance cost estimates are derived from each facility's closure and post closure care plans. Type A waste impoundments are required to have financial assurance per the requirements of Section 1.8 of the regulations.

4. Closure and post-closure requirements: For a Type A waste impoundment representing little or no risk to the environment, the closure plan may be fairly simple and straightforward, involving nothing more than excavation and disposal of any waste that remains in the impoundment at the time of closure.

   Regardless of impoundment classification, post closure care can be eliminated through "clean closure." That is, if the facility elects to remove the contaminants from the site down to a level that allows for unrestricted use, then post closure care can be eliminated. Unrestricted use may be demonstrated by comparing soil contamination against: 1) the current version of what is today the Colorado Soil Evaluation Values (http://www.cdphe.state.co.us/hm/csev.htm), 2) background concentrations, or 3) health protective levels derived from a risk assessment as described in the Corrective Action Guidance Document (http://www.cdphe.state.co.us/hm/caguidance.pdf).

K. Section 9.3 defines requirements for Type B waste impoundments.

1. Design and construction: Type B impoundments represent a broad range of risk, and therefore, the design elements necessary to manage such risk will vary considerably from site to site. The biggest design element concerns the impoundment liner(s). In some cases, existing facilities will be able to demonstrate that the existing liner is sufficient to protect groundwater. For waste impoundments on the riskier end of the spectrum, a new liner system or upgraded liner system may be necessary in order to achieve groundwater protection.

   There was quite a lot of stakeholder concern regarding Section 9.3.2(B). This concern centered on language that stated that a facility may resume operations in an impoundment for which the construction certification is still under Department review "at their own risk." This language was removed and replaced with language that allows the facility to resume waste operations in the impoundment while the Department reviews the construction certification report. If the Department finds a problem in the construction certification that demands a physical fix to the impoundment, the Department would work out a compliance schedule with the affected facility to correct the problem. The Department would not demand immediate cessation of impoundment use that could jeopardize power generation or safe drinking water to the public.

   In Section 9.3.1(D), some stakeholders felt that the standard of maintaining 2 feet of freeboard in impoundments was not an appropriate "one size fits all" approach. The Department has elected to leave that standard in the regulations as a satisfactory default, but inserted language allowing for an alternative amount of freeboard to be approved by the Department.

   Other design and construction elements required at Type B waste impoundments include leak detection monitoring, access control, stormwater control, durable embankments, ground water monitoring, and construction quality assurance and quality control. These portions of Section 9.3 are straight-forward and did not garner any particular stakeholder concerns.

2. Operating requirements: Operational requirements are commensurate with risk. Therefore, the Type B requirements are more extensive than the Type A requirements. The requirements for type B impoundments include ground water monitoring, surface water monitoring, continuous fluid level measurement, a contingency plan, impoundment inspections, waste characterization, and personnel training. Again, these requirements are straight-forward. One note: For non-commercial Type B impoundments receiving only wastes generated on-site, the waste characterization requirements can be greatly simplified due to process knowledge and the degree of control exercised by the owner/operator.

It should also be noted that the regulatory language repeats the concept that a Type B impoundment must be operated such that the basic standards for ground water from the WQCC's Regulation 41 (BSGWs) are maintained at the point(s) of compliance. In cases where naturally occurring concentrations of potential contaminants exceed the BSGWs, using natural background as the compliance level is appropriate. The methodology for doing this can be found in Appendix B to the Solid Waste Regulations. Appendix B can also be used for establishing a site-specific standard for a contaminant that has no established BSGW in Regulation 41.

3. Financial assurance: The solid waste statute requires financial assurance be established by all solid waste sites and facilities. Financial assurance cost estimates are derived from each facility's closure and post closure care plans. Type B waste impoundments are required to have financial assurance per the requirements of Section 1.8 of the regulations.

4. Engineering Design and Operations Plan (EDOP): Section 9.3.4 requires that facilities with Type B waste impoundments submit an EDOP for review and approval by the Department and the local governing authority. Section 9.3.4 contains the requirements for the content of an EDOP, but facilities with Type B waste impoundments need to be careful to also include the content required by Sections 9.3.1, 9.3.2, and 9.3.3.

5. Recordkeeping and reporting requirements: Section 9.3.5 defines recordkeeping and reporting requirements for type B facilities.

6. Closure and post-closure requirements: Type B impoundments will have more extensive closure plans than Type A impoundments. In fact, Type B impoundments must have closure and post-closure plans that satisfy the requirements of Sections 9.3.4(F), 9.3.6, and 9.3.7.

   Regardless of impoundment classification, post closure care can be eliminated through "clean closure." That is, if the facility elects to remove the contaminants from the site down to a level that allows for unrestricted use, then post closure care can be eliminated. Unrestricted use may be demonstrated by comparing soil contamination against: 1) the current version of what is today the Colorado Soil Evaluation Values (http://www.cdphe.state.co.us/hm/csev.htm), 2) background concentrations, or 3) health protective levels derived from a risk assessment as described in the Corrective Action Guidance Document (http://www.cdphe.state.co.us/hm/caguidance.pdf).

II. Issues Encountered During Stakeholder Process:

1. What is a solid waste?

The Solid Waste Act defines solid waste as:

> "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial or commercial operations or from community activities." (§ 30-20-101(6)(a), C.R.S. (2009))

In *American Mining Congress v. EPA*, 824 F.2d 1177, 1190 (D.C.Cir.1987), the court held that Congress intended "solid waste" to include only "discarded material" and that the particular categories "garbage, refuse, sludge from a waste treatment plant, sludge from a water supply treatment plant, and sludge from an air pollution control facility . . . contain materials that clearly fit within the ordinary, everyday sense of 'discarded.'" Therefore, any garbage, refuse, sludge from a waste treatment plant, sludge from a water supply treatment plant, and sludge from an air pollution control facility categorically constitute solid wastes. *See Safe Food and Fertilizer v. E.P.A.,*350 F.3d 1263, 1269 (D.C.Cir. 2003).Other materials are solid waste if they are discarded – that is if they are disposed of, abandoned, thrown way or identified as not for reuse within the "industry's ongoing production process." *American Mining Congress* at 1185.

2. When is solid waste generated?

Solid waste is generated when garbage, refuse or sludge from a waste treatment plant, sludge from a water supply treatment plant, or sludge from an air pollution control facility is created. For example, in the case of a water treatment supply facility, solid waste is generated when a filter separates out sludge from the water. By definition, that sludge is solid waste because "sludge from a water supply treatment plant" is one of the particular classes in the definition of solid waste. *American Mining Congress*, 824 F.2d at 1190; *see also Safe Food* 350 F.3d at 1269. It should be noted however, that Section 9 regulates waste impoundments and equipment ancillary to an impoundment. Section 9 does not regulate solid waste from the moment it is generated.

Section 9 regulates impoundments that store, treat, process or dispose solid waste. Section 9.1.2 establishes exemptions which distinguish the regulated universe from the unregulated universe. For the sake of implementability, Section 9.1.2(F) exempts impoundments whose primary purpose is to treat water, which effectively excludes everything upstream of the solids drying beds, even though such impoundments may contain small amounts of solid waste.

3. When is a material discarded and when does it become a solid waste?

Material is discarded when it is disposed of, abandoned, thrown way or identified as not for reuse within the "industry's ongoing production process." *See American Mining Congress*, 824 F.2d at 1185. The *American Mining Congress* court explained any garbage, refuse, sludge from a waste treatment plant, sludge from a water supply treatment plant, and sludge from an air pollution control facility material is, by its nature, discarded. *Id.* at 1190.

The argument has been made by some of the water treatment stakeholders that the sludge is not discarded until it is removed from the impoundments and put on a truck headed for a disposal facility. Part of the rationale for this argument is that water from the impoundments might be decanted off, reclaimed, and returned to the water treatment process. This argument, however, is at odds with the *American Mining Congress* decision because the sludge is not returned to the "ongoing production process." The primary purpose of a water treatment plant is to produce potable water for its customers. This is accomplished by removal of physical and chemical impurities from raw water to produce potable water. A necessary result of potable water's ongoing production processes is the accumulation of solids and the generation of sludge. The sludge is a separate and distinct waste stream that must be managed as part of the water production process. The sludge is in no way part of the final product, nor is it reused in the potable water. In fact, much time, effort and money is expended specifically to separate solids and sludge from the final finished potable water product. Hence the potable water is part of the ongoing production process, while the sludge is part of the solids and waste management process and is a solid waste.

4. Why is a certificate of designation required for impoundments that store solid waste?

The Solid Waste Act defines solid waste disposal to mean "the storage, treatment, utilization, processing, or final disposal of solid wastes." § 30-20-101(7), C.R.S. (2009). The Act prohibits solid waste disposal anywhere except at a solid waste disposal site and facility which has obtained a certificate of designation (CD). § 30-20-102(2), C.R.S. (2009). Therefore, a facility that stores, treats, utilizes, processes or finally disposes of solid waste must obtain a certificate of designation. Some exemptions from the requirement to get a CD exist – see section 30-20-102, C.R.S. For instance, although a transfer station otherwise meets the definition of a solid waste disposal site and facility that requires a CD, the Act exempts transfer stations from the CD requirement. Also, disposal by certain entities of one's own waste on one's own property is exempt from the CD requirement.

A bill has been written and was introduced to the Water Resources Review Committee in October, 2011, that would exempt drinking water treatment facilities from the requirement to get a CD. The bill was accepted by the

Committee and was introduced as House Bill 12-1078 in the 2012 Session on January 11, 2012.

5. How will Sections 1 and 2 of the Solid Waste Regulations be applied at waste impoundments?

   Section 1 of the Solid Waste Regulations includes generally applicable requirements such as definitions, financial assurance, fees, a waiver process, etc. The Section 1 requirements are applicable to Section 9 impoundments, but generally do not affect day-to-day operations. Section 2 includes minimum solid waste facility standards including ground water monitoring, recordkeeping, closure, and post-closure requirements. Because these requirements do affect day-to-day operations, Section 2.1 of the Regulations indicates that Section 2 applies to *all* solid waste sites and facilities including facilities with impoundments subject to Section 9. Section 9.1.1 clarifies that Section 1 and 2 apply to all waste impoundments and their ancillary equipment unless otherwise specifically noted within Section 9. However, Section 9.1.1 also states that this new Section 9 incorporates, to the extent possible, those portions of Section 2 that normally apply. There are only two references to specific parts of Section 2. Both of these references relate to waste characterization and occur in Sections 9.3.4(E)(4) and 9.3.5(D)(4).

6. How will the WQCC Regulation 41 requirements be meshed with Sections 2 and 9 and Appendix B of the Solid Waste Regulations?

   As is stated in Section 9.1.1, Section 2 of the Solid Waste Regulations applies to waste impoundments regulated under Section 9, but the requirements of Section 2 have already been incorporated into Section 9.

   Appendix B presents methods for 1) determining appropriate enforceable standards for waste constituents for which there is no Regulation 41 standard (App B7(G)); 2) determining background levels for waste constituents (App B3 and B4), some of which may also have Regulation 41 standards, and 3) delineating when a release from a waste impoundment has taken place (App B4 and B5). All of these methods tie back to Regulation 41 as the source for the underlying constituent standards. The term "background levels" refers to both the levels of naturally occurring and anthropogenic constituents in upgradient ground water.

   The term "BSGW/Appendix B" is used and defined in Section 9. This term is used because of the intimate relationship between the Regulation 41 standards (the Basic Standards for Ground Water or BSGW) and Appendix B. As stated in the definition for "BSGW/Appendix B" in Section 9.1.5(F), Regulation 41 is the primary source for ground water standards.

In the classification process, the criteria for determining whether a waste impoundment is Type A are predicated solely on Regulation 41. However, once classification is complete, and an impoundment has been determined to be a Type B waste impoundment, Appendix B is fully applicable.

7. Will an environmental covenant be required at closure?

Section 25-15-317, C.R.S., provides the statutory basis for requiring environmental covenants. An environmental covenant is an enforceable agreement between the state and a party conducting a cleanup remedy or closing a facility. It applies to closure of solid waste disposal sites under the Colorado Solid Wastes Disposal Sites and Facilities Act. The purpose of the covenant is to ensure the state can enforce land use restrictions necessary to protect human health and the environment against current and future property owners. If the facility closure will result in the need for engineering controls (e.g. a final cover) or use restrictions (e.g. no drilling into the waste mass, or no use of ground water), then the property owner must grant the state an environmental covenant at closure that ensures those requirements continue. However, if the property is cleaned up or closed in such a manner that it is suitable for unrestricted use going forward, then no environmental covenant will be required.

8. Will there be flexibility in liner design?

Since Type B waste impoundments represent a broad spectrum of facility types, Section 9 allows facility owners and operators flexibility in terms of the liner designs that may be proposed. (Type A waste impoundments are presumed not to require a liner system.) This flexibility is intended to give facility owners and operators the opportunity to evaluate the use of innovative designs, should they choose to do so, but any option proposed must be demonstrated to be capable of complying with the threshold criterion of protecting groundwater at the point of compliance.

In order to achieve that design goal, the facility may utilize either a prescriptive or performance based design. The prescriptive design consists of either a composite liner or double liner system, and forms a hydraulic barrier incorporating redundancy provided by two different liner materials. Waste impoundments managing highly mobile waste constituents (constituents with high water solubility or high mobility due to pH regimes, etc.) or situated in a non-favorable hydrogeologic setting may be appropriate for a prescriptive design. Additionally, some facilities may opt for the prescriptive design simply because there is a lesser burden insofar as proving its sufficiency. Alternative designs, by contrast, must be demonstrated capable of meeting the design goal. As such, alternative designs will be evaluated not only with respect to the characteristics of the waste to be managed, site setting, and hydrogeologic setting, but also for considerations such as constructability, and operation and maintenance of the waste impoundment.

Particularly for impoundments managing less mobile waste streams (low water solubility and neutral pH regimes, etc.) or characterized by favorable hydrogeology, the option to propose an alternative design will facilitate selecting a design approach that optimizes resources while at the same time providing adequate environmental protection.

9. What will be covered in an associated guidance document?

Working with interested stakeholders, the Department is committed to preparing a Section 9 guidance document that would explain how facilities should prepare certain documents, sample sludge media, analyze sludge media, etc. We plan to convene this process after Section 9 is promulgated. A partial list of topics to include follows:

- analytical suites
- analytical methods
- demonstration methods
- liner permeability testing methods for existing impoundments
- liner design standards (reference appropriate existing guidance, if any)

Other solid waste guidance documents may need to be modified to add clarity and consistency with this new Section 9. This will be dealt with during preparation of the Section guidance.

10. When will the Division develop a guidance document to help with the implementation of the revised Section 9?

The Division hopes to commence development of a companion guidance document through a follow-on stakeholder process shortly before and after Section 9 is promulgated.

11. What is the interface of this Section 9 with the radiation regulations?

The Division's Radiation Program will retain regulatory authority over waste impoundments containing material subject to a radioactive materials license.

12. Can we conduct a Pilot Program to review how the draft regulations will be applied at various types and sizes of regulated entities and what affect the regulations will have at those facilities?

The Department conducted two pilot programs specific to the drinking water treatment sector. The first pilot (Pilot 1) reviewed existing data at a subset of drinking water treatment plants to see whether there was sufficient information to classify the waste impoundments at these sites as Type A or Type B. It was determined that there were significant data gaps to be filled, and that based on the limited sample size of twelve facilities, it appeared unlikely that many drinking

water treatment plants would have sufficient existing data to support classification of their waste impoundments. The Department then conducted Pilot 2, whose purpose was to collect additional data at another subset of drinking water treatment plants for the purpose of determining if preclassifying coagulant sludge waste impoundments as Type A waste impoundments was possible and protective of human health and the environment. Pilot 2 confirmed that waste impoundments that manage coagulant sludges at these facilities did support pre-classification as Type A impoundment. Pilot 2 was limited in scope to a specfic sector and a specific treatment process (i.e. conventional surface water treatment with coagulant sludge); therefore, its results have little applicability to other sectors or drinking water treatment facilities using different treatment technologies.

13. Why are waste impoundments at Drinking Water Treatment Facilities now being regulated by the Solid Waste Program in the HMWMD instead of by the Water Programs (Drinking Water and Clean Water) in the WQCD?

    The introductory sections of this Statement of Basis and Purpose give a lot of information in answer to this question. It is important to note that solid waste impoundments at Drinking Water Treatment Facilities have always fallen under the authority of the Solid Waste Act and Solid Waste Regulations. The Division has needed to upgrade the current Section 9 Waste Impoundment regulations for quite a while. When the stakeholder process was started to discuss a new Section 9, the Division brought the Drinking Water Treatment Facilities into the stakeholder group because it was HMWMD's intent to begin more closely regulating this group.

    It is also important to note that the WQCD has never closely regulated impoundment design or impoundment construction quality at Drinking Water Treatment Facilities. WQCD's main thrust has been the effectiveness of each facility's ability to deliver safe drinking water. Water treatment residuals, their storage, and their ultimate disposition were not high priorities for WQCD. However, as a statutorily mandated implementer of state ground water standards, HMWMD needs to understand the performance of impoundments at Drinking Water Treatment Facilities that manage solid wastes. Just as WQCD has engineering expertise in water treatment, HMWMD has expertise in impoundment design and ground water protection.

14. What risks at Drinking Water Treatment Facilities necessitate the level of regulatory control required in this new Section 9?

    Based on the proposed pre-classification of drinking water treatment impoundments managing coagulant sludge as Type A impoundments, the level of regulatory control at the majority of these facilities will be minimal. Pilot 2 demonstrated that the coagulant sludge impoundments present low risk to the environment, and the minimal regulatory requirements are commensurate with

that risk. For drinking water treatment facilities using other treatment technologies, such as ion exchange or reverse osmosis, the level of regulatory control will be greater owing to the presumed higher risk of these waste streams. This approach is consistent with the preference stated by stakeholders to address the highest risks with tighter regulatory controls.

15. Will the existing fee structure for facilities regulated by Section 9 ($125/hour for review time and $1,000/yr/facility annual fee) remain in place?

    The document review and activity fee , that is currently set at $125/hour, will remain. This is an hourly fee charged by the Solid Waste Program for the review of submitted documents. The fee only recovers the cost of our staff time plus indirect costs associated with that time. This fee may change in the future, but such a change would require a Commission-approved rule change.

    The $1,000/yr fee will be changed into a tiered scheme based on the ongoing effort of the Solid Waste Program to inspect and otherwise track each type of facility. The new annual fee will include, but not be limited to, consideration of the solid waste generation rate at the facility, the type/toxicity of waste generated, and whether the facility is a Type A or Type B facility. When the fee is changed, it will require a rulemaking by the Solid and Hazardous Waste Commission. It is the Division's intent to begin that process and stakeholder involvement after this Section 9 is promulgated. Until then, all annual fees for facilities only regulated by Section 9 (i.e., not subject to other solid waste fees except the hourly fee) will be waived.

16. For Drinking Water Treatment Facilities that have Type A impoundments, what types of flexibilities will be allowed by the Solid Waste Program for the requirements to have a Closure Plan and Financial Assurance?

    Closure Plans: Many facilities may already have a closure plan, but may call it something else – for instance, a "decommissioning plan." If this is the case, the Solid Waste Program fully intends to allow the requirement for a Type A closure plan to be met by these alternative documents.

    In addition, some facilities may have a very long or indefinite design life, as is the case for most drinking water treatment facilities, such that the concept of closure is foreign. In these cases, it is the intent of the Solid Waste Program to allow creation of a closure plan via checklists and formulas that will be presented in the Section 9 Guidance Document when it is developed.

    Financial Assurance: In the Solid Waste Regulations, financial assurance is required so as to protect Colorado taxpayers from having to absorb the cost of cleaning up a facility that goes bankrupt or dodges its closure responsibilities. For a Type A facility, assuming no pre-existing ground water contamination and no

long-term care of waste left in place, impoundment closure costs would consist of simply removing any remaining wastes and taking the wastes to an approved disposal facility. The determination of the appropriate amount of financial assurance would be a straight-forward calculation based on the type, the estimated "normal" amount of waste in each impoundment, and the cost to dispose of the waste at a disposal facility.

The Solid Waste Regulations, in Section 1.8, already allow for many different types of financial assurance mechanisms. Significantly, this includes a local government financial test, fully explained in Section 1.8.11. The Solid Waste Program assumes that most drinking water treatment facilities that are publicly owned or owned by special districts would be able to demonstrate that they meet the requirements for this test. If so, no additional financial assurance would be needed.

So, in summary, Drinking Water Treatment Facilities may be able to use a pre-existing plan to substitute for a closure plan. If not, very simple checklist-driven plans can be prepared. And, for most Drinking Water Treatment Facilities, the local government financial test can be used to meet all financial assurance requirements preventing the need to establish additional and separate financial assurance mechanisms.

17. Will there be compliance schedules that allow smaller facilities with fewer resources longer amounts of time to attain compliance?

    Yes. The version of Section 9 subject to today's rulemaking contains compliance schedules discussed with the stakeholders.

18. Drinking Water Treatment Facilities must disinfect drinking water before it is delivered to customers. The disinfection process produces byproduct chemicals that have very low ground water standards. If an impoundment can meet the Type A criteria except for the levels of disinfection byproducts, will the impoundment default to being a Type B impoundment?

    Following implementation of Pilot II, and the evaluation of data collected, the Department will work with the Water Quality Control Division to propose a strategy for disinfection by-products.

19. Can the proposed liner permeability criterion of 10-7 cm/sec for waste impoundments be aligned with the exemption criteria in WQCC Regulation 61, which states that seepage from an impoundment that does not exceed 10-6 cm/sec will not be considered a discharge to groundwater?

    As stated earlier in this Statement of Basis and Purpose, one of the primary drivers for these new regulations is protection of ground water. To protect ground

water under solid waste impoundments, HMWMD has structured this revised Section 9 to allow regulated facilities the flexibility to follow either a performance-based or prescriptive approach to liner design. Under the performance based approach, existing facilities would demonstrate through analytical results or modeling that the existing liner system is protective of groundwater at the point of compliance. This performance based approach is preferable for existing facilities because it avoids the need to perform forensic testing on an existing liner system, which can be difficult and expensive. It also avoids the prescriptive liner designs presented in the regulations. In summary, then, this new Section 9 does not prescribe a liner permeability requirement unless the facility wants that. Instead, it requires ground water standards to be achieved at the point of compliance independent of liner design.

The methodology for how an existing liner is tested for adequacy will be dealt with in the new Section 9 guidance.

20. How should Drinking Water Treatment Facilities characterize the sludges, or the water fraction thereof, that accumulate in solid waste impoundments at their facility? What sampling and analytical protocols should be used?

    The initial data from Pilot 2 supports pre-classifying coagulant sludge waste impoundments as Type A. All data is expected to be received by the time of the February rulemaking. For those sites that are not pre-classified as Type A, the draft Section 9 provides flexibility to utilize various types of data in characterizing water treatment residuals. Drinking water treatment facilities will often have data from leaching tests performed on dried sludge for purposes of disposal. This data may be compared to Regulation 41 standards for classification purposes. Other SW-846 methods may be utilized on the liquid fraction of the sludge. For those facilities having an underdrain system, the underdrain liquid may lend itself to characterization via drinking water methods. Influent characterization is a possible path to Type A, but this should be done under a demonstration plan with sampling protocol approved by HMWMD. We anticipate providing additional sampling and analysis information in the guidance document that will be prepared for Section 9 implementation following rule promulgation.

21. Drinking Water Treatment Facilities are used to dealing with WQCD engineering staff during periodic sanitary survey inspections. Can the engineering staff also inspect compliance against Section 9 requirements?

    Yes. Compliance with Section 9 will primarily be determined by periodic self-certification of compliance with Section 9 provided by each Drinking Water Treatment Facility to the HMWMD for type A waste impoundments, and brief strategic inspections by the WQCD engineering staff during sanitary surveys.

HMWMD will also perform periodic inspections as needed or as requested by the WQCD engineering staff for type B waste impoundments.

22. How will Self-Certification work?

HMWMD will set up a Self-Certification Program for Type A impoundments. This will involve annual notification of each facility by HMWMD that a self-certification of compliance is due. Accompanying the notification will be a packet of information with instructions for completing the self-certification. Completion of the self-certification checklist will be available on-line or in hard copy and will be returned to HMWMD within the allowed timeframes. HMWMD will review the submitted information and may follow-up with individual facilities for more information. HMWMD will also perform a certain number of follow-up inspections to ensure that the program is working, that the checklist questions make sense, and to confirm results.

A self-certification by a Type A facility will constitute their annual report.

III. Addition of New Definitions to Section 1.2 of the Regulations:

Section 1.2 of the regulations need to include revised definitions, as follows:

1. Sludge – means any solid or semi-solid waste generated by municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility. This definition is different than the definition in Section 1.2. Therefore, the 1.2 definition will be changed.

IV. Alternatives Considered and Why Rejected.

Four basic alternatives, and a few variations on those alternatives, were considered in this rulemaking:

1. The version of the regulations proposed in this rulemaking.
2. Covering the solid waste authorities at water treatment utilities with the WQCD programs, while covering regulation of all other solid waste surface impoundments through the updated Section 9. This alternative was rejected for several reasons. First, as outlined in the section covering SB89-181 earlier in this Statement of Basis and Purpose, statutory language in SB89-181 limits WQCD's ability to regulate certain facilities when another implementing agency has, and is implementing, their own authorities. The Solid Waste Program has the needed authority and implements that authority at other types of solid waste surface impoundments, so having the WQCD regulate the solid waste surface impoundments at drinking water treatment facilities is unnecessary and inconsistent with broader Solid Waste Program implementation. Second, the Solid Waste Program routinely regulates engineered units that manage solid waste

– landfills, incinerators, composters, recyclers, commercial oil and gas brine impoundments, etc. This includes evaluation of liner designs, ground water monitoring and leak detection systems, and contamination fate and transport. As this is the purpose of Section 9 for solid waste surface impoundments, utilizing the existing expertise within the program was a more reasonable and efficient solution than establishing that expertise within WQCD.

3. Several alternatives were considered and rejected that were more extensive than this Section 9 including:

   i. Regulating every part of any facility downstream of the initial generation of solid waste. This would have caused all solid waste at a facility with a solid waste surface impoundment to be regulated either within a surface impoundment or within ancillary equipment. This alternative was rejected because managing most of this solid waste would not be appropriate in Section 9 where only solid waste surface impoundments are intended to be covered.

   ii. Regulating all surface impoundments that would or could manage solid waste. This could have caused storm water impoundments, raw water impoundments, secondary containment structures, backwash basins, and emergency catchment basins to be regulated by this Section 9. After review of existing information, feedback from stakeholders, and information from the Pilot Program, this alternative was rejected as being more intrusive than necessary. The likelihood that these types of impoundments would manage solid waste that could present any danger to ground water or nearby surface water is extremely low. In the off-chance that solid wastes with high levels of contamination enter any of these types of impoundments, the Solid Waste Program has other authorities that would allow us to work with the facility to rapidly address any problems.

4. Another alternative evaluated and rejected was regulating solid waste surface impoundments under the previous (existing) Section 9 regulations. This alternative was rejected because the existing Section 9 is out of date and not consistent with the newer sections of the Solid Waste Regulations. The previous version of Section 9 was largely applied to brine facilities and little attention was given to other types of waste impoundments. Since that time, many aspects of the existing regulations have become outdated as enumerated in section III of this Statement of Basis and Purpose.

V. <u>Cost/Benefit Analysis –</u>

A separate Cost/Benefit Analysis has been prepared for these proposed Section 9 regulations.

**Figure 1**


Solid Waste Surface Impoundments Classification Flowchart
Does the impoundment qualify for any of the exemptions listed in 9.1.2?
YES
Impoundment not regulated under Section 9
NO
Are any of the following true of the impoundment ?
Is the concentration of waste constituents in any underdrain water less than the WQCD Reg 41 Basic Standards for Groundwater? (BSGW)
OR
Is the concentration of waste constituents in the liquid fraction of the sludge less than the BSGW ?
OR
Using a TCLP or SPLP analysis on the solid fraction of the sludge, is the concentration of waste constituents less than the BSGW ?*
YES
NO
No information or insufficient information
Is the concentration of waste constituents in the impoundment influent less than the BSGW ?**
YES
NO
Considering the waste characteristics and hydrogeologic setting ( but not impoundment design or operations)
Based on the wastes managed in the impoundment, would the BSGW always be met at the point of compliance ? ***
YES
NO
Type A Impoundment
Implement minimal controls per Section 9.2
Type B Impoundment
Implement appropriate controls per Section 9.3
* The TCLP test, because of the use of strong acid in digesting a solid sample, will probably yield "worst case" results. Concentrations of analytes may be higher in the test results than would be found in or under the impoundment Therefore, impoundments that may still qualify for Type A classification could fail this screen if it is used by itself.
**Because of the variability in the concentrations of contaminants in impoundment influent, this determination must be made in consultation with HMWMD
*** If the BSGW could be exceeded at the point of compliance because of natural background levels or because of contamination not attributable to wastes managed in the surface impoundment, the impoundment can still be considered a Type A impoundment.

**Figure 2**

**Solid Waste Regulations: Section 9**
**Solid Waste Surface Impoundment Regulatory Requirements Matrix – by Impoundment Type**

| Category | Requirement | TYPE A | TYPE B |
|---|---|---|---|
| General | Design & Operations Plan | | X |
| | Construction Quality Assurance Plan | | X |
| | | | |
| Design Criteria | Access control | X | X |
| | Freeboard monitoring | | X |
| | Groundwater/Leak Detection Monitoring | | X[3] |
| | Stormwater Controls | X | X |
| | Liner System | | X[3] |
| | Surface Water Monitoring | | X[4] |
| | | | |
| Operating Criteria | Contingency Plan / Procedures | | X |
| | Facility Inspections | | X |
| | Waste Characterization Plan/ Procedures | | X[5] |
| | Personnel Training | | X |
| | Financial Assurance | X[1] | X |
| | Removal of surface accumulation | | X[6] |
| | | | |
| Reporting | Excursions from approved plans | | X |
| | Annual Report/Self-Certification | X | X |
| | Fluid level measurement | | X |
| | | | |
| Closure and Post-Closure care | Closure plan | X[2] | X |
| | Closure Report | X[2] | X |
| | Post-Closure Care Plan and Environmental Covenant (if not cleaned to unrestricted use) | X[7] | X[7] |

1 For Type A impoundments, the amount of financial assurance needed depends on the Closure Plan

2 Some Type A impoundments may need only a very simple Closure Plan or may be able to use another similar and pre-existing document for a Closure Plan. Similarly, for facilities with very simple Closure Plans, very simple Closure Reports may suffice. This can be worked out between the facility and the Solid Waste Program before these plans and reports are prepared and submitted.

3 Type B impoundments, depending on the waste type managed and the hydrogeologic setting, could be subject to a range of liner capabilities – from a minimal clay liner to a double liner system with leak detection. In turn, the amount of ground water monitoring required at a Type B impoundment may be dependent on the liner system used and, therefore, may also range from a few monitoring wells to many. An appropriate liner/ground water monitoring system will be a site-specific determination by CDPHE.

4 Surface water monitoring would only be required when nearby surface water bodies are likely to be affected by the waste impoundment.

5 A Waste Characterization Plan is only applicable to commercial impoundment operators to prevent the acceptance of hazardous waste.

6 Removal of surface accumulation applies only to operators that could receive oily waste.

7 A Post-Closure Care Plan and an Environmental Covenant are only required if an impoundment closes with waste left in place where contaminant concentrations in the waste are not safe for all future uses of the property and/or ongoing engineering controls are necessary for protection of human health or the environment.

**Figure 3: Compliance Schedule Gantt Charts per Sections 9.1.7, 9.1.8, and 9.1.9**

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 1 | **Waste impoundments receiving waste from reverse osmosis, ion exchange, iron filtration units** | **4/2/2012** | **1/2/2013** |
| 2 | Prep and submit EDOP or Type A Demo Plan | 4/2/2012 | 1/2/2013 |
| 3 | | | |
| 4 | **Waste Impoundments closing under Clean Air-Clean Jobs Act** | **4/2/2013** | **4/2/2014** |
| 5 | Submit closure notice and schedule | 4/2/2013 | 4/2/2013 |
| 6 | Submit closure plan | 4/2/2014 | 4/2/2014 |
| 7 | | | |
| 8 | **All other waste impoundments (assuming Demo Plan needed)** | **4/2/2012** | **9/30/2016** |
| 9 | Prep and submit IPCR | 4/2/2012 | 4/2/2013 |
| 10 | CDPHE approve IPCR | 4/2/2013 | 7/2/2013 |
| 11 | Prep and submit Demo Plan | 7/2/2013 | 7/2/2014 |
| 12 | CDPHE approve Demo Plan | 7/2/2014 | 10/2/2014 |
| 13 | Implement Demo Plan | 10/2/2014 | 4/2/2015 |
| 14 | Submit Demo Report | 7/2/2015 | 7/2/2015 |
| 15 | CDPHE approve Demo Report | 7/2/2015 | 10/2/2015 |
| 16 | Prep and submit EDOP or CD application if Type B | 10/2/2015 | 9/30/2016 |
| 17 | | | |
| 18 | **All other waste impoundments (assuming Demo Plan NOT needed)** | **4/2/2012** | **7/2/2014** |
| 19 | Prep and submit IPCR | 4/2/2012 | 4/2/2013 |
| 20 | CDPHE approve IPCR | 4/2/2013 | 7/2/2013 |
| 21 | Prep and submit EDOP or CD application if Type B | 7/2/2013 | 7/2/2014 |
| 22 | | | |
| 23 | **Water treatment plants serving fewer than 10,000 people (assuming Demo Plan needed)** | **4/2/2012** | **10/2/2018** |
| 24 | Prep and submit IPCR | 4/2/2012 | 4/2/2014 |
| 25 | CDPHE approve IPCR | 4/2/2014 | 7/2/2014 |
| 26 | Prep and submit Demo Plan | 7/2/2014 | 7/1/2016 |
| 27 | CDPHE approve Demo Plan | 7/4/2016 | 10/4/2016 |
| 28 | Implement Demo Plan | 10/3/2016 | 4/3/2017 |
| 29 | Submit Demo Report | 7/3/2017 | 7/3/2017 |
| 30 | CDPHE approve Demo Report | 7/3/2017 | 10/3/2017 |
| 31 | Prep and submit EDOP or CD application if Type B | 10/2/2017 | 10/2/2018 |
| 32 | | | |
| 33 | **Water treatment plants serving fewer than 10,000 people (assuming Demo Plan NOT needed)** | **4/2/2012** | **7/2/2015** |
| 34 | Prep and submit IPCR | 4/2/2012 | 4/2/2014 |
| 35 | CDPHE approve IPCR | 4/2/2014 | 7/2/2014 |
| 36 | Prep and submit EDOP or CD application if Type B | 7/2/2014 | 7/2/2015 |



**DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT**

**Solid and Hazardous Waste Commission**

**Hazardous Materials and Waste Management Division**

**6 CCR 1007-2**

# STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

**Revision to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Replacement with New Section 8 (Recycling and Beneficial Use) Regulations and Associated Additions and Revisions to Section 1.2 Definitions**

**(Adopted by the Solid and Hazardous Waste Commission on February 21, 2012)**

## Basis and Purpose

I Statutory Authority

These modifications are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 30-20-102(5) and 30-20-122, C.R.S.

II. House Bill

House Bill 07-1288 requires the Department to expand data collection on the diversion of solid waste materials beyond the current scope of recycling operations in Section 8 of the Regulations Pertaining to Solid Waste Sites and Facilities (the Regulations, 6 CCR 1007-2). The data tracking requirements of HB 07-1288 directly apply to recycling facilities and other operations not currently subject to Section 8 of the Regulations. As stated in § 30-20-122, C.R.S., additional duties of the Department include:

§30-20-122 (1) (a) The department shall collect information and data on recycling, solid waste, and solid waste diversion. Data required to be collected by the department on recycling, solid waste, and solid waste diversion as required by this subsection (1) shall include without limitation:

§30-20-122 (1) (a)(I) Statewide and regional solid waste stream components such as type of material, quantities of each material, and flow of each material;

§30-20-122 (1) (a) (II) The proportion of solid waste generated in the state that has been diverted to other uses that may be based upon a model established by the federal environmental protection agency for the purpose of calculating a recycling rate;

§30-20-122 (1) (a) (V) A statewide inventory of sites and facilities performing recycling or other solid waste processing or diversion.

III. Purpose of revising the regulations

The purpose of revising Section 8 is to update the recycling regulations by implementing the requirements of HB 07-1288, classify recycling operations and set specific requirements for each class, adopt regulatory standards for the beneficial use of solid waste, and remove ambiguous regulatory language and definitions on recyclable materials and recycling operations.

Furthermore, this new Section 8 will remove existing inapplicable regulatory exemptions and requirements. The result will allow facilities more flexibility based on the specific materials managed and types of recycling operations conducted, while remaining protective of human health and the environment. The update of Section 8 also includes standards for beneficial use determinations by establishing criteria and testing protocols that sites may use to perform a beneficial use demonstration prior to using materials in a project. The beneficial use standards will also facilitate sites looking to beneficially use solid waste by providing a list of pre-approved materials and uses.

**Discussion of Regulatory Proposal**

I. New and modified Definitions

The proposed Section 8 regulations require new definitions and the modification of some existing definitions. These changes summarized below will be incorporated into Section 1.2 of the solid waste regulations (6 CCR 1007-2, Part 1).

The following definitions are being added to Section 1.2:

1. Construction and demolition debris
2. Drop-off site
3. Environmental media
4. Industrial recycling operation
5. On-site recycling
6. Product
7. Recyclable materials
8. Recyclable material end user
9. Recyclable material generator

The following definitions are being modified in Section 1.2:
1. Commercial wastes
2. Industrial wastes
3. Intermediate processing facility
4. Material recovery facility
5. Processing
6. Three year rolling average

The following definition is being deleted from Section 1.2 as it no longer appears anywhere in the regulations:

Recycling operation

II. Scope and applicability

The introductory subsection lays the foundation for the recycling regulations by stating that all facilities that are operated for the purpose of processing, reclaiming, or recycling recyclable materials as stated in § 30-20-102(5), C.R.S. are subject to Section 8 unless otherwise stated in the exemptions. As defined in § 30-20-101(4), C.R.S., recyclable materials include any type of discarded or waste material that is not regulated under section 25-8-205(1)(e), C.R.S. (biosolids), and can be reused, remanufactured, reclaimed, or recycled, but not including recycled auto parts or excluded scrap metal.

Section 8 sets up a framework approach to regulating recycling operations by classifying facilities based on the types of materials they handle, and the operations at the facility. Facilities that handle municipal solid waste (MSW) recyclable materials are covered in subsections 8.2 drop off sites and recyclable material generators, 8.3 material recovery facilities, and 8.4 recyclable material end users (See Figure 1 below). Facilities that handle industrial non-hazardous solid waste materials are covered in subsections 8.5 industrial recycling operations, and 8.6 beneficial use.

Subsection 8.1.2 states that any recycling facility that does not comply with the regulations or scope set forth in Section 8 no longer qualifies for exemption from having to obtain a certificate of designation as a solid waste disposal site and facility and is subject to the requirements of the Solid Waste Act. The requirements set forth in § 30-20-102(5), C.R.S. states that recycling shall not include materials that are likely to contaminate ground water or create off-site odors as a result of processing, reclaiming, recycling, or storage prior to recycling. Additionally recycling facilities must ensure the facility meets a material turnover rate specified under the definition of a three year rolling average to qualify from being a solid waste disposal site and facility.

Operations exempt from the requirements of Section 8 and the Solid Waste Regulations include facilities that process biosolids, shredded circuit boards, scrap automobiles, scrap appliances, or other processed scrap metal as listed in § 30-20-101, C.R.S. Other exemptions include hazardous

waste, household hazardous waste and operations that are covered in other sections of the solid waste regulations such as composting, waste grease, and waste tires. Exempt facilities that do not comply with other applicable regulations may be solid waste disposal sites and facilities subject to the Act and the Regulations. Community clean up events and temporary drop off events such as Christmas tree mulching operations are exempt from having to register as a recycling facility.




**Figure 1: Recycling Regulations and Facility Classification**

## III. Standards for Drop-off Sites and Recyclable Material Generators (Section 8.2)

This subsection sets up the requirements for 1) drop-off sites that collect recyclable MSW and 2) sites that generate or collect recyclable MSW that is not sent to a recycling facility in Colorado. This section establishes the best management practices for drop-off sites to ensure that nuisance conditions are not created and furthermore, to track data on recyclable materials generated in Colorado that will not be collected at a material recovery facility in Colorado. Recyclable material generators subject to the reporting requirements may include national retail store chains, distribution centers, grocery stores, and any site meeting the definition of a recyclable material

generator who sends recyclables out of state for processing. The definition of a recyclable material generator does not include brokers, but generators may use brokers to obtain data and report on the amount of material generated per site or entity.

All sites that send recyclable materials to a registered material recovery facility (MRF) in Colorado are exempt from the reporting requirement, as the data on recyclable material generated will be collected and submitted by the MRF. Any sites meeting the definition of a recyclable material generator that use a broker to ship directly out of state must register with the Department and submit one report each year identifying the amount of each type of material generated sent out of state for recycling.

Drop-off sites and recyclable material generators must meet the minimum turnover requirements of Section 8.2 to ensure that there is not an overflow of material from improper storage in order to prevent any windblown debris.

## IV. Standards for Material Recovery Facilities (Section 8.3)

Section 8.3 applies to material recovery facilities (MRF) that perform the physical tasks of sorting, separating, and baling MSW recyclable materials that may then be shipped to downstream material brokers or end markets for manufacturing operations. This section applies to recycling operations of materials classified as municipal solid waste and excludes industrial recyclable materials such as construction and demolition debris and any liquid or leachable materials that can be recycled. Section 8.3 includes sites and facilities with operations that process yard waste, as defined in Section 1.2 of the solid waste definitions, as a recyclable material. Material recovery facilities shall register with the Department by submitting the recycling facility initial registration form. The initial registration will also include the types of materials (paper, plastic, glass, aluminum, etc.) accepted at the facility.

MRFs shall develop an operations plan demonstrating how the facility will comply with the regulatory requirements. The operations plan documents and ensures that the facility meets the requirements of a recycling operation and the general site requirements of Section 8.3.4 to maintain its recycling facility status in order to avoid becoming a solid waste disposal site and facility.

As required by Statute, all recycling facilities must meet a material turnover rate which shall be reported each year to the Department. Sites are permitted an initial accumulation or stockpile of materials for the first year in operation. Following the initial accumulation period, the total quantity of materials that are sent off-site shall be at a minimum 75% of the total amount received and in storage on-site within a 3-year rolling average.

MRFs may experience an unexpected or temporary decline in material turnover caused by factors such as economic downturns that can impact the recycling market. Facilities may request a temporary variance to the accumulation period and/or meeting the three (3) year rolling

average via a written waiver request. The facility waiver must be approved by the Department. Nuisance conditions will automatically void this variance.

Intermediate processing facilities or sites that perform recycling operations of non-source separated materials are classified as transfer stations, not subject to the Section 8 requirements except for submitting the annual recycling facility report and must comply with Section 7 of the Regulations. Intermediate processing facilities, or what are commonly referred to as "dirty MRFs" include sites that are designed to remove recyclable materials from municipal solid waste. To be clear, Section 7 requirements apply only to sites accepting non-source separated MSW – that is, MSW collected from residential and commercial sources that has not been separated into recyclable and non-recyclable waste.

Electronic waste recycling operations that sort, dismantle, process, and manage electronics for recycling are subject to Section 8.3 requirements. Facilities must comply with the applicable universal waste and hazardous waste regulations in addition to the Section 8 recycling regulations and Federal requirements.

The reporting requirement modifications for MRFs include the annual report due date being moved forward to on or before March 1 for the prior calendar year's tonnage, and documenting material flow destination and tonnage. Each report shall detail the quantity of each type of material collected, amount of each material sent off-site, and the amount of each material remaining on-site at the end of the calendar year. Facilities shall document the destination of the material sent off-site to prevent double counting of in-state material flow. Facilities may request confidential business information protection on the data submitted per § 24-72-204(3)(a)(IV), C.R.S. All shared data will be aggregated so only the total amount of material per county, region or the state will shared.

MRFs shall notify the Department at least sixty calendar days prior to the closure date, and all solid waste and recyclable materials must be removed for proper management. Any potential nuisance conditions or contamination shall be addressed prior to closure and shall be documented in a final report submitted to the Department on the completion of the closure plan requirements. These requirements help ensure that residual contamination will not result in closure as a solid waste disposal site and facility. If the facility closes with nuisance conditions and/or solid waste on-site, the site will be regulated following closure as a solid waste disposal site and facility. The owner/operator will be responsible for all related costs and requirements. Facilities shall submit a final report to the Department within ninety days of completing closure.

V. Standards for End Users (Section 8.4)

Section 8.4 applies to facilities who utilize discarded or waste materials as a recyclable material for processing the material into a product or raw material. Examples of a facility classified as a recyclable material end user include facilities that: 1) process waste glass bottles into new glass bottles; 2) recycle waste paper into insulation, 3) remanufacture waste plastics into a specified

size or composition to be utilized as a raw material in manufacturing, and 4) utilize waste or discarded material to process into a product or useable raw material for manufacturing.

Section 8.4 applies to facilities that accept and process only municipal solid waste recyclable materials to produce a raw material or product. Section 8.4 does not apply to facilities that accept, purchase, or utilize a product or a raw material composed of recycled content. Additionally, on-site reuse and recycling of a waste generated on-site during a manufacturing operation is exempt from the regulations. Operations that utilize non-MSW materials are classified as either an industrial recycling operation or beneficial use of solid waste and are not subject to Section 8.4. All recyclable material end users are subject to the regulations and must register with the Department.

Recyclable material end users must prevent any ground water contamination as a result of utilizing recyclable materials. Facilities are also subject to the 3-year rolling average to ensure material utilization and turnover occurs. Only recyclable materials brought on-site are subject to the material turnover requirement. Once the waste material has been utilized at the facility by being processed into a product, the material is no longer subject to the turnover rate, as it is no longer a waste. Facilities may submit a waiver request to the accumulation period and material turnover rate for unexpected justifiable circumstances. The Department reserves the right to deny a waiver request, and will revoke a variance if nuisance conditions occur at a site.

Recyclable material end users shall submit an annual report on or before March 1st on the prior calendar year's tonnage. Each report shall detail the quantity of each type of material collected, utilized on-site, and the amount of waste material remaining on-site at the end of the year. Facilities shall document the primary in state and out of state destinations from which material was received to prevent double counting of material flow. All facilities may request confidential business protection on the data submitted per § 24-72-204(3)(a)(IV), C.R.S.

A recyclable material end user shall notify the Department at least sixty calendar days prior to closure, and shall remove all solid waste and recyclable materials for proper management prior to closure. Potential nuisance conditions or contamination shall be addressed prior to closure and shall be documented in a final report submitted to the Department on the completion of the closure plan requirements. These requirements ensure that residual contamination will not result in closure as a solid waste disposal site and facility. If the facility closes with nuisance conditions and or solid waste on-site, the site will be regulated following closure as a solid waste disposal site and facility, with the owner operator responsible for all related costs and requirements. Facilities shall submit a final report to the Department within ninety days of completing closure.

VI. Standards for Industrial Recycling Operations (Section 8.5)

Section 8.5 sets the standards and outlines which facilities are subject to the industrial recycling operation regulations. This section covers all sites operated for the purpose of processing recyclable materials that are not listed by EPA as municipal solid waste and not classified as hazardous waste. More specifically, Industrial recycling operations include facilities that process construction & demolition debris and any other types of solid waste recycling where the discarded or waste material generated is not from residential or commercial sources.

Sites processing non-MSW recyclable materials must meet applicable performance criteria for establishing recyclable materials listed in Section 8.5.2. The listed performance standards prevent sham recycling and alternative forms of illegal disposal. Use of the recycled product must have a demonstrated benefit. Simply avoiding disposal costs does not constitute an associated benefit or a recycling operation.

Recycling on-site generated materials that: 1) remain under continuous ownership and 2) meet the performance standards listed in Section 8.5.2 are exempt from Section 8.5. If the site is deemed to create off-site odors or groundwater contamination, or is performing speculative accumulation of waste, then it is a solid waste disposal site and facility.

Concrete and asphalt operations that manage the material as a commodity within a continuous industry process are exempt from Section 8.5. All of the following conditions must be met for a concrete or an asphalt operation to be determined as managing a commodity 1) material is managed and separated into commodity specific piles processed for reuse; 2) material is managed in active piles separated by material type or use within the past year; and 3) incoming loads shall have all non-concrete, non-asphalt and non-rebar material removed from concrete and asphalt materials within 30 days and non-concrete, non-asphalt and non-rebar material shall not exceed 10% of the total material on-site by weight or volume. While concrete and asphalt processing operations are exempt from the recycling regulations site requirements, facilities will be asked to voluntarily submit data on the amount of material reprocessed annually using a reporting form to be developed.

Sites utilizing only environmental media materials are not subject to Section 8. Environmental media includes soil, sand, gravel, rock and other naturally occurring inert materials that are commonly reused and replaced on a regular basis. Environmental media, if mismanaged so that it creates nuisance conditions or discarded, is subject to the Solid Waste Act and Regulations.

Recycling facilities operated for the purpose of processing, reclaiming, or recycling liquid or leachable recyclable materials are required to submit a design and operations plan (the "Plan") for approval by the Department prior to implementation. The Plan ensures the operation meets the recycling facility requirements and does not have potential for groundwater contamination.

Industrial recycling operations that are not exempt from section 8 are required to register with the Department. Each facility shall submit an annual report on or before March 1st on the prior

calendar year's tonnage. Each report shall detail the quantity of each type of material collected, sent off-site, and the amount of material remaining on-site at the end of the year. Facilities shall document the destination of material sent off-site to prevent any double counting of in-state material flow. All facilities may request confidential business protection of the data submitted, per § 24-72-204(3)(a)(IV), C.R.S. All data that will be disclosed shall be in an aggregated manner, such as the total amount of paper recycled for the state, or the total amount recycled per county or regional area.

An industrial recycling operation shall notify the Department at least sixty calendar days in advance of the closure date and have all solid waste and recyclable materials removed for proper management prior to closure. Any potential nuisance conditions or contamination shall be addressed prior to closure, and a final report shall be submitted to the Department documenting completion of closure plan requirements. These requirements ensure that residual contamination will not result in closure as a solid waste disposal site and facility. If the facility closes with nuisance conditions and or solid waste on-site, the site will be regulated post closure as a solid waste disposal site and facility with the owner operator responsible for all related costs and requirements. Facilities shall submit a final report to the Department within ninety days of completing closure.

VII. Standards for Beneficial Use (Section 8.6)

Section 8.6 establishes the requirements that determine legitimate Beneficial Use of Solid Waste. Section 30-20-102(5), C.R.S states, "The solid and hazardous waste commission shall promulgate rules to specify what time periods and volumes of recyclable materials constitute operations that qualify for this exemption and to define what materials shall be deemed to be recyclable materials for the purposes of this subsection (5)." Instead of creating a specific list of materials that shall be deemed to be recyclable materials, the existing Section 8 provides the following criteria for activities to be deemed recycling activities:

(A) Adherence to established engineering or other appropriate specifications;

(B) Adherence to established product, end user specifications or customer conditions of acceptance;

(C) Environmental impacts relative to those expected from available commercial products;

(D) Demonstrated benefit associated with the use; and

(E) Actual use as a substitute for, or in conjunction with, a commercial product or raw material.

The Department provides flexibility to creative industries by providing criteria instead of a specific list of materials that qualify for Section 8. The Section 8 revisions contain these same

criteria. Additionally, Section 8 lists specific testing and documentation criteria to evaluate whether the use of a waste constitutes recycling or disposal. These criteria also provide for the protection of human health and the environment. The testing process is essential to evaluating the beneficial use of a material, and if a waste fulfills the criteria above, then a Beneficial Use Determination (BUD) will be issued.

Section 8.6 provides clear requirements for the beneficial use of solid wastes. Some wastes and uses are pre-approved (listed in Table 3, Pre-approved Beneficial Uses table), and a BUD is not necessary to reuse those wastes. However, some wastes must be evaluated for reuse due to the lack of: 1) environmental data on the waste, and 2) industry knowledge to support the use. The beneficial use demonstrations steps are as follows:

1. Check Table 3 (Pre-approved Beneficial Uses) to determine whether a waste and end use is listed. If so, follow other applicable sections of the regulations. If a waste and end use is not listed, then follow the next steps.
2. Evaluate the waste for constituents and compare to the Department approved unrestricted use standards, background constituent concentrations, or raw material concentrations. Check Table 1A (Total Elemental Analysis) and/or 1B (Analyte Mobility Analysis) to see if the waste is listed. If so, test for those constituents that are marked. Some wastes may be evaluated using alternative methods as approved by the Department.
3. Evaluate the waste for the proposed use. For example, the waste must be tested for R-value, sheer strength, and density if it is to be used as structural fill for pavement. Evaluation for suitability as a substitute for a raw material will be evaluated on a case-by-case basis.
4. Submit the information to the Department for review.
5. Evaluate the waste and determine the appropriate Category. Check Table 2 (Beneficial Use-by-Category) to determine the allowable uses. The Department will issue a BUD for the requested uses if the review was conducted on a case-by-case basis, and the requested use is not listed on Table 2 (Beneficial Use-by-Category).

The process for obtaining a BUD is incorporated in this Section 8, but the referenced Beneficial Use tables will be on the Division's internet page. The Division hopes to acquire enough analytical testing data and shared industry knowledge to add materials to Table 3 (Pre-Approved Uses) and to adopt different analytical testing criteria when results consistently show non-detect levels or low levels of the constituents of concern in a particular waste stream. Maintaining the Beneficial Use Tables on the Division internet page allows the Division the flexibility to update Table 3 (Pre-Approved Use) when materials meet the testing criteria without having to pass new regulations.

Waste handling requirements for beneficial users are similar to those subject to Section 8.5. The ultimate goal for Section 8.6 is to gather enough industry data to place more beneficial uses on the pre-approved list and have the facility generating or recycling the material comply with

Section 8.5. Facilities subject to both Section 8.5 and Section 8.6 must submit the Industrial Recycling Facility Reporting Annual Form.

**Stakeholder Involvement in the Process**

I. Extent of Agency Consultation with the Recycling Industry and Local Governments Representatives

The Department's Hazardous Materials and Waste Management Division, Solid Waste and Materials Management Program utilized various methods to inform individual industry representatives, industry trade associations, local government agencies, and local government agency associations of the recycling and beneficial use regulations stakeholder process. These methods included:

1. Posting a Stakeholder Process Notification Request Form on the Division's website to notify stakeholders of upcoming stakeholder meetings and related draft documents.

2. Providing industry representatives and local government representatives information regarding stakeholder meetings and providing all draft documents and discussion materials by e-mail.

3. All registered recycling operations were notified by email prior to the release of the first draft of the revisions to the regulations. The primary facility contact for registered recycling operations were sent all drafts of the proposed revisions by email regardless of their active participation in the stakeholder meetings or signing up for the stakeholder process notification request.

   The Division sent out monthly stakeholder meeting email notices that included the latest draft revisions to regulations and the Statement of Basis and Purpose. The emails were sent directly to local county governments and industry representatives, and also to the following organizations for distribution: Colorado Counties, Inc. (CCI), Colorado Municipal League (CML), Colorado Retail Council, Colorado Association for Recycling (CAFR), and Colorado SWANA (CO SWANA). All of these organizations report to local government constituents and industry representatives involved in matters pertaining to solid waste. The Division contacted a combination of 262 individuals and organizations during the stakeholder process, 92 of which represent local government organizations.

4. Discussing the regulations and adopting revisions to the recycling and beneficial use regulations during the stakeholder meetings. Eleven stakeholder meetings were held during the twelve month drafting process from January to December. Stakeholders frequently submitted questions to the Division about the revisions throughout the process. The questions received by the Division were addressed in the following stakeholder meeting to share with the group, and also directly to the

stakeholder proposing the question by email, or phone conversation. Stakeholder questions are listed under the issues encountered section of this document. Work group meetings were held to discuss specific topics such as aggregate recycling, environmental media recycling, and beneficial use requirements. The Division additionally met with stakeholders in addition to the monthly meetings that had unique circumstances to discuss specific details to better understand how the revisions would impact stakeholders and how disputed topics could be resolved.

VIII Issues Encountered During Stakeholder Process:

*Q: "Under 8.2.2 Exemptions; would a facility only have to meet one of the four criteria to be exempt from registering/reporting requirements? All of our materials are sent out to be processed by registered recycling facilities in Colorado (8.2.2(A)). However, we do bale our cardboard and paper before sending it out."*

A: Generally, a facility would only have to meet one of the criteria to qualify for the exemption from Section 8. However, since your facility processes materials (baling), as defined by the definition of "Material Recovery Facility," the facility in question would be subject to Section 8.3. **Note:** Section 8.2.2 was reduced to three criteria during the stakeholder process.

---

*Q: "Are special collection events for Household Hazardous Waste and E-waste exempt?"*

A: Yes, Section 8.1.4 (H) exempts HHW and temporary collection events from the Recycling Regulations.

---

*Q: "Why the change to March 1st to [sic] May 1st?" –Refers to day that the Annual Reporting Forms are due.*

A: The Department wishes to provide the data to stakeholders before it becomes outdated. Most other States have the recycling report set to March 1st of the following year. By moving the date up, the Department can provide this information in a more timely manner.

---

*Q: "Who approves the Design and Operations for a MRF? Does this fall under the jurisdiction of local government?"*

A: Design and Operations Plans for a MRF (8.3) do not need to be approved, but may be reviewed by the Department upon request of the facility. However, the plans must be maintained on-site and available for review upon request by the Department.

---

---

*Q: "Are single stream facilities subject to Section 7, Transfer Station requirements?"*

A: No, single stream recycling facilities are subject to Section 8.3, Material Recovery Facilities. Only intermediate processing facilities, which are designed to remove recyclables from unprocessed MSW, are subject to Section 7.

---

*Q: "Is there a financial assurance requirement to be a recycling facility?"*

A: No, there are no financial assurance requirements to operate a recycling facility.

---

*Q: "The distinctions between "material recovery facility" referenced in Section 8.3, "recyclable material end user" reference in Section 8.4 and the "beneficial user of solid wastes" referenced in Section 8.6 are not clear.*

A: A "Material recovery facility" (MRF) is a processing facility that sorts and separates materials for transport to other processors, end users, and disposal facilities. An end user typically receives recyclable material from a MRF to be incorporated into a manufacturing operation for fabrication of a product. A beneficial user of solid waste is often an end user, but of an industrial waste as defined by the current solid waste regulations.

---

*Q: How would a facility that processes glass or other MSW for beneficial use (aggregate substitute) be classified under Section 8.*

A: A facility processing glass would be subject to 8.3 Material Recovery Facilities, based upon the material classification and the processing operations taking place at the site unless the glass is from a construction and demolition project which would make the facility subject to the requirements of section 8.5 Industrial Recycling Operations.

---

*Q: "Section 8.5.2 as currently worded, several of these performance standards appear to incorporate nonstatutory considerations."*

*Q: "Subsection (C) refers to 'environmental impacts relative to those expected from available commercial products.' This could be interpreted broadly to allow the Department to apply or set consumer product safety standards regulated by other federal and state laws."*

A: Those consumer product standards will always be set by the appropriate regulatory agencies, but the Division will ensure that solid waste used as a substitute ingredient has a similar environmental impact to those raw materials it is replacing. C.R.S. 30-20-102(5) states "The solid and hazardous waste commission shall promulgate rules to specify what time periods and volumes of recyclable materials constitute operations that qualify for this exemption." Subsection (C) comes from the current Section 8, and is intended to allow the Recycling Regulations to be flexible in the solid wastes that could meet the recycling exemption. This concept is in lieu of creating a specific list of materials that would meet the exemption.

---

*Q: "Subsection (D) refers to the 'demonstrated benefit associated with the use.' The Department has no authority to consider the 'benefit' of recycling a particular material…"*

A: As stated above, C.R.S. 30-20-102(5) gives the solid and hazardous waste commission authority to promulgate rules determining which recycling activities are exempt from a Certificate of Designation. As opposed to creating a list of materials and activities that are exempt, the Commission chose to prescribe standards for solid waste recycling. The language "demonstrated benefit associated with the use" clearly states that any material used must provide a benefit to a process or product.

---

*Q: "As an ash marketer it is unclear to me when testing [of fly ash] is required and when it is not."*

A: Due to source variability, fly ash will continue to require initial characterization as stated in 8.6.5(B) to determine appropriate categorization. This may change through time with additional information. The category type determines the allowable end use, and you can reference the uses by category in Table 2.

Recharacterization is also required depending on the category of waste and when part of the process that creates that waste changes. For example, it is expected that the contents of the coal ash will change when the source of coal changes.

---

*Q: "Section 8.6: This section seeks to directly regulate beneficial use and does not adhere to the statutory constraints summarized above and acknowledged in the Attorney General Office's outline regarding the 'Colorado Department of Public Health and Environment Authority to Promulgate Revisions to Section 8 re Recycling.' This section far exceeds the Department's authority to set criteria to determine which facilities qualify for the 'recyclable materials' exemption and which are more properly regulated as 'solid waste disposal' facilities.*

A: Instead of creating a specific list of recyclable materials, this Department allows recyclers to demonstrate the applicable criteria ns Section 8.6.2(E)(1 through 5) are met in recycling the waste in question. These criteria establish a process to foster the acceptances for new and innovative wastes and uses into the recycling universe. Again, once identified on Table 3 (Pre-Approved Beneficial Uses), the material and end use is pre-approved. The other option is to create a list of specific recyclable materials that qualify for the recycling exemption and any other type of solid waste recycling will require a Certificate of Designation.

---

*Q: " Section 8.6 should clarify that it only applies to beneficial use of recyclable materials involving land disposal."*

A: Section 8 does not regulate land disposal. Section 8 regulates recycling and lists the criteria required in applying for a beneficial use of solid waste project approval.

---

*Q: " Section 8.6.2: This section is internally inconsistent. The title "Beneficial Use" and the corresponding definition imply applicability only to "end-users.' However, Section 8.6.2 appears to apply to processing of recyclable materials."*

A: Section 8.6 serves as a process to increase the beneficial utilization of waste materials. An end user, generator, or processor may seek to acquire a Beneficial Use Determination (BUD) for a specific waste. Section 8.6.2 applies to the processing and end use of the wastes. The processing and end use of waste materials for beneficial use shall meet the criteria of 8.6.2.

---

*Q: " Section 8.6.2: The SWA does not authorize the consideration or regulation of the impact of the beneficial use of recyclable materials on wetlands, surface water, and emissions."*

A: The SWA does not specifically authorize the consideration or regulation of the impact of beneficial use of recyclable materials on wetlands, surface water, and emissions, but the SWA does require the solid and hazardous waste commission to promulgate rules determining which recycling activities are exempt from a Certificate of Designation. The adverse impacts mentioned above would be regulated pursuant to Divisions other than the Hazardous Material and Waste Management Division (HMWMD). In other words, if a recycling facility or operation creates those conditions mentioned above, the HMWMD will refer the facility to the appropriate Division. The facility would then be required to meet the standards for that Division.

---

*Q: " Section 8.6.2(B): The meaning of 'current market demand' is not clear."*

A: "Current market demand" implies that a waste material generator may not speculatively accumulate the wastes that may be beneficially used. Those wastes being stored onsite should meet the turnover requirements of section 8.5.

---

*Q: " Section 8.6.2(C): The SWA does not authorize the enforcement of other federal, state, and local requirements.*

A: The SWA provides dual authority of solid waste. The local governing authority may have requirements for the management of solid waste that the Department does not, and the Department is responsible for recognizing that authority.

Section 8 states that the waste usage shall comply with applicable federal, state, and local engineering and zoning requirements. The Division only has the authority to enforce those laws and regulations for which it has specific authority, and will not enforce those for which it does not have authority. However, failure to comply is also a violation of the solid waste regulations. Arguably, failure to comply may result in a recycling operations becoming a solid waste disposal site and facility.

In addition, 30-20-110(1)(b) C.R.S. states:

> Such sites and facilities shall comply with the health laws, standards, rules, and regulations of the department, the water quality control commission, and all applicable zoning laws and ordinances.

*Q: " Section 8.6.2(F) The distinctions between a 'waste generation facility,' a 'material recovery facility' and 'industrial recycling facility' are not clear."*

A: A "waste generation facility," for the purposes of Section 8.6.2(F) is a facility that generates a waste that has the potential for beneficial use. If a waste generation facility receives a BUD and subsequently closes, those unused wastes must be removed prior to closure.

A "material recovery facility" is not regulated under section 8.6. MRFs process Municipal Solid Waste and not industrial wastes.

An 'industrial recycling facility' is not regulated under section 8.6, but may process materials for beneficial use. If a solid waste is approved for BU, then an industrial recycling facility may accept that waste for processing and/or distribution and marketing. The industrial recycling facility shall meet the requirements for Section 8.5.

---

*Q: "Section 8.6.5 (D) (4) I am not sure what constitutes a change in waste generation process versus waste utilization process."*

A: A change in the waste generation process is any change that is likely to result in the waste having different chemical or physical characteristics.

---

*Q: "8.6.5 (E) Generators must notify in thirty (30) days but what is the response time guaranteed by the department back to the generator?"*

A: If the recharacterization is for the annual or biannual recharacterization, then there will not be a response from the Department. If the recharacterization is the result of a change in the generation process, then the quality of the submittal will dictate the response time from the Department.

---

*Q: "Are special collection events for Household Hazardous Waste and E-waste exempt?"*

A: Yes, Section 8.1.4 (H) exempts HHW and temporary collection events from the Recycling Regulations.

---

*Q: "Of course the soil discussion today really didn't clarify for me regarding whether soil would be covered in the recycling. If you could clarify when soils are recycled materials and when they aren't?"*

A: Soils and earthen materials and will only be subject to the solid waste regulations when they are abandoned/discarded or contaminated. Earthen material that is contaminated may be reused under Section 8 if the soil meets the criteria for unrestricted use. Under Section 8, Environmental media which includes sand, soil, rocks, gravel and other naturally occurring inert materials are exempt.

---

*Q: "A cursory review suggests that CDOT Maintenance, Materials and or construction Activities may be affected by all of the section. The sections shall be broke down and comments and concerns for each section provided."*

A: While this not a question, we can say that the only activities that may be affected by the Recycling Regulations are those related to Sections 8.5 and 8.6. Sections 8.5 and 8.6 pertain to non-municipal solid waste recycling. Sections 8.2, 8.3, and 8.4 pertain to municipal solid waste only, and thus asphalt and concrete recyclers would have no obligations under those sections. (It was later determined that such operations will not be subject to Section 8.)

---

Q: *"What is the basis for Table 1A, The Synthetic Precipitation Leaching Procedure was developed to assess whether potentially contaminated material, if left in situ, would leach toxic substances when exposed to normal weathering. There seems to be an absence and understanding of the fate and transport of any contamination in these requirements."*

A: Section 8.6 permits the use of alternatives to TCLP and SPLP, because neither test method is perfect for analyzing wastes for potential beneficial use. However, TCLP provides a worst case scenario for leaching of wastes, and SPLP evaluates wastes using a less aggressive digestion that resembles leaching created from normal weathering as opposed to an acid leaching digestion from the TCLP.

Analytical testing of materials similar to coal ash using TCLP will provide an overestimate of potential contaminants that could leach out of the ash when used as a structural fill. Using SPLP is less conservative, but the Division believes that the SPLP method provides representative test results for coal ash used as a structural fill.

Test methods are being developed by the EPA that address the uncertainty of the conditions (pH, oxidation) surrounding the final placement of coal ash, and the Department will evaluate those test methods for beneficial use once they are available from the EPA.

---

*Q: "What is the time limit for the Department to make a Beneficial Use Determination?"*

A: The Department does not have a set deadline to make a Beneficial Use Determination, but every effort is made to make determinations within 30 days of a complete submittal.

**Alternatives Considered and Why Rejected**

Numerous alternatives were considered based on stakeholder input. The Department incorporated many suggested alternatives into the drafting process that aligned with setting the regulatory requirements as set forth in Statute.

The initial draft regulations included financial assurance for recycling facilities subject to Sections 8.2, 8.3 8.4 and 8.5. The financial assurance provided a mechanism to clean up waste and recyclable material if a facility was unable remove all material prior to closure. Also, financial assurance could be used to offset the risks associated with longer and larger volume materials accumulations periods. Ultimately the financial assurance provisions were removed in favor of material accumulation turnover requirements.

Following review of the draft regulations by the Attorney General Office (AGO), regulating nuisance conditions at recycling facilities under general site requirements was removed from section 8 because the statute does not give the Department authority to regulate this condition.

The initial draft of the regulations required aggregate recycling operations including concrete and asphalt recycling to be subject to Section 8. After much discussion with the aggregate industry, the Colorado Department of Transportation, the AGO and local government entities, it was determined that most operations utilizing aggregate material are operated as an ongoing continuous process within industry and with no waste material is generated. Section 8.5 defines the requirements for determining when concrete and asphalt production is either an ongoing production process or as a recycling of waste material operation.

**Cost Benefit Analysis**

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Agencies.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division (HMWMD)

**6 CCR 1007-2**

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR AMENDMENTS TO SECTIONS 1.7.4

**(Adopted by the Solid and Hazardous Waste Commission on February 21, 2012)**

### Basis and Purpose

The Hazardous Materials and Waste Management Division (HMWMD) has prepared amendments to Section 1.7.4 of the Regulations Pertaining to Solid Waste Sites and Facilities ("the Regulations"). These amendments to 6 CCR 1007-2, Section 1.7.4 are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302 and 30-20-109, C.R.S. The purpose of these amendments to Section 1.7.4 is to reduce the fee collected for the Hazardous Substance Response Fund (HSRF).

### Amendment of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Section 1.7.4

### Background

In 2010, the legislature passed HB 10-1329 concerning the Solid Waste User Fee. HB 10-1329 contains six major provisions including: 1) moving limited SWUF fee setting authority from the legislature to the Solid and Hazardous Waste Commission, 2) establishing individually adjustable fees for the SWUF, HSRF and a new fee for the DOL, 3) setting a SWUF ceiling of $0.50 for these three fees, 4) setting an HSRF ceiling of $10,000,000, 5) providing advanced facility notification of fee changes prior to the effective implementation date, and 6) establishing the SWUF sunset date as July 1, 2017.

On November 16, 2010, the Commission set the fees for the first time for the Hazardous Substances Response Fund. At that meeting, the Division requested a fee increase from 11.9 cents per cubic yard to 16 cents per cubic yard. The increase was requested to balance what at the time was a decreasing fund balance caused by lower solid waste volumes coming into landfills and loss of interest revenue from the legislature taking $32.5 million from the fund to balance the state's budget. At that time, our model projected that the fund balance would be slightly over the $10 million cap, and decrease for three more years before leveling off to just below $8 million. (Figure 1)




After the 2011 state fiscal year close in August, the HSRF fund balance was $13.5 million rather than the $10.5 anticipated. Comparing last year's projections with the state fiscal year 2011 balance shows the following:

- Revenues into the HSRF were higher primarily due to cost recoveries on enforcement sites and the Asarco bankruptcy settlement. These settlements were not anticipated.
- Solid waste volumes were higher than projected, resulting in increased fee collection.
- HB 10-1329 provided for a one time transfer of $400,000 to the Solid Waste program, this transfer was not needed.
- Construction projects were not started due to either not getting funding from EPA or delayed funding due to the federal budget's many continuing resolutions in 2010.
- Delayed remedy decisions pushed some projected costs into future years.

The Division is therefore requesting a decrease in the HSRF portion of the Solid Waste User Fee from the current sixteen cents per cubic yard to five cents per cubic yard. Current projections of the HSRF balance using the five cents per cubic yard fee should bring the fund balance under the $10 million cap within 24 months as required by HB 10-1329. This is a significant reduction but it is necessary to get the balance under the established cap. Hopefully the fee will not need further adjusting for three to four years. (Figure 2)




**Amendment to the Hazardous Substances Response Fund Fee**

The Division is required to manage the fund below the $10 million cap, and therefore requests that the Commission approve the proposed change to the Hazardous Substances Response Fund to reduce the fee from sixteen cents per cubic yard to five cents per cubic yard.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Addition to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Addition of Section 18 (Waste Grease) and Section 1.7.5 (Waste Grease Annual Fees) and Associated Additions to Section 1.2 (Definitions), Section 1.5.2 (Waiver Processes and Procedures), and Section 1.7.3 (Annual Fees)

**(Adopted by the Solid and Hazardous Waste Commission (the Commission) on December 16, 2011)**

**Basis and Purpose**

I. Statutory Authority

The addition of 6 CCR 1007-2, Section 18: Waste Grease, is made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Section 30-20-109(9), C.R.S. These regulations are a direct result of, and implement the requirements of, House Bill 10-1125, passed by the legislature in 2010.

II. House Bill 10-1125

House Bill (HB) 10-1125 amended sections to the Colorado Revised Statutes (C.R.S.). Important to these regulations, HB10-1125 amended Sections 30-20-113, 118, and 123 as follows:

§30-20-113 has been amended to require that any person who collects, transports, stores, processes, or disposes of trap or yellow grease in any manner must be in compliance with §30-20-123 requirements.

§30-20-118 has been amended to include moneys collected pursuant to §30-20-123 in the list of sources of money to be deposited into the solid waste management fund.

§30-20-123 has been added to include many important definitions, exemptions, and requirements for the management, transportation and disposal of trap grease and yellow grease. This section requires that any person who collects, transports, stores, processes, or disposes of trap or yellow grease in any manner be registered with the Department, affix a decal to their transporting vehicle or facility, and use manifests to track all waste grease transport. It also requires that a waste grease facility and waste grease transporter acquire and maintain financial assurance, and that waste grease facilities, waste grease transporters, and personal users of waste grease other than those who use as biofuel pay an annual fee that is established by the Commission (the statute sets the maximum amounts for the fees at $570 per vehicle for waste grease transporters, $1,140 for waste grease facilities, and $96 for personal users of waste grease other than use as biofuel). In these rules, in Section 1.7.5 of these regulations, the Commission has set the fees at the same amounts and has added a small fee of $25 per set of five (5) temporary decals. Additionally, this section requires that a waste grease facility and waste grease transporter submit annual reports to the Department. This section also establishes standards for personal use of waste grease. This section describes the use of uniform manifests to track waste grease shipments from the source of the waste grease to the waste grease destination facility, the minimum information to be collected on the manifests, who gets copies of each waste grease manifest, and how long copies of each manifest must be retained.

III. <u>Purpose of new regulations:</u>

The purpose of these new regulations is to implement the requirements of HB10-1125. HB10-1125 sets up a management scheme for waste grease (trap grease and yellow grease) to ensure that waste grease is accounted for and properly recycled or dispositioned. These regulations set out the waste grease requirements for registrants – waste grease transporters that manage waste grease in transit and waste grease facilities that collect, handle, store, or process waste grease. HB10-1125 also creates requirements for personal use of waste grease, excluding the collection, transportation, use, or storage of waste grease for conversion to and use by the person as biofuel.

**<u>Discussion of Regulatory Proposal</u>**

I. The proposed Section 18 regulations require some new definitions. These changes are summarized below. For consistency, these definitional changes are being made to Section 1.2 of the solid waste regulations (6 CCR 1007-2, Part 1).

The following definitions are being added to Section 1.2:

1. Collect
2. Manifest
3. Personal use of waste grease as biofuel
4. Personal use of waste grease other than for use as biofuel

5. Process
6. Registrant
7. Source of waste grease
8. Store
9. Transport
10. Trap grease
11. Waste grease
12. Waste grease facility
13. Waste grease generator
14. Waste grease transporter
15. Yellow grease

To make clear that this Section 18 is referring to waste grease, or used grease as referenced in the statute, "waste" or "waste grease: was included before the statutory definition terms for "facility" and "grease." The term "waste" was included before the term "grease" that is used in the following statutory definitions of "manifest," "store," and "transport" resulting in waste grease manifest, waste grease storage/processing/facility, and waste grease transporter.

II. The proposed Section 18 regulations required additional changes to other sections of the solid waste regulations (6 CCR 1007-2, Part 1) including adding a reference to Section 18 in Section 1.5.2 (Waiver Processes and Procedures) and Section 1.7.3 (Annual Fees). A new Section 1.7.5 (Waste Grease Annual Fees) to address required annual fees was added.

III. Scope and applicability (Section 18.1)

The first four subsections in this section describe waste grease transporters, waste grease facilities, and personal use of waste grease as biofuel or for a purpose other than biofuel.

Section 18.1.5 describes how the statute gives the authority of these rules.

Section 18.1.6 explains the various exemptions to Section 18.

IV. General Provisions (Section 18.2)

The two general provisions in this section clarify that all waste grease transporters, waste grease facilities, and a personal user of waste grease as biofuel, or a personal user of waste grease for a purpose other than for biofuel, must comply with all applicable provisions of other local, state, and federal laws, regulations, ordinances, and other requirements, and, if waste grease activities are regulated by more than one section of the Waste Grease regulations, they must comply with all applicable sections.

Section 18.2.3 explains how a waste grease generator or source of waste grease (e.g., a restaurant) arranging for the transportation or disposal of waste grease must use a registered waste grease transporter, a personal user of waste grease as biofuel, or a personal user of waste grease other than use as biofuel to transport their waste grease for proper disposition.

V. Standards for Waste Grease Transporters (Section 18.3)

This section sets up new standards for any person, excluding personal users of waste grease as biofuel or personal users of waste grease other than biofuel, transporting waste grease in Colorado. Waste grease transporters may only transport waste grease to certain approved facilities, including a municipal or privately owned solid waste landfill that is registered as a waste grease facility.

Subsections 18.3.2 through 18.3.8 set up the following requirements for waste grease transporters:

a. A system for registering as a "Waste Grease Transporter," including obtaining a "Waste Grease Certificate of Registration" as a waste grease transporter, which is valid until July 15 of the following year and for which violations of may be enforced by the Department in accordance with Sections 30-20-113 and 114, C.R.S. for failure to comply with the Colorado Solid Waste Sites and Facilities Act or the Colorado Solid Waste Regulations. Existing waste grease transporters who register before June 15, 2012 will not need to re-register until June 15, 2013.

b. A requirement that waste grease transporters obtain decals from the Department (issued along with the "Waste Grease Certificate of Registration") for all vehicles used to transport waste grease. The vehicle decals must be affixed to the lower left (driver's side) corner of the windshield of each vehicle used to transport waste grease. Vehicles used to transport waste grease that do not have a windshield (e.g., railstocks) must post the decal in a manner that displays the decal so it is visible on the vehicle, such as affixing the decal to a magnet or placard that can be placed on the railstock.

c. A manifest system to ensure that waste grease generated in Colorado is tracked; this system is mainly the responsibility of the waste grease transporter. By statute, the manifest system does not require the signature of the generator or the final destination facility even if it is a publically owned treatment works (POTW) or registered waste grease facility. A waste grease transporter must use the Uniform Waste Grease Manifest form available from the Department and must provide a copy to the generator or source of the waste grease within thirty days of delivery to the destination facility. The waste grease transporter must provide the registered waste grease facility with a manifest within one business day of

delivery. All manifest copies must be maintained by the waste grease transporter and waste grease destination facility for a period of 3 years. This can be accomplished by saving hard copies or electronic copies (e.g., storage of manifests on a computer system) of the manifest.

d. A requirement that waste grease transporters obtain financial assurance in the amount of $10,000 before hauling waste grease; the waste grease transporter must maintain the financial assurance in accordance with Section 1.8 of the Solid Waste Regulations.

e. A requirement that an annual report be filed with the Department by February 1st of each year on the Waste Grease Transporter Annual Report Form, which includes information accounting for the volume of waste grease handled by the waste grease transporter during the previous calendar year.

f. A requirement that waste grease transporters pay an annual registration fee of $570 per vehicle and $25 per set of five (5) temporary decals.

Subsection 18.3.8 exempts waste grease transporters' facilities from the definition of a "Waste Grease Facility" and thus from the requirements of Section 18.4 as long as the waste grease transporter does not store waste grease for longer than 21 days in the initial vehicle used for waste grease transportation or in a vehicle used for off-site transport from the Waste Grease Transporter's facility.

VI. Standards for Waste Grease Facilities (Section 18.4)

This section sets up new standards for Waste Grease Facilities in Colorado. A waste grease facility may only accept waste grease from a registered waste grease transporter. A municipal or privately owned solid waste landfill can accept and/or process waste grease from a waste grease transporter if the municipal or privately owned solid waste landfill is registered as a waste grease facility. The general provision of Section 18.4.1 requires that all Waste Grease Facilities to meet the requirements of Section 8 of the Solid Waste Regulations pertaining to Recycling Facilities in addition to the new requirements of Section 18.4.

Subsections 18.4.2 through 18.4.9 set up the following requirements for waste grease facilities:

a. A system for registering as a "Waste Grease Facility," including obtaining a "Waste Grease Certificate of Registration" as a waste grease facility, which is valid until July 15 of the following year and may be revoked by the Department for failure to comply with the Colorado Solid Waste Sites and Facilities Act or the

Colorado Solid Waste Regulations. Existing waste grease facilities who register before June 15, 2012 will not need to re-register until June 15, 2013.

b. A requirement that waste grease facilities obtain decals from the Department (issued along with the "Waste Grease Certificate of Registration") for each facility they operate. The waste grease facility decals shall be affixed in a prominent location at the facility. The decals are valid until July 15 the following year.

c. Manifest requirements to ensure that waste grease generated in Colorado is tracked. Waste grease facilities must not accept nor offer any shipment of waste grease without an accompanying Uniform Waste Grease Manifest. All manifest copies must be maintained by the waste grease facility for a period of 3 years. This can be accomplished by saving hard copies or electronic copies (e.g., storage of manifests on a computer system) of the manifest.

d. General provisions including requirements to: ensure adequate road access to waste grease, control litter and weeds in order to minimize the threat to fire or nuisance conditions, maintain a fence surrounding the facility, post signs regarding operations, maintain a working telephone, have a site attendant, meet containment tanks and ancillary equipment requirements, notify the Department in the event of an emergency involving waste grease, have a contingency plan which includes detailed information regarding provisions for assessing the full nature and extent of the release and a detailed written assessment of the impact of the release, arrange for the processing or conversion of waste grease into an end product at least 100% of the three year rolling average, comply with Section 7 of these Regulations or obtain a Certificate of Designation if not processing or end-using waste grease, ensure that any waste greases that is sent off-site is transported only by a registered waste grease transporter, and have a facility closure plan.

e. A requirement that financial assurance is maintained for all Waste Grease Facilities in accordance with Section 1.8 of the Solid Waste Regulations.

f. A requirement that an annual report be filed with the Department by February 1st of each year on the Waste Grease Facility Annual Report Form, which includes information accounting for the volume of waste grease handled by the waste grease transporter during the previous calendar year.

g. A requirement that a waste grease facility pay an annual registration fee of $1140.

VII. Standards for Personal Users of Waste Grease Other than For Use as Biofuel (Section 18.5)

This section sets up new standards for any person collecting or transporting waste grease for personal use of waste grease other than for use as biofuel.

Subsections 18.5.2 through 18.5.3 set up the following requirements for personal users of waste grease other than for use as biofuel:

a. A system for registering as a "Personal User of Waste Grease Other than For Use as Biofuel," including obtaining a "Waste Grease Certificate of Registration" as a personal user of waste grease other than use as biofuel, which is valid until July 15 of the following year and may be revoked by the Department for failure to comply with the Colorado Solid Waste Sites and Facilities Act or the Colorado Solid Waste Regulations. Existing personal users of waste grease other than for use as biofuel who register before June 15, 2012 will not need to re-register until June 15, 2013.

b. A personal user of waste grease other than for use as biofuel must obtain permission from a waste grease registrant in order to take waste grease from the registrant.

c. Transport no more than 55 gallons of waste grease at a time.

d. Store no more than 165 gallons of waste grease at a time.

e. A requirement that a personal user of waste grease other than for use as biofuel pay an annual registration fee of $96.

VIII. Standards for Personal Use of Waste Grease as Biofuel (Section 18.6)

This section sets up new standards for any person collecting or transporting waste grease for personal use of waste grease as biofuel. The new standards require that a personal user of waste grease as biofuel needs written permission to take waste grease from a registrant. However, permission to take waste grease from a source (e.g., restaurant) is not required in these regulations, but the personal user of waste grease as biofuel should obtain permission from the source so they are not charged with waste grease theft.

**<u>Description of Local Government Involvement in the Stakeholder Process</u>**

Executive Order D 2011-005, "Establishing a Policy to Enhance the Relationship between State and Local Government" requires state rulemaking agencies to consult with and engage local governments prior to the promulgation of any rules containing

mandates. The following describes how Executive Order D 2011-005 was addressed during the waste grease regulations stakeholder process.

I. Agency reasoning supporting the need to issue the new regulations

House Bill 10-1125 requires the Solid and Hazardous Waste Commission to promulgate regulations regarding the collection, transportation, storage and disposal of waste grease by December 31, 2011.

II. Potential impacts to local governments

The new Section 18 may impact local governments if the local government transports waste grease, arranges for the transportation or disposal of waste grease, or is a waste grease facility. The new regulations require that any person who transports more than 55 gallons of waste grease at one time in Colorado register as a waste grease transporter. A local government that transports more than 55 gallons of waste grease at a time would have to register as a waste grease transporter and meet the requirements of Section 18.3, which include registration, decal, manifest, financial assurance, annual report, and storage requirements and payment of an annual fee.

Local governments who are generators or sources of waste grease must arrange for transport of their waste grease with a registered waste grease transporter or personal user of waste grease.

A local government that operates a waste grease facility, including a waste grease transfer station or waste grease collection facility, must register as a waste grease facility. Waste grease facilities must meet the requirements of Section 18.4, which include registration, decal, manifest, financial assurance, annual report, and facility operating requirements and payment of an annual fee.

There are a few exemptions that may affect the local government. First, a domestic wastewater treatment works, as defined in Section 25-8-103, C.RS., is exempt from the definition of a waste grease facility and its requirements and the entire Section 18. Second, an exemption was added to the regulations to exempt one-time or occasional waste grease collection events and household hazardous waste facilities that accept waste grease from private citizens as long as the waste grease is picked up by a registered waste grease transporter or transported to a registered waste grease transporter, a registered waste grease facility, or domestic wastewater treatment works, as defined in Section 25-8-103, C.RS., at the conclusion of the event. Third, a permanent household hazardous waste collection facility where waste grease is accepted for drop-off by private citizens is not a waste grease facility nor subject to Section 18.4 so long as the waste grease is picked up by a registered waste grease transporter within 90 calendar days of when the facility accumulates fifty-five gallons of waste grease. Finally, an exemption was

provided for waste grease response activities performed or approved by the governing body having jurisdiction as long as the waste grease collected from the response activity is ultimately transported to a registered waste grease facility or domestic wastewater treatment plant.

III. Extent of Agency consultation with representatives of local governments affected

The Department's Hazardous Materials and Waste Management Division, Solid Waste and Materials Management Program utilized various methods to inform local government agencies and local government agency associations of the waste grease regulations stakeholder process. These methods included:

1. Posting a Stakeholder Process Notification Request Form on the Division's website to notify stakeholders of upcoming stakeholder meetings and related draft documents.
2. Notifying local wastewater treatment works via e-mail of the stakeholder process and including them in stakeholder e-mails regarding upcoming stakeholder meetings and related draft documents.
3. Contacting local county governments, including local environmental health departments and county solid waste departments, by e-mail regarding the stakeholder process and including them in stakeholder e-mails regarding upcoming stakeholder meetings and related draft documents.
4. Contacting the Colorado Municipal League to include in their newsletter information about the stakeholder process for developing new waste grease regulations and providing contact information regarding how interested city and town representatives can participate in the stakeholder process.
5. Discussion with the Department of Local Affairs regarding House Bill 10-1125 and how the new waste grease regulations would impact sources or generators of waste grease and how the Department of Local Affairs would inform inquiring governments of these requirements and how to contact the Division with additional questions regarding HB 10-1125 and the new regulations.

Listing of local government agencies and local government agency associations that were contacted about the waste grease regulations stakeholder process and/or participated in the waste grease regulations stakeholder process:

| | | |
|---|---|---|
| Adams County | Alamosa County | Arapahoe County |
| Boxelder Sanitation District | Boulder County | Boulder County Public Health |
| Centennial Water and Sanitation District | City of Aspen Environmental Health | City and County of Broomfield |

| | | |
|---|---|---|
| City and County of Broomfield Health Department | Chaffee County | Chaffee County Environmental Health |
| Cheyenne County | Clear Creek County | Clear Creek Environmental Health |
| Conejos County | Crowley County | City of Boulder |
| City of Durango | City of Englewood | City of Fort Collins |
| City of Golden Pretreatment | City of Grand Junction | City of Longmont |
| City of Loveland | City of Montrose | City of Pueblo |
| City and County of Denver | City and County of Denver Public Health Inspection | City and County of Denver Environmental Quality |
| Colorado Industrial Pretreatment Coordinators Association | Colorado Municipal League | Colorado Rural Waster Association |
| Colorado Stormwater Council | Colorado Wastewater Utility Council | Dolores County |
| Douglas County | Eagle County | Eagle County Environmental Health |
| El Paso County | El Paso County Health Department | Fremont County |
| Fremont County Environmental Health | Garfield County | Garfield County Environmental Health |
| Gilpin County | Gunnison County | Hinsdale County |
| Hinsdale County Environmental Health | Huerfano County | Jefferson County Health Department |
| Kiowa County | Kit Carson County | Kit Carson County Environmental Health |
| Las Animas-Huerfano | La Plata County | Larimer County |

| | | |
|---|---|---|
| County District Health Department | | |
| Larimer County Environmental Health | Lincoln County | Littleton/Englewood Wastewater Treatment Plant |
| Logan County | Metro Wastewater Reclamation District | Mesa County |
| Mesa County Health Department | Mineral County | Moffat County |
| Montezuma County | Montrose County | Montrose County Environmental Health |
| Morgan County | Northeast Health Department | Otero County |
| Ouray County | Parker Water and Sanitation District | Pitkin County |
| Pitkin County Environmental Health | Platte Canyon Water and Sanitation District | Plumb Creek Wastewater Authority |
| Prowers County | Rio Blanco County | Rio Grande County |
| Routt County | Routt County Environmental Health | Saguache County |
| San Juan Basin Health Department | San Miguel County | San Miguel County Environmental Health |
| Sedgwick County | South Adams County Water and Sanitation District | Southeast Environmental Health |
| St. Vrain Sanitation District | Summit County | Summit County Environmental Health |
| Teller County | Teller County Environmental Health | Tri-County Health Department |
| Weld County Health Department | Widefield Water and Sanitation District | Vail Environmental Health |

**Issues Encountered During Stakeholder Process:**

1. Personal Users of Waste Grease: Section 30-20-123(7) C.R.S. establishes different requirements for personal users of waste grease who use waste grease as biofuel and personal users of waste grease who use waste grease for uses other than biofuel. To distinguish between personal users of waste grease who use waste grease as biofuel and personal users of waste grease that use waste grease for purposes other than biofuel, the following definitions were added to Section 1.2 of the Regulations: "personal use of waste grease as biofuel" and "personal use of waste grease other than for use as biofuel." Standards for Personal Use of Waste Grease Other than For Use as Biofuel are in Section 18.5 and Standards for Personal Waste Grease as Biofuel are in Section 18.6.

2. Section 30-20-123(6), C.R.S appears to contradict section 30-20-123(7) C.R.S. Section 30-20-123(6) C.R.S. states a person arranging for the transportation or disposal of waste grease may only arrange transportation with a registrant. However, a personal user of waste grease as biofuel does not need to register and HB 10-1125 does not establish a system for such a user to register. The Commission has interpreted this by including in Section 18.2.3 – Waste Grease Sources and Generators – a provision that sources and generators of waste grease may only use a registered waste grease transporter, a personal user of waste grease as biofuel who uses waste grease for personal use as biofuel, or is registered as a personal user of waste grease other than for use as biofuel. Additional clarification was added in Section18.6.2 – Standards for Personal Use of Waste Grease as Biofuel – that a personal user of waste grease as biofuel cannot take any waste grease from any container owned by a registrant (a registered waste grease transporter or personal user of waste grease other than for use as biofuel) unless written permission has been granted by the registrant.

3. Waste grease ownership after pickup of waste grease from the generator/source of the waste grease: There was concern from stakeholders regarding who is responsible for or owns the grease once waste grease is accepted for transport. The Commission determined this depends on the contract between the source of waste grease, the waste grease transporter, and the waste grease facility.

4. One-time or occasional waste grease collection events and household hazardous waste facilities: The exemptions in Sections18.1.6 (E) and (F) only apply to one-time or occasional waste grease events that may occur in a community for private citizens to properly dispose of their waste grease and for private citizens to take their residentially generated waste grease to a household hazardous waste facility or other local government agency-owned or approved facility that accepts waste grease from individuals as part of their household hazardous waste collection program. This exemption was added to promote the proper disposal of residentially generated waste grease by encouraging local jurisdictions to offer waste grease collection events and allowing household hazardous waste facilities to accept waste grease from private citizens. This exemption does not

apply to the collection of waste grease from an individual other than a private citizen (e.g., restaurants).

Some permanent household hazardous waste facilities mix residentially generated waste grease with compatible household and conditionally exempt small quantity generator hazardous waste (e.g., characteristic ignitable hazardous waste). If a household hazardous waste facility is using this method for disposal, then the waste grease is now a hazardous waste and must be managed as hazardous waste, transported by a hazardous waste transporter, and disposed of as hazardous waste.

5. Collection, processing, or storage of waste grease in a grease trap, grease interceptor, or waste grease bin/barrell or similar grease removal device at the point of waste grease generation: The exemption in Section 18.1.6 (H) applies to waste grease at the point of generation. For example, a restaurant that has a grease interceptor and is collecting or storing waste grease at the point of generation would not be a waste grease facility. Additionally, a landlord (e.g., a shopping mall, airport terminal) that provides a tank, bin, or other receptacle to the initial source or generator of waste grease (e.g., food court restaurants) for the collection of waste grease would not be a waste grease facility or source for the purposes of Section 18. Instead, the tenant would be the source of waste grease. However, releases of solid waste remain subject to all applicable laws and regulations.

6. Full pump outs of waste grease: The requirement in Section 18.3.1 (D) requires waste grease transporters to complete a full-pump out of waste grease by evacuating liquids and solids from the grease trap, grease interceptor, or similar grease removal device each time the device is pumped. Stakeholders overwhelmingly support this requirement. However, because most grease traps, grease interceptors, or tanks do not have a gauge that indicates the amount of grease that is actually in the tank, the waste grease transporter may have to rely on visual inspection to determine if the trap, interceptor, or similar grease removal device has been fully pumped.

7. Use of person in Section 18: Stakeholders expressed concern over the regulatory definition of "person." Person is defined in Section 1.2 as "an individual, partnership, private or municipal corporation, firm, board of metropolitan district or other sanitation district, or other association of person." Section 18 uses the Section 1.2 definition of person.

8. Financial assurance mechanism: Section 18.3.5 and Section 18.4.7 require that waste grease transporters and waste grease facilities acquire and maintain financial assurance. Section 1.8 of the Regulations allows for the waste grease transporter or waste grease facility to use any of the following types of financial mechanisms: trust fund, letter of credit, surety bond, insurance, corporate financial test, local government financial test,

corporate guarantee, local government guarantee, or state approved mechanism (certificate of deposit, multiple financial mechanisms, or other methods as approved).

9. Processing of waste grease: If waste grease is processed to meet a product specification then the grease is no longer a waste but is instead a product offered for sale in commerce. This product is not subject to laws or regulations concerning waste grease. Waste grease that is not processed is subject to Section 18.

10. Transport of waste grease by rail cars or rail stocks: These types of vehicles are unable to display a decal in a windshield. Instead, Section 18.3.3 (D) allows for placement of the decal on a magnet, placard, or other instrument approved by the Department that can be placed on the rail car or rail stock.

11. Certificate of Designation (CD): A certificate of designation (CD) is a document that the local governing body issues to authorize the use of land for a solid waste disposal site or facility. Section 30-20-102(5), C.R.S. states that recycling facilities need not acquire a CD:

> Any site and facility operated for the purpose of processing, reclaiming, or recycling recyclable materials shall not be considered a solid wastes disposal site and facility and shall not require a certificate of designation as a solid wastes disposal site and facility;

Further, the statute defines a recyclable material as "..any type of discarded or waste material that is not regulated under Section 25-8-205 (1) (e), C.R.S., and can be reused, remanufactured, reclaimed, or recycled,.." Waste grease and particularly waste yellow grease, is a recyclable material that may be processed into a variety of products used in pet food manufacturing, biofuel, or other product. Therefore, facilities that recycle waste grease as a recyclable material are not required to obtain a CD. However, if waste grease is not recycled but is instead disposed of at a site, then the disposal site must obtain a CD from their local governing body and abide by all CD requirements in 6 CCR 1007-2.

12. Waiver: A request of a waiver for any provision of Section 18 is allowable per Section 1.5 of the Regulations. The waiver process and procedures of Section 1.5 must be followed in order to request a waiver.

13. Sections 18.5.3 and 18.6.2 of these Regulations prohibit personal users of waste grease from obtaining waste grease without the written permission of the waste grease transporter from whose waste grease storage container they obtain the waste grease. Several stakeholders argued this prohibition should extend to all persons. The Commission disagrees. First, the statute explicitly prohibits a person from "collecting or transporting grease <u>for personal use</u>" (including both personal use of waste grease as biofuel and personal use of waste grease other than for use as biofuel) from taking "any

grease from any container owned by a registrant without the registrant's written permission." § 30-20-123(7) and § 30-20-123(7)(d)(II), C.R.S. (emphasis added). However, the statute contains no parallel provision for those who collect or transport grease for uses other than personal use. Second, local law enforcement, not the Solid Waste Materials Management Program, is charged with protecting citizens against theft of a commodity.

14. Uniform manifests. Stakeholders had differing views on topic of the "uniform manifest" required by Sections 30-20-123(3)(c)(I) and 30-20-123(3)(c)(IV), C.R.S. Some stakeholders argued the phrase "uniform manifest on a form established or approved by the department" gives the Department discretion to adopt a uniform manifest and also approve other manifests on a case by case basis. § 30-20-123(3)(c)(I), C.R.S. (emphasis added). The Commission, however, believes such an interpretation would undermine the uniformity of the uniform manifest. Further, this interpretation conflicts with other language in the statute which refers to "[t]he uniform manifest required under this section." § 30-20-123(3)(c)(IV), C.R.S. Therefore, the Department will adopt a uniform manifest that must be used by all registrants. Registrants may personalize the uniform waste manifest provided the information, design and format of the uniform waste grease manifest is maintained in the modified form. For example, a business may print the uniform waste grease manifest on a slightly smaller scale that would allow the business to include their logo or other information.

15. Waste grease versus grease: The legislation that requires adoption of these Regulations refers to "grease," "trap grease" and "yellow grease." Sections 30-20-123(2)(d), (i) & (j), C.R.S. However, the Regulations refer to "waste grease." The Commission made this change because the Solid Waste and Materials Management Program, the Program of the Colorado Department of Public Health and Environment charged with enforcing these Regulations, manages waste and does not manage products or commodities. To make it clear that the Regulations only concern grease that constitutes a waste, the Commission added the term "waste grease" to the Regulations where applicable.

16. Manifest signatures: Only registered waste grease transporters are required to sign the Uniform Manifest. The Department's Uniform Manifest includes spaces for the signatures of the generator/source of waste grease and the waste grease destination facility; these signatures are optional and are included on the Uniform Manifest at the stakeholders' request.

17. Destination facilities that do not process waste grease: Section 18.4.5(J) requires a waste grease facility that does not process waste grease to either register as a transfer station pursuant to Section 7 of the regulations or become a solid waste disposal site and facility that must obtain a certificate of designation, as appropriate. Such a facility would also remain subject to these Waste Grease regulations.

**Regulatory Alternatives**

No alternatives to these rules were considered because these rules are strictly the result of new statutory requirements.

**Cost/Benefit Analysis**

A cost-benefit analysis has not been done for these regulations as the regulations are strictly the result of new statutory requirements.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission/Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

**(Adopted by the Solid and Hazardous Waste Commission on November 15, 2011)**

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

## Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Amendment of Section 13.2.5(C) {Incorporation by Reference}

### Basis and Purpose

This amendment to 6 CCR 1007-2, Section 13.2.5(C) is made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302(4.5) and 30-20-109, C.R.S.

This amendment revises paragraph (C) of section 13.2.5 of the Medical Waste regulations adopted by the Solid and Hazardous Waste Commission on August 16, 2011 to specify that the specific materials or regulations incorporated by reference in these regulations are listed in the Statement of Basis and Purpose for this rulemaking, and are available for examination on the internet and at the Department.

As a result of the enactment of House Bill 10-1235, the requirements regarding the incorporation of outside materials by reference in state agency rules changed. Under section 24-4-103(12.5), C.R.S., an agency promulgating rules is allowed to refer to outside materials by incorporating the materials by reference without having to print the entire text of the incorporated material as part of the rule. Agencies must consider whether the material is eligible for incorporation by reference. Incorporation by reference may occur if the outside material is readily available in written form or electronic form, i.e., the internet. The incorporation by reference statute (§ 24-4-103(12.5)) recognizes material from three sources:

- An agency of the United States;
- A state agency, from either this state or another state;
- A nationally recognized organization or association.

The reference in the agency's rules must include the following:

- Identification of the incorporated code, standard, guideline, or rule by citation and date;
- A statement that the rule does not include later amendments to or editions of the incorporated code, standard, guideline, or rule;

- The address of the agency office where the incorporated code, standard, guideline, or rule is available for public inspection;
- Where copies of the incorporated code, standard, guideline, or rule are available for a reasonable charge from the agency adopting the rule and where copies are available from the agency of the United States, this state, or another state or the organization or association originally issuing the code, standard, guideline, or rule.

While the Office of Legislative Legal Services (OLLS) found no substantive issues in its review of the Section 13 Medical Waste Regulations, OLLS did indicate that Section 13.2.5 included material no longer required by Section 24-4-103(12.5), C.R.S., and failed to include a statement of where copies of the incorporated code, standard, guideline, or rule are available for a reasonable charge from the agency adopting the rule, and where copies are available from the agency, state, organization or association originally issuing the code, standard guideline or rule.

This amendment to 6 CCR 1007-1, Section 13.2.5(C) addresses the concerns expressed by OLLS and provides compliance with the new incorporation by reference requirements now in effect pursuant to Section 24-4-103(12.5), C.R.S.

**DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT**

**Solid and Hazardous Waste Commission**

**Hazardous Materials and Waste Management Division**

**6 CCR 1007-2**

**(Adopted by the Solid and Hazardous Waste Commission on August 16, 2011)**

**Statement of Basis and Purpose**
**and Specific Statutory Authority for**

Addition to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Deletion and Replacement of Section 13, Medical Waste (previously Infectious Waste) and Associated Additions to Section 1.2, Definitions and Modification of Section 7.1 (D), Transfer Stations

**Basis and Purpose**

I. Statutory Authority

These modification are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302(4.5) and 30-20-109, C.R.S.

II. House Bill 89-1328

The Colorado Department of Public Health and Environment (the Department) is the state agency responsible for activities related to the federal "Resource Conservation and Recovery Act" (RCRA). RCRA contains requirements for the management of hazardous waste and solid waste. HB89-1328 added a new Part 4 – Infectious Waste to Title 25 Article 15. To implement these statutory requirements, the Department promulgated regulations applicable to all facilities that generate, manage and dispose of infectious waste effective May 30, 1990.

III. Purpose of new regulations:

The purpose of these new regulations is to update the regulations applicable to infectious waste and expand this section to include non-infectious solid wastes including trace chemotherapy waste and waste pharmaceuticals commonly associated with and co-generated in a health care setting. The existing Section 13 has not been modified since 1990 and since that time, some aspects of the existing regulations have become outdated.

In addition, there is increasing awareness of potential environmental impacts associated with disposing of waste pharmaceuticals down the drain. Viable alternatives to disposal down the drain include incineration and disposal in approved landfills designed to contain these wastes. These regulations clarify that landfill disposal of non-hazardous waste pharmaceuticals and other medical wastes can only occur in solid waste sites and facilities that specifically include these wastes in their approved Engineering Design and Operations Plan. Due to the inclusion of additional solid wastes generated in a health care setting, this section will be re-named "Medical Waste."

**Discussion of Regulatory Proposal**

I. The proposed Section 13 regulations require the addition of new definitions. These changes are summarized below. For consistency, these definitional changes are being made to Section 1.2 of the solid waste regulations (6 CCR 1007-2, Part 1).

The following definitions are being added to Section 1.2:

1. Antineoplastic
2. Blood and body fluids
3. Empty container
4. Encapsulation
5. Household medical waste
6. Isolation waste
7. Medical waste
8. Medical waste generator
9. Medical Waste Management Plan
10. Medical waste treatment
11. Pathological waste
12. Pharmaceutical
13. Potentially infectious waste
14. Render non-infectious
15. Reverse distributor
16. Sharps
17. Sharps container
18. Stabilization
19. Trace chemotherapy waste
20. Trauma scene waste

In addition, the following definitions are being modified in Section 1.2:

1. Biohazardous waste
2. Infectious waste

The proposed Section 13 regulations also require the removal of the term "medical waste" from Section 7.1(D) Regulations for Transfer Stations.

II. Scope and applicability (Section 13.1)

This section describes the types of facilities to which these regulations apply. It also describes an exemption to the regulations for household medical waste generators.

III. General Provisions (Section 13.2)

The first general provision in this section declares that no site or facility regulated under this Section 13 can become a health or environmental hazard or allow nuisance conditions to develop. The second general provision clarifies that all sites and facilities that generate, store, consolidate, treat, process, transport or dispose of medical waste must comply with all applicable federal, state and local rules and regulations. The third general provision requires that all records retained as a result of these regulations be maintained onsite in an easily retrievable format. This allows the storage of records in electronic format or hard copy as long as they are accessible at the site or facility for inspection purposes. It also increases the length of time records must be kept to three (3) years to be consistent with other sections of these regulations. The fourth general provision prohibits the compaction of untreated infectious waste prior to treatment.

IV. Certificate of Designation Required (Section 13.3)

This section declares that all medical waste consolidation, storage, treatment, processing and disposal facilities must obtain a Certificate of Designation as a solid waste site or facility. This includes new facilities as well as existing facilities that want to accept untreated medical waste as a new waste stream. It describes four situations where a Certificate of Designation is not required. The first two exemptions are for medical waste generators that temporarily accumulate and/or treat their own medical waste onsite if they meet certain minimum requirements. The next exemption is for entities that conduct medical waste consolidation and short-term storage activities as a community service limited to only households. The final exemption is for facilities that have been issued a Certificate of Designation under the hazardous waste provisions in Title 25 Article 15 Parts 1, 2, 3 and 5.

V. Standards for Medical Waste Generators (Section 13.4)

This section contains language equivalent to 25-15-403 regarding the generator medical waste management plan and was included since many generators appear to be unaware of the statutory requirements. Inclusion of these provisions in the regulations makes it easier for generators to understand the need for the plan and the elements that must be included in their plan.

VI. Standards for Commercial Medical Waste Storage Facilities (Section 13.5)

This section describes the requirements for commercial medical waste storage facilities used for the consolidation and short-term storage of untreated medical wastes prior to

shipment to an approved treatment or disposal facility. The need for such facilities was identified during the stakeholder process as a new type of solid waste facility that would allow for more efficient collection and handling of medical wastes from multiple generators in a manner that would be protective of human health and the environment. Due to the nature of the wastes handled, the Department felt it was more appropriate for these wastes to be managed in facilities that have obtained a Certificate of Designation and have an approved Engineering Design and Operations Plan to ensure proper management of larger quantities of medical wastes rather than at solid waste transfer stations with less oversight. Medical waste storage facilities would also be subject to training requirements, applicable fees, financial assurance, inspections and enforcement requirements.

VII. Standards for Medical Waste Treatment (Section 13.6)

This section clarifies that treatment of infectious medical wastes is any method that renders the waste non-infectious. Non-infectious means the waste has been treated to achieve widely accepted pathogen inactivation standards. It also clarifies which treatment methods are considered acceptable for trace chemotherapy and pharmaceutical waste. This section specifies that treatment technology manufacturers must develop appropriate validation test methods to verify for the Department that their overall technology and specific equipment perform as designed and are able to consistently treat medical waste to acceptable standards. Furthermore, technology manufacturers must determine appropriate verification test methods that can be done on a routine basis by the waste treater to verify for the Department that the treatment process is operating effectively onsite under actual operating conditions. This information must be made available to the medical waste treater for inclusion in their medical waste management plan or application for Certificate of Designation as applicable.

VIII. Engineering Design and Operation Plan Requirements for Commercial Storage and Treatment Facilities (Section 13.7)

This section specifies the requirements for Engineering Design and Operations Plans for owners and operators of commercial storage and treatment facilities. The Engineering Design and Operations Plan must be provided to the Department and local governing body as part of the application for a Certificate of Designation for review and approval prior to acceptance of any medical waste. This section provides the minimum requirements for the Engineering Design and Operations Plan, including a list of prohibited wastes, maps, general site operating plan, description of job duties, technology validation and verification procedures for treatment facilities, waste characterization, screening and acceptance plans, on- and off-site controls to prevent nuisance conditions, waste handling and storage, waste tracking, fire prevention/contingency plans, personnel training plan, and closure plan. Facilities regulated under this section would be subject to applicable fees, financial assurance, inspections and enforcement.

IX. Operating Requirements for Commercial Storage and Treatment Facilities (Section 13.8)

This section specifies the minimum operating requirements for commercial storage and treatment facilities. It includes required facility operational notifications, operational requirements, required facility self-inspections, access controls, and recordkeeping and closure requirements.

X. Standards for Medical Waste Disposal (Section 13.9)

The first provision in this section describes the final disposition requirements for recognizable human anatomical remains. The second provision clarifies that untreated infectious waste can only be disposed of in a solid waste site or facility that has an approved Engineering Design and Operations Plan that specifically includes this waste. It also clarifies that properly treated infectious waste may be disposed of with normal solid waste. The final provision identifies disposal alternatives for trace chemotherapy waste and waste pharmaceuticals, and clarifies that if these options aren't available, such wastes can only be disposed of in a solid waste site or facility that has an approved Engineering Design and Operations Plan that specifically includes these wastes.

XI. Transportation Requirements (Section 13.10)

This section clarifies that medical waste can only be transported to an approved solid waste site or facility unless exempted under Section 13.3.1 for generators that self-transport their own waste. It also describes the actions that the transporter must take in the event of a spill or release of medical waste during transportation.

**Issues Encountered During Stakeholder Process:**

Outdated: The statute references the 1986 "EPA Guide for Infectious Waste Management." Since then, the State and Territorial Association on Alternative Treatment Technologies (STAATT) has defined widely accepted pathogen inactivation standards for infectious waste treatment and developed processes states can use when evaluating new treatment technologies. There have also been important advancements in the concepts of Universal/Standard Precautions by the Centers for Disease Control (CDC), Bloodborne Pathogens by the Occupational Safety and Health Administration (OSHA) and transportation requirements by the US Department of Transportation (US DOT) and United States Postal Service (USPS), including extensive training and specific management requirements.

Limited Scope: In the current solid waste regulations, Section 13 applies only to infectious waste. Since this section was promulgated, however, there has been increasing awareness of potential human health and environmental impacts associated with undesirable disposal practices for pharmaceutical wastes generated in a health care setting. The Department felt this would be a good opportunity to modify the regulations by broadening the scope of Section 13 to include trace chemotherapy waste and waste

pharmaceuticals that can impact human health and the environment if not properly disposed. Since these wastes are already solid waste, inclusion in Section 13 does not increase the regulatory burden on facilities and only serves to clarify and reinforce ongoing efforts by the Hazardous Waste Compliance Assurance Unit to increase awareness of issues related to health care waste management and disposal.

Conflicting Terminology: Infectious waste is regulated by several federal and state agencies, each with its own terminology but often overlapping requirements. Every effort was made to be consistent with other regulatory programs where possible, and define terms as used in these regulations where necessary. Although this means that several terms will be added to Section 1.2 Definitions, the stakeholders felt it was important to clarify the meaning of terminology used in Section 13 and distinguish it from similar sounding terms used in other regulatory programs.

**Regulatory Alternatives**

1) The Department receives numerous calls each year from medical waste generators regarding onsite medical waste management requirements. Many are unaware of the requirements for the generator medical waste management plan, which is available only in the infectious waste statute (25-15-403), or want more specific details and best management practices to incorporate into their plan. An alternative to expand and clarify the requirements for medical waste generators was considered because the statute has only general requirements for a generator medical waste management plan and relies heavily on voluntary compliance with recommendations in the 1986 "EPA Guide for Infectious Waste Management." This alternative was rejected because the statute (25-15-401) specifically declares that no rules or regulations governing generators are necessary for implementation of the statute. Since the regulations are more readily available, and generators appear to be more aware of them than the statute, the decision was made to insert equivalent language to 25-15-403 regarding the generator medical waste management plan into the regulations as Section 13.4.

2) The solid waste statute (30-20-102) says anyone that operates a solid waste disposal site or facility has to obtain a Certificate of Designation. By definition, solid waste disposal includes "storage, treatment, utilization, processing and final disposal." There is no exemption for generators regarding the Certificate of Designation, except a limited one under the "one's own waste" provision. This exemption cannot be used by governmental entities, however, which includes a significant number of community and public health facilities. An alternative to require all medical waste generators to obtain a Certificate of Designation was rejected because the Department does not believe it was the intent of the Legislature to issue a Certificate of Designation to every generator that wants to store and/or treat their own medical waste onsite. The decision was made instead to use Department discretion to adopt limits below which a facility is deemed to be an approved facility for which it is not necessary to obtain a Certificate of Designation. The limits selected were by consensus of the stakeholder group, with packaging and time being key elements to prevent nuisance conditions for putrescible wastes. The limits were

based on best management practices that many of the stakeholders indicated they were already following. These limits should not increase the regulatory burden for generators that ship waste offsite because these wastes have to be packaged for shipment anyway. The limits should not be a significant burden for generators that treat their waste onsite because they normally treat their waste without placing it in storage first. In case they can't, the generator would include proper packaging for temporary storage in their contingency plan as part of their generator medical waste management plan to manage their medical waste in the event of equipment failure, transportation delays or other unplanned events.

3) Until recently, non-hazardous waste pharmaceuticals were routinely disposed of down the drain or sent to a municipal solid waste landfill dispersed in the regular trash stream. When pharmaceuticals started being detected in surface water resources, people became aware that these substances were not being treated by wastewater treatment plants and were being discharged to surface waters in sufficient quantities to cause environmental impacts. To reduce impacts to surface water, disposal down the drain is now discouraged and incineration or landfill disposal are encouraged. In the last few years, pharmaceutical take-back programs have developed that gather enormous quantities of waste pharmaceuticals for disposal. Some of these are sent for incineration in out-of-state solid waste or hazardous waste incinerators, but this is very expensive. Some of these are sent for disposal in certain legacy local municipal solid waste landfills that may not fully meet RCRA Subtitle D design requirements that better contain concentrated quantities of mixed waste pharmaceuticals.

An alternative was considered to require landfills that want to accept this new untreated waste stream to conduct tests to prove their liner system is adequate to contain concentrated quantities of a wide variety of mixed pharmaceutical wastes and prevent releases to groundwater. Although this is still an available option, requiring this alternative was rejected as being too burdensome and costly for the landfills. The decision was made instead to use the concept of protecting groundwater by encouraging methods that cause waste pharmaceuticals to undergo a fundamental physical or chemical change that either destroys the waste (e.g., incineration) or renders it less leachable in the landfill (e.g., encapsulation or stabilization). Both methods reduce the waste's potential to impact groundwater by destroying or immobilizing the constituents of concern similar to what is done in the hazardous waste regulations under the land disposal restrictions (LDR). Details on how waste pharmaceuticals are destroyed or rendered less leachable would be included in the Engineering Design and Operations Plan submitted as part of the application for a new or modified Certificate of Designation. Treatment can be conducted either by a medical waste treatment facility or by a solid waste disposal facility approved to treat waste pharmaceuticals prior to disposal. Solid waste disposal sites and facilities will be required to specifically state in their Engineering Design and Operations Plan if they are able to accept treated or untreated infectious waste, trace chemotherapy waste and/or waste pharmaceuticals.

**Incorporated by Reference Regulatory Citations**

The materials and regulations listed below are available for examination at the state depository libraries or may be obtained by contacting:

Regulatory and Program Authorization Coordinator
Colorado Department of Public Health and Environment
Hazardous Materials and Waste Management Division
4300 Cherry Creek Drive South
Denver, CO 80246-1530

- 49 CFR 173.196 US DOT - Category A infectious substances (packaging).
- 49 CFR 173.197 US DOT - Regulated medical waste (packaging).
- 21 CFR 1307.11 DEA - Distribution by dispenser to another practitioner or reverse distributor.
- 21 CFR 1307.21 DEA - Procedure for disposing of controlled substances.
- 21 USC Sec. 802(6) - Controlled Substances Act Definitions
- 6 CCR 1011-1 Chapter II Part 7.200 et seq. – Donation of unused medications, medical devices and medical supplies.
- 6 CCR 1015-10 – Cancer drug repository program

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission/Hazardous Materials and Waste Management Division

**6 CCR 1007-2**

**(Adopted by the Solid and Hazardous Waste Commission on August 16, 2011)**

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

## Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Amendment of Section 1.7.4(C) {Solid Waste User Fee – Allowable expenditures and reporting}

### Basis and Purpose

This amendment to 6 CCR 1007-2, Section 1.7.4(C) is made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302(4.5) and 30-20-109, C.R.S.

This amendment revises the current reference to Section 25-16-104.5(3)(b), C.R.S. in paragraph 1.7.4(C) to the proper reference of Section 25-16-104.5(2)(a.5), C.R.S. for statutory authority to use tipping fees for local jurisdictions' response activity expenses.

Pursuant to House Bill 10-1329, section 25-16-104.5(3) was repealed (as specified in section 25-16-104.5(7)) "effective upon the date that the fee adopted pursuant to subsection (1.7) of this section takes effect or on July 1, 2011, whichever occurs first." Amendments to the Section 1.7.4 Solid Waste User Fee regulations were adopted by the Solid and Hazardous Waste Commission on November 16, 2010.

Paragraph 1.7.4(C) is being revised at this time to replace the repealed section 25-16-104.5(3)(b) reference with a reference to Section 25-16-104.5(2)(a.5),which states "notwithstanding any provision of law to the contrary, one hundred percent of the moneys collected pursuant to subparagraph (II) of paragraph (a) of subsection (1.7) of this section from persons disposing of solid waste at an attended solid waste disposal site where a local government solid waste disposal fee is imposed to fund hazardous substance response activities at sites designated on the national priority list pursuant to the federal act shall be transmitted to the owner of the solid waste disposal site to the extent that the moneys are used to fund the response activities at the sites on the national priority list. The balance of any moneys described under this paragraph (a.5) that are not used to fund such response activities shall be credited to the hazardous substance response fund created in section 25-16-104.6."

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division (HMWMD)

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR AMENDMENTS TO SECTION 1.7.2 (DOCUMENT REVIEW AND ACTIVITY FEES)

**(Adopted by the Solid and Hazardous Waste Commission on May 17, 2011)**

### Basis and Purpose

These amendments to 6 CCR 1007-2, Section 1.7.2 are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302 and 30-20-109, C.R.S. The purpose of the amendments to Section 1.7.2 is twofold. First, Section 1.7.2 establishes certificate of designation (CD) application or modification notification procedures to verify the Department's receipt of an application or modification and the allowable billing rates and ceiling for the Department's review efforts. Second, Section 1.7.2 establishes a procedure to provide the owner or operator with a project status report following thirty (30) hours of billable staff time.

### Amendment of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Section 1.7.2 (Document Review and Activity Fees)

### Background

The Solid Waste and Materials Management Program (the Program) of the Hazardous Materials and Waste Management Division does not receive any general fund monies. Fees support 100% of unit activities. The fees are comprised of three sources including: 1) the Solid Waste User Fee also referred to as the Hazardous Substance Response Fee or tipping fees, 2) hourly activity fees for document review and evaluation activities and 3) annual facility fees applied to facilities that do not collect and remit the SWUF.

Section 1.7.2 of the Regulations already contains document review activity fee ceilings. The ceilings were established via a stakeholder process following passage of House Bill 07-1288. The ceilings were based on information regarding the number of staff hours required to complete the various document reviews. In addition, 30-20-103 C.R.S. contains allowable CD application review time frames - 30 days for a completeness review and 150 days for a technical review. Therefore, the Program is already limited in how much time it has to review an application or modification, and in how much it may charge for the review.

The Program occasionally receives complaints regarding the review time and fees, even though they are within established limits. To address these occasional complaints, the Program is proposing some accountability mechanisms be added to these regulations.

**Summary of Regulatory Proposal**

The amendment is comprised of two sets of regulatory modifications. The first regulatory modifications establish programmatic procedures to be implemented upon receipt of a CD application or modification. These procedures include notifying the applicant: 1) that the submittal was received, 2) of the project manager's contact information, 3) that two free meetings are available, 4) of the current hourly activity fee and 5) of the document category and allowable billing ceiling. The second regulatory modifications establish programmatic project status update procedures. These include: 1) written applicant notification when thirty hours of billable time has accumulated working on the submittal or document; 2) the amount of document review completed; and 3) that the Department shall continue work on the submittal or document unless the applicant directs the Department in writing to cease work on the project. If the applicant directs the Department to cease work, the applicant will still be responsible for reimbursing the Department for the hours of accumulated review time.

**Stakeholder Issues:**

This proposal is based on interaction between the Program and some recent complainants, and discussion with several regulated facilities, including one large facility owner/operator that can have multiple documents under review at any given time and many submittals over a year's time. These stakeholders said that they could live with these regulations, but that the affirmative response needed from them when 30 hours of review time had accumulated was burdensome. The large facility stakeholder is not among the complainants.

**Regulatory Alternatives:**

No other regulatory alternatives were evaluated.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission/Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

## Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Amendments to the Section 10 Regulations {Waste Tire Facilities and Waste Tire Haulers}

**(Adopted by the Solid and Hazardous Waste Commission on May 17, 2011)**

**Basis and Purpose**

These amendments to 6 CCR 1007-2, Section 10 are made pursuant the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302(4.5) and 30-20-109, C.R.S.

These amendments correct inadvertent errors that exist in the Section 10 Regulations adopted by the Solid and Hazardous Waste Commission on February 15, 2011.

Section 10.1.3 is being amended to correct the conflicting language in paragraphs (H) and (I) using the existing regulatory language from Section 10.3 (Standards for Waste Tire Hauling) which requires that no person shall transport a load of ten (10) or more waste tires at one time unless he/she has registered with the Department by submitting an application for Certificate of Registration (Form WT-1) to the Hazardous Materials and Waste Management Division of the Department and received a Certificate of Registration from the Department.

The exemption language in paragraphs (H) and (I) of section 10.1.3 is being revised to correct and clarify that the Section 10 Regulations do not apply to: 1) a private citizen who beneficially uses ten (10) or more waste tires *(rather than greater than ten (10) waste tires as currently written*) with written approval from the Department; or 2) a private citizen who beneficially uses less than ten (10) waste tires (*rather than ten (10) or less waste tires as currently written*).

Sections 10.3.2(B)(4), 10.5.3(C)(4), 10.6.3(C)(4) and 10.7.3(C)(4) are also being amended at this time to require that applications for a Certification of Registration include the name and address of the "responsible officer" rather than the "principal officer". This wording change was adopted by the Commission for the registration requirements of section 10.4.3(C)(4) for Tire Retailers, Wholesalers and Fleet Service Facilities, but was not universally adopted throughout the Section 10 regulations. These amendments will make the corresponding change in the registration requirements of the Section 10 regulations for Waste Tire Hauling (section 10.3.2), Waste Tire Monofills (section 10.5.3), Waste Tire Processors and End-Users (section 10.6.3) and Waste Tire Collection Facilities (section 10.7.3).

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

**(Adopted by the Solid and Hazardous Waste Commission on February 15, 2011)**

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

Addition to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2, Part 1) – Deletion of Sections 10 (Scrap tire Facilities) and 15 (Waste Motor Vehicle Tire Haulers) and Replacement with New Section 10 (Waste Tire Facilities and Waste Tire Haulers) and Associated Additions to Section 1.2, Definitions

**Basis and Purpose**

I. Statutory Authority

These amendments to 6 CCR 1007-2, Section 10: Waste Tire Facilities and Waste Tire Haulers, are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302(4.5) and 30-20-109, C.R.S. These regulations are a direct result of, and implement the requirements of, House Bill 10-1018, passed by the legislature in 2010, and House Bill 05-1126, passed by the legislature in 2005.

II. House Bill 10-1018

House Bill (HB) 10-1018 extensively modified many sections of the Colorado Revised Statutes (C.R.S.). Important to these regulations, HB10-1018 made significant changes to Sections 25-17-202, and 204, and added Sections 25-17-202.6, 205, 206, and 207 as follows:

§ 25-17-202 was modified to include many important definitions that have been carried over into these regulations, including: End-user, Processor, Tire, Tire-derived product, Waste tire, Waste tire facility, and Waste tire hauler.

§ 25-17-204 was modified to remove the exclusion that allowed tire transport for non-commercial purposes. It now also prohibits transport of a quantity of tires in excess of a limit established by the Commission (the limit of 10 waste tires as set by Section 10.3.2(A) of these regulations) unless the transporting person is registered with the

Department, has affixed a decal to the transporting vehicle, and uses manifests to track all waste tire transport.

§ 25-17-205 has been added to describe all types of facilities that need to place decals on their facilities. These include waste tire storage and collection facilities and waste tire haulers and each of the vehicles used to transport waste tires.

§ 25-17-205 also describes the use of uniform manifests to track waste tire shipments from the waste tire generator to the waste tire processor or end-user. This section describes the minimum information to be collected on the manifests, who gets copies of each waste tire manifest, and how long copies of each manifest must be retained.

§ 25-17-206 has been added to require that all waste tire facilities must be registered with the Department. It also requires that all waste tire facilities, except facilities with an existing certificate of designation (CDs) that are in compliance with these regulations and waste tire retailers and wholesalers, must have a Fire Prevention, Training, and Firefighting Program that has been approved by the local fire authority. This section then requires that all waste tire monofills annually submit to the Department, and comply with, a Waste Tire Inventory Reduction Plan. Next, this section requires that waste tire processors process, end-users convert into and end product, and monofills convert into tire-derived product, at least 75% of the three-year rolling average annual amount of waste tires accepted at the facility as a condition of maintaining their registration. Lastly, this section requires all waste tire facilities except those with an existing CD and tire retailers and wholesalers, to have an operations plan, emergency response plan, closure plan, and post a bond for closure and reclamation of the facility, should it be necessary.

§25-17-207 has been added to describe the enforcement of the regulations. This section also describes the Department's reporting responsibilities to the Transportation Legislation Review Committee, the House Transportation and Energy Committee, and the Senate Transportation Committee. This section also requires the Department to develop an on-line complaint form and a process for addressing complaints received.

III. Purpose of new regulations:

The purpose of these new regulations is to implement the requirements of HB10-1018. HB10-1018 sets up a cradle-to-grave management scheme for waste tires to ensure that all newly generated waste tires are accounted for and properly recycled or dispositioned. These regulations set out the requirements for each type of facility or entity within the cradle-to-grave "lifespan" of a waste tire – tire retailers and wholesalers that generate waste tires as they replace old tires with new tires on vehicles; waste tire haulers and waste tire collection facilities that manage waste tires in transit, waste tire end-users and processors that either manufacture waste tires into new products or turn waste tires into useable feedstocks; and waste tire monofills that store waste tires for extended periods.

**Discussion of Regulatory Proposal**

I. The proposed Section 10 regulations require some new definitions and some modified definitions. These changes are summarized below. For consistency, these definitional changes are being made to Section 1.2 of the solid waste regulations (6 CCR 1007-2, Part 1).

The following definitions are being added to Section 1.2:

1. Beneficial use
2. End-user
3. Fleet Service Facility
4. Processor
5. Tire-derived product
6. Waste tire collection facility
7. Waste tire facility
8. Waste tire hauler

The following definitions are being modified in Section 1.2

1. Agent of a Wholesaler
2. Passenger tire equivalents
3. Retailer
4. Tire (as used in Section 10)
5. Waste tire
6. Waste tire monofill
7. Wholesaler

The following definitions are being deleted from Section 1.2, as these terms no longer appear anywhere in the Regulations

1. Scrap tire
2. Scrap tire recycling
3. Waste motor vehicle tire
4. Waste motor vehicle tire hauler
5. Waste motor vehicle tire monofill
6. Waste motor vehicle tire recycling facility
7. Waste motor vehicle tire storage site

II. Scope and applicability (Section 10.1)

The first two subsections in this section describe the types of waste tire facilities and waste tire haulers to which the new Waste Tire Regulations apply. The third subsection lays out the exemptions to the new Waste Tire Regulations.

Within Section 10.1.3 is an exemption for a person who transports only tires that have been used but retain demonstrable and documented value for re-use or re-sale. The Commission intends that receipts, bills-of-sale, or other equivalent documents that demonstrate the existing or future value of the tires be used to satisfy this exemption.

III. General Provisions (Section 10.2)

The two general provisions in this section clarify that all waste tire facilities and waste tire haulers must comply with all other applicable provisions of law, and, if these facilities/operators conduct activities subject to more than one section of the new Waste Tire Regulations, they must comply with all applicable sections.

IV. Standards for Waste Tire Haulers (Section 10.3)

This section sets up new standards for persons hauling waste tires in Colorado. The waste tire hauling standards apply mainly to those persons hauling a load of ten (10) or more waste tires. However, there is an important requirement in subsection 10.3.1 that anyone hauling any amount of waste tires (this would include an individual hauling their own waste tires) may only deliver those waste tires to certain approved facilities, sites or users.

Subsections 10.3.2 through 10.3.6 are applicable to persons hauling ten (10) or more waste tires and set up the following:

a. A system for registering as a "Waste Tire Hauler", including obtaining a "Certificate of Registration" which is valid until March 15 of the following year and may be revoked by the Department for failure to comply with the Colorado Solid Waste Sites and Facilities Act or the Colorado Solid Waste Regulations;

b. A requirement that Waste Tire Haulers obtain decals from the Department (issued along with the "Certificate of Registration") for all vehicles used to haul waste tires as well as for each facility they operate. The vehicle decals shall be affixed to the lower left (driver's side) corner of the windshield of each vehicle used to haul waste tires and a facility decal must be affixed to each facility the waste tire hauler uses to store/accumulate waste tires. The decals are valid until March 15 of the following year;

c. A manifest system to ensure that waste tires generated in Colorado are tracked from "cradle-to-grave"; this system is mainly the responsibility of the waste tire haulers. Waste tire haulers must use the Uniform Waste Tire Manifest form available from the Department and must provide a copy to both the generator of the waste tires and the destination facility. All manifest copies must be maintained by the waste tire generator, waste tire hauler, and waste tire destination facility for a period of 3 years. This can be accomplished by saving hard copies or electronic copies of the manifests;

d. A requirement that a surety bond be posted in the amount of $10,000 before hauling waste tires;

e. A requirement that an annual report be filed with the Department by February 1st every year on the Commercial Waste Tire Hauler Annual Report Form, which includes information accounting for the number of waste tires handled by the waste tire hauler during the previous calendar year.

Subsection 10.3.7 exempts waste tire haulers who store waste tires at their facilities from the definition of "Waste Tire Collection Facility" and thus from the requirements of the new Section 10.7, as long as the hauler does not store those waste tires for longer than ninety (90) days.

V. Standards for Tire Retailers, Wholesalers, and Fleet Service Facilities (Section 10.4)

This section sets up new standards for Tire Retailers, Wholesalers and Fleet Service Facilities in Colorado that are sources of waste tires pursuant to section 30-20-1007, C.R.S. or 30-20-1008, C.R.S.

Subsections 10.4.2 through 10.4.5 are applicable to all Tire Retailers, Wholesalers and Fleet Service Facilities that manage waste tires. These subsections set up requirements to ensure that waste tires generated at these facilities are stored, managed and disposed in a manner which ensures safety of public health and the environment, including the following:

a. General provisions including requirements to: ensure adequate road access to stored waste tires, control litter and weeds in order to minimize the threat of fire, maintain a working telephone, meet local fire code or the code of the Division of Fire Safety, ensure adequate fencing and tire storage limits, notify the Department in the event of an emergency involving the waste tires, ensure delivery of waste tires only to a registered commercial waste tire hauler, and allows acceptance of waste tires from private citizens who are not registered under the regulations;

b. A system for registering as a "Waste Tire Facility", including obtaining a "Certificate of Registration" which is valid for three (3) years following issuance and may be revoked by the Department for failure to comply with the Colorado Solid Waste Sites and Facilities Act or the Colorado Solid Waste Regulations;

c. A requirement that Tire Retailers, Wholesalers and Fleet Service Facilities obtain decals from the Department (issued along with the "Certificate of Registration") for each facility they operate. The "Waste Tire Facility" decals shall be posted or affixed in a prominent location at the facility. The decals are valid for three (3) years from the date of issuance;

d. Manifest requirements to ensure that waste tires generated in Colorado are tracked from "cradle-to-grave". Tire Retailers, Wholesalers and Fleet Service Facilities must not accept (except in the limited circumstance of a private citizen) nor offer any shipment of waste tires without an accompanying Uniform Waste Tire

Manifest. Tire Retailers, Wholesalers and Fleet Service Facilities must maintain copies of all Waste Tire Manifests for three (3) years.

VI. Standards for Waste Tire Monofills (Section 10.5)

This section sets up new standards for Waste Tire Monofills in Colorado. The general provisions of Section 10.5.1 require all Waste Tire Monofills to have a valid Certificate of Designation and require that all new Certificate of Designation applications for Waste Tire Monofills include the plans and obligations of Section 10.5, including a Waste Tire Facility Operations Plan, a Closure and Post-Closure Plan and evidence of required Financial Assurance.

Subsections 10.5.2 through 10.5.9 set up requirements to ensure that waste tires managed at Waste Tire Monofills are stored, managed and disposed in a manner which ensures safety of public health and the environment, including the following:

a. General provisions including requirements to: ensure adequate road access to waste tires, control litter and weeds in order to minimize the threat of fire, maintain a fence surrounding the facility, post signs regarding operations, maintain a working telephone, have a site attendant, meet tire pile configuration requirements, notify the Department in the event of an emergency involving the waste tires, arrange for the processing of at least 75% of the three year rolling average of the tires accepted during the previous three years, ensure that any waste tires sent off-site are transported only by a registered commercial waste tire hauler and only to an authorized waste tire facility;

b. A system for registering as a "Waste Tire Facility", including obtaining a "Certificate of Registration" which is valid for three (3) years following issuance and may be revoked by the Department for failure to comply with the Colorado Solid Waste Sites and Facilities Act or the Colorado Solid Waste Regulations;

c. A requirement that a waste tire monofill obtain a Waste Tire Facility decal from the Department (issued along with the "Certificate of Registration") for each facility they operate. The Waste Tire Facility decals shall be affixed in a prominent location at the facility. The decals are valid for three (3) years from the date of issuance;

d. Manifest requirements to ensure that waste tires generated in Colorado are tracked from "cradle-to-grave". Waste Tire Monofills must not accept nor offer any shipment of waste tires without an accompanying Uniform Waste Tire Manifest. All Waste Tire Monofills must maintain copies of all Waste Tire Manifests for three (3) years.

e. A requirement that financial assurance must be maintained for all Waste Tire Monofills in accordance with Section 1.8 of the Solid Waste Regulations;

f. A requirement that an annual report be filed with the Department by May 1st every year which includes information accounting for the number of waste tires handled by the Waste Tire Monofill during the previous calendar year and the report must contain a "Waste tire Inventory Reduction Plan".

g. A requirement for a Waste Tire Facility Operations Plan which includes detailed information regarding facility operations and includes the following plans: an Emergency Response Plan, a Fire Prevention, Training and Firefighting Plan, and a Vector Control Plan.

h. A requirement for all Waste Tire Monofills to be closed and maintained in accordance with the closure and post-closure care requirements of Sections 2.5, 2.6, and 10.5 of the Solid Waste Regulations.

VII. Standards for Waste Tire Processors and End-Users (Section 10.6)

This section sets up new standards for Waste Tire Processors and End-Users in Colorado. The general provisions of Section 10.6.1 require all Waste Tire Processors and End-Users to meet the requirements of Section 8 of the Solid Waste Regulations pertaining to Recycling Facilities in addition to the new requirements of Section 10.6.

Subsections 10.6.2 through 10.6.9 set up requirements to ensure that waste tires managed at Waste Tire Processors and End-Users are stored, managed and processed or used in a manner which ensures safety of public health and the environment, including the following:

a. General provisions including requirements to: ensure adequate road access to waste tires, control litter and weeds in order to minimize the threat of fire, maintain a fence surrounding the facility, post signs regarding operations, maintain a working telephone, have a site attendant, meet tire pile configuration requirements, notify the Department in the event of an emergency involving the waste tires, arrange for the processing or converting into an end product at least 75% of the three year rolling average of the tires accepted during the previous three years, ensure that any waste tires sent off-site are transported only by a registered commercial waste tire hauler and only to an authorized waste tire facility;

b. A system for registering as a "Waste Tire Facility", including obtaining a "Certificate of Registration" which is valid for three (3) years following issuance and may be revoked by the Department for failure to comply with the Colorado Solid Waste Sites and Facilities Act or the Colorado Solid Waste Regulations;

c. A requirement that Waste Tire Processors and End-Users obtain a Waste Tire Facility decal from the Department (issued along with the "Certificate of Registration") for each facility they operate. The Waste Tire Facility decals shall

be affixed in a prominent location at the facility. The decals are valid for three (3) years from the date of issuance;

d. Manifest requirements to ensure that waste tires generated in Colorado are tracked from "cradle-to-grave". Waste Tire Processors and End-Users must not accept nor offer any shipment of waste tires without an accompanying Uniform Waste Tire Manifest. All Waste Tire Processors and End-Users must maintain copies of all Waste Tire Manifests for three (3) years.

e. A requirement that financial assurance must be maintained for all Waste Tire Processors and End-Users in accordance with Section 1.8 of the Solid Waste Regulations;

f. A requirement that an annual report be filed with the Department by May 1st every year which includes information accounting for the number of waste tires handled by the Waste Tire Processor or End-User during the previous calendar year and the report must contain evidence establishing that 75% of the three year rolling average of waste tires accepted during the previous three years have been processed or converted into end product.

g. A requirement for a Facility Operations Plan which includes detailed information regarding facility operations and includes the following plans: an Emergency Response Plan, a Fire Prevention, Training and Firefighting Plan, and a Vector Control Plan.

h. A requirement for all Waste Tire Processors and End-Users to be closed and maintained in accordance with the closure and post-closure care requirements of Sections 2.5, 2.6, and 10.6 of the Solid Waste Regulations.

VIII. Standards for Waste Tire Collection Facilities (Section 10.7)

This section sets up new standards for Waste Tire Collection Facilities in Colorado.

Subsections 10.7.2 through 10.7.9 set up requirements to ensure that waste tires managed at Waste Tire Collection Facilities are stored and managed in a manner which ensures safety of public health and the environment, including the following:

a. General provisions including requirements to: ensure adequate road access to waste tires, control litter and weeds in order to minimize the threat of fire, maintain a fence surrounding the facility, post signs regarding operations, maintain a working telephone, have a site attendant, meet tire pile configuration requirements, notify the Department in the event of an emergency involving the waste tires, ensure that any waste tires sent off-site are transported only by a registered commercial waste tire hauler and only to an authorized waste tire facility, and a restriction that no Waste Tire Collection Facility shall have more

than 7500 waste tires on-site at any one time; and an allowance for facilities that collect waste tires as part of community clean-up activities may use a due diligence process to establish that transport by and to a registered facility is not possible.

b. A system for registering as a "Waste Tire Facility", including obtaining a "Certificate of Registration" which is valid for three (3) years following issuance and may be revoked by the Department for failure to comply with the Colorado Solid Waste Sites and Facilities Act or the Colorado Solid Waste Regulations;

c. A requirement that Waste Collection Facilities obtain a Waste Tire Facility decal from the Department (issued along with the "Certificate of Registration") for each facility they operate. The Waste Tire Facility decals shall be affixed in a prominent location at the facility. The decals are valid for three (3) years from the date of issuance;

d. Manifest requirements to ensure that waste tires generated in Colorado are tracked from "cradle-to-grave". Waste Tire Collection Facilities must not accept nor offer any shipment of waste tires without an accompanying Uniform Waste Tire Manifest. All Waste Collection Facilities must maintain copies of all Waste Tire Manifests for three (3) years.

e. A requirement that financial assurance must be maintained for all Waste Tire Collection Facilities in accordance with Section 1.8 of the Solid Waste Regulations;

f. A requirement that an annual report be filed with the Department by May 1st every year which includes information accounting for the amount of waste tires received at the facility and how many waste tires were shipped off-site during the preceding year.

g. A requirement for a Facility Operations Plan which includes detailed information regarding facility operations and includes the following plans: an Emergency Response Plan, a Fire Prevention, Training and Firefighting Plan, and a Vector Control Plan.

h. A requirement for all Waste Tire Collection Facilities to be closed and maintained in accordance with the closure and post-closure care requirements of Sections 2.5, 2.6, and 10.7 of the Solid Waste Regulations.

**<u>Issues Encountered During Stakeholder Process:</u>**

1. Definition of "Person": In the current solid waste regulations, waste tire requirements exist in Sections 10, 15, and 16. The Department thought modifying the regulations to include all of the new HB10-1018 requirements would be a good opportunity to merge all

regulatory requirements relating to waste tires into a single section. That turned out to be impossible because of conflicting definitions of "person" in the statutes. In §30-20-101, C.R.C., "person" is defined as "an individual, partnership, private or municipal corporation, firm, board of a metropolitan district or sanitation district, or other association of persons." This definition applies to all of the regulations in the old Sections 10 and 15 of the solid waste regulations that have now been merged into this new Section 10. However, §30-20-1001, C.R.S., "person" is defined as not including waste haulers, as that term is defined in the same section. This second definition applies to all of the regulations in Section 16 of the solid waste regulations. Since the second definition of "person" exempts waste haulers, it was not possible to merge the waste tire portions of Section 16 into the new Section 10, so Section 16 remains unchanged.

2. Implementation of statutory requirement to "post a bond": Due to the current economic climate, small businesses are having difficulty obtaining bonds at reasonable cost. The Department believes this statutory phrase is a recognition by the legislature that certain waste tire facilities must provide some type of financial assurance that can be utilized to clean up an abandoned site whenever necessary to protect public health and the environment. Therefore, the Department has written the regulatory requirements to allow flexibility within the regulated community to use all of the financial assurance mechanisms available in Section 1.8.4(C) of the solid waste regulations (6 CCR 1007-2).

3. Implementation of "hauling for compensation": The Commission has interpreted the phrase "hauling for compensation" very broadly to include 1) hauling for monetary payment, 2) hauling for trade payment or for other value, and 3) hauling one's own tires to avoid the cost of paying another hauler. There is a disconnect in HB10-1018 between the definition of "waste tire hauler" and prohibitions against "person[s]" doing things like hauling waste tires. HB10-1018 assumed anyone hauling more than a certain number of waste tires is doing so for compensation.

4. The definitions of "scrap tire", scrap tire recycling", "waste motor vehicle tire", "waste motor vehicle tire hauler", "waste motor vehicle tire monofill", "waste motor vehicle tire recycling facility", and "waste motor vehicle tire storage site" have all been deleted from Section 1.2 of the Solid Waste Regulations. These terms were unique to the old Section 15 of the Regulations, which has now been combined into Section 10, and are no longer needed or have been superseded.

5. Two types of decals are required by these regulations: 1) waste tire hauling vehicle decals and 2) waste tire facility decals. The vehicle decals are 3" x 3" square decals that are required to be affixed to the lower left (driver's side) corner on the inside of the vehicle windshield. The decals must be "permanently affixed" to the windshield of owned vehicles and must be "affixed" to the windshield of rented or leased vehicles. To permanently affix the decals to hauler-owned vehicles, the decals will have a peel-and-stick surface. For rented or leased vehicles, the Commission envisions that the decal may be taped to the inside of the windshield and the permanent adhesive on the face of the decal not used. Each vehicle decal has a unique number that will be assigned to a specific vehicle. Each vehicle decal for rented or leased vehicles will have a unique

number, but will indicate that it is assigned to a temporary vehicle and can be re-used on subsequent temporary vehicles.

When a Waste Tire Hauler completes an application for a Certificate of Registration, he/she will include information on all vehicles that will be used to haul waste tires. The Department will issue the necessary decals free of charge as quickly after receipt of the registration application as possible. If a Waste Tire Hauler uses or will use leased or rented vehicles or purchases a new vehicle, the Waste Tire Hauler must update his/her application for a Certificate of Registration within 15 days so that new decals can be issued.

No matter when waste tire vehicle decals are issued, they will all expire on March 15 of each year. The Department will send out reminder notices of the decal expiration so that reapplications from Waste Tire Haulers can be received in a timely manner.

Waste facility decals are 4" x 11" and must be posted or affixed at the facility in a prominent location. This could be in a front window, behind a front counter, or in a public waiting area at the facility. Facility decals are non-transferable and are issued for a 3-year period.

Decals can only be issued if a facility is properly registered. The main purpose of both the vehicle and facility decals is for easy identification, by the waste tire generator, the waste tire hauler, and the waste tire monofill, processor, or end-user, that each entity has been properly registered.

6. To implement Section 10.3.7, the Department will not track each tire against the 90-day storage limitation. Instead, the Department will track on-site waste tire inventory against the manifest records at the facility to ensure that tire inventory turnover rates demonstrate no net waste tire storage increase over a 90-day period.

7. The Commission has chosen not to try to regulate persons hauling purchased used tires in large quantity in these regulations. If persons hauling purchased used tires are inspected by Department inspectors or law enforcement officers, it is assumed they would be able to show a receipt or other documentation proving the value and intent of use of the tires in their possession.

8. Though not specifically mentioned in HB10-1018, fleet service facilities like automobile dealerships, school district maintenance shops, postal service and package delivery maintenance facilities, can and do generate a large number of waste tires. Therefore, the Commission believes that these facilities should be regulated in Section 10. These facilities are most similar to tire retailers or wholesalers - they are replacing old tires on their vehicles with new tires. They are not similar to waste tire haulers, monofills, processors, or end-users. In addition, just like retailers and wholesalers, they should not be subject to the requirements of waste tire collection facilities unless they store tires longer than is reasonable. Therefore, the Commission has chosen to require Fleet Service Facilities to comply with the requirements of Section 10.4 of these regulations.

9. HB 10-1018 requires the use of uniform manifests to track waste tire shipments from the waste tire generator to the waste tire processor or end-user. During the stakeholder process it became evident that the requirements for waste tire manifests would have to be different from the traditional cradle-to-grave process such as is used for hazardous waste. Stakeholder input indicated that a percentage of re-use or salvage tires are removed during waste tire pickup from waste tire generator facilities or at the waste tire hauler's facility where waste tires from multiple waste tire generator facilities are consolidated. In addition, it became evident that tracking each waste tire from a generator to a monofill, processor, or end-user was not realistic or necessary. Therefore, a "two-loop" manifest system has been incorporated into these regulations (see diagram below). The first "loop" occurs between the waste tire hauler and the waste tire generator. In this loop, the waste tire hauler fills out a manifest when he/she picks up tires from a generator. A copy of the manifest is left with the generator and the hauler also keeps a copy of the manifest. On this manifest, the total tires picked up at the generator are indicated, but space is provided on the manifest to indicate how many tires are removed from the waste stream for salvage or re-use. The second "loop" occurs between the waste tire hauler and the monofill, processor, or end-user. For this loop, the waste tire hauler again completes a manifest, gives a copy to the monofill, processor, or end-user, and keeps a copy of the manifest.




The Department designed a "Waste Tire Trip Manifest" that accommodates stakeholder input. The "Waste Tire Trip Manifest" contains the following information, and includes items required by HB10-1018: the manifest number; the date; the name, address and telephone number for the waste tire hauler, waste tire generator, and waste tire destination facility; the e-mail address for the waste tire hauler; the name of the waste tire hauler driver; the registration numbers for the waste tire hauler, waste tire generator, and waste tire destination facility; the decal number for the waste tire hauler and waste tire destination facility; the number or weight of waste tires picked up and delivered by the waste tire hauler; and a signature box for both the waste tire generator and waste tire destination facility. The manifest includes an adjustment table so waste tire haulers can

adjust for the amount of re-use or salvage tires removed from a waste tire generator's load or during waste tire consolidation at the waste tire hauler facility. The manifest will be printed in triplicate by the Department, allowing for waste tire haulers to retain a copy and provide copies to the waste tire generator and waste tire destination facility. These will be made available free of charge to all waste tire haulers. The manifest will also be available on the Waste Tire website within the Department's website if haulers want to print out their own manifests. Because of privacy issues, the stakeholders requested that the manifest be designed to only include one waste tire generator pickup location and one destination facility. The stakeholders preferred to fill out a new and separate manifest for each waste tire pickup and drop-off.

It is the responsibility of the waste tire hauler to properly fill out the "Waste Tire Trip Manifest," obtain waste tire generator and destination facility signatures, and provide copies of the manifests to the waste tire generators and destination facilities. For pickup of tires at a waste tire facility, the waste tire hauler fills out the Waste Tire Hauler and Waste Tire Generator information boxes on the manifest. If these tires are taken directly to a destination facility (ie., a monofill, processor, or end-user), then that facility's information can be added to the same manifest in the Destination Facility information box. However, if the waste tires are brought back to the waste tire hauler's facility prior to being delivered to the waste tire destination facility, the waste tire hauler would fill out the Waste Tire Destination Facility box with his facility information. The waste tire hauler obtains a signature from the waste tire generator after the waste tire generator reviews the information provided by the waste tire hauler to determine completeness and accuracy of the form. The waste tire hauler provides the generator with a copy of the manifest. The generator must retain this copy for three years.

The waste tire hauler would fill out the Adjustment Table only if the waste tire hauler removed any tires from the generator's waste tire pickup for re-use or salvage. The Adjustment Table does not need to be complete before obtaining the generator's signature, but can be completed at the hauler's facility once tire sorting for resale and salvage has been completed. The additional copies of the manifest are retained by the waste tire hauler and must also be kept for three years. As per stakeholder preference, if waste tires are picked up at more than one waste tire generator on a single trip, then the waste tire hauler must generate a new and separate manifest for each separate waste tire generator.

Waste tires may be brought back to the waste tire hauler's facility prior to being delivered to a waste tire destination facility. In this case, the hauler would list his facility as the destination facility on the pick-up manifest. When the hauler is ready to ship these waste tires to a monofill, processor, or end-user, a new manifest must be generated with the waste tire hauler listed as the generator of these waste tires. The hauler must fill out the Waste Tire Hauler, Waste Tire Generator, and Waste Tire Destination facility boxes. The waste tire hauler obtains the signature from the waste tire destination facility after the waste tire destination facility reviews the information provided by the hauler to determine completeness and accuracy of the form. The waste tire hauler provides the waste tire destination facility with a copy of the manifest. The waste tire destination facility must

retain this copy for three years. The additional copies of the manifest are retained by the hauler and must also be kept for three years.

Waste tire haulers may pick up tires from an illegal tire pile cleanup. In this case, the cleanup location would be the waste tire generator. If there is an on-site representative, then that person should sign the manifest as the generator. In addition, waste tire haulers may bring waste tires into Colorado or ship waste tires out-of-state. In these cases, waste tire haulers are still required to use Waste Tire Trip Manifests.

## Alternatives Considered and Why Rejected

No alternatives to these rules were considered as these rules are strictly the result of new statutory requirements.

## Cost/Benefit Analysis

A cost-benefit analysis will be performed if requested by the Colorado Department of Regulatory Services.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division (HMWMD)

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR AMENDMENTS TO SECTIONS 1.7.1 AND 1.7.4

**(Adopted by the Solid and Hazardous Waste Commission on November 16, 2010)**

### Basis and Purpose

The Hazardous Materials and Waste Management Division (HMWMD) prepared amendments to Sections 1.7.1 and 1.7.4 of the Regulations Pertaining to Solid Waste Sites and Facilities ("the Regulations"), to fully implement the Act. These amendments to 6 CCR 1007-2, Sections 1.7.1 and 1.7.4 are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302 and 30-20-109, C.R.S. The purpose of the amendments to Sections 1.7.1 and 1.7.4 are twofold. First, Section 1.7.1 establishes the Solid and Hazardous Waste Commission's authority to set the Solid Waste User Fee (SWUF) within the statutory limits. Second, Section 1.7.4 establishes the SWUF for the Solid Waste Program, the Hazardous Substance Response Fund (HSRF) and the Department of Law (DOL).

### Amendment of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Sections 1.7.1 and 1.7.4

### Background

The HMWMD initiated a stakeholder process in September 2009 to address a significant projected revenue shortfall in the Solid Waste Cash Fund and the Hazardous Substance Response Fund. Both of these funds receive revenue from the Solid Waste Users Fee. This stakeholder process developed new statutory language that became House Bill 10-1329.

HB 10-1329 contains six major provisions including: 1) moving limited SWUF fee setting authority from the legislature to the Solid and Hazardous Waste Commission, 2) establishing individually adjustable fees for the SWUF, HSRF and a new fee for the DOL, 3) setting a SWUF ceiling of $0.50 for these three fees, 4) setting an HSRF ceiling of $10,000,000, 5) providing advanced facility notification of fee changes prior to the effective implementation date, and 6) establishing the SWUF sunset date as July 1, 2017.

After the legislative session, a follow-up regulatory stakeholder process was begun in July 2010. Local governments, solid waste facility owners and operators, consultants, interest groups, lobbyists and HMWMD representatives attended the first meeting. Three additional meetings were conducted between August 2010 and September 2010 at which time the stakeholders reached consensus on the fee constructs and amounts. The HMWMD accommodated potentially interested parties located in outlying

areas of the state by making it possible to participate in these meetings via simulcast conference call and internet video conferencing.

**Summary of Regulatory Proposal**

The Solid Waste and Material Management Unit of the Hazardous Materials and Waste Management Division does not receive any general fund monies. Fees support 100% of unit activities. The fees were historically comprised of two sources including: 1) the Solid Waste User Fee (also referred to as the Hazardous Substance Response Fee or tipping fees) and 2) hourly activity fees. House Bill 07-1288 established a third fee to support the Unit's efforts. This fee is applied to facilities that did not collect and remit the SWUF. In addition, the bill gave the Commission fee setting authority for the hourly activity and annual facility fees. HB10-1329 transferred limited SWUF setting authority to the Commission. The SWUF provided 78% of the Solid Waste Program's funding in fiscal year 2010.




As part of the HB 10-1329 legislative stakeholder process, fee amounts for the Solid Waste Program, the Hazardous Substance Response Fund and the Department of Law were developed and vetted with stakeholders. These fee amounts were then carried forward into the interactive regulatory stakeholder negotiations and statewide discussions. The following fee structure was developed for the three portions of the SWUF as follows:

1) The SWUF to support the Solid Waste Program activities as described in Section 25-16-104.5(1.7)(a)(I) will be increased to thirteen cents ($0.13) per cubic yard or forty-three cents ($0.43) per ton to help cover the expense of solid waste staff plus direct and indirect costs of staff time. The thirteen cents ($0.13) per cubic yard fee is projected to provide for full program staffing for the first time in over three years. In addition, this fee amount should keep the program solvent until the sunset date of 2017.




2) The SWUF to support the HSRF activities as described in Section 25-16-104.5(1.7)(a)(II) will be sixteen cents ($0.16) per cubic yard or fifty-three cents($0.53) per ton. The sixteen cents ($0.16) per cubic yard is projected to provide sufficient funding for the $4,000,000 minimum operating budget that is required to ensure fund solvency while not accumulating a fund balance that exceeds the statutory $10,000,000 fund balance maximum.

Figure 3



3) The SWUF to support the Department of Law activities as described in Section 25-16-104.5(a)(III) will be three cents ($0.03) per cubic yard or ten cents $0.10 per ton.

Stakeholder Issues:

The stakeholders raised several key issues during the regulatory stakeholder process as follows:

1) Regulatory Construct issues:

   a. The stakeholders indicated that many of their facilities were installing scales to weigh the amount of solid waste disposed at the facilities. Therefore, they requested that the regulations include the cubic yard and per ton fee amounts. This request was accommodated in two ways. First the regulation text specifically states the cubic yard and ton fee amounts, and second the regulations include a new table that clearly depicts the cubic yard and per ton fee amounts.

   b. The stakeholders requested that the "conversion factors" previously located Seciton1.7.4.D be moved Section 1.7.4.A. This text revision is reflected in the proposed regulation.

2) The stakeholders indicated that they did not want to re-adjust the SWUF in the near future. Therefore, they requested that we re-evaluate the fee amounts to ensure our costs would be covered for the next several years. The goal was to ensure that they would not have to propose another a fee increase to their commissions for several years. Our fee re-evaluation resulted in the HSRF and DOL fees remaining the same as those proposed during the legislative process. The Solid Waste Program fee was increased by one cent ($0.01) from twelve cents ($0.12) to thirteen cents ($0.13), as depicted above.

Changes since the Conclusion of the Stakeholder Process:

The proposed fee that was presented for the HSRF during the stakeholder process was twenty-six cents per cubic yard. This number had been based on the projections of income and expenditures for the last year. At the completion of year end close, actual amounts for beginning balance, income and expenditures were entered into the HSRF projection model. The state fiscal year 2009 actual amounts showed that incomes were higher and expenses lower for the fiscal year compared to the projections in the model. The result is that the proposed fee for the HSRF has been decreased to sixteen cents per cubic yard.

Regulatory Alternatives:

This regulation is the direct result of HB10-1329 and its legislative stakeholder process. Therefore, no other regulatory alternatives were evaluated.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission/Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

## Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Amendment of § 1.2

**Adopted by the Solid and Hazardous Waste Commission on February 16, 2010:**

### Basis and Purpose

These amendments to 6 CCR 1007-2, Section 1.2 are made pursuant the authority granted to the Solid and Hazardous Commission in Sections 25-15-302(4.5) and 30-20-109, C.R.S.

These amendments revise section 1.2 by modifying the definition of "Agricultural waste", and adding a definition of "All-hazards event".

The Department is currently working with the Colorado Department of Agriculture to develop a Memorandum of Understanding (MOU) regarding lead agency delineation and responsibilities given an "All-hazards event" resulting in the generation of mass livestock carcasses, such as a blizzard or the ordered depopulation of animals by the state veterinarian. The MOU will facilitate implementation of the lead agency's authorities during specified events and preserve the Department's authority to facilitate the composting or other beneficial uses of livestock lost during routine agricultural operations.

These proposed solid waste definition amendments correspond to the implementing regulations currently being developed for promulgation by the Colorado Department of Agriculture, and the implementing guidance being developed by the Department. Specifically these definitions will allow the agricultural waste definition to include livestock lost due to an all hazard event or depopulation orders that are "not returned to the soils as a fertilizer or soil conditioners." Agricultural waste is exempt from being a solid waste. This exemption will facilitate a more timely response action by the Colorado Department of Agriculture, in coordination with the Department, that will prevent the spread of disease, or the contamination of soil, surface water and groundwater.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission/Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

### Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Amendment of § 1.5.2

**(Adopted by the Solid and Hazardous Waste Commission on August 18, 2009)**

**Basis and Purpose**

This amendment to 6 CCR 1007-2, Section 1.5.2 is made pursuant the authority granted to the Solid and Hazardous Commission in Sections 25-15-302(4.5) and 30-20-109, C.R.S.

This amendment revises section 1.5.2 to include sections 14 through 17 in the list of regulatory sections that an applicant may submit, and the Department can grant a waiver request for.

In accordance with the current requirements of 6 CCR 1007-2, section 1.5.2 for the Department's consideration of a specific written waiver request application and documentation, the Department may, after consultation with the governing body having jurisdiction, waive compliance with the standards in sections 2 through 13 of the regulations provided that the application satisfies the following criteria:

- The benefits derived from meeting a standard do not bear a reasonable relationship to the economic, environmental, and energy impacts or other factors which are particular to the facility; and
- Such waiver is consistent with the purposes of the Act and solid waste regulations; and
- Such waiver is not deemed to constitute a major variation from the requirements of these regulations; and
- The waiver will not cause or allow the violation of any air or water quality standard or federal or local restrictions.

This amendment corrects the inadvertent omission of including a reference to sections 14 through 17 in section 1.5.2 when these sections were originally added to the solid waste regulations.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission/Hazardous Materials and Waste Management Division

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

## Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Amendment of § 1.9.2 to change "Informal Conference" to "Compliance Conference"

**(Adopted by the Solid and Hazardous Waste Commission on August 18, 2009)**

### Basis and Purpose

This amendment to 6 CCR 1007-2, Section 1.9.2 is made pursuant the authority granted to the Solid and Hazardous Commission in Sections 25-15-302(4.5) and 30-20-109, C.R.S.

This amendment revises section 1.9.2 to replace references to "Informal Conference" with references to "Compliance Conference". The reason for this change is that the term "Informal Conference" refers to a meeting that is in the informal part of the Hazardous Materials and Waste Management Division's (the "Division's") enforcement process, but is not "informal" in terms of how the meeting is conducted. This has resulted in some confusion to the regulated community.

When the Division issues a Compliance Advisory to a facility for violations discovered during an inspection, the facility may request an Informal Conference. If the Division intends to assess a penalty for the violations, the Division strongly encourages the facility to come in for an Informal Conference, although doing so is entirely optional.

The Informal Conference is an opportunity for facility representatives to present information to the Division regarding the violations discovered during the inspection of its facility. Examples of some topics typically discussed during the Informal Conference include:

- correction of erroneous or incomplete information supplied to the inspector;
- evidence or regulatory interpretations arguing that conditions observed by the inspector do not constitute violations; and
- information regarding progress made by the facility to correct the noted violations.

The Informal Conference is also an opportunity for the Division to inform facility representatives of any revisions to the Compliance Advisory that it may be considering. This might include, for example, adding violations to those already included in the Compliance Advisory, sampling results if any, or subsequent determinations that items noted in the Compliance Advisory are not violations. If a compliance schedule is not noted in the Compliance Advisory, the Division may also work with the facility during the Informal Conference to finalize a schedule to correct any noted violations not already corrected.

The agenda for these meetings is to review each violation, listen to the facility's response to the violation (they may agree that the violation occurred, but differ as to the number of counts; or they may be able to present information that the alleged violation did not occur; etc.), and then learn from the facility what actions they have undertaken to return to compliance. In addition, the Division will inform the facility of its plans for any formal enforcement that may be necessary.

Just as the Compliance Advisory and inspection report are part of the Division's administrative record of enforcement activities against a facility, the information supplied during the Informal Conference is also considered a part of the administrative record. In order to preserve information exchanged during the Informal Conference for the record, these meetings are recorded. The Division is also typically represented at the Informal Conference by the Colorado Attorney General's office. While the Division encourages facilities to bring legal representation to the Informal Conferences, most times the facilities do not. These factors add an additional level of formality to the Informal Conference.

This amendment to change the term "Informal Conference" to "Compliance Conference" has no other effect than to make the term more accurate as to the post-inspection process that it is describing and much less confusing for the regulated community.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission/Hazardous Materials and Waste Management Division

### 6 CCR 1007-2

### STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

**Addition to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Addition of Section 17, Commercial Exploration and Production (EP) Waste Impoundments and Associated Additions to Section 1.2, Definitions**

**(Adopted by the Solid and Hazardous Waste Commission on November 18, 2008)**

**Basis and Purpose**

Section 9 of the Solid Waste rules, the section under which EP waste impoundments are regulated, was promulgated in 1984. There were minor modifications in 2004 to address unattended facilities that received wastes directly into tanks. HB08-1414 ("the Act"), enacted by the legislature in 2008, directs the Solid and Hazardous Waste Commission to promulgate regulations specifically applicable to commercial exploration and production waste impoundments. The Act prescribes several provisions that these rules must contain, including set-backs, fabricated liners, monitoring to prevent migration to groundwater, waste analysis and reporting, fencing and netting, contingency plans and financial assurance. The Act also specifies a schedule for existing facilities to achieve compliance with the new rules. The Hazardous Materials and Waste Management Division (HMWMD) has prepared a new section, Section 17, to the Regulations Pertaining to Solid Waste Sites and Facilities (the "Regulations") to implement the Act. In addition to implementing the statutory requirements cited above, the proposed new Section 17 regulations serve to update the existing requirements for EP waste impoundments, currently found in Section 9 of the Regulations. Waste impoundments other than E&P waste impoundments will continue to be covered under Section 9.

**Statutory Authority**

These regulations are promulgated under the authority of § 30-20-100.5 et seq., C.R.S., specifically § 30-20-109(1.5)(b), C.R.S.

**Summary of Regulatory Proposal**

The HMWMD initiated a stakeholder process in July 2008. A total of 4 well-attended workgroup meetings were held between July 2008 and September 2008. The waste management industry, local governments, the utility sector, oil and gas service companies, corporations and industry organizations, environmental and engineering consultants, and public interest groups participated in these meetings. The HMWMD held the second stakeholder meeting in Grand Junction to accommodate stakeholders on the Western Slope where the majority of these facilities are located. In addition, the HMWMD accommodated those located in outlying areas of the State by making it possible to participate in these

meetings by conference call and the Internet to view slides and presentation materials. Stakeholders were encouraged to send comments via email at any time during the entire stakeholder process. Major issues arising from the stakeholder process are described below.

1. Issues Encountered During Stakeholder Process:

A. Request for More Time to Study Issues Unique to Utility Impoundments: The HMWMD initiated the stakeholder process with only proposed amendments to the Section 9 (Waste Impoundments) regulations. During discussion with stakeholders, the power and water utility sectors noted that the HMWMD lacked some of the information necessary to revise Section 9 to accommodate their particular types of wastes and impoundments. Commentors indicated that the lack of risk data associated with their facilities and wastes warranted gathering additional information on these waste streams. In addition, they recommended evaluating such information prior to the development of revisions to Section 9. Based on stakeholder feedback, the HMWMD decided to accommodate their comments by establishing a separate, ongoing utility sector stakeholder process to collect and evaluate data related to their wastes and facilities. This work will be completed over the next year and prior to developing new regulations impacting non-EP waste impoundment sites and facilities. HMWMD proceeded with the stakeholder rulemaking process for EP waste facilities, as required by statute, creating the new Section 17. All other non-EP waste impoundment facilities will continue to be regulated under the existing Section 9 regulations, which will be modified later.

B. Feasibility of Statutory Compliance Schedules: One commentor indicated that it was technically infeasible for EP waste facilities to comply with the statute-mandated compliance schedules, and suggested that the Department approach the legislature to amend the time-frames. The HMWMD does not view this issue as being germane to the current rulemaking. Promulgation of rules containing the mandated compliance schedules is a requirement of the HB08-1414 statute, and with these proposed Section 17 regulations, the HMWMD intends to implement all requirements of the statute, including the statutorily-mandated time-frames. Furthermore, the HMWMD believes that compliance with the mandated time-frames is technically feasible. Record reviews conducted by the HMWMD indicate that two separate facilities were able to drain and retrofit a total of three separate impoundments, within a single construction period.

C. Applicability of Section 17 to Solid Waste Facilities that Occasionally Accept EP Waste: One question that arose during the stakeholder process is whether Section 17 applies to solidification basins that accept non-EP waste and occasionally accept EP waste. HB08-1414 applies to all commercial solid waste disposal sites and facilities that accept the deposit of EP waste. These solidification basin facilities would 1) be commercial solid waste disposal sites and facilities and 2) receive EP waste. Therefore, if these facilities receive EP waste, Section 17 would apply to solidification basins.

However, the HMWMD recognizes that there are unique operational characteristics of solidification basins including: 1) the duration of liquid waste storage and treatment is not to exceed 48 hours, 2) the waste must be removed and disposed of at an approved solid waste disposal site and facility immediately upon removal, and 3) the short term liquid retention period results in a lack for constant driving head that would cause migration of liquid through the bottom liner.

2. Addition of New Definitions to Section 1.2 of the Regulations: The Act uses terminology not previously defined in the Regulations. Accordingly, these proposed regulations include

adding definitions for "EP Waste" and "EP Waste Disposal Facility" to Section 1.2 of the Regulations.

3. Clarifications to Section 9: With the creation of a new Section 17 for EP waste impoundments conforming changes are also necessary to the applicability section of the existing Section 9 regulations. Otherwise, two separate sections of the solid waste rules would contain conflicting requirements for this type of facility. These amendments exclude EP waste disposal facilities from regulation under Section 9 and directs regulated entities to the new Section 17 regulations.

4. Grandfathering: One commenter noted that Section 17 requires existing E&P facilities to retrofit their existing impoundments and requests that existing facilities be allowed to operate with existing liners. In the Act, the Legislature required that existing facilities were to re-line their impoundments within two years, or three years if granted an extension by the HMWMD. The requirement to retrofit an existing facility is consistent with other regulatory schemes that require upgrades to bring all facilities in a particular market sector up to current industry standards. If older facilities are allowed to operate with out-dated but less expensive technology, there is a market disadvantage against, and possibly a disincentive to build, newer facilities that are more technically advanced. Section 9 contains a grandfathering provision that has led to regulatory disagreements and operational problems at older facilities. The Act does exempt existing E&P facilities from set-back requirements that they could not reasonably comply with.

   The Colorado Court of Appeals ruled in Colorado Dep't of Public Health and Env't vs. Bethell, 60 P.3d 779 (Colo. App. 2002), that new requirements may be imposed at existing solid waste disposal facilities.

5. Non-statutory Technical Requirements: The new Section 17 is a significant re-write of the existing impoundment regulations as applied to EP waste impoundments. Section 17 includes provisions for an engineering design and operation plan; design construction and operation requirements; record keeping and reporting requirements; closure requirements; and post-closure care and maintenance. These regulatory criteria are a codification and clarification of existing requirements in various other sections of the regulations. The main intent of the HMWMD for including these requirements in Section 17 is to make the regulations easier to use by specifying these requirements with more detail and clarity all in one place, and by updating the contingency plan provisions. The majority of the stakeholders supported including and clarifying these provisions in the Section 17 regulations.

**Alternatives Considered and Why Rejected.**

For the statutorily mandated portion of Section 17, no alternatives were considered. The remainder of the provisions clarified and codified existing regulatory requirements as they apply to EP waste impoundment facilities.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission/Hazardous Materials and Waste Management Division

**6 CCR 1007-2**

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

## Amendments to the Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Revision of Section 14 Solid Waste Composting Regulations

**(Adopted by the Solid and Hazardous Waste Commission on November 18, 2008)**

**Basis and Purpose**

The Hazardous Materials and Waste Management Division (HMWMD) of the Colorado Department of Public Health and Environment (the Department) has prepared revisions to Section 14 of the Colorado Solid Waste Regulations, 6 CCR 1007-2, Regulations Pertaining to Solid Waste Sites and Facilities. These amendments address the regulation of composting facilities. The Division is proposing to repeal the existing Section 14 composting regulations, and replace them in their entirety with a new re-written and restructured version. The major amendments being proposed at this time include:

1) Clarifying the applicability of the Section 14 regulations, and specifying the types of composting operations that are exempt from these regulations;
2) Adding compliance schedules for compliance with these Section 14 regulations;
3) Better defining the classification of composting facilities based upon the types of feedstocks received by the facility and the nature of the operation;
4) Adding a new composting facility classification (Class V);
5) Specifying the general requirements that apply to all classifications of composting facilities;
6) Adding class-specific requirements for composting facilities;
7) Modifying the requirements for sampling of finished compost;
8) Modifying the closure and post-closure care and maintenance requirements for compost facilities;
9) Adding composting plan requirements for Class IV and Class V composting facilities; and
10) Modifying the requirements for pilot projects.

The purposes of the revisions to Section 14 are fourfold. First, the composting industry has changed significantly since the promulgation of Section 14 in the year 2000. These revisions to the regulations reflect the current state of practice of this industry. Second, the regulatory exemption language for agricultural waste generators who compost their own agricultural waste and import solid waste required modification to ensure protection of public health and the environment. Third, the addition of a new composting facility classification, Class V, will provide a regulatory framework for agricultural producers to compost their own waste, import other compatible solid waste in types and quantities for effective composting, and sell or distribute compost to the public. Finally, in an effort to promote composting, reduce staff time to review plans, and provide a balanced regulatory structure, Class IV and V composting facilities will not be required to submit a design and operations plan. Instead, these facilities will be required to operate under the standards set forth in Section 14.11. A written Composting Plan that describes procedures and practices for compliance with the requirements in Section 14.11 must be maintained onsite, reviewed and understood by site personnel, and made available for review to

the Department during routine inspections or when a complaint is received regarding the composting operations.

**Statutory Authority**

The Solid Waste Act, Title 30, Article 20, Sections 100 to 122, CRS ("the Act") requires the Department, through the HMWMD, to provide regulatory oversight of solid waste management within the State. The Act, at § 30-20-101.5(2), requires the HMWMD to develop, implement and continuously improve, as necessary, policies and procedures for carrying out its statutory responsibilities. The Solid Waste Regulations and these amendments to the Solid Waste Regulations have been promulgated pursuant to the HMWMD's authority under the Act.

The Act defines solid waste as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility, and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial or commercial operations or from community activities" (§ 30-20-101(6)(a), C.R.S.). The Act exempts several categories of waste from the definition of solid waste – the most relevant to these regulations being agricultural waste (§ 30-20-101(6)(b), C.R.S.).

Because compost feedstocks or bulking materials may include a variety of solid wastes, including sludges and other discarded materials, the Act requires the HMWMD to regulate composting facilities as solid waste disposal sites and facilities performing solid waste disposal. Under the solid waste regulations, composting is considered processing of solid waste where a waste is intentionally manipulated under controlled conditions resulting in a product that is no longer considered a waste.

**Summary of Issues Encountered During Stakeholder Process**

The HMWMD initiated a stakeholder process in July 2008. A total of four meetings were held between July and September 2008. The composting industry, agricultural producers, industry consultants, local governments and the Colorado Department of Agriculture (CDA) participated in these meetings. In addition, a workgroup meeting occurred with staff of HMWMD and the CDA in August 2008. Also, in September 2008, HMWMD staff participated in a site tour of several dairy farms that compost agricultural waste to better understand concerns expressed by the agricultural producers. The HMWMD accommodated those located in outlying areas of the state by making it possible to participate in these meetings by conference call. Stakeholders were encouraged to send comments via email. Significant issues arising from the stakeholder process are outlined below.

<u>Agricultural Exemption</u>

The Act exempts "agricultural waste" from the definition of "solid waste." Therefore, a facility that manages only agricultural waste is not a solid waste site and facility and is not subject to the Solid Waste Regulations. This exemption has been known as the "agricultural exemption," and has allowed individuals to compost waste resulting from the raising of crops and animals on agriculturally zoned land at the location of generation without having to comply with the regulatory requirements regarding design and operations plans, closure and post-closure plans, financial assurance, monitoring composting process, and testing finished product. Compost produced by owners or operators under this agricultural exemption can be sold or distributed as finished compost to the public.

The livestock industry expressed concern that agricultural waste generated by their producers was deficient in carbon and that many facilities that wish to compost their agricultural waste therefore need to import solid waste as a carbon source and as bulking material for their composting recipe. Under the Act, if a facility were to import solid waste, that facility would lose its agricultural exemption and become a solid waste site and facility. The owner and operator would then be required to submit a design and operations plan, closure and post-closure plan and establish financial assurance.

HMWMD recognizes the burden this would place on agricultural composters and that this burden would most likely create an impediment to future composting under the agricultural exemption. Therefore, HMWMD has revised the Regulations to allow, pursuant to certain requirements, a facility that composts agricultural waste to maintain the agricultural exemption even when that facility imports limited types and quantities of solid waste. First, imported solid waste must consist only of wood chips and branches to provide the carbon material necessary for composting of agricultural waste produced onsite. In addition, these materials may only be stockpiled onsite for up to nine months. Non-contaminated wood waste generated during emergency cleanups (e.g. tornados) could be stockpiled longer than nine months if approved by HMWMD and the local governing authority. An agricultural composter using imported bulking material in accordance with the above requirements must also limit distribution of finished product to agricultural-zoned land in order to maintain the agricultural exemption.

Colorado Department of Agriculture

House Bill 08-1231 was approved during the 2008 Colorado legislative session. HB-1231, in part, provides authority to CDA to require composting facilities not regulated by HMWMD to register with CDA. Also, HB-1231 provides CDA a roadmap to implement a sampling and testing program for finished compost from facilities not regulated by HMWMD. In addition, CDA has authority under their statute to test any compost product for compliance with their minimum standards. This includes compost that originates from facilities that are regulated by HMWMD.

Several permitted commercial composters expressed concern that exempt agricultural composters, those that do not import solid waste, are not required to monitor or document the composting process, which is critical for pathogen reduction. In addition, these commenters stated that, when process controls are not implemented, there is no assurance that the finished product sold to the public is "compost," and may, in fact, be only aged manure. These commenters believe that limited product testing alone is not adequate to ensure pathogen reduction and a finished product that is compost. However, HWMWD does not regulate the composting operation or finished product from exempt agricultural composting facilities that do not compost solid waste. Therefore, this concern needs to be addressed by CDA.

CDA believes exempt agricultural composters should be allowed to sell their finished product to the public. CDA considers their testing program for finished product to be adequate and that it would provide representative data to ensure product safety. However, HMWMD believes CDA's testing program is inadequate for two reasons: 1) the testing would not be statistically representative of the potential volume of compost sold by agricultural producers, and 2) CDA's program does not include a provision for monitoring or documenting the composting process to ensure pathogen reduction is occurring. For these reasons, Section 14.1.2(D)(2) prohibits agriculturally-exempt composters, who utilize wood chips or tree branches as composting material, from selling or distributing finished compost to the public.

**Regulatory Proposal**

Class IV and V Composting Operations

CRS 30-20-102(8) allows the Solid and Hazardous Waste Commission to specify criteria under which certain classes of composting facilities would be able to operate without obtaining a Certificate of Designation. HMWMD believes that, because Class IV and V facilities accept materials that present a relatively low threat for harm, generate waste onsite and compost onsite, they should not be required to obtain a certificate of designation.

Specific requirements for Class IV and V composters are defined in Section 14.11.

Class IV: Owners or operators would not be required to submit a design and operations plan. Instead, Class IV facilities must operate under the standards and criteria set forth in Section 14.11. Further, proposed language would require all finished product to be tested prior to distribution. This is a change from the current composting regulation, which allows a Class IV facility to distribute up to 500 cubic yards of compost off site without conducting analysis.

Although the waste types, i.e. green waste, food and manure, are relatively benign, they can present a health risk if pathogens are not destroyed. Process monitoring, documentation of operations and testing of finished product will provide assurance that the compost is safe for distribution. Lastly, the HMWMD is requiring Class IV facilities to establish financial assurance for the facility. While financial assurance was previously not required for Class IV facilities because of the restricted facility size, the type of facility that this class describes, and the waste stream to be composted, the HMWMD believes that there is a potential impact to public health and the environment if an owner or operator of a Class IV facility were to abandon the site. By requiring financial assurance of Class IV facilities, the financial assurance mechanism would provide funding to close the composting facility and provide post-closure care in the event the owner or operator was to abandon the site. In addition, financial assurance is a statutory requirement.

Class V: A Class V composting facility is structured for agricultural producers to compost their own agricultural waste, import other compatible solid waste in types and quantities for effective composting, monitor the composting process, test their finished product, and sell or distribute compost to the public. Owners or operators would not be required to submit a design and operations plan to the Department for review. Instead, Class V facilities must operate under the standards and criteria set forth in Section 14.11. A written Composting Plan that describes procedures and practices for compliance with the requirements in Section 14.11 must be on-site, understood by site personnel, and made available for review to the Department during routine inspections or when a complaint is received regarding the composting operations. Class V owners or operators may voluntarily submit their Composting Plan to the Department for review. The requirement to establish financial assurance is being proposed for Class V composting facilities. As with Class IV composting facilities, the potential exists for a Class V composting facility to impact public health and the environment if its owner or operator were to abandon the site without satisfying all of the closure and post closure care responsibilities found in the Regulations. In that event, the State could use the funding from the financial assurance mechanism to close a composting facility and provide post-closure care. For the aforementioned reasons, and that financial assurance is a statutory requirement, HMWMD has proposed language requiring financial assurance for Class V composting facilities.

The composting classification matrix has been removed from Section 14 and placed here in the statement of basis and purpose to provide guidance for applicants to quickly identify sections of the regulations that would apply to their composting operation.

**COMPOST FACILITY CLASSIFICATIONS AND REQUIREMENTS**

| REQUIREMENT | COMPOST FACILITY CLASSIFICATION | | | | | |
|---|---|---|---|---|---|---|
| Facility Classification (Section 14.2) | **Class I** | **Class II** | **Class III** | **Class IV** | **Pilot Project (Section 14.10)** | **Class V (Agricultural)** |
| General Requirements (Section 14.3) | Yes | Yes | Yes | No (See § 14.11) | No (See § 14.10) | No (See § 14.11) |
| Certificate of Designation (CD) (Section 1.6) | Yes | Yes | No | No | No | No |
| Feedstocks (Section 14.1.4)<br><br>Identify source of feedstocks including liquid waste | Types 1, 2 & 3 | Types 1 & 2 | Type 1 | Type 1 and/or food waste | specified by the pilot project | Type 1 Generator waste only, and "other compatible materials" as approved |
| Facility Restrictions | defined by CD | defined by CD | <50,000 cy | < 2 acres and <5,000cy all materials except finished product | 1 year period <5,000cy all materials | Composting occurs at site of generation |
| Design and Operations (D&O) Plan (Section 14.4) | Yes | Yes | Yes | No (See Composting Plan requirements in Section 14.11) | Yes | No (See Composting Plan Requirements in Section 14.11) |
| Annual Report (Section 14.7.3) | Yes | Yes | Yes | Yes | summary report due at end of pilot | Yes |
| Financial Assurance (Section 1.8) | Yes | Yes | Yes | Yes | Yes | Yes |

(cy) = cubic yard

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division (HMWMD)

**6 CCR 1007-2**

## STATEMENT OF BASIS AND PURPOSE
## AND SPECIFIC STATUTORY AUTHORITY FOR

**Amendment of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Section 1.7.3**

**Adopted by the Solid and Hazardous Waste Commission on August 19, 2008:**

### Basis and Purpose

These amendments to 6 CCR 1007-2, Section 1.7.3 are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302(4.5) and 30-20-109(2.5), C.R.S.

The purpose of these amendments to Section 1.7.3 is to establish annual fees for recycling facilities that are conducting a recycling operation, as defined in Section 1.2 of the Regulations, and that are not otherwise subject to Solid Waste User Fees as established in 25-16-104.5 C.R.S.

### Background

The HMWMD initiated a legislative stakeholder process in October 2006 for the development of language pertaining to House Bill 07 1288. In an effort to support the Bill, draft implementing regulations for Sections 1.7.2 and 1.7.3 were developed, shared, discussed, reviewed, and edited as part of the legislative stakeholder process. After the legislative session, a follow-up stakeholder process was begun in June 2007. Regulations amending Sections 1.7.2 and 1.7.3 of the Solid Waste Regulations, excepting annual fees for recycling facilities, were developed to support implementation of House Bill 07 1288. These regulations were promulgated during the February 2008 rulemaking hearing before the Solid and Hazardous Waste Commission and became effective on April 1, 2008.

Summary of Regulatory Proposal

The Solid Waste and Material Management Unit of the Hazardous Materials and Waste Management Division does not receive any general fund monies. Fees support 100% of unit activities. The fees were historically comprised of two sources including: 1) the Solid Waste User Fees (SWUF) also referred to as the Hazardous Substance Response Fee or tipping fees and 2) hourly activity fees. The SWUF and hourly activity fees were established in statute and regulation respectively. The majority of the fees to support the Solid Waste Unit are derived from the SWUF, which is a fee based on the volume or weight of waste placed at attended solid waste disposal sites and facilities.

As part of the HB 07-1288 legislative stakeholder process a significant majority of the stakeholders in both the legislative and regulatory processes supported the development and implementation of an annual facility fee for solid waste sites and facilities not subject to the SWUF. Through interactive stakeholder negotiations and Statewide discussions, an annual facility fee of $1,000/year per facility was established for each facility type identified in Section1.7.3. However, additional stakeholder concerns were raised indicating that the proposed $1,000/year per facility fee was too burdensome for some recycling facilities.

The annual facility fees were promulgated in Section 1.7.3 of the regulations except for subsections 1.7.3(A)(1)b and 1.7.3(A)(3)d identifying the annual facility fee for operating recycling facilities, and those undergoing post-closure care. These portions of the regulation were "reserved" during the rulemaking hearing to allow additional stakeholder input regarding an appropriate fee amount for the recycling facilities.

The originally proposed annual recycling facility fee of $1,000/year per facility was proposed for each of the nine facilities that were registered as recyclers during the stakeholder process. This fee would yield $9,000 dollars in revenue per year from the recycling facilities. Based on information gained in May and June 2008 from the 2007 recycling data survey, the Division has identified approximately 60 facilities within Colorado that qualify as recycling facilities pursuant to 6 CCR 1007-2, Section 8.

In an effort to maintain a simplified fee collection structure and to remain true to our initial goal of generating $9,000/year in recycling facility revenue, the current amendment identifies an annual recycling facility fee of $150/year for each of recycling facilities. This will generate $9,000 in revenue per year. The fee amount and revenue will be evaluated annually with the goal of determining if and how it should be adjusted.

The proposed regulatory amendment with the $150/year per recycling facility was proposed via email, following evaluation of the data gained via the 2007 recycling facility survey, to the original stakeholder group on June 4, 2008. The email included the original promulgated regulation and Statement of Basis and Purpose along with the proposed amendment and an invitation for comment and conference calls, if requested. The Division specifically requested written comments by June 17, 2008 to facilitate finalization of the proposed regulation. To date, the Division has received one written comment and two phone calls. One phone call requested clarifying language be added to explain that the annual facility fee identified in section 1.7.3 did not apply to facilities that are already subject to the Solid Waste User Fee. Clarifying language was added to Subsection 1.7.3(A) to address this concern. The other requests for information or clarifications were addressed without modifications to the proposed regulation.

In summary, the revised annual recycling facility fee will spread the burden and help off-set the SWUF increases needed to support the unit's activities and efforts.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission

## Hazardous Materials and Waste Management Division (HMWMD)

## 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

**Amendment of Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Sections 1.7.1, 1.7.2 and 1.7.3**

### Basis and Purpose

These amendments to 6 CCR 1007-2, Sections 1.7.2 and 1.7.3 are made pursuant to the authority granted to the Solid and Hazardous Waste Commission in Sections 25-15-302(4.5) and 30-20-109(2.5), C.R.S.

The purpose of these amendments to Sections 1.7.2 and 1.7.3 are twofold. First, Section 1.7.2 clarifies and establishes hourly activity fees, billable activities and billable ceilings for activity fees. Second, Section 1.7.3 establishes annual fess for facilities that are not subject to Solid Waste User Fees as established in 25-16-104.5 C.R.S.

### Background

The HMWMD initiated a legislative stakeholder process in October 2006 for the development of language pertaining to House Bill 07 1288. In an effort to support the Bill, draft implementing regulations for Sections 1.7.2 and 1.7.3 were developed, shared, discussed, reviewed, and edited as part of the legislative stakeholder process. After the legislative session, a follow-up stakeholder process was begun in June 2007. Local governments, solid waste facility owners and operators, consultants, interest groups, lobbyists and state representatives attended the first meeting. Additional meetings were conducted between October 2007 and November 2007. The waste management industry and local governments participated in these meetings. The HMWMD accommodated potentially interested parties located in outlying areas of the state by making it possible to participate in these meetings via simulcast conference call and internet video conferencing.

### Summary of Regulatory Proposal

The Solid Waste Unit of the Hazardous Materials and Waste Management Division does not receive any general fund monies. Fees support 100% of unit activities. The fees were historically comprised of two sources including: 1) the Solid Waste User Fees (SWUF) also referred to as the Hazardous Substance Response Fee or tipping fees and 2) hourly activity fees. The SWUF and hourly activity fees were established in statute and regulation respectively. The majority of the fees to support the Solid Waste

Unit are derived from the SWUF, which is a fee based on the volume or weight of waste placed at attended solid waste disposal sites and facilities.

House Bill 07-1288 approved an increase in the SWUF and allowed for the addition of four FTE to the solid waste staff. Two staff members were designated to assist with the current workload and two staff members were designated to collect data to better define the composition and flow of waste and recyclable materials in Colorado. The data personnel are new and unique positions for the Solid Waste Unit. One goal for the data personnel is to collect material flow information and inform Colorado's marketplace to facilitate development of an integrated material management system for the state.

As part of the HB 07-1288 legislative stakeholder process, three fee mechanisms were developed to fund the four additional solid waste FTE as follows: 1) an increase in the Solid Waste User Fee (this fee is set in statute), 2) a broadening of activities eligible for the hourly activity fee, and 3) annual facility fees for solid waste facilities not previously subject the SWUF.

Through interactive stakeholder negotiations and Statewide discussions, the following fee structure was developed for the hourly fee and the annual fees:

1) The hourly fee will be increased from $72.41 to $125.00 per hour. The hourly fee has not been adjusted since 1991. The current fee proposal of $125.00 per hour is set to cover the actual hourly expense of solid waste staff plus all overhead and indirect costs of each hour of staff time. Regulation § 1.7.2 also includes provisions to broaden and specifically identify the billable activity categories and allows billing for time spent on historic and closed facilities. In addition, the fee structure establishes maximum billable amounts (ceilings) for each activity. Therefore, under § 1.7.2 we will be billing at our actual expense rate to recover actual documented costs, supported by invoices to our customers.

2) A significant majority of the stakeholders in both the legislative and regulatory processes supported the development and implementation of an annual facility fee for solid waste sites and facilities not subject to the SWUF. These facilities do not currently pay a fee to support the costs of the Solid Waste Unit's time and effort incurred in providing oversight, assistance, and enforcement at these locations. The stakeholders involved in the legislative and regulatory stakeholder processes deemed the $1,000 per year fee to be reasonable

In summary, the adjusted hourly activity fees and annual facility fees will help off-set the SWUF increases needed to support the unit's activities and efforts.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission/Hazardous Materials and Waste Management Division

### 6 CCR 1007-2

## STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

**Addition to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Addition of Section 16.6.5, Waste Tire Management Standards for Collection Facilities**

**Basis and Purpose**

As with the management standards already promulgated for used lead acid batteries, the HMWMD recommends promulgation of management standards for waste tires stored at collection facilities. These would be promulgated under authority provided in Title 30, Article 20, Part 1 (Solid Wastes Disposal Sites and Facilities Act), and Title 30, Article 20, Part 10 (Solid Wastes Disposal Limitations). The purpose of these standards is to reduce the potential that waste tires managed at collection facilities will pose a risk to human health and the environment.

**Background**

Title 30, Article 20, Part 10, C.R.S. ("the Act"), passed by the legislature in 2005, limits the disposal options for residentially-generated used lead-acid batteries, used oil and waste tires. In May 2007, the Solid and Hazardous Waste Commission promulgated Section 16 of the Regulations Pertaining to Solid Waste Sites and Facilities ("the Regulations"), in order to implement the Act. However, one part of Section 16 was reserved for further discussion to address concerns raised at the May 15, 2007 Commission meeting. Specifically, the section reserved was Section 16.6.5 dealing with waste tire management standards applicable to collection facilities. The Commission directed the Department to prepare revisions to Section 16.6.5 that would address these concerns. Since that time, the Department has developed the proposed alternative, which gives collection facilities the option of exceeding a two-year storage time, so long as financial assurance coverage is provided for proper disposition of the tires.

**Summary of Regulatory Proposal**

During the stakeholder process and the May 2007 Commission meeting, the HMWMD has maintained that management standards are necessary for waste tire collection facilities because waste tires cause environmental problems when inappropriately managed. Management standards applicable at collection facilities have already been established for used oil and used lead-acid batteries, the other waste streams covered by the Act. Section 16.6.5 establishing waste tire management standards was reserved to address the concern that the proposed two-year storage limit would place undue burden on collection facilities handling waste tires. It was suggested that some collection facilities, especially those located in rural areas, would require more than two years to accumulate a sufficient volume of tires to make transport of the tires to a recycler economical. Such facilities, as the concern was expressed to the Department, would

face a paperwork burden associated with petitioning the Department to obtain waivers every time their operations necessitated extension of the two-year storage period.

The HMWMD is proposing to allow collection facilities the flexibility to either adhere to a two-year storage time limit, or to establish financial assurance. Collection facilities that provide a financial assurance instrument to cover the cost of proper disposition of the tires accumulated would not be under a storage time constraint. Because the proposed tire management standards had already been discussed at length during the stakeholder process conducted on the overall Section 16 development, HMWMD did not hold additional stakeholder meetings. Instead, HMWMD solicited comment on the proposed language adding the option of financial assurance. HMWMD received some comments supportive of the proposed change. We also heard from other stakeholders who expressed the concern that the proposed change enables longer-term storage that will lead to large accumulations of tires at collection facilities, and associated environmental problems. As compared to the status quo, in which collection facilities may store tires indefinitely, the proposed change does not extend the permissible storage time for waste tires at a collection facility. Among other things, the proposed change in fact restricts storage time at collection facilities that do not choose to establish financial assurance, though not restricting storage time to the degree preferred by some stakeholders. There is still the potential that a waste tire collection facility may fail to transport tires to a recycler or other legitimate destination under the Act, and ultimately become an illegal disposal site. However, the proposed storage time limit, together with the proposed financial assurance option, will provide the HMWMD with another mechanism for dealing with this circumstance.

The proposed management standards would limit the size and configuration of tire piles to facilitate fire control, in accordance with standards already established in Section 10.2.9(B) of the Regulations. Collection facilities would also be limited to a two-year accumulation time for waste tires. In enforcing this requirement, the HMWMD will be looking for evidence of throughput. Collection facilities would need to maintain documentation showing that tire input is approximately matched by tire output when viewed over a two-year accumulation period. Collection facilities that use a commercial waste motor vehicle tire hauler should already receive shipping documentation from the hauler that would be suitable for this purpose. Other forms of documentation, including bills of lading, tracking logs, etc. may be used for such purposes. Thus, collection facilities would have the flexibility to use whatever documentation is best suited to their business.

In summary, the proposed waste tire management standards will provide the HMWMD with a mechanism to ensure proper management of these wastes at collection facilities.

# DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT

## Solid and Hazardous Waste Commission/Hazardous Materials and Waste Management Division

### 6 CCR 1007-2

### STATEMENT OF BASIS AND PURPOSE AND SPECIFIC STATUTORY AUTHORITY FOR

**Addition to Regulations Pertaining to Solid Waste Sites and Facilities (6 CCR 1007-2 Part 1) – Addition of Section 16, Disposal of Motorized Equipment Wastes, and Associated Additions to Section 1.2, Definitions**

**Basis and Purpose**

Title 30, Article 20, Part 10, C.R.S. ("the Act"), passed by the legislature in 2005, limits the disposal options for residentially-generated used lead-acid batteries, used oil and waste tires. The Hazardous Materials and Waste Management Division (HMWMD) has prepared a new section, Section 16, to the Regulations Pertaining to Solid Waste Sites and Facilities ("the Regulations"), to fully implement the Act. The objectives of the new Section 16 are twofold. First, Section 16 clarifies certain aspects of the above-referenced statute in order to facilitate its implementation. Also, Section 16 includes recordkeeping requirements for retailers, wholesalers and collection facilities in order to verify proper disposition of these wastes, thus enabling the HMWMD to discharge its enforcement responsibility under Title 30, Article 20, Part 10, § 1009.

In addition to the above new regulations, and resulting from them, under separate statutory authority provided in Title 30, Article 20, Part 1 (Solid Wastes Disposal Sites and Facilities Act), the HMWMD recommends the promulgation of management standards for used lead-acid batteries stored at retailers, wholesalers, or collection facilities.

**Statutory Authority**

These regulations are promulgated under the authority of §§ 25-1-108(c)(1)(a) and 25-1-109(1)(a), C.R.S., §§ 30-20-100.5, -109 and -113(7), C.R.S., and § 30-20-1001 et seq., C.R.S.

**Major Factual and Policy Issues Encountered**

The HMWMD initiated a stakeholder process in November 2006. A total of six workgroup meetings were held between November 2006 and March 2007. The waste management industry, local governments, and the auto service sector participated in these meetings. The HMWMD accommodated those located in outlying areas of the state by making it possible to participate in these meetings by conference call. Retailers and waste haulers, two sectors for which the HMWMD had no preexisting contact list, were contacted via telephone and electronic mail. These businesses were encouraged to send comments via email. Significant policy issues arising from the stakeholder process are outlined below.

**A) Clarifications of Title 30, Article 20, Part 10, C.R.S.**

1. Definitions (Section 1.2 of the Regulations): The Act uses terminology that is not defined, either in statute or in the Regulations. Specifically, the proposed regulations include definitions for "Agent of a Wholesaler," "Collection Facility," "Do-It-Yourselfer," "Do-It-Yourselfer Used Oil Collection Center," "Recycling Facility" and "Self Certification Checklist." Definitions for these terms have been added to Section 1.2 of the Regulations. The proposed regulations would also include fourteen terms defined in the Act, which would be added to Section 1.2 of the Regulations.

The HMWMD also proposes adding clarification to the existing statutory definition of "Residentially-generated." In the Act "residentially-generated" is defined as: "used lead-acid batteries, used oil and waste tires generated by a person." The Act further defines "Person" as "an individual." Since the Act applies only to the subset of used lead-acid batteries, used oil and waste tires that are *residentially-generated*, the scope of the Act depends on how one interprets this term. The statutory definition permits more than one interpretation. An important question considered by the stakeholder workgroup was whether the Act applies only to individuals removing these wastes from their personal vehicles at their place of residence, or whether it applies more broadly to encompass locations to which an individual drives a personal vehicle, such as an auto or tire shop, for the removal of one or more of these waste types. In attempting to clarify this question, the HMWMD referred to the legislative declaration and its expression of the intent of the Act. Contained therein is the following statement: "The intent of this legislation is to prevent residentially generated used oil, used lead-acid batteries and waste tires from being disposed of in the solid waste stream, to reduce exposure of the waste haulers and operators to potentially dangerous materials, and to properly handle, re-process, re-refine, or reuse these materials as resources." Given that the majority of these wastes associated with a personal vehicle are removed at an auto service shop rather than a residence, the HMWMD believes that limiting "residentially-generated" to only those materials removed at a residence would undermine the legislative intent of the Act, as expressed in the legislative declaration. Accordingly, the HMWMD believes that the broad interpretation is more consistent with the intent of the Act, and that "residentially-generated" in this context should include all of these automotive wastes removed from a vehicle put to residential use, regardless of where the wastes were removed. Thus, the regulatory definition proposed herein expands upon the statutory definition to include these wastes from a personal vehicle that are removed at a location other than the residence: "Residentially-generated means used lead-acid batteries used oil, and waste tires generated by a person or from a personal vehicle not used primarily for a commercial or business purpose."

2. General Provisions: The Act prohibits "land disposal" of residentially generated used lead-acid batteries, used oil and waste tires. Land disposal includes the discarding of these items at a solid waste disposal site and facility, or at a transfer station. The HMWMD has proposed in Section 16.2 for purposes of clarification that discarding these items in a waste receptacle or dumpster be prohibited as well. Without this clarification, these wastes could end up being land disposed.

During discussions with stakeholders, the concern became apparent that the Act would prohibit landfills from serving as collection facilities for recycling. The HMWMD believes such interpretation is erroneous and, in fact, contradicts the intent of the Act. Thus, Section 16.2 proposes language clarifying that landfills and transfer stations are still permitted to serve as collection facilities for recycling of these wastes.

3. Due diligence: The Act permits individuals to dispose of used lead acid batteries, used oil, and waste tires at a solid waste disposal site or facility upon showing that no reasonable recycling options are available. If they can make such a demonstration, they may dispose of these items in a solid waste disposal site or facility or transfer station. This section of the Act contains

significant ambiguity and is the primary reason the HMWMD initiated the drafting regulations to implement the Act. Without a clear definition of what due diligence entails, this provision of the Act would be difficult to implement, for individuals making due diligence determinations, for the solid waste disposal sites and facilities potentially receiving these wastes, and for the HMWMD discharging its enforcement responsibility under the Act. In Section 16.3, the HMWMD proposes language that would require individuals to make some basic inquiries into the options available in their locale, such as making contact with recyclers in the phone directory (if any), the County or Municipality of residence and the local solid waste disposal site or facility or transfer station.

In general, most solid waste disposal facilities have not knowingly accepted used lead-acid batteries or used oil, regardless of the source, for over a decade. Stakeholders raised concern that the Act would be used to force solid waste facilities into accepting these items under the due diligence provision of the Act. In light of this well founded concern, the HMWMD proposes in Section 16.3 to clarify that solid waste facilities retain the right to reject these wastes even if an individual has successfully made a due diligence determination.

Since the Act provides the due diligence option specifically to individuals, the HMWMD is recommending language to clarify that due diligence is not available to collection facilities. A collection facility as defined in the proposed regulations collects these materials for recycling, not for disposal.

4. Waste haulers: The HMWMD proposes that the statutory requirement regarding customer notification be clarified. The HMWMD believes this is not intended as a one-time notification for existing customers occurring on or before July 1, 2007. Rather, the HMWMD interprets this statutory requirement to apply to new customers who may be moving into a service area. Therefore, Section 16 proposes that waste haulers provide for notification of new customers as well. Stakeholders voiced concern a periodic renewal requirement would be unduly expensive to waste haulers, causing them to incur excessive mailing costs. This concern is easily addressed because, as mentioned by some in the industry, waste haulers typically operate on a contract or subscription basis, and the waste prohibition language can easily be added to the appropriate section of the contract, or to the bottom of a billing statement.

**B) Used lead-acid battery management standards:**

Management and storage of these wastes varies at collection facilities throughout Colorado, and improper management of these wastes can impact public health and the environment. Minimum storage requirements are proposed to ensure that batteries are managed in a manner that prevents the release of waste or waste constituents to the environment. Establishing these standards would not only provide a level playing field for the waste management industry, but also serve to mitigate risks associated with the potential release of lead-acid battery contents to the environment.

Residentially generated lead acid batteries fall under the household hazardous waste exemption from RCRA Subtitle C requirements. Therefore, the proposed management standards found in Sections 16.4 can be viewed as filling a gap in the existing regulatory programs. Used oil management standards are nothing more than a cross reference to another regulatory program because used oil collection facilities are already covered under Part 279 of the Hazardous Waste Regulations.

While the Act does not provide specific authority for the promulgation of standards for the management of used lead acid batteries, the HMWMD is proposing to promulgate these standards under the authority granted in the Solid Wastes Disposal Sites and Facilities Act, 30-

20-102(5) C.R.S. and 30-20-109 C.R.S. The HMWMD has previously chosen not to regulate collection facilities that function as drop-off centers as recycling facilities under Section 8 of the regulations; that is, they are exempted from Section 8 via Section 8.2.7(A). Therefore, because drop-off centers currently have no management standards for used lead acid batteries, the proposed regulations will cover that gap in the regulations.

**C) Inspections and self-certification:**

The Department has the responsibility for enforcement of the provisions of the Act. This Act has potential to increase the solid waste regulated community by thousands of new entities and by over four million individuals; the HMWMD currently lacks sufficient resources to inspect each of the newly regulated entities. The HMWMD will use its enforcement authority as necessary when facilities are operating in a manner that creates nuisance conditions or violates other provisions of the Regulations. Additionally, given this large number of regulated entities, the HMWMD is proposing self-certification as a necessary enforcement tool to ensure compliance with the Act.

The HMWMD is in the process of implementing self-certification projects, also known as the Environmental Results Program, in other environmental programs within the Department. Self-certification projects build awareness within the regulated community of the applicable regulatory requirements by asking facilities to periodically review the requirements and certify that they are in compliance. This approach has many important advantages: 1) it is a very efficient method for improving compliance rates within a large universe of regulated entities, thus helping to level the economic playing field; 2) it allows precise targeting of follow-up compliance assistance; 3) it allows better targeting of enforcement by helping identify potentially recalcitrant, out-of-compliance facilities; and 4) it serves as a periodic refresher for facility personnel on applicable requirements. The HMWMD has already conducted pilot self-certification projects, and the feedback from the regulated community has consistently been positive – they like the program, the effort is not burdensome, and the benefits are high.

Experience with the program to date has demonstrated that it is much more effective if it is clear to the generator that completing and returning the form is mandatory, not voluntary. Therefore, to ensure that the self-certification process is effective and efficient, the proposed regulation found in Section 16.9.3 establishes mandatory requirements. Section 30-20-113(7) provides authority sufficiently broad to require collection facilities to complete and return self-certification checklists.

**D) Overlapping statute and regulations:**

Section 16 reiterates certain provisions of the Act as well as provisions of the Hazardous Waste Regulations. The HMWMD believes that this situation, though duplicative, makes the Regulations more useful to stakeholders because all of the requirements appear in one place, rather than having statutory requirements appear only in statute.

**Alternatives Considered and Why Rejected**

1. Waste industry representatives participating in the stakeholder process suggested having a 1% *de minimis* threshold level for taking action regarding these wastes at a landfill. The suggestion was made out of concerns that operator safety may be compromised if the Act requires retrieval of each and every waste tire, for example, that is discovered by operators at the working face. The HMWMD believes that the Act places emphasis on keeping these wastes out of the waste stream in the first place, through public education by waste haulers and implementation of less invasive waste screening procedures by solid waste facilities. The legislative declaration states

that part of the purpose of the Act is "to reduce exposure of waste haulers and operators to potentially dangerous materials…"

The corollary to having a 1% threshold is that a large volume of tires could end up in the landfill before any action would be triggered under a landfill's waste characterization plan. Taken as a whole, the waste volume disposed of in Colorado's solid waste landfills approaches 8.5 million tons annually. Assuming 100 light passenger tires per ton, adoption of a 1% threshold could theoretically allow all whole tires generated in Colorado on an annual tonnage basis to be landfilled. The HMWMD believes there are reasonable and prudent steps that should be taken well below a 1% threshold. For instance, if the operator notices tires showing up regularly in loads from a particular hauler, that fact can be communicated to the hauler so that the hauler can then make sure that the proper notice has been given to their customers. For these reasons, the HMWMD rejected the *de minimis* threshold approach, and instead will address the operator safety issue through enforcement discretion and a preference for non-invasive waste screening methods.

2. Used oil filters: Some participants in the stakeholder group advocated prescriptive requirements for draining used oil filters. This concern focused on the improper draining of oil filters, particularly by do-it-yourselfers inexperienced in used oil management, which could then introduce toxic liquids into the waste stream. The HMWMD prefers to address this concern through best management practices communicated, if necessary, in the form of a guidance document, rather than through prescriptive regulations.

3. Prohibition on disposal of processed waste tires: Some participants in the stakeholder group felt that Section 16 should prohibit landfills from disposing not only of whole waste tires, but of processed waste tires as well. While the plain language of the Act states that whole tires may not be sent to a landfill for disposal, this prohibition does not extend to processed tires. Therefore, the HMWMD believes the Act provides no clear statutory authority to restrict disposal of processed waste tires.