**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS,

Plaintiff,

v.

JILL HUNSAKER RYAN, Executive Director of the Colorado Department of Public Health & Environment, in her official capacity.

Defendant.

**Case No. 1:26-cv-03460-PAB-NRN**

**ECO-CYCLE, INC.'S [PROPOSED] BRIEF OF *AMICUS CURIAE* IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**INTEREST OF *AMICUS CURIAE*** ........ 1

**BACKGROUND** ........ 2

**ARGUMENT** ........ 5

**I. The Program's benefits to equity, the economy, and public health and the environment undermine NAW's likelihood of success on the merits of its constitutional claims.** ........ 5

A. The Program remedies substantial equity problems with Colorado's current recycling system and reduces impacts on frontline communities. ........ 6

B. The Program makes the waste economy more efficient and provides a material economic boost to Colorado. ........ 8

C. The Program will benefit Colorado's public health and environment. ........ 9

**II. The balance of the equities and the public interest weigh against entering a preliminary injunction because the Program is already delivering benefits to Colorado.** ........ 10

**CONCLUSION** ........ 13

## <u>INTEREST OF *AMICUS CURIAE*</u>

Eco-Cycle, Inc. ("Eco-Cycle") is a nonprofit recycler based in Boulder, Colorado. Its mission is to innovate, implement, and advocate for local and global Zero Waste solutions to foster a more regenerative, equitable, and climate-resilient future. Eco-Cycle engages in all aspects of recycling, composting and waste reduction, including operating the Boulder County Recycling Center and the City of Boulder's Center for Hard-to-Recycle Materials, running a fleet of hauling trucks, conducting environmental education and recycling in four school districts, and advocating for policy solutions for state and local governments in Colorado.

Eco-Cycle was one of the earliest champions of Colorado's Producer Responsibility Program for Statewide Recycling Act (the "Program"). Eco-Cycle advocated for Senate Bill 20-055, which required the Colorado Department of Public Health and Environment ("CDPHE") to review producer responsibility programs and make policy recommendations based on its findings. *See* S.B. 055, 2020 Gen. Assembly, Reg. Session (Colo. 2022); CDPHE, *Producer Responsibility Literature Review and Policy Recommendations* 5 (2021). Then, alongside a broad coalition of nonprofit, industry, and local and state governments, Eco-Cycle advocated for House Bill 22-1355, which created the Program. *See* H.B. 1355, 2022 Gen. Assembly, Reg. Session (Colo. 2022); Col. Rev. Stat. Ann. § 25-17-701 to -716 (West 2026).

Eco-Cycle continues to actively shape the Program's implementation, including advising CDPHE, Circular Action Alliance, and Interchange 360. Eco-Cycle has consistently encouraged stakeholders to participate in the implementation process and to ensure relevant concerns from local government, environmental justice, environmental, and consumer groups are incorporated

in the Program. Eco-Cycle is interested in ensuring that the benefits of the Program are realized and all Coloradans have equitable access to recycling.

**BACKGROUND**

Historically, Colorado has had a substandard recycling track record. Only 15.6% of the State's waste is recycled—about half the national average. *See* Eco-Cycle, CoPIRG Found., *The State of Recycling & Composting in Colorado* 1 (9th ed. 2025) ("Eco-Cycle 2025 State of Recycling Report"). Many residents—especially those in multifamily housing, rural areas, and poorer areas—lack access to convenient, affordable curbside recycling services. Sustainable Packaging Coalition, *2020–2021 Centralized Study on Availability of Recycling* (2021), https://sustainablepackaging.org/spc-releases-comprehensive-update-of-its centralized-availability-of-recycling-study/ [https://perma.cc/ND23-L5CC]; U.S. Env't Prot. Agency, *An Assessment of the U.S. Recycling System: Financial Estimates to Modernize Material Recovery Infrastructure* 21–22 (2024), https://www.epa.gov/system/files/documents/2024-12/financial_assessment_of_us_recycling_system_infrastructure.pdf [https://perma.cc/4T8J-MNYX].

The Program seeks to address this problem by shifting the burden of managing packaging waste streams from consumers and municipalities to the producers that manufacture the packaging products. Under the Program, companies that sell consumer-facing packaging and paper must join the nonprofit Producer Responsibility Organization ("PRO") to coordinate, fund, and manage statewide recycling for covered materials, or submit an Individual Program Plan ("IPP") to manage statewide recycling of its own covered materials. *See generally* Col. Rev. Stat. Ann. § 25-17-705 (West 2026).

This policy—also called "extended producer responsibility" (EPR)—has been recommended for decades and implemented successfully in other jurisdictions. *See, e.g.*, Holly Kaufman, et al., *Plastics: Exposing Their Climate Impacts* 28 (May 2025) available at https://www.eli.org/research-report/plastics-exposing-their-climate-impact [https://perma.cc/3BDP-WBH5] (naming EPR policies as one measure for government to reduce demand, use, and impact of plastics); Margaret Spring, et al., *Existing U.S. Fed. Authorities to Address Plastic Pollution: A Synopsis for Decisionmakers* 99 (October 2024), available at https://www.eli.org/research-report/existing-us-federal-authorities-address-plastic-pollution-synopsis-decision-makers [https://perma.cc/ZQ7D-N8RV] (naming the Program as an example of state EPR programs). The European Union has utilized EPR programs for decades, and similar laws have since proliferated worldwide. *See* Global Plastic Laws, *Extended Producer Responsibility*, https://www.globalplasticlaws.org/map; Nat'l Conf. State Legislatures, *Extended Producer Responsibility* 10 (Oct. 24, 2023), https://documents.ncsl.org/wwwncsl/Environment/Extended-Producer-Responsibility-f01.pdf [https://perma.cc/9WCL-XGDM] ("The concept of EPR took hold in Europe in the 1990s with packaging as an early focal point. It now exists worldwide, including in Canada, Japan, the Republic of Korea, India, Australia (voluntary) and Chile.").

In the United Staes, over 150 programs covering other product categories have reduced costs to governments and ensured the safe and proper disposal of a diverse range of materials including pharmaceuticals, mercury-containing devices, carpets, and electronics. *See id.* (collecting state laws); Prod. Stewardship Inst., *EPR Laws in the United States*, https://productstewardship.us/epr-laws-map/ [https://perma.cc/5J3A-P3TW]; *see also* Jennifer

Nash & Christopher Bosso, *Extended Producer Responsibility in the United States: Full Speed Ahead?* 17 J. of Indus. Ecology 175, 176 (2013) (stating that Hennepin County, Minnesota saved $681,982 in the first year of its EPR law for waste electronics).

Colorado is no stranger to these programs, either. *See, e.g.*, *Colorado approves first-in-the-nation plan to require EV battery recycling*, Col. Pub. Radio (June 4, 2026), https://www.cpr.org/2026/06/04/colorado-ev-battery-recycling/ [https://perma.cc/SX5W-VWBC]. In 2015, the legislature enacted a program for paint disposal that relies on a nonprofit organization's management. *See* S.B. 029, Gen. Assembly, Reg. Session 2014 (Colo. 2014); (codified as Col. Rev. Stat. § 25-17-401 to -410). This program has been successful at reducing post-consumer paint waste. In 2025, the paint stewardship program collected 785,259 gallons of post-consumer paint. *See* CDPHE, *2026 Status of the Colorado Paint Stewardship Program* 2 (July 2026), available at https://cdphe.colorado.gov/hm/paint-stewardship-recycling (on file with Eco-Cycle). The state has also adopted producer responsibility laws for small- and medium-format loose batteries and electric vehicle (EV) batteries. *See* S.B. 163, 2025 Gen. Assembly, Reg. Session (Colo. 2025) (loose batteries); S.B. 0003, 2026 Gen. Assembly, Reg. Session (Colo. 2026) (EV batteries). Like the Program, environmental and consumer groups, local governments, and relevant industries informed the programs' creation; CDPHE oversees the programs; and producers must participate in the programs. *See* Col. Rev. Stat. Ann. § 25-17-1004 (West 2026) (requiring battery producers to participate in the program).

The Program's benefits to equity, the economy, and public health and the environment; as well as Colorado's investment in implementing the Program, are all reasons to deny Plaintiff

National Association of Wholesaler-Distributors' (NAW's) Motion for Preliminary Injunction (ECF 11).

## ARGUMENT

The Program and its implementation will yield significant benefits to Colorado. This is relevant to the Court's determination of whether preliminary injunctive relief is warranted. *See Glaser v. City of Boulder*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.").

The Court should deny NAW's Motion for two reasons. First, the Program, duly enacted by the General Assembly after a robust public engagement process, manifestly benefits the economy, public health and the environment. These outcomes demonstrate that NAW is unlikely to succeed on the merits of its constitutional challenges. State and local benefits to the law are relevant to defending Plaintiff's dormant commerce clause and First Amendment challenges. Second, balance of the equities and public interest weigh against disrupting a Program that is already delivering its intended benefits. Colorado is already invested in the Program's implementation. Communities are well on their way to putting it in place. The Court should not now enjoin the Program from delivering on its promises.

### I. The Program's benefits to equity, the economy, and public health and the environment undermine NAW's likelihood of success on the merits of its constitutional claims.

Colorado adopted the Program to fix Colorado's inequitable and underperforming recycling system, and it does just that. The Program provides tangible benefits to Coloradans.

These benefits bear on whether Plaintiff is likely to succeed on the merits of its claims.

Specifically, the benefits influence the likelihood NAW will prevail on its dormant commerce cause claim because that analysis requires weighing the "putative local benefits" of the Program. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970); Def.'s Resp. in Opp'n to NAW's Mot. (ECF 15) ("Def.'s Resp.") 11–12. The benefits are also relevant to NAW's First Amendment freedom of speech claim if the Court determines the Program regulates NAW's speech because, under either level of scrutiny, the analysis must consider Colorado's interest in prohibiting producers to recoup the costs of the Program by charging consumers a fee at point-of-sale. *See* Def.'s Resp. 15–16; Pl.'s Mot. for Prelim. Inj. 15–17. In addition, the benefits weigh on NAW's First Amendment compelled speech and free association claim if the Court determines the Program "mandates association" by producers because that analysis must account for Colorado's "compelling state interest" in requiring producers to join the PRO or submit an IPP. *See* Def.'s Resp. 17. NAW is unlikely to succeed on these constitutional claims because the Program advances equity, promotes economic efficiency and growth, and benefits public health and the environment.

A. The Program remedies substantial equity problems with Colorado's current recycling system and reduces impacts on frontline communities.

When HB 22-1355 passed, only 45 of Colorado's 271 municipalities automatically provided curbside recycling to all residents alongside their trash service. *See* Eco-Cycle & CoPIRG Found., *The State of Recycling & Composting in Colorado* 20 (5th ed., 2021), https://ecocycle.org/content/uploads/2022/05/Report_State-of-Recycling-and-Composting-in-Colorado-2021.pdf [https://perma.cc/QDX3-PG45]. Curbside services for multi-family homes paled in comparison to those for single-family homes. Under twenty percent of multifamily

households have curbside recycling access nationwide, compared to nearly forty percent of single-family homes. *Id.* at 21. Services for rural communities were more limited and more expensive than those in urban communities. Critically, services for poorer communities were less available than those in wealthier communities. *See id.* For example, even services in some of the state's biggest cities facing financial challenges cannot support recycling services. *See id.* at 22 ("The City of Aurora, Colorado's third largest city, closed its only single-stream recycling drop-off center in 2020 due to limited staff and funding resources and illegal dumping challenges.").

The Program tackles this inherent inequity by shifting costs from consumers and municipalities to producers. Under the Program, producers pay for services, including transportation of recycling. This alleviates the financial burden on residents and local governments to provide recycling services. The Program replaces a statewide patchwork of recycling programs, where some residents have access to recycling and many more have limited or no access, with a coordinated system where all Coloradans have recycling services that are as convenient as their trash service. This ensures residents can rely on consistent recycling regardless of where they live.

Equity is a substantial and material "putative local benefit" relevant to the Court's consideration of NAW's dormant commerce clause claim. The cost to producers does not outweigh the benefits to providing Coloradans—regardless of where they live—the services to recycle packaging. Any restriction on NAW's rights under the First Amendment must be considered in light of these equitable benefits, too.

B. The Program makes the waste economy more efficient and provides a material economic boost to Colorado.

The Program requires the producers of the materials to decide what packaging they want to use, to fund the programs and infrastructure needed to dispose of that packaging, and reincorporate those materials back into the producers' supply chain. This system incentivizes companies to invest in more recyclable or reusable packaging that incorporates more recycled content, making the waste economy more efficient. This investment promotes economic growth.

Recycling is a significant economic sector nationwide and in Colorado. In 2020, recycling and reuse activities in the United States accounted for 681,000 jobs, $37.8 billion in wages, and $5.5 billion in tax revenues. U.S. Env't Prot. Agency, *Recycling Economic Information (REI) Report* 1 (2020), https://www.epa.gov/sites/default/files/2020-11/documents/rei_report_508_compliant.pdf [https://perma.cc/UX3G-D6KU]. This equates to 1.17 jobs for every 1,000 tons of materials that are recycled. *Id.* at 7. Once fully implemented, the Program is estimated to create 7,900 jobs, generating a $31 million increase in annual wages. *See* CDPHE, *Producer Responsibility Program for Statewide Recycling: Recommendation Prepared for the Joint Budget Committee* (March 12, 2024) https://content.leg.colorado.gov/sites/default/files/pubhea-03-12-24.pdf [https://perma.cc/NUS6-JZ58]. The Program will also save local governments significant funds currently spent on recycling. For example, CDPHE estimated the cost savings for the City and County of Denver to be $14.2 million by 2030 and $16.3 million by 2035. *See id.*

These economic benefits, too, must be considered when weighing NAW's constitutional claims. Communities in Colorado will be able to allocate funds to other services and programs instead of orchestrating recycling or disposal for materials producers create. These cost-savings

to local governments and the economic boon to the recycling industry more broadly cut against NAW's claims that the Program unconstitutionally burdens interstate commerce or restricts its rights under the First Amendment.

C. The Program will benefit Colorado's public health and environment.

The Program will help divert hundreds of thousands of additional tons of recyclable packaging materials from Colorado landfills into reliable streams of locally sourced, recycled feedstock for manufacturing, resulting in increased resource conservation and decreased greenhouse gas emissions. *See* David Azoulay, et al., *Plastic & Health: the Hidden Costs of a Plastic Planet* 20, 43–48 (Amanda Kistler, ed. 2019) (describing the negative impacts of burning plastic to vegetation, human and animal health, and the environment). Incentivizing producers to reduce plastics in the first place and to divert more plastics from waste incineration stands to benefit all Coloradans. Moreover, the benefits of the Program also alleviate inequitable public health burdens. Plastic production facilities, oil refineries, and landfills are more likely to be sited near low-income communities and communities of color. *See* Beyond Plastics, *How and Why Plastics Threaten Environmental Justice*, https://www.beyondplastics.org/fact-sheets/environmental-justice [https://perma.cc/C52M-E5F8]. The Program is expected to decrease the production of non-recyclable packaging materials, which would reduce demand for those facilities and the public health harms to those frontline communities.

The public health and environmental benefits the Program offers are substantial. To demonstrate that it is likely to succeed on its constitutional claims, NAW must demonstrate the impacts of the Program on out-of-state commerce and speech overcome these benefits. Even if those impacts did exist, NAW cannot demonstrate that they outweigh the Program's benefits.

### II. The balance of the equities and the public interest weigh against entering a preliminary injunction because the Program was adopted through a robust public engagement process and is already delivering benefits to Colorado.

Enjoining the Program now would unsettle a well-established Program built on substantial public input and assessment. Coloradans' existing investment in the Program is difficult to overstate. Hundreds of businesses, local governments, non-profits, and individual residents engaged at every stage of the process. During the Program's development, advocates worked with over a hundred entities, including industry and producer entities, on amendments to the bill language, shaping the law's ultimate form.

Implementation of the law is well underway. In the first year after the law was adopted, CDPHE hired a lead staff member to oversee the program, beginning rulemaking, designating the PRO, approving or disapproving any IPPs, and seating the thirteen-member Advisory Board. The following year, the PRO completed a statewide Needs Assessment looking at gaps and opportunities in existing recycling infrastructure and programming. Based on the findings of the Assessment and input from Eco-Cycle and other environmental and non-governmental organizations, CDPHE presented a recommended scenario articulating goals for the PRO to meet to the Joint Budget Committee (JBC). After the JBC approved the recommended scenario, the PRO and the IPP began developing implementation plans. With input from multiple public comment periods and dozens of Advisory Board meetings, the Advisory Board recommended that CDPHE approve the final program plan. The program plans have now received final approval. Both CAA and Interchange 360, the entity that has submitted an IPP, have begun working with communities and service providers to implement the program.

So too have communities and businesses begun investing in staff and allocating funds in anticipation of the Program's implementation. *See* Participating Service Providers, *RecycleOn* (Sept. 16, 2026), https://recycleon.org/participating-service-providers-colorado/ [https://perma.cc/HUU6-6UA7]. Waste management companies and municipalities have invested tens of millions of dollars in new material recovery facilities to add needed capacity to be able to process the increase in recycled packaging anticipated through the Program. *See generally* Eco-Cycle 2025 State of Recycling Report. Armed with the promise of funding for education and outreach, as well as increased recycling collections statewide, communities are preparing to educate residents about the Program and updates to their recycling operations.

According to the September EPR advisory board meeting, over thirty communities are in the process of contracting with CAA for reimbursement for recycling services the governments provide. *See* CDPHE, *Producer Responsibility Program for Statewide Recycling Advisory Board Meeting #66* (Sept. 9, 2026), available at https://www.youtube.com/watch?v=-kKSDIKA2VA. Additional communities have indicated they would like CAA to contract with service providers to serve their residents. *Id.* Over 100 Colorado communities and organizations sent representatives to a training this spring hosted by The Recycling Partnership and Eco-Cycle to learn best practices in recycling education and outreach. Further, several local governments are exploring and adopting policies that will ensure their residents benefit from free recycling as soon as possible during implementation. For example, Broomfield adopted a hauler contract to ensure all residents in single family homes have access to recycling. *Universal Waste Collection in Broomfield*, Broomfield Voice, https://www.broomfieldvoice.com/universalwastecollection-english [https://perma.cc/LN4E-HW9K]; *see* Broomfield, Colo., Mun. Code § 8-04 (2024).

Brighton adopted hauler licensing to ensure that trash haulers provide free recycling if the Program covers the cost. *Brighton establishes new standards for waste haulers*, City of Brighton Press Releases, https://www.brightonco.gov/m/newsflash/Home/Detail/2953 [https://perma.cc/YQ7C-8EBA]; Brighton, Colo., Mun. Code § 5-12 (2026).

Colorado is ready for the Program. Communities across the state have already committed significant time and money into preparing for its implementation. This investment bears directly on whether to grant NAW's Motion. The balance of the equities weighs sharply in favor of the Program. For years, communities have been making their voices heard, providing input, and preparing for producers to carry the burden to recycle packaging. NAW could have participated in that process, but it did not. *See* Def.'s Resp. 3 ("Neither NAW nor its members engaged in the numerous public meetings and public comment period for the draft needs assessment."). Coloradans should not now be penalized upon NAW's tardy protest.

Further, enjoining the implementation of the Program now would be detrimental to the public interest. Communities are relying on the Program's survival. Municipalities are approving budgets, signing contracts, developing service programs, and planning educational programs—all in reliance on the Program moving forward. In addition, for all foregoing reasons Eco-Cycle articulated, delaying or obstructing implementation of the Program inhibits equitable access to recycling, foregoes economic benefits to the state and its communities, and will negatively impact public health and the health of the environment. For these reasons, NAW cannot demonstrate that it is entitled to the "extraordinary remedy" of a preliminary injunction. *See Colorado v. E.P.A.*, 989 F.3d 874, 883 (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24, (2008)).

## CONCLUSION

Colorado's Producer Responsibility Program provides material benefit to the State, its residents, and their health. Residents, communities, and local governments are preparing for the Program's implementation. For the reasons stated above and for the reasons in Defendant's Response in Opposition, the Court should deny NAW's Motion for Preliminary Injunction.

Respectfully submitted on September 28, 2026.

/s/ *Edward Simpson*
Edward F. Simpson (CO #63090)
Wyatt G. Sassman (CO #51890)
Environmental Law Clinic
University of Denver
Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
303-871-6140
edward.simpson@du.edu
wsassman@du.edu
*Attorney for [Proposed] Amicus Curiae Eco-Cycle, Inc.*

**AI USE CERTIFICATION**

Pursuant to Magistrate Judge Neureiter's Standing Order Regarding the Use of Generative Artificial Intelligence (AI) in Court Filings, effective September 22, 2026, I hereby certify that I did not use generative Artificial Intelligence (including but not limited to ChatGPT, Harvey.AI, or Google Gemini) in preparing this motion. I further certify that I personally reviewed this motion for accuracy and all legal citations reference actual, non-fictitious cases or cited authority.

/s/ *Edward Simpson*

Edward F. Simpson (CO #63090)
*Attorney for [Proposed] Amicus Curiae*
*Eco-Cycle, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

/s/ *Edward Simpson*
Edward F. Simpson (CO #63090)
*Attorney for [Proposed] Amicus Curiae*
*Eco-Cycle, Inc.*